IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CLIFFORD F. TUTTLE, JR., AS REPRESENTATIVE OF THE ESTATE OF DENNIS W. TUTTLE, DECEASED, ROBERT TUTTLE, AND RYAN TUTTLE, | § § § § § | |
| Plaintiffs | § § | |
| v. | § § | Civil Action No. 4:21-cv-270 |
| CITY OF HOUSTON; GERALD GOINES, in his individual capacity; STEVEN BRYANT, in his individual capacity; FELIPE GALLEGOS, in his individual capacity; ERIC SEPOLIO, in his individual capacity; MANUEL SALAZAR, in his individual capacity; THOMAS WOOD, in his individual capacity; OSCAR PARDO, in his individual capacity; FRANK MEDINA, in his individual capacity; CLEMENTE REYNA, in his individual capacity; CEDELL LOVINGS, in his individual capacity; NADEEM ASHRAF, in his individual capacity; MARSHA TODD, in her individual capacity; and ROBERT GONZALEZ in his individual Capacity, | § § § § § § § § § § § § § § § § § § § | |
| Defendants. | § | |

**TUTTLE PLAINTIFFS' FIRST AMENDED ORIGINAL COMPLAINT**

COME NOW Plaintiffs Clifford F. Tuttle, Jr., as Representative of the Estate of Dennis W. Tuttle, Deceased, Robert Tuttle, and Ryan Tuttle (hereinafter "Plaintiffs") and file this amended complaint against the City of Houston, Gerald Goines, in his individual capacity, Steven Bryant, in his individual capacity, Felipe Gallegos, in his individual capacity, Eric Sepolio, in his individual capacity, Manuel Salazar, in his individual capacity, Thomas Wood, in his individual capacity, Oscar Pardo, in his individual capacity, Frank Medina, in his individual capacity,

1

Clemente Reyna, in his individual capacity, Cedell Lovings, in his individual capacity, Nadeem Ashraf, in his individual capacity, Marsha Todd, in her individual capacity, and Robert Gonzales, in his individual capacity, and for cause of action would show as follows:

## I.
## INTRODUCTION

1.      This is a civil rights case brought under 42 U.S.C. §§1983, 1988 for the deprivation of Dennis Tuttle's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

2.      Dennis Tuttle and his wife Reggie were at home at 7815 Harding Street in Houston, Texas on the afternoon of January 28, 2019. At about 5 p.m., Houston Police Department ("HPD") narcotics officers broke through their front door and shot them repeatedly. In a matter of seconds, Dennis and Reggie lay dead in pools of blood, several feet from each other on their living room floor.

3.      HPD had no right to be at 7815 Harding Street, or to enter the house, or to kill Dennis and Reggie. HPD was there to execute a trumped up no-knock search warrant based on a false affidavit claiming an informant said Dennis and Reggie were armed heroin dealers. But there was no informant. There was no heroin. There was no automatic weapon. Dennis and Reggie were not and have never been drug dealers, period.

4.      Law enforcement is essential to public safety and security, especially in a city as large as Houston. However, law enforcement has important limits. There is no more fundamental right in the United States than the right to be secure in our homes against unreasonable searches and seizures. In fact, HPD's mission statement reflects its obligation to work within the framework of the U.S. Constitution to enforce the law and to treat life and individual freedoms as sacred. HPD wholly failed to live up to those obligations in this matter.

5.      HPD has a very serious problem in Narcotics Division Squad 15. The problem is perverse, widespread, and longstanding. It involves a pattern of corrupt, reckless, and unconstitutional conduct which endangers our citizens, rather than protecting them. It has been allowed to grow into an entrenched and dangerous subculture with no accountability. It has been allowed to thrive for years through deliberate indifference by supervisors up the chain of command all the way to the offices of the Chief of Police and other policymakers for the City.

6.      The situation is so bad that University of Nebraska criminology professor Sam Walker called Squad 15 "an operation completely out of control…that's continued for some time," as reported by the *Houston Chronicle*. This untethered operation and its deadly conduct giving rise to this case is shocking, but it was sadly predictable and preventable. The people of the City of Houston deserve better. Dennis and Reggie deserved better. Now Dennis and Reggie deserve justice, as do their grieving families.

## II.
## JURISDICTION AND VENUE

7.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§1331 and 1343. This Court has supplemental jurisdiction as to Plaintiffs' state law claims pursuant to 28 U.S.C. §1367(a).

8.      Venue is proper in this Court pursuant to 28 U.S.C. §1391 because Defendants are located, and the events giving rise to Plaintiffs' claims occurred, within the boundaries of this judicial district.

## III.
## PARTIES

9.      Plaintiff Clifford F. Tuttle, Jr., is a citizen of the United States and a resident of the State of Texas. He was appointed as Administrator of the Estate of Dennis W. Tuttle, Deceased, in

Probate Court No. 1 of Harris County, Texas. Accordingly, Clifford F. Tuttle, Jr. brings this suit in his capacity as Representative of the Estate of Dennis W. Tuttle, Deceased.

10.     Plaintiff Robert Tuttle is a citizen of the United States and a resident of the State of Texas. He is the surviving father of Dennis W. Tuttle, Deceased, and brings this suit in his individual capacity.

11.     Plaintiff Ryan Tuttle is a citizen of the United States and a resident of the State of Oregon. He is the surviving son of Dennis W. Tuttle, Deceased, and brings this suit in his individual capacity.

12.     Decedent Dennis W. Tuttle was a citizen of the United States. He was born on March 28, 1959 in Houston, Texas. He lived at 7815 Harding Street in Houston, Texas. Dennis died on January 28, 2019 as a result of being shot unlawfully by police officers acting under color of law within the scope of their employment by the City of Houston in HPD.

13.     Defendant City of Houston is a municipal corporation organized under the Constitution and laws of the State of Texas and located within the United States Southern District of Texas. HPD is a department of and is operated by the City of Houston.  HPD sets policy for its police officers.  Defendant City of Houston has appeared herein.

14.     Defendant Gerald Goines was employed by the City of Houston as a Houston Police Department officer who, at all times relevant to this action, was acting under color of law and within the scope of his employment as a Houston Police Department officer.   Plaintiffs file their claims against Goines in his individual capacity. Defendant Gerald Goines has appeared herein.

15.     Defendant Steven Bryant was employed by the City of Houston as a Houston Police Department officer who, at all times relevant to this action, was acting under color of law and

within the scope of his employment as a Houston Police Department officer.   Plaintiffs file their claims against Bryant in his individual capacity. Defendant Steven Bryant has appeared herein.

16.    Defendant Felipe Gallegos is employed by the City of Houston as a Houston Police Department officer who, at all times relevant to this action, was acting under color of law and within the scope of his employment as a Houston Police Department officer. Plaintiffs file their claims against Gallegos in his individual capacity. Defendant Felipe Gallegos has appeared herein.

17.    Defendant Eric Sepolio is employed by the City of Houston as a Houston Police Department officer who, at all times relevant to this action, was acting under color of law and within the scope of his employment as a Houston Police Department officer. Plaintiffs file their claims against Sepolio in his individual capacity.

18.    Defendant Manuel Salazar is employed by the City of Houston as a Houston Police Department officer who, at all times relevant to this action, was acting under color of law and within the scope of his employment as a Houston Police Department officer. Plaintiffs file their claims against Salazar in his individual capacity.

19.    Defendant Thomas Wood is employed by the City of Houston as a Houston Police Department Sergeant who, at all times relevant to this action, was acting under color of law and within the scope of his employment as a Houston Police Department sergeant. Plaintiffs file their claims against Wood in his individual capacity. Defendant Thomas Wood has appeared herein.

20.    Defendant Oscar Pardo is employed by the City of Houston as a Houston Police Department officer who, at all times relevant to this action, was acting under color of law and within the scope of his employment as a Houston Police Department officer. Plaintiffs file their claims against Pardo in his individual capacity. Defendant Oscar Pardo has appeared herein.

21.      Defendant Frank Medina is employed by the City of Houston as a Houston Police Department officer who, at all times relevant to this action, was acting under color of law and within the scope of his employment as a Houston Police Department officer. Plaintiffs file their claims against Medina in his individual capacity. Defendant Frank Medina has appeared herein.

22.      Defendant Clemente Reyna is employed by the City of Houston as a Houston Police Department Sergeant who, at all times relevant to this action, was acting under color of law and within the scope of his employment as a Houston Police Department Sergeant. Plaintiffs file their claims against Reyna in his individual capacity. Defendant Clemente Reyna has appeared herein.

23.      Defendant Cedell Lovings is employed by the City of Houston as a Houston Police Department officer who, at all times relevant to this action, was acting under color of law and within the scope of his employment as a Houston Police Department officer. Plaintiffs file their claims against Lovings in his individual capacity. Defendant Cedell Lovings has appeared herein.

24.      Defendant Nadeem Ashraf is employed by the City of Houston as a Houston Police Department officer who, at all times relevant to this action, was acting under color of law and within the scope of his employment as a Houston Police Department officer. Plaintiffs file their claims against Ashraf in his individual capacity. Defendant Nadeem Ashraf has appeared herein.

25.      Defendant Marsha Todd is employed by the City of Houston as a Houston Police Department Lieutenant who, at all times relevant to this action, was acting under color of law and within the scope of her employment as a Houston Police Department officer. Plaintiffs file their claims against Todd in her individual capacity. Defendant Marsha Todd has appeared herein.

26.      Defendant Robert Gonzales is employed by the City of Houston as a Houston Police Department Lieutenant who, at all times relevant to this action, was acting under color of law and

within the scope of his employment as a Houston Police Department officer. Plaintiffs file their claims against Gonzales in his individual capacity. Defendant Robert Gonzales has appeared herein.

## IV.
## FACTS

27.     In January 2019, Dennis W. Tuttle ("Dennis") lived with his wife Rhogena Nicholas ("Reggie") in a house he owned at 7815 Harding Street in Houston, Texas. The couple had lived there many years. They were well known and liked by their neighbors and friends.

28.     Dennis was a veteran of the United States Navy. He received an honorable discharge following his service in 1979.

29.     Thereafter, Dennis worked as a machinist. In approximately 1980, he broke his back in an accident. A couple of years later he suffered a serious head injury on the job which required surgery and left Dennis with a seizure disorder. Dennis had permanent disabilities.

30.     Dennis was a peaceful, loving person. He had no criminal record. He was not a drug dealer, which has been confirmed by the FBI.

31.     On January 8, 2019, a woman named Patricia Garcia called the Houston Police Department ("HPD"). For petty and vindictive personal reasons she falsely claimed that her daughter was inside the house at 7815 Harding Street, that the house was a drug house, that the female resident was a heroin dealer, and that the residents had guns, including machine guns, inside the house.

32.     In response to Ms. Garcia's call, HPD dispatched HPD patrol officers Nicole Blankenship-Reeves and R. Morales. These officers went to the house at 7815 Harding Street and observed no signs of criminal activity, which they reported back to the caller, Ms. Garcia.

33.     Ms. Garcia insisted that the officers make entry. The officers researched the home and its occupants but took no further actions at 7815 Harding Street.

34.     HPD patrol officer Blankenship-Reeves gave her handwritten notes regarding the Harding Street activity to HPD Lieutenant Marsha Todd ("Lt. Todd"), with whom she had a relationship. Lt. Todd was employed in HPD's Narcotics Division. She was in charge of Narcotics Squad 24, known as the FAST squad, which handles civil asset forfeiture cases. Lt. Todd also assigns cases to and supervises narcotics officers in other squads.

35.     On January 11, 2019, Lt. Todd relayed officer Blankenship-Reeves' information regarding the Harding Street activity to Gerald Goines ("Goines"). Goines was an HPD narcotics officer in HPD Narcotics Squad 15, which handles general narcotics enforcement.

36.     On January 28, 2019, Goines signed an affidavit for purposes of obtaining a search warrant for 7815 Harding Street. The affidavit stated the following, among other things, under oath:

   a.     Goines conducted an investigation of narcotics activity at 7815 Harding Street for approximately two weeks;

   b.     On January 27, 2019, Goines contacted a confidential informant ("CI") he had used at least ten times before;

   c.     Goines provided the CI money to purchase heroin at 7815 Harding Street;

   d.     Goines observed the CI go directly to the house and meet with a male there;

   e.     The CI returned and surrendered to Goines a quantity of heroin purchased from the man in the house;

   f.     Both Goines and HPD officer Steven Bryant ("Bryant") recognized the substance purchased by the CI as heroin;

   g.     The CI told Goines that the man had a large quantity of heroin in the house, along with a semi-automatic 9 millimeter handgun; and

   h.     The presence of the weapon indicated the suspect's intent to use it to protect or buy time to destroy the narcotics.

37.     Goines' affidavit requested authorization to enter the house at 7815 Harding Street without first knocking and announcing the presence and purpose of the officers executing the search warrant (a "no-knock search warrant").

38.     Goines presented the affidavit and warrant to Houston Municipal Court Judge Gordon G. Marcum, who signed the no-knock search warrant at 1:37 p.m. on January 28, 2019.

39.     At some point prior to 5:00 p.m. on January 28, 2019 Goines assembled eleven armed and armored narcotics officers from Squad 15 to discuss, plan and then execute the no-knock search warrant at 7815 Harding Street.

40.     The Squad 15 members who met with Goines to review and discuss the warrant, plan the raid, and execute the no-knock search warrant included Defendants Goines, Bryant, Felipe Gallegos ("Gallegos"), Eric Sepolio ("Sepolio"), Manuel Salazar ("Salazar"), Sgt. Thomas Wood (Sgt. Wood), Oscar Pardo ("Pardo"), Frank Medina ("Medina"), Sgt. Clemente Reyna (Sgt. Reyna"), Cedell Lovings ("Lovings"), and Nadeem Ashraf ("Ashraf").

41.     Squad 15 did not use body-worn cameras when they executed the no-knock search warrant.

42.     At least six uniformed HPD officers were present for perimeter support.

43.     Squad 15 broke through the front door at 7815 Harding Street. Reggie was on or near a couch in the living room into which the front door opened. The couple's dog was near Reggie. Dennis was in the house in another room.

44.     Upon entry, a Squad 15 officer immediately, and without provocation, shot and killed the dog with a shotgun, dramatically escalating the potential for further violence and gunfire during the raid. Although HPD's public narrative after the incident claimed the dog attacked the officer, in fact the dog was shot approximately 20 feet away from the door where the officer made entry.

45.     Immediately after the initial shotgun blast, the other HPD officers in and outside the house began shooting with semi-automatic handguns and assault style weapons. They fired dozens of rounds, including multiple rounds fired blindly through walls or windows.

46.     The HPD officers shot Dennis at least nine times, more than half of which shots were fired from behind Dennis. They shot Reggie at least three times. At least one round pierced the bodies of both Dennis and Reggie.

47.     Dennis and Reggie died from their gunshot wounds lying in pools of blood within a few feet of each other on their living room floor. They were confirmed deceased at the scene by Dr. Schultz at 5:15 p.m. on January 28, 2019.

48.     Dr. Maryanne Beynon of the Harris County Institute of Forensic Sciences ruled Dennis and Reggie's deaths as homicides from multiple gunshot wounds.

49.     Dennis was 59 years old at the time of his death.

50.     Dennis is survived by his father, Plaintiff Robert Tuttle.

51.     Dennis is also survived by his son, Plaintiff Ryan Tuttle.

52.     The Judge of Harris County Probate Court No. 1 appointed Clifford F. Tuttle, Jr., Robert Tuttle's brother, as Administrator of the Estate of Dennis W. Tuttle on May 14, 2019.

53.     In the aftermath of the shooting, HPD has claimed publicly and in self-serving fashion that Dennis shot at the officers, striking four of them with a .357 caliber revolver.

54.     HPD has not released, and in fact has thwarted the victims' families repeated lawful attempts to obtain, any ballistics or medical evidence to substantiate the City's public claim or to refute the more likely fact that the officers were hit by friendly fire in the chaos.

55.     Dennis was 5 feet 7 inches tall. He weighed 112 pounds. He suffered permanent disabilities. He suffered from other acute physical ailments which would have impacted his ability

to do what HPD publicly claims: he was wearing a brace on his left knee and had an ace bandage wrapped around his right wrist, and he was right-handed. He was not wearing body armor of any kind.

56.     Plaintiffs do not concede that Dennis fired at the officers. If Dennis did fire at the officers, which Plaintiffs deny, he would have done so lawfully in defense of himself, his wife, and his property, in circumstances under which any reasonable person would conclude that his home was under attack by violent criminals.

57.     HPD officers and other investigators examined and searched the property at 7815 Harding Street after the shooting. They found no heroin. They found no semi-automatic handgun.

58.     No heroin was found in Dennis or Reggie on autopsy.

59.     Goines was transported to a hospital for treatment of injuries sustained in the incident. From the hospital, Goines contacted HPD officer John-Louis and told him there were drugs in the console of Goines' city vehicle.

60.     Officer John-Louis reported this information to Bryant, who retrieved some of the drugs from Goines' city vehicle and took them to the lab.

61.     Bryant filed a report claiming that he personally recognized these drugs as the drugs bought by the alleged CI at 7815 Harding Street the day before the shooting. The lab identified the drugs as heroin.

62.     Other items were found in Goines' city vehicle as well, including quantities of crack cocaine, ecstasy, marijuana, and at least one stolen weapon, none of which was properly tagged.

63.     On January 30, 2019, Bryant went to the hospital and asked Goines' to identify the CI Goines described in his affidavit.

64.     Goines wrote the name of a person ("CI #1") on a piece of paper and gave it to Bryant.

65.     HPD investigators R. Lujan and others interviewed CI #1, who acknowledged working with Goines in the past but denied working for Goines on any narcotics buy at 7815 Harding Street.

66.     On January 31, 2019, Lt. Todd went to the hospital to talk to Goines. She requested again that Goines identify the CI used in his affidavit to obtain the no-knock warrant.

67.     Goines wrote the name of a different person ("CI #2") on a piece of paper and gave it to Lt. Todd.

68.     HPD investigators Bass and Rodriguez interviewed CI #2, who reported having bought two bags of heroin and delivering them to Goines, but prior to the date Goines said it happened.

69.     Importantly, CI #2 said she did not buy any heroin at 7815 Harding Street and did not recognize a photo of Dennis. CI #2 said she bought the heroin at a location on Napoleon Street, which is miles away from 7815 Harding Street.

70.     HPD investigators interviewed all confidential informants who worked for Goines. They all denied buying narcotics at 7815 Harding Street or ever purchasing narcotics from Dennis or Reggie.

71.     On February 7, 2019, Bryant admitted to HPD investigators that he in fact was not present with Goines on January 27, 2019 at 7815 Harding Street as he had stated previously. He then invoked the Fifth Amendment and refused further discussion.

72.     On February 13, 2019, Goines admitted that he did not use any CI to buy narcotics at 7815 Harding Street and that he made false statements in the affidavit used to obtain the no-knock warrant.

73.     Goines then concocted a third false story, claiming that he purchased the narcotics himself at 7815 Harding Street on January 27, 2019, although he could not say the male he bought them from was Dennis.

74.     The FBI determined through cell phone data, witness interviews, photographs, and video evidence that Goines was not anywhere near 7815 Harding Street on January 27, 2019 and could not have made such a purchase.

75.     The FBI further determined that the heroin found in Goines' car was purchased by CI #2 and a friend on Napoleon Street on January 21, 2019, then delivered to Goines on January 23, 2019 and that Goines was not present with the CI at the time of the buy on Napoleon Street.

76.     CI #2 told the FBI that CI #2 and Goines had been engaged in a sexual relationship for several years.

77.     The FBI interviewed Judge Gordon Marcum. Judge Marcum told the FBI that at the time he signed the no-knock warrant he believed the facts as sworn by Goines were true. Judge Marcum said further that if he had known there was no CI he would not have signed the warrant because there was no probable cause.

78.     On August 23, 2019, Harris County District Attorney Kim Ogg charged Goines with two counts of felony murder for the deaths of Dennis and Reggie. The charging instrument states that it was reasonably foreseeable that Dennis and Reggie would be surprised by the officers' entry, could be concerned that a burglary was taking place, and that deadly force could be used as a result. Goines was also charged with tampering with a governmental document for falsifying the affidavit.

79.     On November 20, 2019, the United States Attorney's Office announced federal indictments against Goines for his conduct in the Harding Street raid. Goines was charged with two counts of depriving Dennis and Reggie of their constitutional rights resulting in their deaths, and five counts of obstruction of justice.

80.    On November 20, 2019, the United States Attorney's Office announced a federal indictment against Bryant for obstruction of justice for falsifying documents in connection with the Harding Street raid.

81.    On November 20, 2019, the United States Attorney's Office announced a federal indictment against Patricia Garcia for making false 911 calls relating to activities at 7815 Harding Street on January 8, 2019.

82.    On January 8, 2020, A Harris County grand jury indicted Goines for felony murder for the deaths of Dennis and Reggie.

83.    On January 8, 2020, a Harris County grand jury indicted Bryant for felony tampering with a governmental record in connection with the Harding Street raid.

84.    On July 2, 2020, Harris County District Attorney Kim Ogg announced new felony criminal charges against the following HPD narcotics officers:

     a.    Goines: 3 counts of tampering with governmental documents and 1 count of theft by public servant.

     b.    Bryant: 2 counts of tampering with governmental documents and 1 count of theft by public servant.

     c.    Sgt. Reyna: 3 counts of tampering with governmental documents and 1 count of theft by public servant.

     d.    Sgt. Wood: 1 count of tampering with governmental documents and 1 count of theft by public servant.

     e.    Lt. Robert Gonzales: 1 count of misapplication of fiduciary property.

     f.    Hodgie Armstrong: 1 counts of tampering with governmental documents.

85.    On January 25, 2021, Harris County D.A. Kim Ogg announced additional felony criminal charges against the following HPD officers:

a. Gallegos: 1st degree homicide for the death of Dennis.

b. Pardo: Engaging in organized criminal activity (aggregate theft by a public servant) and tampering with a governmental record.

c. Lovings: Engaging in organized criminal activity (aggregate theft by a public servant) and tampering with a governmental record.

d. Ashraf: Engaging in organized criminal activity (aggregate theft by a public servant) and tampering with a governmental record.

e. Sgt. Reyna: Engaging in organized criminal activity (aggregate theft by a public servant) and tampering with a governmental record.

f. Sgt. Wood: Engaging in organized criminal activity (aggregate theft by a public servant) and tampering with a governmental record.

g. Medina: Engaging in organized criminal activity (aggregate theft by a public servant) and tampering with a governmental record.

h. Griff Maxwell: Engaging in organized criminal activity (aggregate theft by a public servant) and tampering with a governmental record.

86.    To date, at least nine of the eleven Squad 15 members who served the no-knock search warrant at 7815 Harding Street have been charged with felony crimes for their criminal conduct during the raid and during the months and years preceding it. These crimes include murder, deprivation of constitutional rights, tampering with governmental documents, obstruction of justice, theft by public servant, and engaging in organized crime.

## V.
## CAUSES OF ACTION
## PLAINTIFFS' CIVIL RIGHTS CLAIMS

87.    Plaintiffs incorporate all preceding paragraphs by reference herein.

88.    Dennis had the right under the Fourth Amendment to the United States Constitution to be secure in his person, home, and property against unreasonable search and seizure, to not have a

warrant issued against him or his home without probable cause, and to not be subjected to excessive and deadly force by Defendants. These rights are protected against deprivation by state actors by the Fourteenth Amendment.

89.     Pursuant to 42 U.S.C §1983, every person who, under color of any statute, ordinance, regulation, custom, or usage of any State, subjects, or causes to be subjected, any citizen of the United States to the deprivation of any rights secured by the Constitution and laws, shall be liable to the injured party in action for redress.

90.     Each Defendant is a "person" within the meaning of 42 U.S.C. §1983.

91.     Each Defendant, jointly, severally, or both, deprived Dennis of his rights under the Fourth Amendment as incorporated and applied to the states through the Fourteenth Amendment.

92.     The acts and omissions of each Defendant were a proximate cause and cause-in-fact of Dennis' injuries and death, and Plaintiffs' damages.

## VI.
## PLAINTIFFS' FIRST CAUSE OF ACTION

### 42 U.S.C. §1983 – Unlawful Search and Seizure – No Probable Cause

93.     Plaintiffs incorporate all preceding paragraphs by reference herein.

94.     On January 28, 2019, while acting under color of Texas law, Goines deprived Dennis or caused him to be deprived of his rights under the Fourth Amendment as incorporated and applied to the states through the Fourteenth Amendment as follows:

    a.     Goines knowingly prepared an affidavit for a search warrant that contained numerous materially false statements;

    b.     Goines presented that affidavit to a State of Texas judicial officer, Judge Gordon Marcum;

    c.     Goines swore under oath to the truthfulness of the contents of that affidavit;

      d.      Goines obtained a search warrant based on that false affidavit from Judge Marcum authorizing a search of Dennis' residence at 7815 Harding Street in Houston, Texas; and

      e.      Goines, together with the other individually named Defendants, all acting under color of law, executed that search warrant by forcibly entering Dennis' home with the use, attempted use, and/or threatened use of a dangerous weapon.

95.    There was no probable cause to support the warrant obtained by Goines for execution at 7815 Harding Street on January 28, 2019.

96.    Judge Marcum would not have signed the search warrant if he had known Goines' affidavit was false because Judge Marcum would have known, but for Goines' misrepresentations, that there was no probable cause upon which to issue the warrant.

97.    All individually named Defendants planned, executed and/or supervised the illegal no-knock search warrant at 7815 Harding Street. Each of them deprived and conspired to deprive Dennis of his right to be secure from unreasonable searches and seizures. Each of them knew about and had participated in the long history of corrupt and illegal conduct in Squad 15 as described in this Complaint. They knew that there was no probable cause for the no-knock search warrant, that the affidavit was false, and that they should not execute the warrant.

98.    Furthermore, all individually named Defendants are liable for failing to intervene to stop Squad 15 from violating Dennis' rights. They had a duty to intervene and a reasonable opportunity to intervene, but chose not to intervene and failed to intervene to protect Dennis from deprivation of his rights by their fellow officers. Therefore, each individually named Squad 15 member who participated in the Harding Street raid is liable under 42. U.S.C. §1983.

99.    The members of Squad 15 worked closely together as a team in the years leading up to this incident. They knew each other very well. Their jobs included working together, knowing where the other squad members were, what cases they were working on, and what they were doing while

on duty. They kept up with each other by cell phone throughout their shifts and even while off duty. The investigation, including cell phone data recovery, conducted by the Harris County District Attorney's office preceding the indictments shows that on more than 50 occasions during the year prior to January 28, 2019, the individually named Defendants, including Goines, Bryant, Gallegos, Reyna, Pardo, Ashraf, Lovings, Wood, Medina, Sepolio and Salazar worked on cases together in which at least Goines, Bryant, Gonzales, Wood, Pardo, Lovings, Ashraf and Reyna turned in false overtime records. The Defendants who have not been indicted yet either participated in the scheme themselves or, in any event, knew the other officers were engaged in organized crime and did nothing to stop it in time to prevent the Harding Street murders.

100.    Defendants Bryant, Gallegos, Reyna, Pardo, Ashraf, Lovings, Wood, Medina, Sepolio and Salazar knew about Goines' pattern of illegal and unconstitutional conduct as described in this Complaint. They knew he had a pattern and practice of lying to obtain illegal no-knock search warrants, lying about the extent of his investigatory work supporting such illegal warrants, and lying about the time he spent working on such cases. In fact, all of the Defendants named in this paragraph participated with Goines in the pattern of organized crime leading up to this incident. Indeed, Goines had requested approximately a hundred fraudulent "no-knock" and other warrants based on made-up informant drug deals. Squad 15 members assisted Goines in this fraud by filling out false paperwork supporting his perjury and by participating in these raids, while knowing of the perjury. As described herein, Goines, Bryant, Gonzales, Wood, Pardo, Lovings, Ashraf and Reyna have been charged with crimes involving tampering with evidence, theft, and other criminal conduct. In short, all the individual Defendants knew about the pattern of illegally obtained warrants used by Squad 15.

101.    Each member of Squad 15, including Goines, Gallegos, Bryant, Reyna, Pardo, Ashraf, Lovings, Wood, Medina, Salazar, and Sepolio reviewed and discussed the no-knock search warrant signed by Judge Marcum (and Goines' false affidavit attached to it) during the tactical plan meeting conducted prior to the raid. Each of them knew that Goines did not investigate narcotics activity at 7815 Harding Street for two weeks as stated in the affidavit because each of them worked with Goines closely during those two weeks and knew he had not done so. Each of them knew Goines was not anywhere near Harding street on January 27, 2019 as stated in the affidavit. Each of them knew that officer Blankenship-Reeves, who was present during and participated in the tactical plan meeting, saw no criminal activity at the target location when she investigated Ms. Garcia's call. Each of them surveilled the house prior to the raid and saw no ongoing signs of criminal activity there. These facts, coupled with Defendants' knowledge of and participation in Goines long pattern of corrupt activity related to search warrants and informants, made it clear to each Defendant that there was no probable cause to execute the phony warrant and that doing so would violate Dennis' clearly established constitutional rights. Each Defendant had an opportunity and the authority, at a minimum, during the meeting and prior to the raid to intervene and stop it. Each Defendant consciously chose not to do so. Instead, each Defendant deliberately, callously, and recklessly executed the phony warrant, used excessive force, and proximately caused Dennis' injuries and death.

102.    Each member of Squad 15, including Gallegos, Bryant, Reyna, Pardo, Ashraf, Lovings, Wood, Medina, Salazar, and Sepolio  knew that Goines and others on Squad 15, had a pattern and practice of making false statements to obtain warrants, and thus knew that many of Squad 15's searches were unconstitutional.  Prior to the shooting of Dennis and Reggie, Defendants Gallegos, Bryant, Reyna, Pardo, Ashraf, Lovings, Wood, Medina, Salazar, and Sepolio knew that Goines

had obtained the warrant based on false facts, and had the opportunity to take action to stop the unconstitutional raid during the tactical plan and leading up to the raid.  Instead, Squad 15 had a criminal and financial motive to encourage and participate in execution of the false warrants. Specifically, because Squad 15 almost always carried out the searches after-hours and subject to additional overtime pay, the members of Squad 15 financially benefitted from these fraudulent warrants and unconstitutional searches. In addition, multiple members of Squad 15 – in particular, Goines, Reyna, Bryant, Gonzales, and Wood – have all been charged with either tampering with evidence or other crimes related to the illegal searches.

103.     Defendant Bryant has admitted that he lied to investigators and lied in his supplemental report when he said he was with Goines at the "buy" on January 27, 2019. In fact, there was no such buy and Bryant knew it. Therefore, Bryant obviously knew during the tactical plan meeting and during the raid itself that there was no probable cause for the police to be there, to search the home, to seize Dennis and Reggie, or to use any force, especially excessive or deadly force. Even so, Bryant deliberately, callously, and recklessly executed the phony warrant, used excessive force, and proximately caused Dennis' injuries and death.

104.     Defendant Lt. Todd learned about Ms. Garcia's initial call to HPD from her girlfriend, officer Blankenship Reeves. Officer Blankenship-Reeves communicated to Lt. Todd that she and officer Morales observed no criminal activity at 7815 Harding Street while responding to the address and investigating the call, and that she had researched the occupants of the home, which would have revealed that Dennis and Reggie were not drug dealers. Therefore, Lt. Todd knew that there was no cause, much less probable cause, to continue any investigation at 7815 Harding Street. Even so, Lt. Todd assigned Goines the task of going after Dennis and Reggie. Lt. Todd had assigned cases to Goines before and was familiar with Goines' pattern of illegal and

unconstitutional conduct as described in this Complaint. Lt. Todd's conduct violated Dennis' constitutional rights and led directly to Goines conduct and his fabrication of the entire story, including the affidavit used for the warrant. In addition, Lt. Todd was Goines' superior in HPD. In assigning this case to Goines, she acted in a supervisory role and is also liable for her failure to supervise Goines and prevent this tragedy.

105.     Defendant Lt. Gonzales was Goines' supervisor in Squad 15 and therefore knew about the planned raid at 7815 Harding Street. Lt. Gonzales knew that Goines did not investigate narcotics activity at 7815 Harding Street for two weeks as stated in the affidavit because he supervised Goines during those two weeks and knew he had not done so. For the same reason, Lt. Gonzales knew Goines was not anywhere near Harding Street on January 27, 2019 as stated in the false affidavit. Lt. Gonzales not only knew about Goines' pattern of illegal and unconstitutional conduct as described in this Complaint, but he also participated personally in such conduct for which Lt. Gonzales now faces criminal charges. Specifically, Lt. Gonzales knew that Goines routinely misused informants and payments to informants. Between 2016 and 2018, Lt. Gonzales repeatedly misapplied government property by allowing Goines to pay informants improperly and to use information improperly obtained to support illegal warrants. Lt. Gonzales knew that Goines routinely lied to obtain no-knock warrants, thus violating the constitutional rights of the targets of those warrants, including Dennis and Reggie. Lt. Gonzales is liable for his failure to supervise Goines, his failure to stop this raid before it happened, and his failure to prevent this tragedy.

106.     At all times relevant to this Complaint, all individually named Defendants were duly sworn and licensed police officers employed by the City of Houston in the Houston Police Department acting under color of law within the scope of their employment.

107.    The actions of all individually named Defendants were a proximate cause and cause-in-fact of Dennis' injuries and death and Plaintiffs' damages.

108.    The conduct of all individually named Defendants were motivated by malice and/or involved reckless and callous indifference to Dennis' constitutional rights. Defendants engaged in this conduct intentionally, willfully, and wantonly, and with deliberate indifference to, and reckless disregard for, Dennis' constitutional rights.

109.    At the time of Defendants' actions described herein, no reasonable officer with the same information could have believed that his actions were lawful in light of clearly established law. Therefore, the individually named Defendants are not entitled to qualified immunity.

## VII.
## PLAINTIFFS' SECOND CAUSE OF ACTION

### 42 U.S.C. §1983 – Unreasonable Search and Seizure – Excessive and Deadly Force

110.    Plaintiffs incorporate all preceding paragraphs by reference herein.

111.    At all times relevant to this Complaint, all individually named Defendants were duly sworn and licensed police officers employed by the City of Houston in the Houston Police Department acting under color of law within the scope of their employment.

112.    On January 28, 2019, while acting under color of Texas law, all individually named Defendants deprived and conspired to deprive Dennis of his rights under the Fourth Amendment as incorporated and applied to the states through the Fourteenth Amendment by using excessive and deadly force during the execution of the no-knock search warrant at 7815 Harding Street.

113.    After illegally forcing entry into Dennis' home, the individually named Defendants unnecessarily escalated the attack by initiating the use of excessive and deadly force by firing their weapons first and without provocation.

114.    HPD has not released ballistics or other information showing which officers actually shot Dennis. It has become clear however that Gallegos was one of the officers who intentionally shot and killed Dennis. Gallegos was indicted by a Harris County Grand Jury for 1st degree homicide for killing Dennis. However, at least nine shots hit Dennis and dozens of other rounds were fired. Therefore, Plaintiffs allege that all individually named Defendants who were present at 7815 Harding Street, including Gallegos, utilized excessive and deadly force.

115.    Furthermore, all individually named Defendants are liable for failing to intervene to stop Squad 15 from violating Dennis' rights. As described above, they had a duty to intervene and a reasonable opportunity to intervene, but chose not to intervene and failed to intervene to protect Dennis from deprivation of his rights by their fellow officers. Therefore, each individually named Squad 15 member who participated in the Harding Street raid is liable under 42 U.S.C. §1983.

116.    As described in this Complaint, Dennis suffered injuries and died on January 28, 2019. His injuries and death resulted solely and directly from the use of force and deadly force that was unjustified and excessive to the need. The excessiveness of the force was objectively unreasonable.

117.    The actions of all individually named Defendants were a proximate cause and cause-in-fact of Dennis' injuries and death and Plaintiffs' damages.

118.    The conduct of all individually named Defendants was motivated by malice and/or involved reckless and callous indifference to Dennis' constitutional rights. Defendants engaged in this conduct intentionally, willfully, wantonly, and with deliberate indifference to, and reckless disregard for, Dennis' constitutional rights.

119.    At the time of Defendants' actions described herein, no reasonable officer with the same information could have believed that his or her actions were lawful in light of clearly established law. Therefore, the individually named Defendants are not entitled to qualified immunity.

120.     As for HPD's still unsubstantiated public claim that Dennis—in his disabled, frail, and undoubtedly shocked and terrified condition—somehow managed to shoot four heavily armed and armored officers with a revolver, Plaintiffs deny that Dennis shot or could have shot any officer under the circumstances.

121.     In the alternative, if Defendants assert in this action that Dennis knowingly shot at the officers, which Plaintiffs deny, any reasonable person would have done so under the reasonable belief that it was immediately necessary to do so to protect himself, his family, and his home against the use of greater force than was necessary by the officers and under circumstances in which any reasonable person would conclude that his home was under attack by violent criminals. Since Defendants' illegal conduct created the circumstances which caused Dennis to shoot, which Plaintiffs deny but which Defendants publicly claim, Defendants are not entitled to any defense based on their own self-defense.

### VIII.
### PLAINTIFFS' THIRD CAUSE OF ACTION

### 42 U.S.C. §1983 – Municipal Liability – Policy, Custom or Practice

122.     Plaintiffs incorporate all preceding paragraphs by reference herein.

123.     Municipalities may be held liable under 42 U.S.C. §1983 for constitutional deprivations committed pursuant to a policy, custom, or practice of the municipality. Even absent an officially adopted policy, a custom or practice that is so persistent and widespread that it fairly represents a municipal policy will support liability against the municipality. A pattern of unconstitutional conduct may be shown on the part of municipal employees who are not policymakers.

124.     The City of Houston at all times relevant to this complaint has maintained policies, customs or practices that caused and were the moving force behind the violation of Dennis' constitutional rights described in this Complaint.

125.    The acts and omissions of each individually named Defendant were caused by said policies, customs or practices.

126.    The City of Houston's policymakers had actual or constructive knowledge about said policies, customs or practices.

127.    The City of Houston's policymakers were deliberately indifferent as to said policies, customs or practices.

128.    Said policies, customs and practices include the following:

    a.    The City's policy or custom of allowing its officers to use excessive force.

    b.    The City's policy or custom of allowing use of no-knock search warrants without supervisory oversight and approval.

    c.    The City's policy or custom of allowing officers and supervisors to remain in the narcotics division indefinitely, without term limits. Goines was allowed to work as a narcotics officer for at least 25 years before the Harding street raid. Bryant worked in narcotics for at least 11 years before the raid. In fact, system wide in HPD's Narcotics Division, 71 officers have spent ten years or more in the division and 31 officers have worked in the division for more than 20 years. Narcotics enforcement is a field known to pose high risk for corruption given the covert nature of the work involving CIs, cash, drugs, and weapons. Generally recognized best practices require regular rotation out of the division of narcotics officers and supervisors to prevent the development, as happened in this case, of a corrupt, dangerous, and illegal subculture within the division.

    d.    The City's policy or custom of not requiring or conducting regular audits of the HPD narcotics division. Prior to the incident, HPD had not audited the HPD narcotics division since 2000.

    e.    The City's policy or custom of allowing narcotics officers to use false affidavits to obtain search warrants, including no-knock search warrants.

    f.    The City's policy or custom of allowing narcotics officers to violate policies related to search warrants, operations planning, and handling of CIs.

    g.    The City's policy or custom of allowing narcotics officers to falsify tactical plans.

    h.    The City's policy or custom of allowing narcotics officers to falsify offense reports and supplemental reports.

i.      The City's policy or custom of allowing narcotics officers to falsify time sheets, including overtime forms.

j.      The City's policy or custom of allowing narcotics officers to falsify contact and communication information relating to CIs.

k.      The City's policy or custom of allowing narcotics officers to lie about whether they were actually present at a narcotics buy conducted by a CI.

l.      The City's policy or custom of allowing narcotics officers to falsify accounting and financial documents relating to CIs.

m.      The City's policy or custom of allowing officers to develop inappropriate relationships with CIs.

n.      The City's policy or custom of allowing narcotics officers to violate policies relating to controlled buys, including making such buys without prior approval.

o.      The City's policy or custom of allowing narcotics officers to violate policies relating to controlled buys, including making such buys alone.

p.      The City's policy or custom of allowing narcotics officers to violate policies relating to custody of narcotics and weapons.

### A.
### HPD's Pattern and Practice of Using Excessive and Deadly Force

129.    HPD has a long and well documented custom and practice of condoning, whitewashing, and therefore causing the use of excessive and deadly force by its officers.

130.    **HPD Officer Involved Shootings**. For example, when "investigating" an officer involved shooting, HPD (1) uses fewer classifications than for other usages of force, (2) ignores the officer's complaint history, (3) and cedes to the Chief of Police the sole final disciplinary outcome. Under HPD's policies and customs, the officer involved in the shooting is (1) not questioned until he has spoken with an attorney, (2) allowed to do an unrecorded walk through of the scene with an attorney, (3) not interviewed live, and (4) given two days to answer written questions about the shooting, with the advice of an attorney.

131.    From 2009 to 2019, HPD had approximately 291 officer involved shootings of civilians. In all of these cases, HPD determined that the shootings were "justified." These policies and customs related to police shooting civilians created a de facto policy under which HPD officers, including all individually named Defendants herein, know they can use and know they are allowed to use deadly force with impunity and approval. These policies and customs have become such a persistent and widespread practice of the city and its employees that they represent the City's policy. Predictably, these policies and customs have become a moving force behind the unconstitutional use of force by HPD officers in general and were a moving force behind, and cause of, the shooting at Harding Street and Dennis' death.

132.    **HPD's Use of Excessive Force in No-Knock Raids**. In addition, HPD also has created a wide-spread custom and unwritten policy of encouraging excessive force during no-knock narcotic raids. In particular, between 2009-2018, HPD officers were involved in at least nine cases where officers discharged their weapons during no-knock raids for narcotic warrants within the city of Houston.  Of those nine shootings, HPD officers wounded or killed civilians in eight of those cases.  Tellingly, Goines was the warrant officer during four of the nine shootings.

133.    **9338 E. Ave. O.**  On March 5, 2009, during a no-knock raid based on the allegation of possession of narcotics, HPD shot and killed Wilfido Joel Alfaro.  During the raid an HPD Officer was also critically injured. The autopsy of Mr. Alfaro revealed that HPD had shot him eight times in the back. Despite this evidence, HPD and the Chief of Police ruled this shooting justified.

134.    **4211 Sherwood.**  On September 17, 2009, Goines and Squad 15 initiated a no-knock raid at 4211 Sherwood during which they shot and wounded Jose Reyes.  In the search warrant, Goines stated that Reyes possessed "several semi-auto hand guns." However, Goines did not identify any handguns or weapons on the post-warrant inventory list. To justify its shooting, HPD alleged that

Reyes – who was unarmed – "attempted" to take one of the officers' weapons. Despite this allegation of an attack on a HPD officer, Squad 15 only charged Reyes with drug related crimes, and did not charge Reyes with assault on a peace officer or attempted murder.  Consistent with its pattern, the City and Chief of Police justified this shooting.

135.   **44 Farrell Street.** On December 17, 2009, as part of a no-knock raid, HPD forced entry at 44 Farrel Street by using a battering ram to demolish the front door. In response, the resident, Jose Montemayor, opened fire because he "thought [HPD] w[as] breaking in to take [his] wife and kids." HPD returned fire and wounded Montemayor. HPD charged Montemayor with drug-related crimes and assault on a peace officer. The City and Chief of Police justified this shooting

136.   **7610 Letcher Street.** On January 5, 2010, HPD utilized a no-knock forced entry, even though it had obtained a standard knock and announce warrant.  During the raid, HPD shot and killed Luis Guidry.  The City and Chief of Police justified this shooting

137.   **7221 Weyburn.** On July 28, 2011, HPD initiated a no-knock narcotics raid at 7221 Weyburn. During the warrant, HPD shot a dog and, as a result of unreasonable force, caused injury to the homeowner via ricochet. The City and Chief of Police justified this shooting

138.   **8301 Allwood.** On February 16, 2012, Goines obtained a no-knock search warrant for 8301 Allwood.  Squad 15 shot and wounded Johnnel Raglin during the raid. To justify the shooting, HPD claimed that Raglin pointed a shotgun at Squad 15.  Despite this claim, Goines did not identify a shotgun, or any weapon, on the warrant inventory.  After HPD arrested Raglin, HPD later obtained a second warrant to obtain firearms. HPD charged Raglin with drug related crimes and assault on a public officer, but ultimately dismissed the charge.  Consistent with its pattern, the City and Chief of Police justified this shooting.

139.  **6725 Sherwood.** On March 19, 2013, as part of a no-knock warrant obtained by Goines, Squad 15 raided 6725 Sherwood Street. While the warrant targeted his brother, HPD shot and severely wounded George Bernard during the raid.  As HPD forced entry, Bernard raised his hands and complied with HPD's demands, yet HPD still shot him.  During the subsequent search, HPD attempted to argue that the shooting was justified because a "pellet" gun was located in the cluttered room near the location where Mr. Bernard fell. The City and Chief of Police determined the shooting was justified. Bernard sued the officers for excessive force, and after the Court denied summary judgment, the City settled the claim.

140.  **1628 Birchwood.**  On September 25, 2013, HPD obtained a no-knock warrant and during the raid shot and killed Ponicano Montemayor at 1628 Birchwood. The City and Chief of Police justified this shooting.

141.  **302 Albanson.** On January 8, 2014, HPD obtained a no-knock warrant for 302 Alabonson street. During the raid, the homeowner, Leroyce McDonald complied with the HPD commands and laid on the floor. HPD officers responded to his compliance by kicking McDonald in the face, breaking his glasses, and injuring his right eye. The City and Chief of Police cleared the officers of wrong-doing.

142.  **6807 Goforth Street.** On April 24, 2018, Goines signed a false affidavit stating that he and Bryant used a CI to purchase drugs at 6807 Goforth Street. Goines falsely alleged he met with a CI, provided funds to the CI to make a buy on April 23rd, searched the CI, personally saw the CI enter and exit the premises, and upon the CI's return, he received cocaine from the CI. Likewise, in order to justify a no-knock warrant, Goines further alleged that the occupant had a "weapon near the front door" that appeared to be a "semi-automatic handgun of a .40 caliber." Bryant further

signed a confidential informant form and confirmed that he had witnessed these events. Both Goines' and Bryant's statements were lies.

143.    On April 25, 2018, Squad 15 members, Goines, Bryant, Reyna, Wood, Lovings, Medina, Gallegos, Pardo, Salazar, Sepolio, Ashraf, and Maxwell, unlawfully raided 6807 Goforth. While the occupant of 6807 Goforth survived the attack, during the raid, Gallegos, Medina, and Lovings discharged their weapons at his dog. Squad 15 arrested the occupant and charged with him possession of less than 1 gram of cocaine. The occupant was ultimately sentenced to 8-months in jail.

144.    **HPD's Use of Excessive and Deadly Force Against Animals.** The City of Houston also has failed to train, supervise, and discipline its officers regarding the use of lethal or deadly force against animals and conducting search warrants in homes with animals. Instead, HPD created a custom/policy of authorizing immediate use of deadly force when faced with a dog during a warrant, arrest, or investigation. In following this custom, the City endangered citizens who were exposed to deadly force through ricochets or crossfire. In addition, the City unnecessarily escalated or initiated deadly force, in particular during no-knock raids.

145.    Specifically, General Order 600-43, HPD authorizes officers "to use any response necessary up to and including deadly force to stop the animal," if "any person is attacked by an animal or is in imminent danger of being attacked by an animal." However, General Order 600-17, HPD excludes shooting an animal from a mandatory reportable force incident.  Instead, under General Order 200-16, HPD treats the shooting of an animal, including the death of the animal, akin to an accidental discharge of a weapon without any injury.  As a result, HPD only mandates a supervisory review of the animal shootings, as opposed to an IAD investigation.  In effect, HPD has authorized officers to shoot and kill animals, with little to no oversight or supervision.

146.     Not surprisingly, from 2007-2017, HPD officers shot and killed 332 animals. In every single case, HPD determined that the shooting was justified. Put differently, it was the common practice and pattern of officers to shoot animals, knowing that they would face no discipline or punishment for those shootings.  Rather, HPD policies actually encouraged this behavior.

147.     The City of Houston completely failed to properly train officers regarding the use of force, including lethal force, in incidents involving dogs. Specifically, the City did not train its officers in utilizing non-lethal force against dogs, including specialized tactics, chemical agents, repellants, dog behavior and tactic, and scenario-based dog-exercises.  As a result, HPD officers repeatedly initiated lethal force, which either (1) harmed a by-stander or (2) caused an unnecessary initiation of force with a homeowner during a search warrant. Indeed, this training should further be coupled with de-escalation tactics for pet-owners or homeowners, particularly when handling no-knock search warrants.  Instead, HPD created a strategy of initiating lethal force against dogs, greatly enhancing the likelihood of further violence, knowing that their actions would be approved by the City regardless of the circumstances.

148.     The following examples of HPD conduct illustrates the customs, practices, training, and policies of the City of Houston:

    a.    **Wes and Aisling Jones.** As a result of a routine police call by a neighbor, two HPD officers were dispatched to the home of Wes and Aisling Jones.  As HPD approached, the Jones' dog was located inside their house. Only seconds after knocking on the door, HPD shot the dog even though the dog was located inside the house. The officers then followed the dog to the homeowners' backyard and continued to shoot. As part of its review, HPD justified the shooting.

    b.    **Mark Condon off-duty shooting.** In July 2013, while walking on a trail with his wife and their two dogs, off-duty Houston police officer Mark Condon was approached by a dog who had escaped a nearby yard. As one of the owner's children approached Condon to get the dog, Condon "pulled out a gun and shot [the dog] in the neck at point blank range."

c.   **10118 Cheeves.** On February 20, 2008, HPD officers were executing a search warrant at 10118 Cheeves. During the warrant, the officer shot the owner's dog, and the dog-owner sustained an injury via ricochet.

d.   **Weyburn.** As explained above, on July 28, 2011, HPD initiated a no-knock narcotics raid at 7221 Weyburn. During the warrant, HPD shot a dog and, as a result of unreasonable force, caused injury to the homeowner via ricochet. The City and Chief of Police justified this shooting.

e.   **2203 Gessner.** On April 17, 2015, an HPD Officer responded to an assault in progress at 2303 Gessner.  Upon arrival, he observed several females yelling and arguing in the parking lot.  A dog from a vehicle parked at a gas pump approached the officer and the HPD officer shot the dog.  One of the fired rounds ricocheted off the ground and struck the dog's owner in the leg.

f.   **6807 Goforth Street.** As explained above, three members of Squad 15 shot a dog during a no-knock raid.

g.   **600 New Urban Way.** On June 20, 2017, HPD responded to a burglary call. The homeowner authorized HPD to secure his home, but warned them that he had two dogs in his backyard.  An HPD officer entered the backyard and shot both of the homeowners' dogs. As the homeowners' five-year-old child discovered the animals, HPD commented that they were "basically just here for the report of people breaking in. Yeah, we shot your dogs, but we don't know specifically what to tell you."

h.   **<u>7711 Greenstone.</u>**  Days before the Harding Street Raid, on January 10, 2019, an HPD officer shot his duty weapon several times at a German Shepherd dog named "Max" striking it twice. The dog died hours later. During the shooting, Ms. Leslie Rivera received a bullet-wound on her right arm from one of the ricochet bullets.

149.   Consistent with these cases, HPD created a custom, pattern, or usage of authorizing and approving HPD officers to shoot dogs in almost any circumstance.  Indeed, by justifying every single animal death from 2007-2017, HPD, through its Chief of Police, encouraged its officers to engage in this exact conduct.  As a result, HPD officers would shoot animals regardless if the animal was threatening or they reasonably feared that the animal would cause them harm. Indeed, this practice was particularly utilized and authorized in the context of no-knock raids.  As a result, HPD was deliberately indifferent to the risks that HPD would shoot animals, and in the process, also shoot people.

150.    Before the incident giving rise to this lawsuit, and known by the City and its policy makers, members of Squad 15 engaged in use of excessive force consistent with these patterns and practices. For example, in 2013, a truck driver accused Gallegos of punching and putting him in a chokehold, while they searched for a burglary suspect. The city ultimately settled this lawsuit for $200,000.  Likewise, Gallegos (and Pardo) participated in the shooting of an unarmed homeowner in Bellaire on September 6, 2017.  Pardo and Gallegos, along with other officers, were involved in a car chase, that culminated at 4504 Sunburst Street.  As the car sped away and struck a fire hydrant, the officers filled the car with bullets.  One of those shots then went through a window and struck a homeowner.  The Grand Jury reviewed this incident but declined to indict Padro, Gallegos, and the other officers.

151.    Similarly, Goines has been involved in multiple road-rage related incidents, at least three officer involved shootings, and has been sued multiple times for excessive force.   Specifically, Goines has been named or identified for misconduct in the following:

> a.  In *Benard v. Houston Police Department*, 4:15-cv-00734, George Bernard sued Goines based on excessive force used during a no-knock warrant; Bryant was also sued in this case;
>
> b.  In *Books v. City of Houston*, 4:20-cv-00758, a homeowner sued Goines for 4th amendment violations and unlawful arrest;
>
> c.  In *Dorsey, et al v. Goines*, 4:99-cv-02086, the estate of a family sued Goines for 4th amendment violations and wrongful death;
>
> d.  In *Francis v. City of Houston*, 4:88-cv-00059, an individual sued Goines for civil rights violations;

e.   In *Brown v. Harris County*, 4:13-cv-0293, an inmate accused Goines of kicking down his door and pointing a gun at his face

**B.**

**Squad 15's Pattern and Practice of Conducting Unreasonable Searches and Seizures**

152.    HPD has a longstanding, widespread policy and custom of allowing unreasonable searches and seizures based on unsupportable warrants and misuse of CIs, particularly in Squad 15. Through its policy and custom of not exercising supervisory oversight, investigating, and taking corrective actions against officers for these violations, HPD authorized officers by its de facto policy to obtain search warrants without probable cause in violation of the Constitution. This de facto policy became the moving force behind the illegal search at 7815 Harding Street and illegal searches by HPD narcotics officers throughout the City of Houston.

153.    Squad 15 is one of the four squads that make up the general enforcement for the Narcotics Division. Therefore, Squad 15 makes up 25% of the general narcotics enforcement for the City. In January 2019, Squad 15 contained two sergeants, Defendants Sgt. Wood and Sgt. Reyna, and nine HPD officers, including Defendants Gallegos, Sepolio, Salazar, Pardo, Medina, Lovings, Goines, Bryant, and Ashraf. Defendant Lt. Gonzalez was assigned as the Lieutenant in charge of Squad 15. Squad 15 also regularly worked with narcotics officers Griff Maxwell and Hodgie Armstrong.

154.    As part of HPD's regular pattern and practice for obtaining narcotics search warrants, Squad 15, and Goines in particular, requested no-knock warrants in virtually every warrant request. In order to make it appear that these requests met the no-knock standard required by federal law, Squad 15 and Goines would routinely and falsely claim that weapons were present at the target location, as they did in this case.

155.    According to media reports based on examination of search warrants obtained through open records requests, Goines presented sworn affidavits for search warrants in approximately 109 narcotics cases between 2012 and 2019. Goines requested no-knock warrants in 96% of the 109 cases, claiming in each case that the suspect possessed a firearm. More specifically, in almost every case Goines claimed that the suspect had a semi-automatic handgun, just like Goines falsely claimed in this case. However, in all but one of these cases, no weapon was recovered according to official inventory sheets filed following the raids. In other words, in 99% of Goines' no-knock warrants obtained on the basis of weapons being present, there was no weapon present and therefore no justification for a no-knock warrant, just like in this case.

156.    HPD's pattern and practice of executing illegal narcotics search warrants based on false affidavits presented by Squad 15 and other officers is further illustrated by the following illegal searches conducted by HPD:

    a.    **Squad 15 Raid on Goforth Street**. On April 24, 2018, Goines falsely signed an affidavit stating he and Stephen Bryant used a CI to purchase drugs at Goforth Street. Goines falsely alleged he met with a CI, provided funds to the CI to make a buy on April 23rd, searched the CI, personally saw the CI enter and exit the premises, and upon the CI's return, he received cocaine from the CI. Likewise, in order to justify a no-knock warrant, Goines further alleged that the occupant had a "semi-automatic handgun of a .40 caliber." Bryant signed a CI form confirming that he had witnessed these events. These statements were false. On April 25, 2018, Squad 15 members, Goines, Bryan, Reyna, Wood, Lovings, Medina, Gallegos, Paro, Salazar, Sepolio, Ashraf, and Maxwell, unlawfully raided the home on Goforth. The occupant survived, but Gallegos, Medina, and Lovings shot his dog. Squad 15 arrested the occupant and charged with him possession of less than 1 gram of cocaine. The occupant was ultimately sentenced to 8-months in jail.

    b.    **Squad 15 raid at 3600 Tuam**. On November 27, 2018, Goines falsely signed an affidavit stating that he used a CI to purchase marijuana at 3600 Tuam. Goines falsely alleged that he and Bryant met with a CI, provided funds to the CI to make a buy on November 27th to purchase marijuana, searched the CI, personally saw the CI enter and exit the premises, and upon the CI's return, he received marijuana from the CI. Later, on December 3, 2018, Goines and Reyna alleged that the payment and buy (1) occurred on December 3, 2018 and (2) Reyna (not Bryant) witnessed the buy. Based on statements from the CI, and Reyna, Bryant, and

Goines' cell phone tracking data, these statements were lies. As a result of these lies, the City obtained a no-knock search warrant for 3600 Tuam and on November 29, 2018, Goines, Gallegos, Salazar, Lovings, Medina, Pardo, Sepolio, Ashraf, Bryan, Reyna, Wood, and Armstrong executed the warrant. Ultimately, the occupant was arrested and charged with possession of a controlled substance.

c.  **Squad 15 Raid at 4855 Fuqua**. On October 14, 2017, Goines falsely signed an affidavit stating that he used a CI to purchase drugs at 4855 Fuqua. Goines falsely alleged he met with a CI, provided funds to the CI to make a buy on October 14th to purchase marijuana, searched the CI, personally saw the CI enter and exit the premises, and upon the CI's return, he received marijuana from the CI.  Goines did not request a no-knock warrant for this address because the suspect was a paraplegic.  In addition to Goines, Reyna also signed a CI activity sheet alleging that he witnessed Goines make the payment to the CI on October 14, 2017 and witnessed the CI purchase marijuana.  Based on the testimony of the CI and the cellphone data of Goines and Reyna, these statements were false. As a result of the raid, Squad 15 arrested the suspect and charge him with possession of a controlled substance. Ultimately, the target was sentenced to deferred adjudication and supervised release.

d.  **Squad 15 Raid on Knoxville**. On January 22, 2019, Hodgie Armstrong falsely signed an affidavit stating that he used a CI to purchase drugs at on Knoxville. Specifically, Armstrong falsely alleged he met with a CI, provided funds to the CI to make a buy on October 14th to purchase marijuana, searched the CI, personally saw the CI enter and exit the premises, and upon the CI's return, he received marijuana from the CI.  Bryant then signed a CI activity sheet alleging that he witnessed Armstrong make the payment to the CI on January 22, 2019 and witnessed the CI purchase of the drugs.  Based on testimony from the CI and Armstrong and Bryant's cell phone tracking data, these statements were lies.

e.  **Squad 15 Warrant for Napoleon Street**. On January 21, 2019, Goines instructed CI #2 and her friend to purchase two bags of heroin from a house on Napoleon Street. In contrast to HPD policy, Goines was not present for the Napoleon street purchase. CI #2 delivered the heroin to Goines two days later on January 23, 2019, while Goines visited her at her residence. Later, Goines requested a search warrant for the Napoleon Street house. In that request, Goines falsely testified that (1) he personally saw the CI enter the Napoleon house, (2) he searched the CI prior to entering the house, and (3) he saw the CI return from the house with the drugs. Goines further falsely testified that the CI obtained "crack" and that there was a weapon on the premises.  Based on these false statements, Goines requested and obtained a "no knock" warrant for the Napoleon street residence. Based on staffing and scheduling reasons, Squad 15 never executed the Napoleon street warrant. But the heroin CI #2 gave Goines remained in his custody, waiting to be planted at 7815 Harding Street.

f.  **5815 Hirsch Street**. HPD Narcotics officers Jimmy Williams obtained a no-knock

search warrant for 5818 Hirsch Street.  As part of the raid, Williams and his team broke down the door and held the occupants and gun point.  To obtain the warrant, the officer swore in an affidavit that he had personally watched a CI purchase drugs at 5818 Hirsch Street. In contrast, he actually did not observe the transaction and lied in the affidavit.  In reality, the transaction actually occurred at 5816 Hirsch Street.  Williams further lied again and claimed he did not execute the warrant after speaking with the homeowner.

g.  **Otis Mallet Case**. Goines and Squad 15's pattern and practice of lying and obtaining false warrants to wrongfully search and seize Houstonians goes back in time to at least 2008. Otis Mallett was arrested in 2008 and convicted based on Goines' false testimony that he bought drugs undercover from Mallet and his brother. Mallet maintained his innocence throughout, but was sentenced to 8 years. Following the Harding street raid, the Mallet case was re-examined. Investigators discovered serious discrepancies with Goines' testimony concerning his use City of funds to make the purchase and other issues which ultimately led to the conclusion that Goines made the whole thing up. What followed was not just a dismissal of the charges against Mallet, but also a finding of "actual innocence."

**C.**

**HPD Allowed Squad 15 to Develop into an Untethered, Corrupt, and Lawless Unit with Absolutely No Accountability**

157.   Through the years leading up to January 28, 2019. HPD allowed Narcotics Squad 15 to develop into, and thrive as, a unit rife with corruption, lawless behavior, and a complete lack of accountability. The members of Squad 15, including all individually named Defendants herein, followed this de facto policy to routinely and repeatedly falsify evidence and reports, obtain phony search warrants, misuse confidential informants, receive pay for hours not worked, and violate the constitutional rights of the citizens of Houston, all with impunity. The City and its policymakers deliberately turned a blind eye to this wide-spread and persistent pattern and practice.

158.   On or about July 1, 2020, HPD released the results of an "internal audit" of Narcotics Squad 15's conduct during the three years prior to and during the Harding Street raid. The audit confirms and sheds light on the existence, scope, and extent of the conduct described above. HPD should have and could have performed, but deliberately followed its own policy not to perform, such an audit in time to save Dennis' life. Some of the pertinent audit findings are as follows:

a. The audit found that at least six standard operating procedures promulgated by HPD which governed the conduct of Squad 15 "lacked sufficient supervisory oversight." The audit described an "overwhelming need" to improve procedures and particularly supervision. This finding goes to the root cause of the rampant misconduct, including the incidents giving rise to this action, which was allowed to occur in Squad 15.

b. The audit found that Squad 15 members, both during the Harding Street raid and during the year preceding it, did not follow policies related to warrant services, operations planning, and handling of CIs.

c. The audit found that numerous Squad 15 members failed to follow important investigative, administrative, evidentiary, and accounting procedures. These procedures are supposed to ensure accountability among the ranks and thereby promote public safety and prevent constitutional violations.

d. For example, the audit found that Goines (1) failed to tag drugs in a timely fashion in 48% of his cases, (2) failed to include case review sheets in 29% of his cases, (3) had expense discrepancies in 27% of his cases, and (4) had tracking errors in 23% of his cases.

e. The audit found that Bryant (1) failed to include case review sheets in 31% of his cases, (2) failed to turn in case files in 18% of his cases, (3) made late case tracking entries in 16% of his cases, and (4) made errors in the thoroughness of his investigations in 10% of his cases.

f. The audit found hundreds of other serious problems in Squad 15 which occurred during a long period of time before the Harding Street raid. These problems, along with the other conduct described in this Complaint, show there was a systemic and unconstitutional problem within Squad 15. As reported by the *Houston Chronicle*, University of Nebraska criminology professor Sam Walker stated "You can't ascribe this to everyday sloppiness…Officers know each other, they know what's going on. It just poisons the whole culture."

g. The poisoned culture, the broken system, and the lack of oversight that caused and fomented the conduct revealed in the audit was allowed to continue until it reached its tragic but predictable low point in the Harding Street raid.

159. In addition to the initial charges against Goines and Bryant, Harris County charged other members of Squad 15 with prior unlawful conduct.

a. Lt. Robert Gonzales, the lieutenant in charge of Squad 15, was charged with misapplication of fiduciary property because he repeatedly failed to verify and authorize the payments of HPD funds to CIs prior to releasing said funds to

narcotics officers who would then use the funds to pay CIs.

b.     Bryant was charged with two counts of tampering with CI forms which contain details regarding the money given to CIs for services or buying drugs. Bryant was also charged with one count of theft by a public servant.

c.     Sgt. Reyna was charged with three counts of tampering with CI forms and theft by public servant. Later, on January 25, 2021, Sgt. Reyna was charged with engaging in organized crime for his role in the corruption within Squad 15.

d.     Sgt. Wood was charged with tampering with CI forms.

e.     Officer Hodgie Armstrong, who was assigned to another unit but often worked with Squad 15, was charged with tampering with an offense report.

160.   On January 25, 2021, still additional charges were brought against Squad 15 members involved in the Harding Street raid.

a.     Defendant Gallegos was charged with 1st degree homicide for Dennis' death.

b.     Defendants Sgt. Reyna, Sgt. Wood, Pardo, Lovings and Ashraf were charged with engaging in organized criminal activity and tampering with governmental records.

c.     Officers Frank Medina and Griff Maxwell were charged with engaging in organized criminal activity and tampering with governmental records.

161.   As a result of these events, the Harris County D.A.'s office has reviewed thousands of cases involving Squad 15. To date, the County has dismissed nearly 200 cases based on the fact that Goines and/or Bryant, now shown to be corrupt, were involved.

162.   As reported by the *Houston Chronicle*, Harris County D.A. Kim Ogg said this about the scope and cause of the charged conduct: "Goines and the others could never have preyed on our community the way they did without the participation of their supervisors." In another *Chronicle* article, D.A. Ogg said "These officers know what they have done…They are well aware that cheating on overtime pay, lying about witnessing one another's undercover drug buys, and circumventing every check and balance…eventually resulted in the killing of an innocent family."

**D.**

**Squad 15's Pattern and Practice of Corruption with Regard to Overtime Pay**

163.     Squad 15 also had a longstanding pattern and practice of corruption with regard to overtime pay. Squad 15's official working hours were in the daytime. However, most warrant service operations are performed outside those hours, entitling Squad 15 officers to overtime pay. The members of Squad 15, including all individually named Defendants, all knew about the regular pattern and practice of illegally obtaining narcotics search warrants and benefitted financially from same. To date, nine of the eleven Squad 15 members who executed the no-knock warrant at 7815 Harding Street have been indicted by Harris County grand juries for felonies including murder, deprivation of constitutional rights, obstruction of justice, tampering with governmental documents, theft by public servant, and organized crime for corrupt conduct which occurred during or prior to the Harding street raid and which would have been discovered and prevented by HPD but for its deliberate indifference to the pattern and practice.

**E.**
**Squad 15's Pattern and Practice of Serious Misconduct in Using CIs**

164.     Squad 15 also had a longstanding pattern and practice of serious misconduct in using CIs. For example, Goines and Bryant worked together on approximately 231 investigations between 2016 and 2019. HPD has now identified 404 errors in those investigations. Goines repeatedly documented and provided inaccurate information regarding transactions with CIs, including for case numbers 16-1163, 17-0772, 17-1328, 17-0554, 17-772, 17-1328, 18-0332, 18-1401, 18-1517, 18-1733, and 19-1861. In addition, Lt. Robert Gonzales approved payments by Goines and Gallegos to CIs after the CIs had already made the purchases and without laboratory testing of the drugs for admission into evidence in the case. Goines also overpaid informants for minuscule amounts of narcotics, and paid CIs for "work not performed." This is particularly problematic

because over the course of several years, Goines maintained an inappropriate personal relationship with at least one of his CIs.

165.    The problems in Squad 15 were also caused by HPD's failure to properly train, supervise and control their officer's use of excessive deadly force, use of false affidavits, and misuse of CIs. Specifically, as recognized by the City after the fact when it changed its SOPs, HPD's policies, patterns, and practices prior to this incident lacked sufficient training and supervisory oversight with respect to narcotics investigation, obtaining, serving, and executing search warrants, use of CIs, and financial accountability. Defendant Lt. Todd was a Lieutenant in the FAST Squad who was also involved in directing this matter to Goines and planning the raid even though she knew from her girlfriend officer Blankenship-Reeves that no criminal activity had been observed at 7815 Harding Street. Defendant Lt. Gonzales ("Lt. Gonzales") was in charge of Squad 15.  He was also involved in Goines' corruption and that of Squad 15 and had knowledge of Goines' conduct leading up to the raid as described herein. Their conduct in failing to train and supervise Squad 15 was done with deliberate indifference, and conscious and reckless disregard to Dennis' safety, security and constitutional rights. The City's failure, and the failure by Lt. Todd and Lt. Gonzales, to properly train, supervise, and control Squad 15 were a proximate cause of Dennis' injuries and death, and Plaintiffs' damages.

**F.**
**HPD's Official Written Policies**

166.    The City of Houston also had official written policies which allowed, encouraged, and assisted Squad 15 to engage in improper searches and use excessive and deadly force. HPD  created and mandated Standard Operating Procedures regarding warrant preparation, warrant service, and confidential informants in Narcotics Division Standard Operating Procedures ("SOPs"). Through these written policies, the city was deliberately indifferent to the known or obvious consequences

that constitutional violations would occur, namely that Squad 15 would obtain illegal search warrants through false affidavits and the improper use of confidential informants.

167.     As part of these written policies, the City (1) failed to require any supervisory limits on no-knock warrants; (2) failed to supervise the execution of warrants, in particular by not mandating that Lieutenants or others in the chain of command, supervise the execution of warrants; (3) failed to supervise tactical plans for search warrants, raids, and no-knock warrants, in particular by not requiring review by the chain of command, including the division commander; (4) allowed Squad 15, and other units, to obtain no-knock warrants from municipal courts; (5) failed to mandate body camera as part of search warrant execution; (6) failed to mandate background checks and criminal history for CIs, (7) failed to require the documentation of all communication between officers and CIs; and (8) failed to mandate any audits or evaluation of officers who utilize CIs. Based on these policies, HPD officers, and in particular Squad 15, knew that by obtaining illegal search warrants and executing illegal searches, would be with the approval of city policymakers. Therefore, these longstanding practices and customs have become so persistent and widespread, that this process fairly represents HPD's policy regarding illegal searches.

168.     Examples of said SOPs include:

    a.    SOP 200/1.02 on Activity Authorization and Notification, which allowed execution of warrants involving forced entry without the presence of the case agent's supervisor. Goines' supervisor was not present during the Harding Street raid.

    b.    SOP 200/1.05 on Narcotics Operational Plan, which allowed execution of warrants by narcotics officers without requiring them to wear and use body-worn cameras.

    c.    SOP 200/1.12 on Search warrants/Buy Busts and Open Air Investigations, which allowed narcotics officers to execute search warrants without supervisory review of the investigative efforts which support the search warrant affidavit. This SOP also allowed HPD narcotics entry teams to make entry without requiring them to wear and use body-worn cameras.

    d.    SOP 200/1.22 on Handling Confidential Informants, which lacked sufficient

supervisory oversight of investigations involving CIs and supervisory verification of the veracity of CI information leading to the issuance of a warrant. This SOP also allowed insufficient documentation of all communications with CIs, including personnel present for any meeting and the purpose of the communication. This SOP also allowed narcotics case agents like Goines to use CIs without regular supervisory oversight to ensure correct utilization of informants and compliance with all policies and procedures.

## G.
## Ratification of HPD Policy, Custom, and Practice by HPD's Chief of Police

169.     HPD's de facto policies, customs and practices which allowed, condoned, and encouraged Squad 15's illegal searches and seizures and use of excessive and deadly force as described in this Complaint, as well as HPD's pattern and practice of turning a blind eye to said conduct, have been ratified by HPD since the day of the Harding Street raid. For example, to this day HPD's Chief of Police Art Acevedo (who has since resigned to take a position as chief at another police department) continues to defend Squad 15's conduct, except for the conduct of Goines and Bryant, claiming that the officers "had probable cause to be there" and "responded appropriately to the deadly threat posed to them during their service."  In further ratification, Chief Acevedo continues to dismiss Squad 15's corrupt and organized criminal activity prior to the raid as "unrelated to the shooting itself." But it is related. What happened at 7815 was, according to Harris County D.A. Kim Ogg, part of Squad 15's "usual routine." Chief Acevedo's notion, held prior to and after the raid as a policymaker for HPD, deliberately turns a blind eye to the fact that longstanding corruption and lack of accountability such as that demonstrated in Squad 15 will undoubtedly result, and did in this case result, in unconstitutional conduct by police officers and injury or death to Houstonians.

170.     The City of Houston, through its policymakers, had actual or constructive knowledge about, but were deliberately indifferent to, all of HPD's policies, customs, and practices referenced

43

in this Complaint.  All such policies, customs, and practices were the moving force behind, and cause of, the deprivation of Dennis' constitutional rights, his injuries and death, and Plaintiffs' damages. The conduct of each individually named Defendant as described in this Complaint was caused by said policies, customs, and practices.

## XI.
## PLAINTIFFS' FOURTH CAUSE OF ACTION
## 42 U.S.C. §1983 – Municipal Liability – Failure to Train, Supervise, and Discipline

171.    Plaintiffs incorporate all preceding paragraphs by reference herein.

172.    The City of Houston failed to properly train, supervise, and discipline officers within the Narcotics Division, including Squad 15. More specifically, the City failed to train, supervise, and discipline its narcotics officers regarding reasonable and safe practices for no-knock warrants. Long before the incident giving rise to this claim, the City and the chiefs of police knew that that during narcotic no-knock raids at least nine shootings occurred between 2009-2018.  During that same time period, the City reported no officer involved shooting related to knock and announce warrants for narcotic crimes. The chiefs of police had direct knowledge of the particular dangers of no-knock warrants because under HPD policies, the chiefs reviewed each of the nine shootings during that period.

173.    The City, including the Chief of Police, failed to train the narcotics unit regarding the use of excessive force during no-knock warrants.  In particular, the City, including the Chief of Police, did not provide mandatory training regarding de-escalation techniques after officer involved shootings, including during a no-knock raid.  In addition, the City and chiefs of police failed to train narcotics officers regarding other important safety techniques during no-knock raids, including using non-lethal force on animals. This is particularly important because firing a weapon at an animal can and foreseeably will unreasonably and unnecessarily escalate the conflict and lead

to further violence.  Notably, after the murders of Dennis and Reggie the City and the Chief of Police mandated de-escalation training in General Order 200-04 and 600-17.

174.    The City and Chief of Police failed to supervise and discipline narcotics officers regarding their pattern and use of excessive force during no-knock warrants, and pattern and use of fraudulent warrants. Instead, based on HPD's custom and policies, HPD officers knew that their reckless use of deadly force and false search warrants would be met with the approval of city policymakers.

175.    The City of Houston and its police chiefs were deliberately indifferent regarding their failure to train, supervise, or discipline regarding the use of excessive force during no-knock warrants and the use of warrants obtained by improper means. Specifically, the City of Houston and its chiefs of police authorized the use of excessive force against civilians and during no-knock warrants based on its procedures identified herein, and failed to discipline or supervise its officers who engaged in excessive force.  Likewise, the City of Houston and its chiefs of police authorized the use of fraudulent search warrants, by failing to discipline or supervise its officers who obtained search warrants based on false affidavits.

176.    The City of Houston and its chiefs of police failed to provide sufficient training to members of the general narcotics division regarding no-knock warrants.  Specifically, unlike SWAT officers, narcotics officers only received generalized training regarding no-knock warrants which did not include mandatory de-escalation training after an officer-involved shooting or the use of protective equipment, including shields.  As a result, general narcotics officers lacked the training of SWAT officers in order to de-escalate and limit officer involved shootings.

177.    The City of Houston and its chiefs of police were deliberately indifferent to the foreseeable result that this failure to train would violate the constitutional rights of citizens like Dennis and Reggie.  HPD and its policymakers knew that no-knock warrants presented substantially greater

risk of escalation and shootings.  HPD and its policymakers also knew that narcotic officers, unlike

SWAT officers, lacked de-escalation training, did not wear body cameras, and lacked ballistic

shields, and thus were more likely to escalate or instigate the use of force, even where such force

was not reasonable.

178.    HPD and its policymakers further knew that mandating the training identified above would

prevent shootings, including the murders of citizens like Dennis and Reggie.  In response to the

public outrage following the murders Dennis and Reggie, HPD promulgated these very policies.

The City, including the Chief of Police, knew that the Narcotics division had repeatedly engaged

in excessive force while carrying out no-knock warrants.  Under HPD's general orders 300-24,

200-16, 200-03, and 200-04, HPD placed responsibility on the Chief of Police to review and

supervise officer involved shootings and disciplinary matters.   Yet the Chief of Police found each

of the shooting identified herein to be justified.

179.    As a result of these failures, Dennis Tuttle suffered the injuries identified in this complaint,

including severe emotional distress, pain, and ultimately death.

## XII.
## PLAINTIFFS' FIFTH CAUSE OF ACTION
## 42 U.S.C. §1983 – Municipal Liability – Failure to Promulgate Adequate Policies

180.    Plaintiffs incorporate all preceding paragraphs by reference herein.

181.    The City of Houston failed to promulgate adequate policies to prevent the violations of

Plaintiffs' Constitutional rights.   Specifically, HPD failed to promulgate sufficient policies

regarding no-knock warrants, including the following:

     a.     HPD should have mandated but failed to mandate that only SWAT or a Narcotics trained SWAT team, carry out no-knock raids;

     b.     HPD should have mandated but failed to mandate that SWAT independently investigate, surveil, and create an appropriate tactical plan for no-knock raids;

      c.      HPD should have mandated but failed to mandate that the Chief of Police review each request for a no-knock warrant;

      d.      HPD should have mandated but failed to mandate the use of body-worn cameras and ballistic shields;

      e.      HPD should have mandated but failed to mandate the use of non-lethal force when approached by dangerous animals, including dogs, during no-knock raids;

      f.      HPD should have mandated but failed to mandate de-escalation training for members of raids after any officer involved shooting; and

      g.      HPD should have mandated but failed to mandate that supervisors, including lieutenants, be present during no-knock raids.

182.    Based on these failures, Defendants violated Dennis' constitutional rights as described herein.  In contrast, had these policies been in force, HPD and its policymakers, including the chief of Police, would have prevented the violation of those rights.

183.    By ignoring these important policies, HPD and its policymakers were deliberately indifferent to the foreseeable result that such failure would become the moving force behind Constitutional violations.  In particular HPD and its chiefs knew that no-knock warrants presented substantially greater risk of escalation and shootings.  HPD, including the Chief of Police, also knew that narcotic officers, unlike SWAT officers, lacked de-escalation training, did not wear body cameras, and lacked ballistic shields, and thus were more likely to escalate or instigate the use of force, even where such force was not reasonable.

184.    HPD and the Chief of Police further knew that mandating the policies identified above, would prevent the use of excessive force, thereby preventing deprivation of constitutional rights, injuries, and deaths, including  the murders of Dennis and Reggie.  In response to public outrage following the murders of Dennis and Reggie, HPD promulgated these very policies.  But the City, including the Chief of Police, knew that its Narcotics division had repeatedly engaged in excessive

force while carrying out no-knock warrants long before Dennis and Reggie were killed.  Under HPD's general orders 300-24, 200-16, 200-03, and 200-04, HPD placed responsibility on the Chief of Police to review and supervise officer involved shootings and disciplinary matters.   Yet the Chief of Police found each of the prior shootings identified above to be justified.

185.   As a result of these failures, Dennis suffered the injuries identified in this complaint, including severe emotional distress, pain, and ultimately death.

## PLAINTIFFS' SIXTH CAUSE OF ACTION: SURVIVAL CLAIM

186.   Plaintiffs incorporate all preceding paragraphs by reference herein.

187.   As described in the preceding paragraphs, Defendants' actions toward Dennis violated his constitutional rights and wrongfully caused his death, which resulted directly and solely from Defendants' actions and without which actions his death would not have occurred.

188.   Prior to his death, Dennis suffered serious personal injuries which resulted directly and solely from Defendants' actions. Dennis Tuttle had a cause of action for personal injury and would have been entitled to bring such action against Defendants based on their wrongful conduct had he lived.

189.   Plaintiffs, through the Estate's duly appointed administrator Clifford F. Tuttle, Jr., have standing to assert this claim on behalf of the Estate pursuant to Tex. Civ. Prac. & Rem. Code § 71.021.

## PLAINTIFFS' SEVENTH CAUSE OF ACTION: WRONGFUL DEATH

190.   Plaintiffs incorporate all preceding paragraphs by reference herein.

191.   As described in the preceding paragraphs, Defendants' actions toward Dennis violated his constitutional rights and wrongfully caused his death, which resulted directly and solely from Defendants' actions and without which actions his death would not have occurred.

192.     Robert Tuttle is the surviving parent of Dennis Tuttle. Ryan Tuttle is the surviving son of

Dennis Tuttle. Therefore, Robert Tuttle and Dennis Tuttle have standing to assert these claims for

wrongful death damages pursuant to Tex. Civ. Prac. & Rem. Code § 71.004.

## XI.
## DAMAGES

193.     Plaintiffs incorporate all preceding paragraphs by reference herein.

## A.
## Survival Damages

194.     As a result of the incident made the basis of this Complaint and the intentional and wrongful

conduct of Defendants, Dennis sustained significant injuries on January 28, 2019 and died as a

result thereof.

195.     Plaintiff Clifford F. Tuttle, Jr., as representative of the Estate, seeks by way of this cause

to recover all survival damages to which the Estate of Dennis Tuttle is entitled under Texas law,

including but not limited to:

  a.     Pain and mental anguish, including the conscious physical pain and emotional pain,
         torment, and suffering experienced by Dennis before his death as a result of the
         occurrence in question; and

  b.     Funeral and burial expenses, including the reasonable amount of expenses for
         funeral and burial for Dennis reasonably suitable to his station in life.

## B.
## Wrongful Death Damages – Plaintiff Robert Tuttle

196.     Plaintiff Robert Tuttle seeks by way of this cause to recover all wrongful death damages to

which he is entitled under Texas law for the wrongful death of his son, including but not limited

to:

a. Pecuniary loss sustained in the past, including the loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value, excluding loss of inheritance, that **Plaintiff Robert Tuttle**, in reasonable probability, would have received from Dennis had he lived.

b. Pecuniary loss that, in reasonable probability, will be sustained in the future.

c. Loss of companionship and society sustained in the past, including the loss of the positive benefits flowing from the love, comfort, companionship, and society that **Plaintiff Robert Tuttle**, in reasonable probability, would have received from Dennis had he lived.

d. **Loss of companionship and society** that, in reasonable probability, will be sustained in the future.

e. **Mental anguish** sustained in the past, including the emotional pain, torment, and suffering experienced by **Plaintiff Robert Tuttle** because of the death of Dennis.

f. Mental anguish that, in reasonable probability, will be sustained in the future.

## C.
## <u>Wrongful Death Damages – Plaintiff Ryan Tuttle</u>

197. Plaintiff Ryan Tuttle seeks by way of this cause to recover all wrongful death damages to which he is entitled under Texas law for the wrongful death of his father, including but not limited to:

a. Pecuniary loss sustained in the past, including the loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value, excluding loss of inheritance, that **Plaintiff Ryan Tuttle**, in reasonable probability, would have received from Dennis had he lived.

b. Pecuniary loss that, in reasonable probability, will be sustained in the future.

c. Loss of companionship and society sustained in the past, including the loss of the positive benefits flowing from the love, comfort, companionship, and society that **Plaintiff Ryan Tuttle**, in reasonable probability, would have received from Dennis had he lived.

d. **Loss of companionship and society** that, in reasonable probability, will be sustained in the future.

e. **Mental anguish** sustained in the past, including the emotional pain, torment, and suffering experienced by **Plaintiff Ryan Tuttle** because of the death of Dennis.

f.     Mental anguish that, in reasonable probability, will be sustained in the future.

## D.
## Exemplary Damages

198.    Plaintiffs seek exemplary damages against each individually named Defendant. Plaintiffs are entitled to exemplary damages because the individual Defendants' actions were motivated by malice and/or involved reckless or callous indifference to Dennis Tuttle's federally protected rights. The individually named Defendants engaged in these actions and omissions intentionally, willfully, and/or wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Dennis Tuttle's constitutionally protected rights.

## X.
## ATTORNEY'S FEES

199.    Pursuant to 42 U.S.C. §1988, Plaintiffs seek and are entitled to recover attorney's fees and costs, including expert fees.

## XI.
## JURY DEMAND

200.    Plaintiffs hereby demand a trial by jury.

## XII.
## PRAYER

201.    WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully pray that all Defendants be cited to appear and answer herein, and that Plaintiffs have judgment against Defendants, jointly and severally, for actual damages, exemplary damages against all individual Defendants, pre- and post-judgment interest, attorney's fees and costs of court, including expert fees, and all further relief, both legal and equitable, as to which Plaintiffs show themselves justly entitled.

Respectfully submitted,

**THE GALLAGHER LAW FIRM, PLLC**

*/s/ L. Boyd Smith, Jr.*

_____

Michael T. Gallagher
Federal Id. No.:  5895
SBOT:  007586000
L. Boyd Smith, Jr.
Federal Id. No.:  8203
SBOT: 18638400
Pamela R. McLemore
Federal Id. No.:  317412
SBOT: 24099711
2905 Sackett Street
Houston, TX 77098
Telephone: (713) 238-7705
Facsimile:  (713) 238-7852
mike@gld-law.com
bsmith@gld-law.com
pamm@gld-law.com

**ATTORNEYS FOR PLAINTIFFS**
Clifford F. Tuttle, Jr. as Representative of the
Estate of Dennis W. Tuttle, Deceased, Robert
Tuttle, and Ryan Tuttle

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned attorney, do hereby certify that a true and correct copy of the foregoing document was forwarded to the following counsel of record on this the 9th day of April 2021 via CM/ECF, pursuant to the Federal Rules of Civil Procedure:

<u>/s/ L. Boyd Smith, Jr.</u>