UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| CLIFFORD TUTTLE, et. al. | |
| Consolidated with | Case No. 4:21-cv-00270 |
| JOHN NICHOLAS, et.al. | |
| Plaintiffs, | |
| v. | |
| CITY OF HOUSTON; ART ACEVEDO, et. al. | |
| Defendants. | (JURY DEMANDED) |

## THE NICHOLAS PLAINTIFFS' FIRST AMENDED ORIGINAL COMPLAINT AND JURY DEMAND

1.      Murder, corruption, lies, sex, and perjury – the history of the Houston Police Department, and in particular, the Houston Police Department's ("HPD") Narcotics Squad 15, plays out like a scene from Training Day.[1] As approved and encouraged by the leaders of the City of Houston, Squad 15 operated as a criminal organization and tormented Houston residents for years by depriving their rights to privacy, dignity, and safety. This misconduct included (1) a long list of illegal search warrants obtained by perjury, (2) false statements submitted to cover-up the fraudulent warrants, (3) a sexual relationship between an informant and police officer, (4) improper payments to informants, (5) illegal and

---

[1] *Training Day* (Warner Bros. Pictures. 2001).

unconstitutional invasions of homes, (6) a long-list of illegal arrests and excessive force against Houston citizens, and, ultimately, (7) the murder of Rhogena Nicholas and Dennis Tuttle. In the ensuing aftermath, the Houston Chronicle referred to the death of Tuttle and Nicholas as "the worst scandal [HPD] has faced in a generation."

2.     Only after the tragic death of Rhogena Nicholas and Dennis Tuttle did the Squad 15 criminal organization began to unravel. While the initial evidence from the shootings exposed shocking corruption, the leadership of the City of Houston and HPD responded to this misconduct by concealing the outstanding evidence and testimony, in order to cover up the tragic events at 7815 Harding Street. In 2019 and 2020, the State of Texas and the Department of Justice brought charges – ranging from murder and civil rights violations to overtime theft and tampering with evidence – against twelve HPD officers connected to Squad 15, including Goines, Gallegos, Bryant, Reyna, Pardo, Ashraf, Lovings, Wood, Medina, Griff Maxwell (a K-9 officer who commonly worked with Squad 15) and Hodgie Armstrong (Goines's former partner). These charges have stemmed from the investigation of the January 28, 2019 raid and murder of Nicholas and Tuttle.

3.     For years prior to these charges, the policymakers within City created the precise custom and practice that killed Nicholas by approving, encouraging, ratifying, defending, or covering up the long history of unconstitutional conduct. Defendants first violated Nicholas's constitutional rights when HPD Officer Goines adhered to Squad 15's custom and practice of lying to obtain a search warrant for 7815 Harding Street. In a sworn affidavit to a Houston municipal judge, Goines falsely claimed that he paid for and witnessed a drug

2

deal between a confidential informant ("CI") and an unidentified man at 7815 Harding Street. He had not. And because Goines alleged that this informant had spotted a gun during the make-believe drug deal, Goines obtained a "no-knock" warrant – a practice he had repeatedly used during the prior decade to obtain over a hundred "no-knock" warrants.



Notably, Goines had previously paid the informant – a woman who admittedly was engaged in a long-term sexual relationship with Goines – to make the heroin purchase from a different house, miles from 7815 Harding Street.

4.      Goines then gathered Squad 15 for the unlawful assault. But Goines's history of perjury and fraud was nothing new to his team. Rather, the other members of Squad 15 knew about his pattern and history of lying to judges to obtain warrants, lying about guns to justify "no-knock" warrants, and lying about informants. Indeed, Goines had requested approximately one hundred fraudulent "no-knock" and other warrants based on made-up informant drug deals. Squad 15 members assisted Goines in this fraud by filling out false

paperwork supporting his perjury and by participating in these raids while knowing of the perjury.

5.      On January 28, 2019, Goines gathered Squad 15 and unlawfully invaded 7815 Harding Street. Members of Squad 15 escalated the attack by firing their weapons and killing Nicholas's dog. Squad 15 had used this escalation strategy before during similar illegal raids. For example, only a few months prior to this attack, members of Squad 15 had used exactly this tactic when Gallegos, Medina, and Lovings fired their weapons at the owners' dog during a raid on a house on Goforth Street.  That operation was also based on a fraudulent warrant obtained by Goines. After Squad 15 initiated deadly force at Harding Street, they then filled the house with gunfire, shooting and killing the unarmed Nicholas. Worse yet, the officer, who fatally killed Nicholas, fired his gun from a position outside the house, where he could not see Nicholas. In other words, the officer could not have viewed Nicholas, or anyone else within the house, as a threat. In sum, HPD illegally obtained the warrant, illegally entered the house, illegally initiated deadly force by firing their weapons first, and then blindly shot into the home's wall to kill Nicholas, all with conscious disregard for her constitutional rights.

6.      The Nicholas family files this lawsuit under 42 U.S.C. §1983 and §1988 for the clear violations of her constitutional rights and conspiracy to violate those rights. Prior to her murder, the City of Houston had created a longstanding, widespread, and deliberately indifferent custom, habit, practice, and/or policy of condoning and ratifying the use of excessive force and unreasonable searches. The final policymakers of the City have

communicated to officers, like Squad 15, that such force and illegal searches are authorized and even expected. The City of Houston has also communicated that the supervisory and municipal apparatus of the City will defend or cover up this exact type of conduct. Because Houston has tolerated – indeed, even encouraged – this unlawful conduct, it has become customary among HPD police officers to use unjustified and excessive force and conduct illegal and fraudulent searches. This conduct was the moving force and cause of Nicholas's death.

7.      Worse yet, the City's only response to its clear wrongdoing is to hide, conceal, and refuse to release the truth. Despite repeated informal, formal, and legal requests from the families of Nicholas and Tuttle, the City has outright refused any accountability or transparency and, instead, obstructed the families' attempts to discover the truth. At the same time, Houston Chief of Police Art Acevedo has continued to praise members of Squad 15 – other than the symbolic and conveniently sacrificed fall-men, Goines and Steven Bryant – as "heroes." Acevedo professed that he "stands with the members of Squad 15," who he "considers victims." Even worse, without any legitimate evidence or basis, Acevedo claimed "the facts are going to come out" to show that HPD "had probable cause to be there."

8.      Put differently, the City of Houston and Chief Acevedo have simply removed their two fall guys – Goines and Bryant – to contain the investigation and dodge any meaningful review or oversight of the corruption that has consumed Squad 15 and HPD. After almost two years of requesting that the City of Houston and Chief Acevedo follow their promise

– in particular, their claim to fully and transparently investigate the misconduct that led to the death of Nicholas and Tuttle and injuries to multiple officers – HPD has refused. As a result of this lack of cooperation, the family and the estate of Rhogena Nicholas have filed this lawsuit to reveal the truth and obtain justice.

## PARTIES

9.      Plaintiff, Jo Ann Nicholas, is asserting claims individually and as an heir of the Estate of Rhogena Nicholas. Jo Ann Nicholas is a citizen and resident of the State of Louisiana.  Jo Ann has standing to maintain this action, including for wrongful death, under Texas Civil Practice & Remedies Code §§ 71.001-71.004 and 71, as well as pursuant to the common law of the State of Texas, for her own benefit as heir of the Estate of Rhogena Nicholas, as well as individually under the Texas Wrongful Death Act.

10.     Plaintiff John Nicholas, the brother of Rhogena Nicholas, is asserting claims on behalf of the Estate of Rhogena Nicholas. John is a citizen and resident of the State of Louisiana.   He has been appointed temporary administrator of the Estate of Rhogena Nicholas, and therefore has standing to maintain this action under Texas Civil Practice & Remedies Code § 71.021 related to Nicholas's fatal injuries under the Texas Constitution. John thus brings this action pursuant to Section 71.021 of the Texas Civil Practice & Remedies Code, commonly known as the "survival statute," as well as pursuant to the common law of the State of Texas, for the benefit of and on behalf of the heirs of the Estate of Rhogena Nicholas.

11.     Defendant, the city of Houston, is a Texas municipal corporation that operates HPD,

which in turn sets city-wide policy for police officers it employs.

12.     Defendant, Art Acevedo, in his official capacity as the chief of police of the Houston Police Department. Chief Acevedo is a final policy maker for HPD and sets city-wide policy for police officers employed by the Department.

13.     Defendant, Gerald Goines, is a HPD officer who, at all times relevant to this action, was acting under color of law and within the scope of his employment as a Houston Police Department officer. Plaintiffs file their claims against Goines in his individual capacity.

14.     Defendant, Steven Bryant, is a HPD officer who, at all times relevant to this action, was acting under color of law and within the scope of his employment as a Houston Police Department officer. Plaintiffs file their claims against Bryant in his individual capacity.

15.     Defendant, Felipe Gallegos, is a HPD officer who, at all times relevant to this action, was acting under color of law and within the scope of his employment as a Houston Police Department officer. Plaintiffs file their claims against Gallegos in his individual capacity.

16.     Defendant Eric Sepolio, is a HPD officer who, at all times relevant to this action, was acting under color of law and within the scope of his employment as a Houston Police Department officer. Plaintiffs file their claims against Sepolio in his individual capacity.

17.     Defendant, Manuel Salazar, is a HPD officer who, at all times relevant to this action, was acting under color of law and within the scope of his employment as a Houston Police Department officer. Plaintiffs file their claims against Salazar in his individual capacity.

18.     Defendant Thomas Wood, is a HPD sergeant who, at all times relevant to this action, was acting under color of law and within the scope of his employment as a Houston Police

Department sergeant. Plaintiffs file their claims against Wood in his individual capacity.

19.     Defendant, Oscar Pardo, is a HPD officer who, at all times relevant to this action, was acting under color of law and within the scope of his employment as a Houston Police Department officer. Plaintiffs file their claims against Pardo in his individual capacity.

20.     Defendant, Frank Medina, is a HPD officer who, at all times relevant to this action, was acting under color of law and within the scope of his employment as a Houston Police Department officer. Plaintiffs file their claims against Medina in his individual capacity.

21.     Defendant, Clemente Reyna, is a HPD Sergeant who, at all times relevant to this action, was acting under color of law and within the scope of his employment as a Houston Police Department Sergeant. Plaintiffs file their claims against Reyna in his individual capacity.

22.     Defendant, Cedell Lovings, is a HPD officer who, at all times relevant to this action, was acting under color of law and within the scope of his employment as a Houston Police Department officer. Plaintiffs file their claims against Lovings in his individual capacity.

23.     Defendant, Nadeem Ashraf is a HPD officer who, at all times relevant to this action, was acting under color of law and within the scope of his employment as a Houston Police Department officer. Plaintiffs file their claims against Ashraf in his individual capacity.

24.     Defendant, Lt. Marsha Todd, is a HPD Lieutenant who, at all times relevant to this action, was acting under color of law and within the scope of her employment as a Houston Police Department officer. Plaintiffs file their claims against Lt. Todd in her individual capacity.

25.     Defendant, Lt. Robert Gonzales is a HPD Lieutenant who, at all times relevant to this action, was acting under color of law and within the scope of his employment as a Houston Police Department officer. Plaintiffs file their claims against Lt. Gonzales in his individual capacity.

## JURISDICTION AND VENUE

26.     This case arises under the Court's federal question jurisdiction based on Plaintiff's claim under 42 U.S.C. §1983 and §1988.

27.     This Court has jurisdiction over the subject matter and over Defendants in their official capacity because Defendants are officials of a municipality of the State of Texas that is headquartered in the Southern District of Texas. This Court also has jurisdiction over Defendants in their individual capacity for Plaintiffs' claims under 42 U.S.C. §1983 et seq.

28.     Venue in this District is proper based on 28 U.S.C. § 1391 and 18 U.S.C. § 1965 because the events giving rise to Plaintiffs' claims occurred in Harris County, Texas, and Defendants are residents of Harris County and Fort Bend County and, thus, subject to personal jurisdiction in the District of this Court.

## CONDITIONS PRECEDENT

29.     All conditions precedent for Plaintiffs obtaining the relief sought in this cause have been performed or have occurred.

## FACTUAL BACKGROUND

**A.  HPD's history of encouraging excessive force against unarmed civilians**

30.     HPD has a long and pronounced history of fostering excessive deadly force against unarmed civilians. Specifically, HPD, through its chief of police, has established inadequate policies and customs of investigating, punishing, supervising, and disciplining police officers who shoot unarmed civilians. As a result, this policy of authorizing excessive force has become a persistent and widespread practice of the city and its employees and thus constitutes a custom that represents the City of Houston's policy. In addition, this failure has become a "moving force" behind an unconstitutional use of excessive deadly force by police officers.

31.     This pattern and practice of unconstitutional use of excessive force is not an accident. Rather, through its policies, enforcement, and investigations of officer-involved shootings, HPD has deliberately created and encouraged a pattern of excessive force by its officers. For example, in its investigation process regarding the shooting of a civilian by a police officer, HPD Internal Affairs (1) uses fewer classifications than other types of use of force incidents; (2) does not look at the police officer's complaint history; and (3) gives the police chief the sole final disciplinary determination. Additionally, general HPD custom and policy following the shooting of a civilian is that the shooting police officer is (1) not questioned until he has spoken with an attorney; (2) allowed to do an unrecorded "walkthrough" of the scene, while accompanied by an attorney; (3) never given a live interview; and (4) given forty-eight hours to answer written questions with an attorney's assistance.

32.     As a result of HPD customs and usage, between 2009 to 2014, HPD had 194

intentional shootings of civilians, 81 of which were of unarmed civilians. Each of the 194 shootings were deemed justified by the Internal Affairs Division ("IAD"). Similarly, between in 2015 to 2016, on-duty HPD officers have killed 32 people, and IAD deemed each of those shootings justified.  As a result, HPD officers know that they will not be disciplined, scrutinized, punished, or charged for shooting unarmed civilians.

B. **HPD's history and custom of encouraging excessive force during no-knock warrants**

33.     In addition, HPD also has created a wide-spread custom and unwritten policy of encouraging excessive force during no-knock narcotic raids. In particular, between 2009-2018, HPD officers were involved in at least nine cases where officers discharged their weapons during no-knock raids for narcotic warrants within the city of Houston.  Of those nine shootings, HPD officers wounded or killed civilians in eight of those cases.  Tellingly, Goines was the warrant officer for four of the nine shooting warrants.

- **9338 E. Ave. O**

34.     On March 5, 2009, during a no-knock raid based on the allegation of possession of narcotics, HPD shot and killed Wilfido Joel Alfaro.  During the raid an HPD officer was also critically injured. The autopsy of Mr. Alfaro revealed that HPD had shot him eight times in the back. Despite this evidence, HPD and the Chief of Police determined that this shooting was justified.

- **4211 Sherwood**

35.     On September 17, 2009, Goines and Squad 15 initiated a no-knock raid at 4211 Sherwood, and HPD shot and wounded Jose Reyes on September 17, 2009.  In the search

11

warrant, Goines stated that Mr. Reyes possessed "several semi-auto hand guns." Yet again, Goines did not identify any handguns or weapons on the post-warrant inventory list. To justify its shooting, HPD alleged that Mr. Reyes – who was unarmed – "attempted" to take one of the officers' weapons. Despite this allegation of an attack on a HPD officer, Squad 15 only charged Reyes with drug related crimes, and did not charge Mr. Reyes with assault on a peace officer or attempted murder.  Consistent with its pattern, the City and Chief of Police justified this shooting.

- **44 Farrell Street**

36.    On December 17, 2009, as part of a no-knock raid, HPD forced entry at 44 Farrell Street by using a battering ram to demolish the front door. In response, the resident, Jose Montemayor, opened fire because he "thought [HPD] w[as] breaking in to take [his] wife and kids." HPD returned fire and wounded Mr. Montemayor. HPD charged Mr. Montemayor with drug-related crimes and assault on a peace officer. The City and Chief of Police justified this shooting.

- **7610 Letcher Street**

37.    On January 5, 2010, HPD utilized a no-knock forced entry, even though it had obtained a standard knock and announce warrant.  During the raid, HPD shot and killed Luis Guidry.  The City and Chief of Police justified this shooting.

- **7221 Weyburn**

38.    On July 28, 2011, HPD initiated a no-knock narcotics raid at 7221 Weyburn. During the warrant, HPD shot a dog and, as a result of unreasonable force, caused injury to the

homeowner via ricochet. The City and Chief of Police justified this shooting.

- **8301 Allwood**

39.     On February 16, 2012, Gerald Goines obtained a no-knock search warrant for 8301 Allwood. As part of the subsequent raid, Squad 15 shot and wounded Johnnel Raglin. To justify the shooting, HPD claimed that Mr. Raglin pointed a shotgun at Squad 15.  Despite this claim, Goines did not identify a shotgun, or any weapon, on the warrant inventory. After HPD arrested Mr. Raglin, HPD later obtained a second warrant to obtain firearms. HPD charged Mr. Raglin with drug related crimes and assault on a public officer, but ultimately dismissed the charge.  Consistent with its pattern, the City and Chief of Police justified this shooting.

- **6725 Sherwood**

40.     On March 19, 2013, as part of a no-knock warrant obtained by Gerald Goines, Squad 15 raided 6725 Sherwood Street. Although the warrant targeted his brother, HPD shot and severely wounded George Bernard during the raid.  As HPD forced entry, Mr. Bernard raised his hands and complied with HPD's demands, but HPD still shot him.  During the subsequent search, HPD attempted to argue that the shooting was justified because a "pellet" gun was located in the cluttered room near the location where Mr. Bernard fell. The City and Chief of Police determined the shooting was justified. Mr. Bernard sued the officers for excessive force, and after the Court denied summary judgment, the City settled the claim.

- **1628 Birchwood**

41.    On September 25, 2013, HPD obtained a no-knock warrant for 6725 Sherwood During the raid, HPD shot and killed Ponicano Montemayor at 1628 Birchwood. The City and Chief of Police justified this shooting.

- **302 Alabonson**

42.    On January 8, 2014, HPD obtained a no-knock warrant for 302 Alabonson Rd. During the raid, the homeowner, Leroyce McDonald complied with the HPD commands and laid on the floor. HPD officers responded to his compliance by kicking Mr. McDonald in the face, breaking his glasses, and injuring his right eye. The City and Chief of Police cleared the officers of any wrongdoing.

- **6807 Goforth Street**

43.    On April 24, 2018, Gerald Goines signed a false affidavit stating that he and Bryant used a CI to purchase drugs at 6807 Goforth Street. Goines falsely alleged he met with a CI, provided funds to the CI to make a buy on April 23rd, searched the CI, personally saw the CI enter and exit the premises, and upon the CI's return, he received cocaine from the CI. Likewise, in order to justify a no-knock warrant, Goines further alleged that the occupant had a "weapon near the front door" that appeared to be a "semi-automatic handgun of a .40 caliber." Bryant further signed a confidential informant form and confirmed that he had witnessed these events. Both Goines' and Bryant's statements were lies.

44.    On April 25, 2018, Squad 15 members, Goines, Bryant, Reyna, Wood, Lovings, Medina, Gallegos, Pardo, Salazar, Sepolio, Ashraf, and Maxwell, unlawfully raided 6807

Goforth. While the occupant of 6807 Goforth survived the attack, during the raid, Gallegos, Medina, and Lovings discharged their weapons at his dog. Squad 15 arrested the occupant and charged with him possession of less than 1 gram of cocaine. The occupant was ultimately sentenced to 8-months in jail.

**C.** **The City of Houston's failure to train, supervise, and discipline its officers in utilizing lethal force against animals and unnecessarily escalating violence by shooting pets**

45.    The City of Houston also has failed to train, supervise, and discipline its officers regarding the use of lethal or deadly force against animals and conducting search warrants in homes with animals. Instead, HPD created a custom/policy of authorizing immediate use of deadly force when faced with a dog during a warrant, arrest, or investigation. In following this custom, the City endangered citizens who were exposed to deadly force through ricochets or cross fire. In addition, the City unnecessarily escalated or initiated deadly force, especially during no-knock raids.

46.    Specifically, in General Order 600-43, HPD authorized officers "to use any response necessary up to and including deadly force to stop the animal," if "any person is attacked by an animal or is in imminent danger of being attacked by an animal." However, in General Order 600-17, HPD excludes shooting an animal from a mandatory reportable force incident.  Instead, under General Order 200-16, HPD treats the shooting of an animal, including the death of the animal, akin to an accidental discharge of a weapon without any injury.  As a result, HPD only mandates a supervisory review of the shooting of an animal, as opposed to an IAD investigation.  In effect, HPD has authorized officers to shoot and

15

kill animals, with little to no oversight or supervision.

47.     Not surprisingly, from 2007-2017, HPD Officers shot and killed 332 animals. In every single case, HPD determined that the shooting was justified. Put differently, it was the common practice and pattern of officers to shoot animals, knowing that they would face no discipline or punishment for those shootings.   Rather, HPD policies actually encouraged this behavior.

48.     The City of Houston completely failed to properly train officers regarding the use of force, including lethal force, in incidents involving dogs. Specifically, the City did not train its officers in utilizing non-lethal force against dogs, including specialized tactics, chemical agents, repellants, dog behavior and tactic, and scenario-based dog-exercises.  As a result, HPD officers repeatedly initiated lethal force, which either (1) harmed a by-stander or (2) caused an unnecessary initiation of force with a homeowner during a search warrant. Indeed, this training should further be coupled with de-escalation tactics for pet-owners or homeowner, particularly when handling no-knock search warrants.  Instead, HPD created a strategy of initiating lethal force against dogs, knowing that their actions would be approved by the City regardless of the circumstances.

49.     The following examples of HPD conduct illustrate the customs, practices, training, and policies of the City of Houston:

- **<u>Wes and Aisling Jones</u>**

50.     As a result of a routine police call by a neighbor, two HPD officers dispatched to the home of Wes and Aisling Jones.  As HPD approached, the Jones' dog was located

16

inside their house. Only seconds after knocking on the door, HPD shot the dog, even though the dog was located inside the house. The officers then followed the injured dog to the homeowners' backyard and continued to shoot. As part of its review, HPD justified the shooting.

- **Mark Condon off-duty shooting**

51.    In July 2013, while walking on a trail with his wife and their two dogs, Mark Condon, an off-duty Houston police officer, was approached by a dog who had escaped a neighbor's yard. As one of the owner's children approached Condon to get the dog, Condon "pulled out a gun and shot him in the neck at point blank range."

- **10118 Cheeves**

52.    On February 20, 2008, HPD officers were executing a search warrant at 10118 Cheeves. During the warrant, the officer shot the owner's dog, and the dog-owner sustained an injury via ricochet.

- **7221 Weyburn**

53.    As explained above, on July 28, 2011, HPD initiated a no-knock narcotics raid at 7221 Weyburn. During the warrant, HPD shot a dog and, as a result of unreasonable force, caused injury to the homeowner via ricochet. The City and Chief of Police justified this shooting.

- **2203 Gessner**

54.    On April 17, 2015, an HPD Officer responded to an assault in progress call at 2303 Gessner.  Upon arrival, he observed several females yelling and arguing in the parking lot

near the gas pumps.  A dog from a vehicle parked at the gas pump approached the officer, and the HPD officer shot the dog.  One of the fired rounds ricocheted off the ground and struck the dog's owner in the leg.

- **6807 Goforth Street**

55.    As explained above, three members of Squad 15 shot yet another dog during a no-knock raid.

- **600 New Urban Way**

56.    On June 20, 2017, in response to a burglary call, a homeowner authorized HPD to secure his home, but warned them that he had two dogs in his backyard.  As an HPD officer entered the backyard, the officer shot both of the homeowners' dogs. As the homeowners' five-year-old child discovered the animals, HPD only responded that they were "basically just here for the report of people breaking in. Yeah, we shot your dogs, but we don't know specifically what to tell you."

- **7711 Greenstone**

57.    Days before the Harding Street Raid, on January 10, 2019, an HPD officer shot his duty weapon several times at a German Shepherd dog, striking it twice. The dog died hours later. During the shooting, Lesslie Rivera received a bullet-wound on her right arm from one of the ricochet bullets.

58.    Consistent with these cases, HPD created a custom, pattern, or usage of authorizing and approving HPD officers to shoot dogs in almost any circumstance.   Indeed, by justifying every single animal death from 2007-2017, HPD, through its Chief of Police,

18

encouraged its officers to engage in this exact conduct. As a result, HPD officers shot animals regardless of whether the animal was threatening or whether the officers reasonably feared that the animal would cause them harm. Indeed, this practice was particularly utilized and authorized in the context of no-knock raids. As a result, HPD was deliberately indifferent to the risks that HPD would shoot animals, and in the process, also shoot people.

**D.** **The City of Houston fails to train, supervise, and discipline Squad 15 (and Narcotics officers) regarding use of force during no-knock warrants**

59.     Even worse, coupled with its failure to train officers regarding response to animals, the City and its final policymakers, including the chiefs of police, additionally (1) failed to enact adequate policies to protect the Constitutional rights of citizens of the city of Houston from excessive force during no-knock raids and (2) failed to discipline, supervise, and train the narcotics officers regarding reasonable and safe practices for no-knock warrants. During this period, the City and the chiefs of police, knew that that during narcotic no-knock raids, at least nine shootings (eight of which were either lethal or caused serious injuries to civilians) had occurred between 2009-2018. In contrast, during that same time period, the City of Houston had not reported any officer involved shooting related to knock and announce warrants within the City of Houston for narcotic crimes. Worse yet, the chiefs of police had direct knowledge of the particular dangers of no-knock warrants because under the HPD policies, they reviewed each of the nine shooting during that period.

60.     Despite this knowledge, HPD failed to promulgate sufficient policies to avoid

violations of the rights of citizens during no-knock warrants.   Specifically, the City, through the chiefs of police failed because:

- HPD should have mandated that only SWAT or a Narcotics trained SWAT team, carry out no-knock raids;

- HPD should have mandated that SWAT independently investigate, surveil, and create an appropriate tactical plan for no-knock raids;

- HPD should have mandated that the Chief of Police review each request for a no-knock warrant;

- HPD should have mandated the use body-worn cameras and ballistic shields during no-knock raids;

- HPD should have mandated non-lethal force when approached by dangerous animals, including dogs, during no-knock raids;

- HPD should have mandated de-escalation training for members of raids after any officer involved shooting; and

- HPD should have mandated supervisors, including lieutenants, be present during no-knock raids.

61.     By failing to implement and execute these important policies, HPD and the chiefs of police were deliberately indifferent as to whether their failure would be the moving force for Constitutional violations.   Importantly, HPD and the chiefs of police knew that no-knock warrants presented substantially greater risk of escalation and shootings, including excessive and deadly force.   HPD and the chiefs of police also knew that narcotic officers,

as opposed to SWAT, lacked de-escalation training, did not wear body cameras, lacked ballistic shields, and thus were more likely to escalate or instigate the use of force, even where such force was not reasonable based on the circumstances.

62.     That HPD implemented the aforementioned policies above after Plaintiffs were murdered demonstrates that HPD and the chiefs of police actually knew that mandating the policies would have prevented the use of excessive force, including the murders of Nicholas and Tuttle.  Furthermore, the City, including the Chief of Police, knew that the Narcotics division had repeatedly engaged in excessive force, while carrying out no-knock warrants.  Under HPD's general orders 300-24, 200-16, 200-03, and 200-04, HPD placed responsibility on the Chief of Police to review and supervise officer involved shootings, excessive force, and disciplinary matters.   Yet the Chief of Police found each of the shootings identified above to be justified.

63.     Similarly, HPD and the chiefs of police also failed to train the narcotics unit regarding excessive force during no-knock warrants.  In particular, the City should have included mandatory training regarding de-escalation techniques after an officer involved shooting, including during a no-knock raid.  This training is particularly important due to the nature of a no-knock warrant, including its increased risk of shootings and risk to homeowners and officers.   In addition to de-escalation, the City and chiefs of police also failed to train Narcotics officers regarding other important safety techniques during no-knock raids, including using non-lethal force on animals. This is especially important because as illustrated above, firing a weapon at an animal can unreasonably and

21

unnecessarily escalate the conflict. Notably, after the murders of Nicholas and Tuttle, the City and the Chief of Police, mandated de-escalation training in General Order 200-04 and 600-17.

64. In addition, the City and chiefs of police failed to supervise and discipline narcotics officers regarding their pattern and use of excessive force during no-knock warrants. As a result of HPD's custom and policies, HPD officers thus knew that their reckless use of deadly force would be approved by the City's policymakers. Therefore, these longstanding practices and customs have become so persistent and widespread that this process fairly represents HPD's policy regarding excessive force.

65. Consistent with this pattern, members of Squad 15 also engaged in excessive force in other contexts. For example, in 2013, a truck driver accused Gallegos of punching and putting him in a chokehold, while they searched for a burglary suspect. The city ultimately settled this lawsuit for $200,000. Likewise, Gallegos and Pardo participated in the shooting of an unarmed homeowner in Bellaire on September 6, 2017. Gallegos and Pardo, along with other officers, were involved in a car chase that culminated at 4504 Sunburst Street. As the car sped away and struck a fire hydrant, the officers filled the car with bullets. One of those shots then went through a window and struck a homeowner. The Grand Jury reviewed this incident but declined to indict Padro, Gallegos, and the other officers.

66. Similarly, Goines has been involved in multiple road-rage related incidents, at least three officer involved shootings, and has been sued multiple times for excessive force. Specifically, Goines has been named or identified for misconduct in the following:

22

- In *Benard v. Houston Police Department*, 4:15-cv-00734, George Bernard sued Goines based on excessive force used during a no-knock warrant;[2]

- In *Books v. City of Houston*, 4:20-cv-00758, a homeowner sued Goines for 4th amendment violations and unlawful arrest;

- In *Dorsey, et al v. Goines*, 4:99-cv-02086, the estate of a family sued Goines for 4th amendment violations and wrongful death;

- In *Francis v. City of Houston*, 4:88-cv-00059, an individual sued Goines for civil rights violations;

- In *Brown v. Harris County*, 4:13-cv-0293, an inmate accused Goines of kicking down his door and pointing a gun at his face

**E.  Squad 15's history and custom of fraudulent no-knock warrants**

67.    In addition to the above, the City has also encouraged and fostered systemic violations within the Narcotics division related to obtaining no-knock search warrants. Specifically, HPD – through its policy and custom of not investigating, punishing, supervising, and disciplining police officers for these violations – authorized officers to obtain search warrants in violation of the Fourth and Fourteenth Amendments. As part of that pattern, several officers, including Squad 15 members, obtained search warrants by providing false statements in sworn affidavits and improperly using confidential informants. As a result, the City's failure to investigate, punish, or discipline the officers

---

[2] Steven Bryant was also sued regarding the Bernard case.

has become the moving force behind the unconstitutional use of illegal searches throughout the City of Houston, and specifically by Squad 15 of the Narcotics division.

68.     In more detail, Squad 15 is one of the four squads that make up the general enforcement for the Narcotics Division in Houston.



Squad 15 thus makes up 25% of the general narcotics enforcement for the City.  In January 2019, Squad 15 contained two sergeants, Thomas Wood and Clemente Reyna, and nine HPD officers, including Felipe Gallegos, Eric Sepolio, Manual Salazar, Oscar Pardo, Frank Medina, Cedell Lovings, Gerald Goines, Steven Bryant, and Nadeem Ashraf. Lt. Robert Gonzales was assigned as the Lieutenant in charge of Squad 15. Squad 15 also regularly worked with narcotics officers Griff Maxwell and Hodgie Armstrong.

69.     As part of their regular pattern and practice for obtaining drug search warrants, Squad 15, through Goines, requested no-knock warrants in virtually every warrant request. Indeed, Goines was the case-agent that obtained the warrant in the vast majority of the Squad 15 raids.  To meet the no-knock standard required by Supreme Court precedent, an

officer "must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." Thus, in their requests for search warrants, Goines and Squad 15 would claim that weapons were present at the target location and allege the possibility of a dangerous condition. These claims were made in sworn affidavit provided to Houston municipal and Harris County judges.

70.     Between 2012-2019, Goines requested and filed sworn affidavits related to search warrants for approximately 109 drug cases. In those warrants, Goines requested a no-knock warrant roughly 95% of the time. To obtain a no-knock warrant, Goines represented that the suspect possessed a firearm inside the target location. Yet in all but one of those cases – 99.08% of his drug search warrants – Goines never recovered a firearm in the subsequent inventory list after the raid. Put differently, despite Squad 15 and Goines repeatedly requesting no-knock warrants based on the presence of firearms, 99.08% of the time there were no firearms at the location and no justification for a no-knock entry. HPD was aware of this disparity and continued to permit Goines to obtain no-knock warrants based on representations that firearms were inside the premises.

71.     As portrayed in the table below, of the approximately 109 warrants, Goines obtained at least 66 warrants from Harris County Courts from January 2012 to January 2019.[3] In

---

[3] In addition to the warrants from Harris County, Goines additionally obtained a significant number of warrants from Houston Municipal Courts.

those 66 warrants, Goines requested a no-knock warrant 64 times. Notably, in the two warrants that Goines did not request a no-knock, the request involved a suspect who was a paraplegic and a search of a suspect at a business. In 61 of the 64 times that Goines requested a no-knock warrant, Goines identified a gun as the basis for the warrant.[4] In each of those cases, Goines had previously sworn under oath that the suspect had dealt dugs and possessed a weapon for the purpose of protecting the drugs.  Yet even though Goines made arrests in approximately 91.8% of cases,[5] he never recovered a single firearm in the subsequent return and inventory list after the search.

| Goines Search Warrants from Harris County Courts/Magistrates | | | | |
|---|---|---|---|---|
| Date | Address | Type of warrant | Basis for no-knock | Inventory after warrant |
| 1/10/2012 | 5542 Shamrock | No knock | Semi-auto handgun and Shotgun | No Gun |
| 1/17/2012 | 3735 Alberta | No knock | Semi-auto handgun | No Gun |
| 2/12/2012 | 5029 Southwind | No knock | Semi-auto handgun | No Gun |
| 2/15/2012 | 8301 1/2 Allwood | No knock | Semi-auto handgun | No Gun |
| 4/10/2012 | 5900 Selinsky #186 | No knock | Semi-auto handgun(s) | No Gun |
| 4/23/2012 | 13903 N. Thorntree | No knock | Semi-auto handgun and rifle | No Gun |
| 4/28/2012 | 8911 Brandon | No knock | Semi-auto handgun | No Gun |
| 5/5/2012 | 5900 Selinsky #104 | No knock | Semi-auto handgun | No Gun |

---

[4] In the three cases that Goines requested a no-knock without identifying a gun, Goines alleged in each that drugs were located near a sink and subject to destruction. Based on those facts, in one case, the Court rejected a no-knock warrant.
[5] As a result of these 61 searches, Squad 15 made approximately 87 arrests at 56 locations.

| | | | | |
|---|---|---|---|---|
| 5/6/2012 | 2211 Chew | No knock | Shotgun | No Gun |
| 5/15/2012 | 2307 Briley | No knock | Shotgun | No Gun |
| 6/19/2012 | 14403 Ella | No knock | Semi-auto handgun | No Gun |
| 7/18/2012 | 1406 Sulphur | No knock | Semi-auto handgun | No Gun |
| 9/5/2012 | 4202 Rockingham | No knock | Semi-auto handgun | No Gun |
| 9/11/2012 | 5022 Northridge | No knock | Shotgun | No Gun |
| 9/12/2012 | 3405 Berry #05 | No knock | Semi-auto handgun | No Gun |
| 9/16/2012 | 8234 Madera | No knock | Semi-auto handgun(s) | No Gun |
| 12/4/2012 | 8601 Broadway #3096 | No knock | Semi-auto handgun | No Gun |
| 1/23/2013 | 830 Duane | No knock | Semi-auto handgun | No Gun |
| 3/19/2013 | 6725 Sherwood | No knock | Semi-auto handgun | No Gun |
| 4/15/2013 | 2916 Anita | No knock | Semi-auto handgun | No Gun |
| 10/29/2013 | 1312 Bayou | No knock | Semi-auto handgun | No Gun |
| 1/22/2014 | 6957 Jay | No knock | Handgun | No Gun |
| 2/13/2014 | 2705 Rosalie | No knock | Semi-auto handgun | No Gun |
| 3/19/2014 | 4423 Stassen | No knock | Semi-auto handgun | No Gun |
| 4/8/2014 | 4841 Shreveport | Knock First (Court rejected no knock) | No allegation of a gun present | n/a |
| 5/8/2014 | 5400 Bunte | No knock | Semi-auto handgun | No Gun |
| 5/11/2014 | 3721 Tuam | No knock | Semi-auto handgun | No Gun |
| 5/13/2014 | 6002 Collingsworth | No knock | Semi-auto handgun | No Gun |
| 5/21/2014 | 3822 Lockwood | No knock | Semi-auto Pistol | No Gun |
| 5/22/2014 | 8040 W. Airport #1504 | No knock | Drugs located near the sink (no allegation of a | n/a |

| | | | gun) | |
|---|---|---|---|---|
| 6/18/2014 | 2402 Houston #219 | No knock | Semi-auto handgun | No Gun |
| 8/7/2014 | 4515 Lockwood | No knock | Drugs located near the sink (no allegation of a gun) | n/a |
| 8/24/2014 | 2714 Dennis | No knock | Semi-auto Pistol | No Gun |
| 9/24/2014 | 3715 Drew | No knock | revolver | No Gun |
| 10/21/2014 | 6957 Jay | No knock | Semi-auto handgun | No Gun |
| 11/4/2014 | 10103 Finchwood | No knock | Semi-auto handgun | No Gun |
| 11/18/2014 | 3236 McGowen | No knock | Semi-auto handgun | No Gun |
| 1/19/2015 | 3212 Stonewall | No knock | Semi-auto handgun | No Gun |
| 2/24/2015 | 9307 Spaulding | No knock | Semi-auto handgun | No Gun |
| 4/1/2015 | 2607 Stevens | No knock | Shotgun | No Gun |
| 4/28/2015 | 1419 Capron | No knock | Semi-auto handgun | No Gun |
| 7/21/2015 | 3806 Caplin | No knock | Semi-auto handgun | No Gun |
| 9/22/2015 | 5330 Willow Glen | No knock | Semi-auto handgun | No Gun |
| 10/21/2015 | 5016 Van Fleet | No knock | Semi-auto handgun | No Gun |
| 1/17/2016 | 7318 Miley | No knock | Semi-auto handgun | No Gun |
| 3/21/2016 | 4110 Luell | No knock | Semi-auto handgun | No Gun |
| 4/12/2016 | 3216 Tuam | No knock | Semi-auto handgun | No Gun |
| 4/18/2016 | 3311 Bremond | No knock | Semi-auto pistol | No Gun |
| 4/18/2016 | 3315 Bremond | No knock | Semi-auto handgun | No Gun |
| 5/14/2016 | 7317 Springdale | No knock | Semi-auto handgun | No Gun |
| 6/27/2016 | 7910 Belbay | No knock | Semi-auto | No Gun |

| | | | handgun | |
|---|---|---|---|---|
| 10/17/2016 | 3517 Tuam | No knock | Semi-auto handgun | No Gun |
| 10/25/2016 | 2807 Nettleton | No knock | Rifle | No Gun |
| 10/25/2016 | 2811 Nettleton | No knock | Semi-auto handgun | No Gun |
| 4/4/2017 | 3316 Drew | No knock | Semi-auto handgun | No Gun |
| 5/18/2017 | 3216 Tuam | No knock | Semi-auto handgun | No Gun |
| 7/13/2017 | 3707 Tuam | No knock | Semi-auto handgun | No Gun |
| 10/15/2017 | 4855 W. Fuqua | Knock first (suspect was a paraplegic) | n/a | n/a |
| 11/28/2017 | 2013 Brewster | No knock | Semi-auto handgun | No Gun |
| 12/5/2017 | 3413 Liberty | Knock first (location was a business) | n/a | n/a |
| 1/23/2018 | 5011 Paige St | No knock | Semi-auto handgun | No Gun |
| 3/20/2018 | 3011 Nagle | No knock | Semi-auto handgun | No Gun |
| 4/24/2018 | 6807 Goforth | No knock | Semi-auto handgun | No Gun |
| 6/4/2018 | 3441 Rosalie | No knock | Semi-auto handgun | No Gun |
| 9/19/2018 | 3206 Napoleon | No knock | Semi-auto handgun | No Gun |
| 10/8/2018 | 3409 Mcilhenny | No knock | Semi-auto handgun | No Gun |

**F. HPD and Squad 15's widespread custom, pattern, and usage of obtaining false warrants based on untrue statements regarding a confidential informant**

72.    In addition to the fraudulent no-knock warrants, serious misconduct also plagued the City of Houston, and Squad 15's use of CIs. For example, from 2016-2019, officers Bryant and Goines worked a total of 231 combined investigations.  The City of Houston

29

has since identified over 400 errors in those investigations. In those three years, Goines repeatedly documented and provided inaccurate information regarding transactions with CIs, including for case numbers 16-1163, 17-0772, 17-1328, 17-0554, 17-772, 17-1328, 18-0332, 18-1401, 18-1517, 18-1733, and 19-1861. Furthermore, Lt. Robert Gonzales approved payments by Goines and Gallegos to CIs after the CIs had already made the purchases and without laboratory testing of the drugs for admission into evidence in the case. Goines also overpaid informants for minuscule amounts of narcotics, and paid CIs for "work not performed." This is particularly problematic because over the course of several years, Goines maintained a sexual relationship with at least one of his CIs.

73.     Based on the repetitive history of Squad 15's constitutional violations, Squad 15's conduct became the customary and standard operating procedure in the City of Houston Police Department. The examples of illegal conduct stated below – specifically, the illegal searches at Goforth, Tuam, Fuqua, Knoxville, Napoleon, and Hirsch Streets and the arrest of Otis Mallet – exemplify the City's illegal searches based on perjury from November 2017 and to January 2019.

**The illegal raid at 6807 Goforth**

74.     On April 24, 2018, Goines signed a false affidavit stating that he and Bryant used a CI to purchase drugs at 6807 Goforth Street. Specifically, Goines falsely alleged he met with a CI, provided funds to the CI to make a buy on April 23rd, searched the CI, personally saw the CI enter and exit the premises, and upon the CI's return, he received cocaine from the CI. Likewise, in order to justify a no-knock warrant, Goines further alleged that the

30

occupant had a "weapon near the front door" that appeared to be a "semi-automatic handgun of a .40 caliber." Additionally, Bryant signed a confidential informant form and confirmed that he had witnessed these events. Both Goines' and Bryant's statements were lies.

75.     On April 25, 2018, Squad 15 members, Goines, Bryant, Reyna, Wood, Lovings, Medina, Gallegos, Pardo, Salazar, Sepolio, Ashraf, and Maxwell, unlawfully raided 6807 Goforth. While the occupant of 6807 Goforth survived the attack, during the raid, Gallegos, Medina, and Lovings discharged their weapons at his dog.  Squad 15 arrested the occupant and charged with him possession of less than 1 gram of cocaine. The occupant was ultimately sentenced to 8-months in jail.

**The illegal raid at 3616 Tuam**

76.     On November 27, 2018, Goines signed a false affidavit stating that he used a CI to purchase Marijuana at 3600 Tuam. In that affidavit, Goines alleged that he and Bryant met with a CI, provided funds to the CI to make a buy on November 27th to purchase marijuana, searched the CI, personally saw the CI enter and exit the premises, and upon the CI's return, he received marijuana from the CI. Later, on December 3, 2018, Goines and Reyna alleged that the payment and buy (1) occurred on December 3, 2018 and (2) Reyna (not Bryant) witnessed the buy. Based on statements from the CI, and the cell phone tracking data for Reyna, Goines, and Bryant's phones, these statements were lies.

77.     As a result of these lies, the City obtained a no-knock search warrant for 3600 Tuam and on November 29, 2018, Goines, Gallegos, Salazar, Lovings, Medina, Pardo, Sepolio,

Ashraf, Bryant, Reyna, Wood, and Armstrong executed the warrant. Ultimately, the occupant was arrested and charged with possession of a controlled substance.

### The illegal raid at 4855 Fuqua

78.     On October 14, 2017, Goines signed a false affidavit stating that he used a CI to purchase drugs at 4855 Fuqua. Specifically, Goines falsely alleged he met with a CI, provided funds to the CI to make a buy on October 14th to purchase marijuana, searched the CI, personally saw the CI enter and exit the premises, and upon the CI's return, he received marijuana from the CI. Goines did not request a no-knock warrant for this address because the suspect was a paraplegic. In addition to Goines, Reyna also signed a "C.I. Activity Sheet" alleging that he witnessed Goines make the payment to the CI on October 14, 2017 and witnessed the CI purchase drugs. Based on the testimony of the CI and the cellphone data of Goines and Reyna, these statements were false.

79.     As a result of the raid, Squad 15 arrested the suspect and charge him with possession of a controlled substance. Ultimately, the target was sentenced to deferred adjudication and supervised release.

### The illegal raid at 4437 Knoxville

80.      On January 22, 2019, Hodgie Armstrong signed a false affidavit stating that he used a CI to purchase drugs at 4437 Knoxville. Armstrong falsely alleged he met with a CI, provided funds to the CI to make a buy on January 22nd to purchase marijuana, searched the CI, personally saw the CI enter and exit the premises, and upon the CI's return, he received marijuana from the CI.  Bryant then signed a "C.I. Activity Sheet" alleging that

he witnessed Armstrong make the payment to the CI on January 22, 2019, and witnessed the CI purchase of the drugs. Based on testimony from the CI and the cell phone tracking date for Armstrong's and Bryant's phones, these statements were lies.

### The illegal warrant for Napoleon Street

81.     On January 23, 2019, based on Goines's instruction, an unnamed CI ("the Napoleon Street CI") and her friend purchased two bags of heroin from a house on Napoleon Street. In contrast to one of HPD's policies, Goines was not present for the Napoleon Street purchase.  Instead, the CI provided Goines with the heroin two days later on January 23, 2019, while Goines visited her at her residence. Several days later, Goines returned to visit the Napoleon Street CI at around midnight. Goines and the CI – as part of their on-going relationship – then engaged in sexual activity.

82.     On that same day, Goines requested a search warrant for the Napoleon Street house. In that request, Goines falsely testified that (1) he personally saw the CI enter the house, (2) he searched the CI prior to entering the house, and (3) he saw the CI return from the house with the drugs. Goines further falsely testified that the CI obtained "crack" and that there was a weapon on the premises. Based on these false statements, Goines requested and obtained a "no knock" warrant for the Napoleon Street residence. Based on staffing and scheduling reasons, Squad 15 never executed the Napoleon Street warrant.

### 5818 Hirsch Street

83.     HPD Narcotics officers Jimmy Williams obtained a no-knock search warrant for 5818 Hirsch Street.  As part of the raid, Williams and his team broke down the door and

held the occupants and gun point.  To obtain the warrant, the officer swore in an affidavit that he had personally watched a CI purchase drugs at 5818 Hirsch Street. In contrast, he actually did not observe the transaction and lied in the affidavit.  In reality, the transaction actually occurred at 5816 Hirsch Street.  Williams further lied again and claimed he did not execute the warrant after speaking with the homeowner.

**Otis Mallet Case**.

84.    Goines and Squad 15's pattern and practice of lying and obtaining false warrants to wrongfully search and seize Houstonians goes back in time to at least 2008. Otis Mallett was arrested in 2008 and convicted based on Goines' false testimony that he bought drugs from Mallet and his brother while undercover. Mallet maintained his innocence throughout, but was sentenced to 8 years. Following the Harding Street raid, the Mallet case was re-examined. Investigators discovered serious discrepancies with Goines' testimony concerning his use of City funds to make the purchase and other issues which ultimately led to the conclusion that Goines made the whole thing up. What followed was not just a dismissal of the charges against Mallet, but also a finding of "actual innocence."

**G. Squad 15's knowledge and participation in the violations**

85.    The members of Squad 15 worked closely together as a team in the years leading up to the Harding Street raid. They knew each other very well. Their jobs required knowing where other squad members were, what cases their coworkers were working on, and what their coworkers were doing while on duty. They kept up with each other by cell phone throughout their shifts and even while off duty. The investigation, which produced

recovered cell phone data among other things, conducted by the Harris County District Attorney's office which led to these officers' indictments show that on more than 50 occasions during the year preceding January 28, 2019, the individually named Defendants, including Goines, Bryant, Gallegos, Reyna, Pardo, Ashraf, Lovings, Wood, Medina, Sepolio and Salazar worked on cases together in which at least Goines, Bryant, Gonzales, Wood, Pardo, Lovings, Ashraf and Reyna turned in false overtime records. The Defendants who have not been indicted yet either participated in the scheme themselves or, in any event, knew the other officers were engaged in organized crime and did nothing to stop it in time to prevent the Harding Street murders.

86.     Defendants Bryant, Gallegos, Reyna, Pardo, Ashraf, Lovings, Wood, Medina, Sepolio, and Salazar knew about Goines' pattern of illegal and unconstitutional conduct as described in this Complaint. They knew Goines had a pattern and practice of lying to obtain illegal no-knock search warrants, lying about the extent of his investigatory work supporting such illegal warrants, and lying about the time he spent working on such cases. In fact, all of the Defendants named in this paragraph participated with Goines in the pattern of crime leading up to this incident. As described herein, Goines, Bryant, Gonzales, Wood, Pardo, Lovings, Ashraf and Reyna have been charged with crimes involving tampering with evidence, theft, and other criminal conduct. In short, all the individual Defendants knew about the pattern of illegally obtained warrants used by Squad 15.

87.     Each member of Squad 15, including Goines, Gallegos, Bryant, Reyna, Pardo, Ashraf, Lovings, Wood, Medina, Salazar, and Sepolio reviewed and discussed the no-

knock search warrant signed by Judge Marcum (and Goines' false affidavit attached to it) during the tactical plan meeting conducted prior to the raid. Each of them knew that Goines did not investigate narcotics activity at 7815 Harding Street for two weeks as stated in the affidavit because each of them worked with Goines closely during those two weeks and knew he had not done so. Each of them knew Goines was not anywhere near Harding street on January 27, 2019 as stated in the affidavit. Each of them knew that officer Blankenship-Reeves, who was present during and participated in the tactical plan meeting, saw no criminal activity at the target location when she investigated Ms. Garcia's call. Each of them observed the house prior to the raid and saw no ongoing signs of criminal activity prior to the raid. These facts, coupled with Defendants' knowledge of and participation in Goines long pattern of corrupt activity related to search warrants and informants, made it clear to each Defendant that there was no probable cause to execute the phony warrant and that doing so would violate Dennis' clearly established constitutional rights. Each Defendant had an opportunity and the authority, at a minimum, during the meeting and prior to the raid to intervene and stop it. Each Defendant consciously chose not to do so. Instead, each Defendant deliberately, callously, and recklessly executed the phony warrant, used excessive force, and proximately caused Dennis' injuries and death.

88. Each member of Squad 15, including Gallegos, Bryant, Reyna, Pardo, Ashraf, Lovings, Wood, Medina, Salazar, and Sepolio knew that Goines and others on Squad 15, had a pattern and practice of making false statements to obtain warrants, and thus knew

that many of Squad 15's searches were unconstitutional. Prior to the shooting of Tuttle and Nicholas, Defendants Gallegos, Bryant, Reyna, Pardo, Ashraf, Lovings, Wood, Medina, Salazar, and Sepolio knew that Goines had obtained the warrant based on false facts, and had the opportunity to take action to stop the unconstitutional raid during the tactical plan and leading up to the raid. Instead, Squad 15 had a criminal and financial motive to encourage and participate in execution of the false warrants. Specifically, because Squad 15 almost always carried out the searches after-hours and subject to additional overtime pay, the members of Squad 15 financially benefitted from these fraudulent warrants and unconstitutional searches. In addition, multiple members of Squad 15 – in particular, Goines, Reyna, Bryant, Gonzales, and Wood – have all been charged with either tampering with evidence or other crimes related to tampering with evidence.

89.     Defendant Bryant admitted that he lied to investigators and lied in his supplemental report when he said he was with Goines at the "buy" on January 27, 2019. In fact, there was no such buy and Bryant knew it. Therefore, Bryant obviously knew during the tactical plan meeting and during the raid itself that there was no probable cause for the police to be there, to search the home, to seize Tuttle and Nicholas, or to use any force, especially excessive or deadly force. Even so, Bryant deliberately, callously, and recklessly executed the phony warrant, used excessive force, and proximately caused Dennis' injuries and death.

90.     Defendant Lt. Todd learned about Ms. Garcia's initial call to HPD from her girlfriend, officer Blankenship Reeves. Officer Blankenship-Reeves communicated to Lt. Todd that she and officer Morales observed no criminal activity at 7815 Harding Street

while responding to the address and investigating the call, and that she had researched the occupants of the home, which would have revealed that Tuttle and Nicholas were not drug dealers. Therefore, Lt. Todd knew that there was no cause, much less probable cause, to continue any investigation at 7815 Harding Street. Even so, Lt. Todd assigned Goines the task of going after Tuttle and Nicholas. Lt. Todd had assigned cases to Goines before and was familiar with Goines' pattern of illegal and unconstitutional conduct as described in this Complaint. Lt. Todd's conduct violated Dennis' constitutional rights and led directly to Goines conduct and his fabrication of the entire story, including the affidavit used for the warrant. In addition, Lt. Todd was Goines' superior in HPD. In assigning this case to Goines, she acted in a supervisory role and is also liable for her failure to supervise Goines and prevent this tragedy.

91.    Defendant Lt. Gonzales was a supervisor and therefore knew about the planned raid at 7815 Harding Street.  Lt. Gonzales knew that Goines did not investigate narcotics activity at 7815 Harding Street for two weeks as stated in the affidavit because he supervised Goines during those two weeks and knew he had not done so.  For the same reason, Lt. Gonzales knew that Goines was not anywhere near Harding Street on January 27, 2019 as stated in Goines' false affidavit.  Lt. Gonzales not only knew about Goines' pattern of illegal and unconstitutional conduct as described in this Complaint, but he also participated personally in such conduct for which Lt. Gonzales now faces criminal charges. Specifically, Lt. Gonzales knew that Goines routinely misused informants and payments to informants.  Between 2016 and 2018, Lt. Gonzales repeatedly misapplied government

property by allowing Goines to pay informants improperly and to use information improperly obtained to support illegal warrants. Lt. Gonzales knew that Goines routinely lied to obtain no-knock warrants, thus violating the constitutional rights of the targets of those warrants, including Tuttle and Nicholas. Lt. Gonzales is liable for his failure to supervise Goines, his failure to stop this raid before it happened, and his failure to prevent this tragedy.

## H. **The City's official policies further encouraged unreasonable searches and excessive force, and the city was deliberately indifferent to the "known or obvious consequences" that constitutional violations would result**

92.     HPD's written policies – particularly policies related to warrants and use of CIs – further encouraged and assisted Squad 15 to engage in its improper searches. HPD had created and mandated Standard Operating Procedures regarding warrant preparation, warrant service, and CIs, as part of Narcotics Division SOPs 100/2.03, 200/1.01, 200/1.02, 200/2.05, 200/1.12, 200/1.15, 200/1.22 and 200/1/35. Through these written policies, the city was deliberately indifferent to the "known or obvious consequences," namely that Squad 15 obtained illegal search warrants through perjury and the improper use of confidential informants. And as a result, Goines and Squad 15 knew that their practice of fraudulently and falsely obtaining illegal search warrants would be met with the approval of city policymakers, including the Chief of Police, based on their failure to discipline, supervise, investigate, or scrutinize this practice.

93.     As part of its written Standard Operating Procedures for narcotics, the City (1) failed to require any supervisory limits on no-knock warrants; (2) failed to supervise the

execution of warrants, in particular HPD did not require Lieutenants or others in the chain of command to supervise the execution of warrants; (3) failed to supervise tactical plans for search warrants, raids, and no-knock warrants, in particular by not requiring review by the chain of command, including the division commander; (4) allowed Squad 15, and other units, to obtain no-knock warrants from municipal courts; (5) failed to mandate body cameras as part of search warrant execution; (6) failed to mandate background checks and criminal history for CIs, (7) failed to require the documentation of all communication between officers and CIs; and (8) failed to mandate any audits or evaluation of officers who utilize CIs.

94. Examples of said SOPs include:

- SOP 200/1.02 on Activity Authorization and Notification, which allowed execution of warrants involving forced entry without the presence of the case agent's supervisor. Goines' supervisor was not present during the Harding Street raid.

- SOP 200/1.05 on Narcotics Operational Plan, which allowed execution of warrants by narcotics officers without requiring them to wear and use body-worn cameras.

- SOP 200/1.12 on Search warrants/Buy Busts and Open Air Investigations, which allowed narcotics officers to execute search warrants without supervisory review of the investigative efforts which support the search warrant affidavit. This SOP also allowed HPD narcotics entry teams to make entry without requiring them to wear and use body-worn cameras.

- SOP 200/1.22 on Handling Confidential Informants, which lacked sufficient supervisory oversight of investigations involving CIs and supervisory verification of the veracity of CI information leading to the issuance of a warrant. This SOP also allowed insufficient documentation of all communications with CIs, including personnel present for any meeting and the purpose of the communication. This SOP also allowed narcotics case agents like Goines to use CIs without regular supervisory oversight to ensure correct utilization of

informants and compliance with all policies and procedures.

95.     Based on these policies, HPD officers, and in particular Squad 15, knew that when they obtained illegal search warrants and executed illegal searches based on false statements, their conduct would be approved by the final policymakers of the City of Houston. Therefore, these longstanding practices and customs have become so persistent and widespread, that this process fairly represents HPD's policy regarding illegal searches.

96.     At all times relevant to the subject matter of this Complaint, the City of Houston and Chief Acevedo, and prior chiefs of police were responsible for the oversight, supervision, discipline, and training of HPD officers, including Squad 15. Despite this clear systemic failure, HPD never reviewed, evaluated, disciplined, or audited Squad 15 or the Narcotics division, during this period.  Far from it, the City repeatedly praised Goines in his evaluations and reviews.  As explained by Goines's lawyer during his detainment hearing –

> The third exhibit, is a collection of approximately ten years' worth of bi-annual evaluations of Mr. Goines by the Houston Police Department where he has been employed for approximately 34 years. . . . As the Court can see, they're all excellent. But, beyond the excellent reviews, the supervisors who are employees of the Houston Police Department have provided, in addition, in each of these evaluations, comments about Mr. Goines' reputation in the community, among other officers, and his ability to do his job and follow instructions. . . .

Directly on point, the City praised Goines for "utiliz[ing] confidential informants to a positive end."

97.     Similarly, HPDs final policymakers also failed to supervise, train, discipline, monitor, and audit the Narcotics unit, including Squad 15. Prior to the events in this case,

HPD last audited the Narcotics unit in 2000, over 20 years ago. Even worse, HPD encouraged and fostered this pattern of illegal conduct because HPD rarely transferred officers into or out of the Narcotics unit. Rather, as confirmed by the Houston Chronicle, seventy-one officers have spent ten years or more in narcotics, and thirty-one officers have worked in the division for twenty years or more. This is particularly troubling because basic police standards and practice mandate routine rotations and transfers for narcotics officers. In other words, the Narcotics officers, including Goines and Squad 15, knew that the City had a policy and custom of allowing and authorizing unreasonable searches based on fraudulent affidavits and improper use of confidential informants. And because these officers worked under this custom and policy for long periods, Goines and Squad 15's violations continued to intensify, leading up to the deadly Harding Street assault.

## I.  **The Fake 911 call**

98.     In early January 2019, Patricia Garcia – a neighbor of Tuttle and Nicholas – initiated false 911 calls regarding Tuttle and Nicholas. As part of her bogus reports, Garcia claimed that her daughter was at 7815 Harding, doing "crack and heroin" with "Reggie." Garcia also falsely stated that the owners had a "machine gun."

99.     In response, HPD dispatched Officer R. Morales and Nichole Blankinship-Reeves. As part of their review, Morales and Blankinship-Reeves identified no criminal conduct at the residence. Morales and Blankinship-Reeves spoke with Garcia who again pushed the officers to enter the house. Ultimately, the officers each researched the house but took no further action. Blankinship-Reeves documented her notes regarding the 911 calls on a

notepad and passed that information to her significant other, Narcotics Division Lieutenant, Marsha Todd. Todd then relayed the information to Gerald Goines on January 11, 2019.

## J.   At the direct suggestion of Lt. Marsha Todd, Goines targets Tuttle and Nicholas

100.    Following his consistent pattern of lies and deceit, Goines began to take action to raid Ms. Nicholas and Mr. Tuttle's house.  Relying on the heroin from Napoleon Street, Goines appeared before Houston Municipal Judge Marcum and requested a "no knock" search warrant for 7815 Harding Street.

101.    Goines testified under oath that on January 27th (1) he personally saw the CI enter the Harding Street house, (2) he searched the CI prior to entering the house, and (3) he saw the CI return from the house with the drugs.  In contrast, the CI never visited 7815 Harding Street, much less bought heroin from Tuttle or any person at Harding Street. Similarly, Goines also falsely claimed that the CI had observed a handgun. This was false – the CI had never even been to Harding Street. Goines also falsely testified that he and officer "S. Bryant" identified and recognized the "brown powder substance" as heroin.  But again, this was also false.

102.    As a result of Goines's perjury, Municipal Judge Marcum signed the "no knock" search warrant on January 28, 2019, for 7815 Harding Street. Judge Marcum has since confirmed to the FBI that he relied on the truthfulness of Goines's affidavit – in particular that the CI had personally viewed a gun and heroin – in granting the warrant. In contrast, had Judge Marcum known that Goines statements were false, he would not have signed the warrant.

**K. January 28, 2019: The Murder of Rhogena Nicholas and Dennis Tuttle**

103.    Armed with his illegal warrant, Goines gathered Lt. Todd and Squad 15, including Gallegos, Sepolio, Salazar, Wood, Pardo, Medina, Reyna, Lovings, Ashraf, and Bryant. Goines then presented a tactical plan to assault 7815 Harding Street. During the plan, Squad 15 and Blankenship-Reeves discussed the CI, the homeowners' dog, and the potential of weapons.  Consistent with Goines and Squad 15's history of fraudulent search warrants and improper use of CIs, Squad 15 knew that the search warrant was bogus.  Specifically, this included Goines, Bryant, Gallegos, Sepolio, Salazar, Wood, Pardo, Medina, Reyna, Lovings, and Ashraf.  Squad 15 did not use body-worn cameras when they executed the no-knock search warrant.  At least six uniformed HPD officers were present for perimeter support.  At approximately 5:00 pm that afternoon, Squad 15 invaded the house and used a "MOBI" to breach the door. As the officers unlawfully entered, Squad 15 members escalated the assault by first firing their weapons and shooting Nicholas's dog.  The dog had not provoked the officers, and the officers did not have a reasonable belief that the dog was a threat. Although HPD's public narrative after the incident represented that the dog attacked the officer, the dog was shot approximately 20 feet away from the door where the officer made entry.  Put differently, at the time of the shooting, the dog was located approximately twenty feet from the officers making entry and thus could not have attacked any officer of Squad 15.

104.    Because HPD broke into her house, fired their weapons first, and killed her dog, Nicholas – unarmed and located on the west of the room – began screaming.  HPD then

filled the room with gunshots from handguns and assault style weapons.  They fired dozens

of rounds, including multiple rounds fired blindly through walls or windows.



105.    During the assault, Squad 15 members shot Nicholas three times, while she was

sitting on the couch and and/or while slumped onto the floor against the couch in the living

room.  Importantly, while located outside of the house in a position where he could not

have seen Ms. Nicholas, a Squad 15 member shot and killed Nicholas.




106.    Nicholas was unarmed and had not engaged in any force against the officers. The Squad 15 officer could not have reasonably believed that Nicholas posed any threat of serious harm. Even more so, the officer who fatally shot Nicholas certainly could not have believed that Nicholas posed any threat of serious harm because he could not see her at the time he shot blindly through the wall of the home.

107.    At the same time, Squad 15 shot Dennis Tuttle, while he approached the front door. In all, HPD shot Dennis at least nine times, more than half of which shots were fired from behind Dennis. At least one round pierced the bodies of both Tuttle and Nicholas. A squad 15 member, now identified as Gallegos, subsequently shot Tuttle multiple times in the back, possibly while he was lying on the floor. In addition, as a result of the shooting five members of Squad 15 suffered injuries. Specifically, Goines, Lovings, and Medina all received gunshot injuries. Wood and Reyna also suffered injuries during the attack. The question of friendly fire identified by the physical evidence, remains, at least so far, unanswered.

108.    Dennis and Rhogena died from their gunshot wounds lying in pools of blood within a few feet of each other on their living room floor. They were confirmed deceased at the scene by Dr. Schultz at 5:15 p.m. on January 28, 2019. Dr. Maryanne Beynon of the Harris County Institute of Forensic Sciences ruled Tuttle and Nicholas's deaths as homicides from multiple gunshot wounds.

109.    Following the fatal attack, the cell phone video taken by a neighbor revealed two lone gunshots approximately thirty minutes after the assault ended.  Minutes after the two

46

gunshots, Narcotics Squad 15 members repeatedly stated "[b]oth suspects [were] down". Almost another hour later, police on the scene began "negotiating" with the Harding Street home.

110.   HPD officers and other investigators examined and searched the property at 7815 Harding Street after the shooting. They found no heroin. They found no semi-automatic handgun. No heroin was found in Dennis or Reggie on autopsy.

**L.   To justify its conduct, HPD attempts to cover-up the unlawful raid and excessive force**

111.   In the immediate aftermath of the attack, the City of Houston, including Chief Acevedo, and the Houston Police Officer's Union publicly presented a false story of heroic police efforts. Specifically, Acevedo exclaimed that HPD "heroically made the entry" and he "was really proud of them." Strikingly, Acevedo glorified Goines in particular, proclaiming that he was a big, strong teddy bear who is tough as nails. Acevedo further stated that "[t]he only thing bigger than his body, in terms of his stature, is his courage," and "God had to give him that big body to be able to contain his courage because the man's got some tremendous courage."

112.   Houston Police Officers' Union President, Joe Gamaldi, publicly labeled Nicholas and Tuttle as "dirtbags" and threatened to "keep[] track" of and "hold [people] accountable every time you stir the pot on our police officers."

> We are sick and tired of having dirtbags trying to take our lives when all we`re trying to do is protect this community and protect our families. . .  If you're the ones that are out there spreading the rhetoric that police officers are the enemy, just know we've all got your number now, **we're going to be keeping track of all of y'all**, and we're going to make sure that we hold you

accountable every time you stir the pot on our police officers. We've had enough, folks. We're out there doing our jobs every day, putting our lives on the line for our families.

For days following the attack, this false narrative reverberated in the local and national media.  Story after story, the City and the Union publicly disparaged Nicholas and Tuttle, while praising Goines and Squad 15. Despite the mountains of contrary evidence available, Gamaldi has never retracted the false statements he made about Tuttle and Nicholas, much less retracted his praise of the accused felons and murderers within Squad 15.

113.   In addition, Chief Acevedo, who was at Harding Street scene during some of the pivotal events, including the two shots fired long after the initial entry of the home, was in a position to correct the public record, but has never done so. Indeed, months after the shooting, Acevedo publicly admitted that he "saw" serious "red flags," while he was on-scene during the shooting.

> I personally saw something, that, that I am not going to talk about here today I personally saw something that I'm not going to talk about here today. I was on that scene within fourteen minutes, fourteen minutes and thirty-two seconds, after the shots wrang out. I left the sixteenth floor of this headquarters. Went to that scene and started processing the visuals, start processing what I was seeing, started processing what I was feeling. And from within a matter of a couple of days we started seeing some red flags, because of the questions that we asked.[6]

Yet, Acevedo also has never explained why he stayed at the scene and did not immediately go to the hospital with his injured officers – a common practice when an officer suffers a serious injury. The Chief also declined to disclose the identity of the civilian with him at the scene.

---

[6] Defendant Art Acevedo, Press Conference, 8-23-2019; archived at https://youtu.be/OhMC2Y0vAeg

114.   By January 30, 2019, the City's false narrative began to unravel. Because he had not documented the name of the CI or followed the proper procedures for bagging and testing the alleged heroin, Officer Bryant approached Goines and requested that he identify the CI.  In response, Goines did not identify the Napoleon Street CI because he knew it would reveal that the CI actually obtained the heroin from Napoleon Street, not Harding Street, that Goines was in a sexual relationship with the CI, and Goines had committed perjury in requesting both the Napoleon Street and Harding Street warrants. Instead, Goines identified an unrelated, separate CI, who quickly denied that she had purchased drugs at 7815 Harding Street.

115.   Knowing that Goines had not legitimately obtained or submitted the heroin, Bryant went to Goines's car and located the heroin obtained at Napoleon Street. Bryant then wrote a false, supplemental report, in a last-ditch attempt to cover-up Squad 15's crimes. Specifically, Bryant documented the following:

> On 1/30/19 Officer Bryant was conduct[ing] a follow-up investigation to this case.  Officer Bryan assigned to squad #15 was involved in the incident at 7815 Harding on 01/28/19. Officer Bryant **had previously assisted Officer Goin[e]s in the investigation on 01/27/19.**  On the morning of 01/30/19[,] Officer Bryant went into Officer Goines['] vehicle to retrieve information in regards to this case. Officer Bryant observed a plastic bag that contained a white napkin and two small packets of a brown powdery substance (Heroin). Officer Bryant had identified the substance as heroin based on his training and experience. Officer Bryant **identified the substance as the narcotics purchased from 7815 Harding on 1/27/19**. Officer Bryant finished the tagging envelope and submission from and immediately took it to the lab for priority testing. Officer Bryan completed this supplement report on 01/30/19.

These statements were false because Goines and Bryant did not obtain the heroin from 7815 Harding Street.

49

116.    The following day, Lt. Todd approached Goines and provided him with a second opportunity to identify the CI. This time Goines identified the Napoleon Street CI. But when approached by HPD, the Napoleon Street CI confirmed that she had not purchased heroin at 7815 Harding Street and had never even been to that location.

117.    A week later, on February 7, 2019, HPD interviewed Bryant again. Contradicting his January 30th Supplemental Report, Bryant confirmed he was not actually present for the alleged purchase at 7815 Harding Street. Knowing that his conduct was criminal, Bryant then invoked his Fifth Amendment rights and declined further comment.

118.    Six days later, on February 13, 2019, Goines changed his testimony again and claimed he personally purchased the heroin at Harding Street. Goines wrote that he "screw[ed] up because [he] made a buy without the correct manpower out there" and "made the purchase by" himself.  Goines also confirmed that "Officer Bryant never observe[d] the narcotic which was purchase[d] from the residence." Rather, Goines "placed that statement in the affidavit." As part of the review by the department of justice, FBI Special Agent Brown confirmed that Goines lied again on February 13, 2019.

33
5     Q Special Agent Brown, the allegation by Gerald Goines on
6     February 13th, 2019, is that he's the one who bought the heroin
7     from 7815 Harding Street on January 27th, 2019, correct?
8     A Yes.
9      Q Has there been an investigation done as to determine the
10     truthfulness of that statement?
11     A Yes.
12     Q And what has that investigation shown?
13     A By looking at a number of things, including cell-site call
14     detail records, cell-site location, witness interviews, photo
15     evidence, video evidence, that he did not make a purchase on

16     January 27th, 2019, according to the evidence we have.
17      Q He was nowhere near Harding Street on January 27, 2019,
18     correct?
19     A He was not in the vicinity.

Goines, Bryant, and Squad 15 knowingly entered 7815 Harding Street based on a warrant

obtained via perjury.

## M. The Nicholas and Tuttle family hire an independent forensic expert

119.    In response to the serious, unanswered question regarding the attack, in April 2019,

the Nicholas and Tuttle Families retained Michael S. Maloney – an independent forensic

investigator.  As an internationally-recognized forensic scientist, Maloney has served as

Senior Agent and Forensic Consultant for the United States Naval Criminal Investigative

Service and Senior Instructor for Death Investigations at the Federal Law Enforcement

Training Center.

120.    As part of Maloney's initial review of the scene at 7815 Harding Street, the forensic

evidence made it clear that HPD had not even conducted a full ballistic recovery at the scene,

much less attempted to accurately investigate the City's story.  Instead, as part of its

investigation, HPD left significant forensic materials unrecovered, including bullet fragments,

teeth, clothing, and other forensic evidence.

121.    Working over four days, Maloney and his team conducted extensive scene

documentation for ballistics markings and reconstruction. Maloney, based on the full scene

examination, the materials recovered, lab testing, and analysis performed to date, determined

with a high degree of confidence that:

- Rhogena Nicholas was shot while sitting on the couch and then possibly while slumped onto the floor against the couch in the living room. Rhogena Nicholas was fatally struck by a bullet from a weapon fired outside the Harding Street Home by a person shooting from a position where the shooter could not have seen Ms. Nicholas at the time she was fatally shot. This is contrary to initial and continued police reporting that she was actively engaged in attempting to wrestle a weapon away from an injured police officer at the time of her demise.

- Dennis Tuttle was initially shot while approaching his front door. He was subsequently shot multiple times in the back and possibly while lying on the floor. This is contrary to initial and continued police reporting that he was actively engaged in a gun battle with the police when he was shot.

- A dog was shot upon the police entry to the home. It was reported the dog was charging/lunging at the police at the time it was shot. This is contrary to scene findings where the dog appears to have been shot at the threshold between the living room and dining room and approximately 20 feet from the officer making entry.

- An unidentified person held a weapon against the inner dining room wall and fired 2 shots into the inner dining room wall towards the kitchen (or within 2-3 inches of the inner dining room wall, as confirmed by lab testing of swab samples, approximately 21 feet from the front door and 14 feet from where Dennis Tuttle was recovered).

Based on Maloney's reconstruction there is no doubt – HPD's narrative was completely false.

122.    HPD has not released, and in fact has thwarted the victims' families repeated lawful attempts to obtain, any ballistics or medical evidence to substantiate the City's public claim or to refute the more likely fact that the officers were hit by friendly fire in the chaos.

**N.  The HPD's audit identifies serious deficiencies with Squad 15**

123.    In February 2019, Acevedo "ordered an investigative audit of the Narcotics Division General Enforcement Squads to determine if policies and procedures were adhered to, during a warrant service at 7815 Harding St." Notably, the audit concluded that "case agents did not follow policies related to warrant services, operations planning, and handling of confidential informants."

52

124.     In addition, the audit recommended that the City amend the Narcotics division SOPs as follows: (1) limit no-knock warrants and require approval by the Chief of Police; (2) require Lieutenants to supervise the execution of warrants; (3) require the division commander to approve tactical plans for search warrants;  (4) require officers obtain warrants from Harris County courts; (5) mandate body camera as part of search warrant execution; (6) mandate background checks and criminal history for CIs, (7) require the documentation of all communication between officers and CIs; and (8) mandate any audits or evaluation of officers who utilize CIs.

125.     In addition, the audit further found that Goines (1) failed to tag drugs before the end of a shift in 48% of his cases; (2) had missing case review sheets in 29% percent of his cases; (3) had expense discrepancies in 27% of his cases; and (4) had tracking errors in 23% of cases. Similarly, the audit also found that Bryant (1) had missing case review sheets in 31% of cases, (2) failed to turn in case files in 18% of cases; (3) made late case tracking entries in 16% of cases; and (4) had errors in the thoroughness of investigation in 10% of cases.

O.  **Harris County charges Goines with murder, and Squad 15 is hit with a slew of State and Federal charges**

126.     On August 23, 2019, the Harris County District Attorney's office charged Goines with felony murder and tampering with a governmental document. Specifically, Goines committed perjury in obtaining the search warrant related to 7815 Harding Street, and as a result of that felony, Nicholas and Tuttle died. The DA further charged Bryant with tampering with a government document – namely his false supplement report from January

30, 2019.

127.    Months later, on November 20, 2019, a federal grand jury charged Goines and Bryant with civil rights violations, falsifying records, and lying about use of confidential informants. In addition, Department of Justice also charged Patricia Garcia for conveying false information to the police in the bogus 911 call.  Garcia has since pled guilty.

128.    On July 1, 2020, the Harris County District Attorney's Office additionally charged Goines with unlawfully obtaining and using search warrants on October 15, 2017, April 24, 2018, and November 28, 2018. Goines was charged with obtaining search warrants through perjury and false statements.  The DA also charged Goines with theft by a public servant.

129.    In addition to Goines, the DA also charged Lt. Robert Gonzales the lieutenant in charge of Squad 15, with misapplication of fiduciary property. The DA alleged that Gonzales "repeatedly fail[ed] to verify and authorize the payment of Houston Police Department Funds to confidential informants prior to Houston Police Department Narcotics officers releasing said funds to said confidential informants" in violation of HPD policy.

130.    Finally, the DA charged Bryant, Reyna, Wood, and Armstrong, as follows:

- Bryant: Two charges of tampering with confidential informant forms which contain details of money allegedly given to informants for services or buying drugs, and one charge of theft by a public servant;

-  Reyna: Three charges of tampering with confidential informant forms and theft by a public servant;

- Wood: one charge of tampering with a confidential informant form and theft by a public servant;

54

- Armstrong: One charge of tampering with an offense report.

131.    On January 25, 2021, the Harris County District Attorney's Office, through an indictment by the Harris County Grand Jury, additionally charged five other members of Squad 15, including Gallegos, Lovings, Ashraf, Pardo, Medina, and Maxwell. The District Attorney charged Gallegos with first-degree murder of Tuttle. The District Attorney also charged the other officers:

- Pardo: One charge of tampering with a governmental record and engaging in organized criminal activity, aggregate theft by a public servant.
- Lovings: One charge of tampering with a governmental record and engaging in organized criminal activity, aggregate theft by a public servant.
- Ashraf: One charge of tampering with a governmental record and engaging in organized criminal activity, aggregate theft by a public servant.
- Medina: One charge of tampering with a governmental record and engaging in organized criminal activity, aggregate theft by a public servant.
- Maxwell: One charge of tampering with a governmental record and engaging in organized criminal activity, aggregate theft by a public servant.

132.    As a result of this conduct, the District Attorney's office reviewed thousands of cases involving Squad 15. In all, the District Attorney's office has determined that approximately 150 cases should be dismissed based on Goines's involvement. Harris County concluded that every conviction "in which Goines was the major player, for the past 11 years, needs to be flipped."

**P.  Even after the City identified misconduct, Chief Acevedo continued to ratify the custom and practice of obtaining fraudulent warrants and use excessive force**

133.    In the aftermath of the arrests and mountain of evidence against Squad 15, Chief Acevedo finally recognized the culpability of Bryant and Goines.  However, Chief

Acevedo has continued to approve and ratify the conduct of the other Squad 15 members during the raid, including the use of excessive force in killing Nicholas.

134.    Acevedo continued to ratify and approve of the violations of Nicholas and Tuttle's Fourth and Fourteenth Amendment rights to be free from unreasonable searches.  In July 2019, Acevedo publicly stated that HPD "had probable cause to be there, but probable cause, right, we didn't need to lie. We could have done this right, and that's what - **the facts are going to come out**." Acevedo, however, has declined to explain the "probable cause to be there."   Acevedo has completely ignored the law enforcement canvas of the neighborhood that concluded that Nicholas and Tuttle were not drug-dealers. Likewise, the Napoleon CI has testified that she had purchased the heroin at Napoleon Street. Although there is no evidence to justify probable cause for the search, Acevedo – as a final policymaker for HPD – has given his approval for the raid based on "probable cause" supported by unstated facts.

135.    Similarly, Acevedo also ratified the use of excessive deadly force by the Squad 15 officers, including the officer that fatally shot Nicholas by recklessly firing his weapon without being able to see what he what he was shooting at. In July 2019, Acevedo stated that the "officers that went in there and acted on behalf of this community after a complaint came in of activities in that house. I still think they're heroes, and they are heroes." Acevedo further added, "[b]ut I'm telling you right now, I stand  . . .  with the members of Squad 15. I consider them victims, and I think everyone up here that knows most of the just about every fact, a lot of the facts in this case considers them as victims."  Again, because the

officers engaged in excessive force in killing Nicholas, Acevedo – as the final policymaker for HPD – has ratified this use of excessive force. During this same time period, both Mayor Turner and Chief Acevedo have positioned themselves in news media reports in 2019 and 2020 as national experts on policing reform.

**Q.** **The City continues to hides the truth from the grieving families**

136.    In July 2019, the estate and surviving family members of the Nicholas and Tuttle family initiated a petition for pre-suit discovery under Texas Rule of Civil Procedure 202 in Harris County, Probate Court.  In response, the City hurled frivolous objection after objection to hide its misconduct prior to the filing of this lawsuit.  First, the City initially objected to jurisdiction in Harris County Probate Court. The Court overruled the City's objection. After an interlocutory appeal and automatic stay, the Fourteenth Court of Appeals in Houston also rejected this argument and issued its opinion *In the Estate of Nicholas*, 2020 Tex. App. LEXIS 2532, 2020 WL 1469519 (Tex. App.—Houston [14th Dist.] March 26, 2020, pet. denied). The City then filed a request for review to the Texas Supreme Court, which the Court denied.  In order to further stall the proceeding, the City filed a motion for rehearing. The Court again denied that motion.

137.    After these motions were repeatedly rejected, the state probate court set the Rule 202 petition for hearing for a fourth time, in December 2020**.**  The City waited to file a notice of removal to federal court less than twenty-four hours before the hearing and eighteen months after the initial filing of the Texas pre-suit proceeding. The Nicholas and Tuttle families then filed an emergency motion to remand, which the Southern District of

Texas granted on January 8, 2021.  The City then filed a baseless notice of appeal in order to avoid the Rule 202 entirely.  Because the City has effectively delayed the 202 proceeding to the two-year anniversary of the claim, the Nicholas family has been forced to file this lawsuit.

**R.   HPD's customs, policies, and/or practices within the HPD caused the violations of Plaintiff's constitutional rights.**

138.   HPD and the individual Defendants' conduct toward Nicholas occurred because of HPD's custom, policy, and practice of unlawful conduct, including, but not limited to: (1) using excessive force in its law enforcement practices; (2) unlawfully obtaining search warrants, based on perjurious statements by officers; (3) failing to intervene to prevent known unlawful conduct; (4) conspiring to deprive citizens of their constitutional rights, including by unlawfully obtaining search warrants, based on perjurious statements by officers; (5) failing to discipline officers, or even find the officers engaged in wrongdoing, in the face of obvious constitutional violations; and (6) failing to adequately train and supervise HPD officers, and in particular Squad 15.

139.   As explained above, HPD, through the actual or constructive knowledge of its final policymakers, has a longstanding, widespread, and deliberately indifferent custom, habit, practice, and/or policy of condoning and ratifying use of excessive force. As a result, it has become customary among HPD police officers to use unjustified and excessive force because HPD has communicated to HPD officers that such force and searches are authorized and, indeed, expected. Additionally, the supervisory and municipal apparatus of the City will then defend and cover up acts of unjustified and excessive force.

58

140.    HPD, through the knowledge or constructive knowledge of its final policymakers, further maintains a longstanding, widespread, and deliberately indifferent custom, habit, practice, and policy of encouraging or tolerating law enforcement officers conducting unlawful searches and obtaining unlawful search warrants based on knowingly false statements made by officers, as well as failing to supervise and train HPD officers in the rights of individuals to be free from such illegal searches. This custom, policy, and/or practice has led to HPD officers, on a regular basis, obtaining unlawful search warrants based on perjury.

141.    The City and its policymakers knew or had constructive knowledge that its officers used excessive and unnecessary force and unlawfully obtained search warrants based on perjury. In light of this knowledge, the City of Houston could have and should have pursued reasonable methods for training and supervising HPD officers, including Squad 15. Moreover, HPD persistently failed to meaningfully investigate and discipline HPD officers, including officers within Squad 15, for their similar uses of excessive force and illegal searches. Based on its repeated failure to find wrongdoing when addressing similar situations to this incident, the City has made it clear – HPD had a custom, policy, and/or practice of encouraging, tolerating, and/or ratifying blatantly illegal and improper conduct. HPD's deliberate and conscious failure to correct prior constitutional violations based on similar conduct constituted an affirmative choice to ratify the conduct, and to send a clear message to its law enforcement officers that it approved of this misconduct.

## S.  The damages of the Nicholas family

142.    The Defendants' actions imposed substantial harm on Nicholas during the raid.

59

Nicholas endured physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, loss of consortium with her family and friends, and sense of security and individual dignity, and tragically the loss of her life.  Plaintiffs also seek loss of support, loss of inheritance, loss of earning capacity, and loss of household services.

143.    Defendants' conduct was the moving force and proximate cause of Nicholas's injuries and losses, including her death, the physical and mental pain and anguish she suffered before and during her death, the loss of her relationship and companionship with her family and friends, the deprivation of her constitutional rights, her loss of enjoyment of life, reputational harm caused by Defendants' false narrative and smear campaign of her character, and other compensatory and special damages including but not limited to her permanent lost earnings and earnings capacity and funeral expenses.

144.    As the mother of Nicholas, Plaintiff Jo Ann Nicholas, seeks past and future mental anguish that she suffered from the date of the incident in question to the time of trial and in the future beyond the time of trial, and loss of companionship/society/ comfort/love as a result of the death of her daughter.

145.    Plaintiffs also seek exemplary damages as authorized by law and attorney's fees.

**First Cause of Action: 42 U.S.C. § 1983 – Excessive Deadly Force in violation of the Fourth and Fourteenth Amendments against the individual Defendants, in their individual capacities**

146.    At all times relevant to the allegations in this Complaint, the individual Defendants acted under color of state law, and within the course and scope of their official duties and employment in their capacities as officers, sergeants, and lieutenants of the HPD.

147.    Under the Fourth and Fourteenth Amendments, Rhogena Nicholas had a clearly established constitutional right to be secure against unreasonable seizures through the use of excessive force.

148.    As described in the preceding paragraphs, the Squad 15 Defendants' actions toward Nicholas violated her clearly established constitutional rights, including those under the Fourth and Fourteenth Amendments of the United States Constitution. Any reasonable law enforcement officer would know or should have known of these clearly established rights at the time of her death.

149.    The misconduct described in this Count was objectively unreasonable and undertaken with willfulness and reckless indifference to the rights of others. In addition, the misconduct and excessive force described in this Count "shocks the conscience."  In particular, the Squad 15 members who fatally shot Nicholas, did so out of reckless indifference because he blindly shot into the house without an adequate line of sight or vision.  Due to the City's obstruction blocking any pre-suit discovery, Nicholas pleads in the alternative that each member of Squad 15 shot Nicholas.

150.    In addition, each individual defendant is also liable based on their failure to intervene to prevent Squad 15 from violating Nicholas's constitutional rights. Each Defendant knew that Goines had obtained the warrant via fraudulent statements, and each Defendant had an opportunity to intervene and stop the violation, during the tactical plan meeting and leading up to the raid. Any reasonable officer in their position would have known that it was unreasonable to use the amount, type, and duration of force used (or to

fail to intervene to attempt to prevent the use of such force).  Any reasonable officer in their position also would have known that to use the amount, type, and duration of force used (or to fail to intervene to prevent the use of such force) would violate Ms. Nicholas's clearly established constitutional rights.

151.   In addition, Lt. Todd and Lt. Gonzales possessed supervisory authority over Squad 15 before and during the raid. At all relevant times, Lt. Todd and Lt. Gonzales had a legal duty to adequately supervise Squad 15. Ignoring this duty, Lt. Todd and Lt. Gonzales failed to properly direct the conduct of their subordinates, failed to enforce proscriptions against the use of excessive force, and/or failed to intervene to stop their subordinates' excessive use of force despite actual or constructive knowledge that Squad 15 presented an excessive risk of harm to Nicholas.

152.   Defendants' excessive use of force or failure to intervene to prevent the excessive use of force caused Nicholas to be unlawfully seized and thereby caused her death. As a direct and proximate result of the violation of the constitutional rights by the Defendants, Plaintiffs suffered general and special damages as alleged in this Complaint and are entitled to relief under 42 U.S.C. §1983, 1988.

153.   Plaintiffs are entitled to exemplary damages because the individual Defendants' actions were motivated malice and/or involved reckless or callous indifference to Nicholas's federally protected rights, and engaged in these actions and omissions intentionally, willfully, and/or wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Nicholas's constitutionally protected rights.

**Second Cause of Action: 42 U.S.C. § 1983 – Unlawful search and seizure in violation of the Fourth and Fourteenth Amendments against the individual Defendants, in their individual capacities**

154.   At all times relevant to the allegations in this Complaint, the individual Defendants acted under color of state law, and within the course and scope of their official duties and employment in their capacities as officers, sergeants, and lieutenants of the HPD.

155.   Under the Fourth and Fourteenth Amendments, Nicholas had a clearly established constitutional right to be secure against unreasonable and unlawful searches.

156.   As described in the preceding paragraphs, the individual Defendants' actions toward Nicholas violated her clearly established constitutional rights, including those under the Fourth and Fourteenth Amendments of the United States Constitution. Any reasonable law enforcement officer knew or should have known of these clearly established rights at the time of Plaintiff's death.

157.   In the manner described in this Complaint, the Squad 15 Defendants, acting under color of law, violated Nicholas's constitutional rights, causing her damage. Specifically, Defendants illegally and unreasonably obtained a search warrant for 7815 Harding Street with the absence of probable cause or reasonable suspicion in violation of the Fourth Amendment of the United States Constitution.

158.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful and deliberate indifference to Nicholas's constitutional rights. Specifically, as described in this complaint, the search warrant contained deliberate falsehoods and without that dishonesty included, the judge would not

have issued the warrant. In addition, each Squad 15 member knew that search warrant was

unreasonable and not authorized prior to the attack on 7815 Harding Street.

159.    Defendants are also liable based on their failure to intervene to prevent Squad 15

from violating Nicholas's constitutional rights. Each Defendant knew that Goines had

obtained the warrant via fraudulent statements, and each Defendant had an opportunity to

intervene and stop the violation during the tactical plan meeting and leading up to the raid.

160.    In addition, Defendants had a long-standing agreement and plan to obtain illegal

search warrants, via perjury and through misuse of confidential informants.  Specifically,

as part of this agreement, Squad 15, Lt. Todd, and Lt. Gonzales, agreed and knew that

member of Squad 15, including Goines, would obtain illegal search warrants in violation

of the Fourth and Fourteenth Amendments.  Each members of the conspiracy agreed to the

plan and intended to further its purpose.  In addition, Squad 15 also financially profited

from the illegal raids because each member billed thousands of dollars each year in

overtime in executing the illegal raids. As a result of this scheme, Defendants violated

Nicholas's constitutional rights.

161.    In addition, Lt. Todd and Lt. Gonzales possessed supervisory authority over Squad

15. At all relevant times, Lt. Todd and Lt. Gonzales had a legal duty to adequately supervise

Squad 15. Ignoring this duty, Lt. Todd and Lt. Gonzales failed to properly direct the

conduct of their subordinates, failing to enforce proscriptions against the use of illegal

searches, or failing to intervene to stop their subordinates' use of illegal searches despite

actual or constructive knowledge that Squad 15 presented an excessive risk of harm to Nicholas.

162. Defendants' unreasonable and unlawful search or failure to intervene to prevent the unlawful search caused Nicholas to be unlawfully searched and seized and thereby caused her death. As a direct and proximate result of the violation of her constitutional rights by Defendants, Nicholas suffered general and special damages as alleged in this Complaint and is entitled to relief under 42 U.S.C. §1983, 1988.

163. Plaintiffs are entitled to exemplary damages because the individual Defendants' actions were motivated by malice and/or involved reckless or callous indifference to Nicholas's federally protected rights, and they engaged in these actions and omissions intentionally, willfully, or wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Nicholas's constitutionally protected rights.

**Third Cause of Action: 42 U.S.C. § 1983 – Municipal liability for a policy, custom usage, or ratification against the City of Houston and Chief Acevedo, in his official capacity**

164. In carrying out the misconduct in Counts One and Two, Defendants took their action based on the policy, practice, and usage of the City of Houston, such that Defendant City of Houston is also liable.

165. As a matter of both policy and practice, the City of Houston, through its final policymakers, including the chiefs of police, encourages, and is thereby the moving force behind, the very type of misconduct at issue in Counts 1 and 2 by failing to adequately supervise, control and discipline its officers such that its failure to do so manifests

65

deliberate indifference.

166.    As a matter of policy, custom, and practice, the City of Houston facilitates the very type of misconduct at issue in Counts 1 and 2 by failing to adequately investigate, punish, and discipline prior instances of similar misconduct, thereby leading Houston police officers to believe their actions will never be meaningfully scrutinized. In that way, the City of Houston directly encourages future uses of excessive deadly force, unlawful searches, and failures to intervene, such as those alleged in this lawsuit.

167.    Generally, as a matter of widespread practice so prevalent as to constitute municipal policy, HPD officers violate the constitutional rights of individuals in a manner similar to that alleged by Nicholas in Counts One and Two on a regular basis.  Nevertheless, the City of Houston only investigates officer misconduct and makes findings of wrongdoing in a disproportionately small number of cases.

168.    It was the custom, practice, or usage of HPD to (1) authorize excessive force against unarmed civilians, (2) authorize excessive force during no-knock raids, (3) authorize unnecessary escalation of deadly force, when encountering animals, and (4) authorize warrants based on perjury.

169.    In addition, prior to and following the raid at 7815 Harding Street on January 28, 2019, Chief Acevedo, as a final policy maker of the City of Houston, ratified both the unreasonable search and the excessive deadly force utilized by Squad 15 because he (1) failed to supervise, reprimand, or take action regarding the violations prior to the raid and (2) he approved and ratified the raid, including the existence of probable cause, after the

raid occurred.   Chief Acevedo in ratifying these acts, approved of obvious violations of clearly established law.

170.   Under Section 34-22 and 34-23 of the Houston City Ordinance, the Chief of Police, is one of the final policy makers for HPD.  In July 2019 Acevedo publicly stated that HPD "had probable cause to be there, but probable cause, right, we didn't need to lie. We could have done this right, and that's what - the **facts are going to come out.**"  Similarly, in July 2019, Acevedo also stated that the "officers that went in there and acted on behalf of this community after a complaint came in of activities in that house. I still think they're heroes, and they are heroes."  Acevedo further added, "[b]ut I'm telling you right now, I stand with the - with the members of Squad 15.  I consider them victims, and I think everyone up here that knows most of the - just about every fact - a lot of the facts in this case considers them as victims."  Based on these, and other, public statements regarding the shooting, Chief Acevedo ratified both Squad 15's decision to engage in the unlawful search and use of excessive force, and the basis for it.  Indeed, Chief Acevedo's decision triggering this ratification was the product of a conscious, affirmative choice to ratify the unconstitutional conduct in question.

171.   The Chief of Police, who was the final policy maker, also reviewed Squad 15's conduct after the Harding Street shooting and subsequently ratified the conduct of each member. Importantly, the Chief of Police ratified the conduct of every single member -- not only Bryant and Goines.

172.   Because Acevedo's approval and ratification of these clear violations was consistent

with the HPD policy to refuse to enforce any disciplinary measures and ratification of similar conduct, his ratification was also the moving force behind, the very type of misconduct at issue in Counts 1 and 2.

173.    Similarly, the City's past ratification and toleration of similar illegal conduct, caused and was the moving force behind the Defendant officers' use of excessive force and unlawful search against Nicholas.

174.    As a result of the City of Houston's policies and practices, and the unjustified and unreasonable conduct of Defendants, Plaintiffs have suffered the injuries identified in this complaint, including severe emotional distress, pain, and ultimately death.

### Fourth Cause of Action:  42 U.S.C. § 1983 – Municipal liability for failure to train, supervise, and discipline, and failure to create policies mandating training, supervision, and discipline against the City of Houston and Chief Acevedo, in his official capacity

175.    In carrying out the misconduct in Counts One and Two, the City of Houston failed to train, supervise, and discipline officers within the Narcotics Division, including Squad 15 as follows:

- HPD and the Chief of Police, failed to train, supervise, and discipline, as well as failed to create policies mandating training, supervision, and discipline of the narcotics unit related to excessive force during no-knock warrants, including failing to mandate de-escalation training after an officer-involved shooting, the use of non-lethal force against animals during a no-knock raid, and the proper handling animals (and their owners) during no-knock warrants;

- HPD and the Chief of Police failed to train, supervise, and discipline as well as failed to create policies mandating training, supervision, and discipline of the narcotics unit regarding the risks and danger of excessively utilizing no-knock warrants compared to knock and announce warrants, the necessity for individual analysis of each narcotic case, including during the tactical plan meeting and surveillance leading up to the raid;

68

- HPD and the Chief of Police failed to train, supervise, and discipline as well as failed to create policies mandating training, supervision, and discipline for HPD officers regarding their pattern and use of excessive force against unarmed civilians;

- HPD and the Chief of Police failed to supervise and discipline as well as failed to create policies mandating training, supervision, and discipline of HPD narcotics officers regarding the use of excessive force during no-knock warrants;

- HPD and the Chief of Police failed to supervise and discipline, as well as create policies mandating supervision and discipline of narcotics officers regarding their improper use of confidential informants, and pattern and obtaining fraudulent warrants; and

Plaintiffs address each of these claims separately below.

### HPD's Failure to train, supervise, and discipline, as well as promulgate adequate policies mandating training, supervision, and discipline, regarding the use of excessive force during no-knock warrant raids

176.   HPD and the Chief of Police failed to train, supervise, and discipline the narcotics unit, as well as failed to create policies mandating training, supervision, and discipline of the narcotics unit related to excessive force during no-knock warrants.  First, Defendants should have mandated training for de-escalation techniques after any officer involved shooting, including after a no-knock raid shooting. HPD should have passed the following policy prior to the Harding Street raid:

> As part of the post-critical incident review process, the division commander is responsible for consulting with the Training Division after the employee's critical incident. The Training Division shall review the employee's critical incident to identify any remedial training, if needed. This training does not indicate fault on the employee, nor will it be used against the employee in any departmental investigation. Any training serves to address possible training issues as exhibited and identified in that specific critical incident (e.g., officer safety, de-escalation, tactical considerations, scene management). If the incident involves a discharge of a firearm that causes death or serious injury to another person, the employee shall attend a one-day training session with the Training Division's Patrol Tactics Unit.

Prior to this incident, it did not.  Rather, HPD only passed this policy in the wake of Plaintiffs' deaths.  Similarly, HPD should have created policies and trained, supervised, and disciplined its officers regarding de-escalation techniques as follows:

> Whenever practical, officers shall use de-escalation techniques to gain voluntary compliance and to seek to avoid or minimize use of physical force. When safe and feasible, officers shall attempt to slow down or stabilize the situation so that more time, options, and resources are available. Time, distance, numbers, cover, and concealment are key elements to reduce the severity and risk associated with scene management, de-escalation, and response to resistance.

Again, they did not. Instead, only after the murders of Nicholas and Tuttle, the City and the Chief of Police, mandated this precise type of training and supervision in General Order 200-04 and 600-17.  Likewise, HPD should have mandated this training (and applied this policy) for officers carrying out no-knock warrants.

177.   Furthermore, the City and Chief of Police also failed to train narcotics officers regarding other important safety techniques during no-knock raids, including using non-lethal force on animals. This is particularly important because firing a weapon at an animal can unreasonably and unnecessarily escalate the conflict.  Specifically, in General Order 600-43, HPD authorized officers "to use any response necessary up to and including deadly force to stop the animal," if "any person is attacked by an animal or is in imminent danger of being attacked by an animal." However, in General Order 600-17, HPD excludes shooting an animal from a mandatory reportable force incident.  Instead, under General Order 200-16, HPD treats the shooting of an animal, including the death of the animal, akin to an accidental discharge of a weapon without any injury.  As a result, HPD only mandates

a supervisory review of the shooting of an animal, as opposed to an IAD investigation.  In effect, HPD has authorized officers to shoot and kill animals, with little to no oversight or supervision.

178.   Not surprisingly, from 2007-2017, HPD Officers shot and killed 332 animals. In every single case, HPD determined that the shooting was justified. Put differently, it was the common practice and pattern of officers to shoot animals, knowing that they would face no discipline or punishment for those shootings.   Rather, HPD policies actually encouraged this behavior.

179.   The City of Houston completely failed to properly train officers regarding the use of force, including lethal force, in incidents involving dogs. Specifically, the City did not train its officers in utilizing non-lethal force against dogs, including specialized tactics, chemical agents, repellants, dog behavior and tactic, and scenario-based dog-exercises.  As a result, HPD officers repeatedly initiated lethal force, which either (1) harmed a by-stander or (2) caused an unnecessary initiation of force with a homeowner during a search warrant. Indeed, this training should further be coupled with de-escalation tactics for pet-owners or homeowner, particularly when handling no-knock search warrants.  Instead, HPD created a strategy of initiating lethal force against dogs, knowing that their actions would be approved by the City regardless of the circumstances.

180.   In addition, the City, through the chiefs of police failed to train because:

- HPD should have mandated that only SWAT or a Narcotics trained SWAT team, carry out no-knock raids;

- HPD should have mandated that SWAT independently investigate, surveil, and create an appropriate tactical plan for no-knock raids;

- HPD should have mandated that the Chief of Police review each request for a no-knock warrant;

- HPD should have mandated the use body-worn cameras and ballistic shields during no-knock raids;

- HPD should have mandated non-lethal force when approached by dangerous animals, including dogs, during no-knock raids;

- HPD should have mandated de-escalation training for members of raids after any officer involved shooting; and

- HPD should have mandated supervisors, including lieutenants, be present during no-knock raids.

181.   Instead of following these important procedures, HPD created a wide-spread custom and unwritten policy of encouraging excessive force during no-knock narcotic raids. In particular, between 2009-2018, HPD officers were involved in at least nine cases where officers discharged their weapons during no-knock raids for narcotic warrants within the city of Houston.  Of those nine shootings, HPD officers wounded or killed civilians in eight of those cases.  Tellingly, Goines was the warrant officer for four of the nine shooting warrants.  As described above, these shootings included 9338 E. Ave. O; 4211 Sherwood; 44 Farrell Street; 7610 Letcher Street; 7221 Weyburn; 8301 Allwood; 6725 Sherwood; 1628 Birchwood; 302 Alabonson; and 6807 Goforth Street.

182.    Consistent with this pattern, members of Squad 15 also engaged in excessive force in other contexts. For example, in 2013, a truck driver accused Gallegos of punching and putting him in a chokehold, while they searched for a burglary suspect. The City ultimately settled this lawsuit for $200,000.   Likewise, Gallegos (and Pardo) participated in the shooting of an unarmed homeowner in Bellaire on September 6, 2017.  Pardo and Gallegos, along with other officers, were involved in a car chase, that culminated at 4504 Sunburst Street.  As the car sped away and struck a fire hydrant, the officers filled the car with bullets.  One of those shots then went through a window and struck a homeowner.  The Grand Jury reviewed this incident but declined to indict Padro, Gallegos, and the other officers.

183.    Similarly, Goines has been involved in multiple road-rage related incidents, at least three officer involved shootings, and has been sued multiple times for excessive force. Specifically, Goines has been named or identified for misconduct in the following:

- In *Benard v. Houston Police Department*, 4:15-cv-00734, George Bernard sued Goines based on excessive force used during a no-knock warrant;[7]

- In *Books v. City of Houston*, 4:20-cv-00758, a homeowner sued Goines for 4th amendment violations and unlawful arrest;

- In *Dorsey, et al v. Goines*, 4:99-cv-02086, the estate of a family sued Goines for 4th amendment violations and wrongful death;

---

[7] Steven Bryant was also sued regarding the Bernard case.

- In *Francis v. City of Houston*, 4:88-cv-00059, an individual sued Goines for civil rights violations;

- In *Brown v. Harris County*, 4:13-cv-0293, an inmate accused Goines of kicking down his door and pointing a gun at his face.

184.   By ignoring these egregious failures, including its lack of adequate policies, supervision, oversight, and training, HPD, through the Chief of Police, was deliberately indifferent that its failure would be the moving force for Constitutional violations. In particular HPD, including the Chief of Police, knew that no-knock warrants presented substantially greater risk of escalation and shootings.  HPD, including the Chief of Police, also knew that narcotic officers, as opposed to SWAT, lacked de-escalation training, did not wear body cameras, and lacked ballistic shields, and thus were more likely to escalate or instigate the use of force, even where such force was not reasonable.

185.   HPD and the Chief of Police further also knew that mandating the policies identified above, would prevent shootings, including the murders of Nicholas and Tuttle.  In response to the outrage at the murders of Nicholas and Tuttle, HPD created these precise policies. Furthermore, the City, including the Chief of Police, knew that the Narcotics division had repeatedly engaged in excessive force, while carrying out no-knock warrants.   Under HPD's general orders 300-24, 200-16, 200-03, and 200-04, HPD placed responsibility on the Chief of Police to review and supervise officer involved shootings and disciplinary matters.   Yet the Chief of Police found each of the shooting identified above to be justified.

186.    HPD, including the Chief of Police knew that the City had insufficient policies

regarding the use of force against animals.  But as opposed to mandating this type of supervision, training, and discipline, the chief of police and HPD chose to (1) not audit the narcotic units, (2) not mandate the policies and training identified above, (3) not supervise or discipline as described herein, (4) to always justify shootings of animal and civilians, and (5) to allow narcotics officers to work in this uncontrolled environment without any risk of transfers or employment changes.  Indeed, under HPD's general orders 300-24, 200-16, 200-03, and 200-04, HPD placed responsibility on the Chief of Police to review and supervise officer involved shootings and disciplinary matters.  Yet the Chief of Police found each of the shooting identified above to be justified.

187.   Because his approval and ratification of these clear violations was consistent with the HPD policy to refuse to enforce any disciplinary measures and ratification of similar conduct, Acevedo's ratification was also the moving force behind, the very type of misconduct at issue in Counts 1 and 2.

188.   Similarly, the City's past ratification and toleration of similar illegal conduct, caused and was the moving force behind the HPD Defendants' use of excessive force and unlawful search, against Nicholas. As a result of the City of Houston's policies and practices, and the unjustified and unreasonable conduct of Defendants, Plaintiffs have suffered the injuries identified in this complaint, including severe emotional distress, pain, and ultimately death.

189.   As a result of the City of Houston's failure, Plaintiffs have suffered the injuries identified in this complaint, including severe emotional distress, pain, and ultimately death.

**HPD's Failure to train, supervise, and discipline, as well as failed to create policies mandating training, supervision, and discipline, regarding the risks and danger of excessively utilizing no-knock warrants compared to knock and announce warrants**

190.    HPD and the Chief of Police failed to train, supervise, and discipline, as well as failed to create policies mandating training, supervision, and discipline of the narcotics unit regarding the risks and danger of excessively utilizing no-knock warrants compared to knock and announce warrants, the necessity for individual analysis of each narcotic case, including during the tactical plan meeting and surveillance leading up to the raid.

191.    Squad 15 makes up 25% of the general narcotics enforcement for the City.  As part of their regular pattern and practice for obtaining drug search warrants, Squad 15, through Goines, requested no-knock warrants in virtually every warrant request. Indeed, Goines was the case-agent that obtained the warrant in the vast majority of the Squad 15 raids. Between 2012-2019, Goines requested and filed sworn affidavits related to search warrants for approximately 109 drug cases. In those warrants, Goines requested a no-knock warrant roughly 95% of the time. To obtain a no-knock warrant, Goines represented that the suspect possessed a firearm inside the target location. Yet in all but one of those cases – 99.08% of his drug search warrants – Goines never recovered a firearm in the subsequent inventory list after the raid. Put differently, despite Squad 15 and Goines repeatedly requesting no-knock warrants based on the presence of firearms, 99.08% of the time there were no firearms at the location and no justification for a no-knock entry. HPD was aware of this disparity and continued to permit Goines to obtain no-knock warrants based on representations that firearms were inside the premises.

192.    As portrayed in the table above, of the approximately 109 warrants, Goines obtained

at least 66 warrants from Harris County Courts from January 2012 to January 2019.[8] In

those 66 warrants, Goines requested a no-knock warrant 64 times. Notably, in the two

warrants that Goines did not request a no-knock, the request involved a suspect who was a

paraplegic and a search of a suspect at a business. In 61 of the 64 times that Goines

requested a no-knock warrant, Goines identified a gun as the basis for the warrant.[9] In each

of those cases, Goines had previously sworn under oath that the suspect had dealt dugs and

possessed a weapon for the purpose of protecting the drugs.  Yet even though Goines made

arrests in approximately 91.8% of cases,[10] he never recovered a single firearm in the

subsequent return and inventory list after the search.

193.    Prior to the Harding Street raid, the City and the Chiefs of Police, knew that that

during narcotic no-knock raids, at least nine shootings had occurred between 2009-2018.

In contrast, during that same time period, the City of Houston has not reported any officer

involved shooting related to knock and announce warrants within the city of Houston for

narcotic crimes. Worse yet, the chiefs of police had direct knowledge of the particular

dangers of no-knock warrants because under the HPD policies, they reviewed each of the

nine shooting during that period.

194.    Despite this knowledge, HPD failed to supervise, train, and discipline its officers

---

[8] In addition to the warrants from Harris County, Goines additionally obtained a significant number of warrants from Houston Municipal Courts.

[9] In the three cases that Goines requested a no-knock without identifying a gun, Goines alleged in each that drugs were located near a sink and subject to destruction. Based on those facts, in one case, the Court rejected a no-knock warrant.

[10] As a result of these 61 searches, Squad 15 made approximately 87 arrests at 56 locations.

regarding the excessive use of no-knock warrants. Furthermore, based on the history of deadly force, HPD should have barred Narcotics officers from carrying out no-knock warrants entirely. Again, in the wake of this case, Defendants issued this precise policy.  In addition, the City, through the chiefs of police failed to train because:

- HPD should have mandated that only SWAT or a Narcotics trained SWAT team, carry out no-knock raids;

- HPD should have mandated that SWAT independently investigate, surveil, and create an appropriate tactical plan for no-knock raids;

- HPD should have mandated that the Chief of Police review each request for a no-knock warrant;

- HPD should have mandated the use body-worn cameras and ballistic shields during no-knock raids;

- HPD should have mandated non-lethal force when approached by dangerous animals, including dogs, during no-knock raids;

- HPD should have mandated de-escalation training for members of raids after any officer involved shooting; and

- HPD should have mandated supervisors, including lieutenants, be present during no-knock raids.

Instead of following these important procedures, HPD created a wide-spread custom and unwritten policy of encouraging excessive use (and excessive force) during no-knock narcotic raids.

78

195.    By ignoring these failures, including its lack of adequate policies, supervision, oversight, and training, HPD, through the Chief of Police, was deliberately indifferent that its failure would be the moving force for Constitutional violations. In particular HPD, including the Chief of Police, knew that no-knock warrants presented substantially greater risk of escalation and shootings.  HPD, including the Chief of Police knew that the City had insufficient policies regarding no-knock warrants.  But as opposed to mandating this type of supervision, training, and discipline, the chief of police and HPD chose to (1) not audit the narcotic units, (2) not mandate the policies and training identified above, (3) not supervise or discipline as described herein, (4) always justified shootings of animal and civilians, and (5) allowed narcotics officers to work in this uncontrolled environment without any risk of transfers or employment changes.  Indeed, under HPD's general orders 300-24, 200-16, 200-03, and 200-04, HPD placed responsibility on the Chief of Police to review and supervise officer involved shootings and disciplinary matters.  Yet the Chief of Police found each of the shooting identified above to be justified.

196.    Alternatively, because his approval and ratification of these clear violations was consistent with the HPD policy to refuse to enforce any disciplinary measures and ratification of similar conduct, Acevedo's ratification was also the moving force behind, the very type of misconduct at issue in Counts 1 and 2.  Similarly, the City's past ratification and toleration of similar illegal conduct, caused and was the moving force behind the HPD Defendants' use of excessive force and unlawful search, against Nicholas.

197.    As a result of the City of Houston's policies and practices, and the unjustified and

unreasonable conduct of Defendants, Plaintiff has suffered the injuries identified in this complaint, including severe emotional distress, pain, and ultimately death.

### HPD failed to train, supervise, and discipline, as well as failed to create policies mandating training, supervision, and discipline its officers regarding the use of excessive force against unarmed civilians

198.    HPD has a long and pronounced history of fostering excessive deadly force against unarmed civilians. Specifically, HPD has established inadequate policies and customs of investigating, punishing, supervising, and disciplining police officers who shoot unarmed civilians. As a result, this policy of authorizing excessive force has become a persistent and widespread practice of the city and its employees, it constituted a custom that represents the city of Houston's policy. In addition, this failure has become a "moving force" behind an unconstitutional use of excessive deadly force by police officers.

199.    This pattern and practice of unconstitutional use of excessive force is not an accident. Rather, through its policies, enforcement, and investigation of officer-involved shootings, HPD has deliberately created and encouraged a pattern of excessive force by its officers. For example, in its investigation process regarding the shooting of a civilian by a police officer, HPD Internal Affairs (1) uses fewer classifications than other types of use of force incidents; (2) does not look at the police officer's complaint history; and (3) gives the police chief the sole final disciplinary determination. Additionally, general HPD custom and policy following the shooting of a civilian is that the shooting police officer is (1) not questioned until he has spoken with an attorney; (2) allowed to do an unrecorded "walkthrough" of the scene, while accompanied by an attorney; (3) never given a live

interview; and (4) given forty-eight hours to answer written questions with an attorney's assistance.

200.   As a result of HPD customs and usage, between 2009 to 2014, HPD had 194 intentional shootings of civilians, 81 of which were of unarmed civilians. Each of the 194 shootings were deemed justified by the Internal Affairs Division ("IAD"). Similarly, between in 2015 to 2016, on-duty HPD officers killed 32 people, and IAD deemed each of those shootings justified.  As a result, HPD officers understand that officers will not be disciplined, scrutinized, punished, or charged for shooting unarmed civilians.  And even worse, HPD officers have benefited from this custom.

201.   By ignoring these egregious failures, including its lack of adequate policies, supervision, oversight, and training, HPD, through the Chief of Police, was deliberately indifferent that its failure would be the moving force for constitutional violations, including Plaintiffs' deaths. In particular, HPD and the Chief of Police, knew that officers engaged in excessive force against unarmed civilians.  Indeed, in *Baker v. Castro*, CIVIL ACTION NO. H-15-3495, in the S.D. of Tex., the plaintiffs identified the precise issues regarding excessive force and Defendants' inadequate policies and training.  Ultimately, Defendants settled the Baker case for approximately $1.2 million. As a result, HPD, including the Chief of Police, knew that the City had insufficient policies regarding the investigation, supervision, training, and discipline for officers involved in shooting of unarmed civilians. But as opposed to mandating this type of supervision, training, and discipline, the Chief of Police and HPD chose to (1) not mandate the policies and training identified above, (2) not

supervise or discipline as described herein, and (3) always justify shootings of unarmed civilians.  Indeed, under HPD's general orders 300-24, 200-16, 200-03, and 200-04, HPD placed responsibility on the Chief of Police to review and supervise officer-involved shootings and disciplinary matters.  Yet the Chief of Police found each of the shootings identified above to be justified.

202.    Alternatively, because Art Acevedo's approval and ratification of these clear violations was consistent with the HPD policy to refuse to enforce any disciplinary measures and ratification of similar conduct, his ratification was also the moving force behind the very type of misconduct at issue in Counts 1 and 2.  Similarly, the City's past ratification and toleration of similar illegal conduct caused and was the moving force behind Defendant officers' use of excessive force and unlawful search against Nicholas.

203.    As a result of the City of Houston's policies and practices and the unjustified and unreasonable conduct of Defendants, Plaintiffs have suffered the injuries identified in this complaint, including severe emotional distress, pain, and ultimately death.

**HPD failed to train, supervise, and discipline its officers regarding their improper use of confidential informants, and pattern and obtaining fraudulent warrants**

204.    Next, the City and the Chief of Police failed to train, supervise, and discipline, as well failed to adopt adequate policies mandating the training, discipline, and supervision related to obtaining warrants and carrying out no-knock warrants.  After this incident, the Narcotics audit found that at least six standard operating procedures promulgated by HPD which governed the conduct of Squad 15 "lacked sufficient supervisory oversight." The audit described an "overwhelming need" to improve procedures and particularly

supervision. This finding goes to the root cause of the rampant misconduct, including the incidents giving rise to this action, which was allowed to occur in Squad

205.    In addition, the audit found that Squad 15 members, both during the Harding Street raid and during the year preceding it, did not follow policies related to warrant services, operations planning, and handling of CIs. The audit found that numerous Squad 15 members failed to follow important investigative, administrative, evidentiary, and accounting procedures. These procedures are supposed to ensure accountability among the ranks and thereby promote public safety and prevent constitutional violations. For example, the audit found that Goines (1) failed to tag drugs in a timely fashion in 48% of his cases, (2) failed to include case review sheets in 29% of his cases, (3) had expense discrepancies in 27% of his cases, and (4) had tracking errors in 23% of his cases. The audit found that Bryant (1) failed to include case review sheets in 31% of his cases, (2) failed to turn in case files in 18% of his cases, (3) made late case tracking entries in 16% of his cases, and (4) made errors in the thoroughness of his investigations in 10% of his cases.

206.    The audit found hundreds of other serious problems in Squad 15 which occurred during a long period of time before the Harding Street raid. These problems, along with the other conduct described in this Complaint, illustrate Squad 15's systemic and unconstitutional violations of law. As reported by the Houston Chronicle, University of Nebraska criminology professor Sam Walker stated "You can't ascribe this to everyday sloppiness . . . Officers know each other, they know what's going on. It just poisons the whole culture."

207.   As a result of the aforementioned failure to train, supervise, and discipline, as well failed to adopt adequate policies mandating the training, discipline, and supervision, Defendants instead encouraged HPD, including Goines and the other Defendants, to obtain unlawful search warrants, through perjury and misuse of CIs.  As explained herein, prior to this incident, HPD had a pattern of obtaining warrants via perjury and misusing CIs as described above.  As a result, this failure was the moving force of Plaintiff's death.

208.   By ignoring these egregious failures, including its lack of adequate policies, supervision, oversight, and training, HPD, through the Chief of Police, was deliberately indifferent that its failure would be the moving force for Constitutional violations. HPD, including the Chief of Police knew that the City had insufficient policies regarding no-knock warrants.  But as opposed to mandating this type of supervision, training, and discipline, the chief of police and HPD chose to (1) not audit the narcotic units, (2) not mandate the policies and training identified above, (3) not supervise or discipline as described herein, (4) always justified shootings of animal and civilians, and (5) allowed narcotics officers to work in this uncontrolled environment without any risk of transfers or employment changes.  Indeed, under HPD's general orders 300-24, 200-16, 200-03, and 200-04, HPD placed responsibility on the Chief of Police to review and supervise officer involved shootings and disciplinary matters.  Yet the Chief of Police found each of the shooting identified above to be justified.

209.   Because his approval and ratification of these clear violations was consistent with the HPD policy to refuse to enforce any disciplinary measures and ratification of similar

conduct, Acevedo's ratification was also the moving force behind, the very type of misconduct at issue in Counts 1 and 2.

210.　Similarly, the City's past ratification and toleration of similar illegal conduct, caused and was the moving force behind the HPD Defendants' use of excessive force and unlawful search, against Nicholas.

211.　As a result of the City of Houston's policies and practices, and the unjustified and unreasonable conduct of Defendants, Plaintiffs have suffered the injuries identified in this complaint, including severe emotional distress, pain, and ultimately death.

## Fifth Cause of Action: Wrongful Death

212.　As described in the preceding paragraphs, Defendants' actions toward Rhogena Nicholas violated her constitutional rights and wrongfully caused her death, and without those actions, her death would not have occurred.

213.　Prior to her death, Nicholas suffered serious personal injuries including but not limited to severe pain and emotional distress during the period after she was shot but before she died. In addition, Jo Ann suffered from pecuniary loss as a result of the wrongful death of Nicholas. In addition, Jo Ann suffered loss of companionship and mental anguish as a result of the wrongful death of Rhogena Nicholas.

214.　Jo Ann has standing to assert this claim pursuant to Tex. Civ. Prac. & Rem. Code § 71.004.

## Sixth Cause of Action: Survival claim

215.　As described in the preceding paragraphs, Defendants' actions toward Rhogena

85

Nicholas violated her constitutional rights and wrongfully caused her death, and without those actions, her death would not have occurred.

216.    Prior to her death, Rhogena Nicholas suffered serious personal injuries including but not limited to severe pain and emotional distress during the period after she was shot but before she died. In addition, Jo Ann Nicholas suffered from pecuniary loss as a result of the wrongful death of Rhogena Nicholas.

217.    Plaintiff, the Estate of Rhogena Nicholas, through temporary administrator John Nicholas, and Jo Ann Nicholas as an heir of the estate of Rhogena Nicholas, have standing to assert this claim pursuant to Tex. Civ. Prac. & Rem. Code § 71.021.

## **Prayer for Relief**

a.   For compensatory damages for past and future lost wages, reputational harm, mental and emotional distress, anxiety, loss of companionship, and all other general damages alleged and proved at the time of trial,

b.   Recovery of expert witness fees;

c.   Recovery of attorney fees;

d.   Taxable costs incurred herein;

e.   Pre- and post-judgment interest;

f.   punitive damages; and

g.    all such other and further relief, at law or in equity, to which Plaintiffs may be entitled.

Respectfully submitted,

DOYLE LLP

_____

MICHAEL PATRICK DOYLE (#06095650)
PATRICK M. DENNIS (#24045777)
JEFFREY I. AVERY (#24085185)
The Clocktower Building
3401 Allen Parkway, Suite 100
Houston, Texas 77019
Phone: (713) 571-1146
Fax:  (713) 571-1148
Email: service@doylelawfirm.com

CHARLES C. BOURQUE, JR.
Louisiana State Bar No. 20118
*Pro Hac Vice* pending
ST. MARTIN & BOURQUE, LLC
315 Barrow St.
Houma, LA 70360
985-876-3891 (phone)
985-851-2219 (fax)
cbourque@stmblaw.com
**Attorneys for Plaintiffs John Nicholas, as
temporary administrator of the Estate of
Rhogena Nicholas and Jo Ann Nicholas,
individually and as an heir of the Estate of
Rhogena Nicholas**

87

## **CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of the foregoing brief was served on the attorney of record for each party in the above case in accordance with the Federal Rules of Civil Procedure on this 9th day of April 2021.

/s/ Michael Patrick Doyle

## **JURY DEMAND**

Plaintiffs, John Nicholas, as temporary administrator of the Estate of Rhogena Nicholas and Jo Ann Nicholas, individually and as an heir of the Estate of Rhogena Nicholas, hereby demand a trial by jury, a right enshrined in the Constitutions of the United States of America and the State of Texas and preserved by the sacrifices of many.

_____
MICHAEL PATRICK DOYLE