```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
                      HOUSTON DIVISION
                 CIVIL ACTION NO: 4:21-cv-00270
CLIFFORD F. TUTTLE, JR.,
REPRESENTATIVE OF THE ESTATE OF
DENNIS W. TUTTLE, DECEASED, ROBERT
TUTTLE, and RYAN TUTTLE,
        Plaintiffs,
vs.
CITY OF HOUSTON; GERALD GOINES, in
his individual capacity; STEVEN BRYANT,
in his individual capacity; FELIPE
GALLEGOS, in his individual capacity;
ERIC SEPOLIO, in his individual capacity;
MANUEL SALAZAR, in his individual
capacity, THOMAS WOOD, in his individual
capacity, OSCAR PARDO, in his individual
capacity; FRANK MEDINA, in his individual
capacity; CLEMENTE REYNA, in his
individual capacity; CEDELL LOVINGS, in
his individual capacity; NADEEM ASHRAF,
in his individual capacity; MARSHA TODD,
in her individual capacity; and ROBERT
TODD, in his individual capacity,
        Defendants.
_____/
                 CIVIL ACTION NO. 4:21-cv-00272
JOHN NICHOLAS, as temporary administrator
of the Estate of Rhogen Nicholas and JO ANN
NICHOLAS, individually and as an heir of
the Estate of Rhogena Nicholas,
        Plaintiffs,
vs.
CITY OF HOUSTON; GERALD GOINES, in his
individual capacity,
STEVEN BRYANT, in his individual capacity;
FELIPE GALLEGOS, in his individual
capacity; ERIC SEPOLIO, in his individual
capacity; MANUEL SALAZAR, in his individual
capacity; THOMAS WOOD, in his individual
capacity; OSCAR PARDO, in his individual
capacity; FRANK MEDINA, in his individual
capacity; CLEMENTE REYNA, in his individual
capacity; CEDELL LOVINGS, in his individual
capacity; NADEEM ASHRAF, in his individual
capacity; MARSHA TODD, in her individual
capacity; and ROBERT GONZALEZ, in his
individual capacity,
        Defendants.
_____/
              VIDEO-RECORDED DEPOSITION OF
                    ANDREW J. SCOTT
                    (Pages 1 - 217)
                 Thursday, July 18, 2024
                 10:10 a.m. to 4:40 p.m.
                   LOCATION: Lexitas
         2385 NW Executive Center Drive, Suite 100
                 Boca Raton, Florida 33431
                Stenographically Reported By:
                      Michelle Payne
```

```
 1   force that was used against the plaintiffs.  And also
 2   review the supervision that was provided to the
 3   narcotics division, particularly Squad 15, and then also
 4   take a look at the agency's custom and practice, if you
 5   will, with regards to investigating officer involved
 6   shootings.
 7        Q.   And all the things that you just listed, is it
 8   your position that they fall within the expertise that
 9   you have regarding high liability police policies and
10   procedures?  Does that make sense?
11        A.   Yes, sir.  I think my testimony was police --
12   high liability police practices and procedures.
13        Q.   Oh, I'm sorry, I couldn't read my own writing,
14   it says practices.  So let me repeat the question.
15             Is your testimony that the areas that you just
16   outlined, search warrants, use of force, supervision,
17   and custom and practices regarding investigations of
18   officers, all of those things fall within the high
19   liability police practices and procedures area of
20   expertise?
21        A.   That is correct.
22        Q.   In other words, if a person professes to be an
23   expert in high liability police practice and procedures
24   that person is qualified to talk about those four
25   things?
```



Andrew J. Scott

Page 13

1  A. Sure. Specifically related to this case.
2  Obviously my expertise expands beyond the four corners
3  of my police report. Excuse me, my expert report.
4  Q. I understand that. I understand that we're
5  talking about just as it relates to this case right now.
6  A. Then you are correct.
7  Q. All right. So we will get to your report and
8  opinions later in the deposition, but what I want to
9  find out now whether you consider yourself an expert in
10 some other areas that were not listed regardless of
11 whether you've been engaged to talk about it in this
12 case. Okay?
13 A. Yes, sir.
14 Q. Do you consider yourself to be an expert in
15 shooting reconstruction?
16 A. I wouldn't say I'm an expert in shooting
17 reconstruction but I am very familiar with it having
18 engaged in shooting and crime scene reconstructions over
19 the course of my tenure and as a expert in police
20 practices and procedures.
21 Q. But do you hold yourself out as an expert in
22 shooting reconstruction?
23 A. Related to this case I do not.
24 Q. What about DNA analysis, do you consider
25 yourself to be an expert in DNA analysis?

Andrew J. Scott

Page 17

```
 1        Q.   Okay.  And we'll get to the details like I
 2   said in a moment.  If you look at pages two
 3   through seven of your report --
 4        A.   Yes, sir.
 5        Q.   -- you note that you reviewed 125 enumerated
 6   items of evidence or documents.  Correct?
 7        A.   Yes, sir.
 8        Q.   I don't know if you've done the math, but
 9   would you agree that 91 of those 125 items are written
10   HPD policies or procedures?  And I'll just tell you I'm
11   referring to items 48 through 125.
12        A.   That appears to be the case.
13        Q.   Okay.  And the four discreet opinions that we
14   just identified, would it be correct to say that those
15   opinions do not criticize or deal with -- I shouldn't
16   say deal with, let's stick with criticize.  Those
17   discreet opinions do not criticize any written policy or
18   procedure of the Houston Police Department?
19        A.   No, that was not within the realm of my -- the
20   request by my clients to examine.
21        Q.   Okay.  So you weren't asked to determine
22   whether or not you had any criticism of any written HPD
23   policy or procedure; did I understand that correctly?
24        A.   Correct, I was not asked to look into those
25   policies from an expert perspective.
```

888-893-3767
www.lexitaslegal.com



Andrew J. Scott
Page 22

1  A. Yes.
2  Q. Do you agree that no written HPD policy or
3  procedure authorized HPD officers to use excessive
4  force?
5  A. No, I didn't see anything in the policies that
6  suggested that.
7  Q. That would be quite unusual; wouldn't it?
8  A. Yes.
9  Q. Do you agree that no written HPD policy or
10 procedure authorized HPD officers to fabricate
11 information included in a search warrant?
12 A. Correct.
13 Q. That would also be unusual?
14 A. Yes.
15 Q. And in your career as a police officer I take
16 it that you've never seen a written policy of a police
17 department that told officers it's okay to fabricate
18 information in a warrant?
19 A. Never in my experience.
20 Q. And the same would be true with respect to a
21 policy that told officers it's okay to use excessive
22 force, a written policy?
23 A. I've never seen that either.
24 Q. Now I want to talk to you real quick about
25 conduct and what your report says about, quote,

888-893-3767
www.lexitaslegal.com



Andrew J. Scott
Page 23

```
 1    "unlawful conduct."  Okay.  And let me try to tell you
 2    where I'm going with this.
 3             The way I read your report the unlawful
 4    conduct that you contend caused the alleged
 5    constitutional violations in this case consist of three
 6    discreet areas of conduct.  I'm going to go through
 7    those and just ask you if I'm reading your report
 8    correctly.  Okay?
 9        A.   Sure.
10        Q.   All right.  The first instance of unlawful
11    conduct that you claim caused the alleged constitutional
12    violations in this case was Officer Goines lying on a
13    warrant.  Correct?
14        A.   Correct.
15        Q.   One of them?
16        A.   That is correct, corroborated by the Houston
17    Police Department.
18        Q.   And then the second one I want to ask you
19    about is -- excuse me, the second act that you contend
20    is unlawful conduct is Officer Gallegos shooting
21    Ms. Nicholas because you contend that she did not pose a
22    threat.  Is that correct?
23        A.   Based on the totality of circumstances that is
24    correct.
25        Q.   Okay.  And then the third one is Gallegos
```

888-893-3767
www.lexitaslegal.com



```
 1   firing the final shot at Tuttle because by then you
 2   contend that Mr. Tuttle no longer posed a threat.  Is
 3   that correct?
 4        A.   That's correct.
 5        Q.   Okay.  So I want to make sure that I'm clear.
 6   Is there any other instance of unlawful conduct that you
 7   contend was committed by the officers on the scene that
 8   caused the alleged constitutional violations other than
 9   these three that we just went over?
10        A.   No.
11        Q.   Okay.  Doctor Scott, I want to jump to your CV
12   and talk to you about some of that.
13             MS. SILVA:  Hopefully you see that on your
14        screen, sir, it's Exhibit 123.
15        A.   I do.
16   BY MR. ODOM:
17        Q.   Okay.  Do you have Exhibit 123 in front of
18   you?
19             MS. SILVA:  Court reporter it's number eight
20        if you want to hand opposing counsel a hard copy.
21             MR. BOURQUE:  What is the document?
22             THE WITNESS:  It's my CV.
23             MR. BOURQUE:  Okay.
24   BY MR. ODOM:
25        Q.   You ready?
```

```
 1   certified as a police officer.  Right?
 2        A.   No.  So the courses that I'm illustrating here
 3   other than the law enforcement certification that we
 4   just discussed, these courses were taken voluntarily, or
 5   the agency recognizing that I'm being moved into a
 6   position as a detective needed formalized training in
 7   the topical area, for example, homicides or crime scene
 8   reconstruction, those types of things.  And so depending
 9   on the position I was in I either had to take a certain
10   course or the majority of those courses I took on my
11   own.
12        Q.   Okay.  I think that answers it.  Okay.  Now
13   let's move back to your report.  I want to start on
14   page 16 with your opinion number one.  Are you there?
15        A.   Yes, sir.
16        Q.   Okay.  Your opinion number one says "the
17   search warrant obtained for 7815 Harding Street,
18   Houston, Texas by HPD Officer Gerald Goines was based on
19   fabricated information and evidence not probable cause.
20   Obtaining and executing a search warrant without
21   probable cause is contrary to well-established police
22   practices and official Houston Police Department
23   policy."
24             Did I read that correctly?
25        A.   Yes, sir.
```



1  Q.  Are you saying that you went back and did some
2  independent investigation from HPD's internal
3  investigation to reach this conclusion, or are you
4  saying that you read what HPD concluded and said yeah,
5  that's right?
6  A.  It's the latter part of your question.  I
7  reviewed what HPD did, I reviewed the statements, I
8  reviewed everything that was investigated, and as a law
9  enforcement expert I am in agreement with what HPD
10 determined.
11 Q.  Okay.  Turn to the last paragraph under
12 opinion one which is on page 20 paragraph 1.7.
13 A.  Yes, sir.
14 Q.  You there?
15 A.  Yes.
16 Q.  I want to direct your attention to the last
17 sentence which says "it is more likely than not in a
18 degree of professional certainty that if the search
19 warrant obtained by Officer Goines had not been acquired
20 Mr. Dennis Tuttle and Ms. Rhogena Nicholas would not
21 have been shot and killed by HPD officers on January 28,
22 2019."
23     Did I read that correctly?
24 A.  Yes, sir.
25 Q.  What you're saying there is if the warrant

```
 1   7815 Harding Street, Houston, Texas, by HPD Officer
 2   Goines was based on fabricated information and evidence
 3   not probable cause.  Is that correct?
 4        A.   That's correct.
 5        Q.   And you further state on page 20 in
 6   paragraph 1.7, based on the facts of this case,
 7   supported by HPD IA investigations into this incident,
 8   there is no doubt that Officer Goines falsified the
 9   probable cause affidavit and search warrant for 7815
10   Harding Street.  Is that correct?
11        A.   Yes, sir.
12        Q.   You do not state in your report that Steven
13   Bryant assisted Gerald Goines in falsifying information
14   used to obtain the search warrant.  Correct?
15        A.   That's correct.
16        Q.   And have you seen any evidence that Mr. Bryant
17   assisted Gerald Goines in falsifying information used to
18   obtain the search warrant?
19        A.   No.
20        Q.   You do not state in your report that Mr.
21   Bryant was involved in drafting the probable cause
22   affidavit?
23        A.   Correct.
24        Q.   And have you seen any evidence that Mr. Bryant
25   was involved in drafting that probable cause affidavit
```

```
 1   for the search warrant?
 2        A.   No.
 3        Q.   Further, you do not state in your report that
 4   Mr. Bryant was involved in presenting the search warrant
 5   application to the magistrate judge who signed it.  Is
 6   that correct?
 7        A.   Correct.
 8        Q.   Have you seen any evidence that Mr. Bryant was
 9   involved in sending the search warrant application to
10   the magistrate judge?
11        A.   No.
12        Q.   Is it fair to say that what your report states
13   or suggests is that Mr. Bryant was involved in cover-up
14   for Gerald Goines after the shooting took place?
15        A.   Correct.
16        Q.   And so basically what -- what is alleged that
17   Mr. Bryant did was to help Goines cover-up whatever his
18   prior misconduct was after the shooting.  Is that
19   correct?
20        A.   Yes, sir.
21        Q.   On page 28 of your report opinion two states
22   in part that the failure to supervise identified above,
23   was the moving force or proximate cause of the
24   underlying constitutional violations by Goines and
25   Bryant in the moving force or proximate cause of the
```



```
 1   death of Tuttle and Nicholas.  Is that correct?
 2        A.   Yes.
 3        Q.   Did you form an opinion that Mr. Bryant
 4   violated the constitutional rights of Mr. Tuttle in
 5   relation to the Harding Street raid?
 6        A.   No, I can't say that he contributed to the
 7   unconstitutional actions prior to the raid.  But
 8   obviously engaged in the cover-up afterwards.
 9        Q.   But that cover-up would not be a violation of
10   Mr. Tuttle's constitutional rights.  Is that correct?
11        A.   You're correct, sir.
12        Q.   Similarly, did you form an opinion that Mr.
13   Bryant violated the constitutional rights of Ms.
14   Nicholas in relationship the Harding Street raid?
15        A.   I don't believe I did.
16        Q.   And is it your opinion that there was not a
17   violation of Ms. Nicholas's constitutional rights by Mr.
18   Bryant?
19             MR. SMITH:  Object to the form.
20        A.   Correct.
21   BY MR. NACHTIGALL:
22        Q.   So what were -- and correct me if I'm wrong
23   here, but what were the constitutional violations by Mr.
24   Bryant that were either a moving force or proximate
25   cause of the death of Mr. Tuttle and Ms. Nicholas?
```



1    A.   Basically there were none in reference to the
2    acquisition of the affidavit, although Officer Bryant
3    did engage in breaking down the door which allowed the
4    team to gain entry based on the fictitious warrant.
5    Q.   And at the time that he broke down that door
6    to gain entry we don't have information that would lead
7    us to believe that he knew that it was based on a
8    falsified search warrant.  Is that correct?
9    A.   Correct, we have no information in the record.
10        MR. NACHTIGALL:  I don't have any more
11   questions.  Thank you.
12        MR. DAY:  Al, this is Dwayne Day, I've just
13   got a very, very quick clarification for the
14   witness.
15                CROSS EXAMINATION
16   BY MR. DAY:
17   Q.   Mr. Scott, my name is Dwayne Day I represent
18   Gerald Goines in this civil matter.  Have you been
19   retained or asked to testify on behalf of the Harris
20   County District County's Office in the criminal case?
21   A.   I have not.
22   Q.   Okay.  Let's talk about your opinion number
23   three.  I just want -- I think Al did a good job of
24   clearing this up but I want to make sure it's crystal
25   clear.  In opinion number three you put in there while