UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CLIFFORD F. TUTTLE, JR., *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:21-CV-00270 |
| | § | |
| CITY OF HOUSTON, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## ORDER

Before the Court are the following motions: (1) Defendant City of Houston's (the "City")

Motion to Exclude Expert Opinions and Testimony of Andrew Scott and Michael Maloney (the

"Motion to Exclude") (Doc. #303), Plaintiffs' Response (Doc. #335), and the City's Reply (Doc.

#346); (2) Defendant Felipe Gallegos' ("Gallegos") Motion for Summary Judgment (Doc. #318),

Plaintiffs' Response (Doc. #334), Gallegos' Reply (Doc. #353), and Plaintiffs' Sur-Reply[1] (Doc.

#359); (3) Defendant Robert Gonzales' ("Gonzales") Motion for Judgment on the Pleadings (the

"Motion for Judgment")[2] (Doc. #310), Plaintiffs' Response (Doc. #340), and Gonzales' Reply

---

[1] In Gallegos' Reply (Doc. #353), he submitted a new affidavit to dispute certain arguments raised in Plaintiffs' Response (Doc. #334). Plaintiffs then filed an Objection and Response that (1) objects to the Court's consideration of Gallegos' affidavit and (2) responds to this new evidence. Doc. #359. In turn, Gallegos filed a Motion to Strike the Objection and Response, arguing that it was filed without leave of Court. Doc. #362. To aid in the complete and efficient resolution of the issues presented in Gallegos' Motion for Summary Judgment, the Court (1) overrules Plaintiffs' objection to Gallegos' new affidavit and (2) denies Gallegos' Motion to Strike (Doc. #362) and accepts Plaintiffs' Objection and Response as a Sur-Reply.

[2] The Motion for Judgment was filed by Gonzales as well as former Defendants Nadeem Ashraf, Cedell Lovings, Frank Medina, Oscar Pardo, Clemente Reyna, Manuel Salazar, Eric Sepolio, and Thomas Wood (collectively, the "Individual Officers"). Doc. #310. However, the Individual Officers have since been dismissed from this case. *See* Doc. #437. Thus, the Motion for Judgment

(Doc. #344); (4) Gonzales' Motion for Summary Judgment (Doc. #312), Plaintiffs' Response (Doc. #332), and Gonzales' Reply (Doc. #347); (5) Defendant Steven Bryant's ("Bryant") Motions for Summary Judgment (Doc. Nos. 313, 314), Plaintiffs' Response (Doc. #333), and Bryant's Reply (Doc. #342); and (6) the City's Motion for Partial Summary Judgment on Plaintiffs' Claims Based on Service of the Warrant (Doc. #305) and Motion for Partial Summary Judgment on Plaintiffs' Claims Based on Alleged Excessive Force (Doc. #308) (collectively, the City's "Motions for Summary Judgment"), Plaintiffs' Responses (Doc. Nos. 330, 331), and the City's Replies (Doc. Nos. 348, 350).

Having considered the parties' arguments, the submissions, and the applicable legal authority, the Court denies the Motion to Exclude (Doc. #303), denies Gallegos' Motion for Summary Judgment (Doc. #318), grants the Motion for Judgment (Doc. #310) as it pertains to Gonzales, grants Gonzales' Motion for Summary Judgment (Doc. #312), grants Bryant's Motions for Summary Judgment (Doc. Nos. 313, 314) in part, and grants the City's Motions for Summary Judgment (Doc. Nos. 305, 308).[3]

## I.  Background

### a.  Factual Background

This case arises from the botched execution of a no-knock search warrant by the Houston Police Department's ("HPD") Narcotics Division, Squad 15, at 7815 Harding Street on January 28, 2019, during which Dennis Tuttle ("Tuttle") and Rhogena Nicholas ("Nicholas") (collectively,

---

is DENIED as MOOT as it pertains to the Individual Officers. In this Order, the Court will evaluate the Motion for Judgment as it pertains to Gonzales only.

[3] Also before the Court is the City's Motion to Seal its Brief in Support of its Motion in Limine (the "Motion to Seal"). Doc. #374. Plaintiffs have not filed a response, which the Court takes "as a representation of no opposition." *See* S.D. Tex. Local R. 7.4. The Court finds good cause to grant the Motion to Seal.

"Decedents") were killed. The families and estates of Tuttle and Nicholas (collectively, "Plaintiffs") now bring this case pursuant to 42 U.S.C. § 1983 ("Section 1983"), alleging constitutional violations against the City and the HPD officers and supervisors who were involved in the raid.

### 1. The Search Warrant

On January 8, 2019, the Decedents' neighbor, Patricia Garcia ("Garcia"), repeatedly called 911 and falsely claimed that her daughter was doing drugs inside the Decedents' home at 7815 Harding Street. Doc. #336, Ex. 42 at 4. Garcia also claimed that there were guns inside the home.[4] *Id.* In response to Garcia's 911 call, HPD Officers Richard Morales ("Morales") and Nichole Blankenship-Reeves ("Blankenship-Reeves") were dispatched to investigate 7815 Harding Street. *Id.*; Doc. #336, Ex. 43 at 8. While outside of the house, a woman walked by on the phone and stated that cops were at a "dope house." Doc. #306, Ex. 4 at 7. However, Morales and Blankenship-Reeves did not observe any criminal activity, or anyone coming or going from the house. Doc. #336, Ex. 42 at 8, Ex. 43 at 10–11. Blankenship-Reeves passed on a note she prepared regarding 7815 Harding Street to Lieutenant Marsha Todd ("Todd") in the Narcotics Division. Doc. #336, Ex. 42 at 38. Todd then passed the tip to Squad 15 Officer Defendant Gerald Goines ("Goines"). Doc. #336, Ex. 64 at 16.

On January 28, 2019, Goines secured a no-knock search warrant for 7815 Harding Street. Doc. #336, Ex. 10. To obtain the warrant, Goines lied on an affidavit and falsely claimed that on January 27, 2019, a confidential informant purchased heroin and observed a firearm at 7815 Harding Street. Doc. #336, Ex. 10 at 5, Ex. 40 at 7. Goines also falsely claimed that fellow Squad

---

[4] Garcia later pleaded guilty to one count of false information and hoaxes as a result of her fabricated reports. *See United States v. Garcia*, No. 21-20309, 2022 WL 1014146, at *1 (5th Cir. Apr. 5, 2022).

15 Officer Steven Bryant observed the drug buy.[5] Doc. #336, Ex. 10, at 5, Ex. 11 at 50–51.

After Goines obtained the Harding Street search warrant, his Squad 15 supervisors, Sergeants Clemente Reyna ("Reyna") and Thomas Wood ("Wood") reviewed the warrant and a tactical plan for its execution. Doc. #306, Ex. 24 at 5; Doc. #305, Ex. 6 at 28. Reyna and Wood then forwarded these documents to their supervisor, Lieutenant Robert Gonzales, who oversaw Squad 15. Doc. #306, Ex. 24 at 5; Doc. #305, Ex. 6 at 28. Ultimately, Wood approved the execution of the warrant to proceed. Doc. #306, Ex. 24 at 5. Wood then accompanied Squad 15 Officers Frank Medina ("Medina") and Felipe Gallegos on a "drive-by" of 7815 Harding Street for tactical purposes. Doc. #305, Ex. 6 at 18, 20, 25. After the drive-by, Goines led a pre-raid briefing with all of the officers who would partake in the execution of the search warrant. Doc. #306, Ex. 24 at 7. Goines summarized the Decedents' property and told officers to expect a female resident, a male resident known to carry a gun, and an aggressive dog. *Id.*

## 2. The Raid

Shortly after the briefing, a group of eighteen officers dispatched to 7815 Harding Street to execute the warrant. *See* Doc. #308, Ex. 7 at 5. The "entry team" for the warrant execution consisted of Squad 15 Officers Medina, Bryant, Gallegos, Goines, Cedell Lovings ("Lovings"), Manuel Salazar ("Salazar"), Oscar Pardo ("Pardo"), Eric Sepolio ("Sepolio"), and Nadeem Ashraf ("Ashraf"), as well as Sergeants Reyna and Wood (collectively, the "Squad 15 Officers"). *Id.* HPD Officers Morales, Blankenship-Reeves, Joseph Arechiga, Samuel Garza ("Garza"), Valeriano Rios ("Rios"), and Yvette Ortiz ("Ortiz") assisted with "perimeter security." *Id.* Though Morales, Blankenship-Reeves, Rios, Ortiz, and Garza had body-worn cameras ("BWC"),

---

[5] In connection with his lying to obtain the Harding Street search warrant, Goines has been convicted of felony murder.

they failed to activate them prior to the start of the raid, in violation of HPD's policy. Doc. #336, Ex. 9 at 53. Instead, they activated their BWCs at differing times during and after the raid.

When the caravan of officers arrived at 7815 Harding Street, the entry team organized into a "stack" and breached the front door while announcing that police were there. Doc. #336, Ex. 70 at 31, Ex. 71 at 9. Medina was the first to enter the home, breaking left upon entry. Doc. #336, Ex. 47 at 6. According to Medina, he noticed Nicholas standing to his left and told her to put her hands on her face and to get down. *Id.* at 13. Nicholas did not comply, and she continued to yell and "flail[]" her hands. *Id.* Medina then heard a gunshot from his right and turned to see an "angry" dog, which he shot. *Id.* at 13, 19. Shortly thereafter, Medina was shot in the shoulder and fell back against a couch. *Id.* at 21. At that time, Medina first observed Tuttle behind a wall in the dining room area of the home. *Id.* Medina then went unconscious. *Id.* Bullet fragments consistent with a .223-caliber gun were noted in Medina's gunshot wound. Doc. #336, Ex. 34 at 35.

Lovings was the second person to enter the house. Doc. #309, Ex. 6 at 6. While Medina had gone to the left, Lovings broke to the right. *Id.* at 7. Lovings saw a dog running toward him, and around the same time saw a "muzzle flash"—a glimpse of light that accompanies a gunshot. *Id.* at 6. Lovings then fired his M6 .223 rifle at the dog "several" times. *Id.* at 6, 11; *see* Doc. #336, Ex. 34 at 27. In addition, though Lovings did not hear a gunshot, he heard Medina yell that he was "hit." Doc. #309, Ex. 6 at 6. After Lovings shot the dog, he observed another muzzle flash from the dining room area, where he saw Tuttle standing with a gun. *Id.* at 11. Tuttle and Lovings then fired their weapons at each other. *Id.* at 12. Tuttle shot Lovings in the neck with a .357 revolver gun, leaving Lovings paralyzed from the neck down. *Id.* at 8, 12; Doc. #336, Ex. 34 at 35; Doc. #309, Ex. 1 at 4. Lovings was unsure whether any of the bullets he fired hit Tuttle, but

he did observe Tuttle "flinch" and hide back behind a wall. Doc. #309, Ex. 6 at 12. Lovings, who laid paralyzed on the floor, then saw Tuttle attempt to take the rifle off his body. *Id.* at 9.

Salazar and Pardo entered the residence just after Medina and Lovings. *See* Doc. #336, Ex. 34 at 27. When Salazar entered, he observed Lovings shoot at the dog. Doc. #336, Ex. 41 at 15. Salazar also saw Tuttle behind a wall shooting a gun three to four times toward Medina, and he heard Medina say he was "hit." *Id.* at 14. Salazar then fired his Springfield 1911 .45 caliber handgun at Tuttle approximately ten times. *Id.* at 3, 17. After shooting at Tuttle, Salazar fell to the ground and rolled out of the house. *Id.* at 19. Pardo only made it a few steps inside the house before he heard someone yell "dog" and the firing of multiple gunshots. Doc. #336, Ex. 71 at 11. Pardo then heard Medina say he was "hit" and saw Medina laying on the couch. *Id.* at 12. Pardo also observed Nicholas standing over Medina, yelling. *Id.* at 13. Pardo was then pushed out of the house along with Salazar. *Id.* at 14. At this point, only Medina and Lovings remained inside the house—both of them injured.

What happened next is hotly disputed. In sum, there are three versions of events. The first version has been advanced by the City, Squad 15 Officers, and Gonzales, based primarily on the recollections of the Squad 15 Officers. The second version has been advanced by Plaintiffs based primarily on the available BWC video and the opinions of their retained expert, Michael Maloney ("Maloney"). The third version comes from Maloney, based on his crime scene reconstruction and independent investigation of what occurred during the raid. Each version of events is recounted in detail below.

### i. The City, Squad 15 Officers, and Gonzales' Version

During the sequence of events outlined above, Gallegos stood outside the house, just to the right of the front porch. Doc. #309, Ex. 5 at 7. From his position, he heard several gunshots and

heard Medina yell that he was "hit." *Id.* Gallegos then observed Salazar and Pardo "fall backwards off the front porch." *Id.* at 8. Next, Gallegos saw Lovings drop in the threshold of the doorway. *Id.* At this point, Gallegos gained view of the inside the house, where he observed Medina unconscious on the couch and Nicholas standing over him, cursing and tugging at the gun attached to Medina's vest. *Id.* at 10. Nicholas' hands later tested positive for gunshot residue. Doc. #308, Ex. 2 at 5. As he observed Nicholas tugging at Medina's gun, Gallegos shot at Nicholas with his M6 .223 rifle between one and three times. Doc. #309, Ex. 5 at 11. At least one of the bullets hit and killed Nicholas, who fell toward the couch. *Id.* at 11–12. At some point after Gallegos shot Nicholas, Sepolio went inside the house and helped extract Medina. Doc. #336, Ex. 39 at 199, Ex. 72 at 21.

After Gallegos shot and killed Nicholas, he continued to hear gunshots from inside the house. Doc. #309, Ex. 5 at 12. Gallegos took a couple of steps back from the door, still along the right side of the house, where he shot through the wall toward where he believed Tuttle was located. *Id.* Gallegos then broke a window that was near him so that he could see inside the home. *Id.* at 13. Inside the window, Gallegos observed an empty bedroom. *Id.* Gallegos then backed up toward a tree and yelled for someone to grab Lovings. *Id.* at 14. Goines then went toward the front door, but was struck by a bullet or bullet fragments in his face, causing him to retreat. *Id.* Next, Reyna attempted to approach the front door, at which time Gallegos saw "two hands come out of the front door holding a revolver" pointed at Reyna. Doc. #309, Ex. 5 at 14. Tuttle and Reyna exchanged gunfire simultaneously, with Reyna using his .40 caliber Glock. *Id.* at 15; Doc. #309, Ex. 20 at 6–7. Bullet fragments from Tuttle's gunshots hit Reyna's face, causing injuries. Doc. #309, Ex. 20 at 7.

After observing Tuttle shoot at Reyna, Gallegos shot Tuttle in his left hand. Doc. #309,

Ex. 5 at 14. Reyna then moved away from the house, and Tuttle retreated into the house. *Id.* at 15. Gallegos began moving from his position near the tree to gain vision inside the doorway. Doc. #309, Ex. 5 at 15. Gallegos saw Tuttle inside the house, leaning against the front door and holding a gun to his chest with his right hand. *Id.* at 16. According to Gallegos, Tuttle raised the gun toward him. *Id.* at 17. Thus, Gallegos shot at Tuttle several times, with the bullets hitting Tuttle at least once in the shoulder and twice in the buttocks area. *Id.* at 17–18. Tuttle fell to the ground inside the house, causing Gallegos to lose his visual. *Id.* at 18. Pardo then attempted to retrieve Lovings, who was still injured and laying in the doorway. Doc. #336, Ex. 71 at 19. Pardo observed Tuttle sitting on the floor near Lovings, just inside the home, with a gun in his hand. *Id.* Pardo then shot at Tuttle once and retreated to a position near Gallegos. *Id.* at 19–20.

Gallegos walked up the stairs of the front porch and saw Tuttle through the doorway. *Id.* Tuttle was in a seated position on the floor with a gun in his right hand, resting on his thigh. *Id.* Tuttle began yelling at Gallegos, asking what he wanted and stating there were "no drugs." *Id.* at 19. Gallegos told Tuttle to stop moving, after which Tuttle "look[ed] directly at [Gallegos]" and "beg[an] to raise the weapon." *Id.* Gallegos raised his own weapon, at which time Tuttle "flinched." *Id.* Gallegos then shot Tuttle for a final time, hitting Tuttle in his "back/neck area" and killing him. *Id.* From Squad 15's initial entry of the home to Gallegos' final shot at Tuttle, the entire gunfight lasted eighty seconds. Doc. #309, Ex. 4 at 6.

### ii.    Plaintiffs' Version

Plaintiffs dispute several aspects of the City, Squad 15 Officers, and Gonzales' version of events. First, though Medina, Lovings, Goines, and Reyna all suffered gunshot wounds during the raid, there is only evidence that Lovings was shot by Tuttle. Doc. #336, Ex. 34 at 35. Medina, Goines, and Reyna's wounds were consistent with .223-caliber weapons—which were only carried

by other officers. *Id.*

Second, Plaintiffs aver that Gallegos shot Nicholas *after* Medina was extracted from the house—making it impossible for Gallegos to have seen Nicholas standing over Medina, tugging at his weapon, before Gallegos shot her. Doc. #330 at 11–12. In support of this theory, Plaintiffs point to the available BWC video, which shows the Squad 15 Officers exiting a white van and moving toward the home. Doc. #336, Ex. 62 at 00:09. About seventeen seconds after the officers start moving toward the house, a loud noise is captured by Rios' BWC. *Id.* at 00:26. About ten seconds later, a series of gunshots is heard. *Id.* at 00:38. According to Plaintiffs, these are mostly shots fired by Salazar and Lovings. Doc. #330 at 12. About two seconds later, Sepolio and Medina are pictured running from the direction of the house toward Squad 15's white van. Doc. #336, Ex. 62 at 00:40; Doc. #336, Ex. 70 at 39–40. Rios' BWC then shows a flash of the front of the house. Doc. #336, Ex. 62 at 00:40. According to Plaintiffs, this short snippet portrays Medina and Sepolio behind a van and Gallegos to the far left of the house. Doc. #330 at 13. Below is an image from Plaintiffs' briefing that shows the snippet from Rios' BWC as well as Plaintiffs' believed identification of the officers. *Id.* at 9.



In the five seconds following this snippet, the BWC captures the sound of several more gunshots. Doc. #336, Ex. 62 at 00:40–00:46. According to Plaintiffs, these shots were also likely

fired by Salazar and Lovings. Doc. #330 at 14. It is at this point that Plaintiffs believe Gallegos moved toward the house and engaged Nicholas—after Medina had already moved outside. *Id.* Moreover, it is only after Medina and Sepolio are seen exiting the house that a sound consistent with glass (i.e., a window) breaking is heard on the BWC. Doc. #336, Ex. 62 at 00:47–00:49. Thus, Plaintiffs claim Gallegos could not have seen Nicholas tugging at Medina's gun inside the home. Instead, Plaintiffs allege Gallegos shot Nicholas without warning or provocation. Doc. #330 at 15.

Third, Plaintiffs dispute that Gallegos could have shot Nicholas in her right side if she was standing over Medina. Nicholas was shot twice: once on her right thigh and once on the right side of her torso. Doc. #336, Ex. 67 at 21–22. But Maloney, through his investigation, determined that if Nicholas was standing over Medina while Medina was sitting on the couch, Gallegos could not have shot her on the right side because he would have only been exposed to Nicholas' left side. Doc. #336, Ex. 34 at 35–36.

Fourth, Plaintiffs dispute that it would have been possible for Tuttle to hold or raise his weapon at Gallegos when Gallegos shot him the final two times. Doc. #330 at 16–17. Maloney's investigation revealed that Tuttle was shot a total of nine times. Doc. #336, Ex. 34 at 33. Some of these gunshot wounds were sustained when Gallegos shot Tuttle after observing him exchange gunfire with Reyna. *Id.*; *supra* p. 7. According to Maloney, after Gallegos fired these shots, Tuttle had sustained seven total gunshot wounds, including wounds to "both arms and hands." Doc. #336, Ex. 34 at 33. At this point, Maloney opines that Tuttle was "incapable of holding a weapon." Doc. #336, Ex. 34 at 33. Thus, when Gallegos shot Tuttle the final two times, it would not have been possible for Tuttle to raise or point a weapon. *Id.* at 33–34.

10

### iii. Maloney's Version

Interestingly, Plaintiffs have advanced a theory of events that differs slightly from the final conclusion of their retained expert, Maloney. In particular, Maloney concluded that Gallegos shot Nicholas "[a]fter Medina is shot and collapses on the couch." *Id.* at 26. Indeed, Maloney's investigation revealed that, from Gallegos' shooting position, he could not have actually seen Nicholas. *Id.* at 27. Instead, Maloney opines that Gallegos shot toward Nicholas, through the front door where Tuttle was standing, and the bullet was "destabilized by the doorframe," grazed Tuttle's forearm, and ultimately killed Nicholas. *Id.* at 26–27. This is corroborated in part by a bullet that was recovered from the couch inside the Decedents' home, which contained both Tuttle and Nicholas' DNA. *Id.* at 35.

### b. Procedural History

On April 9, 2021, Tuttle's family and estate (the "Tuttle Plaintiffs") and Nicholas' family and estate (the "Nicholas Plaintiffs") filed their respective Amended Complaints, which are the live pleadings, asserting claims against the City, the Squad 15 Officers, and Gonzales. Doc. Nos. 48, 49. Specifically, Plaintiffs asserted state law wrongful death and survival claims as well as Section 1983 claims that stem from unlawful search and seizure due to (1) lack of probable cause arising from obtaining the Harding Street warrant and (2) excessive force arising from the raid. *Id.* Throughout the pendency of this lawsuit, several of Plaintiffs' claims have been dismissed. And on January 6, 2025, the Court dismissed all of Plaintiffs' remaining claims against Sepolio, Salazar, Wood, Pardo, Medina, Reyna, Lovings, and Ashraf (collectively, the "Individual Officers"). Doc. #437.

In addition to Plaintiffs' wrongful death and survival claims, the following Section 1983 claims remain pending: (1) with respect to Gallegos, Plaintiffs' excessive force claims; (2) with

respect to Gonzales, the Nicholas Plaintiffs' supervisory liability claims based on excessive force and the Nicholas and Tuttle Plaintiffs' supervisory liability claims based on lack of probable cause; (3) with respect to Bryant, Plaintiffs' excessive force and probable cause claims; (4) with respect to the City, Plaintiffs' municipal liability claims based on excessive force and lack of probable cause; and (5) with respect to Goines, Plaintiffs' excessive force and probable cause claims. *See id.* With respect to Bryant and Gonzales, Plaintiffs have also suggested that they have pending Section 1983 conspiracy claims. *See* Doc. Nos. 332, 333, 340.

Apart from Goines, all of the remaining Defendants have moved for summary judgment or judgment on the pleadings on all of the remaining claims asserted against them. Doc. Nos. 305, 308, 310, 312, 313, 314, 318. Gallegos and Gonzales have also asserted qualified immunity. *See id.* Moreover, the City has moved to exclude certain opinions by Plaintiffs' experts. Doc. #303. The Court will resolve the City's Motion to Exclude (Doc. #303) first because it bears upon evidence submitted in support of Plaintiffs' responses to the parties' various summary-judgment motions. Then, the Court will resolve Gallegos' Motion for Summary Judgment (Doc. #318), Gonzales' Motion for Judgment (Doc. #310) and Motion for Summary Judgment (Doc. #312), Bryant's Motions for Summary Judgment (Doc. Nos. 313, 314), and the City's Motions for Summary Judgment (Doc. Nos. 305, 308) in turn.

## II. Legal Standards

### a. Federal Rule of Civil Procedure 56

Summary judgment is proper where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "A genuine dispute as to a material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Rogers v. Bromac Title Servs., L.L.C.*, 755 F.3d 347, 350 (5th Cir. 2014)

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The moving party bears the initial burden on demonstrating the absence of a genuine issue of material fact." *Carnes Funeral Home, Inc. v. Allstate Ins. Co.*, 509 F. Supp. 3d 908, 915 (S.D. Tex. 2020) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). If that burden is met, "the burden shifts to the non-moving party to set forth specific facts showing a genuine issue for trial." *Id.* (citing FED R. CIV. P. 56(e)). Courts must "construe[] 'all facts and inferences in the light most favorable to the nonmoving party.' Summary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012) (quoting *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir.2010)).

### b.  Federal Rule of Civil Procedure 12(c)

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c). A motion brought pursuant to Rule 12(c) is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts. *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002). The standard for deciding a Rule 12(c) motion is identical to that of Rule 12(b)(6). *Mt. Hawley Ins. Co. v. Jamal & Kamal, Inc.*, 550 F. Supp. 3d 432, 435 (S.D. Tex. 2021).

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a motion to dismiss under Rule 12(b)(6), courts must

liberally construe the complaint in favor of the plaintiff and take all well-pleaded facts as true. *Id.* at 662. In addition, all reasonable inferences must be drawn in the plaintiff's favor. *Severance v. Patterson*, 566 F. 3d. 490, 501 (5th Cir. 2009). A well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556. "The court's review is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).

### c. Qualified Immunity

Qualified immunity protects government officials sued in their individual capacities "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is an "immunity from suit rather than a mere defense to liability." *Pearson v. Callahan*, 555 U.S. 223, 237 (2009). Once a defendant has invoked the defense of qualified immunity, the plaintiff carries the burden of demonstrating its inapplicability. *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009).

In *Saucier v. Katz*, the Supreme Court established a two-part framework to determine if a plaintiff has overcome a qualified-immunity defense. 533 U.S. 194 (2001). First, the court asks whether, taken in the light most favorable to the injured party, "the facts alleged show the officer's conduct violated a constitutional right." *Id.* at 201. Second, the court considers whether the allegedly violated right was "clearly established." *Id.* at 201. When deciding whether the constitutional right was clearly established, the court asks whether the law so clearly and unambiguously prohibited the conduct such that a reasonable official would understand that what he was doing violated the law. *Wyatt v. Fletcher*, 718 F.3d 496, 503 (5th Cir. 2013). "Answering

in the affirmative requires the court to be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity. This requirement establishes a high bar." *Id.* Furthermore, even if "the defendant's actions violated a clearly established constitutional right," the court will then ask whether qualified immunity is nevertheless "appropriate because the defendant's actions were 'objectively reasonable' in light of 'law which was clearly established at the time of the disputed action.'" *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) (quoting *Collins v. Ainsworth*, 382 F.3d 529, 537 (5th Cir. 2004)).

## III.   Analysis

### a.   The City's Motion to Exclude

First, the Court will resolve the City's Motion to Exclude because it seeks exclusion of evidence submitted in support of Plaintiffs' Responses to the parties' various summary-judgment motions. Specifically, the City asks the Court to exclude the opinions of Plaintiffs' experts Andrew Scott ("Scott") and Maloney pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993). Doc. #303.

"The admission or exclusion of expert testimony is a matter left to the discretion of the trial court." *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 563 (5th Cir. 2004). Witnesses who are qualified by "knowledge, skill, experience, training or education" may present opinion testimony. FED. R. EVID. 702. However, the proponent of such a witness must demonstrate that "it is more likely than not" that (1) the expert's knowledge will assist the trier of fact, (2) "the testimony is based upon sufficient facts or data," (3) "the testimony is the product of reliable principles and methods," and (4) the expert has applied the principles and methods reliably to the facts of the case. *Id.*

"[I]n determining the admissibility of expert testimony, the district court should approach its task with proper deference to the jury's role as the arbiter of disputes between conflicting opinions." *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996) (cleaned up). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *14.38 Acres of Land,* 80 F.3d at 1077 (cleaned up). Typically, juries should "hear the expert's testimony and decide whether the predicate facts are accurate." *Ureteknologia De Mexico S.A. De C.V. v. Uretek (USA), Inc.*, 434 F. Supp. 3d 517, 529 (S.D. Tex. 2020). Courts are narrowly tasked with making "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93.

### 1. Scott

The City first moves to exclude Scott's opinion that the Harding Street search warrant was based on false information and not on probable cause, which is contrary to established police practices and HPD policy. Doc. #303 at 9. The City argues that this opinion is based on an undisputed issue, duplicative, and unhelpful to the jury. *Id.* However, the Court finds that this opinion testimony is relevant to Plaintiffs' claims against the City and "will help the trier of fact to understand the evidence." FED. R. EVID. 702(a); *see also Est. of Baker v. Castro*, No. CV H-15-3495, 2018 WL 11354973, at *4 (S.D. Tex. Sept. 18, 2018) (determining that Scott is "qualified to discuss officer practices and standards based on his approximately thirty years in law

enforcement occupations"). As such, the Court denies the City's request to exclude and strike this opinion.

Second, the City moves to exclude Scott's opinion that HPD had a custom of allowing officers to engage in excessive force. Doc. #303 at 9–11. Specifically, the City argues that this opinion is unreliable because Scott relied on newspaper articles that predate former HPD Chief Art Acevedo's ("Acevedo") tenure and did not conduct an independent analysis "to determine if a single use of force incident found to be justified by the City under Chief Acevedo was . . . actually unjustified." *Id.* at 10. However, these issues "regarding the reliability of Scott's methodology are more appropriately addressed at trial on cross-examination." *Est. of Baker*, 2018 WL 11354973, at *4 (rejecting the City's argument that Scott's testimony was unreliable because "Scott just reviewed materials that were provided to him and did not conduct an independent investigation"); *see also 14.38 Acres of Land*, 80 F.3d at 1077 ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration."). As such, the Court denies the Motion to Exclude as it pertains to Scott.

### 2. Maloney

Next, the City moves to exclude Maloney's opinions in their entirety because they are unreliable. Doc. #303 at 11–14. The City also takes issue specifically with Maloney's opinion that, from Gallegos' position at the time he fatally shot Nicholas, Gallegos could not have seen Nicholas standing over Medina. Rather, Maloney has determined that Gallegos fired a shot that grazed Tuttle but ultimately hit and killed Nicholas. Maloney based this conclusion, in part, on the fact that a bullet was recovered from the couch inside the Decedents' home that had both Nicholas and Tuttle's DNA. The City argues for the exclusion of Maloney's opinions because (1)

when presented with unseen evidence that Plaintiffs' counsel had neglected to present, Maloney changed his mind about one of his separate, unrelated opinions, (2) Maloney only reviewed Lovings' deposition transcript and did not review the depositions of any other Squad 15 Officers, and (3) with respect to his opinion regarding Nicholas' death, Maloney did not exclude other possible alternatives as to why Nicholas and Tuttle's DNA could be found on the couch bullet. *Id.*

In crafting his expert report, Maloney conducted (1) a "crime scene investigation" at 7815 Harding street to "collect and document remaining ballistic evidence, blood stain pattern/DNA evidence, and trajectories," (2) "a review of both the Houston Forensic Science Center and Texas Ranger's processing, documentation and analysis of the scene," (3) "a crime scene analysis/reconstruction," and (4) "statement audits to determine the veracity of witnesses statements for forensic viability." Doc. #336, Ex. 34 at 5. And though Maloney did not review all of the Squad 15 Officers' *depositions* in this case, he did review their sworn statements that were made to HPD's Internal Affairs Division ("IAD") shortly after the raid took place. *See id.* at 6. In addition, Maloney's opinions regarding how Nicholas was ultimately killed are not exclusively premised on the DNA found on the couch bullet. *See* Doc. #336, Ex. 79 at 43–44. For example, Maloney's opinion was also based on blood flow from Nicholas' body, where she dropped after being shot, the medical examiner's statements, and bullet trajectories. *Id.* Given the breadth of Maloney's preparation for his expert opinion, it appears that the City's objections primarily concern the "bases and sources" of Maloney's opinion, which go to the "weight to be assigned that opinion rather than its admissibility." *14.38 Acres of Land*, 80 F.3d at 1077 (cleaned up). As such, the Court finds that Maloney's opinions are both relevant and reliable, and the Motion to Exclude is denied.

### b.   Gallegos' Motion for Summary Judgment

Next, Gallegos has asserted qualified immunity and moved for summary judgment with respect to Plaintiffs' Section 1983 excessive force claims and state law wrongful death and survivor claims.  Doc. #318.  To defeat a qualified-immunity defense, Plaintiffs must raise a genuine issue of material fact as to whether (1) Gallegos violated the Decedents' statutory or constitutional rights, and (2) the unlawfulness of Gallegos' conduct was clearly established.  The Court will evaluate each prong of the qualified-immunity analysis in turn.

### 1.   Constitutional Violation

Plaintiffs allege that Gallegos violated the Decedents' Fourth Amendment right to be free from unreasonable search and seizure by using unreasonable and excessive force.  Doc. Nos. 48, 49.  To prevail on a claim for the use of excessive force under the Fourth Amendment, Plaintiffs must show an "(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Trammell v. Fruge*, 868 F.3d 332, 340 (5th Cir. 2017).  Because the Decedents died as a result of Gallegos' use of force, only the second and third elements—which are "often intertwined"—are in dispute. *See Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012).

"Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'" *Hanks v. Rogers*, 853 F.3d 738, 745 (5th Cir. 2017) (quoting *Graham v. Connor*, 490 U.S. 386 (1989)).  Courts consider three factors when determining whether force was excessive or unreasonable: "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.  However, "[t]he threat-of-

harm factor typically predominates the analysis when deadly force has been deployed." *Harmon v. City of Arlington, Tex.*, 16 F.4th 1159, 1163 (5th Cir. 2021). Thus, in the Fifth Circuit, "[a]n officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a threat of serious harm to the officer or to others." *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009). In analyzing the threat posed by a suspect, Fifth Circuit "precedent dictates that the threat be examined only at the moment deadly force is used and that an officer's conduct leading to that point is not considered."[6] *Crane v. City of Arlington, Tex.*, 50 F.4th 453, 466 (5th Cir. 2022). Thus, an officer's "actions prior to the moment he used deadly force, escalatory as they were, cannot be considered." *Id.*

Here, Plaintiffs have identified the following instances of alleged excessive force: (1) the fatal shots Gallegos fired at Nicholas and (2) the final two shots Gallegos fired at Tuttle. Doc. #334 at 39, 33. The Court will evaluate the excessiveness and reasonableness of the force used against Nicholas and Tuttle separately.

### i. Nicholas

Gallegos argues that his use of force against Nicholas was not excessive or unreasonable because he reasonably believed Nicholas posed a threat of harm. Doc. #318 at 21. Specifically, Gallegos argues that he only shot Nicholas after Medina and Lovings had been shot, and while Nicholas was standing over an incapacitated Medina attempting to take his gun. *Id.* at 21–24. In support of this argument, Gallegos relies on: (1) his own sworn testimony based on his recollection of events, (2) the testimony of other Squad 15 Officers, (3) a report showing Nicholas' hands tested positive for gunshot residue, and (4) investigations by the IAD and Texas Rangers, which

---

[6] The Court notes that the Supreme Court has granted certiorari in *Barnes v. Felix*, 91 F.4th 393 (5th Cir.), *cert. granted*, 145 S. Ct. 118 (2024), to examine the propriety the so-called "moment of threat doctrine."

concluded that that the use of force against Nicholas was justified. *See* Doc. #309, Ex. 4 at 6; Doc. #308, Ex. 6 at 46. Plaintiffs, however, argue that Gallegos shot Nicholas unprovoked, while she was unarmed, and *after* Medina had exited the house. Doc. #334 at 29–33. To support their argument, Plaintiffs rely on (1) a BWC snippet that Plaintiffs assert shows Gallegos standing away from the house at the same time Medina is pictured outside, (2) Maloney's expert opinion that, based on the location of Nicholas' gunshot wounds, Nicholas could not have been standing over Medina when Gallegos shot her, and (3) credibility issues regarding the testimony of Gallegos and other Squad 15 Officers. *See id.*

The Fifth Circuit has made clear that no constitutional violation exists where an officer uses deadly force on a suspect that appears to be reaching for a weapon. *See, e.g.*, *Valderas v. City of Lubbock*, 937 F.3d 384, 390 (5th Cir. 2019) ("Our circuit has repeatedly held that an officer's use of deadly force is reasonable when an officer reasonably believes that a suspect was attempting to use or reach for a weapon."); *Batyukova v. Doege*, 994 F.3d 717, 729 (5th Cir. 2021) (affirming summary judgment in favor of the officer where he "made a split-second decision to use deadly force against a non-compliant person who made a movement consistent with reaching for a weapon"). Thus, if Nicholas was reaching for Medina's weapon when Gallegos used deadly force, Gallegos would be entitled to summary judgment on Plaintiffs' excessive force claim. But, as the Court outlines in detail below, there is conflicting evidence on this issue that creates factual disputes which preclude summary judgment.

First, Plaintiffs have provided BWC video that depicts an officer, whom Plaintiffs have identified as Gallegos, standing away from the house while Medina and Sepolio are running out of the house. Plaintiffs assert that they are able to identify this officer as Gallegos because (1) the officer in the video appears to be wearing a short sleeve shirt, which Gallegos wore the day of the

raid, (2) the officer in the video appears to have a skin tone and tattoos consistent with Gallegos' body, and (3) the Texas Rangers' report placed Gallegos in the location of the unidentified officer in the video. Doc. #336, Ex. 19 at 8, Ex. 70 at 51–52. Gallegos has since submitted an affidavit wherein he disputes that the unidentified officer in the video is him. *See* Doc. #353, Ex. 1.

Second, Plaintiffs point to several inconsistencies in Gallegos' own testimony. Significantly, Gallegos first indicated to the IAD that he broke the window *before* he shot Nicholas. Doc. #336, Ex. 18 at 17–18. In the BWC video, however, Medina is seen exiting the house well before the sound of glass breaking is heard. Gallegos later changed his testimony and stated that he broke the window *after* he shot Nicholas. Gallegos also stated in his IAD interview that Nicholas did not actually "lay her hands" on Medina's weapon. Doc. #336, Ex. 18 at 37. But in his deposition, Gallegos testified that he observed Nicholas "tugging" and "pulling" at Medina's gun. Doc. #336, Ex. 39 at 103.

Third, even assuming that Medina was still inside the house when Gallegos shot Nicholas, Maloney determined that Nicholas could not have been standing over Medina on the couch. This is because, based on the layout of the house, location of the couch, and Gallegos' position when he shot Nicholas, Maloney determined that Nicholas would have been exposing only the left side of her body to Gallegos. Doc. #356, Ex. 34 at 35. However, Nicholas was shot on the *right* side of her body. Doc. #336, Ex. 67 at 21–22. As such, Maloney concluded that "Nicholas was not next to the policeman or reaching over his body for the shotgun when she was shot." Doc. #3356, Ex. 34 at 32.

Thus, Plaintiffs have presented evidence that suggests (1) Medina was not inside the house when Nicholas was shot and (2) Nicholas could not have been standing over Medina, or even next to Medina, when Gallegos shot her. However, Gallegos testified that he shot Nicholas because he

observed her grabbing Medina's weapon. Moreover, Nicholas' hands tested positive for gunshot residue. Importantly, "[a]t this stage of the case, the court may not weigh the evidence and/or judge the credibility of the witnesses." *McIntosh v. Smith*, 690 F. Supp. 2d 515, 527 (S.D. Tex. 2010). Given the competing evidence, and construing all facts in favor of Plaintiffs, the Court finds that Gallegos has not conclusively established that Nicholas posed a threat of harm. Specifically, a fact issue exists as to whether Nicholas was standing over Medina and attempting to grab his weapon at the time Gallegos shot her. As such, with respect to Nicholas, the Court finds Plaintiffs have met their burden to raise a fact issue as to the first prong of the qualified-immunity analysis.

### ii. Tuttle

Next, Gallegos asserts that his use of force against Tuttle was justified because Tuttle posed a threat of harm. Doc. #318 at 24–26. Though Tuttle suffered nine total gunshot wounds, Plaintiffs only challenge the constitutionality of the final two shots Gallegos fired at Tuttle. Doc. #334 at 33–38. Specifically, Plaintiffs argue that Gallegos used excessive force when he shot Tuttle (1) in the buttocks area and (2) in his neck/back area. *Id.* In both instances, Gallegos recalls that Tuttle was holding a gun or raised his weapon. *Supra* pp. 7–8. However, Plaintiffs argue that during both instances, Tuttle had already sustained seven gunshot wounds, including to both hands and arms, that would have rendered him incapable of holding a gun. Doc. #334 at 33–38.

In this Circuit, "[a]n officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a threat of serious harm to the officer or to others." *Manis*, 585 F.3d at 843. However, "[m]erely having a gun in one's hand does not mean *per se* that one is dangerous." *Graves v. Zachary*, 277 F. App'x 344, 348 (5th Cir. 2008). Moreover, "an exercise of force that is reasonable at one moment can

become unreasonable in the next if the justification for the use of force has ceased." *Lytle v. Bexar Cnty., Tex.*, 560 F.3d 404, 413 (5th Cir. 2009); *see also Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 277 (5th Cir. 2015).

For instance, in *Graves*, an officer responded to a call reporting that the plaintiff threatened his girlfriend with a gun. 277 F. App'x at 345. When the officer arrived on the scene, he observed the plaintiff with a gun to his own head. *Id.* The officer, who stated he feared the plaintiff may turn the gun on others, shot the plaintiff once. *Id.* at 346. "After a short delay," the officer shot the plaintiff again, this time in the chest. *Id.* The plaintiff alleged that the second shot constituted excessive force because he had already been incapacitated by the first shot. *Id.* The district court denied the officer's summary-judgment motion and found that he was not entitled to qualified immunity. *Id.* at 345. On appeal, the Fifth Circuit affirmed, finding that there were "factual disputes as to whether [the plaintiff] was incapacitated by the first shot such that the second shot was unnecessary." *Id.* at 348. Specifically, the Fifth Circuit rejected the officer's argument that "as long as [the plaintiff] possessed the gun," he posed a threat of harm, because "[m]erely having a gun in one's hand does not mean *per se* that one is dangerous." *Id.* Instead, the question is whether, "[v]iewing the facts objectively, after being shot, did [the plaintiff] appear to be in any condition to fire his weapon?" *Id.* Because "[the officer] says yes, but [the plaintiff] says no," the Fifth Circuit found there was a fact issue as to "whether [the officer] violated [the plaintiff's] constitutional rights by shooting him after he was already 'incapacitated.'" *Id.* at 348–49.

Similarly, in *Mason*, an officer and his police canine responded to reports of an armed robbery. 806 F.3d at 272. When he arrived on the scene, the officer observed the plaintiff with a gun in his waistband. *Id.* at 273. The officer then sent the police canine after the plaintiff. *Id.* According to the officer, the plaintiff's hand came in contact with his gun after being attacked by

the dog. *Id.* Thus, the officer shot the plaintiff five times, at which point the plaintiff laid in a "prone position, face down." *Id.* The officer then "temporarily stopped firing." *Id.* According to the officer, he observed the plaintiff move in a way that suggested he was about pull out his gun. *Id.* at 274. In contrast, another eyewitness stated she only saw the plaintiff "pick up his head and put it back down." *Id.* After observing the plaintiff's movement, the officer shot the plaintiff two more times, killing him. *Id.* Though the district court granted summary judgment in favor of the officer on the plaintiff's excessive force claim, the Fifth Circuit reversed. *Id.* at 277. In so doing, the Fifth Circuit noted that "force that is reasonable at one moment can become unreasonable in the next." *Id.* (internal quotations and citation omitted). And in the *Mason* case, "a reasonable jury could conclude that [the plaintiff] lay incapacitated on the ground and did not move in a threatening manner before [the officer] fired the final two shots." *Id.* In reaching this conclusion, the Fifth Circuit relied on the eyewitness's testimony, as well as an expert's testimony that it would have been difficult for the plaintiff to move his arm after being shot five times. *Id.*

Here, it is undisputed that, at the time Gallegos fired the shots in question, (1) Tuttle had shot Lovings, (2) three other officers had also sustained gunshot wounds[7], and (3) Tuttle had already been shot several times. It is also undisputed that, throughout the entire eighty-second exchange, Tuttle fired his gun three to four times. Doc. #336, Ex. 70 at 89, Ex. 34 at 35. However, the parties dispute whether Tuttle was already incapacitated or capable of firing his weapon at the time Gallegos fired the final two shots. Because Gallegos shooting Tuttle in the buttocks and neck were "two distinct moments of force," the Court will analyze them separately. *See Tucker v. City of Shreveport*, 998 F.3d 165, 171 (5th Cir. 2021) (internal quotations omitted).

---

[7] The Court notes that the parties *do* dispute whether those gunshots came from Tuttle or by friendly fire.

First, the Court turns to the shot to Tuttle's buttocks. Gallegos has testified that he stood near a tree and observed Tuttle and Reyna exchange gunfire near the doorway of the house, at which time Gallegos shot Tuttle in the hand. *Supra* pp. 7–8. Tuttle then retreated into the house, and Gallegos moved from his position near the tree. *Id.* As Gallegos approached, he saw Tuttle leaning against the front door. *Id.* According to Gallegos, Tuttle then raised his weapon and Gallegos shot several times, hitting Tuttle at least once in his buttocks. *Id.* However, Plaintiffs assert that Tuttle was already incapable of holding or raising a weapon. Doc. #334 at 34. Specifically, Maloney testified that, by the time Gallegos shot Tuttle in the buttocks and neck, Tuttle had already "received shots to both arms and hands" and "was incapable of holding a weapon." Doc. #336, Ex. 34 at 33. Likewise, forensic pathologist Dr. Robert C. Bux ("Dr. Bux") testified that (1) the gunshot to Tuttle's left arm made it "impossible to grasp a firearm, let alone pull the trigger" and (2) the gunshot to Tuttle's right wrist made it "unlikely that he could grasp the gun and pull the trigger." Doc. #336, Ex. 36 at 10–11. As in *Graves*, the question in this case is whether, "[v]iewing the facts objectively, after being shot, did [Tuttle] appear to be in any condition to fire his weapon? [Gallegos] says yes, but [Plaintiffs] say no." *Graves*, 277 Fed. App'x at 348. Thus, because Plaintiffs have pointed to evidence suggesting that Plaintiff was incapacitated at the time Gallegos shot Tuttle in the buttocks, there is a factual dispute as to "whether [Gallegos] violated [Tuttle's] constitutional rights by shooting him after he was already 'incapacitated.'" *See id.* at 348–49.

Next, the Court evaluates the final shot to Tuttle's neck. According to Gallegos, after he shot Tuttle in the buttocks, Tuttle fell to the ground inside the house. *Supra* p. 8. Pardo then observed Tuttle with a gun in his hand and near Lovings, who lay paralyzed on the ground. Pardo shot at Tuttle once, but it is unclear if Tuttle was hit. *See* Doc. #336, Ex. 71 at 20. Pardo retreated

to a position near Gallegos, who continued to walk toward the house. *Supra* p. 8. Gallegos found Tuttle in a seated position near the doorway and again saw Tuttle begin to raise his weapon. *Id.* Gallegos then shot Tuttle near the back of his neck. *Id.* To refute Gallegos' recollection of events, Plaintiffs again rely on the testimony of Maloney and Dr. Bux, which indicates Tuttle was not able to hold or raise a weapon by this point. *See* Doc. #334 at 34. In addition, audio from BWC suggests that this final shot occurred twenty seconds after the previous gunshots are heard. Doc. #336, Ex. 62 at 1:27–1:47. And while the audio also reveals that someone appeared to yell "stop moving," that statement is heard at the same time the final shot is fired. *Id.* at 1:47. Thus, as in *Mason*, the Court finds there is evidence that, viewed in the light most favorable to Plaintiffs, suggests that Tuttle would not have been capable of holding a weapon or moving in a threatening manner at the time Gallegos fired this final shot. *See Mason*, 806 F.3d at 277. As such, a fact issue also exists as to whether Tuttle was "incapacitated" when Gallegos shot Tuttle's neck. Plaintiffs have therefore met their burden to raise a fact issue as to the first prong of the qualified immunity analysis as it relates to Tuttle.

## 2. Clearly Established Law

Because Plaintiffs have raised a fact issue with respect to whether Gallegos engaged in unconstitutionally excessive force, "[t]he next question is whether [Gallegos'] violation was objectively unreasonable in light of clearly established law." *See Graves*, 277 Fed. App'x at 349. "While a plaintiff need not find a case 'directly on point,'" to show a clearly established law violation, "'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Roque v. Harvel*, 993 F.3d 325, 334 (5th Cir. 2021) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). "The Supreme Court has also explained that the clearly established law 'should not be defined at a high level of generality.'" *Id.* at 334–35 (quoting *White v. Pauly*, 580 U.S. 73, 79

(2017)). However, "in an obvious case, general standards can clearly establish the answer, even without a body of relevant case law." *Id.* at 335 (cleaned up).

First, with respect to Nicholas, Plaintiffs argue that it is clearly established law that officers cannot use deadly force on unarmed and nondangerous suspects. Doc. #334 at 39. Gallegos has not provided any other justification for shooting Nicholas other than thinking she posed a threat because she was standing over Medina and grabbing at his weapon. Doc. #318 at 21–24. However, viewing the evidence in the light most favorable to Plaintiffs, it is possible that at the time Gallegos shot Nicholas, Medina was either not inside the home or Nicholas was not reaching for his weapon. It has long been clearly established law that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting [her] dead." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). Because fact issues exist with respect to whether Nicholas posed a threat at the time Gallegos shot her, and because the law is clearly established that officers cannot use deadly force on a nonthreatening suspect, Gallegos is not entitled to qualified immunity as it pertains to his shooting of Nicholas.

Next, with respect to Tuttle, Plaintiffs argue that it is clearly established that officers cannot use deadly force on a suspect who has been incapacitated. Doc. #334 at 39. While Gallegos asserts that he only shot Tuttle after Tuttle raised his own weapon, the Court has determined fact issues exist on this issue. *Supra* pp. 19–27. Viewing the evidence in the light most favorable to Plaintiffs, it is possible that Tuttle was already "incapacitated or otherwise incapable of using [a weapon] (functionally unarmed)." *See Roque*, 993 F.3d at 335. And "multiple cases show that by [January 28, 2019], the day that [Gallegos] shot [Tuttle], it was clearly established that after incapacitating a suspect who posed a threat, an officer cannot continue using deadly force." *Id.* at 336 (citing *Lytle*, 560 F.3d at 413; *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014)). Specifically, as the Court

outlined above, *Graves* and *Mason* show that it was clearly established that it is a violation of the Fourth Amendment to shoot dead a suspect who has been incapacitated and is functionally unarmed, even where that suspect previously posed a threat. *See Graves*, 277 Fed. App'x at 348; *Mason*, 806 F.3d at 277. Because there are factual disputes regarding whether Tuttle was incapacitated when Gallegos shot him the final two times, Gallegos is not entitled to qualified immunity as it pertains to his shooting of Tuttle. As such, Gallegos' Motion for Summary Judgment is denied with respect to Plaintiffs' Section 1983 excessive force claims.

### 3. Wrongful Death and Survival Claims

Plaintiffs' Amended Complaints assert wrongful death and survival claims against Gallegos pursuant to Sections 71.004 and 71.021 of the Texas Civil Practice and Remedies Code. Doc. #48 ¶¶ 189, 192; Doc. #49 ¶¶ 214, 217. Gallegos has moved for summary judgment with respect to Plaintiffs' state law claims because they are barred by individual immunity under Section 101.106 of the Texas Tort Claims Act ("TTCA") ("Section 101.106"). Doc. #318 at 27 (citing TEX. CIV. PRAC. & REM. CODE § 101.106). In response, Plaintiffs argue that they are not asserting claims under the TTCA. Doc. #334 at 39–40. Rather, their state law claims "are simply the derivative method for asserting wrongful death and survival under Section 1983." *Id.*

"Section 101.106(a) applies to tort claims, including intentional tort claims." *Chavez v. Alvarado*, 550 F. Supp. 3d 439, 451 (S.D. Tex. 2021). However, Section 101.106 "does not apply to [Section] 1983 claims." *Id.* (collecting cases). As such, Gallegos is not entitled to summary judgment on Plaintiffs' derivative Section 1983 wrongful death and survival claims. *See Edwards v. Oliver*, No. 3:17-CV-01208-M-BT, 2021 WL 881283, at *11 (N.D. Tex. Jan. 19, 2021), *report and recommendation adopted*, 2021 WL 873190 (N.D. Tex. Mar. 9, 2021), *appeal dismissed and remanded on other grounds*, 31 F.4th 925 (5th Cir. 2022) ("Accordingly, Plaintiffs' § 1983

wrongful-death and survival claims are not subject to or barred by the [TTCA] at Texas Civil Practice and Remedies Code § 101.106, and [the defendant] is not entitled to summary judgment on Plaintiffs' § 1983 wrongful-death and survival claims on that ground."). Gallegos' Motion for Summary Judgment is therefore denied.

### c. Gonzales' Motion for Judgment and Motion for Summary Judgment

With respect to Gonzales, the Nicholas Plaintiffs have asserted supervisory liability claims premised on excessive force and lack of probable cause. Doc. #49. The Tuttle Plaintiffs have only asserted supervisory liability claims based on lack of probable cause. Doc. #48. Plaintiffs have also suggested they have pending claims against Gonzales for Section 1983 conspiracy, as well as state law wrongful death and survival. However, Gonzales disputes that such claims remain pending. *See* Doc. #310. Thus, Gonzales has asserted qualified immunity and moved for summary judgment on all of Plaintiffs' supervisory liability claims, and has moved for judgment on the pleadings with respect to any purported conspiracy or state law claims. Doc. Nos. 310, 312. The Court will first resolve Gonzales' Motion for Summary Judgment as it pertains to Plaintiffs' supervisory liability claims. Then, the Court will turn to the Motion for Judgment as it pertains to Plaintiffs' conspiracy and state law claims.

### 1. Supervisory Liability

"A supervisory official may be held liable under [Section] 1983 only if (1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury." *Gates v. Tex. Dep't of Protective & Regul. Servs.*, 537 F.3d 404, 435 (5th Cir. 2008). "Supervisory officials cannot be held liable under [S]ection 1983 for the actions of subordinates . . . on any theory of vicarious or *respondeat superior* liability." *Est. of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d

375, 381 (5th Cir. 2005). Instead, "Plaintiffs must show that the conduct of the supervisors denied [the Decedents'] constitutional rights." *Id.* "To hold a supervisory official so liable, the plaintiff must show that: (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Smith v. Brenoettsy*, 158 F.3d 908, 911–12 (5th Cir. 1998).

"For an official to act with deliberate indifference, 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Smith*, 158 F.3d at 912 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). This "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410 (1997). "Deliberate indifference requires a showing of more than negligence or even gross negligence." *Est. of Davis*, 406 F.3d at 381. "To establish deliberate indifference, 'a plaintiff usually must demonstrate a pattern of violations and that the inadequacy of the training is obvious and obviously likely to result in a constitutional violation.'" *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009) (quoting *Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2003)). As the Fifth Circuit has explained:

> Prior indications cannot simply be for any and all "bad" or unwise acts, but rather must point to the specific violation in question. That is, notice of a pattern *of similar* violations is required. While the specificity required should not be exaggerated, our cases require that the prior acts be fairly similar to what ultimately transpired and, in the case of excessive use of force, that the prior act have involved injury to a third party.

*Est. of Davis*, 406 F.3d at 383 (citations omitted).

Alternatively, "a plaintiff may demonstrate liability based on a single incident if the constitutional violation was the highly predictable consequence of a particular failure to train" or

supervise. *Davidson v. City of Stafford, Tex.*, 848 F.3d 384, 397 (5th Cir. 2017) (internal quotations and citations omitted). This so-called "single incident exception" is "narrow," and one that the Fifth Circuit has reiterated it is "reluctant to expand." *Burge v. St. Tammany Par.*, 336 F.3d 363, 373 (5th Cir. 2003). "To rely on this exception, a plaintiff must prove that the 'highly predictable' consequence of a failure to train [or supervise] would result in the specific injury suffered, and that the failure to train [or supervise] represented the 'moving force' behind the constitutional violation." *Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005). The single-incident exception is "generally reserved" for cases in which the policymaker provides no training or supervision "with respect to the relevant constitutional duty." *Littell v. Houston Indep. Sch. Dist.*, 894 F.3d 616, 625 n.5 (5th Cir. 2018).

### i. Excessive Force

As to the Nicholas Plaintiffs' excessive force claims, Gonzales argues there is no fact issue as to whether he acted with deliberate indifference. Doc. #312 at 14–15. In response, the Nicholas Plaintiffs generally argue that Gonzales acted with deliberate indifference because he "knew or should have known" (1) that HPD had a history of failing to hold officers responsible for "shooting civilians," (2) "the common-sense implications of a no-knock raid and the risk for violence and excessive force that could occur," and (3) that, "if [Gonzales] was permitting his officers to violate the [C]onstitution by pursuing no-knock warrants without adequate probable cause, other constitutional violations may follow." Doc. #332 at 15–16.

None of the Nicholas Plaintiffs' arguments "demonstrate a prior pattern by [Gallegos] of violating constitutional rights by employing excessive force," which is what the Court must focus on for purposes of evaluating deliberate indifference. *See Est. of Davis*, 406 F.3d at 383. Indeed, the Nicholas Plaintiffs point to no evidence that is "relevant to whether [Gonzales] was on notice

that [Gallegos] might use excessive force when confronted with" the execution of a no-knock search warrant. *See Roberts*, 397 F.3d at 294. Because the Nicholas Plaintiffs have failed to raise a fact issue as to whether Gonzales acted with deliberate indifference, Gonzales is entitled to summary judgment with respect to the Nicholas Plaintiffs' supervisory liability claims based on excessive force.

### ii. Lack of Probable Cause

Next, with respect to Plaintiffs' claims based on lack of probable cause, Gonzales again argues (1) that he did not act with deliberate indifference and (2) that there is no causal nexus between the alleged failure to supervise and the violation of the Decedents' rights. Doc. #312 at 16–20. Gonzales also argues that Plaintiffs cannot show he violated any clearly established law. *Id.* at 20. However, as discussed in detail below, "[b]ecause this case falters on the requirement of deliberate indifference, [the Court] need not address the other two prongs of supervisory liability." *Est. of Davis*, 406 F.3d at 382.

Plaintiffs first argue that Gonzales was deliberately indifferent because he had actual or constructive knowledge that Goines had a pattern of violating constitutional rights. Doc. #332 at 11. As outlined above, "[t]o prevail under a deliberate indifference theory, a plaintiff must show that the defendant official 'was aware of facts from which an inference of substantial risk of serious harm could be drawn,' and that 'the official actually drew that inference.'" *Ford v. Anderson Cnty., Tex.*, 102 F.4th 292, 317 (5th Cir. 2024) (quoting *Thompson v. Upshur Cnty.*, 245 F.3d 447, 458–59 (5th Cir. 2001)).

Here, Plaintiffs point to several pieces of evidence that they argue indicate that Goines had a pattern of lying on search warrant affidavits. For instance, a post-raid internal audit by HPD specifically noted "a *pattern* of criminal conduct by [Goines]." Doc. #336, Ex. 1 at 4 (emphasis

added).  Notably, "Goines knowingly portrayed false or misleading information in order to obtain no knock search warrants in his investigations" on six different occasions in 2018 and 2019 alone. *Id.* at 13.  In addition, a survey of more than one hundred search warrants that Goines obtained between 2012 and 2019 revealed that almost all of them were requests for no-knock warrants based on the suspect possessing a firearm.  *See* Doc. #336, Ex. 61.  However, after execution of all of these search warrants, Goines listed a firearm as being recovered in only one instance.  *Id.* Another post-raid HPD audit also revealed widespread violations of Standard Operating Procedures ("SOPs") within HPD's Narcotics Division, including a number of violations by Goines from 2016 to 2019.  *See* Doc. #305, Ex. 5.

Though there is certainly evidence indicating Goines had a history of lying on affidavits and violating other SOPs, Plaintiffs have fallen short of showing that Gonzales was *"aware"* of these facts such that he could draw the inference that a substantial risk of serious harm existed. *See, e.g., Est. of Davis*, 406 F.3d at 385 (finding no deliberate indifference where there was "no evidence to suggest" that the supervisors were "aware" of evidence that could have indicated the subordinate officer would use excessive force).  And though Plaintiffs have argued that Gonzales *should have* uncovered Goines' pattern of misconduct, "[t]he test for deliberate indifference is subjective, rather than objective, in nature because *an official's failure to alleviate a significant risk that he should have perceived but did not*, while no cause for commendation, *cannot under our cases be condemned* as the infliction of punishment."  *Wernecke v. Garcia*, 591 F.3d 386, 401 (5th Cir. 2009) (cleaned up) (emphasis added).  In addition, the Court understands that post-raid investigations revealed significant failures on Gonzales' part as a supervisor.  *See* Doc. #336, Ex. 11 at 13–21.  However, "[a]ctions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and do not divest officials of

qualified immunity." *Alton v. Tex. A&M Univ.*, 168 F.3d 196, 201 (5th Cir. 1999). The highly stringent standard of deliberate indifference requires Plaintiffs to raise a fact issue as to whether Gonzales was subjectively aware of facts that would have permitted him to infer that a substantial risk of serious harm existed. And Plaintiffs point to no evidence that suggests Gonzales was aware that Goines had previously lied on search warrant affidavits. In other words, "there is no conduct from which it could be reasonably concluded that [Gonzales] made a deliberate or conscious choice to endanger constitutional rights." *Est. of Davis*, 406 F.3d at 385.

Plaintiffs also attempt to rely on the "single incident exception." Doc. #332 at 11. In this regard, Plaintiffs must show that Goines received *no* training or supervision regarding the constitutional violation at issue. *See Est. of Davis*, 406 F.3d at 386); *Lewis v. Williamson Cnty., Tex.*, No. 1:21-CV-00074-LY-SH, 2022 WL 2161054, at *6 (W.D. Tex. June 15, 2022) ("[Plaintiff] does not satisfy the narrow single-incident exception because he does not allege that Williamson County officers received no supervision or training regarding the constitutional violation at issue."). However, the evidence before the Court shows that Goines received at least some training and supervision. For instance, in 2018, when Gonzales became aware that Goines had not been timely submitting paperwork, Goines was prohibited from "working new cases" and "solely work[ed] on his case files." Doc. #336, Ex. 11 at 18. In addition, all HPD officers— including Goines—received training consistent with standards set forth by the Texas Commission on Law Enforcement ("TCOLE"). *See* Doc. #305, Ex. 8 at 39–52 (noting course completions in, among other things, "investigations," "ethics," "report writing," and "mechanics of arrest and search"). "It is not enough to say that more or different training or supervision would have prevented the result of the ill-fated raid." *Est. of Davis*, 406 F.3d at 386. Thus, Plaintiffs cannot rely on the single incident exception. Because Plaintiffs have not raised a fact issue with respect

to deliberate indifference, Gonzales' Motion for Summary Judgment is granted as to Plaintiffs' supervisory liability claims based on lack of probable cause for the warrant.

## 2. Conspiracy and State Law Claims

Next, Gonzales has moved for judgment on the pleadings with respect to any supposed conspiracy claims asserted by the Plaintiffs. Doc. #310. As an initial matter, the parties dispute whether Plaintiffs ever actually asserted a conspiracy claim against Gonzales to begin with. *See* Doc. Nos. 310, 340. By way of background on this issue, Plaintiffs filed their respective Amended Complaints on April 9, 2021. Doc. Nos. 48, 49. In response, Gonzales—along with the Individual Officers—asserted qualified immunity and moved to dismiss under Rule 12(b)(6). On December 16, 2022, the Court issued an Order resolving the various motions to dismiss, which the Individual Officers and Gonzales appealed. Doc. #229. The Fifth Circuit determined that Plaintiffs had plausibly alleged Section 1983 excessive force claims against the Individual Officers based on direct liability theories, as well as supervisory liability claims against Gonzales. *Id.* at 8–9. However, the Fifth Circuit held Plaintiffs failed to sufficiently allege excessive force and search-and-seizure claims premised on failure-to-intervene theories. *Id.* The Fifth Circuit also left intact Plaintiffs' wrongful death and survival claims. *Id.* at 9. Neither this Court nor the Fifth Circuit explicitly addressed any supposed conspiracy claims asserted by the Plaintiffs.

On August 5, 2024, Plaintiffs, the Individual Officers, and Gonzales jointly stipulated to the dismissal of Plaintiffs' excessive force claims. Doc. #301. On August 9, 2024, the Individual Officers and Gonzales filed the Motion for Judgment, arguing that the stipulated dismissal of the excessive force claims also disposed of Plaintiffs' state law wrongful death and survivor claims because Plaintiffs no longer have any pending Section 1983 claims. Doc. #310 at 9. The Individual Officers and Gonzales also argue that, to the extent Plaintiffs assert that they have

pending conspiracy claims, either (1) Plaintiffs never pleaded conspiracy, or (2) their conspiracy claims are insufficiently pled. *Id.* In their Response to the Motion for Judgment, Plaintiffs argue they still have pending Section 1983 conspiracy claims against the Individual Officers and Gonzales. Doc. #340. However, Plaintiffs subsequently moved for voluntary dismissal of their remaining claims against the Individual Officers pursuant to Rule 41(a)(2). Doc. #432. Thus, on January 6, 2024, the Court dismissed the Individual Officers from this case with prejudice, thereby mooting the Motion for Judgment with respect to these parties. However, the issues presented in the Motion for Judgment remain ripe for consideration as it pertains to Gonzales.

"To prove a conspiracy under [Section] 1983, a plaintiff must allege facts that indicate (1) there was an agreement among individuals to commit a deprivation, and (2) that an actual deprivation occurred." *Jabary v. City of Allen*, 547 F. App'x 600, 610 (5th Cir. 2013) (per curium). "A plaintiff must develop facts that evince 'a preceding agreement, not merely parallel conduct that could as well be independent action.'" *Morales v. Carrillo*, 625 F. Supp. 3d 587, 599 (W.D. Tex. 2022) (quoting *Jabary*, 547 F. App'x at 610); *see also Watsky v. Williamson Cnty., Texas*, No. 1:21-CV-374-RP, 2024 WL 3433705, at *3 (W.D. Tex. July 15, 2024) ("Allegations of conspiracy without facts demonstrating prior agreement between defendants cannot survive a motion to dismiss.").

Here, Plaintiffs' respective Amended Complaints contain only conclusory allegations regarding a supposed conspiracy involving Gonzales to deprive the Decedents' of their constitutional rights. For instance, while Plaintiffs generally allege Gonzales knew that Squad 15 Officers "would obtain illegal search warrants" or "conspired to deprive" constitutional rights, Plaintiffs have pleaded no facts that show a "prior agreement" between Gonzales and any other party to falsify a search warrant or use excessive force. *See Watsky*, 2024 WL 3433705, at *3;

Doc. #48 ¶¶ 97, 112; Doc. #49 ¶ 160. Thus, even assuming that Plaintiffs have pending conspiracy claims against Gonzales, the Court finds they have not plausibly alleged these claims under Rule 12(c). In addition, with respect to Plaintiffs' state law claims against Gonzales, Plaintiffs have stated that they "only asserted these claims as part of their Section 1983 claims." Doc. #340 at 5–6. As such, because the Court has determined that Plaintiffs have no viable Section 1983 claims against Gonzales, their state law claims should also be dismissed. The Motion for Judgment is therefore granted with respect to Gonzales.

### d. Bryant's Motions for Summary Judgment

Bryant moves for summary judgment with respect to Plaintiffs' Section 1983 claims based on excessive force and lack of probable cause for the warrant, as well as their state law wrongful death and survival claims. Doc. Nos. 313, 314. In response, Plaintiffs did not oppose summary judgment on their excessive force claims, but argue that fact issues preclude summary judgment on their remaining claims. Doc. #333 at 10. Plaintiffs also assert they have pending conspiracy claims against Bryant, which was not substantively addressed in Bryant's Motion for Summary Judgment. *Id.* at 15.

### 1. Lack of Probable Cause

First, Bryant moves for summary judgment on Plaintiffs' Section 1983 claims based on lack of probable cause for the search warrant, which are premised on both direct liability and failure to intervene theories. Doc. #313 at 8; Doc. #314 at 6. "To state a claim under [Section] 1983, a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000). In addition, "an officer may be liable under [Section] 1983 under a theory of bystander liability where

the officer (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013) (internal quotations and citation omitted). The alleged constitutional violation in this case involves the Fourth Amendment, which protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause." U.S. CONST. amend. IV.

Plaintiffs argue that several pieces of evidence raise a fact issue with respect to whether Bryant either (1) was directly involved in obtaining the Harding Street warrant or (2) knew about Goines lying to obtain the warrant and failed to intervene. Doc. #333 at 12–14. Notably, prior to the Harding Street raid, Bryant and Goines already had a history of falsely listing each other on search warrant affidavits as the second officer present during confidential informant drug buys. Doc. #305, Ex. 4 at 4. And in this case, Bryant "indicated he became aware of the Harding Street investigation on January 27, 2019, when Officer Goines called him and told him he was going to do a buy. Officer Goines told Officer Bryant he did not need him to accompany him to the buy." Doc. #336, Ex. 11 at 38. However, consistent with their "pattern of criminal misconduct," Goines listed Bryant on the Harding Street warrant as a witness to the confidential informant drug buy. *See* Doc. #305, Ex. 4 at 4. In fact, this drug buy never occurred. However, two days *after* the raid, Bryant "tagged" narcotics that were supposedly bought from the confidential informant.[8] Doc. #336, Ex. 11 at 7. Moreover, in Bryant's depositions during the course of this case, he has consistently asserted his Fifth Amendment privilege in response to questions concerning his

---

[8] In connection with his post-raid misconduct, Bryant has since pleaded guilty to destruction, alteration, or falsification of records in federal investigations and bankruptcy, in violation of 18 U.S.C. § 1519. *See* Plea Agreement, *United States of America v. Bryant*, 4:19-cr-832 (S.D. Tex. June 1, 2021), ECF No. 113.

knowledge of and involvement in Goines' Harding Street investigation. *See, e.g.*, Doc. #336, Ex. 45 at 23–30.

Other than the call Goines made to Bryant the night before the raid, which apprised Bryant that Goines was planning a drug buy for his investigation of 7815 Harding Street, there is no evidence before the Court demonstrating Bryant's direct involvement in obtaining the warrant. As such, the Court finds that Plaintiffs have not raised a genuine factual dispute as to whether Bryant had any direct involvement in Goines fraudulently obtaining the Harding Street warrant. However, Plaintiffs have raised a genuine factual dispute with respect to their failure to intervene claims. Specifically, Plaintiffs have presented evidence which suggests that Goines and Bryant had an established history of falsely listing each other as second witnesses to drug buys. And in this case, there is evidence suggesting Goines told Bryant he was going to organize a drug buy for his Harding Street investigation but "did not need [Bryant] to accompany him to the buy." Doc. #336, Ex. 11 at 38. This is enough to raise a factual dispute as to whether, consistent with their history of lying on search warrant affidavits, Goines would again lie about Bryant witnessing a drug buy at 7815 Harding Street. Given that Goines called Bryant and informed him of the upcoming buy before obtaining the warrant, Bryant also had a "reasonable opportunity to prevent" Goines from violating Plaintiffs' constitutional rights. *See Whitley*, 726 F.3d at 646. Thus, Bryant's Motion for Summary Judgment is granted with respect to Plaintiffs' claims based on lack of probable cause to the extent such claims are premised on direct liability, but denied to the extent the claims are premised on failure to intervene.

### 2. Conspiracy

Next, the Court addresses Plaintiffs' supposed conspiracy claims against Bryant. Though Bryant failed to substantively address these claims in his Motion for Summary Judgment, he

sought judgment on all of Plaintiffs' "federal and Texas state claims." Doc. #313 at 14; Doc. #314 at 14. In addition, Bryant's Reply brief—in an abundance of caution—requested leave for the Court to address this issue because the same arguments presented in Bryant's Motion for Summary Judgment apply to Plaintiffs' purported conspiracy claims. Doc. #342 at 4–5. Thus, the Court will evaluate whether Plaintiffs' conspiracy claims withstand summary judgment.

As the Court recounted above with respect to Gonzales, "[t]o prove a conspiracy under [Section] 1983, a plaintiff must allege facts that indicate (1) there was an agreement among individuals to commit a deprivation, and (2) that an actual deprivation occurred." *Jabary*, 547 F. App'x at 610. Plaintiffs allege that Bryant conspired with Goines to obtain a fraudulent search warrant for 7815 Harding Street, in violation of the Decedents' Fourth Amendment rights. *See* Doc. #58 ¶ 112; Doc. #49 ¶ 159. However, Plaintiffs have not pointed to any evidence that suggests Bryant and Goines came to a "preceding agreement" to violate Plaintiffs' Fourth Amendment rights. *See Morales*, 625 F. Supp. 3d at 599 (quoting *Jabary*, 547 F. App'x at 610); *Watsky*, 2024 WL 3433705, at *3. As such, summary judgment is granted with respect to Plaintiffs' conspiracy claims against Bryant.

### 3. State Law Claims

Finally, Bryant has moved for summary judgment with respect to Plaintiffs' state law wrongful death and survival claims, arguing that "there is an absence of evidence that Bryant caused any injury to, or the death of," the Decedents. Doc. #313 at 11–12; Doc. #314 at 11–12. Plaintiffs, on the other hand, argue that they have raised a fact issue as to whether Bryant caused the Decedents' deaths. Doc. #333 at 14–15.

"[A] plaintiff seeking to recover on a wrongful death claim under [Section] 1983 must prove both the alleged constitutional deprivation required by [Section] 1983 and the causal link