# EXHIBIT 1



6027 NW 31 Way
Boca Raton, FL 33496
(561) 302-0756 Tel
(561) 892-8250 Fax
ascott@ajspoliceconsulting.com
www.ajspoliceconsulting.com

January 15, 2024

## In the United States District Court
## Southern District of Texas
## Houston Division

| | |
|---|---|
| **Clifford F. Tuttle, Jr.**, as Representative of the Estate of **Dennis W. Tuttle**, Deceased, **Robert Tuttle, and Ryan Tuttle**, ) ) ) ) | |
| *Plaintiffs,* ) ) | |
| v. ) ) ) | |
| City of Houston: **Gerald Goines**, in his individual capacity; **Steven Bryant**, in his individual capacity; **Felipe Gallegos**, in his individual capacity; **Eric Sepolio**, in his individual capacity, **Manuel Salazar**, in his individual capacity; **Thomas Wood**, in his individual capacity; **Oscar Pardo**, in his individual capacity; **Frank Medina**, in his individual capacity; **Clemente Reyna**, in his individual capacity; **Cedell Lovings**, in his individual capacity; **Nadeem Ashraf**, in his individual capacity; **Marsha Todd**, in her individual capacity, and **Robert Gonzalez**, in his individual capacity ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No.: 4:21-cv-00270 |
| *Defendants.* ) | |
| AND | |
| **Clifford F. Tuttle** et al. ) ) | |
| Consolidated with **John Nicholas** et al. ) *Plaintiffs,* ) ) | |

1

v.                                      )
                                        )     Case No.: 4:21-cv-00270
**City of Houston; Art Acevedo** et al.  )
                                        )
            Defendants.                 )
                                        )

## ATTORNEYS:

Mr. Michael Patrick Doyle, Esq.
Michael T. Gallagher, Esq.
Mr. Boyd Smith, Esq.

## FIRM ADDRESSES:

The Clocktower Building
340 Allen Parkway, Suite 100
Houston, Texas 77019

(O) 713-571-1148

The Gallagher Law Firm PLLC
2905 Sackett Street
Houston, Texas 77027

(O) 888-222-7052

## ITEMS REVIEWED:

1. Tuttle Plaintiffs' First Amended Original Complaint.
2. The Nicholas Plaintiffs' First Amended Original Complaint And Jury Demand.
3. Confidentiality Order.
4. The autopsy report for Mr. Dennis W. Tuttle.
5. The autopsy report for Ms. Rhogena A. Nicholas.
6. Houston Police Department (HPD) Homicide Report Volume I (Bates Stamped COH35021-48).
7. Search Warrant and Affidavit for 7815 Harding Street (Bates Stamped COH37438-37443).
8. Audit of Narcotics Cases Related to Officer Goines (Bates Stamped COH38995-39036).

2

007918 NICHOLAS

9.  HPD Narcotics Division Review and Revision of relevant SOPs (Bates Stamped COH5358-5423).
10. HPD Internal Affairs (IA) Report written by Lieutenant Nguyen, dated 06/28/19, Issue Record # 54047-2019 (Bates Stamped COH5431-5481).
11. HPD IA report written by Sergeant Carroll, dated 06/19/19, Issue Record # 54047-2019 (Bates Stamped COH5487-5642).
12. HPD IA report written by Lt. French, dated 05/06/2019, Issue Record # 54155-2019 (Bates Stamped COH37473-37539).
13. HPD IA report written by Sgt. Rexroad, dated 05/01/19, Issue Record # 54155-2019 (Bates Stamped COH37540-37640).
14. Statements of HPD Officer Arechiga, Officer Ashraf, Officer Blankenship-Reeves. Officer Steven Bryant, Commander Follis, Officer Gallegos, Officer Garza, Officer Goines, Lieutenant Gonzalez, Officer John-Louis, Officer Lovings, Officer Maxwell, Officer Medina, Officer Morales, Officer Ortiz, Officer Pardo, Sergeant Reyna, Officer Rios, Officer Salazar, Officer Sepolio, Lieutenant Todd, and Sergeant Wood.
15. BARC Animal Shelter & Adoptions activity report, Activity Number A19-829101-1 (Bates Stamped COH077698-99).
16. Deposition of Nicole Blankenship-Reeves with exhibits.
17. Deposition of Jill Dupre with exhibits.
18. Deposition of Jonathan French with exhibits.
19. Deposition of Rebecca Gonzalez with exhibits.
20. Deposition of Richard Morales with exhibits.
21. Deposition of Son Nguyen with exhibits.
22. Deposition of Lieutenant Marsha Todd with exhibits.
23. Deposition of Mr. Cliff Tuttle.
24. Deposition of Mr. Ryan Tuttle.
25. Deposition of Robert Gonzalez with exhibits.
26. Deposition of Marianne Beynon with exhibits.
27. Deposition of Joeanne Nicholas.
28. Deposition of Patricia Nicholas.
29. Deposition of Jeff Wolf, with exhibits.
30. Deposition of Felipe Gallegos, with exhibits.
31. Crime Scene Photos of 7815 Harding Street (Bates Stamped COH1122-1214).
32. Autopsy Photos of Mr. Dennis Tuttle (Bates Stamped COH810-118).
33. Autopsy Photos of Ms. Rhogena Nicholas (Bates Stamped COH1119-121, 1215-1422).
34. Houston Forensic Science Center Reports, Case Number 2019-03760 (Bates Stamped HFSC-01150-1196).
35. Medical Records for Officer Goines (Bates Stamped COH61328-64718).
36. Medical Records for Officer Lovings (Bates Stamped COH50689-52301).

007919 NICHOLAS

37. Medical Records for Officer Median (Bates Stamped COH52302-52416).
38. Medical Records for Sergeant Reyna (Bates Stamped COH52417-52598).
39. Medical Records for Dennis Tuttle (Bates Stamped COH54992-56044).
40. HPD Tactical Plan for 7814 Harding Street (Bates Stamped COH038367-68).
41. Texas Ranger Final Presentation (PowerPoint presented by Texas Ranger Wolf).
42. Plaintiffs' Forensic Pathologist expert report authored by Robert Bux, M.D.
43. Plaintiffs' Crime Scene Reconstruction expert report authored by Mr. Michael Maloney.
44. HPD Crime Scene Video dated 01/30/19 (HFSC-3853).
45. HPD Crime Scene Video dated 01/28/19 (HFSC 3854.
46. HPD Crime Scene photographs (HFSC 1868-3852).
47. Various documents (Bates Stamped FHSC 1698, 1765-67, 1772-1867, 1318-1377).
48. HPD Standard Operating Procedure (SOP), Narcotics Division, *Budgetary Guidelines*, Procedure Number 100/3.01.
49. HPD General Order (GO.) Subject: *Internal Directives* (Bates Stamped COH797-799).
50. HPD GO No. 100-03, Subject: *Definition of Terms* (Bates Stamped 0411-420).
51. HPD G. O. No. 100-06, Subject: *Department Mission, Values, Ethics, and Guiding Principles* (No Bates stamp).
52. HPD GO No. 200-02, Subject: *Employees Facing Legal Action* (Bates Stamped COH00421).
53. HPD GO No. 200-03, Subject: *Investigation Of Employee Misconduct* (Bates Stamped COH00789-796).
54. HPD Circular No. 15-0515-115, Subject: *Revision of General Order, 200-08, Conduct and Authority* (Bates Stamped COH0031-338).
55. HPD GO No. 200-08, Subject: *Conduct and Authority* (Bates Stamped COH1153-11160).
56. HPD Circular No. 16-0311-060, Subject: *Revision of General Order, 300-04, Compensation* (Bates Stamped COH00373-00378).
57. HPD GO No. 300-08, Subject: *Classified Employee Efficiency Rating* (Bates Stamped COH77833-77837).
58. HPD GO No. 300-14, Subject: *Extra Employment* (Bates Stamped COH00429-0442).
59. HPD GO No. 300-24, Subject: *Early Warning System* (Bates Stamped COH11365-11374).
60. HPD GO No. 300-35, Subject: *Phase Down Program* (Bates Stamped COH00443-448).
61. HPD GO No. 400-02,  Subject: HPD *Badges and Identification Cards* (Bates Stamped COH00449-453).
62. HPD Circular No. 16-0324-069, Subject: *Creation of General Order 400-28 Body Worn Cameras* (Bates Stamped COH00379-396).
63. HPD Circular No. 17-0816-204, Subject: *Revision of General Order 400-28 Body-Worn Cameras* (Bates Stamped COH00397-00410).
64. HPD GO No. 500-19, Subject: *Warrant Service Procedures* (Bates Stamped COH77838-77840).

007920 NICHOLAS

65. HPD GO No. 600-16 (effective 2010), Subject: *Confidential Informants and Other Source Information* (Bates Stamped COH4033-4043).
66. HPD GO No. 600-16 (issue date 03/27/15), Subject: *Confidential Informants and Other Sources on Information.*
67. HPD GO No. 600-17 (issue date 01/04/08), Subject: *Use of Force* (Bates Stamped COH00454-0458).
68. HPD Circular No. 15-0925-249, Subject: *Revision of General Order 600-17, Use of Force* (Bates Stamped COH00339-355).
69. HPD Circular No. 15-0930-256, Subject: *Revision of General Order 600-17, Use of Force* (Bates Stamped COH00356-372).
70. HPD GO No. 700-01 (dated 10/20/03), Subject: *Property and Evidence Control Regulations* (Bates Stamped COH077864-077875).
71. HPD GO No. 700-01, Subject: *Property and Evidence Control Regulations* (Bates Stamped COH77841-77863).
72. HPD SOP, Professional Standards Command, Internal Affairs Division titled *Investigation of Cases Involving Criminal Activity*, effective 06/03/15 (Bates Stamped COH805-809).
73. HPD SOP titled *Internal Affairs Division*, Procedure Number 200/1.09 (effective date 03/14/19) titled *Investigation of Cases Involving Criminal Activity.*
74. HPD Narcotics Division Procedure 104/1.10 titled *Quality Control Section* (Bates Stamped COH00406).
75. HPD Narcotics Division Procedure 200/39 titled, *Body Worn Camera.*
76. HPD Narcotics Division Procedure 200/1.12 titled *Search Warrants, By/Busts and Street Pops.*
77. HPD Narcotics Division Procedure Number 200/1.12, titled *Search Warrants, By/Busts and Street Pops* (07/01/19).
78. HPD Narcotics Division Procedure Number 200/1.12 titled *Search Warrants, Arrest Warrants by/Busts, and Open Air Investigations* (01/21/20).
79. HPD Narcotics Division Procedure Number 200/1.13 titled *Safety Cover Surveillance* (Bates Stamped COH4032).
80. HPD Narcotics Division Procedure Number 200/1.15 titled *Handling of Contraband* (Bates Stamped COH10761-62) effective 11/13/15.
81. HPD Narcotics Division Procedure Number 200/1.15 titled *Handling of Contraband* (Bates Stamped COH53672), effective 07/01/19.
82. HPD Narcotics Division Procedure Number 200/1.15 titled *Handling of Contraband* (Bates Stamped 10614-10615), effective 12/15/19.
83. HPD Narcotics Division Procedure 200/1.16, titled *Controlled Delivery of Narcotics* (Bates Stamped COH10616).
84. HPD Narcotics Division Procedure Number 200/1.02 titled *Activity Authorization and Notification* (Bates Stamped COH10739-40), effective 12/31/08.

007921 NICHOLAS

85. HPD Narcotics Division Procedure Number 200/1.02 titled *Activity Authorization and Notification* (Bates Stamped COH53659), effective 07/01/19.
86. HPD Narcotics Division Procedure Number 200/1.02 titled *Activity Authorization and Notification* (Bates Stamped COH10595-96), effective 12/15/19.
87. HPD Narcotics Division Procedure Number 100/3.04 titled *Inspections* (Bates Stamped COH10734), effective 11/13/19.
88. HPD Narcotics Division Procedure Number 100/3.04 titled *Inspections* (Bates Stamped COH10590), effective 12/01/19.
89. HPD Narcotics Division Procedure Number 200/1.01 titled *Establishing Criteria For Investigations* (Effective Dates: 12/31/08, 07/01/19, 12/01/19).
90. HPD Narcotics Division Procedure Number 200/1.03 titled *Jurisdictional Considerations.*
91. HPD Narcotics Division Procedure Number 200/1.04 titled *Receiving and Recording Citizen Information.*
92. HPD Narcotics Division Procedure Number 200/1.05 titled *Tactical Plan.*
93. HPD Narcotics Division Procedure Number 200/1.06 titled *Narcotics-Federally Funded Task Forces* (Effective Dates: 11/13/15, 12/15/19).
94. HPD Narcotics Division Procedure Number 200/1.07 titled *Handling Prisoners.*
95. HPD Narcotics Division Procedure Number 200/1.08 titled *Narcotics Operations Control Center-Event Deconfliction.*
96. HPD Narcotics Division Procedure Number 200/1.09 titled *Release of Information To The Media.*
97. HPD Narcotics Division Procedure Number 200/1.11 titled *Undercover Buy (Buy/Walks)* (Effective Dates: 11/13/15, 12/15/19).
98. HPD Narcotics Division Procedure Number 200/1.14 titled *Use of Uniform Officers.*
99. HPD Narcotics Division Procedure Number 200/1.16 titled *Controlled Delivery of Narcotics.*
100. HPD Narcotics Division Procedure Number 200/1.18 titled *Narcotics Training Aids.*
101. HPD Narcotics Division Procedure Number 200/1.19 titled *Houston Investigative Support Center (HISC).*
102. HPD Narcotics Division Procedure Number 200/1.20 titled *Money/Vehicle Seizures.*
103. HPD Narcotics Division Procedure Number 200/1.22 titled *Handling of Confidential Informants: Recruitment or Contract* (Effective Dates: 01/05/16, 07/01/19, 12/20/19).
104. HPD Narcotics Division Procedure Number 200/1.24 titled *Reversals.*
105. HPD Narcotics Division Procedure Number 200/1.25 titled *Canine Detail.*
106. HPD Narcotics Division Procedure Number 200/1.26 titled *Cellular Phone Usage.*
107. HPD Narcotics Division Procedure Number 200/1.27 titled *Building Security For The 3rd Floor-1200 Travis (Narcotics Division).*
108. HPD Narcotics Division Procedure Number 200/1.28 titled *Technical Operations Group.*
109. HPD Narcotics Division Procedure Number 200/1.29 titled *Forfeiture Abatement Seizure Team (FAST).*

007922 NICHOLAS

110.   HPD Narcotics Division Procedure Number 200/1.30 titled *Surreptitious Audio Recordings Of Support In Police Facilities And Vehicles.*
111.   HPD Narcotics Division Procedure Number 200/1.31 titled *After Hours And Weekend Investigative Coverage.*
112.   HPD Narcotics Division Procedure Number 200/1.32 titled *Obtaining And Use Of Alias Identifications.*
113.   HPD Narcotics Division Procedure Number 200/1.33 titled *Control, Deployment, And Qualifications/Training Of Specialized Weapons.*
114.   HPD Narcotics Division Procedure Number 200/1.34 titled *Deployment Of Undercover Load Vehicles.*
115.   HPD Narcotics Division Procedure Number 200/1.35 titled *Noise Flash Diversionary Devices (NFDD)* (Effective Dates: 01/17/17, 12/15/19).
116.   HPD Narcotics Division Procedure Number 200/1.36 titled *Consumption Of Alcohol.*
117.   HPD Narcotics Division Procedure Number 200/1.37 titled *Installation Of Covert Video Devices In Hight Voltage Equipment.*
118.   HPD Narcotics Division Procedure Number 200/1.38 titled *Use Of Naloxone (Narcan).*
119.   *HPD SOP Narcotics Division Procedure Number 100/3.05, Subject: Inventory Control* (Effective Date: 11/13/15, 12/01/19).
120.   *HPD SOP Narcotics Division Procedure Number 100/3.01, Subject: Narcotics Division-Captain* (Effective Date: 11/13/15).
121.   *HPD SOP Narcotics Division Procedure Number 100/1.01, Subject: Narcotics Division Commander* (Effective Date: 12/01/19).
122.   *HPD SOP Narcotics Division Procedure Number 100/2.01, Subject: Narcotics Report Outline* (Effective Date: 11/13/15, 12/01/19).
123.   *HPD SOP Narcotics Division Procedure Number 100/2.02, Subject: Statistical Summaries Of Narcotic Enforcement* (Effective Date: 12/01/19).
124.   *HPD SOP Narcotics Division Procedure Number 100/2.03, Subject: Case Tracking Sheet* (Effective Dates: 11/13/15, 12/01/19).
125.   Additional HPD policies to include *Budgetary Conditions*-100/3.01, *Funds/Expense Letters Limits of Authority And Use Of Flash Money*-100/2.05, *Assigned City Vehicles*-100/2.07, *Division Equipment Issuance And Use*-100/2.08, *Offense Report Routing Procedure*-100/2.10, *Court Ordered Expunctions*-100/2.11, *Case Evidence Files*- 100.2.12 (Effective Dates: 11/13/15, 12/01/19), *Budgetary Guidelines*-100/3.01, *Correspondence Guidelines*-100/3.02, *Filing Systems*-100/3.03, *Inspections*-100/3.04, *Inventory Control*-100/3.05 (Effective Dates: 11/13/15, 12/01/19), *Standard Operating Procedures (SOP) Review*-100/3.06 (Effective Dates: 12/31/08, 12/01/19), and *Emergency Mobilization*-100/3.07.

007923 NICHOLAS

## INCIDENT, DATE AND TIME:

January 28, 2019, approximately 4:59 p.m.

## INCIDENT LOCATION:

7815 Harding Street
Houston, Texas

## LAW ENFORCEMENT INVOLVED:

Officer Gerald Goines
Officer Steven Bryant
Officer Felipe Gallegos
Officer Eric Sepolio
Officer Manuel Salazar
Sergeant Thomas Wood
Officer Oscar Pardo
Officer Frank Medina
Sergeant Clemente Reyna
Officer Cedell Lovings
Officer Nadeem Ashraf
Lieutenant Marsha Todd
Lieutenant Robert Gonzalez

Jurisdiction: Houston (TX) Police Department.

## MEDICAL EXAMINER:

Marianne E. Beynon, M.D.
Harris County Institute of Forensic Science

Deceased:

Dennis Wayne Tuttle:
Cause of Death: Multiple gunshot wounds
Manner of Death: Homicide

8

007924 NICHOLAS

Rhogena Ann Nicholas:
Cause of Death: Multiple gunshot wounds
Manner of Death: Homicide

## INCIDENT SUMMARY:

*The incident summary is based upon the materials noted in this report's "Items Reviewed" section, including statements, depositions, video evidence, photographs and police reports. This writer makes no credibility assessments of any of the individuals involved in this incident.*

January 8, 2019:

Houston Police Department (HPD) received a 911 call whereby the caller stated that her daughter was located at 7815 Harding Street and she was taking drugs. The caller requested that Officers be sent to remove her daughter from the residence. Officers Morales and Blankenship-Reeves responded to the house on Harding Street. Upon their arrival, they did not observe any activity at the residence, and they did not knock on the door to inquire. At that time, the 911 caller insisted that the Officers enter the residence and retrieve her daughter. The Officers informed the caller they could not do that. The caller told the Officers they were doing drugs in the house, and they (the residents of 7815 Harding Street) had "lots of guns" in the house (Blankenship-Reeves deposition, p. 13). While on the scene, the Officers did not observe any criminal or suspicious activity or observe any dogs.

While the Officers were still on the scene, the 911 caller called back, informing the Police Department that she was looking through a window at the residence. Neither Officer observed anyone at the residence looking in a window. Both Officers cleared the scene but met at a local restaurant shortly afterward. The Officers eventually spoke with the 911 caller, who was later identified as Patricia Garcia.[1] The caller insisted the Officers needed to go into the house, and she wanted to remain anonymous. Officer Blankenship-Reeves would later explain to HPD homicide investigators that she questioned the legitimacy of the 911 call.[2]

While on the scene of the Harding Street residence, Officer Blankenship-Reeves noted tag information of a car parked in the driveway at 7815 Harding Street. She jotted some notes on a yellow sheet of paper regarding the tag information of the vehicle. The vehicle was registered to

---

[1] Ms. Garcia was eventually criminally charged for making a false 911 call on January 8, 2019, related to the 7815 Harding Street address.

[2] Interview of Officer Blankenship-Reeves, 02/05/19, by HPD Special Investigations Unit (SIU) Officers Rodriguez and Lopez (Bates stamped COH 077437-77438).

007925 NICHOLAS

an individual by the name of Wayne Osborne. She also determined through the Harris County Appraisal District website that the homeowner of the Harding Street address was Mr. Dennis Tuttle. Officer Blankenship-Reeves also searched social media and found Mr. Tuttle's Facebook account, which listed Rhogena Nicholas as his wife.[3] She (Officer Blankenship-Reeves) would later provide that sheet of paper with the information she gathered to Lieutenant Marsha Todd, who was assigned to the HPD Narcotics Division.

After departing the Harding Street residence, Officer Blankenship-Reeves contacted Lt. Marsha Todd via cell phone.[4] While on the phone with Lieutenant Todd, Officer Morales asked Lt. Todd how to spell heroin. According to Lieutenant Todd (deposition, p. 47), Morales asked if she could have someone in the Narcotics Division look into the Harding Street address regarding drug activity.

Officers Morales and Blankenship-Reeves would later assist the Narcotics Division Squad 15 with executing the fraudulent search warrant obtained by Officer Goines for 7815 Harding Street, which occurred on January 28, 2019.

January 11, 2019:

Lieutenant Todd contacted HPD Narcotics Officer Gerald Goines via text messaging and asked him to look into the Harding Street address regarding drug activity while also texting "ASAP" (Lt. Todd deposition, p. 99). In the text message she sent to Officer Goines, she mentioned the Harding Street location was a "Street-level heroin house" (Todd deposition, p. 180). Lieutenant Todd took a picture of the sheet of paper with the information Officer Blankenship-Reeves gave to her and texted the picture to Officer Goines. In her deposition (p. 102-103), Lieutenant Todd stated that she had no other conversation with Officer Goines about the Harding Street house before the January 28, 2019, raid.
January 15, 2019:

Officer Goines obtained a NOCC number verifying there were no conflicts with other law enforcement agencies related to 7815 Harding Street (Lt. French deposition, p. 27).[5]

---

[3] Ibid.

[4] Officer Blankenship-Reeves and Lt. Marsha Todd have a personal relationship and live together.

[5] NOCC is a system used by HPD for deconfliction purposes. Deconfliction relates to avoiding the possibility that other law enforcement agencies might be investigating a particular target.

007926 NICHOLAS

January 21, 2019:

Officer Goines contacted a known Confidential Informant (identified as CI # 6730) he has used in the past to purchase heroin located at a residence at 2721 Napoleon Street, Houston. However, the CI utilized a friend of hers to buy the heroin (two packets) at the Napoleon St. location (Lt. French deposition, p. 28). This individual was not registered or known as a CI used by HPD or Officer Goines. Officer Goines was not present when the transaction occurred at the Napoleon address (Lt. Frenchy deposition, p. 29). HPD IA would later determine that Officer Goines violated HPD policy by utilizing an undocumented CI and not being near the area at the time of the drug purchase by the CI.

January 22, 2019:

Officer Goines submitted a search warrant affidavit for the Napoleon Street location, swearing in the search warrant Affidavit that a CI bought cocaine from that location.

January 23, 2019:

Officer Goines met with the CI # 6730 and picked up the drugs purchased by the CI's girlfriend at the Napoleon Street location a few days earlier (Lt. French deposition, p. 30). The drugs, two packets of heroin, were never tagged for evidence storage by Officer Goines. Officer Goines kept the narcotics in his police vehicle. HPD IA would later determine that Officer Goines violated HPD policy by not tagging the purchased narcotics into evidence and keeping narcotic evidence in his police vehicle.

January 24, 2019:

Officer Goines, the HPD SWAT team, and members of Narcotics Squad 15 were scheduled to execute the search warrant at 2721 Napoleon Street. However, the raid was canceled because the SWAT team was called away to another call. There was a second attempt to execute the search warrant, but surveillance before the raid revealed no activity at the residence, and the execution of the search warrant was canceled again.

January 26, 2019:

Officer Goines visited CI # 6730 at her apartment. It was determined that Officer Goines had an ongoing sexual relationship with this CI for approximately two to four years (Lt. French deposition, p. 33). Furthermore, surveillance video of his visit revealed that he was carrying two firearms into the CI's residence. HPD IA would later determine that Officer Goines violated

11

007927 NICHOLAS

HPD policy when HPD supervisors discovered a stolen .380 cal. handgun in his police vehicle, as well as undocumented narcotics and cash.

January 27, 2019:

Officer Goines stated in his search warrant Affidavit that he met with a CI, and the CI allegedly bought heroin at 7815 Harding Street. Later investigation would determine that Officer Goines did not have a CI purchase heroin from 7815 Harding Street. Officer Goines would later admit that he never used a CI to purchase narcotics at 7815 Harding Street. Officer Goines claimed he bought the heroin from 7815 Harding Street directly. Subsequent investigation would reveal that the CIs known to be used by Officer Goines, including CI # 6730, never bought heroin from the Harding Street address (Lt. French deposition, p. 36). Additionally, it would later be determined by HPD IA that Officer Goines violated HPD policy by being untruthful and fabricating the entire story about heroin being purchased from 7815 Harding Street and the fabricated probable cause cited to obtain the search warrant. The HPD IA also determined that Officer Goines had engaged in a pattern of criminal misconduct because in addition to 7815 Harding Street, 2721 Napolean Street, and 4570 South Wayside Drive, additional warrants generated by Officer Goines contained fabricated or misleading evidence (Sgt. Rexroad report, p. COH37575).

January 28, 2019:

Officer Goines drafted a search warrant Affidavit and presented it to Magistrate Marcum to authorize and sign the search warrant for 7815 Harding Street (Lt. French deposition, p. 37). Officer Goines e-mailed the signed search warrant to his immediate supervisor, Sergeant Reyna, of Narcotics Squad 15. Sergeant Reyna then e-mailed the search warrant and Tactical Plan to Lieutenant Gonzalez, who approved the Tactical Plan and search warrant execution. Lt. Gonzales never forwarded the search warrant and tactical plan for 7815 Harding Street to his supervisor, Commander Follis. HPD IA investigation would later determine that Lieutenant Gonzales violated HPD policy by not forwarding the Harding Street search warrant and Affidavit to Commander Follis for his review and approval.

Prior to the issuance of the search warrant for 7815 Harding Street, Narcotics Squad 15 member Officer Felipe Gallegos had been scheduled to transfer to another unit. An e-mail text among the Squad 15 members revealed that the unit wanted to get a group photograph of Squad 15 before Officer Gallego left the unit. Officer Goines offered up the anticipated execution of a search warrant the next day on January 28, 2019, as an opportunity to obtain the group photo of Squad 15 members and Officer Gallegos.

Shortly before the execution of the search warrant at Harding Street, Officer Goines convened a briefing with members of Squad 15 and HPD uniform patrol members. Based on all accounts

12

007928 NICHOLAS

from those HPD members at the briefing, Officer Goines discussed the purchase of heroin that occurred at the location, that the male suspect was armed with a gun, and there was possibly a female in the house. It was also brought to the attention of the members attending the briefing by Officer Blankenship-Reeves that there was a big white dog at the residence. Officer Blankenship-Reeves did not offer any other information at the briefing explaining her previous call for service at the Harding Street location on January 8, 2019. Officer Goines provided no information regarding the names or identities of the people inside the house nor the layout of the interior of the targeted residence on Harding Street. The search warrant obtained by Officer Goines was a "No-Knock" search warrant.[6]

Before the execution of the search warrant at the Harding Street residence, some surveillance was allegedly conducted of the residence, but it is unclear when that surveillance took place (Lt. French deposition, p. 48). HPD policy requires surveillance to be conducted of the target site at least one hour before the execution of a warrant.

At approximately 4:59 p.m., the search warrant was executed at 7815 Harding St. The Officers were deployed in a stack[7] formation before entering the residence. The order of the stack formation started with Officer Frank Medina (point), then Officer Steven Bryant (door breacher), Officer Cedell Lovings, Officer Manuel Salazar, Officer Oscar Pardo, Officer Eric Sepolio, Officer Nadeem Ashraf, Officer Felipe Gallegos, Sergeant Clemente Reyna, Sergeant Thomas Wood, and Officer Gerald Goines.[8] According to the report synopsis generated by the Harris County District Attorney's Office,

> *"Officers with the Narcotics South Division, squad 15 were executing a No-Knock search warrant at 7815 Harding Street. Narcotics Officers were advised that there was a large dog in the house, possibly several firearms and that one of the suspects was known to carry a firearm in his waistband at all times. Upon making entry into the residence multiple shots were fired at the Officers. The Officers became engaged in gunfire which resulted in one male, later identified Dennis Tuttle, one female, later identified as Rhogena Nicholas, and a white dog deceased inside of the residence.*

---

[6] A No-Knock search warrant allows law enforcement Officers not to have to knock and announce their presence before entering into the target premises. The predicate for this type of warrant is based on the articulable suspicion that the occupants may be armed or evidence may be destroyed if notice is given.

[7] Stack is referred to as the formation of Officers preparing to enter a premises. A stack is usually a linear line of Officers, one behind the other.

[8] Harris County District Attorney Civil Rights Division, Report of Investigation Officer Involved Shooting, 7815 Harding Street, Texas 77012, Report # S-19-07, authored by Captain Billy Millian (Stamped S2023.09-01 # 00962-01016)

13

007929 NICHOLAS

> *Sergeant C. Reyna, Officer F. Medina, Officer C. Lovings, Officer G. Goines, and*
> *Sergeant T. Woods were transported to Memorial Hermann Hospital. We later learned*
> *that Sgt. Reyna sustained a gunshot wound to the face, Officer Medina sustained a*
> *gunshot wound to his shoulder, Officer Lovings sustained a gunshot wound to his*
> *back/spine, and Officer Goines sustained a gunshot wound to his neck. Sgt. Woods did*
> *not sustain any gunshot wounds however he sustained a knee injury."[9]*

Given the nature and scope of the incident, HPD Chief of Police Acevedo responded to the scene. Also, HPD Special Investigations Unit (SIU) and HPD Internal Affairs investigators responded to the scene. SIU was responsible for investigating the shooting as a criminal investigation, and HPD IA was responsible for investigating the incident related to administrative violations. Within days of the Harding Street incident, Chief Acevedo publicly praised the valor and heroics of the Officers involved in the raid and claimed Mr. Tuttle and Ms. Nicholas were drug dealers.

HPD IA investigation determined that Sgt. Reyna, Officer Gallegos, Officer Pardo, and Officer Salazar discharged their respective firearms at Mr. Tuttle killing him (Nguyen deposition, p. 80). Officer Gallegos also shot and killed Ms. Nicholas (Nguyen deposition, p. 80). The IA investigation determined that Officers Medina, Sepolio, and Lovings discharged their firearms at the dog, killing the dog (Nguyen deposition (p. 80). HPD Internal Affairs investigation determined that the shooting deaths of Mr. Tuttle and Ms. Nicholas and the shooting death of the family dog were justified.[10] However, HPD's IA investigation determined the search warrant obtained by Officer Goines for 7815 Harding Street was obtained by fabricated and untruthful evidence and affirmation.[11] Additionally, the HPD Internal Affairs investigation determined that there was a failure of supervision by the Narcotics Division supervisors (Lt. Gonzalez, Sgt. Reyna, and Sgt. Wood) as it related to supervising Officer Goines, Officer Bryant, and members of Squad15.[12]

Furthermore, HPD IA determined that Officer Stephen Bryant violated HPD policy by colluding with Officer Goines to cover Officer Goines' deception regarding the Harding Street incident. Other Officers on the scene were found to have violated HPD's Body-Worn Camera policy.

---

[9] Ibid (p. 00963-964).
[10] HPD Internal Affairs Investigation Summary report authored by Lt. S.C. Nguyen of Internal Affairs, dated June 28, 2019, Issue Record # 54047-2019.
[11] HPD Internal Affairs Investigation Summary report authored by Lt. J. L. French of Internal Affairs, dated May 6, 2019, Issue Record # 54155-2019.
[12] Ibid.

14

Officer Gallego was found to have violated HPD's policy by not registering and qualifying with his sidearm which he had with him on the day of the Harding Street raid.[13]

Officer Goines and Officer Bryant retired from the Houston Police Department shortly after this incident. Furthermore, Officer Goines and Officer Bryant were criminally charged by the Harris County District Attorney's office relating to their actions involving the death of Mr. Tuttle and Miss Nicholas. Similarly, Officer Gallegos was indicted for the murder of Ms. Nicholas. Additional criminal charges were filed against other members of Squad 15 for conduct discovered during the investigation of the incident at 7815 Harding Street. The criminal charges are still pending.

## SUMMARY OF PRIMARY OPINION(S):

***My opinions are provided to educate the jury on well-established police practices and procedures.***

My opinions and the basis for my opinions are formed from the totality of my specialized knowledge, skill, education, research, literature, training, and information I have reviewed. My opinions and basis for my opinions are based on sufficient facts and data reviewed; they are the product of reliable law enforcement principles and methods. I have applied these law enforcement principles and methods reliably to the facts and circumstances of this case. There is a body of knowledge in literature about the practices and standards to which modern, professionally administered police agencies should adhere. The standards and accepted practices have evolved in the interest of fostering and maintaining police agencies that are professional, effective, and whose practices and policies are observant of the law. Standards have evolved, in part, as a response to reported cases of police misconduct and as tools to limit police discretion and ensure that police behavior is within acceptable professional, legal, and constitutional limits.

There is a substantial body of literature and knowledge regarding the types and causes of police misconduct. I am well familiar with and have contributed to the literature and body of knowledge regarding the types and causes of police misconduct. Within the broad range of criminal justice, my area of study and practical experience is, and has been, high liability police practices, including police misconduct and its relationship with policy, procedure, training, supervision, and accountability mechanisms. I am a life member of the International Association of Chiefs of Police (IACP), a member of the Police Executive Research Forum (PERF), a life member of the Florida Police Chiefs Association (FPCA), and a life member of the Palm Beach County

---

[13] HPD Internal Affairs Investigation Summary report authored by Lt. S.C. Nguyen of Internal Affairs, dated June 28, 2019, Issue Record # 54047-2019.

007931 NICHOLAS

Association of Chiefs of Police (PBCAC). I hold a Doctor of Criminal Justice degree from Saint Leo University, Florida. My other experience, knowledge, and training are further identified in my Curriculum Vitae, which is attached to this report.

My opinions are also based on my 30 years of law enforcement experience, knowledge, and training (see attached Curriculum Vitae). My experience includes seven years as Chief of Police and four years as an Assistant Chief of Police. My experience and training include being an Assessor and Team Leader for The Commission on Accreditation for Law Enforcement Agencies, Inc. (CALEA) and an assessor, Team Leader, and former Chairperson for the Commission on Florida Law Enforcement Accreditation, Inc. (CFA). As an assessor for both accreditation bodies, I conducted assessments for over 100 law enforcement agencies nationwide. These assessments included a review of all the department's written policies, including use of force, criminal investigations including narcotics investigations, Internal Affairs, and search warrant applications and execution. My opinions were also derived from my experience as a patrol Officer, criminal investigator, Sergeant, Lieutenant, Commander of Criminal Investigations, Commander of the Narcotics Unit, Commander of Internal Affairs, and Commander of Uniform Patrol during my law enforcement career. My opinions were supported by written material published by The International Association of Chiefs of Police (IACP) Model Policies, Training Keys, Concepts & Issues papers, CALEA standards, and other published peer-reviewed articles on criminal investigations, supervision, and police use of force.

*I presently hold the following opinions to a reasonable degree of professional certainty:*

## Opinion 1:

The search warrant obtained for 7815 Harding Street, Houston, Texas, by HPD Officer Gerald Goines was based on fabricated information and evidence, not probable cause. Obtaining and executing a search warrant without probable cause is contrary to well-established police practices and official Houston Police Department policy.

## Analysis:

1.1     The International Association of Chiefs of Police (IACP) regularly provides publications related to all aspects of law enforcement practices. To that end, the IACP provides definitions for the following terms.

*"Affidavit: A written statement under oath. Case agent: The Officer primarily responsible for the investigation, which includes preparing, planning, and implementing the search warrant.*

16

007932 NICHOLAS

*Deconfliction: The process of determining when law enforcement personnel are conducting an event in close proximity to one another at the same time, and then notifying the affected agencies or personnel regarding the identified conflict.*

*Probable cause: When articulable facts and circumstances within an Officer's knowledge are sufficient to warrant a prudent person or one of reasonable caution to believe that the suspect has committed, is committing, or is about to commit an offense."[14]*

*"Confidential Informant (CI): An individual, under the direct supervision of an enforcement Officer, who is provided with a reasonable expectation of confidentiality, and who furnishes information about suspected criminals or criminal activity for consideration, either financial, prosecutorial, or judicial; or a person who actively participates in a criminal investigation or intelligence operation under the direct supervision of an enforcement Officer with or without compensation.*

*Confidential Informant File: File maintained to document all information that pertains to a CI.*

*Unreliable Informant File: File containing information pertaining to an individual who has failed at following an established written CI agreement and has been determined to be generally unfit to serve as a CI."[15]*

1.2 The Fourth Amendment of the U.S. Constitution states, in part,

*"...no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."[16]*

*"This means that no search warrant can be obtained by any law enforcement Officer unless:*

*• probable cause exists to conduct the search,*

---

[14] International Association of Chiefs of Police, IACP Law Enforcement Policy Center, Concepts & Issues Paper-Glossary (July 2023, p.2).
[15] International Association of Chiefs of Police, IACP Law Enforcement Policy Center, Concepts & Issues Paper, Model Policy-Definitions titled Confidential Informants (December 2020).
[16] Constitution of the United States, Amendment IV.

17

007933 NICHOLAS

*• probable cause is presented to a judicial authority under oath, and*
*• the place to be searched and the evidence being sought there are specifically*
*described both in the application for the warrant and in the warrant itself."[17]*

Additionally, *"The Fourth Amendment to the U.S. Constitution prohibits unreasonable searches. Therefore, Officers should consider obtaining a search warrant whenever time and circumstances permit, adhering to the following guidelines:*

1. *To obtain a search warrant, an Officer must be able to show probable cause to believe that a specific person may be found at a particular location or specific evidence, contraband, or products of a crime may be found there or on a person.*

2. *Specific facts establishing probable cause shall be set forth with clarity and specificity.*

3. *Officers shall not rely solely upon personal opinion or unauthenticated third-party information or hearsay. Evidence of probable cause may be based on personal observation/knowledge of the Officer, information from another peace Officer, or information from a reliable source."*

4. *When informants are used-particularly confidential informants-the reliability of the informant and information provided shall be specified. Whenever possible, Officers shall corroborate informant information.[18]*

1.3   HPD IA Lt. French concluded in the investigation of Officer Goines and the execution of the Search warrant that:

*"This investigation was able to show that Officer Goines fabricated the Affidavit and search warrant for 7815 Harding Street and lied to Sergeant Bass during his hospital interview. General Order 200-18-Conduct and Authority, Section 2-Truthfulness, states in part:*

> *Employees shall not make false, untrue, or misleading statements (verbal or written, made directly by or authorized by the employee). Any statement or omission of pertinent information that intentionally, knowingly, or recklessly*

---

[17] International Association of Chiefs of Police, IACP Law Enforcement Policy Center, Concepts & Issues Paper-Glossary (July 2023, p.2).

[18] International Association of Chiefs of Police, IACP Law Enforcement Policy Center, Considerations Paper (July 2023, p. 1-2).

18

007934 NICHOLAS

> *misrepresents facts or misleads others shall be considered a false statement. A violation of this policy may result in discipline up to and including indefinite suspension."[19]*

1.4   Lt. French further wrote in his report:

> *"It was clear that Officer Goines fabricated many aspects of the 7815 Harding Street search warrant/Affidavit. He contradicted himself during his interview with Sergeant Bass by claiming that he made the control buy by his [sic] self, CI # 6730 and Ms. (redacted) claimed to have purchased the heroin from 2721 Napoleon St. which was consistent with phone records, records of which did not show Officer Goines in the vicinity during the day of the purchase, and finally, Officer Bryant's discovery of the heroin inside Officer Goines' vehicle further confirmed Goines' lies, as he documented tagging the narcotics, but was found to have never checked into the Narcotics evidence. This investigation found sufficient evidence to sustain the allegation of Truthfulness against Officer Goines; however, as a result of his retirement from the Houston Police Department during the course of this investigation, the allegation of truthfulness against Officer Goines shall be classified as INFORMATION.*

1.5   Lt French further concluded in his report:

> *The search warrant and Affidavit for 7815 Harding Street was proven a complete fabrication. Texas Penal Code Statue 37.10-Tampering with Governmental Record, states in part:*
>
> *(a) A person commits an offense if he:*
>
> *(1) knowingly makes a false entry in or false alteration of a governmental record full;*
>
> *(2) makes, presents, or uses any record, document, or thing with knowledge of its falsity and with intent that it be taken as a genuine governmental record;*
> *(5) makes, presents, or uses a governmental record with knowledge of its falsity;*
>
> *(3) an offense under this section is a felony of the third degree if it is shown on the trial of the offense that the governmental record was;*

---

[19] HPD Internal Affairs Investigation Summary report authored by Lt. J. L. French of Internal Affairs, dated May 6, 2019, Issue Record # 54155-2019 (p. 46-Bates Stamped COH 037522).

007935 NICHOLAS

### (D) a search warrant issued by a magistrate.[20]

1.6    Lieutenant French further determined that Officer Goines violated other HPD policies, including improper procedure, dealing with confidential informants, improper handling of contraband and evidence, failing to abide by HPD internal directives, and demonstrating poor judgment.[21] Lieutenant French further determined that Officer Bryant violated HPD official policies and laws by being untruthful in his supplemental report in an attempt to cover up Officer Goines' misconduct.

1.7    Based on the facts of this case, supported by the HPD IA investigations of this incident, there is no doubt that Officer Goines falsified the probable cause affidavit and search warrant for 7815 Harding Street. There was no probable cause for the warrant to be issued. Not having probable cause and fabricating false information to obtain a search warrant is contrary to well-established police practices and procedures and is a criminal violation. It is more likely than not, within a degree of professional certainty, that if the search warrant obtained by Officer Goines had not been acquired, Mr. Dennis Tuttle and Ms. Rhogena Nicholas would not have been shot and killed by HPD Officers on January 28, 2019.

## Opinion 2:

Houston Police Department failed to supervise its Narcotics Division members properly, including HPD narcotics Officers Gerald Goines and Steven Bryant. The failure to supervise extended up the chain of command and included Sergeants Reyna and Wood, Lieutenant Gonzales, Commander Follis, and the command staff above him all the way to the Chief of Police. Despite having an official policy which requires supervisors to actively enforce the law and official policies so as to not permit or fail to prevent violations, HPD had a pattern and practice of failing to actively supervise the Narcotics Division, with supervisors at every level simply taking their subordinates at their word rather than verifying it, thereby turning a blind eye to potentially improper and illegal conduct. The failure to supervise these Officers allowed them to engage in criminal misconduct. HPD's failure to supervise its Narcotics Division members was inconsistent with well-established police practices and procedures.

---

[20] Ibid (p. 48-Bates Stamped COH 037524).
[21] Ibid (p. 48-51-Bates Stamped COH 007524-037527).

## Analysis:

2.1     There are three major duties and functions of a law enforcement supervisor which include leading, directing, and controlling members of a police department.[22] The supervisor's responsibilities primarily deal with directing their subordinates.[23] According to Iannone (1987), providing direction to subordinates consumes most of the supervisor's time.[24] *"The directing function involves not only putting a prepared plan into operation but also following through with observation and inspection to determine that the work ordered is actually and properly done. A follow-up control system is a must for organizations and leaders."* [25]

2.2     Furthermore, a supervisor's responsibility within a law enforcement agency includes planning, organizing, staffing, directing, coordinating, reporting, and budgeting.[26] Also, one of the more significant responsibilities of a supervisor in law enforcement is that of delegating tasks to be accomplished and authority commensurate with accomplishing that task. However, a supervisor who delegates a task to a subordinate cannot delegate the responsibility or the accountability of having that task completed.[27] Furthermore, *"the process of delegation loses its value as a supervisory tool if follow-up inspections are not made to ensure that objectives are accomplished and deadlines are met."[28]*

2.3     Lt. Robert Gonzales, Sgt. Reyna and Sgt. Wood were responsible for supervising Officer Goines, Officer Bryant, and other members of Narcotics Squad 15. HPD IA Lt. French concluded in the investigation about the supervision of Narcotics Squad 15, stating, in part,

   *Lieutenant Gonzales was the head of Narcotics Division Squad 15. Lieutenant Gonzales was unaware of the Harding St. investigation until January 28, 2019, when Sergeant Reyna advised him the morning of the search warrant. Lieutenant Gonzales explained that it was not out of the ordinary for him not to be apprised of the pending investigation unless approached by a supervisor or case agent regarding an issue with*

---

[22] Iannone, Nathan E. (1987). *Supervision of Police Personnel, Fourth Edition.* Prentice-Hall, Inc. (previous editions printed in 1970, 1975, 1980).
[23] Ibid.
[24] Ibid.
[25] Ibid (p. 17).
[26] Ibid (p. 13).
[27] Ibid.
[28] Ibid (p. 28).

21

007937 NICHOLAS

*the investigation. He reviewed the Harding Street tactical plan, via e-mail, but recalled he did not provide the tactical plan to Commander Follis."[29]*

*"As a result of Lieutenant Gonzales' failure to ensure Commander Follis received a copy of the tactical plan for 7815 Harding St., the allegation of internal directives against Lieutenant Gonzalez is SUSTAINED.[30]*

2.4   According to Lieutenant French's report,

*"Lieutenant Gonzales admitted during his interview that if the Harding St. investigation had been ongoing for two weeks, he was unaware but should have known about the investigation and Sergeants Reyna and Wood should have known as well. [31]* Lieutenant Gonzales stated further, *"that he expected his sergeants to verify information provided to them by their Officers/case agents.*

*Lieutenant Gonzales also stated that he expected his supervisors to ensure reports were entered related to investigations.[32]*

*Lieutenant Gonzales admitted he was unaware whether or not surveillance had been conducted prior to running the warrant on Harding Street, but when asked whether he expected surveillance to have been conducted, Lieutenant Gonzales say, "Oh, yes."[33]*

*Lieutenant Gonzales stated he did not agree with sergeants delegating the responsibility of generating case tracking sheets upon their case agents.[34]*

*Lieutenant Gonzales also admitted that there was no way for a supervisor to verify information given by a case agent/Officer. When asked if he knew if his supervisors ever did spot checks to check up on their Officers or personally verify information Lieutenant Gonzales stated "No."[35]*

---

[29] HPD Internal Affairs Investigation Summary report authored by Lt. J. L. French of Internal Affairs, dated May 6, 2019, Issue Record # 54155-2019 (p. 52-Bates Stamped COH 037528).

[30] HPD Internal Affairs Investigation Summary report authored by Lt. J. L. French of Internal Affairs, dated May 6, 2019, Issue Record # 54155-2019 (p. 53-Bates Stamped COH 037529).

[31] Ibid.

[32] Ibid

[33] Ibid (p. 54-Batrs Stamped 037530).

[34] Ibid.

[35] Ibid.

007938 NICHOLAS

> *Lieutenant Gonzales stated that he was aware of past issues with Officer Goines'*
> *untimely reports. Lieutenant Gonzales stated that in the past, Officer Goines was kept*
> *from new cases until he caught up with paperwork.[36]*
>
> *Lieutenant Gonzales was not sure of when a case was actually closed out.[37]*
>
> *Lt. Gonzales admitted that sometimes he and his sergeants did not catch the date on*
> *late warrants. This was in response to an example in which Sergeant Rexroad pointed*
> *out a warrant return turned in four months after the warrant."[38]*

2.5     According to Lieutenant French's report,

> *"Lieutenant Gonzales admitted that his sergeants should have asked more questions of*
> *Officer Goines. Lieutenant Gonzales had the ultimate responsibility to ensure his*
> *sergeants conducted proper follow-up with the case agents, but as evidenced in this*
> *investigation, that failed to happen in the instance of 7815 Harding Street with Officer*
> *Goines. Lieutenant Gonzales should have taken a more active role in the supervision of*
> *Squad 15. He was often unaware of investigations, stating he would not know of some*
> *until he received the blue back file. Lieutenant Gonzales' lack of involvement led to a*
> *system in which he relied almost solely upon his sergeants and case agents to handle*
> *investigations, thus leaving him uninformed and unable to question the status of*
> *ongoing investigations. Lieutenant Gonzales agreed during his interview that better*
> *review by his supervisors could have prevented some of Officer Goines' issues, but*
> *Lieutenant Gonzales did not ensure that his sergeants conducted adequate reviews.*
> *Lieutenant Gonzales pointed out that he did not agree with his sergeants delegating*
> *case tracking sheets to their investigators, yet he did nothing to stop this practice.*
> *Further, Lieutenant Gonzalez admitted that he relied upon his sergeants to keep him*
> *abreast of investigations; however, as the lieutenant, he had the authority and*
> *responsibility to know the activities of his investigators well before the conclusion of an*
> *investigation and turn-in of the blue back file. As a result the allegation of Supervisory*
> *Conduct against Lieutenant Gonzales is SUSTAINED."[39]*

---

[36] Ibid.

[37] Ibid (p. 55-Battes Stamped 037531).

[38] Ibid.

[39] Ibid (p. 55-56,Bates Stamped COH-037531-32).

23

007939 NICHOLAS

2.6    The HPD Internal Affairs investigation determined Lieutenant Gonzalez, who had
       supervisory responsibility for the entire Narcotics Squad 15 and its members, failed to
       supervise his unit properly. The above-cited Internal Affairs report documented
       Lieutenant Gonzales' complete abdication of his supervisory duties and responsibilities.
       It is little wonder that Officer Goines would go rogue given such little to no supervision.
       HPD had noted Lieutenant Gonzales' Laissez-faire supervisory style, but only after the
       Harding Street incident, as noted in Lieutenant French's report,

       *"Lieutenant Gonzales was documented by Commander Follis in his February 2019 job
       performance review as needing to more closely monitor his squad's activities. This was
       completed after the January 28, 2019, Harding St. raid. Sergeant Rexroad cited
       examples from the narcotics division audit in which case tracking sheets were
       generated days and even weeks after the initial transaction. Lieutenant Gonzales stated
       that his supervisors should have been aware and ensured the case agents had entered
       the case tracking sheets. Lieutenant Gonzales placed the onus upon his supervisors
       during the majority of his answers regarding adherence to narcotics division SOPs.
       General Order 200-08-Conduct and Authority, Section 8-Supervisory Conduct, states
       in part,*

       *Supervisors shall actively enforce the law and the policies and procedures of the
       Houston Police Department supervisor shall not permit or otherwise fail to prevent
       violations of the law or the rules, regulations, policies, or procedures of the Houston
       Police Department by any employee."[40]*

2.7    Lieutenant French concluded in his Internal Affairs investigation report that Sgt. Reyna
       failed to supervise Officer Goines properly. Lt. French's report stated, in part,

       *"Sergeant Reyna was one of Officer Goines's sergeants. Sergeant Reyna was asked if
       he had any prior knowledge of the Harding Street investigation before January 28,
       2019. Sergeant Reyna stated, 'Um, I had knowledge that he was doing an investigation,
       uh,-a we're trying to develop a search warrant on the east-in east Houston, on the east
       side.' Sergeant Reyna admitted he did not know the address until the day of the
       warrant."[41]*

---

[40] Ibid (p. 55, Bates Stamped COH 0037531).
[41] Ibid (p. 56-Bates Stamped COH 0037532).

*"Sergeant Reyna stated to question his case agents over details would amount to accusing the case agent of lying."[42]*

2.8   Lt. French wrote in his report, in part, regarding Sgt. Reyna's supervisory performance,

*"This investigation was able to show that Sergeant Reyna took his Officers at their word versus verifying and spot checking their activities. Sergeant Reyna was responsible to supervise the activities of his case agents including Officer Goines. Sergeant Reyna was presented with the findings of Officer Goines' vehicle inventory in which untagged narcotics and a stolen pistol was found. Sergeant Rexroad asked Sergeant Reyna how it was possible for Officer Goines to have those items in his vehicle. [Sergeant Reyna replied, in part] 'There is no good answer for that. I mean, they're not-they absolutely not supposed to have that on them.' Sergeant Reyna affirmed that case tracking sheets and CI receipts for funds should have been connected to the narcotics found in Officer Goines' vehicle. Sergeant Reyna was shown instances in which Officer Goines documented weapons in his search warrants; however, they were not documented in the related incident reports. Sergeant Reyna agreed that the discrepancy should have been caught. Sergeant Reyna stated that by closely monitoring his case agents' investigations, it might seem that he was questioning their honesty. However this should not have been a consideration in simply checking with his Officers to ensure they were following policy. Further, Sergeant Reyna explained that he confronted Officer Goines about the timeliness of his cases but cited that he was often in training or taking time off because of his buildup of time to burn. Sergeant Reyna was capable of denying Officer Goines time off to ensure his cases were kept up to date. Sergeant Reyna reviewed Officer Goines' cases, thus he saw that Officer Goines had problems with timeliness with his paperwork, even though he stated he never had any red flags with Officer Goines. As Officer Goines' supervisor, Sergeant Reyna should have kept better track of Officer Goines' investigations, specifically his documentation, as Officer Goines was known to be habitually late with his reports. Sergeant Reyna was made aware of late warrant returns and late case tracking sheets generated by Officer Goines, which he should have been aware of knowing of Officer Goines' administrative habits. As a result of these findings, the allegation of Supervisory Conduct against Sergeant Reyna is SUSTAINED.*

*Narcotics Division SOP 100/2.3-Case Tracking Sheet, Section 3 of Operation, states in part:*

---

[42] Ibid.

25

> *The narcotics squad supervisor, or designee, will access and complete a CT*
> *Sheet any and every time an arrest or seizure is made; However, Squad*
> *Supervisors will only obtain a CT# from this procedure once per investigation.*

*Additionally, General Order 200-08-Conduct and Authority, Section 9-Delegation of*
*Responsibility, states in part:*

> *Supervisors who delegate tasks to subordinate employees are ultimately*
> *accountable for ensuring the tasks are completed."[43]*

2.9    Furthermore, Lieutenant French concluded in his report,

> *"Ultimately, Sergeant Reyna was responsible for ensuring that the case tracking sheets*
> *were entered in a timely manner by his Officers/case agents. Therefore, the allegations*
> *of Internal Directives and Delegation of Responsibility against Sergeant Reyna are*
> *SUSTAINED."[44]*

2.10    Lt. French wrote in his report regarding Sgt. Wood's supervisory performance, in part,

> *Sergeant Wood stated throughout his interview that his Officers/case agents were*
> *proactive, did not need babysitting, and were relied upon to create case tracking sheets*
> *and update their supervisors with their activities, which sometimes they would never*
> *hear about unless the lead panned out. Sergeant Wood was responsible to keep closer*
> *watch over his Officers, which was his duty as a Narcotics Division supervisor;*
> *However, Sergeant Wood failed to adequately supervise. As a supervisor, Sergeant*
> *Wood could have required his Officers to notify him of any investigations, whether or*
> *not a case tracking sheet was required, but he did not do so. As a result the allegation*
> *of Supervisory Conduct against Sergeant Wood is SUSTAINED."[45]*

2.11    Lieutenant French also wrote in his report regarding Sergeant Wood's supervisory
performance, in part,

> *"Sergeant Wood attested that case agents were responsible for completing the case*
> *tracking sheets and would only produce one if they had activity from a lead.*

---

[43] Ibid (p. 57-58-Bates Stamped COH 0037533-34).
[44] Ibid.
[45] Ibid (p. 60, Bates Stamped COH 0037536)

007942 NICHOLAS

*Sergeant Wood stated that he and Sergeant Reyna had their Officers/case agents produce case tracking sheets because their job was proactive and the Officers/case agents had firsthand knowledge of the cases. Ultimately, Sergeant Wood was responsible to ensure that case tracking sheets were generated, either by him, Sergeant Reyna, or by their case agents. As a supervisor, Sergeant Wood was responsible to ensure his case agents completed a case tracking sheet if he delegated them to do so, which he indicated during his interview. As a result, the allegation of Delegation of Responsibility against Sergeant Wood is SUSTAINED.*"[46]

2.12   Given the conclusion of the HPD IA investigation into the supervisory responsibilities of Lieutenant Gonzalez, Sergeant Reyna, and Sergeant Wood, it is evident that the HPD Narcotics Squad 15 members conducted their work with little to no supervisory oversight. As Lieutenant French noted in his Internal Affairs report, Lieutenant Gonzales relied exclusively on Sergeant Reyna and Sergeant Wood to ensure that the Narcotics investigators did their jobs properly. However, upon review of Sergeant Reyna and Sergeant Wood's testimony to HPD IA investigators, the two Sergeants were either concerned about questioning their subordinates' integrity if they inquired about the status of a particular investigation or did not think they had to babysit their investigators.

2.13   It is well known in law enforcement that Officers assigned Narcotics and Vice enforcement responsibilities are subjected to incredible influences. Not being scrutinized regularly or periodically may lead to Officer corruption, improper police practices and procedures, and policy violations. To that end, the supervisors of the HPD Narcotics Division, particularly Lieutenant Gonzales, Sergeant Reyna, and Sgt. Wood, who supervised Narcotic Squad 15, did very little to incorporate checks and balances to mitigate and prevent the behavior of Officer Goines and Officer Bryant. Only after the Harding Street incident occurred did HPD Chief Acevedo order an audit of the Narcotics Squad 15, particularly Officer Goines' activity. This type of audit should have been regularly conducted by the supervisory staff of Narcotics Squad 15, before the Harding Street incident, but it did not occur. The subsequent audit of Officer Goines' cases revealed a number of deficiencies, incongruities in the reports he generated, and, overall, questionable search warrants executed in previous cases. To that end, it is more likely than not that if the supervisors had overseen the Narcotics squad and 15 members performing their supervisory responsibilities as expected, the Harding Street debacle could have been mitigated or prevented.

---

[46] Ibid.

27

2.14   The failure of HPD to supervise its Narcotics Division was grossly inconsistent with well-established police practices and procedures. Lt. French was not ordered by HPD to investigate the supervisory conduct of any Narcotics supervisor above the level of Lt. Gonzales and he did not do so. However, the same lack of oversight, failure to actively supervise, and failure to verify subordinate compliance with the law and with HPD policies found with respect to Lt. Gonzales and Sergeants Reyna and Wood were exhibited by Commander Follis and the command staff above him all the way up to the Chief of Police. Commander Follis testified several times in his deposition (p. 120, 181) that he "trusted" Lieutenant Gonzales, Sergeants Reyna and Woods, and the Officers of Squad 15 and did nothing to verify they were adhering to HPD policies. Former Assistant Chief Lopez was cited in the Harris County District Attorney's Officer Report of Investigation regarding the Harding Street incident, "Assistant Chief Lopez attributed some of the issues to supervisors and their supervising styles. He also mentioned complacency and or placing to much trust in the wrong employees."[47]

2.15   Based on the lack of supervision and disciplinary action identified above, Goines, Bryant, and Squad 15 knew that their conduct would be met with tacit approval by their supervisors, all the way up to the Chief of Police. The failure to supervise also encouraged Goines, Bryant, and Squad 15 to continue their unlawful conduct, including violations of the Fourth Amendment in obtaining and executing search warrants. The failure to supervise identified above, was the moving force or proximate cause of the underlying Constitutional violations by Goines and Bryant and the moving force or proximate cause of the death of Tuttle and Nicholas.

2.16   This failure to supervise involved a clear constitutional duty implicated in recurrent situations that Officer Goines and Officer Bryant (and Narcotics Division officers) were certain to face. As Narcotic Officers, Gerald Goines and Steven Bryant were repeatedly involved in procuring and executing search warrants, including in no-knock situations. The underlying constitutional duty here, related to violations of the Fourth Amendment in obtaining search warrants, is clear. Based on that, it should have been obvious to HPD, including the command staff all the way to the Chief of Police that the failure to supervise Goines and Bryant was likely to lead to a violation of the Fourth Amendment rights of those they would encounter, including Mr. Tuttle and Ms. Nicholas.

2.16   Sergeants Reyna and Wood, Lieutenant Gonzales, Commander Follis, and the command staff above him all the way to the Chief of Police, had a duty to ensure that their subordinates, including Goines and Bryant, to actively supervise the Narcotics Division,

[47] Harris County District Attorney's Officer Report of Investigation (Stamped S2023.09-1, # 0333).

28

007944 NICHOLAS

with supervisors at every level simply taking their subordinates at their word rather than verifying it, thereby turning a blind eye to potentially improper and illegal conduct. Had HPD, including the command staff all the way to the Chief of Police, sufficiently supervised Goines and Bryant, HPD would have prevented the unconstitutional conduct based on well-established police practices and procedures to prevent this very conduct.

## Opinion 3:

Members of the Houston Police Department used deadly force against Mr. Dennis Tuttle and Ms. Rhogena Nicholas while executing a fraudulent search warrant. The force used to kill Mr. Dennis Tuttle and Ms. Rhogena Nicholas by HPD Officer Gallegos was unnecessary and excessive and was inconsistent with well-established police practices and procedures and official HPD policy.

## Analysis:

3.1     Law enforcement Officers nationwide, including LCPD law enforcement personnel, are trained concerning the United States Supreme Court decision in *Graham. v. Connor*, 490 U.S. 386 (1989) regarding objectively reasonable force. As the court explained, the "proper application [of force] requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the Officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 395.[48] This has been embedded in basic police Officer training.

3.2     *Graham* provided additional information about the reasonableness of the force used by the police. The Supreme Court's decision stated:

> *"...the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable Officer on the scene, rather than with 20-20 vision of hindsight... the calculus of reasonableness must embody allowance for the fact that Officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving about the amount of force that is necessary in that particular situation."[49]*

3.3     Additionally, police are trained to use only that force that is objectively reasonable and legally justified for the following reasons: in defense of another, in self-defense, to

---

[48] *Graham. v. Connor*, 490 U.S. 38 (1989)
[49] Ibid.

007945 NICHOLAS

effectuate an arrest, or to prevent an arrest from being defeated by resistance or escape. Furthermore, as previously cited in this report, law enforcement Officers are trained throughout the country on the objectively reasonable force calculus when seizing an individual under the 4th Amendment to include, would a reasonably prudent and well-trained Officer act in a similar fashion given similar circumstances and were the actions acceptable, or more importantly, reasonable?

3.4    For the use of deadly force, police are trained to use deadly force only if the suspect poses a threat of serious physical harm, either to the Officer or to others. This training stems from the limits of deadly force articulated by the United States Supreme Court. *See Tennessee v. Garner*, 471 U.S. 1 (1985).

3.5    Each use of force deployed by a law enforcement officer in a particular incident must conform with the objectively reasonable calculus noted in *Graham*.

3.6    Houston Police Department General Order No 600-17, titled *Use of Force,* states, in part, under *Policy*,

*"The Houston Police Department places its highest value on the life and safety of its employees and members of the community.*

*This General Order applies to all employees. The term employee(s) applies to both classified and civilian employees within the context of the application of this General Order. This General Order does not grant civilian employees any authority beyond the authority they have under the Texas Penal Code, the Texas Code of Criminal Procedure or City of Houston Ordinances.*

*Employees are authorized by law to use force to protect themselves or others, to effect an arrest, or to maintain custody of those arrested. When dealing with members of the community, suspects, or prisoners, employees must use only the amount of force reasonably necessary to protect themselves or others, to effect an arrest, or to bring an incident under control, even if under the circumstances the law would allow the use of greater force."*[50]

3.7    Houston Police Department General Order No 600-17, titled *Use of Force,* states, in part, under *General Use of Force Principles*,

---

[50] Houston Police Department General Order No. 600-17 titled *Use of Force* (Issue Date: September 30, 2015) (p. 1 Bates Stamp COH 00357).

30

007946 NICHOLAS

*"Use of force must be objectively reasonable based on the totality of the circumstances. The circumstances justifying the initial use of force may change during the course of an event. It is the duty of all employees to constantly assess the situation and adjust the use of force accordingly. Employees who use force against any person must detail the specific reasons for using such force."[51]*

3.8   Houston Police Department General Order No 600-17, titled *Use of Force,* states, in part, under *Use of Deadly Force,*

*"The Use of deadly force shall be limited to those circumstances in which Officers reasonably believe it is necessary to protect themselves or others from the imminent threat of serious bodily injury or death. Officers shall consider their immediate surroundings and the safety of uninvolved persons before using deadly force."[52]*

3.9   By all accounts, the order of the stack formation before entry was made into the residence started with Officer Frank Medina (point person), then Officer Steven Bryant (door breacher utilizing a "Moby" device), Officer Cedell Lovings, Officer Manuel Salazar, Officer Oscar Pardo, Officer Nadeem Ashraf, Officer Felipe Gallegos, Sergeant Thomas Wood, and Officer Gerald Goines.[53]

3.10   According to Officer Medina's statement, when Officer Bryant breached the door, Officer Medina was the first to step inside the house. Officer Medina said he entered the residence's living room from the front door and observed a white female to his left. He ordered her to put her hands on her face and sit down, but she did not comply and was screaming. He then heard a gunshot to his right and observed a large, vicious white dog running towards him and the other officers. According to Officer Medina, he shot at the dog, causing it to fall backwards. At that time, he felt something hit his shoulder, and he was pushed back onto the couch; realizing he was shot, he yelled, "I'm hit." He then tried to roll towards the doorway and could not see the female anymore nor hear her screaming. Officer Sepolio assisted him out of the house.[54]

---

[51] Ibid (p. 2, Bates Stamp COH 00358).
[52] Ibid (p. 4, Bates Stamp COH 00360)
[53] Harris County District Attorney Civil Rights Division, Report of Investigation Officer Involved Shooting, 7815 Harding Street, Texas 77012, Report # S-19-07, authored by Captain Billy Millian (Stamped S2023.09-01 # 00962-01016)
[54] Ibid (Stamped S2023.09-01, # 01015-16).

31

007947 NICHOLAS

3.11    According to Officer Lovings' written statement, he followed Officer Medina into the house with Officer Salazar behind him. Officer Lovings observed a white female to his left screaming obscenities. As Officer Lovings moved to his right, he heard a male voice state, "I told y'all last week I don't have any dope." He then heard Officer Medina say, "I'm hit, I'm hit." Officer Lovings said he did not hear a gunshot before Officer Medina said he was hit. Officer Lovings said he then observed a large dog running at him from the back of the house, and he fired several rounds at the dog, yelling, "Dog!" Officer Lovings said he saw a muzzle flash and immediately observed a white male a few feet away from him pointing a gun at him. Officer Lovings said he began firing his gun at the male as he (Lovings) was shot. Officer Lovings was shot in the neck and fell down onto the floor. Officer Lovings wrote that he observed the male crouch against the living room wall, and the male attempted to grab his rifle, but the rifle sling prevented the male from getting the rifle. Officer Loving remembered hearing several more gunshots coming from above him, conjecturing it was the white male, although he could not see. He observed the white male retreat back into the house. Officer Lovings then observed Officer Gallegos by the front doorway, right side, and then heard more gunfire. Officer Lovings did not know who drug him from the house.[55]

3.12    Officer Salazar was the third officer to enter the residence. According to Officer Salazar's statement, Officer Lovings moved to the center of the house when he entered, and then he heard someone yelling, "Dog!" At that time, Officer Salazar moved to the left of Officer Lovings and observed an aggressive Pitbull dog. According to Officer Salazar, Officer Lovings shot the dog. Officer Salazar then heard a woman screaming and being belligerent. Officer Salazar heard another shot and then heard Officer Medina yell he was hit. Officer Salazar then observed a male come from the dining room area, pointing a pistol at them. Officer Salazar said that the male fired several shots in their direction. After shooting in their direction, the male took cover behind the dining room wall. Officer Salazar heard someone yell pull back, and as he was going backward he fell with his firearm still pointing at the threat. As he fell backwards, he heard additional shots being fired, and he tried to return fire, but he realized his magazine was empty. He reloaded while hearing continued shooting. At that time, he observed Sergeant Reyna crawling in his direction with a bloody face. He then dragged Sergeant Reyna to the side of the house.[56]

3.13    Officer Pardo was the 4th officer to enter the house. According to Officer Pardo's statements, he observed the other officers enter the house (Medina, Lovings, Salazar). He

---

[55] Ibid (Stamped S2023.09-01, # 01026).
[56] Ibid (Stamped S2023.09-01, # 01037-38).

007948 NICHOLAS

observed a white female on the left side of the room. Officer Pardo heard a dog barking, then heard shots towards the dog, and then heard the dog cry. He then heard additional shots and heard Officer Medina say he was hit. He heard a woman yelling obscenities. According to Officer Pardo, he observed Officer Medina on the couch in the living room, and a female was over him. Officer Medina had a shotgun on his chest, trying to cover the shotgun with one of his arms. Officer Pardo stated he turned his weapon towards the female because he thought the female was moving for Officer Medina's shotgun. Officer Pardo said someone either pulled him back or shoved him, and he landed on his face outside of the residence. He did a tactical role and was on his feet again. He observed Officer Lovings on the floor near the front door. He then observed Officer Gallegos move up and heard more gunshots. He then observed a white male with a gun at the door threshold stepping over Officer Lovings and observed Officer Reyna get shot. Officer Pardo fired one round at the white male while moving forward with Officer Gallegos toward the porch.

The white male disappeared back into the residence. Officer Pardo then ran to the porch and grabbed Officer Lovings. At that time, he observed the white male with a gun in his hand (right hand) next to Officer Lovings' legs. Officer Pardo fired another round at the white male. According to Officer Pardo, he and Officer Gallegos moved back to the front porch of the residence, at which point he (Pardo) fired three additional rounds at the white male. He remembered another officer yelling that Officer Lovings was shot. Officer Pardo stated he only had his left foot in the residence when he observed the white female near the southwest corner.[57]

3.14    According to Officer Gallegos' statement, the officers announced, "Houston Police, search warrant" when they entered the house. Officer Gallegos was still outside of the residence but heard an officer from inside the house yell, "Dog," and immediately heard shots being fired, and it sounded like it was from a shotgun. He then heard more shots fired, which sounded like they came from a smaller caliber firearm. He then heard Officer Medina yell, "I'm hit." Officer Gallegos said that he made his way closer to the porch, and as he got closer to the front door, he observed Officer Salazar and Officer Pardo get knocked backward off the porch landing. He said the exchange of gunfire continued as he made his way to the front door to assist the officers inside. He observed Officer Lovings fall to the ground in the middle of the doorway, blocking the entrance. At that point, Officer Gallegos was able to see inside the living room. He observed Officer Medina lying on his back on the couch, not moving, and he observed a female standing over him in a dominant position yelling, "Motherfucker, Motherfucker." It appeared she was

---

[57] Ibid (Stamped S2023.09-01, # 01044-45).

33

007949 NICHOLAS

attempting to grab Officer Medina's shotgun. Officer Gallegos said he fired several rounds at the female, and then she fell on the couch. Officer Gallegos said that he was afraid for Officer Medina's life. Officer Gallegos said he moved towards the door to assist Officer Lovings, but he heard more gunfire from inside the house. At that time, he discharged his rifle multiple times into the house through the exterior wall of the house, in the direction where he heard the gunfire. He justified shooting into the house via the exterior wall because several officers had been wounded. He then observed a white male come to the front door, open it, and stand over Officer Lovings. The white male had a gun in his bandaged hand and fired one more shot, which struck Sgt. Reyna. Officer Gallegos then fired a round at the suspect, hitting him in his hand, which forced him to pull back into the house. Officer Gallegos approached the front door opening and came face to face with the white male who was standing a couple of feet in the doorway but pointing the weapon in his direction. Officer Gallegos fired additional rounds until the male went down to the ground. Once the suspect was on the ground, according to Officer Gallegos, he (the suspect) yelled, "What the fuck do you want from me? There are no drugs in here." According to officer Gallegos, the suspect was sitting on his rear end and grabbed the handgun and raised it at him. Officer Gallegos fired multiple shots at the suspect until he was no longer moving.[58]

3.15    According to the deposition testimony of Officer Gallegos (p. 92-93), he observed Officer Medina sitting back on the couch and observed Ms. Nicholas tugging at officer Medina's shotgun saying, "Motherfucker, Motherfucker!" Officer Gallegos testified (p. 95) that he shot Ms. Nicholas because Officer Medina was shot and Ms. Nicholas was aggressively tugging the shotgun. Officer Gallegos testified (p. 96) that it was fairly light in the house and used his rifle flashlight. He further testified (p. 97) that Ms. Nicholas was "right above" Officer Medina. He placed Ms. Nicholas between Officer Medina and the coffee table in the living room. He claimed that miss Nicholas was facing Officer Medina at an angle but also towards the front door. He testified (p. 97), Ms. Nicholas' front of her body was exposed to him. He claimed (p. 98) Miss Nicholas was somewhat squared with him but on an angle. He further testified that he fired one to three rounds at her. He said he knew he had hit her because he saw the bullets hit her. He further testified (p. 98) that he did not issue any orders to Ms. Nicholas before shooting. Officer Gallegos testified (p. 100) that Ms. Nicholas did not drop where he saw her. She turned to the right and fell towards the couch.

Officer Gallegos testified (p. 101) that once he shot Ms. Nicholas, he then shot into the house through the exterior wall with his rifle. He further testified (p. 102) that he did not

---

[58] Ibid (S2023.09-01, # 010160-62)

007950 NICHOLAS

remember how many times she shot into the house through the wall. He testified he could not see the person he was shooting at, but he was shooting in the direction where the gunfire was coming from. He further testified (p. 103), "You can't shoot what you can't see." He further testified (p. 104) that he was shooting, but he could not see anyone. He further testified (p. 104) that he did not know who else was shooting into the house.

Officer Gallegos further testified (p. 107-109) that after he broke out a window at the front of the house, he returned to a tree in front of the yard. He yelled for someone to get Officer Lovings. Officer Goines ran up and got shot. Officer Reyna ran up to the front door, and Officer Gallegos observed two hands coming out of the door holding a revolver. He testified he observed the subject shoot Sergeant Reyna in the face, and he, Officer Gallegos, then shot Mr. Tuttle in the hand.

3.16   Officer Gallegos testified (p. 125) that he lost sight of Mr. Tuttle when he fell. He testified that Mr. Tuttle had the gun in his right hand, and it was resting on his right thigh. Officer Gallegos testified that he fired the last shot while standing on the porch. He further testified (p. 126) that Mr. Tuttle had his right hand and right arm resting on his right thigh and was seated. He further testified (p. 127) he remembered Mr. Tuttle yelling, "What the fuck do you want from me? There are no drugs here." Officer Gallegos testified (p. 127) that he told Mr. Tuttle to shut up. At that time that is when Mr. Tuttle lifted his arm and hand with the gun, and Officer Gallegos shot him. Officer Gallegos testified he shot him in the back of the neck. Officer Gallegos testified (p. 130) he did not know what happened to Mr. Tuttle's gun. Officer Gallegos testified (p. 132) that all the bullet wounds Mr. Tuttle sustained occurred before he shot him in the head.

Officer Gallegos testified (p. 133) that he can be heard saying, "Shut the fuck up, stop moving," but he did not tell Mr. Tuttle to drop the gun. He further testified (p. 134) he did not see Mr. Tuttle reach for Officer Lovings' gun. Officer Gallegos testified (p. 134) when he yelled, "Shut the fuck up," he was telling his fellow officers that. Officer Gallegos testified (p. 136) as he was approaching the front door, which is when he heard Mr. Tuttle say there were no drugs there. Officer Gallegos expended 20 .223 caliber bullets during the incident.

During Gallegos's deposition, he was asked how Miss Nicholas could be a threat to Officer Medina if she was located at the opposite end of the couch where Officer Medina was located. He testified in response (p. 171) that he could only go on what he observed; Ms. Nicholas hunched over Officer Medina when he shot her. Officer Gallegos testified (p. 176) that he believed Ms. Nicholas was an imminent threat of great bodily harm or death to Officer Medina and the other officers in the house. He testified he had to stop

007951 NICHOLAS

that threat. Officer Gallegos testified (p. 197) that he was indicted for murder in this incident. Officer Gallegos testified (p. 211) that when he shot Mr. Tuttle for the final time, Mr. Tuttle was sitting on the floor.

3.17    Sgt. Reyna was in the 9th position of the stack. According to Sergeant Reyna's statement, he heard someone shoot the dog. He then heard someone yell they were hit. He observed Officer Lovings slumped on the floor of the house. Officer Goines was in front of Sergeant Reyna. Officer Reyna observed Officer Goines go down after hearing shots. Sergeant Reyna tried to reach for Officer Lovings and saw a white male. Sergeant Reyna then shot at the white male an unknown amount of times, and then Sergeant Reyna was shot once in the face.[59] Officer Gallegos testified (p. 117) that after he shot Mr. Tuttle in his left hand, Mr. Tuttle withdrew into the house. According to Officer Gallegos (p. 118), he observed Mr. Tuttle up against the front door, with his back and shoulder up against the door. The gun was in his right hand against his chest and looking in his (Gallegos) direction. He further testified (p. 121) that when he and Mr. Tuttle made eye contact, Mr. Tuttle raised his arm with the gun toward him, and he shot Mr. Tuttle. He doesn't remember how many times. He testified (p. 121-122), that when Mr. Tuttle was hit, he fell back. He continued to shoot at Mr. Tuttle until Mr. Tuttle fell.

3.18    Officer Goines was in the 11th position. According to Officer Goines' statements, he observed the other officers gain entry into the residence. He heard multiple gunshots. He observed an officer fall while in the house and then observed another unknown officer on the floor on the front entry of the residence. Officer Goines rushed to assist his fellow officers. As he was running to the opened front door, he heard the suspect inside the house yelling, "Get the gun and finish him!" Officer Goines then tried to grab the officer who was down at the front door, and at that time Officer Goines was struck by gunfire. Officer Goines was shot in the face area.[60]

3.19    Crime scene photographs documented that Ms. Nicholas was found dead, with her knees on the floor, slumped over at her waist on the other side of the U-shaped couch (along the west wall of the living room, northernmost portion of the couch), away from Officer Medina. The autopsy report for Ms. Nicholas revealed that she sustained a gunshot wound to the right side of her right breast, traversing slightly in a downward trajectory

---

[59] Ibid (S2023.09-01, # 010166-68)
[60] Ibid (S2023.09-01, #010777-78)

007952 NICHOLAS

and exiting out of her upper left back. She also sustained a gunshot wound to her right thigh.[61]

3.20    As previously noted in this report, the family dog was shot and killed during the raid. The same large white dog that was shot by either Officer Medina or Officer Lovings, allegedly was able to try and get on its feet and growled "aggressively" and was shot again by Officer Sepolio.[62] A second dog was found injured in the residence, and it is unclear what type of injury it sustained. Internal Affairs Lieutenant Nguyen testified in his deposition (p. 119) that the IA investigation did not look into how the second dog in the house was injured. A third dog was found hiding in the residence. No necropsy was done on the deceased dog, nor was there any account as to how the second dog was injured.

3.21    HPD Internal Affairs Lieutenant S.C. Nguyen wrote a report regarding the investigation into the incident at 7815 Harding Street. His investigation focused on the force used by the officers during the raid. Lieutenant Nguyen concluded in his report that Officers Medina, Sepolio, and Loving were justified in shooting the family dog.[63]

3.22    Lieutenant Nguyen concluded in his report that Officers Salazar, Pardo, Gallegos, and Sergeant Reyna's use of deadly force by shooting at and/or of Mr. Dennis Tuttle and Ms. Regina Nicholas was justified (Nguyen deposition, p. 80).[64] Lieutenant Nguyen testified in his deposition (p. 84, 85) that he based his report conclusions solely on the police officers' testimony. Furthermore, he testified (p. 85) that there was no physical evidence he considered in his conclusion calculus when he determined the Officers were justified in killing Mr. Tuttle and Ms. Nicholas. Lt. Nguyen testified (p. 88-90) if blood stain spatter analysis was conducted for Ms. Nicholas. He further testified that if blood stain analysis and DNA evidence analysis were conducted showing Ms. Nicholas was not where the officer said she was, he would have entered that as evidence for his investigation. He further testified (p. 94) that there was no evidence that any of the officers were shot by friendly fire, meaning by other HPD officers on the scene.

---

[61] Harris County Institute of Forensic Sciences Autopsy Report of Rhogena Ann Nicholas, Case No. ML 19-0331, authored by Marianne E. Beynon, M.D., dated January 29, 2019.

[62] Harris County District Attorney Civil Rights Division, Report of Investigation Officer Involved Shooting, 7815 Harding Street, Texas 77012, Report # S-19-07, authored by Captain Billy Millian (Stamped S2023.09-01, # 001052).

[63] HPD IA Investigation Summary Issue Record #54047-2019, authored by Lt. S.C. Nguyen, dated June 28-2019 (p. 41-42, Bates Stamped COH 05471-5472).

[64] Ibid (p. 42-45, Bates Stamped COH 005472-5475)

37

3.23    Lieutenant Nguyen concluded in his report that Officer Gallegos violated HPD policy by possessing a firearm (Glock semi-automatic handgun) during the warrant execution at Harding Street that was not registered with the HPD, nor had he officially qualified with the firearm. Additionally, Lieutenant Nguyen concluded in his report that Officers Rios, Oritz, Garza, Morales, and Blankenship-Reeves violated HPD policy by not activating their respective body-worn cameras in a timely fashion during the execution of the search warrant.[65]

3.24    Given the totality of facts, evidence, and statements in this incident, it is this writer's opinion to a reasonable degree of professional certainty that the use of deadly force against Ms. Nicholas by Officer Gallegos was not reasonable for the following reasons:

1) Ms. Nicholas was unarmed when she was shot.
2) Physical evidence did not corroborate that Ms. Nicholas was standing over or near Officer Medina when she was shot.
3) Ms. Nicholas sustained a gunshot wound to the right side of her right breast, which traversed in a downward trajectory, exiting her upper back. She also suffered a gunshot wound to her right thigh.[66]
4) Ms. Nicholas was found dead on the northernmost portion of the U-shaped couch against the west wall of the living room. If one were to consider Ms. Nicholas' location, as Officer Gallegos and Officer Pardo described, Ms. Nicholas would have sustained wounds either to her left side or frontal area.
5) There was no blood stain/spatter evidence indicating that when Miss Nicholas was shot, she walked from in front of Officer Medina to where she ultimately collapsed on the northernmost portion of the couch against the west wall. Officer Gallegos admitted he shot Ms. Nichalos, and he testified she collapsed as soon as he shot her.
6) There was no fingerprint or DNA evidence on Officer Medina's shotgun belonging to Ms. Nicholas, indicating she never touched Officer Medina's shotgun.
7) Officer Gallegos discharged multiple gunshot rounds into the exterior of the house. He blindly shot into the residence from the house's exterior without any target acquisition. A reasonable and well-trained police officer would not have

---

[65] Ibid (p. 45-48, Bates Stamped COH 005475-05478).
[66] Harris County Institute of Forensic Sciences Autopsy Report of Ms. Rhogena Nicholas (January 28, 2019) authored by Dr. Marianne E. Beynon, M.D.

38

blindly discharged his firearm into an occupied home, regardless of the resistance noted during this incident.

8) Ms. Nicholas collapsed where she was shot, which was not near Officer Medina.

3.25    The use of deadly force against Ms. Nicholas was inconsistent with what a well-trained police officer would have done, given similar circumstances. The use of deadly force against Ms. Nicholas was inconsistent with well-established police practices and procedures and the Houston Police Department's policy on the use of deadly force.

3.26    During this incident, Mr. Tuttle was shot nine times. It is alleged that Mr. Tuttle was armed with a handgun and discharged it at some of the officers. A bullet fragment recovered from Officer Lovings was traced by HFSC as having been fired from the revolver found at the scene. No ballistic evidence related to the other three injured officers was traced to the revolver. An examination of the revolver revealed that it was discharged during the incident four times at most, assuming it was loaded with six live rounds before the incident. An examination of the cylinders of the firearm revealed an unusual sequence of bullet casings. An examination of the cylinder revealed three expended casings, a live round, another expended casing, and a live round. No explanation has been provided to explain how this could have occurred, meaning, how one of the rounds in the cylinder skipped a casing during such a chaotic incident.

3.27    All of the officers who fired their guns at Mr. Tuttle; Sergeant Reyna, Officer Salazar, Officer Pardo, and Officer Gallegos were determined to be justified by the HPD Internal Affairs investigation. However, a review of the injuries sustained to Mr. Tuttle's hands and arm indicated that when Mr. Tuttle was on the ground, he would have been incapable of picking up and pointing a gun given the severity of injuries to both his hands and his left arm. To that end, it would appear that Mr. Tuttle was unarmed when he was shot the last time by Officer Gallegos.

3.28    Given the totality of facts, evidence, and statements in this incident, it is this writer's opinion to a reasonable degree of professional certainty, that the use of deadly force against Mr. Tuttle by Officer Gallegos was not reasonable for the following reasons:

1) Mr. Tuttle was shot nine times. Five of the gunshots were to his back and traversed to his front (Lt. Nguyen deposition, p. 133).[67]

2) Mr. Tuttle sustained grievous wounds to his left hand, right wrist, and left arm.

---

[67] Harris County Institute of Forensic Sciences Autopsy Report of Mr. Dennis Tuttle (January 28, 2019) authored by Dr. Marianne E. Beynon, M.D.

007955 NICHOLAS

3) Given the grievous nature of those wounds, it is more likely than not that Mr. Tuttle was unable to hold a firearm in either hand and point it at Officer Gallegos, as he stated in his statements and deposition. Officer Gallegos claimed that Mr. Tuttle was sitting down on the floor and raised his revolver towards him, using his right hand, when Officer Gallegos shot Mr. Tuttle in the back of the head. Officer Gallegos admitted to shooting Mr. Tuttle.

4) There was no blood spatter or any type of blood evidence on the revolver Mr. Tuttle used in this incident. The lack of blood evidence would be highly unusual given the gravity of the wounds to Mr. Tuttle's hands and arm. Mr. Tuttle's DNA evidence was found on the revolver.

5) The firearm used by Mr. Tuttle was found several feet away from him, underneath a heater, located just to the east of where Mr. Tuttle lay dead. There was no information in the record explaining how Mr. Tuttle's gun could be found underneath the heater, particularly given the grievous nature of his wounds.

6) If Mr. Tuttle had been without a weapon when he was shot by Officer Gallegos, the use of deadly force against him would not have been reasonable and would be inconsistent with what a well-trained police officer would do.

7) Furthermore, if Mr. Tuttle was without a weapon when he was shot, it would be inconsistent with well-established police practices and procedures and Houston Police Department policy to shoot an unarmed individual.

8) Officer Gallegos admitted that he shot multiple bullets through the exterior wall of the front of the house. It is unclear if any of those rounds struck Mr. Tuttle. However, Officer Gallegos had no information about who else might have been in the house, particularly innocent bystanders, including Ms. Nicholas. His indiscriminate shooting into the house from the exterior without target acquisition was not reasonable and inconsistent with what a well-trained police officer would or should have done.

## Opinion 4:

The Houston Police Department, as overseen by Chief Acevedo, had a custom and practice of allowing its officers to engage in excessive force actions, particularly deadly force, with little to no disapproval of the agency's management. This custom and practice is indicative of the City of Houston Police Department's deliberate indifference to those individuals who have been subjected to excessive force, particularly deadly force, by the actions of the HPD officers who engage in excessive force. The custom and practices of the Houston Police Department described are inconsistent with generally accepted police practices and procedures.

007956 NICHOLAS

## Analysis:

4.1    The Commission on Accreditation for Law Enforcement Agencies, Inc. (CALEA) provides standards to law enforcement agencies nationwide. Participating with CALEA is a voluntary process. CALEA was formulated in 1986 with the direct assistance of the International Association of Chiefs of Police (IACP), the National Florida Sheriff's Association (NFSA), the Police Executive Research Forum (PERF), and the National Organization of Black Law Enforcement Executives (NOBLE). The City of Houston Police Department is not CALEA accredited.

4.2    The development of these standards was intended to provide law enforcement agencies nationwide with baseline law enforcement practices that law enforcement agencies should adhere to, to augment their practices, procedures, and service delivery to the community. To that end, accredited law enforcement agencies are expected to adhere to these standards in written policy, by action of its members, or by word and deed.

4.3    CALEA dedicates an entire chapter (53) titled *Inspectional Services*. This chapter requires an accredited law enforcement agency the size of HPD to engage in routine, regularly scheduled inspections of all components of a law enforcement agency. The chapter intends to ensure the agency regularly inspects its components to ensure they comply with agency policy, practices, and if required, state and federal statutes. These inspections would include a review of all Division, Bureaus, and Units within the agency, including the Narcotics Division, and annualized use of force analysis.

4.4    The introduction of CALEA Chapter 53 states,

*"The standards in this chapter relate to the inspectional process within a law enforcement agency. The inspectional process is an essential mechanism for evaluating the quality of the agency's operations; ensuring that the agency's goals are being pursued; identifying the need for additional resources; and ensuring that control is maintained throughout the agency. Inspections may include, evaluation of facilities, vehicles, equipment, records, personnel, investigative procedures, crime reporting practices, and incident reports. The inspectional process compares the agency's formal expectations with actual performance. Inspections conducted with a positive approach provide a means of communication within the agency, not only administratively but also operationally.*

007957 NICHOLAS

*The inspectional process, at both the line and the staff levels, provides the chief executive officer and other managers and supervisors with a means of regularly assessing the agency's efficiency and effectiveness and provides information necessary to plan for change. Clear objectives for the inspectional process should be established; it should also be acknowledged that inspectional activity can properly evaluate performance only by comparing it with previously established goals, objectives, policies, procedures, rules and regulations. All agencies should conduct line inspections, which should be carried out by supervisors at all levels. Larger agencies should also have formally organized staff inspection components.*

*Staff inspections may overlap depending on the construction of the specific systems. Generally, line inspections focus on the condition of facilities, equipment, procedures, uniforms, etc., and are done frequently by a line supervisor. Staff inspections generally focus on agency procedures and are done infrequently by staff personnel. For example, a line inspection may determine if patrol officers are checking their cars at the beginning of their shift as required by a department directive. A staff inspection system may monitor organizational components in terms of inputs, outputs, and outcomes. These reports are valuable for decisions concerning resource allocation, modification of component objectives, and training needs."*[68]

4.5   This writer recognizes that HPD is not a CALEA-accredited agency, nor has it ever been. However, given the size of HPD, one would expect that the agency would have a mechanism to audit itself regularly. Many law enforcement agencies refer to this function as "Staff Inspections." There is no evidence that HPD has such a functional unit, although there is a unit titled "Inspections." However, the HPD Inspections unit is geared towards policy development and review. There was no information in the records reviewed by this writer that HPD engaged in annualized or periodic audits and inspections of the Narcotics Division.

4.6   Similarly, no records indicated HPD conducted routine and regular analysis over any period of time regarding the use of force by its members. In fact, after the Harding Street incident, Chief Acevedo ordered a three-year audit of the Narcotics Division, Squad 15. Seargent Reyna and Sergeant Wood told HPD IA, "It was not common to check for CI

---

[68] Commission on Accreditation for Law Enforcement Agencies, Inc. (CALEA) (Version 6.19) Chapter 53 Introduction, Inspectional Services.

007958 NICHOLAS

receipt for fund forms or incident reports prior to running the warrant to verify information" while they were supervisors overseeing Squad 15.[69] Lieutenant Gonzales echoed the same when HPD IA interviewed him. None of Squad 15 mentioned any inspection or audit of the unit during their tenure. Commander Follis testified in his deposition (p. 204) that he did not recall the HPD Inspections Unit doing anything in the Narcotics Division. He further testified (p. 205) that the Inspections Unit role was to create policy or revise policy. Commander Follis testified (p. 205) that no external audits were conducted in the Narcotics Division. Commander Follis' testimony coincides with former HPD Assistant Chief Lopez's report citing that, inexplicably, audits of the Narcotics Division were discontinued approximately 10 years prior to the Harding Street incident.[70]

4.7    It is this writer's experience, having previously consulted as a law enforcement expert on police practices and procedures involving HPD, that there was a custom and practice by HPD to not thoroughly investigate officer-involved shootings (OIS), resulting in the vast majority of HPD OIS being ruled as justified.[71] For example, every shooting that happened in the City of Houston between 2009 and 2014 was determined to be justifiable.[72] These shootings involved armed and unarmed civilians. Given that custom and practice between 2009-2014, there is no evidence that anything has changed given the 7815 Harding Street incident and the shooting deaths of Mr. Dennis Tuttle and Ms. Rhogena Nicholas. For example, HPD IA Lt. Son Nguyen testified in his deposition (p. 57-58) that he could not recall one HPD OIS where the department determined that an involved officer was untruthful regarding the use of force.

4.8    Similarly, Lt. Nguyen could not recall, during his two years as the Commander of HPD IA, where HPD IA sustained an OIS of a civilian. Furthermore, Lt. Nguyen testified (p. 84-85) that he based his conclusion and justification of the Officer's shooting of Mr. Tuttle and Mr. Nicholas solely on the statements of the officers who were involved. He did not review any physical evidence that might contradict what the officers testified to.

---

[69] P. 58, Bates Stamp COH 0037534)

[70] Harris County District Attorney's Officer Report of Investigation (Stamped S2023.09-1, # 0335).

[71] In the United States District Court, Southern District, Texas Houston Division. The Estate of **Jordan Baker**, by and through Administrator Janet Baker v. Juventino Castro, the City of Houston, RPI Management Company, LLC and RPI Interest I, Ltd., Case Number: 4:1-CV-3495.

[72] Supplemental expert report authored by Dr. Andrew Scott (November 12, 2017, p. 3). In the United States District Court, Southern District, Texas Houston Division. The Estate of Jordan Baker, by and through Administrator Janet Baker v. Juventino Castro, the City of Houston, RPI Management Company, LLC and RPI Interest I, Ltd., Case Number: 4:1-CV-3495.

007959 NICHOLAS

4.9   The Houston Police Department, overseen by Chief Acevedo, determined that the officers were justified in using deadly force against Ms. Nicholas and Mr. Tuttle. The conclusion of this investigation that the officers utilized deadly force against Ms. Nicholas and Mr. Tuttle coincides with the agency's standing custom and practice of determining that most, if not all, deadly force incidents involving HPD law enforcement officers are justified, even if physical evidence is inconsistent with the officer's rendition of the facts. For example,

> *"Every intentional shooting of a citizen or at a citizen by Houston Police Department, between the years of 2009-2014, was determined to be justifiable in the eyes of the Houston Police Department. In fact, even when an HPD officer was deemed to have committed other unprofessional acts HPD always found the shooting justified. In addition to the data and spreadsheets provided by the City of Houston, HPD Internal Affairs Division Captain May, representing the City of Houston Police Department, testified in his deposition (p. 36), every shooting that happened in the City of Houston between 2009 and 2014 was determined to be justifiable. These shootings involved armed and unarmed civilians."[73]*

4.10  Under Chief Acevedo's watch, commencing in 2016, he had a duty and obligation to ensure the management and oversight of the HPD were conducted to provide the highest accountability for its police officers. This accountability required assurance that agency members followed agency policy in action and deed. How this should have occurred is through proper supervision, accountability, and audits and inspections. The investigation into the Harding Street incident revealed that the agency failed to supervise and monitor the actions of its officers properly, indicating a deliberate indifference to the safety of the community it was sworn to protect and serve. Only after the Harding Street incident did Chief Acevedo order an audit of Narcotics Squad 15. The audit determined:

1) HPD stopped annual audits approximately 10 years before this incident.[74]
2) Supervisors overseeing Squad 15 turned a blind eye on what their subordinates did or did not do. More specifically, the supervisors were complacent and placed too much trust in their employees.[75]
3) The audit revealed a number of policy violations and additional fraudulent search warrants by Officer Goines.

---

[73] Ibid.

[74] Harris County District Attorney's Office Report of Investigation (Stamped S2023.09-1, # 335).

[75] Ibid (Stamped S2023.09-1, # 00333).

007960 NICHOLAS

4) No other audits were done of the Narcotics Division under Chief Acevedo's watch.[76]
5) Resulting from Chief Acevedo's ordered audit of the Narcotics Division after the Harding Street incident resulted in a number of policy revisions related to the Narcotics Division.[77] [78]
6) Policy changes noted after Chief Acevedo's audit should have been done prior to the Harding Street incident.

4.11    It should be noted that upon Chief Acevedo's employment as Chief of Police of the Houston Police Department, all Narcotic Division policies existing upon his arrival as Chief remained the same until after the Harding Street incident (Commander Follis' deposition, p. 203). Furthermore, no investigation or inquiry was made about HPD supervisory leadership in the Narcotics Division beyond that of Sgt. Wood, Sgt. Reyna and Lt. Gonzales. No investigation was conducted as to the responsibility Commander Follis had regarding his supervision of the Narcotics Division, nor was there an investigation into the supervisory responsibilities of Commander Follis' supervisors. Based on Commander Follis' deposition testimony, he too exemplified the same complacent leadership style his subordinate supervisors were cited to have violated, yet he was not cited for any supervisory policy violations.

4.12    Chief Acevedo and his management team failed to monitor and supervise its members properly in general, but more specifically, related to Narcotics Squad 15. As Chief of Police, it was Chief Acevedo and his immediate supervisory staff's obligation to ensure its agency members adhered to agency policy. Failure to do so was inconsistent with well-established police practices and procedures.

4.13    Based on the lack of supervision and disciplinary action identified above, Gallegos and Squad 15 knew that their use of excessive deadly force would be met with tacit approval by supervisors, the Chief of Police. This failure encouraged Gallegos and Squad 15 to continue their unlawful conduct, including the use of excessive deadly force. The failure to supervise and discipline above, was the moving force or proximate cause of the underlying excessive deadly force in violation of the Fourth Amendment by Gallegos and the moving force or proximate cause of the death of Tuttle and Nicholas.

---

[76] Ibid.

[77] Narcotics Division Review And Revision Of Relevant SOPs report (Bates Stamped COH 05359).

[78] HPD Report -Recommendations (Bates Stamped COH 05417-18).

45

*I reserve the right to amend my opinions as needed to rebut the opinions set forth by Defendant's expert and/or new information is brought to light upon further discovery.*

## APPENDICES:

Curriculum Vitae
Testimony List
Fees

Respectfully submitted,

Andrew J. Scott, III, D.C.J.
Doctor of Criminal Justice

AJS Consulting, LLC
ascott@ajspoliceconsulting.com
561-302-0756

46

007962 NICHOLAS