IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CLIFFORD F. TUTTLE, JR., REPRESENTATIVE OF THE ESTATE OF DENNIS W. TUTTLE, DECEASED, ROBERT TUTTLE, AND RYAN TUTTLE, | § § § § § | |
| Plaintiffs | § § | |
| v. | § § | Civil Action No. 4:21-cv-00270 |
| CITY OF HOUSTON, *et al.*, | § § § | |
| Defendants. | § | |

**AND**

| | | |
|---|---|---|
| JOHN NICHOLAS, as temporary administrator of the Estate of Rhogena Nicholas and JO ANN NICHOLAS, individually and as an heir of the Estate of Rhogena Nicholas, | § § § § § | |
| Plaintiffs | § § | |
| v. | § § | Civil Action No. 4:21-cv-00272 |
| CITY OF HOUSTON, *et al.*, | § § § | |
| Defendants. | § | |

## DEFENDANT CITY OF HOUSTON'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS BASED ON SERVICE OF THE WARRANT[1]

---

[1] Throughout this motion, "Plaintiffs" collectively refers to the Nicholas Plaintiffs and the Tuttle Plaintiffs. "Nicholas Plaintiffs" refers to the current Plaintiffs in the case originally filed as 4:21-cv-00272. "Tuttle Plaintiffs" refers to the current Plaintiffs in the case originally filed as 4:21-cv-00270. "Tuttle" refers to Dennis Tuttle. "Nicholas" refers to Rhogena Nicholas. "City" refers to the City of Houston. Each individual defendant is referred to by his or her last name. "HPD" refers to the Houston Police Department. "Individual Defendants" refers to all individual defendants.

This motion addresses Plaintiffs' Section 1983 claims and wrongful death and survival claims against the City related to HPD's service of the search warrant on 7815 Harding Street and respectfully requests that the Court dismiss these claims as a matter of law.[2]

## INTRODUCTION

What happened on January 28, 2019, at 7815 Harding Street was a tragedy. But the events leading up to that day are attributable to only one person: former police officer Gerald Goines, who submitted a false affidavit in support of a search warrant. However, as reprehensible as Goines' actions were that day, his conduct does not create liability for the City. It is well established that a municipality cannot be liable under Section 1983 on a theory of *respondeat superior*. *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978). A municipality can only be liable under Section 1983 for the conduct of an employee in extremely limited circumstances:

- Under an "official policy" theory of liability, a municipality may be liable if a plaintiff proves the existence of (1) a municipal policy; (2) of which a municipal policymaker had actual or constructive knowledge; (3) that was the "moving force" behind the plaintiff's constitutional violation. *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002).[3]

- Under a theory of failure to train, supervise, or discipline a municipal employee, a municipality may be liable if a plaintiff proves that (1) the municipality's specific training, supervision, or discipline policy was inadequate; (2) the municipality was "deliberate[ly] indifferen[t]" in adopting that policy; and (3) the inadequate policy directly caused the violation of the plaintiff's constitutional right. *Henderson v. Harris Cnty., Tex.*, 51 F.4th 125, 130 (5th Cir. 2022), *cert. denied sub nom. Henderson v. Harris Cnty.*, 143 S. Ct. 2661 (2023). "Deliberate indifference" typically requires evidence of a pattern of similar prior incidents "arising from a policy so clearly inadequate as to be obviously likely to result in a constitutional violation." *Covington v. City of Madisonville*, 812 F. App'x. 219, 225 (5th Cir. 2020). Such a pattern must include "a significant number of previous incidents placed in the context of the size of the police department, the number of criminal incidents investigated, and [such] specificity that the other incidents are fairly similar to what

---

[2] Plaintiffs' claims based on alleged excessive force are addressed in a simultaneously filed motion for partial summary judgment and, as outlined therein, also fail as a matter of law.

[3] With respect to quoted material, unless otherwise indicated, all brackets, ellipses, footnote call numbers, internal quotations, and citations have been omitted for readability. All emphasis is original unless otherwise indicated.

transpired in the present dispute." *Lewis v. City of Houston*, No. 4:22-CV-00844, 2023 WL 2249991, at *7 (S.D. Tex. Feb. 27, 2023).

The City respectfully submits that Plaintiffs cannot meet these strict requirements here.

## SUMMARY OF THE ARGUMENT

Plaintiffs' "official policy" theory of liability—which requires proof of either a "formally announced" municipal policy or a widespread pattern or practice demonstrating a municipal custom (*Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 168-69 (5th Cir. 2010))—fails for three reasons. First, no "formally announced" HPD policy permits officers to make false statements to obtain a search warrant. Plaintiffs' policy expert recognizes that HPD policy did not permit Goines to lie on the search warrant affidavit.[4] Additionally, Plaintiffs cannot present evidence of a pattern of similar prior incidents to constitute a City "custom" of permitting officers to lie on search warrant requests. *See Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 852 (5th Cir. 2009) (twenty-seven incidents are insufficient).

Second, even if such a custom existed—and it did not—Plaintiffs cannot show that Chief Art Acevedo, who was HPD Chief of Police from 2016 until 2021 and is the relevant policymaker for establishing *Monell* liability, had actual or constructive knowledge of such a custom or ratified it. The evidence shows that Chief Acevedo was completely unaware of Goines' deceptive conduct.

Third, even if a custom existed, Plaintiffs cannot show that it was the "moving force" behind the alleged constitutional violations. *Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 280 (5th Cir. 2015) ("moving force" requires plaintiff to show (1) a "direct causal connection between the policy and the alleged constitutional deprivation" and (2) that the municipality "promulgated the policy with deliberate indifference to the known or obvious consequences that

---

[4] Ex.1, A. Scott Dep., at 72:16-25 (opining that Goines' lying was contrary to HPD policy).

constitutional violations would result"). Each of these three reasons independently entitle the City to summary judgment on Plaintiffs' Section 1983 claims based on their "official policy" theory.

Plaintiffs' Section 1983 claims based on theories of inadequate training, supervision, and discipline also fail. The City provided the Individual Defendants with relevant training, supervision, and discipline that exceeded requisite standards and state law requirements. Further, Plaintiffs cannot show deliberate indifference on the part of the City or Chief Acevedo because there was no pattern of officers lying on search warrant requests that would have risen to a level of alerting either the City or Chief Acevedo of such a problem. The City is thus entitled to summary judgment on Plaintiffs' claims related to training, supervision, and discipline.

As Judge Hanks recently recognized in another *Monell* case against the City arising from Goines' conduct, the actions of this one officer do not implicate the City:

> [A]llegations [of Goines' misconduct] do not establish that this conduct was such a widespread practice that knowledge of these incidents can be chargeable to the City. . . . [H]ere, the factual allegations concern the conduct of ***just one officer in one squad in a department of thousands of officers: Goines.***

*Jeffrey v. City of Houston*, No. 4:23-CV-00069, 2024 WL 1313897, at *4 (S.D. Tex. Mar. 27, 2024) (dismissing *Monell* claims). Judge Hanks' conclusion is also warranted in this case.

Accordingly, the City respectfully requests that the Court grant summary judgment for the City on each of Plaintiffs' Section 1983 claims based on service of the warrant.

## FACTUAL BACKGROUND

In 2019, HPD consisted of over 5,000 officers.[5] These officers were spread across forty-six divisions, including the Narcotics Division, which was comprised of twenty-three squads.[6]

---

[5] Ex. 2, R. Hardy Aff., at ¶ 5.
[6] *Id.*; Ex. 3, Narcotics Division Organizational Chart, at COH00049668. All documents, including this one, that were maintained by HPD and produced by the City are proved up in the declaration of HPD's Custodian of Records, Sondra Clark, which is attached as Exhibit 4.

Squad 15 contained twelve narcotics officers—including Goines.[7]  In 2019, Goines was a senior police officer who had served with HPD for 35 years[8] and had been in the Narcotics Division for almost 26 years.[9]  Prior to the events of January 28, 2019, Goines had never given anyone at HPD reason to question the veracity of his police work.[10]  No district attorney had ever relayed problems in any of Goines' investigations.[11]  Similarly, no criminal defense attorney had ever complained to HPD that Goines included inaccurate information in any search warrant application.[12]  Likewise, the City is unaware of a criminal defense attorney ever filing a motion prior to January 28, 2019, alleging that Goines included false information in a search warrant affidavit.[13]

On January 8, 2019,[14] Tuttle and Nicholas' neighbor, Patricia Garcia, made several 911 calls in which she "repeatedly and falsely told law enforcement" that Tuttle and Nicholas "were drug dealers, that they were using drugs, that they had 'machine guns,' and that there was a hostage situation" at the home.  *See United States v. Garcia*, No. 21-20309, 2022 WL 1014146, at *1 (5th Cir. 2022).  During one of her 911 calls, Ms. Garcia detailed that Tuttle and Nicholas would not open the door if the police knocked.[15]  As a result of these 911 calls, two HPD patrol officers (Richard Morales and Nicole Blankinship-Reeves) were dispatched to investigate the allegations made by Ms. Garcia.[16]  While on the sidewalk near 7815 Harding Street, these officers questioned a person walking by who denied making the prior 911 calls and referred to 7815 Harding Street as

---

[7] Ex. 3, Narcotics Division Organizational Chart, at COH00049668.
[8] Ex. 5, G. Goines Civil Service Commission Appointment form, at COH00012057.
[9] Ex. 6, G. Goines Employee Resume Report, at COH00083047.
[10] Ex. 2, R. Hardy Aff., at ¶¶ 10-12 (explaining that there were no complaints in Goines' personnel file dated prior to the Harding Street incident that related to the veracity of his work).
[11] *Id*. at ¶¶ 10, 12.
[12] *Id*.
[13] *Id*.
[14] Ex. 7, N. Blankinship-Reeves Dep., at 7:23-25 and 12:9-16.
[15] *Id*. at 14:8-15.
[16] Ex. 7, N. Blankinship-Reeves Dep., at 7:23-25; Ex. 8, R. Morales Dep., at 8:8-9:11.

5

a "dope house."[17]   Because Ms. Garcia refused to identify herself (claiming that Tuttle and Nicholas would look for her if she provided more personal information), the HPD officers were not permitted to approach the house or to investigate any further.[18]  The patrol officers passed the tip to Marsha Todd in the Narcotics Division, who then passed the tip to Goines.[19]

However, rather than follow all the training and instructions he had received about being truthful, honest, and accurate as an HPD police officer—including, but not limited to, when supplying information in search warrant affidavits—Goines filled out a search warrant application that included false information.[20]  In the application, Goines falsely claimed that a confidential informant had purchased heroin at 7815 Harding Street on January 27, 2019.[21]  Goines then stood before a judge on January 28, 2019, and swore to the veracity of those allegations in order to obtain the warrant to search 7815 Harding Street.[22]  At the time, no one at the City had reason to suspect that Goines would ever commit perjury in order to obtain a search warrant.[23]

When HPD served the warrant, Tuttle opened fire on the Individual Defendants,[24] ultimately injuring Medina,[25] Lovings,[26] Goines, and Sergeant Reyna.[27]  The officers were forced to defend themselves, resulting in Gallegos' fatal shootings of both Tuttle and Nicholas.[28]

---

[17] Ex. 7, N. Blankenship-Reeves Dep., at 35:11-36:4; Ex. 8, R. Morales Dep., at 21:6-22:5.
[18] Ex. 7, N. Blankenship-Reeves Dep., at 20:18-25; Ex. 8, R. Morales Dep., at 18:2-13.
[19] Ex. 7, N. Blankenship-Reeves Dep., at 51:1-7, 61:7-62:21; Ex. 8, R. Morales Dep., at 26:7-18.
[20] Ex. 9 at COH00006578 (7815 Harding Street Warrant).
[21] *Id*.
[22] *Id*.
[23] Ex. 2, R. Hardy Aff., at ¶¶ 10-12; Ex. 17, A. Acevedo Aff., at ¶ 7.
[24] Ex. 11, F. Medina Dep., at 44:13-45:12, 46:2-20.
[25] *Id*.
[26] Ex. 12, C. Lovings Dep. Vol. I, at 34:8-12.
[27] Ex. 13, F. Gallegos Dep., at 117:25-118:14.
[28] *Id*. at 105:7-13 and 138:1-138:20.

I.    **HPD Had Robust Policies Regarding Supervision of Narcotics Division Investigations, Including the Use of CIs and Warrant Service.**

Immediately following the shootings, multiple administrative ("Internal Affairs Division" or "IAD") and criminal investigations ensued.[29]  Indeed, one of Chief Acevedo's initiatives when he became Chief in 2016 was creating the Special Investigations Unit ("SIU") to specifically investigate officer-involved shootings, which has been lauded as a model for the Nation.[30]  As a result of the IAD and SIU investigations, Goines' untruthful warrant affidavit was uncovered.[31]

Revelation of Goines' actions was "shock[ing]"[32] for many reasons.  His deception flew in the face of the City's policies and procedures, which prohibited officers from lying generally and, more specifically, on warrant applications.[33]  HPD General Order 200-08(2) provided:

> Employees shall not make false, untrue, or misleading statements (verbal or written, made directly by or authorized by the employee).  Any statement or omission of pertinent information that intentionally, knowingly, or recklessly misrepresents facts or misleads others shall by considered a false statement.  A violation of this policy may result in discipline up to and including indefinite suspension.[34]

HPD officers take an oath to uphold the law.[35]  Prior to the Harding Street incident, officers were required to act if they became aware of a violation of the law,[36] and that standard still applies today.[37]  Thus, if any officer was aware that Goines lied on a search warrant affidavit, that officer had a duty to report that unlawful conduct.[38]  Officers were also subjected to annual Employee

---

[29] *See* Ex. 14 (SIU Investigation Report #1120670-19 Case Synopsis); *see* Ex. 15 (Final Report) at COH0005359.
[30] Ex. 16, A. Acevedo Dep., at 19:9-20:12.
[31] *Id*. at 113:23-114:4.
[32] Ex. 10, P. Follis Dep., at 101:6-14.
[33] Ex. 17, A. Acevedo Aff., at ¶ 3.
[34] Ex. 19 at COH00000331 (General Order 200-08), at 3.
[35] Ex. 36, Termeulen Aff., at ¶ 9.
[36] Ex. 19 at COH00000335 (GO 200-08).
[37] Ex. 20 at COH0011153 (GO 200-08, May 2019).
[38] Ex. 19 at COH00000335 (GO 200-08).

Integrity checks of their criminal histories and licenses[39] and a fulsome investigation following any allegations of misconduct in order to ensure that they followed relevant HPD Standard Operating Procedures ("SOP") and General Orders ("GO").[40]

HPD maintained SOPs and GOs for regulating all officers' investigations and warrant service, and it had specific SOPs that applied to the Narcotics Division.[41]  Supervisors were responsible for monitoring officer performance and ensuring training and adherence to HPD policies, including, but not limited to, the policies related to narcotics buys and confidential informants ("CIs").[42]  Supervisors were tasked with monitoring their teams "for patterns of inappropriate behavior or performance and initiat[ing] appropriate intervention in a timely manner."[43]  Commander Paul Follis (who was the Commander of the Narcotics Division from 2016 until May 2019) reviewed the performance of every lieutenant under his command every six months.[44]  Additionally, each lieutenant would review the performance of the sergeants under their supervision every six months, and the sergeants would review the performance of the officers assigned to them every six months as well.[45]

Relevant to the allegations regarding the Narcotics Division officers' use of CIs, the SOPs and GOs required that officers notify their supervisors before all meetings with a CI and before

---

[39] Ex. 21 at COH00042032 (GO 200-11).
[40] Ex. 22 at COH00000789 (GO 200-03); Ex. 23, I. Duplechain Dep., at 171:2-173:1.
[41] Ex. 24 at COH00041554 (GO 100-07); *see generally* Ex. 18 (Narcotics Division SOPs, Jan. 2016).  *See also*, Ex. 25 at COH00000797 (GO 100-01); Ex. 24 at COH00041554 (GO 100-07); Ex. 19 at COH00000331 (GO 200-08) (establishing that all officers, including those in Narcotics Division, were responsible for knowing and following all applicable General Orders and SOPs).
[42] Ex. 26 at COH0042261 (GO 300-24); Ex. 27 at COH0011165, COH0011166 (GO 600-16).
[43] Ex. 26 at COH0042261 (GO 300-24).
[44] Ex. 28, P. Follis Aff., at ¶ 6.
[45] *Id*.

any undercover narcotics buy,[46] both of which two police officers had to attend.[47]  Two officers

(the officer making the payment and a second witness) had to sign off on all payments to a CI.  A

Sergeant (if under $250), Lieutenant (if under $2500), Captain (if under $7500) or Assistant Chief

(if over $7500) also had to approve and sign off on CI payment receipts.[48]  As required, in this

case Sergeant Reyna personally witnessed and signed off on Goines' payment receipts to his CIs,

each of which seemed to be in order.[49]

Additionally, the CI was obligated to sign a receipt acknowledging the amount of money

he/she received for the purchase of narcotics.[50]  Each month, officers were required to submit

original copies of their "CI Receipt for Funds" to their squad Sergeants and shift Lieutenant, who

in turn reviewed the receipts to make sure that payments to CIs were appropriate and consistent

with the information in the investigation files.[51]  The Narcotics Division Sergeant reviewed

expense reports and CI receipts every month.[52]  The SOPs also permitted a Narcotics Division

supervisor to audit an officer's CI expenses at any time—not limited to the monthly review.[53]

Payments to CIs were further audited by the commander of the Narcotics Division and the HPD

Office of Budget and Finance.[54]  Finally, supervisors were required to evaluate the use of CIs

annually, as well as at additional unscheduled times if a supervisor became aware of any facts or

---

[46] Ex. 27 at COH0011165 (GO 600-16(5)); Ex. 18 at COH0010751 (SOP 200/1.11).
[47] Ex. 18 at COH0010777 (SOP 200/1.22), COH0010751 (SOP 200/1.11).
[48] *Id*. at COH0010777-78 (SOP 200/1.22); Ex. 27 at COH0011169 (GO 600-16(10)).
[49] *See* Ex. 14 (SIU Investigation Report #1120670-19 Case Synopsis).
[50] Ex. 18 at COH0010777 (SOP 200/1.22).
[51] *Id*. at COH0010718 (SOP 100/2.05).
[52] *Id*. at COH0010716.
[53] *Id*.
[54] *Id*. at COH0010719; Ex. 27 at COH0011170 (GO 600-16(11)).

perceptions that could have adversely affected the integrity of the officer.[55]  Captains had the authority to terminate the relationship between any officer and a CI at their discretion.[56]

In addition to regulating the use of CIs, multiple SOPs dictated supervisor oversight of officers' search warrant service.  To begin, the investigating officer had to notify his supervisor about any investigation and any request for a search warrant.[57]  The guidelines for safe service of a search warrant were set forth in SOP 200/1.12, which required that thorough planning take place prior to service, including giving all participating personnel accurate information about the suspects and the residence being searched.[58]  Prior to service of any search warrant, tactical plans were prepared and then reviewed and approved by a supervisor.[59]  Tactical plans included a required threat assessment section,[60] as well as a detailed account of all factors affecting safety.[61] The officers involved in serving the warrant had a mandatory briefing to go over the tactical plan before service.[62]  Supervisors were present at both the briefing and service of the warrant.[63]  Visual surveillance of the location was required at least one hour before the warrant was served and throughout the operation.[64]

Here, Sergeants Reyna and Wood kept in regular communication with Squad 15 both in person and via a group text message.[65]  Sergeant Reyna was consistently notified of the general

---

[55] Ex. 27 at COH0011166 (GO 600-16(11)); *see also* Ex. 44, CI Quarterly Audit Examples.
[56] *Id*.
[57] Ex. 18 at COH0010739 (SOP 200/1.02); *see also* Ex. 43, Narcotic Statistical Report Examples (tracking activities).
[58] *Id*. at COH0010754 (SOP 200/1.12).
[59] *Id*. at COH0010744 (SOP 200/1.05).
[60] *Id*. at COH0010754 (SOP 200/1.12).
[61] *Id*. at COH0010744 (SOP 200/1.05).
[62] *Id*. at COH0010755 (SOP 200/1.12).
[63] *Id*. at COH0010695 (SOP 100/1.06), COH0010756 (SOP 200/1.12).
[64] *Id*. at COH0010755 (SOP 100/1.12).
[65] *See, e.g.*, Ex. 29 at COH0005457 (HPD IAD Report for Issue # 54047-2019).

investigative work that his officers were conducting, including CI buys.[66]   Sergeant Reyna  asked

for details of his team's cases, especially, but not exclusively, when administrative deadlines were

coming up.[67]   Goines' direct supervisors were notified of the Harding Street warrant prior to the

date of service.[68]   Indeed, Sergeant Reyna learned of Goines' investigation into 7815 Harding

Street several days before service of the warrant.[69]   Sergeants Reyna and Wood received and

reviewed both the warrant and the tactical plan and ensured that these materials were sent to

Lieutenant Gonzales for review prior to service.[70]   Sergeant Wood approved Squad 15 to move

forward with service.[71]   Prior to the mandatory warrant briefing, Sergeant Wood, along with

Medina and Gallegos, completed a drive-by of 7815 Harding Street in order to assess any tactical

concerns or threats.[72]   Then, immediately before the warrant was served, the requisite warrant

briefing occurred, which Goines' Supervisors, Sergeants Reyna and Wood, attended.[73]   Sergeant

Reyna specifically recalls that Goines, as the case agent, gave a summary of the warrant, the

location of service, and potential risks that could arise; and that the officers discussed necessary

safety protocols.[74]   Wood recalls discussing the expectation that two suspects would be in the

---

[66] *Id*.

[67] *Id*.

[68] Ex. 30, T. Wood Dep. Vol. I, at 46:18-22; Ex. 29 at COH0005457 (HPD IAD Report for Issue # 54047-2019).

[69] Ex. 29 at COH0005457 (HPD IAD Report for Issue # 54047-2019); *see* Ex. 30, T. Wood Dep. Vol. I, at 54:1-9.

[70] Ex. 30, T. Wood Dep. Vol. I, at 53:8-11, 54:1-9; Ex. 29 at COH0005447 (HPD IAD Report for Issue # 54047-2019).

[71] Ex. 30, T. Wood Dep. Vol. I, at 53:12-14.

[72] *Id*. at 62:18-63:1.

[73] *Id*. at 58:17-20; Ex. 31, C. Reyna Dep., at 31:16-24.

[74] Ex. 31, C. Reyna Dep., at 31:16-24.

home, that one suspect would be armed, and the possibility of a dog being present.[75]  In addition, the house was surveilled the requisite one hour prior to warrant service being completed.[76]

Collection of evidence during service of a warrant was also highly regulated and supervised by HPD.[77]  For example, officers were subject to proactive IAD investigations, also known as "informal integrity checks."[78]  The IAD had an "internal proactive" division that regularly staged searches, which officers believed to be real.[79]  In the staged home or car, IAD personnel planted a specific amount of money or drugs that were to be found by the officers.[80]  This process provided a means of checking that Officers were honest and accurate in returning the correct amount of contraband or cash into evidence because Officers were aware that these integrity checks could be done at any time.[81]

After a warrant was served, the officers involved were required to meet with their supervisor to assess the warrant service.[82]  The affiant of a search warrant was required to place the warrant return in a "Blue Back," which is also referred to as an offense report folder or case folder.[83]  The Blue Back included an inventory and chain of custody report documenting any drugs, weapons, or other contraband that were recovered during service of the search warrant and receipts showing that evidence was tagged into HPD's lab or property room and signed off by a Case

---

[75] Ex. 30, T. Wood Dep. Vol. I, at 58:17-59:19.

[76] Ex. 10, P. Follis Dep., at 67:1-9.

[77] *See* Ex. 18 at COH0010697 (SOP 100/1.07), COH0010698 (SOP 100/1.08), COH0010710 (SOP 100/2.01).

[78] Ex. 16, A. Acevedo Dep., at 23:18-24:14; Ex. 23, I. Duplechain Dep., at 173:19-174:18, 177:15-178:17 (Commander Duplechain explaining that these narcotics search warrant integrity checks are different from the annual employee integrity background checks of HPD officers).

[79] Ex. 16, A. Acevedo Dep., at 23:18-24:14.

[80] *Id*.; *see also*, Ex. 23, I. Duplechain Dep., at 177:15-178:17.

[81] *Id*.

[82] Ex. 18 at COH0010757 (SOP 200/1.12).

[83] *Id*. at COH0010711 (SOP 100/2.01), COH10727 (SOP 100/2.10), COH0010730 (SOP 100/2.12).

Management Specialist.[84]  The officer in charge of the investigation (referred to as a "case agent") was responsible for timely drafting detailed narratives for the written reports, which included all facts pertinent to an investigation.[85]  The Blue Back further included, among other things, a case activity sheet, complainant details, suspect and arrestee lists, list of criminal charges, criminal history reports, scene summary, offense details, and any CI receipts showing payments to a CI for a drug purchase that was the basis for a search warrant.[86]  Finally, Blue Backs included a list of investigation steps that were taken as the case developed, which often necessitated supplemental or multiple reports to be added to the Blue Back.[87]  The "narrative" portions of these reports and supplements often spanned multiple pages and included step-by-step details chronicling the officers' actions, observations at the scene, and interactions with any citizens.[88]

The Blue Back was reviewed by a supervisor (most often a Sergeant).[89]  It was then reviewed again by a Lieutenant in order to ensure accuracy and requisite content.[90]  These reviews made sure that Narcotics officers were complying with the relevant SOPs and GOs.[91]  After these reviews were completed, the Blue Back was sent to the Narcotics Division Quality Control Section, which monitored all investigation related paperwork that Narcotics Division officers generated—including, but not limited to, evidence inventories, offense reports and search warrants—in order to ensure timely and accurate paperwork completion.[92]

---

[84] Ex. 28, P. Follis Aff., at ¶ 19; *see, e.g.*, Ex. 18 at COH001710 (SOP 100/2.01), COH0010761 (SOP 200/1.15).
[85] Ex. 28, P. Follis Aff., at ¶¶ 14, 22; Ex. 18 at COH0010709 (SOP 100/2.01).
[86] Ex. 28, P. Follis Aff., at ¶¶ 19, 21-22.
[87] *Id*. at ¶ 22.
[88] *Id*.; Ex. 18 at COH0010709-11 (SOP 100/2.01).
[89] Ex. 18 at COH0010711 (SOP 100/2.01), COH10727 (SOP 100/2.10).
[90] *Id*. at COH0010684 (SOP 100/1.01), COH0010688 (SOP 100/1.03), COH0010694 (SOP100/1.06).
[91] *See*, *e.g.*, *id*., at COH0010688 (SOP 100/1.03).
[92] *Id*. at COH0010702 (SOP 100/1.10).

Goines' supervisors, Lieutenant Gonzales and Sergeant Wood, actively monitored his Blue Backs as directed by the SOPs.[93]  As a result of this monitoring, Commander Follis and Lieutenant Gonzales became aware of Goines' untimely completion of administrative paperwork.[94]  Thus, in compliance with HPD policy,[95] Goines was "grounded" to his desk and was not permitted to initiate new investigations until he caught up.[96]

Aside from untimely paperwork completion, it appeared to Goines' supervisors that his files complied with all other HPD policies and procedures.[97]  There was nothing in his case files that indicated that Goines was lying on search warrant affidavits.[98]

Additionally, complaints related to the truthfulness of Goines' police work—such as complaints from a district attorney or criminal defense attorney regarding inaccuracies in his files or testimony, and motions to suppress that were granted due to the veracity of his work—would have been reflected and saved in Goines' personnel file.[99]  But no such complaints against Goines were made prior to the Harding Street incident, as reflected by Goines' personnel file.[100]  Further, citizen complaints against police officers alleging officer misconduct would have been investigated by HPD's Internal Affairs Division.[101]  No IAD investigation related to Goines providing untruthful information occurred prior to January 28, 2019, because no such citizen

---

[93] *Id*. at COH0010684 (SOP 100/1.01), COH0010688 (SOP 100/1.03); Ex. 28, P. Follis Aff., at ¶ 23; Ex. 29 at COH00005447 (HPD IAD Report for Issue # 54047-2019).
[94] Ex. 10, P. Follis Dep. at 39:4-14.
[95] Ex. 18 at COH0010709 (SOP 100/2.01), COH0010702 (SOP 100/1.10), COH0010684 (SOP 100/1.01) (providing for discipline by the Captain where necessary).
[96] Ex. 10, P. Follis Dep. at 39:4-40:5.
[97] *Id*. at 39:20-40:5.
[98] *Id*.
[99] Ex. 2, R. Hardy Aff., at ¶¶ 10-11.
[100] *Id.* at ¶ 12.
[101] Ex. 28, P. Follis Aff., at ¶ 4.

complaint was made against Goines.[102]  Nor did IAD investigate any other HPD officer prior to the Harding Street incident for providing false information on a search warrant affidavit during Chief Acevedo's tenure because no such complaint or allegation had been made.[103]  Finally, in addition to all the inspections, audits, and checks and balances laid about above, the Narcotics Division was subject to periodic audits by the U. S. Department of Justice ("DOJ").[104]  Indeed, the DOJ audited the Narcotics Division in February 2019 and found nothing that was noteworthy.[105]

## II.    HPD Trained Officers on the Importance of Being Truthful and Accurate in Seeking Search Warrants.

HPD reinforced its policies governing officer investigations and warrant service by providing all HPD officers, including Goines and the rest of Squad 15, with extensive training on compliance with those policies.[106]  This included training both prior to the time that an officer joined HPD and throughout an officer's career.  Such training met or exceeded that which was required by the Texas Commission on Law Enforcement ("TCOLE").[107]

To start, all officers were required to successfully complete a six-month long police academy training, which included training related to lawful arrests and searches.[108]  After successful completion of the Training Academy, HPD officers move on to a four-to-six month long Field Training Program, where new probationary officers are paired with experienced officers and tasked with applying Training Academy principles to real world situations.[109]  Officer

---

[102] Ex. 2, R. Hardy Aff., at ¶ 12; Ex. 17, A. Acevedo Aff., at ¶ 5.
[103] Ex. 16, A. Acevedo Dep. at 31:6-32:2, 32:11-15; *see also*, Ex. 32, Assistant Chief Lopez Interrogatory No. 10 Resp. ("I told former Chief Art Acevedo that his investigation did not uncover any evidence that there were additional police officers in the Narcotics Division, aside from Officer Gerald Goines, putting false information on search warrants.").
[104] Ex. 16, A. Acevedo Dep., at 26:24-27:9.
[105] Ex. 33, DOJ Audit, at COH0008363.
[106] Ex. 34 at COH0074805-942 (Squad 15 Officers' TCOLE Training Reports).
[107] *Id*.; Ex. 36, E. Termeulen Aff., at ¶¶ 4, 7.
[108] Ex. 36, E. Termeulen Aff., at ¶ 4.
[109] Ex. 36, E. Termeulen Aff., at ¶ 6.

performance is critiqued daily, and remedial training is available to address any weaknesses.[110] Only after a probationary officer successfully completes the program are they allowed to continue their employment with HPD as an officer.[111]

To the extent HPD officers are chosen for specialty divisions, training requirements increase further.[112]  The Narcotics Division facilitated additional mandatory training programs related to search and seizures for its officers, as well as programs focused on warrant service and handling CIs.[113]  Senior HPD Officer Erik Termeulen has led the training for the Narcotics Division since 2009.[114]  He specifically trained the officers in Squad 15, including Goines.[115] Before joining the Narcotics Division Goines and every member of Squad 15 was required to attend 80 hours of narcotics specific training in the form of "Narcotics Investigator School" and "Narcotics Survival School,"[116] which included training by members of the Harris County District Attorney's office to be truthful, honest, and accurate when preparing and submitting a search warrant affidavit.[117]  In a 2018 warrant update class, Termeulen also emphasized to Goines and the rest of Squad 15 the importance of being truthful, accurate, and complete in warrant affidavits.[118]

"Narcotics Investigator School" featured an eight-hour training session focused on the legal requirements for obtaining a warrant, including the need to complete requests and affidavits

---

[110] *Id.*

[111] *Id.*

[112] *Id.* at ¶ 8.

[113] *See generally* Ex. 18 (Narcotics Division SOPs, Jan. 2016); Ex. 37 (2017 Narcotics Training Manual).

[114] Ex. 35, E. Termeulen Dep., at 6:18-7:10.

[115] *Id.* at 7:15-8:1.

[116] Ex. 36, E. Termeulen Aff., at ¶ 8.

[117] *Id.* at ¶ 9.

[118] *Id.*; *see also* Ex. 34 at COH00074805-942 (Squad 15 Officers' TCOLE Training Reports) (showing attendance records).

truthfully.[119]  As part of this training, officers were instructed to assess and reassess the situation involved in service of a warrant, including the plan to serve the warrant.[120]

After completing "Narcotics Survival School" and "Narcotics Investigator School," new Narcotics officers underwent an additional period of field training alongside seasoned Narcotics officers, which provided practical experience.[121]  All officers were required to complete 40 hours of annual training, and Narcotics officers who were assigned as investigators were required to complete additional quarterly trainings specifically tailored to their assignments as Narcotics officers, including updates on warrant training.[122]

Because of this careful, interwoven framework of policies and training promulgated by the City, the City is unaware of any evidence that an HPD officer had ***ever*** been accused of providing false information on a search warrant affidavit prior to January 28, 2019.[123]  Thus, no one at HPD had reason to suspect that Goines would commit perjury to obtain a warrant.[124]  In the aftermath of this incident, to determine, among other things, whether there was a problem within HPD of police officers not being truthful when submitting search warrant affidavits, Chief Acevedo requested that the IAD, the SIU, and Assistant Chief Lopez conduct fulsome investigations of the Harding Street incident and Goines' prior search warrants, all of Squad 15, and the policies and procedures of the Narcotics Division.[125]  Each of the investigations reached the same conclusion: "there's still no evidence of systemic corruption before or after Harding Street other than Gerald

---

[119] Ex. 34 at COH00074805-942 (Squad 15 Officers' TCOLE Training Reports).
[120] *See* Ex. 36, E. Termeulen Aff., at ¶ 8.
[121] *Id*.
[122] *Id*.; Ex. 34 at COH00074805-942 (Squad 15 Officers' TCOLE Training Reports).
[123] Ex. 16, A. Acevedo Dep. at 31:6-32:2, 32:11-15; *see also*, Ex. 32, Assistant Chief Lopez Interrogatory No. 10 Resp.
[124] Ex. 2, R. Hardy Aff. at ¶¶ 10-12.
[125] *See* Ex. 15 (Final Report) at COH0005359; Ex. 16, A. Acevedo Dep. at 31:6-32:2, 32:11-15; Ex. 17, A. Acevedo Aff. at 10.

Goines."[126]  Stated differently, all of these investigations could not identify any other Houston police officer who had provided false statements in a search warrant affidavit.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when, after viewing the record in the light most favorable to the nonmovant, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986).  Once the moving party meets this burden, the nonmovant must "come forward with specific facts indicating a genuine issue for trial."  *Brandon v. Sage Corp.*, 808 F.3d 266, 270 (5th Cir. 2015).

## ARGUMENT & AUTHORITIES

A municipality cannot be held liable for civil rights violations under a theory of *respondeat superior.  Monell*, 436 U.S. at 691.  Instead, a municipality can only be liable when the municipality itself causes a constitutional deprivation.  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).  However, a high degree of fault on the part of the municipality is required before it can be held liable for civil rights violations under 42 U.S.C. § 1983.  *See Snyder v. Trepagnier*, 142 F.3d 791, 796 (5th Cir. 1998).  Proof of municipal liability sufficient to satisfy *Monell* under a theory of "official" municipal policy requires: (1) an official municipal policy, (2) of which a municipal policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose "moving force" is that official policy.  *Pineda*, 291 F.3d at 328; *see also Bd. of Cnty. Com'rs of Bryan Cnt., Okl. v. Brown*, 520 U.S. 397, 404 (1997) ("The plaintiff

---

[126] Ex. 16, A. Acevedo Dep. at 31:6-32:2, 32:11-15; *see also*, Ex. 32, Assistant Chief Lopez Interrogatory No. 10 Resp. ("I told former Chief Art Acevedo that his investigation did not uncover any evidence that there were additional police officers in the Narcotics Division, aside from Officer Gerald Goines, putting false information on search warrants.").

must . . . demonstrate that through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged").

Additionally, a plaintiff may bring a Section 1983 claim based on a theory of inadequate training, supervision, and/or discipline. *See Henderson*, 51 F.4th at 130 (failure to train and supervise); *Mason*, 806 F.3d at 280-81 (failure to discipline). To prevail on such a claim, a plaintiff must show "(1) the city failed to train or supervise [or discipline] the officers involved; (2) there is a causal connection between the alleged failure . . . and the alleged violation of the plaintiff's rights; and (3) the failure to train or supervise [or discipline] constituted deliberate indifference to the plaintiff's constitutional rights." *Henderson*, 51 F.4th at 130. "[D]eliberate indifference requires a showing of more than negligence or even gross negligence. Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference[.]" *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005). Deliberate indifference therefore typically requires evidence of a "pattern" of similar prior incidents "arising from a policy so clearly inadequate as to be obviously likely to result in a constitutional violation." *Covington*, 812 F. App'x. at 225. Such a "pattern" must include "a significant number of previous incidents placed in the context of the size of the police department, the number of criminal incidents investigated, and [such] specificity that the other incidents are fairly similar to what transpired in the present dispute." *Lewis*, 2023 WL 2249991, at *7.

Plaintiffs' claims related to the warrant that Goines obtained for Harding Street cannot satisfy these elements. Accordingly, the City is entitled to summary judgment on each of Plaintiffs' claims.

I.    **Plaintiffs Cannot Show that the City had an "Official Policy" Authorizing Officers to Lie on Affidavits, or that a City Policymaker had Knowledge of Such a Policy.**

Although the City acknowledges that Goines included false information in the search warrant affidavit for 7815 Harding Street, Plaintiffs cannot establish that the City had an official policy—whether in the form of a formally announced policy or a custom—that authorized or condoned such behavior.  Nor can Plaintiffs show that to the extent a custom for such behavior existed, the City had actual or constructive knowledge of it.  This dooms Plaintiffs' claims for *Monell* liability under an "official policy" theory.

A.    Plaintiffs cannot establish an official City policy authorizing officers to lie on affidavits.

Proof of an official municipal policy can be satisfied in one of two ways: (1) through "a policy statement formally announced by an official policymaker," or (2) through "a persistent widespread practice of city officials or employees, which . . . is so common and well settled as to constitute a custom that fairly represents municipal policy."[127]  *Zarnow*, 614 F.3d at 168-69. Plaintiffs cannot fulfill either of these options, making summary judgment proper.

***There was no officially adopted and promulgated policy.***    Official policy may be contained in "a policy statement, ordinance, regulation, or decision" that the City "formally announced."  *Id*. at 166, 168.  As recognized by Plaintiffs' policy expert, HPD had no written policy that permitted Goines to lie on a warrant affidavit.[128]  Thus, Plaintiffs' Section 1983 claims based on an "officially adopted and promulgated" or "formally announced" City policy fail.

***There was no custom.***    Nor can Plaintiffs establish any widespread pattern or practice demonstrating a custom.  Meeting this burden "is a very heavy one."  *Nebout v. City of Hitchcock*,

---

[127] Alternatively, a "custom" may be shown by evidence that "a *final policymaker* took a single unconstitutional action." *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 169 (5th Cir. 2010). Plaintiffs do not allege that a single decision by a City policymaker establishes a "custom" in this case.  *See generally* Dkts. 48, 49.

[128] Ex. 1, A. Scott Dep., at 72:16-25 (opining that Goines' lying was contrary to HPD policy).

71 F. Supp. 2d 702, 707 (S.D. Tex. 1999).  When a plaintiff uses a pattern of prior incidents to prove a custom, "sufficiently numerous prior incidents," as opposed to "isolated incidents," are required.  *Peterson*, 588 F.3d at 851 (twenty-seven incidents were insufficient); *see also Pineda*, 291 F.3d at 329 (eleven incidents were insufficient).  The course of conduct must have occurred "for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees."  *Peterson*, 588 F.3d at 850.  The conduct must be "so common and well-settled as to constitute a custom that fairly represents municipal policy."  *Id.*

Additionally, a "pattern requires similarity and specificity."  *Id*. at 851. "[P]rior indications cannot simply be for any and all bad or unwise acts, but rather must point to the specific violation in question."  *Id*.  A "bare list of prior incidents" will not suffice.  *Bond v. Nueces Cnty.*, No. 2:19-CV-43, 2019 WL 13221680, at *5 n.5 (S.D. Tex. Sept. 5, 2019).  There must be "a significant number of previous incidents placed in the context of the size of the police department, the number of criminal incidents investigated, and [such] specificity that the other incidents are fairly similar to what transpired in the present dispute."  *Lewis*, 2023 WL 2249991, at *7.

Importantly, the actions of one officer in a police department the size of HPD are not enough to establish a City custom.  *See Jeffrey*, 2024 WL 1313897, at *4 (citing *Milam v. City of San Antonio*, 113 Fed. Appx. 622, 625 n. 3 (5th Cir. 2004)); *see, e.g., Peterson*, 588 F.3d at 852 (explaining that the size of the police department and the number of related incidents that occurred during the relevant time frame is key context to consider).  In *Jeffrey*, the plaintiff attempted to hold the City liable based on 162 alleged false affidavits and portions of testimony made by

Goines.[129] *Jeffrey*, 2024 WL 1313897, at *4. But Judge Hanks explained that this number standing alone, even if true, "d[id] not establish that this conduct was such a widespread practice." *Id.* Because Goines was "*just one officer in one squad in a department of thousands of officers*," it was not enough. *Id.* Instead, the plaintiff needed to establish that a sufficient number of other HPD officers engaged in the same conduct, enough to show that the conduct was actually widespread. *Id.* Context matters; Plaintiffs must show a widespread pattern or practice given "the size of the police department." *Lewis*, 2023 WL 2249991, at *7. Plaintiffs have not—and cannot—meet this threshold here.

Back in 2019, HPD consisted of over 5000 officers spread out over forty-six separate divisions.[130] This included the Narcotics Division, which was broken out into twenty-five separate squads that consisted of six to twelve officers each. The Narcotics Division alone generated 913 warrants between 2016 and 2018,[131] and participated in over 3,534 narcotics buys.[132] Despite multiple investigations—which were launched in the aftermath of the Harding Street incident— "there's still no evidence of systemic corruption before or after Harding Street other than Gerald Goines."[133] Stated differently, there is no evidence that any officer other than Goines lied on a search warrant affidavit.

HPD conducted several SIU investigations after the Harding Street incident. One of these SIU investigations included review of the prior search warrants for which Goines submitted

---

[129] These allegations in *Jeffrey* were never proven, and as discussed further below in this Section, the evidence in this case only supports six instances of Goines *potentially* including false information in a warrant affidavit or testimony.
[130] Ex. 2, R. Hardy Aff., at ¶ 5.
[131] *Id.* at ¶ 6.
[132] *Id.*
[133] Ex. 16, A. Acevedo Dep. at 31:6-32:2, 32:11-15.

affidavits.[134]  The investigators reviewed the search warrant files, interrogated the confidential informants whom Goines alleged had performed controlled buys of the narcotics, and interrogated the police officers whom Goines alleged had witnessed the controlled buys.[135]  The investigation revealed only **_six_** prior search warrants where Goines may not have provided completely truthful information.[136]  Importantly, there is no evidence that this information was known by anyone within the City or by Chief Acevedo prior to the Harding Street incident.[137]

These statistics do not come close to satisfying the numerical requirements for establishing a "widespread" pattern or practice.  Six search warrants simply do not amount to a custom.  *See Peterson*, 588 F.3d at 852 (twenty-seven incidents are insufficient); *Pineda*, 291 F.3d at 329 (eleven incidents are insufficient).  This is especially true given that the figures are all ascribed to a single officer in a department of thousands.  *See Jeffrey*, 2024 WL 1313897, at *4.

In an attempt to establish a pattern or practice, Plaintiffs point to seven purported prior incidents of "illegal narcotics search warrants based on false affidavits,"[138] two of which are already included in the six search warrants identified by the SIU investigation.[139]  As a matter of law, even if all eleven incidents—the six incidents identified by the SIU investigation and the additional five distinct incidents alleged by Plaintiffs—included instances of falsified warrant affidavits, these eleven incidents occurring periodically over more than a decade are insufficient

---

[134] Ex. 14 (SIU Investigation Report #1120670-19 Case Synopsis); Ex. 17, A. Acevedo Aff., at ¶ 10.

[135] Ex. 14 (SIU Investigation Report #1120670-19 Case Synopsis).

[136] *Id*. at COH0007497.  For one search warrant affidavit, the investigation did not definitively determine that Goines provided false information because even though the confidential informant said that she did not make the controlled buy, her cell phone records indicated that she was in the area of the controlled buy during that same time.  *Id*. at COH00074960-61.

[137] *Id*. at COH00074956.

[138] Dkt. 48, at ¶ 156.

[139] *Compare* Dkt. 48, at ¶ 156, and Dkt. 49, at ¶¶ 74–84, *with* Ex. 14 (SIU Investigation Report #1120670-19 Case Synopsis).

to establish a custom of HPD officers lying on search warrant affidavits given the size of HPD. *See Peterson*, 588 F.3d at 852 (no pattern: twenty-seven prior incidents over four years); *Pineda*, 291 F.3d at 329 (no pattern: eleven prior incidents over unspecified time period).

Moreover, the additional incidents alleged by Plaintiffs are not sufficiently similar to the Harding Street incident to constitute a pattern of similar conduct. The "4437 Knoxville" incident[140] did not involve a search warrant affidavit, and because no warrant was ever issued, or even sought, in that case, no constitutional violation occurred at all.[141]   Similarly, Plaintiffs list a 2019 investigation at Napolean Street where, as Plaintiffs admit, no warrant was ever served,[142] so no constitutional violation occurred.  The "Hirsch St." incident[143] involved an officer who mistakenly wrote the wrong address—5818 Hirsch St., instead of 5816 Hirsch St.—in the search warrant affidavit.[144]  None of these incidents "point to the specific violation in question," as required for municipal liability to attach. *Peterson*, 588 F.3d at 851.  Finally, the "Otis Mallet" case[145] was not filed until 2021, well after service of the search warrant at Harding Street, and therefore could not have alerted the City or Chief Acevedo of any issue prior to Harding Street.[146]

The six incidents identified by SIU and the additional five incidents identified by Plaintiffs—four of which involved potential lying by a single officer (Goines), and one of which involved a scrivener's error by another officer—do not amount to "sufficiently numerous prior

---

[140] Dkt. 48 at ¶ 156(d); Dkt. 49 at ¶ 80.

[141] Ex. 38 (Narcotics Division Confidential File for CT # 19-1933) (incident involved an allegedly false statement made by an officer on an informant activity sheet).

[142] Dkt. 48, at ¶ 156(e); Dkt. 49. at ¶ 82.

[143] Dkt. 48, at ¶ 156(f) (inaccurately characterizing warrant as a "no-knock warrant"); Dkt. 49, at ¶ 83 (same).

[144] Ex. 39 (HPD IAD Report for Issue #46067-2014).

[145] Dkt. 48, at ¶ 156(g); Dkt. 49, at ¶ 84.

[146] Ex. 40 (Docket Report for *Mallett v. Goines*, No. 4:21-cv-02644 (S.D. Tex.)) (showing that case was filed on August 13, 2021).

incidents" or meet the "heavy" burden Plaintiffs must show.  *Id.* at 850; *Nebout*, 71 F. Supp. 2d at 707; *see also Pineda*, 291 F.3d at 329 (eleven incidents insufficient).  Even if eleven incidents could be deemed "sufficiently numerous," the fact that all but one of the incidents involve Goines alone defeats Plaintiffs' claims against the City.  *Jeffrey*, 2024 WL 1313897, at *4 ("[A]llegations [of Goines' misconduct] do not establish that this conduct was such a widespread practice that knowledge of these incidents can be chargeable to the City.").  Accordingly, Plaintiffs cannot establish a custom that satisfies the requirements for imposing *Monell* liability.

Plaintiffs separately allege that in 109 Narcotics investigations conducted between 2012 and 2019 Goines represented that a firearm was present at the location most of the time, but in all but one of those cases Goines "never recovered a firearm in the subsequent inventory list after the raid."[147]  But these allegations ***do not*** establish that Goines filed 109 *false* affidavits.  Instead, they represent a misunderstanding of the Officer's Return and Inventory Search Warrant ("Officer's Return").

An Officer's Return tracks the evidence of a crime that is recovered during service of a search warrant.[148]  Because almost all of the aforementioned search warrants were for narcotics, the inventories typically listed the narcotics that were recovered during the service of the warrant.[149]  If other items ***evidencing a crime*** were recovered during the warrant search, such items would also be included on the evidence inventory that was placed in a Blue Back.[150]  A weapon that was lawfully owned by a suspect was not seized or listed on an evidence inventory unless it

---

[147] Dkt. 48, at ¶ 155; Dkt. 49, at ¶¶ 70–71.
[148] Ex. 28, P. Follis Aff., at ¶ 20.
[149] *Id.*
[150] *Id.* at ¶ 21.

was suspected that the weapon was evidence of a crime.[151]  In addition, the fact that a gun was not seen or located during service of a search warrant (and, therefore, necessarily would not be included on either an Officer's Return or evidence inventory) does not mean that it was not seen during the drug purchase.[152]  Put simply, the fact that a weapon may or may not have been recovered during service of a search warrant *for narcotics* in no way suggests that the observation of a weapon as stated in the underlying search warrant affidavit was false.[153]

In sum, after multiple investigations in which numerous witnesses were interrogated, only six prior search warrant affidavits were identified in which Goines may have provided false or inaccurate information.  And there is no evidence that prior to the Harding Street incident anyone within HPD had reason to suspect Goines of falsifying information in any search warrant affidavit—including the warrant at issue here.  Thus, there is insufficient to establish a custom giving rise to *Monell* liability.  *Peterson*, 588 F.3d at 852.

B. Plaintiffs cannot show that a City policymaker had knowledge of any alleged custom authorizing officers to lie on affidavits.

Even if there were a pattern or practice on the part of the City's police officers sufficient to demonstrate a custom—and there is not—Plaintiffs' claims would still fail for another, independent reason.  The undisputed evidence establishes that neither the City nor its policymaker, Chief Acevedo, had actual or constructive knowledge of any such custom of officers lying on affidavits to obtain search warrants.

A plaintiff seeking to establish an "official policy" theory of liability via evidence of a municipal custom "must also establish actual or constructive knowledge of such custom" by the

---

[151] *Id*.  For example, if an officer observes an obliterated serial number on a weapon or the suspect is a felon in possession of a weapon, that weapon will be seized and documented on the inventory. *Id*.
[152] *Id*.
[153] *Id*.

municipality or relevant policymaker. *Hicks-Fields v. Harris Cty.*, 860 F.3d 803, 808 (5th Cir. 2017). "Actual knowledge may be shown by such means as discussions at council meetings or receipt of written information." *Id.* "Constructive knowledge may be attributed to the governing body . . . for example, where the violations were so persistent and widespread that they were the subject of prolonged public discussion or of a high degree of publicity." *Id.* at 808–09.

In *Jeffrey*, Judge Hanks set out examples of evidence that would establish actual or constructive knowledge by the City or the Chief of Police with respect to Goines' conduct:

- Evidence "establishing that Goines' alleged actions were out in the open or done in the presence of or with the assistance of the Chief of Police or other City policymaker";

- Evidence establishing "that the number of false affidavits filed by Goines constitute such a significant percentage of the total number of affidavits provided to magistrates by HPD officers during the period at issue that the Chief of Police would have had knowledge of his conduct"; or

- Evidence establishing "that either the Chief of Police or the City were notified of any concerns with Goines's probable cause affidavits and testimony prior to [the plaintiff's] arrest and conviction."

*Jeffrey*, 2024 WL 1313897, at *4. ***None of that evidence is present here***. Instead, the uncontroverted evidence unequivocally establishes that Chief Acevedo ***did not*** have either actual or constructive knowledge of Goines' conduct at any point prior to this incident.[154] As he explained in his deposition, Chief Acevedo was not aware of any systemic problem with Goines' search warrant affidavits until the investigations into Harding Street began.[155]

The City is unaware of any motion being filed during Chief Acevedo's tenure before the Harding Street incident to suppress evidence that was purportedly falsified by Goines.[156] There is also no evidence of any (1) publicity related to Goines' conduct prior to the Harding Street incident

---

[154] Ex. 16, A. Acevedo Dep., at 47:4-15; Ex. 17, A. Acevedo Aff., at ¶ 7.
[155] Ex. 16, A. Acevedo Dep., at 47:4-15.
[156] Ex. 2, R, Hardy Aff., at ¶¶ 10, 12.

or to false affidavits used in search warrants, (2) discussions at city council meetings, or (3) any of the other type of evidence that can sometimes be used to establish knowledge. *See id.* Absent actual or constructive knowledge of Goines' lying, Chief Acevedo also could not have "ratified" such unconstitutional conduct. *Allen v. Hays*, 65 F.4th 736, 750 (5th Cir. 2023).

It is undisputed that prior to January 28, 2019, Chief Acevedo had no knowledge that Goines potentially lied on any search warrant affidavit.[157] Because Plaintiffs have not shown that a policymaker had actual or constructive knowledge of any custom related to false statements in warrant affidavits, Plaintiffs' Section 1983 claims based on their "official policy" theory fail.

C.  Plaintiffs cannot show that an official City policy was the "moving force" behind the alleged constitutional violations.

Summary judgment should also be granted on Plaintiffs' "official policy" theory because Plaintiffs have not demonstrated that any official City policy was the "moving force" behind Tuttle or Nicholas' injuries. Under the *Monell* framework, Plaintiffs must prove that a specific City policy was the "moving force" behind the alleged constitutional violations. *Pineda*, 291 F.3d at 328. "Moving force" requires proof of both (1) causation—that is, a "direct causal connection between the policy and the alleged constitutional deprivation," and (2) culpability (aka, deliberate indifference). *Mason*, 806 F.3d at 280.

The "moving force" inquiry imposes a threshold of proof higher than "but-for" causation. *Id.*; *York v. Welch*, No. 20-40580, 2024 WL 775179, at *3 (5th Cir. Feb. 26, 2024) ("The causation prong requires proximate causation."). Plaintiffs cannot satisfy this standard because, as the evidence demonstrates, there is no "formally announced" City policy or HPD custom authorizing officers to lie on warrant affidavits, and "a nonexistent policy cannot cause an injury." *Chavez v. Alvarado*, 550 F. Supp. 3d 439, 457 (S.D. Tex. 2021).

---

[157] Ex. 17, A. Acevedo Aff., at ¶ 7.

Moreover, as the Harding Street incident illustrates, "no policy will prevent the criminal acts of a rogue officer." *Martinez v. Rojo*, 2020 WL 2542612, No. 1:17-CV-00102-BU, at *32 (N.D. Tex. 2020). As Plaintiffs' expert, Dr. Andrew Scott, recognized, "noble cause" corruption—that is, where a seemingly well-meaning and well-regarded officer cuts corners and violates policies under a misguided attempt to do "good" or "ensure that a bad guy is taken off the streets"—is an issue that plagues many police forces.[158] Dr. Scott admitted that he is unaware of a solution to this "noble cause" problem.[159]

Additionally, culpability—that is, deliberate indifference—is a stringent standard of fault" that requires Plaintiffs to prove that the City was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]," and drew that inference. *Estate of Davis*, 406 F.3d at 381. As already discussed, Plaintiffs cannot show deliberate indifference on the part of the City or Chief Acevedo because there was no pattern of officers lying on search warrant requests that would have alerted either the City or Chief Acevedo of such a problem.[160] *See Covington*, 812 F. App'x. at 225 ("Establishing deliberate indifference generally requires a pattern of similar violations arising from a policy so clearly inadequate as to be obviously likely to result in a constitutional violation."). Because Plaintiffs have no such evidence, summary judgment on Plaintiffs' "official policy" theory of municipal liability is appropriate.

## II.    Plaintiffs Cannot Show the City's Training, Supervision, or Discipline was Deficient or that a City Policymaker was Deliberately Indifferent to the Same.

Plaintiffs' separate theories of inadequate training, supervision, and discipline also fail. The training, supervision, and discipline that the City provided all members of Squad 15, including

---

[158] Ex. 1, A. Scott Dep. at 58:2-19.
[159] *Id.* at 59:9-60:3.
[160] *Supra* Argument & Authorities Section I.A.

Goines, was more than adequate.  Additionally, there is no evidence that either the City or Chief Acevedo acted with deliberate indifference.  Thus, summary judgment for the City is warranted.

A.  <u>The City's training, supervision, and discipline of Goines and the other members of Squad 15 was not deficient.</u>

*Training.*  To succeed on a failure-to-train theory, a plaintiff must specifically establish "how a particular training program is defective."  *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009).  A claim for "better or more training" will not create *Monell* liability.  *City of Canton*, 489 U.S. at 391.  Plaintiffs fail to specify the purportedly inadequate aspects of the City's search warrant training.  Indeed, Plaintiffs' policy expert ***admits*** that he has no criticism of HPD's training policies.[161]  Absent such evidence, Plaintiffs cannot overcome summary judgment. *See, e.g.*, *Trammell v. Fruge*, 868 F.3d 332, 345 (5th Cir. 2017).

Additionally, as set forth above, all Squad 15 officers, including Goines, received training that either met or exceeded TCOLE requirements,[162] which is "a factor counseling against a failure to train finding."  *Zarnow*, 614 F.3d at 170–71.  Plaintiffs do not allege that the TCOLE requirements were inadequate.[163]  Plaintiffs' failure to do so, in conjunction with the evidence establishing the regular, relevant training that HPD officers received, entitles the City to summary judgment on Plaintiffs' Section 1983 claims based on allegedly inadequate training.  *See, e.g.*, *O'Neal v. City of San Antonio*, 344 F. App'x. 885, 888 (5th Cir. 2009); *Martinez v. City of Buda, Tex.*, No. A-16-CA-1116-SS, 2018 WL 837609, at *7 (W.D. Tex. Feb. 13, 2018).

---

[161] Ex. 1, A. Scott Dep., at 18:8-12.
[162] Ex. 34 at COH00074805-942 (Squad 15 Officers' TCOLE Training Reports); Ex. 36, E. Termeulen Aff., at ¶¶ 4, 7, 8.
[163] *See generally* Dkts. 48, 49.

***Supervision and Discipline.***[164]  "[A] failure-to-supervise claim is evaluated in the same way as a failure-to-train claim." *Trammell*, 868 F.3d at 344 n.11.  To succeed on a failure-to-supervise claim, Plaintiffs must demonstrate that the municipality's supervision policies and procedures were "inadequate."  *Id*. at 345.  Here, Plaintiffs' expert merely repeats Plaintiffs' allegations that Goines' supervisors took "his word…as gospel" without any questioning and that they "knew nothing" about this investigation until one day prior to service at Harding Street.[165]  However, this is disproved by the evidence.[166]

As set forth above, all the Individual Defendants were regularly supervised regarding their work, investigations, and performance of their duties.[167]  Squad 15's direct supervisors, Sergeants Reyna and Wood, kept in frequent communication with them both in person and, because their work was rarely tied to a desk, via a group chat that the supervisors regularly utilized to monitor the team.[168]  Sergeant Reyna regularly questioned officers about the status of their work, including CI buys.[169]  Evidence of this is shown by the fact that Sergeant Reyna learned about the warrant for 7815 Harding Street four or five days prior to its service.[170]  In compliance with the relevant SOPs, Goines was supervised during the warrant briefing that occurred immediately prior to service of the warrant at Harding Street, and his supervisors, Sergeants Reyna and Wood, were

---

[164] Because courts often analyze these claims together, the City will address them together here. *See, e.g.*, *Byrd v. City of Madisonville, Tex.*, No. CV H-19-4473, 2020 WL 2857951, at *5 (S.D. Tex. May 11, 2020), *report and recommendation adopted sub nom. Byrd v. Madisonville Consol. Indep. Sch. Dist.*, No. 4:19-CV-4473, 2020 WL 2850755 (S.D. Tex. June 1, 2020).

[165] Ex. 1, A. Scott Dep., at 87:19-88:11; 88:22-89:12.

[166] *See supra* Argument & Authorities Section I.A.

[167] *Id*.

[168] *See, e.g.*, Ex. 29 at COH0005457 (HPD IAD Report for Issue # 54047-2019).

[169] *Id*.

[170] *Id*.

present during both the briefing and service of the warrant.[171]  Moreover, several witnesses testified to the conversation and questioning that took place during the warrant briefing, which addressed the occupants of the home, the presence of a dog, and the drugs that were anticipated based on Goines' investigation.[172]  This evidence disproves the allegation by Plaintiffs' expert that Goines' supervisors did *nothing* to monitor his investigations, including the investigation of 7815 Harding Street.

The sufficiency of HPD's supervision was also true for service of search warrants.  As discussed, HPD had specific requirements governing officers' investigations and Blue Backs, which obligated supervisors to regularly review and audit officers' files.[173]  Goines' direct supervisors and Lieutenant Gonzales reviewed his Blue Backs to ensure compliance with applicable SOPs and GOs.[174]  When Follis and Gonzales were made aware that Goines had fallen behind in his paperwork, Goines was "grounded" to his desk and was not permitted to initiate new investigations until he caught up.[175]

The 2014 Hirsch incident that Plaintiffs cite[176] provides a salient example of the robust supervision and discipline that HPD maintained when discrepancies with regard to warrants were found.  As described above, an officer mistakenly searched the wrong residence: 5816 Hirsch instead of 5816 ½ Hirsch, which resulted in a citizen complaint being filed.[177]  The neighbor who lived at 5816 Hirsch subsequently filed a complaint with HPD.[178]  Facilitating the collection of

---

[171] *Id.* at COH00005436-37; Ex. 30, T. Wood Dep. Vol. I, at 58:17-20; 72:20-73:17; Ex. 31, C. Reyna Dep., at 31:16-24; Ex. 13, F. Gallegos Dep. at 76:24-77:3.
[172] Ex. 30, T. Wood Dep. Vol. I, at 58:17-59:24; Ex. 31, C. Reyna Dep., at 31:16-24.
[173] *See supra* Factual Background Section I.A.
[174] Ex. 28, Follis Aff., at ¶ 23.
[175] Ex. 10, P. Follis Dep. at 39:4-40:2.
[176] Dkt. 48, at ¶ 156(f); Dkt. 49, at ¶ 83.
[177] Ex. 39 (HPD IAD Report for Issue #46067-2014).
[178] *Id.*

citizen complaints is a recognized cornerstone of maintaining holistic oversight of police, and HPD had multiple avenues to field such complaints.[179]  After a fulsome IAD investigation ensued, the officer responsible for the error was suspended.[180]

As illustrated above, both HPD and the Narcotics Division had a robust system of checks and balances to ensure Narcotics officers' compliance with the various SOPs and GOs that governed their work.  Because the City's relevant training, supervision, and discipline of HPD officers were not inadequate, the Court should grant summary judgment in the City's favor on Plaintiffs' Section 1983 claims based on their theories of failure to train, supervise, and discipline.

B. No policymaker was deliberately indifferent to any alleged inadequate training, supervision, or discipline.

Even if Plaintiffs could establish deficient training, supervision, or discipline, summary judgment would still be appropriate on Plaintiffs' claims because Plaintiffs cannot show that the City promulgated such inadequate policies with deliberate indifference.  *See Henderson*, 51 F.4th at 130.  As set forth above,[181] there was no widespread pattern or practice of similar violations, let alone one of which the City or Chief Acevedo had actual or constructive knowledge.  Thus, Plaintiffs' claims based on failure to train, supervise, and discipline fail as a matter of law.  *Id*.

## III.    Plaintiffs Cannot Show that the City Failed to Promulgate Adequate Policies.

To the extent Plaintiffs assert an additional theory of municipal liability based on the City's alleged failure to audit Squad 15,[182] this theory fails for three reasons.

---

[179] Ex. 2, R. Hardy Aff., at ¶ 11; *See also* Ex. 41, "Sworn Affidavit" form for Citizen Complaints in English and Spanish, https://www.houstontx.gov/ police/contact/images/sworn affidavit_eng.pdf and https://www.houstontx.gov/police/contact/imagessworn affidavit_sp.pdf (both accessed May 30, 2024); Ex. 42, HPD Internal Affairs Division "How to Make a Complaint," https://www.houstontx.gov/police/ divisions/internal_affairs/index.htm (accessed May 28, 2024).

[180] Ex. 39 (HPD IAD Report for Issue #46067-2014).

[181] *See supra* Argument & Authorities Sections I.A & I.B.

[182] Dkt. 49 ¶¶ 97, 208; Dkt. 48 ¶¶ 128, 167.

**First**, contrary to Plaintiffs' allegations, the Narcotics Division was subjected to regular inspections and audits between January 1, 2014, and January 28, 2019, including:

- Audits by the office of Budget and Finance;
- Audits of CI funds;
- Audits of CI files;
- A DOJ Audit;
- Various levels of investigation of officer Blue Back case files;
- Integrity checks by IAD;
- Investigations by SIU.[183]

A municipality may only be held liable under a theory of failure to promulgate a policy where the policymaker "***fails to act affirmatively at all***"—that is, where the need to act "is so obvious, and inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need." *Burge v. Parish of St. Tammany*, 187 F.3d 452, 471 (5th Cir. 1999) (emph. added). Far from "fail[ing] to act affirmatively at all" (*id*.), HPD regularly took action to ensure the veracity and accuracy of their officers' police work.

**Second**, Plaintiffs cannot establish a direct causal link between an alleged failure to audit and the injuries at issue here. When probed as to why he had not previously ordered a holistic audit of the entire Narcotics Division, Chief Acevedo rightfully pointed out that no "audit would be able to uncover an officer making something up."[184] *See Snyder*, 142 F.3d at 799 (reversing judgment against city because plaintiff's evidence in support of failure-to-promulgate theory fell short of "rigorous" and "stringent" causation requirements).

**Third**, "[t]o present a viable claim . . . for the alleged failure to promulgate a policy, the failure must be an intentional choice and amount to subjective deliberate indifference." *Carmona*

---

[183] Ex. 23, I. Duplechain Dep., at 32:21-34:2; 36:25-37:10; 39:7-18; 47:16-48:11; 49:22-50:8; 51:6-24; 87:1-6; 178:6-17.
[184] Ex. 16., A. Acevedo Dep., at 26:12-18, 27:15-23.

*v. City of Brownsville*, No. 1:23-CV-084, 2024 WL 472340, at *9 (S.D. Tex. Feb. 6, 2024).  As already discussed, Plaintiffs have failed to establish a pattern of similar constitutional violations demonstrating "deliberate indifference" by the City to support *any* of their liability theories.  The lack of such a pattern similarly dooms this theory of liability.  Therefore, to the extent Plaintiffs maintain their Section 1983 claims on a theory of failure to promulgate policies, summary judgment should be granted for the City.

## IV.    The City is Entitled to Summary Judgment on Plaintiffs' State Law Claims.

Plaintiffs assert standalone state law claims for wrongful death and survival.  It is unclear if Plaintiffs intend to tie those claims solely to their excessive force allegations or to their allegations regarding service of the warrant too.  Regardless, for the reasons set forth in the City's companion motion for summary judgment on Plaintiffs' excessive force allegations,[185] the City is immune from Plaintiffs' state law claims because lying on a warrant, which is akin to a willful invasion of privacy, is clearly an "intentional tort" for purposes of immunity.  *Johnson v. MHMR Auth. of Brazos Valley*, No. CV H-23-3448, 2023 WL 8630064, at *6 (S.D. Tex. Dec. 13, 2023).  The City is therefore entitled to summary judgment on these state law claims as a matter of law.

**<u>CONCLUSION</u>**

For the reasons stated above, the City respectfully requests that the Court grant this Motion for Partial Summary Judgment on Plaintiffs' Section 1983 and state law claims based on service of the warrant, and grant the City all other and further relief to which it is entitled, whether in law or equity.

---

[185] The City relies upon and incorporates by reference the arguments regarding Plaintiffs' state law claims that are set forth in the City's simultaneously filed motion for partial summary judgment on Plaintiffs' excessive force claims.

Dated: August 9, 2024

Respectfully submitted:

**BECK REDDEN LLP**

**THE ODOM LAW FIRM**

*/s/ Alistair B. Dawson*
Alistair B. Dawson
State Bar No. 05596100
Federal Bar I.D. 12864
adawson@beckredden.com
Garrett S. Brawley
State Bar No. 24095812
Federal Bar I.D. 3311277
gbrawley@beckredden.com
Lena E. Silva
State Bar No. 24104993
Federal Bar I.D. 3608019
lsilva@beckredden.com
1221 McKinney St., Suite 4500
Houston, Texas 77010-2010
Telephone: (713) 951-3700

*/s/ Al Odom*
Al Odom
State Bar No. 15201100
Federal Bar I.D. 12913
601 Sawyer Street, Suite 225
Houston, Texas 77007
Telephone: (713) 357-5153
E-mail: aodom@aodomlawfirm.com

**ATTORNEYS FOR DEFENDANT CITY OF HOUSTON**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was sent to all counsel of record on this the 9th day of August 2024, pursuant to the Federal Rules of Civil Procedure.

*/s/ Alistair B. Dawson*
Alistair B. Dawson

## CERTIFICATE OF CONFERENCE

I hereby certify that I conferred with Plaintiffs' counsel, and they are opposed to the relief sought in this motion.

*/s/ Alistair B. Dawson*
Alistair B. Dawson

36