IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CLIFFORD F. TUTTLE, JR., REPRESENTATIVE OF THE ESTATE OF DENNIS W. TUTTLE, DECEASED, ROBERT TUTTLE, AND RYAN TUTTLE, | § § § § § | |
| Plaintiffs | § § | |
| v. | § § | Civil Action No. 4:21-cv-00270 |
| CITY OF HOUSTON, *et al.*, | § § § | |
| Defendants. | § | |

**AND**

| | | |
|---|---|---|
| JOHN NICHOLAS, as temporary administrator of the Estate of Rhogena Nicholas and JO ANN NICHOLAS, individually and as an heir of the Estate of Rhogena Nicholas, | § § § § § | |
| Plaintiffs | § § | |
| v. | § § | Civil Action No. 4:21-cv-00272 |
| CITY OF HOUSTON, *et al.*, | § § § | |
| Defendants. | § | |

**CITY OF HOUSTON'S MOTION FOR PARTIAL SUMMARY JUDGMENT
ON PLAINTIFFS' CLAIMS BASED ON ALLEGED EXCESSIVE FORCE**[1]

---

[1] Throughout this motion, "Plaintiffs" collectively refers to the Nicholas Plaintiffs and the Tuttle Plaintiffs. "Nicholas Plaintiffs" refers to the current Plaintiffs in the case originally filed as 4:21-cv-00272. "Tuttle Plaintiffs" refers to the current Plaintiffs in the case originally filed as 4:21-cv-00270. "Tuttle" refers to Dennis Tuttle. "Nicholas" refers to Rhogena Nicholas. "City" refers to the City of Houston. Each individual defendant is referred to by his or her last name. "HPD" refers to the Houston Police Department. "Individual Officers" collectively refers to the individual defendants except for Goines and Bryant.

This motion addresses Plaintiffs' Section 1983 claims and wrongful death and survival claims against the City based on alleged excessive force and respectfully requests that the Court dismiss these claims as a matter of law.[2]

## INTRODUCTION

The City recognizes the tragedy that occurred on January 28, 2019, at 7815 Harding Street. Tuttle, Nicholas, and the other officers of Squad 15 were victims of Goines' condemnable conduct. But Fifth Circuit law requires more than the actions of one officer within a department of 5,290 to support liability against the City. *Jeffrey v. City of Houston*, No. 4:23-CV-00069, 2024 WL 1313897, at *4 (S.D. Tex. Mar. 27, 2024) (dismissing *Monell* claims because allegations related to "*just one officer in one squad in a department of thousands of officers: Goines*").[3] Similarly, Goines lying to obtain the underlying search warrant cannot "transform a later, reasonable use of force" into excessive force. *Cnty. of Los Angeles, Calif. v. Mendez*, 581 U.S. 420, 422-23 (2017) (rejecting the Ninth Circuit's "provocation rule," which would transform a reasonable use of force into excessive force if an officer had first committed a separate constitutional violation (i.e., an unlawful search) that contributed to the officer's need to use force). For the reasons set forth below, the City respectfully submits that Plaintiffs' claims fail as a matter of law.

## SUMMARY OF THE ARGUMENT

In support of their Section 1983 excessive force claims, Plaintiffs assert three theories of municipal liability arising out of Officer Gallegos' alleged use of excessive force during the Harding Street incident:

---

[2] Plaintiffs' claims based on the warrant are addressed in a simultaneously filed motion for partial summary judgment and, as outlined therein, also fail as a matter of law.

[3] With respect to quoted material, unless otherwise indicated, all brackets, ellipses, footnote call numbers, internal quotations, and citations have been omitted for readability. All emphasis is original unless otherwise indicated.

1. At the time of the incident, the City had an official policy authorizing HPD officers' excessive use of force against persons and animals.[4]

2. The City had a policy of failing to train, supervise, and/or discipline HPD officers regarding use of force.[5]

3. The City failed to promulgate policies preventing the use of excessive force during service of no-knock warrants, and mandating the training, supervision, and/or discipline of HPD officers regarding use of force.[6]

Plaintiffs' claims against the City based on these liability theories fail for three reasons.

**First**, there is no underlying violation of Tuttle or Nicholas' constitutional rights supporting Plaintiffs' Section 1983 claims. *Harrington v. Harris,* 118 F.3d 359, 365 (5th Cir. 1997) (requiring an underlying constitutional violation for liability to be imposed under Section 1983). In order to prevail on their use-of-force claims, Plaintiffs must prove that Officer Gallegos' use of force was unconstitutional—that is, both excessive and objectively unreasonable. *Trammell v. Fruge*, 868 F.3d 332, 340 (5th Cir. 2017). Stated differently, Plaintiffs must prove that no reasonable police officer—when presented with what transpired on January 28, 2019—would have believed that a police officer or others were at risk of serious harm. *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009).

The unrefuted facts highlight that the officers' actions were neither excessive nor unreasonable:

- Tuttle was in possession of a .357 revolver. Tuttle's DNA was found on the .357 recovered from the crime scene.[7]

- Tuttle's and Nicholas's hands tested positive for gunshot residue.[8]

---

[4] Dkt. 48 ¶ 128(a); Dkt. 49 ¶ 169.
[5] Dkt. 48 ¶¶ 172-76; Dkt. 49 ¶ 175.
[6] Dkt. 48 ¶ 181; Dkt. 49 ¶ 175.
[7] **Ex. 1, Antu Dep.** at 73:9–17 (Tuttle had a .357); **Ex. 2, DNA report**.
[8] **Ex. 3, Gunshot Residue Rep**.

- Officer Medina was shot prior to any officer shooting at Nicholas or Tuttle.[9]

- Tuttle shot Lovings in the neck. Ballistics testing confirmed the bullet from Lovings' gunshot wound came from Tuttle's .357 revolver.[10] The gunshot to Lovings resulted in him being permanently paralyzed.[11]

- Tuttle pointed his gun at numerous Individual Officers.[12]

- Plaintiffs' expert now admits that Tuttle fired three or four times at Individual Officers.[13]

- Four HPD officers were ultimately shot during the incident.[14]

- Gallegos' unrebutted testimony establishes that he perceived Nicholas as an immediate threat to Medina (who had just been shot and was unconscious on the couch) prior to shooting and killing Nicholas.[15]

- Gallegos' unrebutted testimony establishes that he perceived Tuttle as an immediate threat to himself and to other officers prior to shooting and ultimately killing Tuttle.[16]

- Lovings', Medina's, and Sepolio's unrebutted testimony establishes that they each perceived Tuttle's dog as an immediate threat to themselves and to other officers prior to shooting the dog.[17]

- The entire shooting incident involving Tuttle and Nicholas lasted only 80 seconds.[18]

This is why every law enforcement agency that investigated the incident found the use of force justified, including the independent investigation conducted by the Texas Rangers at the request

---

[9] *See infra* Factual Background Section I.
[10] **Ex. 4, J. Dupre Dep.** at 39:7–12; 45:13–47:8 (bullet retrieved from Lovings came from Tuttle's .357 revolver); **Ex. 5, HFSC Report** at 1586 (same); **Ex. 6, DWQ to HFSC** at Nos. 8, 9, 12, 16, and 21 (confirming chain of custody); **Ex. 7, DWQ to HCIFS** at Nos. 6–7 (confirming chain of custody); *see also* **Ex. 8, Maloney Dep. Vol. I** at 28:15–19.
[11] **Ex. 11, Lovings Dep. Vol. I** at 37:7-10; **Ex. 24, Lovings Dep. Vol. II** at 39:14–40:12.
[12] *See infra* Factual Background Section I.
[13] Ex. 8 (Maloney Dep. I) at 243:13–24.
[14] **Ex. 9, Wolf Dep.** at 105:20–106:6.
[15] **Ex. 10, Gallegos Dep.** at 102:10–103:2; 179:12–19; 180:3–10; 188:21-189:5.
[16] *See infra* Factual Background Section I.
[17] Ex. 11 (Lovings I) at 28:8–14, 30:24–31:4; **Ex. 12, Medina Dep.** at 66:6-9, 67:1–21; **Ex. 13, Sepolio Dep.** at 27:8–15, 28:5–10, 93:3–11, 110:11-16. *See also* Ex. 1 (Antu Dep) at 76:24–77:9.
[18] Ex. 9, (Wolf) at 104:7–11.

of the Harris County District Attorney's Office.[19] Officers responding to shots fired at them with deadly force is constitutional. *Harris v. Serpas*, 745 F.3d 767, 772 (5th Cir. 2014).

**<u>Second</u>**, even assuming *arguendo* that the force *was* unconstitutional, Plaintiffs' claims independently fail because Plaintiffs cannot establish liability against the City under the settled standard of *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978). This standard requires, among other things, proof that (1) a City policy maker (*i.e.*, Chief Acevedo) promulgated a City policy, custom, or framework of training, supervision, or discipline with "deliberate indifference," and (2) that the policy, custom, or framework directly "caused" the underlying constitutional violation. *Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 280 (5th Cir. 2015) (discussing *Monell*).

These requirements are intentionally difficult because they distinguish *Monell* liability from *respondeat superior* liability—which cannot support liability against municipalities as a matter of law. *Monell*, 436 U.S. at 691. For example, "[d]eliberate indifference requires a showing of more than negligence or even gross negligence. Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference[.]" *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005). Deliberate indifference therefore typically requires evidence of a "pattern" of similar prior incidents "arising from a policy so clearly inadequate as to be obviously likely to result in a constitutional violation." *Covington v. City of Madisonville*, 812 F. App'x. 219, 225 (5th Cir. 2020). Such a "pattern" must include "a significant number of previous incidents placed in the context of the size of the police department, the number of criminal incidents investigated, and [such] specificity that the other incidents are fairly similar to what transpired in the present dispute." *Lewis v. City of Houston*, No. 4:22-CV-00844, 2023 WL 2249991, at *7 (S.D. Tex. Feb.

---

[19] *Id*. at 102:20–103:5; **Ex. 14, Harding Street IAD Use of Force** at COH00005471–5475.

27, 2023). The evidence in this case establishes there was no prior "pattern" of excessive or unreasonable use of force by HPD officers:

- HPD employed over 5,000 officers from January 1, 2016, through January 28, 2019.[20]

- ***Zero*** citizens were shot by HPD officers during the service of search warrants from January 1, 2016, through January 27, 2019—a period in which HPD narcotics officers served over 913 search warrants.[21]

- This incident was the ***first*** officer-involved shooting of a person during the service of a search warrant during Chief Acevedo's tenure as Chief of Police.[22]

- This incident was the ***first*** time that Officer Gallegos had fired his weapon at a civilian and his first officer involved shooting during the service of a search warrant.[23]

Plaintiffs have no evidence of a "significant number of previous" excessive force incidents.

Plaintiffs attempt to sidestep this dispositive evidence by cobbling together ten incidents of alleged "excessive" force over a nine-year period[24]—none of which are sufficiently similar to the incident in question to amount to a pattern.[25] *Id*. (noting the prior incidents must be "fairly similar to what transpired in the present dispute"). Even if the Court found that all ten of these prior incidents were "fairly similar" to what happened at Harding Street (which the City asserts it should not), ten incidents over a nine-year period would not "support a pattern of illegality in one of the Nation's largest cities and police forces" as a matter of law. *Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002) (finding no pattern despite eleven incidents of "excessive" force). This case offers no reason to stray from well-established Fifth Circuit boundaries.

---

[20] **Ex. 15, Dec. of R. Hardy** at ¶ 7.
[21] *Id*. at ¶¶ 6, 8.
[22] *Id*. at ¶¶ 6, 8; *see also* **Ex. 16, Aff. of A. Acevedo** at ¶ 2.
[23] Ex. 10 (Gallegos) at 188:8–14; 198:23–199:9.
[24] Dkt. 48 ¶¶ 133-43; Dkt. 49 ¶¶ 34-44.
[25] Only five of the incidents cited by the Plaintiffs involved a suspect shooting at police officers. *See generally* **Ex. 48, Compilation of IAD Report Investigative Summaries or Incident Report Related to Ten Alleged Use of Force Against Person Incidents**.

Plaintiffs' Section 1983 claims also fail under *Monell* because Plaintiffs cannot establish that any HPD policy, custom, training, supervision, or discipline authorized unconstitutional uses of force or caused the alleged excessive force at issue here. As set forth in more detail below, the Individual Officers received extensive and comprehensive training and supervision on the appropriate use-of-force:

- All HPD officers were required to undergo robust use-of-force training that either met or exceeded the Texas Commission of Law Enforcement ("TCOLE") qualification and training requirements.[26]

- All HPD officers were instructed, in accordance with constitutional standards, that they could not use deadly force unless the officer "reasonably believe[d] it [was] necessary to protect themselves or others from the imminent threat of serious bodily injury or death."[27]

- HPD officers were subject to yearly formal training mandates, which met or exceeded TCOLE's standards and included use-of-force training.[28]

- All HPD narcotics officers received extensive training on use of force generally; use of force during the service of knock-and-announce and no-knock search warrants (including what to do and how to go about serving the warrant, the duty to "reassess" service if circumstances changed, how to respond to a suspect shooting at officers, and not withdrawing if an officer or others remained at risk of injury); use of force against animals; de-escalation techniques; use of force options; and the use of force against unarmed citizens.[29]

- All HPD officers were subject to comprehensive mandatory internal affairs investigations of any officer-involved shooting resulting in a citizen injury.[30]

The City's use-of-force policies, customs, training, supervision, and discipline were constitutionally appropriate and, therefore, cannot support Plaintiffs' Section 1983 claims.

---

[26] **Ex. 17, Aff. of E. Termeulen** at ¶ 4. As set forth below, the fact that HPD's training exceeded the requirements of TCOLE is dispositive. *See infra* Argument & Authorities Section I.D(2)(a).

[27] *Id*. at ¶ 5.

[28] *Id*. at ¶ 7.

[29] *Id*. at ¶¶ 5, 7–8.

[30] Ex. 16 (Acevedo Aff.) at ¶ 9.

**Third**, Plaintiffs' state law wrongful death and survival claims based on the alleged use of force fail because they are barred by governmental immunity and the Texas Tort Claims Act ("TTCA"). *Malone v. City of Fort Worth*, 297 F. Supp. 3d 645, 668 (N.D. Tex. 2018) (granting summary judgment on state law claims against City for alleged excessive force because "[i]ntentional torts are excepted from the waiver of sovereign immunity under the TTCA").

## FACTUAL BACKGROUND

Unbeknownst to the City,[31] Goines committed perjury to obtain the "no-knock" search warrant for 7815 Harding Street. But his actions, though condemnable, are irrelevant to this Court's evaluation of Gallegos' challenged use of force.[32] *See Mendez*, 581 U.S. at 423 (noting other constitutional violations cannot "transform a later, reasonable use of force" into excessive force). Instead, Plaintiffs must demonstrate both (1) an unconstitutional use of force, and (2) inadequate policies, customs, training, supervision, or discipline that caused the unconstitutional use of force and were promulgated with deliberate indifference. *See, e.g.*, *Mason*, 806 F.3d at 280. Accordingly, the factual background below focuses on the officers' actions during service of the warrant at 7815 Harding Street and the City's use-of-force policies, customs, training, supervision, and discipline.

### I. The Individual Officers Reasonably Responded to the Threats Presented by Tuttle, Nicholas, and Tuttle's Dog During Service of the Warrant at 7815 Harding Street.

The warrant service at 7815 Harding Street began with an operational meeting.[33] At this meeting, officers were told that the male resident at 7815 Harding Street was known to carry a

---

[31] *Id*. at ¶ 7.

[32] On August 5, 2024, Plaintiffs dismissed all excessive force claims against each Individual Officers, except Officer Gallegos. Dkt. 301.

[33] Ex. 10 (Gallegos) at 172:21–174:1. Additional facts related to service of the warrant are set forth in the City's concurrently filed motion for partial summary judgment on Plaintiffs' claims based on service of the warrant.

handgun in his waistband and that a large, aggressive dog was known to be inside the residence.[34] A team of eighteen officers then drove to 7815 Harding Street in an unmarked van, several patrol vehicles, and an unmarked canine vehicle.[35] The "entry" team tasked with serving the warrant consisted of Officers Medina, Lovings, Bryant, Salazar, Pardo, Sepolio, Ashraf, Gallegos, Goines, and Sergeants Reyna and Wood.[36] Officers Arechiga, Blankinship-Reeves, Morales, Garza, Rios, Ortiz, and Maxwell were non-narcotics officers assigned to the perimeter.[37] Despite the number of officers involved in serving the warrant, Plaintiffs have abandoned their excessive force claims against all of the Individual Officers except Officer Gallegos.[38] To that end, Plaintiffs challenge only the reasonableness of Officer Gallegos' shooting of Nicholas and final shot of Tuttle.[39]

Upon arriving at 7815 Harding Street, the entry team exited the unmarked van, organized into an entry "stack," and approached the residence.[40] Prior to or while breaching the door, numerous officers announced, "Houston Police search warrant," and at least one of the marked patrol vehicles "turn[ed] on their lights and hit the sirens."[41] After the door was opened, Medina was the first officer to enter the residence.[42] Medina turned left and observed Nicholas next to the couch.[43] Unbeknownst to Medina, Tuttle was hiding behind the dining room wall waiting to ambush him with a .357 revolver.[44] Diagram 1 marks Nicholas' location with an "N" and Tuttle's

---

[34] *Id*. The fact that the dog was known to be aggressive was confirmed by Tuttle and Nicholas' neighbor during his deposition. *See also* Ex. 1 (Antu Dep) at 76:24–77:9.

[35] **Ex. 18, Wolf Report** at 4; Ex. 10 (Gallegos) at 88:23–89:9; Ex. 14 (IAD Use of Force) at COH00005433.

[36] Ex. 18 (Wolf Report) at 4.

[37] *Id*. at 4; Ex. 14 (IAD Use of Force) at COH00005433.

[38] *See* Dkt. 301; *see also* **Ex. 19, A. Scott Dep.** at 118:2-25.

[39] Ex. 19 (Scott) at 23:3-24:10, 118:2-25.

[40] Ex. 10 (Gallegos) at 79:15–22.

[41] *Id*. at 88:23–89:14; **Ex. 20, Ashraf Dep.** at 38:1–8, 90:5–22.

[42] Ex. 12 (Medina) at 17:24–25.

[43] *Id*. at 44:13–45:4.

[44] *Id*. at 75:4–8 (first saw Tuttle by dining room wall after being shot).

later-observed location with a "D1":[45]



*Diagram 1*

Upon observing Nicholas, Medina moved to the location noted with a "1" on Diagram 1 and instructed Nicholas to put her hands on her face.[46] Nicholas disregarded the instructions, screamed, and flailed her hands.[47] While still attempting to secure compliance with his directives through continued verbal instructions to Nicholas, Medina heard a gunshot to his right.[48] From the moment the first officer exited the unmarked van to this initial gunshot, approximately 18 seconds elapsed.[49]

Medina turned toward the noise and observed an angry dog running toward him and other officers.[50] In response, Medina discharged his firearm at the animal.[51] Meanwhile, with Medina

---

[45] **Ex. 21, Diagram 1** (prepared by Medina during deposition; diagram not to scale).

[46] Ex. 12 (Medina) at 52:1–14 (location); 50:9–20 ("I gave her the instructions to put her hands on her face, repeated it[.]").

[47] *Id*. at 45:9–12 (flailing); 50:9–20 (instructions and response).

[48] *Id*. at 52:1–14.

[49] Ex. 9 (Wolf) at 109:10–110:2.

[50] Ex. 12 (Medina) at 66:6–25.

[51] *Id*.

distracted by the charging dog, Tuttle shot Medina from his hidden location behind the dining room wall.[52] Medina described his first view of Tuttle as follows:

> As I was scanning after I shot the dog I went to scan and then felt the pain come through my right shoulder, and there's a wall in your diagram that comes out, that protrudes just a little bit, and that's where I saw him as I was flying back and then lights out.[53]

Tuttle shot Medina before any HPD officers fired at him or Nicholas.[54] Medina then verbalized he was "hit" and lost consciousness on the couch next to Nicholas.[55]

Lovings was the second officer to enter the residence.[56] While Medina went to the left, Lovings turned to the right.[57] In a quick sequence of events without an established order, Lovings observed Tuttle's charging dog, shot the dog in fear for the safety of himself and other officers, and heard Medina yell he was "hit."[58]

After seeing a muzzle flash, Lovings turned and saw Tuttle standing next to the dining room wall with a gun.[59] In fear for his life, Lovings unsuccessfully fired at Tuttle.[60] Tuttle responded by re-hiding behind the dining room wall.[61] From his hiding place, Tuttle shot

---

[52] *Id*. at 75:4–8 (first saw Tuttle being the dining room wall after being shot). The Texas Rangers' investigation determined the first shot occurred approximately nine seconds after officers entered the house and within 18 seconds of entering the house the dog has been shot, Medina is shot, Nicholas has been shot, and Medina is seen being removed from the house. Ex. 9 (Wolf Dep.) at 106:7–108:15, 109:17-110:2.

[53] Ex. 12 (Medina) at 75:4–8; s*ee also* **Ex. 22, Pic. from Medina Dep. Vid**.

[54] Ex. 12 (Medina) at 75:4–12.

[55] *Id*.; Ex. 11 (Lovings I) at 30:17–21; Ex. 21 (Diagram 1) (noting location on the couch with a 2).

[56] Ex. 11 (Lovings I) at 26:12–14.

[57] *Id*. at 30:5–9.

[58] *Id*. at 30:17–31:15.

[59] *Id*. at 28:5–24, 33:11–19, 38:22–39:7, 53:5–21, 55:2–56:18, 69:5–13; *see also* **Ex. 23, Salazar Dep.** at 57:1–9, 65:14–18.

[60] Ex. 11 (Lovings I) 55:2–56:18.

[61] *Id*. at 56:23–57:7.

Lovings.[62] This gunshot wound left Lovings paralyzed from the neck down.[63] While lying in the doorway unable to move, Lovings observed Tuttle "c[o]me and tr[y] to take the gun off of me, tr[y] to pull my rifle off of my body."[64]

Salazar and Pardo were the only additional officers to enter the residence during the above sequence of events.[65] Given the relatively small size of the house and Tuttle's actions, multiple officers were essentially stacked on top of each other in the doorway.[66] From the doorway, Salazar observed both the dog charge Lovings and Tuttle shoot in the direction of officers.[67] In response, and in fear for his life, Salazar unsuccessfully fired at Tuttle.[68] Salazar and Pardo were then forced out of the house.[69] Before being forced to retreat, Pardo observed Nicholas standing over Medina, screaming.[70]

During the above events, Gallegos was located outside the house.[71] Upon hearing gunfire, Gallegos moved up to the right of the house.[72] This location is noted with a "2" in Diagram 2:[73]

---

[62] *Id*. at 39:1–7; *see also* Ex. 24 (Lovings II) at 39:14–40:12 (Lovings noting the entry wound). Even Plaintiffs' shooting expert, Michael Maloney, acknowledges that Tuttle shot Lovings. Ex. 8 (Maloney Dep. I) at 28:15–19.

[63] Ex. 11 (Lovings I) at 37:7–10; Ex. 24 (Lovings II) at 39:14–40:12.

[64] *Id*. at 39:1–7.

[65] Ex. 10 (Gallegos) at 110:18–111:6. Ashraf stepped one foot in. Ex. 20 (Ashraf Dep.) at 40:5–41:24.

[66] Ex. 10 (Gallegos) at 86:10–14, 99:12–100:4.

[67] Ex. 23 (Salazar Dep.) at 48:8–50:8.

[68] *Id*. at 61:12–25, 64:17–19.

[69] Ex. 10 (Gallegos) at 99:12–100:4.

[70] **Ex. 25, Pardo Dep.** at 44:3–24; *see also id.* at 11:6–10, 42:13–47:23 108:10–17 (noting Pardo believed Nicholas had shot Medina and him being pushed out of the house).

[71] Ex. 10 (Gallegos) at 96:3–97:19.

[72] *Id*.

[73] *Id*.; *see also* **Ex. 26, Diagrams 2–4** (prepared by Gallegos during his deposition; diagram not to scale).



*Diagram 2*

From this position, Gallegos heard Medina yell, "I'm hit."[74] He then saw two officers fall backward off the front porch while trying to retreat from the residence.[75] Gallegos next observed Lovings collapse at the front door.[76] Specifically, Lovings "fold[ed] backwards like a folding chair. So his shoulders were basically touching his ankles."[77]

With a paralyzed Lovings lying in the doorway, Gallegos was able to see into the residence for the first time.[78] He immediately observed "Officer Medina . . . sitting back on the couch, and . . . Ms. Rhogena Nicholas standing over officer Medina tugging at his shotgun that is slung to his vest saying, Mother[…], mother[…]."[79] Perceiving Nicholas as an immediate threat, Gallegos shot her: "Officer Medina was already wound[ed], he was nonresponsive, and she was reaching for his

---

[74] Ex. 10 (Gallegos) at 96:3–97:19.
[75] *Id*. at 99:12–16.
[76] *Id*. at 100:23–101:1.
[77] *Id*. at 101:12–18; *see also* Ex. 20 (Ashraf Dep.) at 53:7–13 (noting he saw Lovings get shot and thought he was dead).
[78] Ex. 10 (Gallegos) at 102:10–19.
[79] *Id*.

weapon, which I saw as a threat."[80] Nicholas' hands later tested positive for gunshot residue.[81] After shooting Nicholas in response to her attempts to obtain Medina's shotgun, Gallegos observed Nicholas "kind of move—turn to the right and—fall towards the couch."[82]

At this point, only two officers remained in the residence.[83] Each of them, Lovings and Medina, were injured and unresponsive.[84] In fear for his fellow officers, Gallegos fired directed gunshots through the exterior wall of the house away from Medina, Lovings, and Nicholas, and towards the direction he believed the suspect was located.[85] As explained by Gallegos, "[t]he purpose [of this] was . . . to give [Gallegos] some time to react to what was happening inside the house[.]"[86] It is unclear if any of these shots struck Tuttle.[87]

Taking advantage of the cover fire from his directional shots, Gallegos moved to the right to break an exterior window to gain visibility into the house.[88] Upon failing to gain visibility of the scene, Gallegos backed up towards the tree noted as "4" in Diagram 3:[89]

---

[80] *Id*. at 188:21–189:5; *see also id*. at 102:10–103:2; 179:12–19; 180:3–10.
[81] Ex. 3, (GSR Reports).
[82] Ex. 10 (Gallegos) at 110:4–9.
[83] *Id*. at 110:18–111:6.
[84] Ex. 11 (Lovings I) at 37:7-10; Ex. 10 (Gallegos) 102:10–103:2; 179:12–19; 180:3–10; 188:21–189:5.
[85] Ex. 10 (Gallegos) at 111:8–114:19.
[86] *Id*. at 113:9–14.
[87] *Id*. at 111:8–114:19.
[88] *Id*. at 116:23–117:5.
[89] *Id*. at 117:1–24.



*Diagram 3*

While backing up, Gallegos yelled for someone to extract Lovings.[90] Goines moved toward the front door in response.[91] "[A]s soon as [Goines] gets in front of the front door, he gets struck by a round in his jaw and dropped to the ground. He then begins to crawl back, half of his jaw or face is hanging off, bleeding profusely[.]"[92] The bullet that injured Goines came from inside the house where Tuttle was located.[93] Sergeant Reyna attempted to approach the front door and extract Lovings after Goines was shot.[94] As Reyna reached for Lovings, Tuttle came out of the door and pointed his weapon directly at Reyna's face.[95] In fear for his life, Reyna discharged an unknown number of rounds at Tuttle.[96] It is unclear if any of these rounds struck Tuttle.[97] Then, as Reyna

---

[90] *Id.* at 118:1–14. At this point, Sepolio had already begun to assist Medina and remove him from the house. Ex. 13 (Sepolio) at 76:24–78:25; 188:16–21.

[91] Ex. 10 (Gallegos) at 118:1–14.

[92] *Id.*

[93] *Id.* (noting Tuttle later comes out of the front door holding a revolver).

[94] *Id.*; **Ex. 27, Reyna Dep.** at 40:4–15, 42:11–25.

[95] Ex. 27 (Reyna) at 40:4–15, 42:11–43:19.

[96] *Id.* at 49:1–50:13.

[97] *Id.*

fired his weapon, Tuttle simultaneously shot at Reyna and caused Reyna to sustain injuries to his face from bullet fragments.[98]

During the altercation between Tuttle and Reyna, Gallegos saw Tuttle's hands appear through the doorway holding a revolver pointed at Reyna.[99] In response, Gallegos fired and struck Tuttle's left hand.[100] After being shot in the left hand, Tuttle retreated into the house.[101] With Tuttle's retreat, Reyna was safely extracted by other officers.[102] Gallegos then continued working his way toward the tree noted in Diagram 3. At the tree, Gallegos paused.[103] He explained his thoughts during this moment at his deposition:

> Because at this point, the only thing I can think about is four of my guys are shot, there's nobody else around me, one of my -- one of my guy[s] is in the doorway, I'm [not] sure if he's dead or alive. And then, of course, the thought of the moment I step out from behind the tree, I'm not knowing what to expect, so I think about my family, I think about my wife, I think about my kids. And all of this is playing through [my] mind whenever I have to make a decision, and I told myself if I -- if I don't step out from behind this tree and help my guys out, I'm going to consider myself a coward. So I have -- I had to do what I had to do and I finally stepped out from behind the tree around to the left, and I started to slowly try to gain vision inside of the doorway as I'm walking towards, I believe, what was the sidewalk [that leads to the front porch].[104]

---

[98] Ex. 10 (Gallegos) at 118:1–14; *see also* Ex. 25 (Pardo) at 86:3–6 (noting he saw Dennis Tuttle shoot at Reyna). The bullet that Tuttle fired at Reyna may have hit the doorway before fragments of the bullet hit and injured Reyna. Regardless, Reyna is clear that Tuttle fired at him and that he was injured from the gunshot. Ex. 27 (Reyna) at 40:4–15, 42:11–43:18, 49:1–50:13.

[99] Ex. 10 (Gallegos) at 118:1–14.

[100] *Id*.; *see also id* at 123:20-23.

[101] *Id*. at 123:20–124:22.

[102] Ex. 27 (Reyna) at 51:21–25.

[103] Ex. 10 (Gallegos) at 123:20–124:22.

[104] *Id*. at 124:8–124:22.

After stepping out from behind the tree, Gallegos slowly moved back toward the residence.[105] This location is depicted in Diagram 3 by a "5."[106] From there, Gallegos came face-to-face with Tuttle for the first time.[107] Gallegos described what happened next during his deposition:

> [A]t this point we made eye contact that's engraved in my head. I can still see it today. We made eye contact. . . . At that point he saw me, his eyes got opened real big, and then he . . . extended his arm – extended his right arm with his weapon towards me, and that's when I began to, again, engage him as I moved towards him.[108]

Gallegos does not recall how many times he shot at Tuttle during this interaction.[109] Gallegos' shots at least struck Tuttle once in the shoulder and then twice in the buttocks area when Tuttle turned back into the residence after the initial shot to his shoulder.[110] As Tuttle turned back into the residence, Gallegos again lost sight of Tuttle.[111]

With Tuttle back inside the residence, Pardo attempted to retrieve Lovings.[112] As Pardo approached, he observed Tuttle sitting on the floor with a gun in his hand next to Lovings.[113] Pardo fired twice at Tuttle in fear for Lovings' safety.[114] There is no evidence establishing these shots struck Tuttle.[115]

Pardo then retreated and regrouped with Gallegos to the right of the front door.[116] Pardo and Gallegos reapproached the front door together.[117] Upon stepping on the porch, Gallegos

---

[105] *Id*. at 125:5–9.
[106] *Id*. at 128:23–129:2.
[107] *Id*. at 125:5–9.
[108] *Id*. at 131:23–132:8.
[109] *Id*. at 132:9–10.
[110] *Id*. at 132:11–18, 133:24–134:13.
[111] *Id*. at 135:21–136:11.
[112] Ex. 25 (Pardo) at 74:20–75:11.
[113] *Id*. at 66:8–67:13.
[114] *Id*. at 70:9–13.
[115] *Id*. at 71:16–17.
[116] *Id*. at 73:6–13.
[117] *Id*.

observed Tuttle "seated kind of on his – more dominate on his right side of his buttock with one leg – his right leg was kind of bent and his left leg was extended. He had the gun in his right [hand] still and it [was] resting on his right thigh."[118] Pardo similarly testified that Tuttle was sitting on the floor with a gun in his hand.[119] On Diagram 4, Gallegos' location at this time is marked by a "6," and Tuttle's location is marked by a "DT":[120]



*Diagram 4*

While sitting, Tuttle yelled, "What the f[…] do you want from me, there's no drugs in here."[121]

The next sequence of events was described by Gallegos during his deposition:[122]

> **A:**…I told him to stop moving. At that point he looks directly at me, begins to raise the weapon one more time, when he raises the weapon I -- I then like extend my rifle out and he sort of -- when he sees my rifle go up he sort of flinches, and that's when I take my last shot.
>
> ***
>
> **Q:** So where did you hit Dennis Tuttle when you fired your last shot?
>
> **A:** So my point of aim was for his head, for his face. Through my training and experience what I've learned -- or learning how to take hostage shot -- situation shots, we've learned that the best place to shoot to completely incapacitate someone is what we call a T-frame. So from the eyeballs down to about the mouth. At that moment that was my intention but because he flinched and turned it ended up hitting him here around the back/neck area.

---

[118] Ex. 10 (Gallegos) at 135:21–136:11.
[119] Ex. 25 (Pardo) at 74:8–14, 75:12–21.
[120] Ex. 10 (Gallegos) at 136:17–137:4.
[121] *Id*. at 138:5–11.
[122] *Id*. at 138:15–139:14; *see also* Ex. 11 (Lovings I) at 72:16–75:16 (noting he told Gallegos he would need to take a head shot because Tuttle was not going down).

No other shots were fired at Tuttle or Nicholas after this last exchange.[123] This was the first time

that Gallegos had ever fired at a civilian during the service of a warrant.[124]  He testified that he

remembers the sequence of events vividly and clearly.[125]

After these last shots, Gallegos covered the front door while Pardo removed Lovings.[126]

Sepolio then reapproached the house and relieved Gallegos at the front door.[127]  Minutes later,

Tuttle's dog "got up," "made an aggressive move" toward Sepolio, and began "growling."[128]

Perceiving the dog to be a threat, Sepolio fired two additional shots at the animal. These final two

shots occurred three-and-a-half minutes after the initial shooting incident.[129]  No additional shots

occurred, and certainly no shots were fired thirty minutes after the initial gunfire exchange nor

were any shots fired into a wall in the house as has been represented to this Court.[130]

---

[123] *See infra* FN129–130.

[124] Ex. 10 (Gallegos) at 188:8–20, 198:23–199:9.

[125] *Id*. at 188:8–20.

[126]*Id*. at 141:14–22.

[127] Ex. 13 (Sepolio) at 94:1–6.

[128] *Id*. at 27:8–15, 28:5–10, 93:3–11, 110:11-22.

[129] *Id*. at 110:11-22 (final shots); Ex. 9 (Wolf) at 104:7–11, 300:14–301:4.

[130] Ex. 9 (Wolf) at 300:14–301:4, 307:16–308:4. The Court will recall that at the initial conference in this case, the Court asked counsel for the Nicholas Plaintiffs, Mr. Doyle, about an allegation in paragraph 109 of the Nicholas Plaintiffs' complaint that "two shots [were] fired approximately 30 minutes after the assault." **Ex. 28, Hearing Transcript** at 12. Mr. Doyle confirmed that two shots were fired 30 minutes after the initial gunfire exchange and further alleged that "somebody [went] inside the house put a gun against a wall and fired twice." *Id* at 14. The Court seemed somewhat astounded by Mr. Doyle's allegations and asked him to confirm them. "Did I understand you correctly?" *Id*. at 16. In response, Mr. Doyle reconfirmed the allegations.

The allegation that two shots were fired thirty minutes after the initial gunfire was investigated—at the request of the Harris County District Attorney ("HCDA")—by the Texas Rangers. The Texas Rangers found *no evidence* to support this allegation. Ex. 9 (Wolf) at 63:4–14, 104:7–11, 300:14–301:4, 307:16–308:4. The results of the Texas Ranger investigation were presented to the HCDA in late 2019. *Id*. at 90:10–18, 151:24–152:5. This was long before Mr. Doyle's representations were made to this Court. The Plaintiffs' expert has since conceded that after reading the Texas Ranger report he realized there was *no truth* to the "two shots thirty minutes later" allegation. Ex. 8 (Maloney Dep. I) at 70:6–72:14.

Sepolio held his position at the front door until SWAT arrived. SWAT took control of the scene.[131] Administrative and criminal investigations into the incident immediately followed.[132]

## II.    The City's Use-of-Force Policies and Framework of Training, Supervision, and Discipline Met or Exceeded Applicable State and Constitutional Standards.

In addition to establishing an unconstitutional use of force, to maintain their claims against the City Plaintiffs must prove that the use of force was directly caused by a constitutionally inadequate City policy, training, supervision, or discipline, which the City promulgated with deliberate indifference. *Henderson v. Harris Cnty.*, 51 F.4th 125, 130 (5th Cir. 2022) (failure to train and supervise); *Mason*, 806 F.3d at 280-81 (failure to discipline); *Pineda*, 291 F.3d at 328 (5th Cir. 2002) ("official policy" theory). To avoid dismissal of these claims at the pleadings stage, Plaintiffs made outlandish (and unsupported) allegations about the City's use-of-force policies, training, supervision, and discipline. Specifically, Plaintiffs alleged that the Individual Officers were allowed to murder citizens with "impunity" during the service of search warrants because the City did not maintain use-of-force policies preventing excessive force, or adequate training, supervision, or discipline policies ensuring that officers complied with applicable constitutional

---

Plaintiffs hired Mike Maloney as their "shooting reconstruction" expert in this case. Both in his report and early in his deposition, Maloney stated that after the gunfire exchange between Tuttle and the Individual Officers, and after Tuttle had been shot by Gallegos, Sepolio picked up Tuttle's gun, opened it, found that only two shots had been fired, walked to the back of the dining room, and fired two bullets from Tuttle's gun into the dining room wall. *Id*. at 191:20–192:2. Later in his deposition, when presented with crime scene photos that he claimed to have never seen before and that disprove his assertions, Maloney completely recanted this story and confirmed that it never happened—no officer picked up Tuttle's gun and fired two shots into the dining room wall. *Id*. at 234:22–235:8. Instead, Maloney confirmed that Mr. Tuttle fired at least three and perhaps four shots at HPD officers. *Id*. at 243:13–24.

The prior representations to this Court that two shots were fired thirty minutes after the initial gunfire and that there were two shots fired into the wall of the house have never been withdrawn. Indeed, they remain in paragraphs 109 and 121 of the Nicholas Plaintiffs' complaint.

[131] Ex. 13 (Sepolio) at 119:13–16 (noting SWAT relieved him at the front door).

[132] Ex. 16 (Acevedo Aff.) at ¶ 9.

limitations on the use of force.[133] The truth, as supported by the evidence outlined below, is that there is no evidence to support these allegations. Summary judgment is therefore appropriate.

A. The City's use-of-force policies tracked and met constitutional standards.

HPD's policies specifically disallowed the use of excessive force against animals and people. Indeed, even Plaintiffs' policy expert concedes that he has no criticism of HPD's use-of-force policies.[134] The relevant policy related to the use of force against people was in General Order 600-17.[135] Consistent with constitutional standards, any officer's use of force was required to be "objectively reasonable based on the totality of the circumstances."[136] The policy also recognized "[t]he circumstances justifying the initial use of force may change during the course of an event" and charged officers with a "duty" to "constantly assess the situation and adjust the use of force accordingly."[137] Any deadly force was further limited to situations "in which officers reasonably believe it is necessary to protect themselves or others from the imminent threat of serious bodily injury or death."[138]

The relevant policy related to the use of force against animals was in General Order 600-43.[139] This policy similarly limited the use of force against animals to situations where "any person is attacked by an animal or is imminent danger of being attacked by an animal."[140] In such

---

[133] Dkt. 48 ¶¶ 128(a), 131, 172-76, 181; Dkt. 49 ¶¶ 169, 175.

[134] Ex. 19 (Scott) at 118:11-17.

[135] **Ex. 29, GO 600-17**; *see also* **Ex. 30, Dec. S. Clark** at ¶ 14 (noting this was the applicable policy at the time of the Harding Street Incident).

[136] Ex. 29 (GO 600-17) at COH00000341. GO 600-17 went so far as to provide that employees could only use the amount of force reasonably necessary to protect themselves or others, "even if under the circumstances the law would allow the use of greater force." *Id.*

[137] *Id.*

[138] *Id.* at COH00000343.

[139] **Ex. 31, GO 600-43**; *see also* Ex. 30 (Clark Dec.) at ¶ 15 (noting this was the applicable policy at the time of the Harding Street Incident).

[140] Ex. 31 (GO 600-43) at COH00000803.

situations, "officers are authorized to use any response necessary up to and including deadline force to stop the animal (*see* General Order 600-17)."[141]   The policy also noted that in the event "the situation can be contained without further danger of attack or injury, officers shall turn over the capture or destruction of the animal to BARC."[142]

B.  <u>The City's use-of-force training was appropriate and met applicable Texas and constitutional standards.</u>

HPD's limitations on the use of force were also taught to officers through HPD's robust formal and informal training program. As an initial matter, Plaintiffs' expert admits that he has no criticism of HPD's training on use of force.[143]   And this is with good reason, for all HPD officers were required to meet or exceed TCOLE qualification and training requirements.[144] This process begins during HPD's Training Academy—a six-month academic and physical training program.[145] In total, officers receive over 1000 hours of training reflecting commonly accepted law enforcement techniques that are consistent with state statutes and constitutional principles.[146]

Officers are specifically trained related to use of force, deadly force, use of force against animals, and de-escalation techniques.[147]   This includes training on use-of-force option principles, including that the amount of force used must only rise to the level necessary to maintain officer and citizen safety.[148]   Officers are also specifically trained on use of force as it relates to the General Orders outlined above.[149] Officers are further trained in commonly accepted police procedures for

---

[141] *Id.*

[142] *Id.* BARC is the City of Houston's Animal Shelter and Adoption Facility. *Id.* at COH00000800.

[143] Ex. 19 (Scott) at 18:8-12.

[144] Ex. 17 (Termeulen Aff.) at ¶ 4.

[145] *Id.*

[146] *Id.*; *see also* **Ex. 32, Gallegos Training Records** at COH00049296 (noting over 1,000 hours related to the academy).

[147] Ex. 17 (Termeulen Aff.) at ¶ 5.

[148] *Id.*

[149] *Id.*

gaining and maintaining control over individuals and various incident scenes.[150] Finally, officers are trained in the laws of arrest, search and seizure, use of force, the Texas Code of Criminal Procedure, the Texas Penal Code, and the U.S. Constitution (including rights under the Fourth Amendment).[151] This legal-specific training is generally taught by the Harris County Assistant District Attorneys.[152]

After completion of the Training Academy, HPD officers are placed in the department's Field Training Program.[153] In that program, now probationary officers are teamed with experienced field training officers and tasked with applying Training Academy principles to real world situations.[154] Officer performance is critiqued on a daily basis, and remedial training is available to address any perceived weaknesses.[155] The program lasts four to six months.[156] In the event a probationary officer cannot successfully complete the program, the officer is not allowed to continue his or her employment with HPD as an officer.[157]

After successful completion of the Field Training Program, HPD officers remain subject to yearly formal training mandates and requirements.[158] These mandates and requirements either meet or exceed TCOLE's standards and regularly include use-of-force and de-escalation training.[159] For example, Officer Gallegos received 780 hours of formal training between January 1, 2016, and January 27, 2019, including an eight-hour training course on "Use of Force Options"

---

[150] *Id.*
[151] *Id.*
[152] *Id.*
[153] *Id.* at ¶ 6.
[154] *Id.*
[155] *Id.*
[156] *Id.*
[157] *Id.*
[158] *Id.* at ¶ 7.
[159] *Id.*

and an eight-hour training course on "De-Escalation Techniques."[160] These specific trainings were taken by all of the Individual Officers.[161]

To the extent HPD officers are chosen for specialty divisions, training requirements increase further.[162] Upon transfer to HPD's Narcotics Division, new narcotics officers are required to participate in 80 hours of narcotics specific training in the form of "Narcotics Survival School" and "Narcotics Investigator School."[163] This training again addresses use of force, the duty to "reassess" the situation if circumstances change, use of force against animals, and use of force options specific to narcotics' operation scenarios.[164] Once complete, new narcotics officers undergo an additional period of field training alongside seasoned narcotics officers to gain practical experience.[165] All narcotics officers are also required to participate in quarterly trainings specifically tailored to their assignments as narcotics officers.[166] To accomplish this, HPD maintains a Narcotics Division Training Unit that ensures all narcotics officers receive adequate narcotics-specific training.[167] Through this training framework, every HPD narcotics officer, including the Individual Officers, received extensive and frequent training on the relevant General Orders, Narcotic Division Standard Operating Procedures, use of force, use of force during the service of search warrants, use of force during the service of no-knock search warrants, use of

---

[160] Ex. 32 (Gallegos Training Records) at COH00049289 (use of force options), COH00049291 (De-Escalation Techniques / Tactical Positioning), COH00049288–49292 (total).
[161] *See generally* **Ex. 33, Compilation of Individual Defendants Training Records.**
[162] Ex. 17 (Termeulen Aff.) at ¶ 8.
[163] *Id.*
[164] *Id.*
[165] *Id.*
[166] *Id.*
[167] *Id.*

force against animals, de-escalation techniques, use of force options, and the use of force against unarmed citizens.[168]

C. <u>The City's supervision of officers' use of force was rigorous, multi-faceted, and appropriate.</u>

Officers' adherence to the aforementioned standards and training was monitored through a rigorous, multi-faceted supervision framework designed to identify and investigate potential non-compliance.[169]

First, HPD placed a global "duty to intervene" on every officer.[170] "Any employee present and observing another employee using force that is beyond that which is reasonable under the circumstances shall, when in a position to do so, safely intercede to prevent the use of such force."[171] Officers were further required to "immediately report" such "observation to an on-duty supervisor."[172]

Second, HPD characterized *all* incidents of officers pointing firearms at a person as "Reportable Force."[173] "Reportable Force," in turn, required the immediate notification of an "on-duty supervisor."[174] To the extent a firearm was discharged at a person or a person sustained serious bodily injury, HPD policy required the additional notification of HPD's Emergency Communications Division supervisor and the Command Center.[175]

---

[168] *Id*. at ¶¶ 5, 8.
[169] *See generally* Ex. 29 (GO 600-17).
[170] *Id*. at COH00000341.
[171] *Id*.
[172] *Id*.
[173] *Id*. at COH00000341-342.
[174] *Id*. at COH00000344.
[175] *Id*. at COH00000344-346.

Third, the on-duty supervisor was then required to respond to the scene and "check to see if anyone is injured and ensure the injured are treated."[176]  To the extent the incident involved the "[i]ntentional[] discharge[]" of a firearm at a person or "serious bodily injury," a formal investigation into the propriety of the underlying use of force was automatically triggered.[177] Specifically, HPD policy required the immediate notification of the Homicide Division[178] ("Homicide") to conduct a criminal investigation and the Internal Affairs Division ("IAD") to initiate an administrative investigation.[179] In all other situations, the supervisor was required to contact the IAD and "speak with the IAD lieutenant for direction" if the supervisor's on-scene investigation revealed "violations of department policy regarding the use of force."[180]

Fourth, the involved officer was required to complete an original and/or supplemental incident report and a Use of Force form.[181] Those reports included "[t]he employee's specific reasons for using force," a thorough explanation of "what force was used and why it was used," and "a detailed description of all actions taken by the officer and by the person against whom the force was used."[182]  The on-duty supervisor was then required to review the documentation, complete a supplement to the original incident report, and complete a "Use of Force After Action Report."[183]  Those reports were then forwarded up the supervisor's chain of command.[184] The

---

[176] *Id*. at COH00000346.

[177] *Id*. at COH00000347.

[178] *Id*. Prior to the Harding Street Incident, this responsibility was assigned to the Special Investigations Unit ("SIU") by Chief Acevedo. Ex. 16 (Acevedo Aff.) at ¶ 9.  Thus, the SIU investigated the shooting at Harding Street to determine if criminal conduct occurred.

[179] Ex. 29 (GO 600-17) at COH00000347.

[180] *Id*.

[181] *Id*. at COH00000348–350; **Ex. 34, General Order 200-08**, at 3 (officers required to tell the truth).

[182] Ex. 29 (GO 600-17) at  COH00000348–350.

[183] *Id*. at COH00000350–352.

[184] *Id*.

Lieutenant, Captain, and Assistant Chief of the on-duty supervisor were each required to review the After Action Report "to ensure that appropriate action is taken if deemed necessary."[185]

D. <u>The City's use-of-force investigations were detailed and thorough.</u>

Each investigation of use-of-force incidents initiated through the above supervision framework was detailed and thorough.[186]

As noted in more detail below, during Chief Acevedo's tenure there were *zero* officer-involved shootings of persons during the service of search warrants prior to the Harding Street incident. As for other officer-involved shootings of persons, they were each (1) administratively investigated by the IAD, and (2) criminally investigated by Homicide or SIU.[187] Chief Acevedo further strengthened this investigation process by transferring investigations of officer-involved shootings and other possible police misconduct from Homicide to SIU.[188] This shift in responsibilities ensured that the officers criminally investigating officers were specifically trained to investigate officer-involved shootings and detect potential officer misconduct.[189] SIU was also tasked with working closely with the Harris County District Attorneys' ("HCDA") Civil Rights Division—the HCDA division tasked with investigating potential officer misconduct—during any such investigation and presented the results of their investigation to the HCDA's office.[190] The HCDA then presented the results of the SIU investigation and any investigation of that their office conducted to the Harris County Grand Jury to determine whether any indictments should be issued

---

[185] *Id.*
[186] Ex. 16 (Acevedo Aff.) at ¶¶ 9–12.
[187] *Id.*
[188] *Id.* at ¶ 9.
[189] *Id.*
[190] *Id.*

to any of the officers involved in the shooting.[191] Ultimately, it was the SIU that uncovered Goines' actions related to the underlying warrant.[192]

The robust nature of HPD's investigation process is illustrated by the Harding Street investigation itself. The Harding Street IAD investigation files include thousands of documents; a 51-page investigative summary and a 1390-page report related to the use of force; a second 62-page investigative summary and a 1635-page report related to the underlying warrant; over 40 witness statements; and numerous pieces of physical evidence, like body worn camera footage, cell phone data, and surveillance videos.[193] The SIU investigation files similarly include thousands of documents, three reports totaling over 1,313 pages, over 40 witness interviews, and a similar compilation of evidence.[194]

HPD's pre-Harding Street investigations were also detailed and thorough. Prior to the Harding Street incident there were no officer-involved shootings of persons during the service of search warrants during Chief Acevedo's tenure. Nevertheless, an examination of the IAD files for three incidents that occurred prior to Chief Acevedo's tenure and that Plaintiffs identified in their complaints is illustrative:

> **9338 E. Ave. O (2009):** The IAD investigation into this incident includes over 500 documents totaling over 1,000 pages, a 6-page investigative summary, a 98-page investigative report, 14 witness statements, and numerous pieces of physical evidence, such as firearms reports, surveillance videos, and crime scene photos.[195]

---

[191] *Id.*

[192] *Id.*

[193] **Ex. 35, Dec. of Garrett S. Brawley** at ¶ 3. To avoid burdening the Court with the entire voluminous files associated with the investigations noted in this section, the City establishes the robust nature of these files through the declaration of Garrett S. Brawley, counsel for the City in this matter. To the extent the Court prefers the submission of the underlying investigation files, the City will coordinate with the Court to submit the files in their entirety for review.

[194] Ex. 35 (Brawley Dec.) at ¶ 4.

[195] Ex. 35 (Brawley Dec.) at ¶ 5.

The IAD investigator ultimately found the investigation "revealed sufficient evidence to prove that the discharge of firearms by [the Officers] was justified[.] . . . After witnessing Suspect Alfaro intentionally discharge his weapon at Officer Salter and cause serious bodily injury to him, [the Officers] had no choice but to neutralize the threat of the armed suspect[.]"[196]

**44 Farrell Street (2009):** This IAD investigation includes over 280 documents totaling over 450 pages, a 5-page investigative summary, a 41-page investigative report, 13 witness statements, and numerous pieces of physical evidence, such as scene diagrams, ambulance and jail records, firearm reports, and crime scene photos.[197]

The IAD investigator ultimately found the investigation "revealed sufficient evidence to prove that the discharge of firearms by Sergeant Torres was justified[.]" "[A]s officers attempted entry into the residence, suspect(s) fired at officers, striking Officer Dunn, causing him to fall near the front door." The suspect also admitted to shooting "two times through the front door as officers attempted to gain entry into his house." Therefore, the discharge of Sergeant Torres' firearm was justified.[198]

**1628 Birchwood (2013)**: This IAD investigation includes over 240 documents totaling almost 400 pages, a 3-page investigative summary, a 28-page investigative report, 3 witness statements, and numerous pieces of physical evidence, such as ambulance records, incident reports, firearm reports, and crime scene photos.[199]

The IAD investigator ultimately found that the investigation uncovered evidence "sufficient to conclude that Officer Hamala was justified in discharging his weapon during this incident. Mr. Montemayor was armed with a pistol loaded with 14 live rounds and was moving towards the entry team. When Officer Hamala announced 'Police,' Mr. Montemayor turned his head towards Officer Hamala and raised the pistol in Officer Hamala's direction[.]"[200]

E. <u>The City appropriately disciplined officers when the use of force was unjustified.</u>

When the aforementioned investigation processes revealed any violation of HPD's use-of-force policy, HPD ensured that the violating officer was appropriately disciplined. For example, two pre-Harding Street officer-involved shootings (*not* during service of a warrant) were found to

---

[196] **Ex. 36, 9338 E. Ave. O IAD Report Investigative Summary** at COH00064763.
[197] Ex. 35 (Brawley Dec.) at ¶ 6.
[198] **Ex. 37, 44 Farrell St. IAD Report Investigative Summary** at COH00066455–56.
[199] Ex. 35 (Brawley Dec.) at ¶ 7.
[200] **Ex. 38, 1628 Birchwood IAD Report Investigative Summary** at COH00068942.

be unjustified during Chief Acevedo's tenure.[201] Ten other HPD officers were found to have

engaged in the unjustified use of force between January 1, 2016, and January 28, 2019.[202] In each

instance, the officer was disciplined or resigned in lieu of undergoing the disciplinary process.[203]

F. <u>The City's robust use-of-force policies, training, supervision, and discipline led to zero pre-
Harding Street shootings during the service of warrants under Chief Acevedo.</u>

The above framework effectively prevented HPD officers from using excessive force

during the service of search warrants. As laid out in more detail below, each of Plaintiffs' theories

require proof that, among other things, Chief Acevedo knowingly promulgated an excessive use-

of-force policy or framework of training, supervision, or discipline with "deliberate indifference"

to the likelihood that citizens would suffer constitutional violations similar to ones at issue in this

case. *See, e.g.*, *Malone*, 297 F. Supp. 3d at 655. In order to prove this, Plaintiffs must demonstrate

"at least a pattern of similar violations" by HPD officers prior to the Harding Street incident. *Id*.

There is no such pattern here.

Chief Acevedo became the Chief of Police on November 30, 2016, and was in that position

on the date of the Harding Street incident.[204] Throughout Chief Acevedo's tenure, HPD was the

fifth largest police department in the United States, serving the nation's fourth largest city.[205]  In

2019, HPD consisted of over 6,311 employees, 5,290 police officers, 46 divisions, and 23 squads

---

[201] **Ex. 39, A. Acevedo Dep.** at 14:17–18:24. First, an officer's use of force was found to be
unjustified where the off-duty officer entered an altercation while walking his dog and discharged
his firearm. *Id*. at 14:24–15:24. Second, an officer's use of force during his investigation of an
alert from his home monitoring system was found unjustified after the officer's initial statements
were disproven by HPD's IAD investigation. *Id*. at 16:3–11.  *See also* Ex. 16 (Acevedo Aff.) at ¶
12.
[202] Ex. 15 (Hardy Dec.) at ¶ 9.
[203] *Id*.
[204] Ex. 16 (Acevedo Aff.) at ¶ 2.
[205] Ex. 15 (Hardy Dec.) at ¶ 7.

specific to the Narcotics Division.[206] HPD's operations were similarly robust. From January 1, 2016, through December 31, 2018, HPD's Narcotics Division engaged in the following:[207]

- Narcotics officers served over 913 search warrants.

- Narcotics officers participated in over 3,534 narcotics buys.

Despite these significant numbers, there were *zero* officer-involved shootings of persons during the service of search warrants from January 1, 2016, until the warrant service at 7815 Harding Street on January 28, 2019.[208] These statistics refute any allegation that there was a pattern of excessive force against persons by HPD officers.

Similarly, Plaintiffs have only identified two animal shootings during the service of a warrant for this same time period.[209] In both instances, the shootings were justified:

- **6807 Goforth Street**:[210] On April 25, 2018, HPD officers served a search warrant resulting in the recovery of .95 grams of crack cocaine and a firearm. During the warrant service, two dogs were shot because they both "charge[d]" officers in an "aggressive manner and growling" and came running at "officers showing teeth in an aggressive manner." The officers indicated each dog was shot because they "fear[ed]…[for their] safety and the safety of the officers behind [them]." No citizen was injured during this warrant service.

- **7711 Greenstone Street**:[211] On January 10, 2019, an HPD patrol officer assisted the FBI in the service of a federal arrest warrant. During service, an HPD patrol officer discharged his firearm at a dog. Investigation of the incident found the shooting "justified" because numerous FBI and HPD officers testified the dog was "aggressive," had been released towards officers during prior interactions with the suspect, and "charg[ed]" the officers prior to being shot. Video evidence further supported the officers' statements.

Accordingly, Plaintiffs lack sufficient evidence to show that Chief Acevedo would have been alerted prior to Harding Street of any issues with HPD's use of force against persons or

---

[206] *Id*. at ¶ 5.
[207] *Id*. at ¶ 6.
[208] *Id*. at ¶ 8.
[209] Dkt. 48 ¶ 148; Dkt. 49 ¶¶ 49–57.
[210] **Ex. 40 6807 Goforth Street Incident Report** at COH00053824–53825, COH00053835–53837.
[211] **Ex. 41 7711 Greenstone Street IAD Report Investigative Summary** at COH00059074–75.

animals during the service of search warrants.[212] In contrast, HPD's demonstrated history of *not* using excessive force during the service of search warrants shows that HPD maintained a well-trained police force pursuant to the constitutional use-of-force policies outlined above. Accordingly, Plaintiffs' use-of-force claims against the City fail as a matter of law.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when, after viewing the record in the light most favorable to the nonmovant, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). Once the moving party meets this burden, the nonmovant must "come forward with specific facts indicating a genuine issue for trial." *Brandon v. Sage Corp.*, 808 F.3d 266, 270 (5th Cir. 2015).

## ARGUMENT & AUTHORITIES[213]

As laid out in additional detail below, Plaintiffs' various theories of liability against the City fail as a matter of law for a myriad of reasons unique to each theory. But the simplest path is Plaintiffs' lack of evidence supporting a finding of deliberate indifference by the City or Chief Acevedo in the promulgation of any use-of-force policy, training, supervision, or discipline. Without such evidence, all of Plaintiffs' claims fail as a matter of law. This lack of deliberate indifference is dispositive regardless of whether the Court finds the underlying use of force justified or the City's use-of-force policies, training, supervision, or discipline constitutional. Nevertheless, because an underlying constitutional violation is a predicate to any claim against the

---

[212] Ex. 16 (Acevedo Aff.) at ¶ 12.

[213] The City refers to and incorporates by reference the standard for Section 1983 municipal liability under theories of "official policy" and failure to train, supervise, and/or discipline as set forth in the "Argument and Authorities" section of the City's simultaneously filed Motion for Partial Summary Judgment on Plaintiffs' Claims Based on Service of the Warrant.

City, the section below begins with Plaintiffs' lack of evidence to support the alleged excessive force. To the extent the Court prefers to begin with the above noted lack of deliberate indifference, this section begins on page 41 as to the use of force against Tuttle and Nicholas and page 60 as to the use of force against Tuttle's dog.

I.   **Plaintiffs' Section 1983 Claims Based On the Use Of Force Against Tuttle And Nicholas Fail as a Matter Of Law.**

A.   The City is entitled to Summary Judgment on each of Plaintiffs' liability theories because there is no evidence of constitutional violations.[214]

"[A]n underlying constitutional or statutory violation is a predicate to liability under § 1983." *Harrington,* 118 F.3d at 365. In support of their Section 1983 claims, Plaintiffs allege that Gallegos used excessive force against Tuttle and Nicholas, which violated Tuttle and Nicholas' Fourth Amendment rights to be free from unreasonable seizure, as incorporated and applied to the states through the Fourteenth Amendment.[215]   To prevail on a Fourth Amendment claim of excessive force, Plaintiffs must demonstrate that in addition to Tuttle and Nicholas being "seized" within the meaning of the Fourth Amendment, they each suffered an "(1) injury, (2) which resulted directly and only from a use of force that was ***clearly*** excessive, and (3) the excessiveness of which was ***clearly*** unreasonable."[216]   *Trammell*, 868 F.3d at 340 (emph. added).

In the Fifth Circuit use of deadly force is "presumptively reasonable when the officer has reason to believe that the suspect poses a threat of serious harm ***to the officer or to others***." *Ontiveros*, 564 F.3d at 382 (emph. added). "[W]hen an officer in this Circuit reasonably believes

---

[214] The City relies upon and incorporates by reference any motions for summary judgment filed by any Individual Officers related to alleged use of excessive force against Tuttle and Nicholas.
[215] Dkt. 48 ¶ 112; Dkt. 49 ¶¶ 147.
[216] Questions of whether use of force is "excessive" (element two) or clearly "unreasonable" (element three) "are often intertwined." *Roque v. Harvel*, 993 F.3d 325, 333 (5th Cir. 2021).

he has encountered such a threat, the constitutional inquiry ends there." *Barnes v. Felix*, 532 F. Supp. 3d 463, 469 (S.D. Tex. 2021).

Whether an officer has reason to believe that a suspect poses a threat of serious harm "is judged from the perspective of a reasonable officer on the scene, and only the facts then knowable to the defendant officers may be considered." *Crane v. City of Arlington, Tex.*, 50 F.4th 453, 463 (5th Cir. 2022). "[T]he threat [is to] be examined only ***at the moment deadly force is used***," regardless of what transpired up to that moment. *Id*. at 466 (emph. added). Specifically regarding armed suspects, the Fifth Circuit has "never required officers to wait until a defendant turns toward them, with weapon in hand, before applying deadly force to ensure their safety." *Garcia v. Blevins*, 957 F.3d 596, 602 (5th Cir. 2020).

Officer actions leading up to a shooting "are not relevant for the purposes of an excessive force inquiry in this Circuit" (*Harris*, 745 F.3d at 772), "even when the officers' conduct departs from established police procedures" (*Barnes*, 532 F. Supp. 3d at 471). Analysis of whether an officer's use of force was reasonable "must . . . allow[] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor,* 490 U.S. 386, 396-97 (1989).

Further, it is irrelevant "whether an officer was in actual, imminent danger of serious injury." *Harris*, 745 F.3d at 773. Rather, all that matters is whether the officer "reasonably believed that the suspect posed a threat of serious harm to the officer or to others." *Id*. Even if it is clear in hindsight that no such threat actually existed, the use of force must be assessed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

Situations where courts in this Circuit have found the use of deadly force justified include:

- The suspect appearing to shoot at an officer. *Garza v. Briones*, No. 5:16-CV-00251, 2018 WL 8868510, at *5 (S.D. Tex. Sept. 13, 2018), *aff'd*, 943 F.3d 740 (5th Cir. 2019) ("Defendants were not required to be *certain* that [the suspect] fired the first shot; they were only required to have a reasonable belief that he did.").

- The suspect threatening an officer with a weapon. *Stroik v. Ponseti*, 35 F.3d 155, 159 (5th Cir. 1994) (use of deadly force was justified based on "crucial fact" that suspect "was pointing a gun at [the officer]"; *Garza v. Briones*, 943 F.3d 740, 745 (5th Cir. 2019) (use of deadly force was justified where suspect refused to comply with police orders, waved around what officers presumed to be a handgun, pointed the gun in the officer's direction, and seemingly aimed it, even though suspect's gun turned out to be "only a BB gun").

- The suspect moving in such a manner that the officer could reasonably believe the suspect was reaching for a weapon. *Cloud v. Stone*, 993 F.3d 379, 387 (5th Cir. 2021) (standard applies even if officer has not yet seen a gun or no gun is ever found at the scene).

In this case, Plaintiffs' claims of excessive force must be considered in the context of the events that occurred on January 28, 2019. Within seconds of entering the residence, an aggressive dog charged at the Individual Officers, and Tuttle shot Medina. During this same time frame, Nicholas refused to follow the instructions that Medina gave her. Seconds later, Tuttle shot Lovings, who collapsed at the front door. Nicholas then reached for Medina's shotgun, which lay next to the incapacitated officer. In fear for the lives of Medina and the other officers, Gallegos shot Nicholas. Meanwhile, Tuttle walked toward the front of the house with a gun in his hand and pointed it at the officers. Tuttle then shot Goines and Reyna. Having already shot four officers, with the gun still in his hands, Tuttle then pointed the gun at Gallegos before the final exchange of gunfire ensued. The entire shoot-out lasted only eighty seconds. Given the chain of events that occurred during those few seconds, the question for this Court is whether it was reasonable for Gallegos to believe that Nicholas and Tuttle posed a threat of serious harm to any of the officers involved in service of the warrant.

*1) The use of force against Nicholas was not excessive.*

As laid out above, Gallegos only shot Nicholas after the shooting of Medina and Lovings and because Nicholas was standing over an incapacitated Medina tugging at his shotgun.[217] With two officers already shot by one of the suspects, Gallegos believed that Nicholas was a threat to Medina and other officers as she attempted to gain control of Medina's gun.[218] Using deadly force to prevent a suspect from obtaining a firearm is objectively reasonable as a matter of law. *See Cloud*, 993 F.3d at 387 (use of deadly force not excessive where loaded revolver lay on ground behind and to left of suspect, and suspect made a sudden move in the gun's direction); *Manis v. Lawson*, 585 F.3d 839, 845 (5th Cir. 2009) (use of deadly force was not excessive where suspect, in defiance of officers' orders, reached for and appeared to retrieve what the officer "reasonably believed to be a weapon"). Accordingly, Plaintiffs' claims based on the use of force against Nicholas fail as a matter of law.

Plaintiffs' sole challenge to the reasonableness of Gallegos' conduct arises from an alternative version of events asserted by their shooting expert, Michael Maloney.[219] Maloney's theory is that Nicholas was inadvertently killed when a bullet directed at Tuttle ended up hitting Nicholas.[220] Maloney speculates that Gallegos could not have seen Nicholas over the body of Medina because when Gallegos fired the fatal shot, Nicholas was actually on the far side of the living room and was not visible to Gallegos from his position outside the house.[221] Despite Officer

---

[217] *See supra* Factual Background Section I.
[218] Ex. 10 (Gallegos Dep.) at 188:21–189:5; *see also id*. 102:10–103:2; 179:12–19; 180:3–10.
[219] In addition to the challenges made herein to Michael Maloney's theories, the City relies upon and incorporates by reference its simultaneously filed Motion to Exclude Expert Testimony of Andrew Scott and Michael Maloney.
[220] Ex. 8 (Maloney Dep. I) at 92:11–25; 127:13–23; 135:3–136:5.
[221] *Id*.

Gallegos' testimony to the contrary,[222] Maloney theorizes that Gallegos was actually shooting at Tuttle, who was at the front door holding a gun in his hand.[223] According to Maloney, the shot directed at Tuttle grazed him and then went on to hit and kill Nicholas.[224] As set forth below, if Gallegos did intend to shoot Tuttle, he was justified in doing so because Tuttle had already shot two officers and continued to point his gun at other officers.

Furthermore, if the Court accepts Plaintiffs' version of events (which it should not because Maloney's opinions are unreliable as laid out in the City's simultaneously filed motion to exclude), Plaintiffs' Section 1983 claims based on the use of force against Nicholas still fail because no fourth amendment violation occurred:

> [T]he Fourth Amendment addresses "misuse of power," not the accidental effects of otherwise lawful government conduct. . . . [A] Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement . . . nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement . . . but only when there is a governmental termination of freedom of movement *through means intentionally applied*.

*Brower v. Cnty. Of Inyo*, 489 U.S. 593, 596-97 (1989). "[T]he ultimate question is whether [Gallegos] had the purpose of shooting [Nicholas]. . . . If [Gallegos] merely accidentally shot [Nicholas], then all of the [Section 1983] claims fail[.]" *Melvin v. Karman*, 550 F. App'x 218, 219-21 (5th Cir. 2013) (affirming summary judgment for city on Section 1983 claims based on alleged use of excessive force in violation of the Fourth Amendment because the evidence showed only

---

[222] Ex. 10 (Gallegos Dep.) at 105:7-21.

[223] Ex. 8 (Maloney Dep. I) at 92:11–25; 127:13–23; 135:3–136:5 (Maloney noted he could not testify to what Gallegos was "aiming" at while maintaining that Gallegos could not have seen Nicholas).

[224] *Id*. According to Maloney, this might have been when Gallegos shot at Tuttle's hand. *Id*. Maloney also acknowledged the DNA evidence underpinning his entire theory may have came from the couch instead of the bullet striking Tuttle and Nicholas. **Ex. 42, Maloney Dep. Vol. II** at 41:16 – 43:24.

that the officer shot a bullet, which happened to hit and kill the decedent). Absent evidence that Gallegos intended to shoot Nicholas (which Maloney explicitly denies), Plaintiffs cannot establish a violation of Nicholas' Fourth Amendment rights.[225] *Brower*, 489 U.S. at 596-97; *Melvin*, 550 F. App'x at 220; *see Young v. City of Killeen,* 775 F.2d 1349, 1353 (5th Cir. 1985) ("[I]t does not follow that a negligent taking of life is a constitutional deprivation.").

In sum, if the Court accepts the testimony of Gallegos and Pardo that Nicholas was standing over Medina trying to secure his shotgun and, therefore, Gallegos "reasonably believed" that Nicholas posed a risk of harm to Medina and others,[226] then the use of force by Gallegos was reasonable and not excessive. *Harris*, 745 F.3d at 772. Alternatively, if the Court accepts the version of events offered by Maloney, then Gallegos' shooting of Nicholas was accidental and does not amount to Fourth Amendment violation. *Melvin*, 550 F. App'x at 220. Either way, the Nicholas Plaintiffs have not established that Nicholas suffered a constitutional violation. All of their use-of-force claims based on the alleged use of force against Nicholas fail as a matter of law.

### 2) The use of force against Tuttle was not excessive.

Due to the overwhelming evidence demonstrating the threat of deadly harm that Tuttle repeatedly posed to officers, and the admission by Plaintiffs' expert that "clearly Mr. Tuttle was a

---

[225] Likewise, even if Plaintiffs asserted that Gallegos' allegedly unintentional shooting of Nicholas amounted to a violation of her substantive due process rights under the Fourteenth Amendment (which they do not), their claims would still fail due to lack of evidence that Gallegos "inten[ded] to harm [Nicholas] physically or to worsen [her] legal plight." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 853-54 (1998) ("[W]hen unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates [liability under the due process clause of the Fourteenth Amendment.]"); *see Three Legged Monkey, L.P. v. City of El Paso Tex.*, 652 F. App'x 236, 238 (5th Cir. 2016) (explaining that executive action violates substantive due process under the Fourteenth Amendment only if it "shocks the conscience," which is an "extremely high standard requiring stunning evidence of arbitrariness and caprice that extends beyond mere violations of state law, even violations resulting from bad faith to something more egregious and more extreme").

[226] Ex. 10 (Gallegos Dep.) at 102:10–19, 105:7-21; Ex. 25 (Pardo Dep.) at 44:3–19.

threat when he was shooting at the officers,"[227] Plaintiffs now challenge only Gallegos' final shot of Tuttle.[228] Plaintiffs appear to rest this entire assertion on the argument that because of the gunshot wounds to Tuttle's hands, Tuttle was allegedly incapable of raising his gun and, therefore, the final shot from Gallegos was excessive.[229] For the reasons set forth below, the excessive force claims related to Tuttle fail as a matter of law.

**First**, Plaintiffs' theory related to the "final shot" does not contradict the Individual Officers' corroborated accounts that Tuttle (1) held a gun in his hand, which he repeatedly pointed at the officers, (2) initiated gunfire at the officers, (3) shot and wounded four officers in less than a minute, (4) never voluntarily relinquished his gun or communicated to the officers an intent to surrender, and (5) continued to threaten officers with his weapon even in his final moments.[230] These facts alone establish that Gallegos' last shot at Tuttle was not excessive. *Garza v. Briones*, 943 F.3d 740, 745 (5th Cir. 2019) (use of deadly force was justified where suspect refused to comply with police orders, waved around what officers presumed to be a handgun, pointed the gun in the officer's direction, and seemingly aimed it, even though suspect's gun turned out to be "only a BB gun").

**Second**, even if a purported expert speculates that at some point during the Harding Street incident Tuttle ceased posing a threat of harm, "hindsight and speculation create no genuine, material fact issue as to how a reasonable officer could have interpreted [Tuttle's] actions" at the time of the incident. *Ontiveros*, 564 F.3d at 384. Plaintiffs attempt to show that Tuttle stopped posing a threat of harm to the officers at some point during the incident because after Tuttle shot

---

[227] Ex. 19 (Scott Dep.) at 157:4-5.
[228] *Id*. at 23:3-9, 23:25-24:10; *see also* Dkt. 301.
[229] Ex. 19 (Scott Dep.) at 150:5–152:22; 154:19–155:10.
[230] *See supra* Factual Background Section I; *see also* Ex. 42 (Maloney Dep. II) at 20:9–23:5.

Medina and Lovings, his right wrist and left hand and forearm were wounded, purportedly rendering Tuttle incapable of holding a weapon.[231]  Even assuming *arguendo* that Plaintiffs have an expert who is qualified to testify as to whether Tuttle was physically capable of "hold[ing] a weapon" after sustaining his injuries, an officer "need not stop shooting until the threat has ended," and Plaintiffs have never maintained that Tuttle "clearly [gave] himself up" to the officers. *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014) (holding that officers' use of deadly force did not violate the Fourth Amendment where suspect posed a "severe threat to public safety," and he never "clearly [gave] himself up"). Nor is there evidence that prior to the final shot of Tuttle "it was clear to [Gallegos] that [Tuttle] was no longer a threat." *Cantu v. Austin Police Dep't*, No. 1:21-CV-00084-DAE-SH, 2023 WL 8634821, at *8 (W.D. Tex. Dec. 12, 2023), *report & rec. adopted*, No. 1:21-CV-84-DAE, 2024 WL 492395 (W.D. Tex. Feb. 8, 2024). Not even Maloney opines that Gallegos knew Tuttle was purportedly incapacitated prior to the last shot.[232]

Put plainly, "[p]laintiffs have failed to present sufficient evidence that [Gallegos] had a way of knowing that [Tuttle] was incapacitated or the degree to which he was incapacitated[.]" *Cantu v. Austin Police Dep't*, No. 1:21-CV-84-DAE, 2024 WL 492395, at *5 (W.D. Tex. Feb. 8, 2024). In fact, the officers' corroborated testimony shows that immediately prior to each shooting of Tuttle, Tuttle had (1) shot multiple officers, and (2) threatened other officers with his gun.[233] There is no issue as to the reasonableness of Gallegos' belief that Tuttle continued to pose a substantial threat of harm until the last shot.

**Third**, even if—as Plaintiffs speculate—Tuttle was laying on the ground facing the living room couch at the time of the last shot, instead of sitting on the floor facing the front of the house

---

[231] Ex. 19 (Scott Dep.) at 150:5–152:22; 154:19–155:10.
[232] Ex. 8 (Maloney Dep. I) at 190:22-191:4.
[233] *See supra* Factual Background Section I.

and holding his gun,[234] Gallegos was still justified in believing that use of deadly force was necessary to protect both himself and other officers from Tuttle's threat of imminent harm. Even under Plaintiffs' own version of events, (1) Tuttle faced Lovings, who lay injured and in a vulnerable position in the entryway of the house just a few feet away from Tuttle, (2) Tuttle raised his upper body and propped himself up by his elbows, (3) Tuttle's weapon lay in close proximity to him, and (4) none of the Individual Officers knew that Tuttle was supposedly unable to hold a weapon.[235] Furthermore, Plaintiffs do not dispute that by this time four officers had already been shot and wounded, and Tuttle had neither voluntarily relinquished his weapon nor communicated any intent to surrender. Thus, even under Plaintiffs' version of events, Gallegos' last shot at Tuttle was neither unreasonable nor excessive. *Harris*, 745 F.3d at 772 ("[U]se of deadly force is not unreasonable when an officer would have reason to believe that the suspect poses a threat of serious harm to the officer or others."). Because Gallegos did not violate Tuttle's constitutional right to be free from unreasonable seizure, summary judgment should be granted for the City on Plaintiffs' Section 1983 claims based on use of force against Tuttle.

B.  <u>The City is entitled to summary judgment on each of Plaintiffs' liability theories because there is no evidence of "deliberate indifference."</u>

Even if this Court determines that it cannot decide at the summary judgment stage of this case whether excessive force occurred, Plaintiffs' claims independently fail because Plaintiffs cannot establish the elements required to hold the City liable under *Monell*. As shown in the following sections, Plaintiffs' various theories of municipal liability each fail for a variety of reasons. However, Plaintiffs' lack of evidence establishing that the City acted with "deliberate

---

[234] Ex. 10 (Gallegos) at 137:5-14.
[235]  Ex. 8 (Maloney Dep. I) at 179:16–191:5.

indifference" requires a global summary judgment on *all of* Plaintiffs' theories of municipal liability.[236]

Specifically, for each of Plaintiffs' theories—(1) that the City had an official policy authorizing excessive use of force; (2) that the City had a policy of failing to train, supervise, and/or discipline HPD officers regarding the use of force; (3) that the City failed to promulgate adequate policies related to the use of force—Plaintiffs must prove *inter alia* that the City promulgated, or failed to promulgate, the policy at issue "with ***deliberate indifference*** to the known or obvious consequences that constitutional violations would result." *Mason*, 806 F.3d at 280 (emph. added). "Deliberate indifference is a stringent standard of fault," requiring Plaintiffs to prove that the City was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]," and drew that inference. *Estate of Davis*, 406 F.3d at 381. "Deliberate indifference requires a showing of more than negligence or even gross negligence. Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference[.]" *Id.*

To establish that the City was deliberately indifferent, Plaintiffs must prove, among other things, that either the City or its policymaker, Chief Acevedo, had actual or constructive knowledge that the City's use-of-force policies would cause HPD officers to violate a person's constitutional rights. *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Because Plaintiffs have no such evidence, summary judgment on all Plaintiffs' theories of municipal liability is appropriate.

---

[236] Where a municipality has an official written policy that is facially unconstitutional, deliberate indifference need not be shown for purposes of an "official policy" theory of liability. *Edwards v. City of Balch Springs*, 70 F.4th 302, 308 (5th Cir. 2023). Because Plaintiffs neither allege nor identify any officially adopted and promulgated written City policy authorizing the excessive use of force, Plaintiffs must demonstrate "deliberate indifference."

1) *Plaintiffs have not demonstrated that the City actually knew of its allegedly inadequate use-of-force policies.*

There is no evidence that either the City or Chief Acevedo had actual knowledge of allegedly inadequate use-of-force policies, training, supervision, or discipline. In the Fifth Circuit, "[a]ctual knowledge may be shown by such means as [1] discussions at council meetings or [2] receipt of written information." *Hicks-Fields v. Harris Cnty.*, 860 F.3d 803, 808 (5th Cir. 2017). Here, there is no evidence that issues concerning inadequate use-of-force policies were considered at a City of Houston council meeting or provided to Chief Acevedo in written form. Thus, Plaintiffs cannot maintain any of their claims on a contention that the City had actual knowledge of inadequate use-of-force policies.

2) *Plaintiffs cannot demonstrate constructive knowledge through a pattern of similar prior incidents.*

Constructive knowledge, alternatively, may be attributed to a municipality "where the violations were so persistent and widespread that they were the subject of prolonged public discussion or of a high degree of publicity." *Id*. at 808-09. Plaintiffs have not demonstrated a "persistent and widespread" pattern of unconstitutional use of force sufficient to impute constructive knowledge to either the City or Chief Acevedo.

A pattern of unconstitutional conduct cannot simply consist of "any and all bad or unwise acts." *Peterson v. City of Fort Worth*, 588 F.3d 838, 851 (5th Cir. 2009); *Bond v. Nueces Cnty.*, No. 2:19-CV-43, 2019 WL 13221680, at *5 n.5 (S.D. Tex. Sept. 5, 2019) (producing a "bare list of prior incidents" will not suffice). Rather, prior incidents "must point to the specific violation in question." *Peterson*, 588 F.3d at 851. Here, the alleged violation is the excessive use of deadly force during the service of a search warrant.

To establish a pattern of unconstitutional conduct, Plaintiffs must produce evidence of a pattern of prior unconstitutional conduct that is both similar to the constitutional violation at issue and "aris[es] from a policy so clearly inadequate as to be obviously likely to result in a constitutional violation." *Covington*, 812 F. App'x. at 225. In short, "[a] pattern requires similarity and specificity." *Sanchez v. Gomez*, 283 F. Supp. 3d 524, 536 (W.D. Tex. 2017). Plaintiff's burden of demonstrating such a pattern "is a very heavy one." *Nebout v. City of Hitchcock*, 71 F. Supp. 2d 702, 707 (S.D. Tex. 1999). Plaintiffs fail to do so here.

Plaintiffs identify ten prior incidents that occurred over a nine-year period that they allege demonstrate a pattern of HPD officers' unconstitutional use of force.[237] For numerous reasons, those incidents fail to establish a pattern of unconstitutional conduct.

**First**, even *assuming* each incident identified by Plaintiffs was similar to the Harding Street incident (which they are not), ten incidents over a nine-year period in a police department the size of HPD is insufficient to establish *"deliberate indifference"* as a matter of law. *Peterson*, 588 F.3d at 852 (no pattern: twenty-seven prior incidents in Fort Worth over four years); *Pineda*, 291 F.3d at 329 (no pattern: eleven prior incidents in Houston during unspecified time period); *Alfaro v. City of Houston*, No. CIV.A. H-11-1541, 2013 WL 3457060, at *14 (S.D. Tex. July 9, 2013) (no pattern: twenty prior incidents in Houston during four-year period).

**Second**, the incidents on which Plaintiffs rely are not sufficiently similar to the Harding Street incident to amount to a pattern of unconstitutional use of deadly force during the service of a warrant. As outlined above, there were ***zero*** officer involved shootings of a person during the service of search warrants from January 1, 2016, until the warrant service at 7815 Harding Street

---

[237] Dkt. 48 ¶¶ 133-43; Dkt. 49 ¶¶ 34-58; *see also* **Ex. 43, R. Tuttle Resp. to Rogs** at ans. to rog. #20; **Ex. 44**, **C. Tuttle Resp. to Rogs** at ans. to rog. #20; **Ex. 45, P. Nicholas Resp. to Rogs** at ans. to rog. #21; **Ex. 46, J. Nicholas Resp. to Rogs** at ans. to rog. #21.

on January 28, 2019.[238] Plaintiffs instead rely on the following incidents, each of which are not sufficiently similar to the Harding Street under applicable law:

- **6807 Goforth Street**[239] – In the only incident that occurred during Chief Acevedo's tenure, Plaintiffs point to officers' use of lethal force against a dog. A lethal "shooting-at-an-animal example is not factually similar enough to what ultimately transpired in this case—the death of a person—to establish a pattern." *Edwards v. Oliver*, No. 3:17-CV-01208-M-BT, 2019 WL 4603794, at *6 (N.D. Tex. Aug. 12, 2019), *report & rec. adopted*, No. 3:17-CV-01208-M-BT, 2019 WL 4597573 (N.D. Tex. Sept. 23, 2019).

- **7221 Weburn**[240] – Plaintiffs complain about "HPD [shooting] a dog" and the homeowner being injured "via ricochet." The lethal shooting of a dog cannot demonstrate a pattern in this case. *Id*. Additionally, an officer's unintentional shooting of a person does not amount to a constitutional violation. *See Melvin*, 550 F. App'x at 219-21.

- **44 Farrell Street**[241]**; 302 Alabonson** – Plaintiffs cite one incident where a person was wounded when officers "kick[ed] [him] . . . breaking his glasses, and injuring his right eye,"[242] and another incident where no one—other than an HPD officer—was injured at all.[243] These "injuries" do not "point to the specific violation in question." *Peterson*, 588 F.3d at 851.

- **4211 Sherwood; 8301 Allwood; 6725 Sherwood** – Plaintiffs list three incidents in which people were wounded—not killed—in response to threatening conduct (i.e., person "attempted to take one of the officers' weapons"[244]; person "pointed a shotgun at Squad 15"[245]; noncompliant suspect ran toward kitchen while looking at officer and grasping waistband area of his pants[246]).[247] Not only do those injuries not "point to the specific violation in question" (*id*.), but the officers' use of force in each of those instances was also justified.[248] *See Davidson v. City of Stafford*, 848 F.3d 384, 396 (5th Cir. 2017) (rejecting prior incidents involving facts where officers "likely had probable cause" to seize people); *Flores v. Harris*, No. CV H-17-3817, 2019 WL 1426313, at *27 (S.D. Tex. Mar. 29, 2019)

---

[238] *See supra* Factual Background Section II.F.

[239] Dkt. 48 ¶¶ 142-43; Dkt. 49 ¶ 44.

[240] Dkt. 48 ¶ 137; Dkt. 49 ¶ 38.

[241] Dkt. 48 ¶ 135; Dkt. 49 ¶ 36.

[242] Dkt. 48 ¶ 141; Dkt. 49 ¶ 42.

[243] Ex. 37 (44 Farrell IAD Investigative Summary) at COH00066453-57.

[244] Dkt. 48 ¶ 134; Dkt. 49 ¶ 35.

[245] Dkt. 48 ¶ 138; Dkt. 49 ¶ 39.

[246] **Ex. 47, 6725 Sherwood Incident Report** at pg. 10.

[247] Likewise, the suspect at 44 Farrell Street, where no one other than an HPD officer was injured (*see* Ex. 37 (44 Farrell IAD Investigative Summary) at COH00066453-57), "opened fire" on police officers, injuring an officer. Dkt. 48 ¶ 135; Dkt. 49 ¶ 36.

[248] *See generally* Ex. 48, (Compilation IAD Report Investigative Summaries or Incident Report Alleged Use of Force Against Persons).

(granting summary judgment for the City because the plaintiff did not present evidence that the persons identified in the prior incidents "were not making any threatening gestures that could justify deadly force").

Even if the Court assumes that the remaining three incidents cited by Plaintiffs were unjustified, they do not demonstrate a pattern when considered in their proper context. In *Peterson*, the Fifth Circuit held that plaintiffs have the burden of "provid[ing] context that would show a pattern," such as the size of the police department and how many related incidents (i.e., service of warrants) occurred during the relevant time frame. *Peterson*, 588 F.3d at 851 & n.4; *Lewis*, 2023 WL 2249991, at *7 ("[T]here must be a significant number of previous incidents placed in the context of the size of the police department, the number of criminal incidents investigated, and [such] specificity that the other incidents are fairly similar to what transpired[.]"). Plaintiffs have not met this burden.

The City of Houston is the fourth-largest city in the United States, and its police force is one of the Nation's largest. Relying on three prior incidents of officer-involved shootings during a nine-year timeframe that were unrelated to the service of search warrants simply does not amount to a pattern of unconstitutional conduct. *Davidson*, 848 F.3d at 396–97 (no pattern: two prior incidents in Stafford over three-and-a-half years); *Carnaby v. City of Houston*, 636 F.3d 183, 190 (5th Cir. 2011) (no pattern: two prior incidents of "excessive" use of force in Houston over four years); *Castro v. McCord*, 259 F. App'x. 664, 669 (5th Cir. 2007) (no pattern: two prior incidents of "excessive" use of force in Harris County over five years).

**Third**, only one of the prior incidents that Plaintiffs identify occurred during Chief Acevedo's tenure, and no person was injured in that incident.[249] In Section 1983 cases alleging *Monell* liability against a municipality, the relevant time frame is the time during which the

---

[249] Dkt. 48 ¶¶ 142-43; Dkt. 49 ¶ 44.

municipality's policymaker held policymaking authority. *Lewis*, 2023 WL 2249991, at *8. It is undisputed that Chief Acevedo was the policymaker at the time of the Harding Street incident.[250] Thus, only the time period prior to the Harding Street incident during which Chief Acevedo served as Chief of Police—November 30, 2016, through January 27, 2019—is relevant to the decision of whether Plaintiffs have alleged a sufficient number of prior incidents to establish a "pattern." *Id*.

The one alleged prior incident that occurred during Chief Acevedo's tenure was an officer-involved shooting of a dog.[251] This event does not qualify as an incident sufficiently similar to the Harding Street incident to support a pattern. *Edwards*, 2019 WL 4603794, at *6.

**Fourth**, Plaintiffs do not have evidence to support their assertion that the identified incidents were "unjustified" uses of force. In fact, the available evidence establishes the opposite, that each incident involved an appropriate use of force.[252] Accordingly, these incidents cannot support an alleged pattern of unjustified use of force. *Carnaby v. City of Houston*, No. 4:08-CV-1366, 2009 WL 7806964, at *14 (S.D. Tex. Oct. 28, 2009) (no pattern: in all but one of the prior incidents "HPD found that the officer's use of force was intentional and justified").

At best, Plaintiffs have equivocal evidence that one of ten incidents involved an unjustified use of force because it resulted in a later-settled lawsuit over an officer's purported use of excessive force.[253] But courts within the Fifth Circuit generally refuse to find a pattern of unconstitutional conduct when the prior incidents on which a plaintiff relies "offer[] equivocal evidence of compliance with the Fourth Amendment." *Pineda*, 291 F.3d at 329. The reason for this approach is that reliance on a prior offense report—without contemporaneous litigation alleging a

---

[250] Dkt. 48 ¶ 169; Dkt. 49 ¶ 12.
[251] Dkt. 48 ¶ 143; Dkt. 49 ¶ 44.
[252] *See generally* Ex. 48, (Compilation IAD Report Investigative Summaries or Incident Report Alleged Use of Force Against Persons).
[253] Dkt. 48 ¶ 139; Dkt. 49 ¶ 40.

constitutional violation arising out of the same—leads to the "practical effect" of "requir[ing] the City to defend 'cases within cases' from historical records to justify [police conduct]." *Id.*; *see Davidson*, 848 F.3d at 396 n.6 ("That we would have to consider whether each prior incident constitutes an unconstitutional [act] further cuts against a finding of a pattern."). Thus, when a plaintiff's allegations of prior officer misconduct are unsubstantiated, courts refuse to find a pattern for purposes of municipal liability. *See, e.g.*, *Davidson*, 848 F.3d at 396 (no pattern: alleged prior police misconduct did not result in litigation over constitutional violations).

Plaintiffs cannot demonstrate a pattern of similar prior incidents sufficient to establish deliberate indifference by the City. Summary judgment should therefore be granted on all of Plaintiffs' Section 1983 claims based on the alleged use of excessive force.

C. The City is entitled to summary judgment on Plaintiffs' "official policy" theory.

In addition to the dispositive lack of evidence demonstrating deliberate indifference, Plaintiffs lack evidence that the City had an "official policy" authorizing or condoning excessive use of force against people, and that such a policy was known by the City or Chief Acevedo and was the "moving force" behind Nicholas and Plaintiffs' injuries. Therefore, for this independent reason, summary judgment should also be granted on Plaintiffs' claims that are based on an alleged unconstitutional "official policy."

>    1)  *The City did not have an "official policy" authorizing the unconstitutional use of force against people.*

The Fifth Circuit has identified two forms that "official" municipal policy may take. *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 168-69 (5th Cir. 2010). First, official policy may be evidenced by a custom—that is, a "persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and

well settled as to constitute a custom that fairly represents municipal policy."[254] *Id*. at 169. In other words, Plaintiffs must show "a ***pattern*** of unconstitutional conduct." *Id*. (emph. added). As already discussed, Plaintiffs have failed to demonstrate a pattern of unconstitutional conduct similar to the facts at hand,[255] which defeats their theory that the City had a custom of authorizing the unconstitutional use of force against people.

Second, official policy may be contained in "a policy statement, ordinance, regulation, or decision" that the City "formally announced." *Id*. at 166, 168. But as admitted by Plaintiffs' policy expert, none of HPD's written policies authorize or condone the use of excessive force.[256] Further, Plaintiffs' expert has no criticism of HPD's written policies.[257] Accordingly, Plaintiffs cannot prevail on their "official policy" theory of liability.

> ### 2) No official City policy was the "moving force" behind Plaintiffs' alleged constitutional violations.

Summary judgment should also be granted on Plaintiffs' "official policy" theory because Plaintiffs have not demonstrated that any official City policy directly caused Tuttle or Nicholas' injuries. Plaintiffs' burden under the *Monell* framework includes proving that a specific City policy was the "moving force" behind the alleged constitutional violations. *Pineda*, 291 F.3d at 328. "Moving force" requires proof of both (1) culpability (aka, deliberate indifference, which has already been discussed[258]), and (2) causation—that is, a "direct causal connection between the policy and the alleged constitutional deprivation." *Mason*, 806 F.3d at 280.

---

[254] Alternatively, a "custom" may be shown by evidence that "a *final policymaker* took a single unconstitutional action." *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 169 (5th Cir. 2010). Plaintiffs do not allege that a single decision by a City policymaker establishes a "custom" in this case. *See generally* Dkts. 48, 49.

[255] *See supra* Argument & Authorities Section I.B(2).

[256] Ex. 19 (Scott) at 118:11-20.

[257] *Id*. at 17:13–18:7.

[258] *See supra* Argument & Authorities Section I.B.

The "moving force" inquiry imposes a threshold of proof higher than "but-for" causation. *Id.* "The causation prong requires proximate causation." *York v. Welch*, No. 20-40580, 2024 WL 775179, at *3 (5th Cir. Feb. 26, 2024). Plaintiffs' failure to demonstrate the existence of any "official policy" authorizing or condoning the unconstitutional use of force by HPD officers defeats the moving force element: "a nonexistent policy cannot cause an injury." *Chavez v. Alvarado*, 550 F. Supp. 3d 439, 457 (S.D. Tex. 2021).

Moreover, as the evidence clearly demonstrates,[259] it was the threatening conduct of Nicholas and Tuttle that directly caused their injuries, not the existence of any City policy. *Tenn. v. Garner*, 471 U.S. 1, 11 (1985) (holding that deadly force may be used if a suspect threatens an officer with a weapon); *Garza*, 2018 WL 8868510, at *5 (officers were justified in "opening fire" where suspect was armed, noncompliant, and "had just aimed his weapon at an officer"). In short, even if HPD had put additional or different use-of-force policies in place as of January 28, 2019, they still would not have prevented Tuttle and Nicholas' injuries because of the independent actions that Tuttle and Nicholas took that day.

Accordingly, Plaintiffs' "official policy" theory fails because they have not established that any official City policy was the "moving force" behind Tuttle and Nicholas' injuries.

### 3) Chief Acevedo did not ratify unconstitutional use of force.

Plaintiffs alternatively claim that the City is liable because Chief Acevedo purportedly "ratified" Gallegos' alleged use of excessive force.[260] To succeed on a Section 1983 claim via a ratification theory, a plaintiff must show that the policymaker had actual or constructive

---

[259] *See Supra* Factual Background Section I, and Argument & Authorities Section I.A.
[260] *See, e.g.*, Dkt. 48 ¶ 169; Dkt. 49 ¶¶ 135, 170.

knowledge that the subordinate's actions violated a person's constitutional rights and approved the action anyway. *Allen v. Hays*, 65 F.4th 736, 750 (5th Cir. 2023).

"Good faith statements made in defending complaints against municipal employees do not demonstrate ratification." *Zarnow*, 614 F.3d at 169. Fifth Circuit precedent "does *not* stand for the broad proposition that if a policymaker defends his subordinates and if those subordinates are later found to have broken the law, then the illegal behavior can be assumed to have resulted from an official policy." *Coon v. Ledbetter,* 780 F.2d 1158, 1161 (5th Cir. 1986).

Accordingly, the theory of ratification is limited to "extreme factual situations" where a subordinate's actions are "manifestly indefensible." *Davidson,* 848 F.3d at 395; *Coon*, 780 F.2d at 1162. When an officer's version of events "[does] not show that the [officer's] actions were manifestly indefensible," a municipality is not liable under the ratification theory simply because a policymaker accepted the officer's version of events. *Coon*, 780 F.2d at 1162.

Plaintiffs have adduced no evidence that Gallegos' actions were "manifestly indefensible" based on the Individual Officers' version of events. The Individual Officers gave accounts of the incident that justify Gallegos' actions.[261] That Chief Acevedo "believed [the Individual Officers'] version of events" does not amount to the City ratifying unconstitutional conduct. *James v. Harris Cnty.*, 508 F. Supp. 2d 535, 554 (S.D. Tex. 2007). "To hold the city liable because the policymaker concluded that the officers acted appropriately would convert liability through ratification into *respondeat-superior* liability." *Griffin v. City of Sugar Land*, No. CV H-18-3121, 2019 WL 175098, at *12 (S.D. Tex. Jan. 11, 2019), *aff'd sub nom. Griffin v. City of Sugarland*, 787 Fed. Appx. 244 (5th Cir. 2019). Accordingly, Chief Acevedo's defense of Gallegos' conduct following the incident does not amount to "ratification" that can impute Section 1983 liability onto the City.

---

[261] *See supra* Factual Background Section I.

51

D. <u>The City is entitled to summary judgment on Plaintiffs' liability theories of failure to train, supervise, and discipline.</u>

The liability theories of failure to train, failure to supervise, and failure to discipline are distinct from the "official policy" theory of municipal liability. *Zarnow*, 614 F.3d at 170. But the same "moving force" standard applies to each of these theories. *See e.g.*, *Roberts v. City of Shreveport*, 397 F.3d 287, 292 (5th Cir. 2005). Thus, for Plaintiffs to prevail on their theories of failure to train, supervise, and discipline, they must demonstrate that: (1) the City's policies on use-of-force training, supervision, and discipline were inadequate, (2) the City was deliberately indifferent in adopting those policies (aka, culpability), and (3) the inadequate policies directly caused Tuttle and Nicholas' injuries. *Henderson*, 51 F.4th at 130 (failure to train and supervise); *Mason*, 806 F.3d at 280-81 (failure to discipline).

1) *Plaintiffs have not established deliberate indifference or causation.*

As discussed above,[262] Plaintiffs have no evidence of "actual or constructive knowledge" sufficient to demonstrate "deliberate indifference" by the City for their Section 1983 claims.[263] Accordingly, these theories each fail as a matter of law based on this issue alone.

Plaintiffs' theories of failure to train, supervise, and discipline also fail because there is no evidence that the injuries at issue were directly caused by the City's purportedly inadequate use-of-force policies. For example, there is no evidence showing that (1) despite extensive policies

---

[262] *See supra* Argument & Authorities Section I.B.
[263] In rare cases, when "the plaintiff's injury is a patently obvious or highly predictable result of inadequate training[, supervision, or discipline]," a plaintiff may be able to establish deliberate indifference without demonstrating a pattern of prior, similar constitutional violations. *Speck v. Wiginton*, 606 F. App'x 733, 736 (5th Cir. 2015). Plaintiffs have never asserted that this "single-incident" exception applies, nor do the facts of this case warrant application of this rarely used exception. *Connick v. Thompson*, 563 U.S. 51, 63 (2011) (giving hypothetical for when single-incident exception may apply); *Littell v. Houston ISD*, 894 F.3d 616, 625 nn.5 & 6 (5th Cir. 2018) (noting that the Fifth Circuit has "only one published 'single incident' failure-to-train case" in which the plaintiff prevailed).

prohibiting officers' excessive or unreasonable use of force HPD officers believed the City allowed use of deadly force "with impunity and approval,"[264] or (2) "that this knowledge was the affirmative cause for . . . use [of] deadly excessive force." *James*, 508 F. Supp. 2d at 549. Further, as discussed, Tuttle and Nicholas' own threatening conduct caused their injuries, and no additional or different officer training, supervision, or discipline policies would have changed that. Accordingly, Plaintiffs have not carried their burden of proving causation for their theories of failure to train, supervise, or discipline. *See, e.g.*, *Martinez v. Rojo*, No. 1:17-CV-00102-BU, 2020 WL 2542612, at *20-21 (N.D. Tex. May 19, 2020) (granting city's motion for summary judgment on failure-to-supervise theory because there was no evidence that police officers were ignorant of the city's official policies governing officer conduct or that police officers believed that their chain of command did not expect them to comply with those policies).

### 2) Plaintiffs have not established that the City's training, supervision, or discipline policies were inadequate.

Plaintiffs also cannot prevail on their theories of failure to train, supervise, or discipline because Plaintiffs cannot show that the City had inadequate policies regarding use-of-force training, supervision, or discipline.

### a) The City's use-of-force training was substantive and broad.

Plaintiffs' complaints give lip service to purported failure-to-train claims.[265] Tellingly, Plaintiffs' policy expert, Dr. Andrew Scott, does not criticize HPD's use-of-force training.[266] No doubt this is because it is undisputed that HPD's use-of-force training met, and indeed exceeded, training requirements under Texas law and TCOLE standards, and Plaintiffs do not allege that

---

[264] Dkt. 48 ¶ 131; *see also* Dkt. 49 ¶ 166.
[265] Dkt. 48 ¶¶ 45, 175–203; Dkt. 49 ¶¶ 171–179.
[266] Ex. 19 (Scott Dep.) at 18:8–12.

those state requirements are inadequate.[267] This alone is sufficient to defeat Plaintiffs' failure-to-train and failure-to-supervise claims. *O'Neal v. City of San Antonio*, 344 F. App'x. 885, 888 (5th Cir. 2009) (explaining that "if the training of police officers meets state standards" there can be no cause of action for failure to train "absent a showing that this legal minimum of training was inadequate to enable the officers to deal with the usual and recurring situations faced by . . . peace officers"); *see also Martinez v. City of Buda*, No. A-16-CA-1116-SS, 2018 WL 837609, at *7 (W.D. Tex. Feb. 13, 2018) (granting summary judgment for city on claims of failure to train and supervise because officers' training complied with TCOLE, and plaintiffs offered no evidence that the state-certified training was inadequate).

Here, Plaintiffs have no evidence that Texas' statewide training requirements were inadequate. Even if Plaintiffs did make such allegations, the evidence establishes that HPD required officers to complete training that exceeded TCOLE requirements.[268] This training specifically included extensive and frequent training on the relevant General Orders, Narcotic Division Standard Operating Procedures, use of force, use of force during the service of search warrants, use of force during the service of no-knock search warrants, de-escalation techniques, use of force options, and the use of force against unarmed citizens.[269] Therefore, Plaintiffs have failed to show that the City's use-of-force training and supervision policies were inadequate as a matter of law, and summary judgment is appropriate. *Bender v. Fenimore*, No. 4:12CV245-KPJ, 2016 WL 11480734, at *6 (E.D. Tex. Dec. 13, 2016) (granting summary judgment for county on failure-to-train claim because sheriff department complied with TCOLE training standards, despite Plaintiff's allegations that department lacked specific written policies setting forth standards for a

---

[267] *See supra* Factual Background Section II.B.
[268] *See supra* Factual Background Section II.B.
[269] *Id.*

deputy's performance, had no formal performance evaluation system, and maintained no records of complaints of violations by officers).

### b) The City's investigation into officer-involved shootings was thorough and robust.

Plaintiffs appear to base their failure-to-supervise theory exclusively on the conclusory assertion of their expert that there was a custom and practice by HPD to not thoroughly investigate officer-involved shootings.[270] The evidence establishes just the opposite.

For every officer-involved shooting, HPD employs a multi-layered system of investigation.[271] Indeed, consistent with HPD standards, HPD facilitated a thorough, expansive, and lengthy investigation into the Harding Street incident and the other officer-involved shootings identified by Plaintiffs.[272] *See Webb v. City of San Antonio*, No. CIVA SA-07-CA-651-OG, 2008 WL 4871778, at *3 (W.D. Tex. Sept. 12, 2008) (incident was "duly investigated" for purposes of a "failure to investigate" claim where *inter alia* city employee "compiled all the information, investigation reports, complaint intake log, original reports and statements from all Officers and witnesses present").

Nevertheless, despite HPD's robust investigation into the Harding Street incident and all of the other incidents identified by Plaintiffs—which Plaintiffs do not challenge—Plaintiffs attempt to cut a wide swath by relying on Dr. Scott's criticism of HPD investigations of ***every shooting that happened in the City of Houston since 2009***[273] because many of those shootings

---

[270] Ex. 19 (Scott Dep.) at 171:24–175:5.
[271] *See supra* Factual Background Sections I.C & I.D.
[272] *See id*. at Section I.D.
[273] In addition to the challenges made herein to Dr. Andrew Scott's theories, the City relies upon and incorporates by reference its simultaneously filed Motion to Exclude Expert Testimony of Andrew Scott and Michael Maloney.

were found to be justified.[274] But Plaintiffs fail to identify a single omission in any of those investigations that caused a purportedly improper under-investigation. No doubt this is because Dr. Scott did not actually review any of the investigations for those shootings, but instead merely based his opinion on data that was compiled in newspaper articles.[275]

Plaintiffs also fail to point to evidence undermining the findings in each of those prior instances that use of force was justified. As was previously found by another federal court with regard to Dr. Scott's similar reliance on multiple prior incident reports, none of which concluded that use of force was unjustified or excessive, Dr. Scott's overreaching opinion without evidence that a single prior incident of deadly force was, in fact, unreasonable "does not create a genuine issue of material fact regarding whether the City of [Houston] was on notice of a history of prior uses of excessive force." *Btesh v. City of Maitland*, No. 6:10-CV-71-ORL-19DAB, 2011 WL 3269647, at *14, 30 (M.D. Fla. July 29, 2011), *aff'd sub nom. Btesh v. City of Maitland*, 471 F. App'x 883 (11th Cir. 2012). Although Plaintiffs may disagree with the findings in those prior incident reports, "[t]he fact that Plaintiff[s] disagree[] with the outcome is irrelevant." *Webb*, 2008 WL 4871778, at *3 (granting summary judgment for city). Plaintiffs have failed to show that the City's policy of supervising officers' use of force was inadequate.

Furthermore, like the failure-to-supervise theory asserted in *James v. Harris County*, Plaintiffs' theory "fails for lack of proof that the [City's policy] was the 'moving force' of a constitutional injury." *James*, 508 F. Supp. 2d at 546.

> Plaintiffs did not produce evidence that an omission in any investigation was material to the outcome of that investigation. That is, Plaintiffs presented no evidence that any of the investigation outcomes likely would have changed had the additional steps recommended by Plaintiffs' experts been completed. . . . There also

---

[274] Ex. 19 (Scott Dep.) at 171:24–175:5; *see also id.* at 178:23–179:5 (acknowledging this could indicate officers were following policy when it comes to use of force).
[275] *Id.* at 172:17-173:16.

was no evidence that the putatively poor quality of investigations was known to the deputies generally or those accused of engaging [in] subsequent excessive force incidents in officer-involved shootings. Finally, Plaintiffs did not introduce evidence that deputies' use of excessive force in officer-involved shootings prior to the Harrison shooting went undetected as a consequence of the HCSO's failure to perform more complete investigations.

*Id*. Because Plaintiffs have not proven that HPD "consistently failed to enforce its excessive force policy through under-investigation of officer-involved shootings (or otherwise)" (*id*.), Plaintiffs' Section 1983 claims based on the failure-to-supervise theory fail for this independent reason.

### c) The City's historical findings that use of force was justified does not amount to an inadequate policy of discipline.

For purposes of determining whether a municipality has an inadequate policy of discipline, the Fifth Circuit has directed courts to consider whether the municipality regularly performed "a purely formalistic investigation in which little evidence was taken, the file was bare, and the conclusions of the investigator were perfunctory." *Piotrowski v. City of Houston*, 237 F.3d 567, 581-82 (5th Cir. 2001). As discussed, the City's investigations into officer-involved shootings were robust in both policy and practice, and Plaintiffs have offered no evidence to the contrary.[276] Accordingly, Plaintiffs failure-to-discipline claims fail as a matter of law under the applicable Fifth Circuit standard, and summary judgment is appropriate.

Plaintiffs attempt to sidestep this standard by arguing that because HPD investigations often found officer-involved shootings to be constitutionally justified, the City failed to adequately discipline officers.[277] This argument assumes that HPD "justified" officer shootings that were, in fact, unconstitutional. Plaintiffs have no such evidence. Moreover, Plaintiffs would have this Court disregard thoroughly investigated findings and blindly assume that use of force in those prior

---

[276] *See supra* Factual Background Section II.D.
[277] Ex. 19 (Scott Dep.) at 171:24–175:5.

incidents was excessive. This is wholly inappropriate and cannot serve as grounds for overcoming summary judgment here. *Pineda*, 291 F.3d at 329.

E.  The City is entitled to summary judgment on Plaintiffs' theory that the City failed to promulgate adequate policies.

Plaintiffs' final theory of municipal liability is that the City failed to promulgate policies (1) preventing the use of excessive force during service of no-knock warrants, and (2) mandating the training, supervision, and discipline of HPD officers in the narcotics unit regarding their use of force during service of no-knock warrants.[278]  These claims fail for three reasons.

**First**, these allegations are simply false. As previously addressed, HPD expressly limits use of force to constitutional limits in all scenarios (including the service of no-knock search warrants) through GO 600-17.[279] Similarly, the City has extensive policies addressing use-of-force training,[280] investigation of officer-involved shootings,[281] and discipline of officers in the event excessive force is used.[282] As such, Plaintiffs cannot show HPD's polices were inadequate, were not adhered to prior to the Harding Street incident, or were systemically disregarded by HPD officers prior to the Harding Street incident. *See Evans v. City of Marlin*, 986 F.2d 104, 108 (5th Cir. 1993) (affirming summary judgment for city on failure-to-promulgate theory because city had relevant policies in place, and even if the policies "were not strictly followed" during incident, such negligence would "not support liability under § 1983").

---

[278] Dkt. 48 at ¶ 181; Dkt. 49 at ¶¶ 60, 175.
[279] *See supra* Factual Background Section II.A.
[280] *See id*. at Section II.B.
[281] *See id*. at Sections II.C & II.D.
[282] *See id*. at Section II.E.

**Second**, Plaintiffs cannot establish a direct causal link between the absence of any "policies" and the injuries at issue here.[283]  *See Snyder v. Trepagnier*, 142 F.3d 791, 799 (5th Cir. 1998) (reversing judgment against city because plaintiff's evidence in support of failure-to-promulgate theory fell short of "rigorous" and "stringent" causation requirements).

**Third**, "[t]o present a viable claim under Section 1983 for the alleged failure to promulgate a policy, the failure must be an intentional choice and amount to subjective deliberate indifference." *Carmona v. City of Brownsville*, No. 1:23-CV-084, 2024 WL 472340, at *9 (S.D. Tex. Feb. 6, 2024). As discussed, Plaintiffs have failed to establish "deliberate indifference" in support of any of their liability theories.[284]

Therefore, Plaintiffs' failure-to-promulgate theory does not support their Section 1983 claims. Summary judgment should be granted for the City.

## II. Plaintiffs' Section 1983 Claims Against the City Based on the Shooting of Tuttle's Dog Fail as a Matter of Law.

It is unclear from Plaintiffs' complaints whether they claim that Tuttle or Nicholas suffered a constitutional violation arising from the shooting of Tuttle's dog.  Nevertheless, to the extent that Plaintiffs do assert Section 1983 claims based on the dog shooting, those claims also fail.

A. The City is entitled to summary judgment on Plaintiffs' dog-shooting claims because there is no evidence of constitutional violation.

As set forth above, there can be no liability under Section 1983 when there is no underlying constitutional violation. *Pineda*, 291 F.3d at 328; *Harrington*, 118 F.3d at 365. Because the undisputed evidence in this case establishes that Tuttle's dog aggressively charged the Individual

---

[283] *See supra* Argument & Authorities Sections I.C(2) & I.D(1) (noting that Tuttle and Nicholas' threatening conduct was the direct cause of their injuries, and no additional or different policy would have prevented those injuries).
[284] *See id*. at Section I.B.

Officers before being shot, the officers' use of force was justified, and, therefore, neither Tuttle nor Nicholas suffered a constitutional violation related to the use of force against Tuttle's dog.

Although the shooting of a pet dog "may constitute a seizure under the Fourth Amendment," such is the case **_only_** if the shooting is "objectively unreasonable." *Grant v. City of Houston*, No. 4:11-CV-3278, 2014 WL 4966224, at *8 (S.D. Tex. Sept. 30, 2014), *aff'd*, 625 F. App'x 670 (5th Cir. 2015); *see also Stephenson v. McClelland*, 632 F. App'x 177, 184 (5th Cir. 2015). To determine whether a seizure is objectively unreasonable, courts must examine "the totality of the circumstances" and "analyze th[e] question from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Stephenson*, 632 F. App'x at 184. Importantly, "[i]t is objectively reasonable for an officer to shoot a dog that he reasonably believes poses a threat." *Id.* at 185. Such was the case here.

The Individual Officers were warned prior to serving the warrant that there was a "large" and "aggressive" dog on the property.[285]  When service of the warrant began, Medina turned his head and saw the dog coming at him from the dining room.[286]  As Medina testified, the dog was "large," "very angry and vicious," and was "running towards [him] angrily."[287]  Medina then fired one shot at the dog.[288]  Similarly, Lovings also saw "the dog running towards [him]."[289]  Viewing the dog as a threat,  Lovings shot the dog.[290]

Minutes after the initial shooting incident, while Sepolio was covering the doorway of the residence until SWAT arrived, Sepolio saw the dog "g[e]t up," "ma[k]e an aggressive move"

---

[285] Ex. 12 (Medina) at 37:17–23; Ex. 11 (Lovings I), at 15:17–24; Ex. 13 (Sepolio) at 44:14–45:2.
[286] Ex. 12 (Medina) at 63:7-9, 66:17–22.
[287] *Id*. at 66:1–9, 67:1–21.
[288] *Id*. at 45:21–46:4.
[289] Ex. 11 (Lovings I) at 28:5–21, 30:24–31:4, 49:14–18.
[290] *Id*. at 28:5–24.

toward Sepolio, and begin "growling."[291]  Perceiving the dog to be a threat, Sepolio fired the final

two shots at the dog.[292]

As the undisputed evidence demonstrates, Medina, Lovings, and Sepolio each reasonably

believed that the dog posed an immediate threat of serious harm.[293]  Under the circumstances, the

shooting of the dog was reasonable and does not amount to a constitutional violation. Absent a

constitutional violation, Plaintiffs' Section 1983 dog-shooting claims fail as a matter of law.

B. The City is entitled to summary judgment on plaintiffs' liability theories of "official policy" and failure to train, supervise, and discipline.

Even if the officers' use of force against Tuttle's dog amounted to a constitutional violation,

the City would still be entitled to summary judgment on Plaintiffs' claims because they fail for

additional, independent reasons. First, the City is entitled to summary judgment on Plaintiffs' dog-

shooting claims based on an "official policy" theory of liability. Plaintiffs have not identified a

"formally announced" City policy authorizing the unconstitutional use of force against dogs.

*Zarnow*, 614 F.3d at 168. The HPD policies about which Plaintiffs complain authorized use of

force against an animal only when "any person is attacked by an animal or is in imminent danger

of being attacked by an animal,"[294] which comports with constitutional standards. *Grant v. City of*

*Houston*, 625 F. App'x. 670, 676-77 (5th Cir. 2015) (officer had "right to use deadly force to

protect himself from the threat of serious bodily harm" from plaintiff's dog).

Plaintiffs also have not established a City custom authorizing the use of excessive force

against dogs, whether to "cause[] an unnecessary initiation of force with a homeowner during a

---

[291] Ex. 13 (Sepolio) at 27:8–15, 28:5–10, 93:3–11, 110:11-16, 119:13–16.

[292] *Id*. at 93:3–11, 110:11–16.

[293] Ex. 12 (Medina) at 66:1–9, 67:1–21; Ex. 11 (Lovings I) at 28:5–21; Ex. 13 (Sepolio) at 110:11–16.

[294] Dkt. 49 at ¶ 46; *see also* Ex. 31 (GO 600-43).

search warrant,"[295] or otherwise. Plaintiffs point to nine "prior incidents" of dog shootings over an eleven year period.[296] Even assuming those incidents "point to the specific violation in question" (*Peterson*, 588 F.3d at 851), nine incidents over eleven years do not rise to the level of a "pattern" sufficient to demonstrate a City custom. *See id.* at 850 (twenty-seven incidents over four years insufficient); *Pineda*, 291 F.3d at 329 (eleven incidents insufficient). Moreover, there is no evidence that these incidents were, in fact, unconstitutional uses of force, which cuts against a finding of pattern. *See Davidson*, 848 F.3d at 897 n.6. Thus, there is no evidence supporting Plaintiffs' claims that the City had a custom of authorizing excessive use of force against dogs.

Next, Plaintiffs' have not established the City's liability based on theories of failure to train, supervise, or discipline. Plaintiffs' policy expert does not criticize HPD's training, supervision, or discipline of HPD officers with regard to the use of force against animals.[297] Undoubtedly this is because it is undisputed that HPD's training met training requirements under Texas law and TCOLE standards,[298] and Plaintiffs have no evidence that such training requirements were inadequate. Accordingly, summary judgment is warranted on Plaintiffs' Section 1983 claims based on Plaintiffs' theory that the City failed to adequately train HPD officers on use of force against animals. *Martinez*, 2018 WL 837609, at *7.

As for Plaintiffs' failure-to-supervise and failure-to-discipline theories, Plaintiffs do not identify a single omission in any supervisory dog-shooting investigation that resulted in a purportedly improper under-investigation of the shooting. *James*, 508 F. Supp. 2d at 546. Nor do Plaintiffs identify an instance where "a purely formalistic investigation in which little evidence

---

[295] Dkt. 48 at ¶ 147; *see also* Dkt. 49 at ¶ 103.
[296] Dkt. 49 at ¶¶ 49–58; Dkt. 48 at ¶ 148.
[297] Ex. 19 (Scott) at 189:7-12.
[298] *See supra* Factual Background Section II.B.

was taken, the file was bare, and the conclusions of the investigator were perfunctory." *Piotrowski*, 237 F.3d at 582. Although Plaintiffs may disagree with the ultimate findings in those supervisory investigations—that the use of force against an animal was justified—Plaintiffs' disagreement with the outcomes of those investigations "is irrelevant" for purposes of *Monell* liability. *Webb*, 2008 WL 4871778, at *3. Accordingly, Plaintiffs failure-to-supervise and failure-to-discipline claims fail as a matter of law, and summary judgment is appropriate.

Finally, as with Plaintiffs' claims based on the use of force against Nicholas and Tuttle, Plaintiffs have no evidence that the City acted with "deliberate indifference" to the alleged use of excessive force against dogs during the service of search warrants or that any City policy "directly caused" the shooting of Tuttle's dog. To the contrary, the evidence shows that Tuttle's dog was shot in response to its threatening, aggressive behavior toward the Individual Officers.[299] *See Stephenson*, 632 F. App'x at 185 (officer was justified in shooting large dog that suddenly appeared, unleashed—thereby startling the officer—and that showed its teeth). The City is entitled to summary judgment on each of Plaintiffs' *Monell* liability theories related to the dog shooting.

## III. Plaintiffs' State Law Claims Against the City are Barred by Governmental Immunity and Therefore Fail as a Matter of Law.

In addition to their Section 1983 claims, Plaintiffs seek to assert standalone state law claims for wrongful death and survival based on alleged use of excessive force.[300] The City is immune from those claims based on governmental immunity, and summary judgment should be granted on them as a matter of law. *See* Tex. Civ. Prac. & Rem. Code § 101.057(2); *City of Watauga v. Gordon*, 434 S.W.3d 586, 594 (Tex. 2014) (noting the TTCA does not waive governmental immunity "for claims arising out of intentional torts"); *see also Saenz v. City of El Paso*, 637 F.

---

[299] *See id.* at Section I.
[300] Dkt. 48 ¶¶ 186-192; Dkt. 49 ¶¶ 212-17.

App'x 828, 830-31 (5th Cir. 2016) (noting claims alleging excessive force sound in intentional tort); *Malone*, 297 F. Supp. 3d at 668 (granting city's motion for summary judgment on state law claims arising out of alleged excessive use of force because "[i]ntentional torts are excepted from the waiver of sovereign immunity under the TTCA").

## **CONCLUSION**

For the reasons stated above, the City respectfully requests that the Court grant this Motion for Partial Summary Judgment on Plaintiffs' Section 1983 and state law claims based on use of force, and grant the City all other and further relief to which it is entitled, whether in law or equity.

Dated: August 9, 2024

Respectfully submitted:

**BECK REDDEN LLP**

*/s/ Alistair B. Dawson*
Alistair B. Dawson
State Bar No. 05596100
Federal Bar I.D. 12864
adawson@beckredden.com
Garrett S. Brawley
State Bar No. 24095812
Federal Bar I.D. 3311277
gbrawley@beckredden.com
Lena E. Silva
State Bar No. 24104993
Federal Bar I.D. 3608019
lsilva@beckredden.com
1221 McKinney St., Suite 4500
Houston, Texas 77010-2010
Telephone: (713) 951-3700

**THE ODOM LAW FIRM**

*/s/ Al Odom*
Al Odom
State Bar No. 15201100
Federal Bar I.D. 12913
601 Sawyer Street, Suite 225
Houston, Texas 77007
Telephone: (713) 357-5153
E-mail: aodom@aodomlawfirm.com

**ATTORNEYS FOR DEFENDANT CITY OF HOUSTON**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was sent to all counsel of record on this the 9th day of August 2024, pursuant to the Federal Rules of Civil Procedure.

*/s/ Alistair B. Dawson*
Alistair B. Dawson

## CERTIFICATE OF CONFERENCE

I hereby certify that I conferred with Plaintiffs' counsel, and they are opposed to the relief sought in this motion.

*/s/ Alistair B. Dawson*
Alistair B. Dawson
