IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CLIFFORD F. TUTTLE, JR., AS | § | |
| REPRESENTATIVE OF THE ESTATE | § | |
| OF DENNIS W. TUTTLE, DECEASED, | § | |
| ROBERT TUTTLE, AND RYAN TUTTLE, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | |
| CITY OF HOUSTON, GERALD GOINES, | § | Civil Action No.: 4:21-cv-270 |
| in his individual capacity; STEVEN | § | |
| BRYANT, in his individual capacity; | § | |
| FELIPE GALLEGOS, in his individual | § | |
| capacity; ERIC SEPOLIO, in his individual | § | |
| capacity; MANUEL SALAZAR, in his | § | |
| individual capacity; THOMAS WOOD, | § | |
| in his individual capacity; OSCAR PARDO, | § | |
| in his individual capacity; FRANK | § | |
| MEDINA, in his individual capacity; | § | |
| CLEMENTE REYNA, in his individual | § | |
| capacity; CEDELL LOVINGS, in his | § | |
| individual capacity; NADEEM ASHRAF, | § | |
| in his individual capacity, MARSHA TODD, | § | |
| in her individual capacity, and ROBERT | § | |
| GONZALES, in his individual capacity, | § | |
| | § | |
| *Defendants*. | § | |

CONSOLIDATED WITH

| | | |
|---|---|---|
| JOHN    NICHOLAS,    as    temporary | § | |
| administrator  of  the  Estate  of  Rhogena | § | |
| Nicholas    and    JO    ANN    NICHOLAS, | § | |
| individually and as an heir of the Estate of | § | |
| Rhogena Nicholas, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | |
| | § | |
| CITY OF HOUSTON; ART ACEVEDO, in | § | |
| his official capacity as the chief of police of the | § | |

1

Houston Police Department, GERALD §
GOINES, in his individual capacity; §
STEVEN BRYANT, in his individual §
capacity; FELIPE GALLEGOS, in his §
individual capacity; ERIC SEPOLIO, in his §
individual capacity; MANUAL SALAZAR, §
in his individual capacity; THOMAS WOOD, §
in his individual capacity; OSCAR PARDO, §
in his individual capacity; FRANK MEDINA, §
in his individual capacity; CLEMENTE §
REYNA, in his individual §
capacity; CEDELL LOVINGS, in his §
individual capacity; NADEEM ASHRAF, §
in his individual capacity; MARSHA TODD, §
in her individual capacity; and ROBERT §
GONZALEZ in his individual Capacity, §
§
         *Defendants*. §

## DEFENDANT ROBERT GONZALES'
## MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

Defendant Robert Gonzales ("Gonzales") files this Motion for Summary Judgment pursuant to Rule 56. In support of said motion, Gonzales respectfully show the Court as follows:

### NATURE AND STAGE OF PROCEEDINGS

1.      This is a federal civil rights case stemming from January 28, 2019, execution of a narcotics search warrant at 7815 Harding Street. On January 27, 2021, the plaintiffs filed suit. Against Gonzales, Tuttle asserted Fourth Amendment claims for unlawful search/lack of probable cause (hereinafter, the "warrant claim"), bystander liability stemming from the warrant claim, excessive force, bystander liability to use excessive force, and supervisory liability stemming from the warrant claim [Doc. #48]. Against Gonzales, Nicholas asserted Fourth Amendment and Fourteenth Amendment claims for excessive force, unlawful search (hereinafter included in the "warrant claim"), bystander liability/failure to intervene stemming from the excessive force, and warrant claims, and supervisory liability stemming from the excessive force claim, and the warrant

claim [Doc. #49].

2.　　　　On March 4, 2021, Gonzales moved to dismiss based on qualified immunity. The United States Court of Appeals for the Fifth Circuit dismissed all direct claims against Gonzales due to lack of personal involvement, as well as bystander liability/failure to intervene. *Tuttle v. Sepolio*, 68 F.4th 969, 975–76 (5th Cir. 2023).

3.　　　　The only claims remaining against Gonzales are Nicholas's supervisory liability theory stemming from the excessive force claim [Doc. #49 at ¶151] and both Nicholas and Tuttle's supervisory liability theory stemming from the warrant claim [Doc. #48 at ¶105 and Doc. #49 at 161]. Gonzales hereby moves for summary judgment.

### STATEMENT OF ISSUES

**I.　　Gonzales is entitled to summary judgment on Nicholas's supervisory liability theory for the excessive force claim based on qualified immunity.**

**II.　　Gonzales is entitled to summary judgment on Tuttle and Nicholas's supervisory liability theory for the warrant claim based on qualified immunity.**

### STANDARD OF REVIEW

### I.　　Summary judgment standard

4.　　　　Summary judgment is proper under Rule 56, Federal Rules of Civil Procedure, if the movant establishes that there is no genuine issue of material fact and the law entitles the movant to a judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catreet*, 477 U.S. 317, 322 (1986); *Vann v. City of Southaven*, 884 F.3d 307, 309 (5th Cir. 2018). While the movant must demonstrate the absence of a genuine issue of material fact, the movant does not need to negate the elements of the non-movant's case. *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 335 (5th Cir. 2017) (citation omitted).

5.　　　　Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, which shifts to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial. *Hankins v. Wheeler*, ___ F.4th ___, 2024 WL 3610109, at *3 (5th Cir. Aug. 1, 2024); *Kim v. Hospira, Inc.*, 709 F. App'x 287, 288 (5th Cir. 2018), quoting *Nola Spice Designs, LLC v. Haydel Enter., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015). The nonmovant cannot satisfy this burden merely by denying the allegations in the opponent's pleadings but can do so by tendering depositions, affidavits, and other competent evidence to buttress its claim. *Hankins*, 2024 WL 3610109 at *3. "The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim." *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (internal citations omitted); *Infant v. Law Office of Joseph Onwuteaka, P.C.*, 735 F. App'x 839, 843 (5th Cir. 2018). The non-movant cannot demonstrate the existence of a material fact "by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *McCarty v. Hillstone Rest. Grp., Inc.*, 864 F.3d 354, 357 (5th Cir. 2017) (internal citation omitted).

6.     Factual controversies are to be resolved in favor of the non-movant, "but only when…both parties have submitted evidence of contradictory facts." *Little v. Liquid Air*, 37 F.3d 1069, 1075 (5th Cir. 1994); *see also Wease v. Ocwen Loan Servicing, LLC*, 915 F.3d 987, 992 (5th Cir. 2019); *Tolan v. Cotton,* 572 U.S. 650, 659 (2014). "A complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial and mandates the entry of summary judgment for the moving party." *Alvarez v. City*

*of Brownsville*, 904 F.3d 382, 389 (5th Cir. 2018) (*en banc*) (internal quotations and citations omitted).

## II.    Qualified immunity

7.    Governmental officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) (en banc). Qualified immunity "gives ample room for mistaken judgements," by protecting "all but the plainly incompetent or those who knowingly violate the law." That is the balance that courts have struck between compensating wronged individuals for deprivation of constitutional rights and frustrating officials in discharging their duties for fear of personal liability. *Brown v. Lyford*, 243 F.3d 185, 190 (5th Cir. 2001) (footnotes omitted); *accord Joseph v. Bartlett*, 981 F.3d 319, 328 (5th Cir. 2020).

8.    Once a defendant has invoked the defense of qualified immunity, the plaintiff carries the burden of demonstrating its inapplicability. *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009).  The threshold inquiry in resolving an issue of qualified immunity is whether, taking the facts in the light most favorable to the plaintiff, the officer's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Scott v. Harris*, 550 U.S. 372, 377-78 (2007).  Next, the Court considers whether the allegedly violated right is "clearly established" in that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Id.* at 201.

9.    The second prong of the qualified immunity test is better understood as two separate inquiries: whether the allegedly violated constitutional rights were clearly established at the time of the incident; and, if so, whether the conduct of the defendants was objectively unreasonable in

the light of that then clearly established law. *Taylor v. LeBlanc*, 60 F.4th 246 (5th Cir. 2023).

10.    "Answering in the affirmative requires the court to be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Wyatt v. Fletcher*, 718 F.3d 496, 503 (5th Cir. 2013). *"This requirement establishes a high bar." Id.* When there is no controlling authority specifically prohibiting a defendant's conduct, the law is not clearly established for the purposes of defeating qualified immunity. *Id.* Officials "who reasonably but mistakenly commit a constitutional violation are entitled to immunity." *Collins v. Ainsworth*, 382 F.3d 529, 537 (5th Cir. 2004) (quoting *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 490 (5th Cir. 2001)).

11.    Courts have discretion to decide which prong of the qualified-immunity analysis to address first. *Morgan*, 659 F.3d at 371.

### III.    Supervisory liability under § 1983

12.    Under a §1983 claim, a supervisor may be held liable for the wrongful acts of a subordinate, "when [the supervisory official] breaches a duty imposed by state or local law, and this breach causes plaintiff's constitutional injury.*" Smith v. Brenoettsy*, 158 F.3d 908, 911 (5th Cir. 1998) (quoting *Sims v. Adams*, 537 F.2d 829, 831 (5th Cir. 1976)). Section 1983 does not create supervisory or respondeat superior liability. *Brown v. Taylor*, 911 F.3d 235, 245 (5th Cir. 2018). In other words, supervisors cannot be held liable for the actions of their subordinates under a theory of vicarious liability. *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987). Rather, to state a claim against a supervisor, a plaintiff must show either that the supervisor was personally involved in the constitutional violation or that there is a sufficient causal connection between the supervisor's conduct and the constitutional violation." *Brown*, 911 F.3d at 245. In the absence of actual involvement, a plaintiff must show that: 1) the supervisor failed to supervise the subordinate official; 2) a causal link exists between the failure to train or supervise and the violation of the

plaintiff's rights; and 3) the failure to train or supervise amounts to deliberate indifference. *Smith*, 158 F.3d at 911-12; *Terrell v. Harris Cnty.*, 107 F.4th 452, 458 (5th Cir. 2024)

13.    "For an official to act with deliberate indifference, 'the official must both beware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Deliberate indifference requires a showing of more than negligence or even gross negligence. *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005); Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and do not divest officials of qualified immunity. *Id.*; *see also Gilbert v. French*, No. CIV.A. H-06-3986, 2008 WL 394222, at *14 (S.D. Tex. Feb. 12, 2008), aff'd, 364 Fed. Appx. 76 (5th Cir. 2010) ("No cause of action exists under § 1983 for mere negligent supervision."). For a supervisor to act with deliberate indifference, he must usually know about a pattern of similar violations. *Romero v. Brown*, 937 F.3d 514, 523 (5th Cir. 2019). A "showing of deliberate indifference requires that the plaintiffs show that the failure to train reflects a deliberate or conscious choice to endanger constitutional rights." *Estate of Davis*, 406 F.3d at 377.

14.    The Supreme Court has squarely rejected that governmental officials may be held liable because they merely had knowledge of or acquiesced in their subordinate's misconduct. *Iqbal*, 556 U.S. at 677.

## SUMMARY OF THE ARGUMENT

15.    At this juncture, the only force plaintiffs contend was excessive was used by Gallegos, specifically in shooting Nicholas and his last shot at Tuttle. As to Nicolas' supervisory liability theory based on use of excessive force, Gonzales is entitled to judgment for four reasons. First, there is no predicate constitutional violation. Second, there is no causal link between

Gonzales' supervision and the use of force, because Nicholas and Tuttle's actions posing an immediate threat of injury or death to the officers was an intervening cause. Third, there is no deliberate indifference because there were no other similar instances involving Gallegos. Finally, there is no clearly established law; instead, the closest on-point authority from the Fifth Circuit affirmed summary judgment for the defendants on the supervisory liability claim.

16.    Regarding Tuttle and Nicholas's supervisory liability theory premised on the warrant claim, Gonzales is entitled to summary judgment for three reasons. First, there is no causal link between Gonzales' supervision and Goines' actions in lying on a search warrant affidavit.[1] Second there is no deliberate indifference because there were no similar instances involving Goines; the only concerns brought to Gonzales' attention was that Goines was untimely in his paperwork, which is insufficiently similar to impose supervisory liability. Finally, there is no clearly established law; instead, the closest on-point authority from the Fifth Circuit affirmed summary judgment on the supervisory liability claim.

## STATEMENT OF FACTS

17.    Gonzales joins in and incorporates by reference the facts and evidence in the City of Houston's Motion for Partial Summary Judgment on Plaintiffs' Claims Based on Service of the Warrant [Docs. #305 and #307] and Motion for Partial Summary Judgment on Plaintiffs' Claims Based on Alleged Excessive Force [Docs. #308 and 309].

## ARGUMENT AND AUTHORITIES

18.    Plaintiffs have now limited constitutional violations to three discrete areas of conduct: 1) Officer Goines lying on the warrant affidavit; 2) Officer Gallegos shooting at Nicholas;

---

[1] Goines is criminally charged stemming from his conduct and is entitled to a presumption of innocence. For purposes of this motion only Gonzales **assumes** the truth of plaintiffs' allegations that Goines lied in the search warrant affidavit.

3) Officer Gallegos' *last* shot at Tuttle.[2]

**I.   Gonzales is entitled to summary judgment on Nicholas's supervisory liability theory for the excessive force claim based on qualified immunity.**

**A.  There is no predicate constitutional violation.**

19.      It is well-settled that a failure-to-supervise claim is derivative, meaning it must be based on some predicate violation. *Hunter v. City of Houston*, 4:19-CV-02521, 2021 WL 4481092, at *7 (S.D. Tex. Sept. 29, 2021) (citing *Zimmerman v. Cutler*, 657 F App'x 340, 348–49 (5th Cir 2016, per curiam); *Hill v Carroll County*, 587 F3d 230, 238 (5th Cir 2009). In the absence of a predicate constitutional violation, no supervisory liability theory can survive. *Id.*; *Wade v. City of Houston, Tex.*, ___ F.4th ___, 2024 WL 3664536, at *2 (5th Cir. Aug. 6, 2024) (citing *Tamez v. Manthey*, 589 F.3d 764, 772 (5th Cir. 2009)).

**1.  Gallegos' intentional force was objectively reasonable because he reasonably perceived Nicholas to pose an imminent threat to Medina.**

20.      It is unrefuted that Gallegos fired at Nicholas because he perceived her to pose an imminent threat of bodily injury and death to Officer Medina, who briefly passed out on the couch after being shot by Tuttle.[3] Gallegos perceived Nicholas to be standing right next to Medina, hunched over aggressively tugging on Medina's shotgun screaming "Motherfucker, motherfucker."[4] Gallegos knew that if Nicholas could get ahold of his shotgun, she could shoot or finish or kill Officer Medina; he had to stop that before it happened.[5] At the time he shot her,

---

[2] Ex. A, Scott dep. 23:3-24:10. For purposes of this motion only, Gonzales **assumes** Scott's opinions are admissible and demonstrates that even considering Scott's opinions, there is no genuine issue of material fact. Gonzales joins in and incorporates by reference Defendant City of Houston's *Daubert* motion to exclude Scott.

[3] Ex. B, Gallegos dep. 102:10-103:2; 103:15-25; 105:1-106:5; 180:3-10; 188:15-189:17; 193:10-13; Ex. C, Wolf dep. at 72:2-22; 77:8-78:2.

[4] Ex. B, Gallegos dep. 102:10-103:2; 103:15-25; 105:1-106:5; 178:23-179:4; 179:12-19; 180:3-10; 188:15-189:17; 193:10-13; Ex. C, Wolf dep. at 85:23-87:10

[5] Ex. B, Gallegos dep. at 180:3-10

he believed that there was an imminent threat of serious bodily injury to himself or his fellow officers.[6]

21.    It is well-settled that an officer may use deadly force when the officer has probable cause to believe the suspect poses a threat of serious physical harm to the officer or to others. *See e.g., Salazar-Limon v. City of Houston*, 826 F.3d 272, 278 (5th Cir. 2016); *Cass v. City of Abilene*, 814 F.3d 721 (5th Cir. 2016) (per curiam); *Kelly v. City of Houston, Tex.*, 268 F.3d 1064 (5th Cir. 2001) (per curiam, unpublished); (citing *Fraire v. City of Arlington,* 957 F.2d 1268, 1276 (5th Cir.1992) (it is not constitutionally unreasonable to use deadly force when the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, at the moment the shooting took place)).

22.    Nicholas pled that Nicholas was "unarmed and had not engaged in any force against the officers." [Doc. #49 at ¶106]. While it is unrefuted that Nicholas did not wield her own weapon, Nicholas can adduce no actual evidence that Nicholas did not tug at Medina's shotgun as he lay unconscious. Even if Nicholas could adduce evidence that she never tugged at Medina's shotgun, whether Gallegos' actions are objectively reasonable must be judged from the perspective of a reasonable officer on the scene and must allow for the fact that officers are forced to make split-second judgments in circumstances that are tense, uncertain and rapidly evolving. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). If Nicholas had not actually been standing as close to Medina as Gallegos perceived, or if Gallegos had been mistaken that Nicholas was tugging at Medina's shotgun, such errors do not make Gallegos' use of force objectively unreasonable; the Fifth Circuit has held in a line of cases that it is not objectively unreasonable for officers to use deadly force when they perceive a furtive gesture to indicate a reach for a weapon. *See Argueta v.*

---

[6] Ex. B, Gallegos dep. at 188:15-189:17; 193:10-13.

*Jaradi*, 86 F.4th 1084, 1090–91 (5th Cir. 2023) (collecting cases).

23.     Indeed, what Gallegos was able to perceive was that Nicholas actually had both hands on Medina's shotgun and was tugging at it.[7]   As such, the facts here are even more compelling than the furtive gesture cases, in which deadly force was held objectively reasonable when the officer perceived the suspect to be reaching for a weapon, even though no weapon was visible, and even when the suspect ultimately had none. *See Batyukova v. Doege*, 994 F.3d 717, 722–23 (5th Cir. 2021) (holding deadly force was objectively reasonable after suspect suddenly reached toward his waistband, but was later found to be unarmed) *Salazar-Limon*, 823 F.3d at 275, 279 (same); *Manis v. Lawson*, 585 F.3d 839, 842 (5th Cir. 2009) (holding use of deadly force was objectively reasonable after suspect began to repeatedly reach underneath the front seat, though no weapon was recovered); *Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379, 381 (5th Cir. 2009) (holding use of deadly force was objectively reasonable where suspect reached into a boot at chest level for what officer believed could be a weapon, but was later found unarmed). In contrast here, Medina's shotgun ***was*** plainly visible, and it appeared to Gallegos that Nicholas was tugging at it. The objective reasonableness of Gallegos's use of force is supported by that of Officer Pardo who perceived Nicholas to pose a serious threat and intended to shoot Nicholas had he not fallen or been pushed out of the doorway.[8]

> ## 2.    Nicholas's alternative Fourteenth Amendment theory that Gallegos blindly fired through the wall when he could not see her is untenable.

24.     Nicholas pled a Fourteenth Amendment claim asserting that the Squad 15 members who fatally shot Nicholas did so by blindly shooting into the house without an adequate line of

---

[7] Ex. B, Gallegos dep. 102:10-103:2; 103:15-25; 105:1-106:5; 178:23-179:4; 179:12-19; Ex. C, Wolf dep. at 85:23-87:10.
[8] Ex. D, Pardo dep. at 41:3-44:24; 45:25-46:14; 52:7-14.

sight, which "shocks the conscience" [Doc. #49 at 149]. Because it is unrefuted that Nicholas was Gallegos' intended target when he fired, Nicholas's claim must be addressed pursuant to the Fourth Amendment, rather than the Fourteenth. *Gone v. Smith*, 4:16-CV-00684, 2017 WL 978703, at *3 (S.D. Tex. Mar. 14, 2017), aff'd sub nom. *Hernandez v. Smith*, 793 Fed. Appx. 261 (5th Cir. 2019); *contra The Estate of Gray v. Dalton*, 1:15CV061-SA-DAS, 2017 WL 74716, at *3 (N.D. Miss. Jan. 6, 2017), *on reconsideration in part sub nom. Estate of Dunn Gray v. Dalton*, 1:15CV061-SA-DAS, 2017 WL 564035 (N.D. Miss. Feb. 10, 2017) (holding that the Fourth Amendment standards do not apply to persons other than one who was a deliberate object of force); *Diamond-Brooks v. City of Webster*, 12-CV-3482, 2014 WL 1761612 (S.D. Tex. Apr. 30, 2014) (holding that defendants were entitled to summary judgment on Fourth Amendment claim asserted by woman who was grazed by a bullet that passed through its intended target); *see also Brower v. County of Inyo*, 489 U.S. 593, 596 (1989) ("In sum, the Fourth Amendment addresses "misuse of power," not the accidental effects of otherwise lawful government conduct.") (citation omitted).

25.     During the discovery period, Nicholas has suggested that Gallegos could not have seen Nicholas when he fired at her. The basis for that suggestion is a house of cards built from plaintiffs' purported ballistics expert Maloney.[9]  Maloney reaches this conclusion based upon: 1) a bullet was recovered from the couch that had the DNA of both Nicholas and Tuttle on it, from which Maloney concludes the bullet passed through both of them; and 2) the concept that Nicholas essentially dropped where she was standing when she was shot.[10]  The first conclusion is speculative and unreliable because DNA could have come from the couch itself, rather than from "passing through" both Tuttle and Nicholas, which means the location where the bullet was found

---

[9] Gonzales joins in and incorporates by reference Defendant City of Houston's *Daubert* motion to exclude Maloney.

[10] Ex. E, Maloney dep. at 41:16-43:24.

cannot be used to determine Nicholas' location when she was shot. The second conclusion relies upon a mischaracterization of the testimony medical examiner, who testified that while Nicholas probably could not "leap" over the coffee table after being shot, she could very well have taken a few steps before collapsing where she was ultimately found.[11]  Ultimately, Maloney's conclusion that Gallegos could not see Nicholas when he fired is sheer speculation that is insufficient to create a genuine issue of material fact. *Manis*, 585 F.3d at 845 ("The expert's subsequent speculation that deadly force was unjustified is insufficient to create a genuine, material fact issue."); *Ontiveros*, 564 F.3d at 384 ("[H]indsight and speculation create no genuine, material fact issue as to how a reasonable officer could have interpreted Ontiveros's actions.").

26.     In any event, Nicholas can adduce no evidence that meets the applicable "shocks the conscience" test on these facts. *County of Sacramento v. Lewis*, 523 U.S. 833, (1998).  To determine what "shocks the conscience," the *Lewis* Court compared situations where officials have a reasonable opportunity to deliberate their actions prior to deciding how to proceed, with situations where officials must "act decisively and ... show restraint at the same moment, and their decisions have to be made 'in haste, under pressure, and frequently without the luxury of a second chance.'" *Id.* Where officers are forced to make split second decisions, an officer's conduct only shocks the conscious if force is employed maliciously or sadistically for the very purpose of causing harm. *Id*.

27.     Nicholas can adduce no evidence that Gallegos employed force maliciously or sadistically; rather he believed he was it was objectively reasonable to shoot Nicholas to save his own life and that of his colleagues.[12]

### B.  There is no causal nexus.

---

[11] Ex. F, Beynon dep. at 79:25-81:9; 82:18-83:23; 84:12-22; 85:1-13.
[12] Ex. B, Gallegos dep. at 180:3-10; 188:15-189:17; 193:10-13

28.    Nicholas can adduce no evidence causally connecting Nicholas's death to any allegedly wrongful act or omission by Lt. Gonzales in his supervision of Gallegos. Rather, the evidence establishes that the cause of Nicholas's death was her threatening behavior towards an incapacitated Medina.[13]   Similarly, even plaintiffs' purported expert recognizes that if Tuttle hadn't made the decision to shoot, he and Ms. Nicholas would not have been shot and killed, because the officers *of course* did not enter the house to shoot and kill them regardless of what Tuttle and Nicholas did.[14]

### C.  There is no deliberate indifference.

29.    Nor can Nicholas adduce evidence that Lt. Gonzales was deliberately indifferent to a pattern of similar excessive force incidents involving Gallegos. Rather the evidence establishes that Gallegos had two use of force complaints against him, in 2012 and 2013.[15]  The one in 2013 involved a robbery suspect who alleged Gallegos injured him without using a weapon.[16]  There was another use of force incident in 2015, but Gallegos was exonerated of any wrongdoing.[17] Gallegos had been investigated for shooting dogs during execution of a warrant, those uses of force were also found justified.[18] Gallegos had only ever been involved in another incident where he discharged a weapon at a human, and it involved a high speed chase, rather than execution of an arrest or search warrant.[19]  And the Harding Street incident was the very first time that Officer

---

[13] Ex. B, Gallegos dep. 102:10-103:2; 103:15-25; 105:1-106:5; 178:23-179:4; 179:12-19; 180:3-10; 188:15-189:17; 193:10-13.
[14] Ex. A, Scott Dep. at 78:13-25; Ex. B, Gallegos dep. at 206:18-24 ("Q: The suspects in this case…were not compliant, were they? A: No, sir, they weren't. Q: If they had been compliant, would you be sitting here today wondering what happened to them? A: No, sir, we wouldn't.")
[15] Ex. B, Gallegos dep. at 25:1-4.
[16] Ex. B, Gallegos dep. at 25:5-19.
[17] Ex. B, Gallegos dep. at 25:20-26:3.
[18] Ex. B, Gallegos dep. at 26:4-27:6.
[19] Ex. B, Gallegos dep. at 27:10-29:2.

Gallegos shot anyone during execution of a warrant.[20]

30.     In *Estate of Davis*, the Fifth Circuit held supervisors were entitled to qualified immunity on supervisory liability claims stemming from the execution of a no-knock search warrant. 406 F.3d 375. The district court noted that the following evidence supported supervisory liability:

- The subordinate fired his weapon on three occasions during training when the scenarios did not call for it;
- A background investigation report indicated the subordinate had a tendency to act aggressively
- A citizen's report of a traffic stop indicated the subordinate behaved "like a psycho" and was "going to kill somebody";
- And the subordinate had a reputation for exposing himself that earned him the nickname "Penie".

*Id.* at 378. Recognizing that prior indications cannot simply be for any and all "bad" or unwise acts, but rather must point to the specific violation in question, the Fifth Circuit held that none of the prior acts indicated use of excessive force against a third party resulting in injury. *Id.* at 383. With respect to the background report, the court recognized there was no evidence to suggest the supervisor was aware of it, and the district court did not impute knowledge to them. *Id.* at 384. Finally, the court held that it was "not enough to merely say that more or different training or supervision would have prevented the result of the ill-fated raid." *Id.* at 386.

31.     Just as in *Davis*, there is no evidence that Gallegos has a pattern of similar instances.[21]  Accordingly, there is no evidence of deliberate indifference such that would overcome Gonzales' qualified immunity for a supervisory liability theory based on a use of force against Nicholas.

**D.  There is no clearly-established law.**

---

[20] Ex. B, Gallegos dep. at 198:23-199:9; Ex. A, Scott Dep. at 184:17-20
[21] Ex. B, Gallegos dep. at 24:23-29:2

32.     As *Estate of Davis* demonstrates, there is no clearly-established law that would have put Gonzales on notice that his supervision of Gallegos violated clearly-established constitutional rights, because even if there had been a constitutional violation, there is no pattern of conduct to suggest deliberate indifference. *See also Terrell*, 107 F.4th at 458 (where subordinate was accused of sexual assault, granting motion to dismiss supervisory liability theory on qualified immunity because subordinate's prior arrest for sexual assault—for which he had been no-billed—did not demonstrate a pattern).

33.     Nicholas' cannot identify ***any*** settled precedent that found a supervisor liable on similar facts. Gonzales is entitled to judgment as a matter of law that he is shielded by qualified immunity from Nicholas's supervisory liability claim stemming from her excessive force claim.

## II.     Gonzales is entitled to summary judgment on Tuttle and Nicholas's supervisory liability theory for the warrant claim based on qualified immunity.

### A.  There is no causal nexus.

34.     Neither Tuttle nor Nicholas can adduce evidence to support their conclusory allegations that Gonzales knew that Goines had not investigated 7815 Harding St. for two weeks [Doc. #48 at ¶105; Doc. #49 at ¶91]. Goines' immediate supervisors were Sergeants Reyna and Wood.[22] Lt. Gonzales was over two squads, Squad 14 and Squad 15.[23] Once the warrant had been procured, it would need to be reviewed by the case agent's immediate sergeant, rather than a Lieutenant, to determine what the next steps would be.[24]  Plaintiffs' purported expert testified that in his experience a supervisor reviewed the affidavit to ensure there is probable cause, not to specifically do a fact check to make sure all the information was corroborated.[25]  This is because

---

[22] Ex. G, Acevedo dep. at 178:16-21.
[23] Ex. H, Follis dep. at 25:2-8.
[24] Ex. B, Gallegos dep at 226:22-227:13.
[25] Ex. A, Scott dep. at 33:23-34:10; 35:2-21.

it is necessity for officers to have to rely on the truthfulness and voracity of other officers that they're involved with.[26]   At any given time, there were dozens or sometimes hundreds of investigations being worked in those squads; Gonzales would not have an in-depth knowledge of each particular case.[27]   Plaintiffs' purported police practices experts admits that he has seen no evidence that any officer other than Goines and perhaps Bryant actually knew that the search warrant was based on false information.[28]

35.    Similarly, Plaintiffs can adduce no evidence that Gonzales failed to supervise Goines in a way that caused Goines to lie in an affidavit. Nor can Plaintiffs adduce evidence that Gonzales's manner of supervision reflected a conscious choice to endanger constitutional rights. And as described in the City of Houston's Motion HPD had robust policies of supervision, which included lieutenant review of Blue Backs, semi-annual performance reviews, review of CI fund receipts, and compilation and circulation of productivity reports, which described the amounts of narcotics, weapons, and cash seized during enforcement activity.[29]   Not surprisingly, the internal affairs investigation did not conclude that the failure to supervise caused Goines to fabricate facts in an affidavit.[30]

36.    Nicholas alleges "Furthermore, Lt. Robert Gonzales approved payments by Goines and Gallegos to CIs after the CIs had already made the purchases and without laboratory testing of the drugs for admission into evidence in the case." [Doc. #49 at ¶72]. Nicholas can adduce no such evidence. But even if this were true, Plaintiffs can adduce no evidence that the laboratory

---

[26] Ex. A, Scott dep. at 33:23-34:10; 35:2-21.
[27] Ex. H, Follis dep. at 36:8-13; 36:22-23; 37:1-2.
[28] Ex. A, Scott dep. at 112:14-19
[29] Gonzales incorporates by reference the facts and evidence in Houston's Motion for Partial Summary Judgment Based on Service of the Warrant, Factual Background section I.
[30] Ex. A, Scott dep. at 82:7-14; 83:9-16

tests did not ultimately confirm the narcotics purchased by the CI. And in any event, Plaintiffs can adduce no evidence that Gonzales' made the inference that premature approval for payments to CIs would somehow cause Goines to lie on a search warrant.

37.     To survive summary judgment, it is not enough for a plaintiff to suggest the more or different supervision would have made a difference. *Estate of Davis*, 406 F.3d 386.  Even if it were enough, Plaintiffs cannot adduce such here. As Follis observed "[I]f somebody wants to do wrong, if somebody wants to do evil, then that person is going to find a way to do the evil.[31] Similarly, Lt. French testified "a determined liar and criminal is going to go out and do the things that they do no matter how stringent the supervision."[32]

38.     Even Plaintiffs' purported expert concurs.[33]  He testified there is no recognized literature within the police community that guarantees a department can eliminate rogue officers.[34] Furthermore, Scott testified that even if the supervisors had done more, it would not have prevented Officer Goines from including false information on an affidavit and submitting it to a judge.[35]  And Scott conceded that if the supervisors had asked Goines more questions before the warrant was served, there's no suggestion that Goines would have confessed that he made it up.[36]

39.     Finally, as discussed in Section I.B., *supra*, the evidence establishes that Tuttle and Nicholas were shot because they posed an imminent threat of bodily injury or death to the officers, not because of Gonzales' supervision.

### B.  There is no deliberate indifference.

---

[31] Ex. H, Follis dep. at 122:6-24; 123:3-16.
[32] Ex. I, French dep. at 171:20-172:18; 173:5-23; *see also* Ex. G, Acevedo dep. at 96:11-97:14.
[33]  Ex. A, Scott dep. at 55:17-59:17; 189:25-190:6 ("[E]very officer has that capability to circumvent policy.  It's obviously up to the individual officer if he or she does.").
[34] Ex. A, Scott dep. 59:22-60:3.
[35] Ex. A, Scott dep. at 83:21-84:7; 91:1-9.
[36] Ex. A, Scott dep. at 99:11-15.

40.     Everyone was shocked to find out that Goines had lied in an affidavit and was found with contraband in his vehicle.[37]   He was a very well respected, highly regarded member of the Narcotics Division.[38] No one had any idea that there was malfeasance or anything out of the ordinary going on.[39]

41.     Nicholas pled that Goines had engaged in other acts of excessive force [Doc. #49 at ¶¶183]. But since use of force is completely different from lying on a search warrant—and Nicholas now does not contend that Goines engaged in any impermissible force—such conduct does not give rise to an inference of deliberate indifference. *See Estate of Davis*, 406 F.3d at 383.

42.     Similarly, there is evidence that Gonzales discovered and addressed issues under his supervision.  Gonzales was aware that Goines was untimely in submitting paperwork and took steps to correct the tardiness.[40]   Being untimely on paperwork is a far cry from lying on a search warrant affidavit. *See id.; see also Mallett v. Goines*, No. CV H-21-2644, 2021 WL 5449529, at *3 (S.D. Tex. Nov. 22, 2021) (dismissing supervisory liability claim against HPD sergeant because alleged notice of an inconsistency in Goines paperwork at most supports an inference about Goines's non-compliance with expense reporting requirements, but not an inference of the sergeant's deliberate indifference to a substantial risk of a constitutional violation).

43.     In any event, rather than being deliberately indifferent to the tardiness, Gonzales instructed Sgts. Reyna and Wood that Goines was not permitted to do any more field work until he got caught up on his paperwork.[41]   And plaintiffs can adduce no evidence to suggest it would have been obvious that tolerating or even condoning untimely paperwork would have resulted in

---

[37] Ex. H, Follis dep. at 94:10-14.
[38] Ex. H, Follis dep at 88:19-89:3.
[39] Ex. H, Follis dep. at 158:12-17.
[40] Ex. H, Follis dep. at 39:4-40:7; 154:1-25.
[41] Ex. H, Follis dep. at 39:4-40:7; 154:1-25.

Goines lying on a search warrant affidavit.

### C. There is no clearly-established law.

44.    A right is "clearly established" only if preexisting precedent has placed the constitutional question beyond debate. The courts must define that constitutional question with specificity. Indeed, the dispositive question is whether the violative nature of particular conduct is clearly established. *Harmon v. City of Arlington*, No. 20-10830, 2021 U.S. App. LEXIS 32142, at *1 (5th Cir. 2021) (citations omitted). As the cases discussed in Section I.D., *supra* illustrate, plaintiffs cannot demonstrate that as of January 28, 2019, the law was so clearly established that any supervisor would have known that Gonzales' supervision of Goines was unconstitutional. Not a single case has ever held a supervisor liable on these facts. As such, Plaintiffs cannot overcome Gonzales' qualified immunity.

### CONCLUSION

45.    Gonzales respectfully requests that this Court grant his motion for summary judgment and enter judgment that Plaintiffs take nothing on their claims.

Respectfully submitted,

**ARTURO G. MICHEL**
**City Attorney**

CHRISTY L. MARTIN
Chief, Torts/Civil Rights

Date:  August 9, 2024          By:    */s/ Christy L. Martin*
                                ATTORNEY IN CHARGE
                                SBN:  24041336
                                FBN:  754168
                                832.393.6438
                                christy.martin@houstontx.gov
                                CITY OF HOUSTON LEGAL DEPARTMENT
                                900 Bagby, 4th Floor
                                Houston, Texas 77002
                                832.393.6259 Facsimile
                                ***Attorneys for Robert Gonzales***

### CERTIFICATE OF SERVICE

I hereby certify that pursuant to the Federal Rules of Civil Procedure, a true and correct copy of the foregoing was filed via CM/ECF and served via electronic filing manager to all counsel of record.

*/s/ Christy L. Martin*
CHRISTY L. MARTIN