IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CLIFFORD F. TUTTLE, JR., et al. | § | |
| Consolidated with | § | |
| JOHN NICHOLAS, et al. | § | |
| | § | |
| Plaintiffs, | § | CASE NO. 4:21-CV-00270 |
| | § | |
| v. | § | |
| | § | |
| CITY OF HOUSTON, et al. | § | |
| | § | |
| Defendants. | § | |

---

**OFFICER FELIPE GALLEGOS'S MOTION FOR SUMMARY JUDGMENT**

---

# TABLE OF CONTENTS

Table of Authorities ................................................................................................ iii

Introduction .........................................................................................................1

Summary of The Argument ...................................................................................1

Factual Background ..............................................................................................3

    Officer Gallegos Reasonably Responded to the Threats Presented by Tuttle
    and Nicholas During Service of the Warrant at 7815 Harding Street. ...................3

Arguments & Authorities .....................................................................................11

I.     Plaintiffs' Section 1983 Claim Based On the Use of Force Against Tuttle
      and Nicholas Fail as a Matter of Law. ...........................................................12

     A.   Office Gallegos is Entitled to Qualified Immunity. ...................................12

     B.  No Constitutional Violation Occurred. ....................................................13

        i.    The use of force against Nicholas was not excessive. ...........................16

        ii.  The use of force against Tuttle was not excessive. ...............................19

II.    Plaintiffs' State Law Claims Against Officer Gallegos are Barred by
      Individual Immunity and Therefore Fail as a Matter of Law. .........................22

Conclusion .........................................................................................................22

**Cases:**

*Barnes v. Felix,*
    532 F. Supp. 3d 463 (S.D. Tex. 2021) ........................................................ 5, 18, 19

*Batyukova v. Doege,*
    994 F.3d 717 (5th Cir. 2021) ............................................................................... 17

*Brandon v. Sage Corp.,*
    808 F.3d 266 (5th Cir. 2015) ............................................................................... 16

*Brower v. Cnty. Of Inyo,*
    489 U.S. 593 (1989).............................................................................................. 22

*Cantu v. Austin Police Dep't,*
    2023 WL 8634821 (W.D. Tex. Dec. 12, 2023), *report and recommendation*
    *adopted*, 2024 WL 492395 (W.D. Tex. Feb. 8, 2024)........................................ 25

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986).............................................................................................. 16

*Cloud v. Stone,*
    993 F.3d 379 (5th Cir. 2021) ......................................................................... 20, 21

*Club Retro, L.L.C. v. Hilton,*
    568 F.3d 181 (5th Cir. 2009) ............................................................................... 16

*Crane v. City of Arlington, Tex.,*
    50 F.4th 453 (5th Cir. 2022) ................................................................................ 19

*Franka v. Velasquez,*
    332 S.W.3d 367 (Tex. 2011)................................................................................ 26

*Garcia v. Blevins,*
    957 F.3d 596 (5th Cir. 2020) ............................................................................... 19

*Garza v. Briones,*
    943 F.3d 740 (5th Cir. 2019) ......................................................................... 19, 24

*Garza v. Harrison*,
574 S.W.3d 389 (Tex. 2019) ......................................................................... 7, 26

*Graham v. Connor,*
490 U.S. 386 (1989) ......................................................................................... 19

*Hale v. City of Biloxi*,
731 F. App'x 259 (5th Cir. 2018) ................................................................... 18

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982) ......................................................................................... 16

*Harrington v. Harris*,
118 F.3d 359 (5th Cir. 1997) .......................................................................... 18

*Harris v. Serpas*,
745 F.3d 767 (5th Cir. 2014) ............................................................... 6, 19, 26

*Kokesh v. Curlee*,
14 F.4th 382 (5th Cir. 2021) ........................................................................... 16

*Manis v. Lawson*,
585 F.3d 839 (5th Cir. 2009) .......................................................................... 21

*Melvin v. Karman*,
550 F. App'x 218 (5th Cir. 2013) ................................................................... 22

*Morgan v. Swanson*,
659 F.3d 359 (5th Cir. 2011) ..................................................................... 16, 17

*Morrow v. Meachum*,
917 F.3d 870 (5th Cir. 2019) ....................................................................... 5, 17

*Mullenix v. Luna*,
577 U.S. 7 (2015) ............................................................................................. 17

*Ontiveros v. City of Rosenberg, Tex.*,
564 F.3d 379 (5th 2009) ...................................................................... 17, 18, 24

*Plumhoff v. Rickard*,
572 U.S. 765 (2014) ......................................................................................... 24

*Roque v. Harvel*,
    993 F.3d 325 (5th Cir. 2021) ............................................................... 18

*Saucier v. Katz*,
    533 U.S. 194 (2001).............................................................................. 17

*Smith v. Heap*,
    31 F.4th 905 (5th Cir. 2022) ........................................................... 7, 26

*Stroik v. Ponseti*,
    35 F.3d 155 (5th Cir. 1994) ................................................................ 20

*Tarver v. City of Edna*,
    410 F.3d 745 (5th Cir. 2005) .............................................................. 16

*Thomas v. Baldwin*,
    595 F. App'x 378 (5th Cir. 2014) ....................................................... 17

*Thomas v. City of San Antonio, Tex.*,
    2014 WL 541154 (W.D. Tex. Feb. 10, 2014)...................................... 17

*Trammell v. Fruge*,
    868 F.3d 332 (5th Cir. 2017) ........................................................... 5, 18

*Young v. City of Killeen,*
    775 F.2d 1349 (5th Cir. 1985) ............................................................ 23

**Statutes:**

42 U.S.C. § 1983............................................................................... 16, 18

Tex. Civ. Prac. & Rem. Code § 101.106 ............................................ 7, 26

**Rules:**

Fed. R. Civ. P. 10(c) ............................................................... 5, 21, 22, 26

Fed. R. Civ. P. 56...................................................................................... 5

## INTRODUCTION

Defendant Felipe Gallegos files his Motion for Summary Judgment pursuant to Rule 56, the Federal Rules of Civil Procedure, and the Court's order (ECF No. 297). Officer Gallegos recognizes the tragedy that occurred on January 28, 2019 at 7815 Harding Street resulting in Plaintiffs' deaths and the permanent paralysis of fellow Squad 15 Officer Cedell Lovings. Officer Gallegos maintains that a reasonable officer encountering the circumstances he encountered would have believed that a police officer or others were at risk of serious harm as a result of Plaintiffs' actions. For this reason and as further detailed herein, the excessive force Section 1983 claim against Officer Gallegos and the related state law claims should be dismissed as a matter of law.

## SUMMARY OF THE ARGUMENT[1]

In support of their Section 1983 claim against Officer Gallegos, Plaintiffs assert that Officer Gallegos's use of force was unconstitutional—that is, both excessive and objectively unreasonable. *Trammell v. Fruge*, 868 F.3d 332, 340 (5th Cir. 2017). In order to succeed on this claim, Plaintiffs must defeat Officer Gallegos's assertion of qualified immunity by demonstrating he violated clearly established law. *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019). Plaintiffs must also prove that no reasonable police officer—when presented with what transpired on January 28, 2019—would have believed that a police officer or others were at risk of serious harm. *Trammell*, 868 F.3d at 340; *Barnes v. Felix*, 532 F. Supp. 3d 463, 469 (S.D. Tex. 2021).

But the following undisputable facts highlight that Officer Gallegos's actions neither violated clearly established law nor were excessive or unreasonable:

- Tuttle was in possession of a .357 revolver. Tuttle's DNA was found on the .357 recovered

---

[1] All exhibits referenced in the instant motion refer to exhibits filed by the City of Houston in connection with its summary judgment motion. *See* Fed. R. Civ. P. 10(c). With respect to quoted material, unless otherwise indicated, all brackets, ellipses, footnote call numbers, internal quotations, and citations have been omitted for readability. All emphasis is in original unless otherwise indicated.

from the crime scene.[2]

- Tuttle's and Nicholas's hands tested positive for gunshot residue.[3]

- Officer Medina was shot by Tuttle prior to any officer shooting at Nicholas or Tuttle.[4]

- Tuttle shot Lovings in the neck. Ballistics testing confirmed the bullet from Lovings' gunshot wound came from Tuttle's .357 revolver.[5] The gunshot to Lovings resulted in him being permanently paralyzed.[6]

- Tuttle pointed his gun at numerous Individual Officers.[7]

- Plaintiffs' expert now admits that Tuttle fired three or four times at Individual Officers.[8]

- Four HPD officers were ultimately shot during the incident.[9]

- Officer Gallegos's unrebutted testimony establishes that he perceived Nicholas as an immediate threat to Medina (who had just been shot and was unconscious on the couch) prior to shooting and killing Nicholas.[10]

- Officer Gallegos's unrebutted testimony establishes that he perceived Tuttle as an immediate threat to himself and to other officers prior to shooting and ultimately killing Tuttle. Specifically, Gallegos witnessed Lovings collapse at the front door from a gunshot wound, Medina similarly injured and unresponsive, Tuttle shoot Goines in the jaw, Tuttle shoot at Reyna, and Tuttle raise his weapon towards Officer Gallegos.[11]

- The entire shooting incident involving Tuttle and Nicholas lasted only 80 seconds.[12]

These facts explain why every law enforcement agency that investigated the incident found the use of force justified, including the independent investigation conducted by the Texas Rangers at the request of the Harris County District Attorney's Office.[13] Officers responding to shots fired at them with deadly force is constitutional. *Harris v. Serpas*, 745 F.3d 767, 772 (5th Cir. 2014) ("[U]se of deadly force is not unreasonable when an officer would have reason to believe that the

---

[2] **Ex. 1, Antu Dep.** at 73:9–17 (Tuttle had a .357); **Ex. 2, DNA report**.

[3] **Ex. 3, Gunshot Residue Rep.**

[4] *See infra* Factual Background Section.

[5] **Ex. 4, J. Dupre Dep.** at 39:7–12; 45:13–47:8 (bullet retrieved from Lovings came from Tuttle's .357 revolver); **Ex. 5, HFSC Report** at 1586 (same); **Ex. 6, DWQ to HFSC** at Nos. 8, 9, 12, 16, and 21 (confirming chain of custody); **Ex. 7, DWQ to HCIFS** at Nos. 6–7 (confirming chain of custody); *see also* **Ex. 8, Maloney Dep. Vol. I** at 28:15–19.

[6] **Ex. 11, Lovings Dep. Vol. I** at 37:7-10.

[7] *See infra* Factual Background Section.

[8] Ex. 8 (Maloney Dep. I) at 243:13–24.

[9] **Ex. 9, Wolf Dep.** at 105:20–106:6.

[10] **Ex. 10, Gallegos Dep.** at 102:10–103:2; 179:12–19; 180:3–10.

[11] *See infra* Factual Background Section.

[12] Ex. 9, (Wolf) at 104:7–11.

[13] *Id.* at 102:20–103:5; **Ex. 14, Harding Street IAD Use of Force** at COH00005471–5475.

suspect poses a threat of serious harm to the officer or others.").

Additionally, Plaintiffs' state law wrongful death and survival claims based on the alleged use of force fail because they are barred by individual immunity under the Texas Tort Claims Act ("TTCA"). *See* Tex. Civ. Prac. & Rem. Code § 101.106; *see also Smith v. Heap*, 31 F.4th 905, 913–14 (5th Cir. 2022); *Garza v. Harrison*, 574 S.W.3d 389, 399–400 (Tex. 2019).

## FACTUAL BACKGROUND

As discussed below in detail, when HPD served the search warrant at 7815 Harding Street, resident Dennis Tuttle opened fire on the officers. Tuttle first shot Officer Medina, then Officer Lovings, and eventually Sgt. Reyna and Goines. During the melee, the other occupant of the house, Rhogena Nicholas, ignored officers' directives and instead reached for the weapon of injured Officer Medina. The officers defended themselves, and Tuttle and Nicholas were ultimately killed.

**Officer Gallegos Reasonably Responded to the Threats Presented by Tuttle and Nicholas During Service of the Warrant at 7815 Harding Street.**

The warrant service at 7815 Harding Street began with an operational meeting.[14] At this meeting, officers were told that the male resident at 7815 Harding Street was known to carry a handgun in his waistband and that a large, aggressive dog was known to be inside the residence.[15] A team of eighteen officers then drove to 7815 Harding Street in an unmarked van, several patrol vehicles, and an unmarked canine vehicle.[16] The "entry" team tasked with serving the warrant consisted of Officers Medina, Lovings, Bryant, Salazar, Pardo, Sepolio, Ashraf, Gallegos, Goines, and Sergeants Reyna and Wood.[17] The entry team was dressed in their narcotics uniforms.[18] Seven

---

[14] Ex. 10 (Gallegos) at 172:21–174:1.
[15] *Id*. *See also* Ex. 1 (Antu Dep) at 76:24–77:9.
[16] **Ex. 18, Wolf Report** at 4; Ex. 10 (Gallegos) at 88:23–89:9; Ex. 14 (IAD Use of Force) at COH00005433.
[17] Ex. 18 (Wolf Report) at 4.
[18] Ex. 10 (Gallegos) at 69:1–69:12.

additional, non-narcotics officers were assigned to the perimeter.[19]

Upon arriving at 7815 Harding Street, the entry team exited the unmarked van, organized into an entry "stack," and approached the residence.[20] Prior to or while breaching the door, numerous officers announced, "Houston Police search warrant," and at least one of the marked patrol vehicles "turn[ed] on their lights and hit the sirens."[21] After the door was opened, Medina was the first officer to enter the residence.[22] Medina turned left and observed Nicholas next to the couch.[23] Unbeknownst to Medina, Tuttle was hiding behind the dining room wall waiting to ambush him with a .357 revolver.[24] Diagram 1 marks Nicholas' location with an "N" and Tuttle's later-observed location with a "D1."[25]



Diagram 1

Upon observing Nicholas, Medina moved to the location noted with a "1" on Diagram 1 and instructed Nicholas to put her hands on her face.[26] Nicholas disregarded the instructions, screamed, and flailed her hands.[27] While still attempting to secure compliance with his directives through continued verbal instructions to Nicholas, Medina heard a gunshot to his right.[28] From the moment the first officer exited the unmarked van to this initial gunshot, approximately 18 seconds elapsed.[29] Medina turned toward the noise and observed an angry dog running toward

---

[19] *Id*. at 4; Ex. 14 (IAD Use of Force) at COH00005433.
[20] Ex. 10 (Gallegos) at 79:15–22.
[21] *Id*. at 88:23–89:9; **Ex. 20, Ashraf Dep.** at 38:1–8, 90:5–22.
[22] Ex. 12 (Medina) at 17:24–25.
[23] *Id*. at 44:13–45:4.
[24] *Id*. at 75:4–8 (first saw Tuttle by dining room wall after being shot).
[25] **Ex. 21, Diagram 1** (prepared by Medina during deposition; diagram not to scale).
[26] **Ex. 12, Medina Dep.** at 52:1–14 (location); 50:9–20 ("I gave her the instructions to put her hands on her face, repeated it[.]").
[27] *Id*. at 50:9–20 (instructions and response).
[28] *Id*. at 52:1–14.
[29] Ex. 9 (Wolf) at 109:10–110:2.

him and other officers.[30] In response, Medina discharged his firearm at the animal.[31] Meanwhile, with Medina distracted by the charging dog, Tuttle shot Medina from his hidden location behind the dining room wall.[32] Medina described his first view of Tuttle as follows:

> As I was scanning after I shot the dog I went to scan and then felt the pain come through my right shoulder, and there's a wall in your diagram that comes out, that protrudes just a little bit, and that's where I saw him as I was flying back and then lights out.[33]

Medina then verbalized he was "hit" and lost consciousness on the couch next to Nicholas.[34]

Lovings was the second officer to enter the residence.[35] While Medina went to the left, Lovings turned to the right.[36] In a quick sequence of events without an established order, Lovings observed Tuttle's charging dog, shot the dog in fear for the safety of himself and other officers, and heard Medina yell he was "hit."[37] After Medina had been shot, Lovings also saw Tuttle standing next to the dining room wall with a gun.[38] In fear for his life, Lovings unsuccessfully fired at Tuttle.[39] Tuttle responded by re-hiding behind the dining room wall.[40] From his hiding place, Tuttle shot Lovings.[41] This gunshot wound left Lovings paralyzed from the neck down.[42] While lying in the doorway unable to move, Lovings observed Tuttle "c[o]me and tr[y] to take the

---

[30] Ex. 12 (Medina) at 66:6–24.

[31] *Id*. at 66:6–24.

[32] *Id*. at 75:4–8 (first saw Tuttle behind the dining room wall after being shot).

[33] *Id*. at 75:4–8; *see also* **Ex. 22, Pic. from Medina Dep. Vid**.

[34] Ex. 12 (Medina) at 75:4–12; Ex. 11 (Lovings I) at 30:17–21; Ex. 21 (Diagram 1) (noting location on the couch with a 2).

[35] Ex. 11 (Lovings I) at 26:12–14.

[36] *Id*. at 30:5–9.

[37] *Id*. at 30:17–31:4.

[38] *Id*. at 28:5–24; 33:11–19, 38:22–39:7, 53:5–21, 55:2–56:18, 69:5–13; *see also* **Ex. 23, Salazar Dep.** at 57:1–9; 65:14–18.

[39] Ex. 11 (Lovings I) 55:2–56:18.

[40] *Id*. at 56:23–57:7.

[41] *Id*. at 39:1–7; *see also* **Ex. 24, Lovings Dep. Vol. II** at 39:14–40:12 (Lovings noting the entry wound). Even Plaintiffs' shooting expert, Michael Maloney, acknowledges that Tuttle shot Lovings. Ex. 8 (Maloney Dep. I) at 28:15–19.

[42] Ex. 11 (Lovings I) at 37:7–10.

gun off of me, tr[y] to pull my rifle off of my body."[43] Tuttle shot Medina and shot Lovings before any HPD officers fired at him or Nicholas.[44]

Salazar and Pardo were the only additional officers to enter the residence during the above sequence of events.[45] Given the relatively small size of the house and Tuttle's actions, multiple officers were essentially stacked on top of each other in the doorway.[46] From the doorway, Salazar observed both the dog charge Lovings and Tuttle shoot in the direction of officers.[47] In response, and in fear for his life, Salazar unsuccessfully fired at Tuttle.[48] Salazar and Pardo were then forced



*Diagram 2*

out of the house.[49] Before being forced to retreat, Pardo observed Nicholas standing over Medina.[50] During the above events, Officer Gallegos was located outside the house.[51] Upon hearing gunfire, Officer Gallegos moved up to the right of the house.[52] This location is noted with a "2" in Diagram 2.[53]

From this position, Officer Gallegos heard Medina yell, "I'm hit."[54] He then saw two officers fall backward off the front porch while trying to retreat from the residence.[55] Officer Gallegos next observed Lovings collapse at the front door.[56] Specifically, Lovings "fold[ed]

---

[43] *Id.* at 39:1–7.
[44] Ex. 12 (Medina) at 75:4–12; Ex. 11 (Lovings I) at 30:17–21; 33:15–34:7, 38:22–39:12, 67:25–68:24.
[45] Ex. 10 (Gallegos) at 110:18–111:6. Ex. 20 (Ashraf Dep.) at 40:5–41:24.
[46] Ex. 10 (Gallegos) at 86:10–14, 99:12–100:4.
[47] Ex. 23 (Salazar Dep.) at 48:8–50:8.
[48] *Id.* at 61:12–25, 64:17–19.
[49] Ex. 10 (Gallegos) at 99:12–100:4.
[50] **Ex. 25, Pardo Dep.** at 44:3–19; *see also id.* at 11:6–10, 42:13–47:23 108:10–17.
[51] Ex. 10 (Gallegos) at 96:3–97:19.
[52] *Id.*
[53] *Id.*; *see also* **Ex. 26, Diagrams 2–4** (prepared by Gallegos during his deposition).
[54] Ex. 10 (Gallegos) at 96:3–97:19.
[55] *Id.* at 99:12–16.
[56] *Id.* at 100:23–101:1.

backwards like a folding chair. So his shoulders were basically touching his ankles."[57]

With a paralyzed Lovings lying in the doorway, Officer Gallegos was able to see into the residence for the first time.[58] He immediately observed "Officer Medina . . . sitting back on the couch, and . . . Ms. Rhogena Nicholas standing over officer Medina tugging at his shotgun that is slung to his vest saying, Motherfucker, motherfucker."[59] Perceiving Nicholas as an immediate threat, Gallegos shot her: "Officer Medina was already wound[ed], he was nonresponsive, and she was reaching for his weapon, which I saw as a threat."[60] Nicholas's hands later tested positive for gunshot residue.[61] After shooting Nicholas in response to her attempts to obtain Medina's shotgun, Officer Gallegos observed Nicholas "kind of move—turn to the right and—fall towards the couch."[62]

At this point, only two officers remained in the residence.[63] Each of them, Lovings and Medina, were injured and unresponsive.[64] In fear for his fellow officers, Officer Gallegos fired directed gunshots through the exterior wall of the house away from Medina, Lovings, and Nicholas, and towards the direction he believed the suspect was located.[65] As explained by Officer Gallegos, "the goal was to put directed fire towards where the [suspect's] gunfire [wa]s coming from."[66] It is unclear if any of these shots struck Tuttle.[67]

---

[57] *Id*. at 101:12–18; *see also* Ex. 20 (Ashraf Dep.) at 50:7–13 (noting he saw Lovings get shot and thought he was dead).
[58] Ex. 10 (Gallegos) at 102:10–19.
[59] *Id*. at 102:10–19.
[60] *Id*. at 188:21–189:5; *see also id*. at 102:10–103:2; 179:12–19; 180:3–10.
[61] Ex. 3, (GSR Reports).
[62] Ex. 10 (Gallegos) at 110:4–9.
[63] *Id*. at 110:18–111:6.
[64] Ex. 11 (Lovings I) at 37:7-10; Ex. 10 (Gallegos) 102:10–103:2; 179:12–19; 180:3–10; 188:21–189:5.
[65] Ex. 10 (Gallegos) at 111:8–114:19.
[66] *Id*. at 113:25–114:1.
[67] *Id*. at 111:8–114:19.



*Diagram 3*

Taking advantage of the cover fire from his directional shots, Officer Gallegos moved to the right to break an exterior window to gain visibility into the house.[68] Upon failing to gain visibility of the scene, Gallegos backed up towards the tree noted as "4" in Diagram 3.[69]

While backing up, Officer Gallegos yelled for someone to extract Lovings.[70] Goines moved toward the front door in response.[71] "[A]s soon as [Goines] gets in front of the front door, he gets struck by a round in his jaw and dropped to the ground. He then begins to crawl back, half of his jaw or face is hanging off, bleeding profusely[.]"[72] The bullet that injured Goines came from inside the house where Tuttle was located.[73] Sergeant Reyna attempted to approach the front door and extract Lovings after Goines was shot.[74] As Reyna reached for Lovings, Tuttle came out of the door and pointed his weapon directly at Reyna's face.[75] In fear for his life, Reyna discharged an unknown number of rounds at Tuttle.[76] It is unclear if any of these rounds struck Tuttle.[77] Then, as Reyna fired his weapon, Tuttle simultaneously shot at Reyna and caused Reyna to sustain injuries to his face from bullet fragments.[78]

During the altercation between Tuttle and Reyna, Officer Gallegos saw Tuttle's hands

---

[68] *Id*. at 116:23–117:5.

[69] *Id*. at 117:1–24.

[70] *Id*. at 118:1–14. At this point, Sepolio had already assisted Medina and removed him from the house. **Ex. 13, Sepolio Dep.** at 76:24–78:25.

[71] Ex. 10 (Gallegos) at 118:1–14.

[72] *Id*.

[73] *Id*. (noting Tuttle later comes out of the front door holding a revolver).

[74] *Id*.; **Ex. 27, Reyna Dep.** at 40:4–15, 42:11–25.

[75] Ex. 27 (Reyna) at 40:4–15, 42:11–43:18.

[76] *Id*. at 49:1–50:13.

[77] *Id*.

[78] Ex. 10 (Gallegos) at 118:1–14; *see also* Ex. 25 (Pardo) at 86:3–6 (noting he saw Dennis Tuttle shoot at Reyna). The bullet that Tuttle fired at Reyna may have hit the doorway before fragments of the bullet hit and injured Reyna. Regardless, Reyna is clear that Tuttle fired at him and that he was injured from the gunshot. Ex. 27 (Reyna) at 40:4–15, 42:11–43:18, 49:1–50:13.

appear through the doorway holding a revolver pointed at Reyna.[79] In response, Officer Gallegos fired and struck Tuttle's left hand.[80] After being shot in the left hand, Tuttle retreated into the house.[81] With Tuttle's retreat, Reyna was safely extracted by other officers.[82] Officer Gallegos then continued working his way toward the tree noted in Diagram 3. At the tree, Officer Gallegos paused.[83] He explained his thoughts during this moment at his deposition:

> Because at this point, the only thing I can think about is four of my guys are shot, there's nobody else around me, one of my -- one of my guy[s] is in the doorway, I'm [not] sure if he's dead or alive. And then, of course, the thought of the moment I step out from behind the tree, I'm not knowing what to expect, so I think about my family, I think about my wife, I think about my kids. And all of this is playing through [my] mind whenever I have to make a decision, and I told myself if I -- if I don't step out from behind this tree and help my guys out, I'm going to consider myself a coward. So I have -- I had to do what I had to do and I finally stepped out from behind the tree around to the left, and I started to slowly try to gain vision inside of the doorway as I'm walking towards, I believe, what was the sidewalk [that leads to the front porch].[84]

After stepping out from behind the tree, Officer Gallegos slowly moved toward the residence again.[85] This location is depicted in Diagram 3 by a "5."[86] From there, Officer Gallegos came face-to-face with Tuttle for the first time.[87] Officer Gallegos described what happened next during his deposition:

> [A]t this point we made eye contact that's engraved in my head. I can still see it today. We made eye contact. . . . At that point he saw me, his eyes got opened real big, and then he . . . extended his arm – extended his right arm with his weapon towards me, and that's when I began to, again, engage him as I moved towards him.[88]

---

[79] Ex. 10 (Gallegos) at 118:1–14.
[80] *Id*.
[81] *Id*. at 123:20–124:22.
[82] Ex. 27 (Reyna) at 51:21–25.
[83] Ex. 10 (Gallegos) at 123:20–124:22.
[84] *Id*. at 124:8–124:22.
[85] *Id*. at 125:5–9.
[86] *Id*. at 128:23–129:2.
[87] *Id*. at 125:5–9.
[88] *Id*. at 132:4–8.

Officer Gallegos does not recall how many times he shot at Tuttle during this interaction.[89] Officer Gallegos's shots at least struck Tuttle once in the shoulder and then twice in the buttocks area when Tuttle turned back into the residence after the initial shot to his shoulder.[90] As Tuttle turned back into the residence, Officer Gallegos again lost sight of Tuttle.[91] With Tuttle back inside the residence, Pardo attempted to retrieve Lovings.[92] As Pardo approached, he observed Tuttle sitting on the floor with a gun in his hand next to Lovings.[93] Pardo fired twice at Tuttle in fear for Lovings' safety.[94] There is no evidence establishing these shots struck Tuttle.[95]

Pardo then retreated and regrouped with Officer Gallegos to the right of the front door.[96] Pardo and Officer Gallegos reapproached the front door together.[97] Upon stepping on the porch, Officer Gallegos observed Tuttle "seated kind of on his – more dominate on his right side of his buttock with one leg – his right leg was kind of bent and his left leg was extended. He had the gun in his right [hand] still and it [was] resting on his right thigh."[98] Pardo similarly testified that Tuttle


*Diagram 4*

was sitting on the floor with a gun in his hand.[99] On Diagram 4, Officer Gallegos's location at this time is marked by a "6," and Tuttle's location is marked by a "DT".[100]

While sitting, Tuttle yelled, "What the fuck do you want from me, there's no drugs in

---

[89] *Id*. at 132:9–10.
[90] *Id*. at 132:11–18, 133:24–134:13.
[91] *Id*. at 135:21–136:11.
[92] Ex. 25 (Pardo) at 74:20–75:11.
[93] *Id*. at 66:8–67:13.
[94] *Id*. at 70:9–13.
[95] *Id*. at 71:16–17.
[96] *Id*. at 73:6–13.
[97] *Id*.
[98] Ex. 10 (Gallegos) at 135:21–136:11.
[99] Ex. 25 (Pardo) at 74:8–14, 75:12–21.
[100] Ex. 10 (Gallegos) at 136:17–137:4.

here."[101] The next sequence of events was described by Gallegos during his deposition:[102]

> **A:**…I told him to stop moving. At that point he looks directly at me, begins to raise the weapon one more time, when he raises the weapon I -- I then like extend my rifle out and he sort of -- when he sees my rifle go up he sort of flinches, and that's when I take my last shot.
>
> ...
>
> **Q:** So where did you hit Dennis Tuttle when you fired your last shot?
>
> **A:** So my point of aim was for his head, for his face. Through my training and experience what I've learned -- or learning how to take hostage shot -- situation shots, we've learned that the best place to shoot to completely incapacitate someone is what we call a T-frame. So from the eyeballs down to about the mouth. At that moment that was my intention but because he flinched and turned it ended up hitting him here around the back/neck area.

No other shots were fired at Tuttle or Nicholas after this last exchange.[103] This was the first time that Officer Gallegos had ever fired at a civilian during the service of a warrant.[104] He testified that he remembers the sequence of events vividly and clearly.[105]

After these last shots, Officer Gallegos covered the front door while Pardo removed Lovings.[106] Sepolio then reapproached the house and relieved Officer Gallegos at the front door.[107]

## ARGUMENT & AUTHORITIES

Summary judgment is appropriate when, after viewing the record in the light most favorable to the nonmovant, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). Once the moving party meets this burden, the nonmovant must "come forward with specific facts indicating a genuine issue for trial." *Brandon v. Sage Corp.*, 808 F.3d 266, 270 (5th Cir. 2015).

---

[101] *Id*. at 138:5–11.
[102] *Id*. at 138:15–139:14; *see also* Ex. 24 (Lovings II) at 72:16–75:16 (noting he told Gallegos he would need to take a head shot because Tuttle was not going down).
[103] *See* Ex. 13 (Sepolio) at 110:11–16; Ex. 9 (Wolf) at 104:7–11, 300:14–301:4, 3:07:16-308:4.
[104] Ex. 10 (Gallegos) at 188:8–20, 198:23–199:9.
[105] *Id*. at 188:8–20.
[106] *Id*. at 141:14–22.
[107] Ex. 13 (Sepolio) at 94:1–6.

As laid out in additional detail below, Plaintiffs' claims against Officer Gallegos fail as a matter of law because Plaintiffs are unable to demonstrate that Officer Gallegos's actions violated clearly established law, and Plaintiffs lack evidence to support the alleged use of excessive force.

## I.     Plaintiffs' Section 1983 Claim Based On the Use of Force Against Tuttle and Nicholas Fail as a Matter of Law.

### A.     *Officer Gallegos is Entitled to Qualified Immunity.*

Government officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) (en banc). Qualified immunity is justified unless no reasonable officer could have acted as the defendant officer did, or every reasonable officer faced with the same facts could not have acted as the defendant officer did. *Kokesh v. Curlee*, 14 F.4th 382 (5th Cir. 2021); *see also Morgan*, 659 F.3d at 371 ("When considering a defendant's entitlement to qualified immunity, [a court] must ask whether the law so clearly and unambiguously prohibited his conduct that '*every* reasonable official would understand that what he is doing violates [the law].'"). "If officers of reasonable competence would disagree as to whether the plaintiffs' rights were violated, the officer's qualified immunity remains intact." *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005). Once a defendant has invoked the defense of qualified immunity, the plaintiffs carry the burden of demonstrating its inapplicability. *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009).

The threshold qualified immunity inquiry is whether, taking the facts in the light most favorable to the plaintiff, the officer's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Next, the Court considers whether the allegedly violated right is "clearly established" in that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* The court "must be able to point to controlling authority—or a 'robust

consensus of persuasive authority'—that defines the contours of the right in question with a high degree of particularity." *Morgan*, 659 F.3d at 371–72 (citation omitted). A case directly on point is not required, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015). "The specificity requirement assumes special significance in excessive force cases, where officers must make split-second decisions to use force. The results depend 'very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Morrow*, 917 F.3d at 876.

For the reasons set forth in subsection I(B), no constitutional violation occurred as Officer Gallegos's use of force was reasonable under the circumstances with which he was presented. Furthermore, no constitutional right that was clearly established was violated. To the contrary, Fifth Circuit case law is replete with analogous cases showing Officer Gallegos's actions comported with the law regarding the use of deadly force. *See, e.g., Batyukova v. Doege*, 994 F.3d 717, 722–23 (5th Cir. 2021) (holding deadly force was objectively reasonable after suspect suddenly reached toward his waistband, but was later found to be unarmed); *Thomas v. City of San Antonio, Tex.*, No. SA:12-cv-33-DAE, 2014 WL 541154, at *4 (W.D. Tex. Feb. 10, 2014), *aff'd sub nom. Thomas v. Baldwin*, 595 F. App'x 378 (5th Cir. 2014) (where Fifth Circuit "upheld the use of deadly force when an officer believed a suspect was reaching for a gun when he moved his hands out of the officer's line of sight in defiance of the officer's order."); *Ontiveros*, 564 F.3d at 381 (officer was reasonable in using deadly force when he shot suspect as suspect reached for his boot where officer believed suspect could have a weapon); *Hale v. City of Biloxi*, 731 F. App'x 259, 260 (5th Cir. 2018) (an officer's use of deadly force is reasonable when a suspect moves out of the officer's line of sight such that the officer could reasonably believe the suspect was reaching for a weapon).

Thus, at a minimum, Officer Gallegos is entitled to qualified immunity for Plaintiffs' excessive force claim.

**B. *No Constitutional Violation Occurred.***

"[A]n underlying constitutional or statutory violation is a predicate to liability under § 1983." *Harrington v. Harris,* 118 F.3d 359, 365 (5th Cir. 1997). In support of their Section 1983 claims, Plaintiffs allege that Gallegos used excessive force against Tuttle and Nicholas, which violated Tuttle and Nicholas' Fourth Amendment rights to be free from unreasonable seizure.[108] To prevail on a Fourth Amendment claim of excessive force, Plaintiffs must demonstrate that in addition to Tuttle and Nicholas being "seized" within the meaning of the Fourth Amendment, they each suffered an "(1) injury, (2) which resulted directly and only from a use of force that was ***clearly*** excessive, and (3) the excessiveness of which was ***clearly*** unreasonable."[109] *Trammell*, 868 F.3d at 340 (emphasis added).

In the Fifth Circuit, use of deadly force is "presumptively reasonable when the officer has reason to believe that the suspect poses a threat of serious harm ***to the officer or to others***." *Ontiveros*, 564 F.3d at 382 (emphasis added). "[W]hen an officer in this Circuit reasonably believes he has encountered such a threat, the constitutional inquiry ends there." *Barnes*, 532 F. Supp. 3d at 469.

Whether an officer has reason to believe that a suspect poses a threat of serious harm "is judged from the perspective of a reasonable officer on the scene, and only the facts then knowable to the defendant officers may be considered." *Crane v. City of Arlington, Tex.*, 50 F.4th 453, 463 (5th Cir. 2022). "[T]he threat [is to] be examined only ***at the moment deadly force is used***,"

---

[108]  ECF No. 48 ¶ 112;  ECF No. 49 ¶¶ 147.

[109]  Questions of whether use of force is "excessive" (element two) or clearly "unreasonable" (element three) "are often intertwined." *Roque v. Harvel*, 993 F.3d 325, 333 (5th Cir. 2021).

regardless of what transpired up to that moment. *Id*. at 466 (emphasis added). Specifically, regarding armed suspects, the Fifth Circuit has "never required officers to wait until a defendant turns toward them, with weapon in hand, before applying deadly force to ensure their safety." *Garcia v. Blevins*, 957 F.3d 596, 602 (5th Cir. 2020).

Officer actions leading up to a shooting "are not relevant for the purposes of an excessive force inquiry in this Circuit[,]" *Harris*, 745 F.3d at 772, "even when the officers' conduct departs from established police procedures[,]" *Barnes*, 532 F. Supp. 3d at 471. Analysis of whether an officer's use of force was reasonable "must . . . allow[] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor,* 490 U.S. 386, 396–97 (1989).

Further, it is irrelevant "whether an officer was in actual, imminent danger of serious injury." *Harris*, 745 F.3d at 773. Rather, all that matters is whether the officer "reasonably believed that the suspect posed a threat of serious harm to the officer or to others." *Id*. Even if it is clear in hindsight that no such threat actually existed, the use of force must be assessed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

Courts within this Circuit have found the use of deadly force justified in circumstances similar to the circumstances of this case. *See, e.g., Garza v. Briones*, No. 5:16-cv-251, 2018 WL 8868510, at *5 (S.D. Tex. Sept. 13, 2018), *aff'd*, 943 F.3d 740 (5th Cir. 2019) ("Defendants were not required to be *certain* that [the suspect] fired the first shot; they were only required to have a reasonable belief that he did."); *Stroik v. Ponseti*, 35 F.3d 155, 159 (5th Cir. 1994) (where suspect threatened officer with weapon); *Cloud v. Stone*, 993 F.3d 379, 387 (5th Cir. 2021) (where officer could have reasonably believed that the suspect was reaching for a weapon).

In this case, Plaintiffs' claims of excessive force must be considered in the context of the events that occurred on January 28, 2019. Within seconds of entering the residence, an aggressive dog charged at the Individual Officers, and Tuttle shot Medina. During this same time frame, Nicholas refused to follow the instructions that Medina gave her. Seconds later, Tuttle shot Lovings, who collapsed at the front door. Nicholas then reached for Medina's shotgun, which lay next to the incapacitated officer. In fear for the lives of Medina and the other officers, Officer Gallegos shot Nicholas. Meanwhile, Tuttle walked toward the front of the house with a gun in his hand and pointed it at the officers. Tuttle then shot Goines and Reyna. Having already shot four officers, with the gun still in his hands, Tuttle then pointed the gun at Officer Gallegos before the final exchange of gunfire ensued. The entire shoot-out lasted only eighty seconds. Given the chain of events that occurred during those few seconds, the question for this Court is whether it was reasonable for Officer Gallegos to believe that Nicholas and Tuttle posed a threat of serious harm to any of the officers involved in service of the warrant.

### i. The use of force against Nicholas was not excessive.

As laid out above, Officer Gallegos only shot Nicholas after the shooting of Medina and Lovings and because Nicholas was standing over an incapacitated Medina tugging at his shotgun.[110] With two officers already shot by one of the suspects, Officer Gallegos believed that Nicholas was a threat to Medina and other officers as she attempted to gain control of Medina's gun.[111] Using deadly force to prevent a suspect from obtaining a firearm is objectively reasonable as a matter of law. *See Cloud*, 993 F.3d at 387 (use of deadly force not excessive where loaded revolver lay on ground behind and to left of suspect, and suspect made a sudden move in the gun's direction); *Manis v. Lawson*, 585 F.3d 839, 845 (5th Cir. 2009) (use of deadly force was not

---

[110] *See supra* Factual Background Section.
[111] Ex. 10 (Gallegos Dep.) at 188:21–189:5; *see also* 102:10–103:2; 179:12–19; 180:3–10.

excessive where suspect, in defiance of officers' orders, reached for and appeared to retrieve what the officer "reasonably believed to be a weapon"). Accordingly, Plaintiffs' claims based on the use of force against Nicholas fail as a matter of law.

Plaintiffs' sole challenge to the reasonableness of Officer Gallegos's conduct arises from an alternative version of events developed by their shooting expert, Michael Maloney.[112] Maloney's theory is that Nicholas was inadvertently killed when a bullet directed at Tuttle ended up hitting Nicholas.[113] Maloney speculates that Officer Gallegos could not have seen Nicholas over the body of Medina because when Officer Gallegos fired the fatal shot, Nicholas was actually on the far side of the living room and was not visible to Officer Gallegos from his position outside the house.[114] Despite Officer Gallegos's testimony to the contrary,[115] Maloney theorizes that Officer Gallegos was actually shooting at Tuttle, who was at the front door holding a gun in his hand.[116] According to Maloney, the shot directed at Tuttle grazed him and then went on to hit and kill Nicholas.[117] As set forth below, if Officer Gallegos did intend to shoot Tuttle, he was justified in doing so because Tuttle had already shot two officers and continued to point his gun at other officers.

Furthermore, if the Court accepts Plaintiffs' version of events (which it should not because

---

[112] In addition to the challenges made herein to Michael Maloney's theories, Officer Gallegos relies upon and incorporates by reference, pursuant to Fed. R. Civ. P. 10(c), the City's Motion to Exclude Expert Testimony of Andrew Scott and Michael Maloney, ECF No. 303.

[113] Ex. 8 (Maloney Dep. I) at 92:11–25; 127:13–23; 135:3–136:5.

[114] *Id.*

[115] Ex. 10 (Gallegos Dep.) at 105:7-21.

[116] Ex. 8 (Maloney Dep. I) at 92:11–25; 127:13–23; 135:3–136:5 (Maloney noted he could not testify to what Gallegos was "aiming" at while maintaining that Gallegos could not have seen Nicholas).

[117] *Id.* According to Maloney, this might have been when Gallegos shot at Tuttle's hand. *Id.* Maloney also acknowledged the DNA evidence underpinning his entire theory may have come from the couch instead of the bullet striking Tuttle and Nicholas. **Ex. 42, Maloney Dep. Vol. II** at 41:16 – 43:24.

Maloney's opinions are unreliable as laid out in the City's motion to exclude, ECF No. 303, and incorporated by reference herein pursuant to Fed. R. Civ. P. 10(c)), Plaintiffs' Section 1983 claim based on the use of force against Nicholas still fails because no Fourth Amendment violation occurred:

> [T]he Fourth Amendment addresses "misuse of power," not the accidental effects of otherwise lawful government conduct. . . . [A] Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement, . . . nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement, . . . but only when there is a governmental termination of freedom of movement *through means intentionally applied*.

*Brower v. Cnty. Of Inyo*, 489 U.S. 593, 596–97 (1989) (emphasis in original). Under *Brower*, "the ultimate question is whether [Officer Gallegos] had the purpose of shooting [Nicholas]. . . . If [Officer Gallegos] merely accidentally shot [Nicholas], then all of the [Section 1983] claims fail[.]" *Melvin v. Karman*, 550 F. App'x 218, 220 (5th Cir. 2013) (affirming summary judgment for Section 1983 claims where Plaintiff's evidence merely showed that the officer shot a bullet, and that one of them hit and killed the decedent). Absent evidence that Officer Gallegos intended to use deadly force against Nicholas (which Maloney explicitly denies), Plaintiffs cannot establish a violation of Nicholas's Fourth Amendment rights. *Brower*, 489 U.S. at 596–97; *Melvin*, 550 F. App'x at 220; *see also Young v. City of Killeen,* 775 F.2d 1349, 1353 (5th Cir. 1985) ("[I]t does not follow that a negligent taking of life is a constitutional deprivation.").

In sum, if the Court accepts the testimony of Officer Gallegos and Pardo that Nicholas was standing over Medina trying to secure his shotgun and, therefore, Officer Gallegos "reasonably believed" that Nicholas posed a risk of harm to Medina and others,[118] then the use of force by Officer Gallegos was reasonable and not excessive. *Harris*, 745 F.3d at 772. Alternatively, if the

---

[118] Ex. 10 (Gallegos Dep.) at 102:10–19; Ex. 25 (Pardo Dep.) at 44:3–19.

Court accepts the version of events offered by Maloney, then Officer Gallegos's shooting of Nicholas was accidental and does not amount to a Fourth Amendment violation. *Melvin*, 550 F. App'x at 220. Either way, the Nicholas Plaintiffs have not established that Nicholas suffered a constitutional violation. And so, their claim against Officer Gallegos based on the alleged use of force against Nicholas fails as a matter of law.

### ii. The use of force against Tuttle was not excessive.

Due to the overwhelming evidence demonstrating the threat of deadly harm that Tuttle repeatedly posed to officers, and the admission by Plaintiffs' expert that "clearly Mr. Tuttle was a threat when he was shooting at the officers," Plaintiffs now challenge only Officer Gallegos's final shot of Tuttle.[119] Plaintiffs appear to rest this entire assertion on the argument that because of the gunshot wounds to Tuttle's hands, Tuttle was incapable of raising his gun and, therefore, the final shot from Officer Gallegos was excessive.[120] For the reasons set forth below, the excessive force claim related to Tuttle fails as a matter of law.

**First**, Plaintiffs' theory related to the "final shot" does not contradict the Individual Officers' corroborated accounts that Tuttle (1) held a gun in his hand, which he repeatedly pointed at the officers, (2) initiated gunfire at the officers, (3) shot and wounded four officers in less than a minute, (4) never voluntarily relinquished his gun or communicated to the officers an intent to surrender, and (5) continued to threaten officers with his weapon even in his final moments.[121] These facts alone establish that Officer Gallegos's last shot at Tuttle was not excessive. *Garza v. Briones*, 943 F.3d 740, 745 (5th Cir. 2019) (officers' use of deadly force did not violate Fourth Amendment where suspect refused to comply with police orders, waived around what officers

---

[119] *See* **Ex. 19, Scott Dep.** at 157:4–5; ECF No. 301.
[120] Ex. 19 (Scott Dep.) at 150:5–152:22; 154:19–155:10.
[121] *See supra* Factual Background Section; *see also* Ex. 42 (Maloney Dep. II) at 20:9–23:5.

presumed to be a handgun, raised the gun and pointed it in officer's direction, and seemingly aimed the gun, even though suspect's gun turned out to be "only a BB gun").

**Second**, even if a purported expert speculates that at some point during the Harding Street incident Tuttle ceased posing a threat of harm, "hindsight and speculation create no genuine, material fact issue as to how a reasonable officer could have interpreted [Tuttle's] actions" at the time of the incident. *Ontiveros*, 564 F.3d at 384. Plaintiffs attempt to show that Tuttle stopped posing a threat of harm to the officers at some point during the incident because after Tuttle shot Medina and Lovings, his right wrist, left hand, and forearm were wounded, purportedly rendering Tuttle incapable of holding a weapon.[122] Even assuming *arguendo* that Plaintiffs have an expert who is qualified to testify as to whether Tuttle was physically capable of "hold[ing] a weapon" after sustaining his injuries, an officer "need not stop shooting until the threat has ended," and Plaintiffs have never maintained that Tuttle "clearly [gave] himself up" to the officers. *See Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014) (holding that officers' use of deadly force did not violate the Fourth Amendment where suspect posed a "severe threat to public safety," and he never "clearly [gave] himself up"). Nor is there evidence that prior to the final shot of Tuttle "it was clear to [Officer Gallegos] that [Tuttle] was no longer a threat." *Cantu v. Austin Police Dep't*, No. 1:21-CV-84-DAE-SH, 2023 WL 8634821, at *8 (W.D. Tex. Dec. 12, 2023), *report and recommendation adopted*, No. 1:21-CV-84-DAE, 2024 WL 492395 (W.D. Tex. Feb. 8, 2024). Not even Maloney opines that Officer Gallegos knew Tuttle was purportedly incapacitated prior to the last shot.[123]

Put plainly, "[p]laintiffs have failed to present sufficient evidence that [Officer Gallegos] had a way of knowing that [Tuttle] was incapacitated or the degree to which he was

---

[122] Ex. 19 (Scott Dep.) at 150:5–152:22; 154:19–155:10.
[123] Ex. 8 (Maloney Dep. I) at 179:16–180:25.

incapacitated[.]" *Cantu*, No. 1:21-CV-84-DAE, 2024 WL 492395, at *5. In fact, the officers' corroborated testimony shows that immediately prior to each shooting of Tuttle, Tuttle had (1) shot multiple officers, and (2) threatened other officers with his gun.[124] There is no issue as to the reasonableness of Officer Gallegos's belief that Tuttle continued to pose a substantial threat of harm until the last shot.

**Third**, even if—as Plaintiffs speculate—Tuttle was laying on the ground facing the living room couch at the time of the last shot, instead of sitting on the floor facing the front of the house and holding his gun,[125] Officer Gallegos was still justified in believing that use of deadly force was necessary to protect both himself and other officers from Tuttle's threat of imminent harm. Even under Plaintiffs' own version of events, (1) Tuttle faced Lovings, who lay injured and in a vulnerable position in the entryway of the house just a few feet away from Tuttle, (2) Tuttle raised his upper body and propped himself up by his elbows, (3) Tuttle's weapon lay in close proximity to him, and (4) none of the Individual Officers knew that Tuttle was supposedly unable to hold a weapon.[126] Furthermore, Plaintiffs do not dispute that by this time four officers had already been shot and wounded, and Tuttle had neither voluntarily relinquished his weapon nor communicated any intent to surrender. Thus, even under Plaintiffs' version of events, Officer Gallegos's last shot at Tuttle was neither unreasonable nor excessive. *Harris*, 745 F.3d at 772 ("[U]se of deadly force is not unreasonable when an officer would have reason to believe that the suspect poses a threat of serious harm to the officer or others."). Because Officer Gallegos did not violate Tuttle's constitutional right to be free from unreasonable seizure, summary judgment should be granted for Plaintiffs' Section 1983 excessive force claim against him.

---

[124] *See supra* Factual Background Section.
[125] Ex. 10 (Gallegos) at 137:5-14.
[126] Ex. 8 (Maloney Dep. I) at 179:16–191:5.

## II. Plaintiffs' State Law Claims Against Officer Gallegos are Barred by Individual Immunity and Therefore Fail as a Matter of Law.

In addition to their Section 1983 claim, Plaintiffs assert standalone state law claims for wrongful death and survival based on the alleged use of excessive force.[127] These claims are barred by the Texas Tort Claims Act, Tex. Civ. Prac. & Rem. Code § 101.106. *See Franka v. Velasquez*, 332 S.W.3d 367, 370 (Tex. 2011). Plaintiffs have sued Officer Gallegos based on conduct that is within the general scope of his police duties. *See Smith*, 31 F.4th at 913–14; *Garza*, 574 S.W.3d at 399–400. The Plaintiffs could have and have brought their state law claims under the Texas Tort Claims Act against the City of Houston. *See id.* Thus, Officer Gallegos is immune from claims asserted under Texas law.

## CONCLUSION[128]

For the foregoing reasons, Officer Gallegos respectfully requests that the Court grant his Motion for Summary Judgment on Plaintiffs' excessive force Section 1983 claim and Plaintiffs' state law claims against him.

Respectfully submitted,

 */s/ Russell Hardin, Jr.*
Russell Hardin, Jr.
*Attorney-in-Charge*
State Bar No. 08972800
Federal I.D. No. 19424
Email:  rhardin@rustyhardin.com

OF COUNSEL:

RUSTY HARDIN & ASSOCIATES, LLP
Marshall Douglas Murphy (Of Counsel to the Firm)
  State Bar No. 24013215
  Federal I.D. No. 24254
Letitia D. Quinones (Of Counsel to the Firm)
  State Bar No. 24008433

---

[127] ECF No. 48 ¶¶ 186–192; ECF No. 49 ¶¶ 212–17.

[128] Officer Gallegos incorporates by reference, pursuant to Fed. R. Civ. P. 10(c), the Individual Officers' motion for judgment on the pleadings as to any purported conspiracy claim.

Federal I.D. No. 23722
John MacVane (Of Counsel to the Firm)
  State Bar No. 24085444
  Federal I.D. No. 2209776
Jennifer Brevorka
  State Bar No. 24082727
  Federal I.D. No. 1725400
Aisha Dennis
  State Bar No. 24128655
  Federal I.D. No. 3290460
1401 McKinney Street, Suite 2250
Houston, Texas  77010
Telephone:  (713) 652-9000
Facsimile:  (713) 652-9800
Email:  dmurphy@rustyhardin.com
Email:  lquinones@rustyhardin.com
Email:  jmacvane@rustyhardin.com
Email:  jbrevorka@rustyhardin.com
Email:  adennis@rustyhardin.com

***ATTORNEYS FOR FELIPE GALLEGOS***

## CERTIFICATE OF SERVICE

I hereby certify that on August 9, 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing *via* electronic mail to all counsel of record.

 */s/ Aisha Dennis*
Aisha Dennis