UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| CLIFFORD TUTTLE, et. al. | |
| Consolidated with | |
| JOHN NICHOLAS, et.al. | |
| Plaintiffs, | |
| v. | Case No. 4:21-cv-00270 |
| CITY OF HOUSTON; ART ACEVEDO, et. al. | (JURY DEMANDED) |
| Defendants. | |

**THE TUTTLE AND NICHOLAS PLAINTIFFS' RESPONSE TO DEFENDANT, THE CITY OF HOUSTON'S MOTION FOR SUMMARY JUDGMENT REGARDING THE EXCESSIVE FORCE MONELL CLAIMS**

## I.
## INTRODUCTION

The City of Houston created a policy or custom that assured officers, like Felipe Gallegos, that they "could use excessive force in his pursuit of [Tuttle and Nicholas] and not worry about being meaningfully disciplined or punished."[1] This type of claim – sometimes known as the highly predictable consequence *Monell* theory – occurs when a "custom of excessive force" is created by using "internal investigatory procedures to provide accused officers an opportunity to conform

---

[1] *Arrington v. City of Chicago*, No. 17 C 5345, 2018 U.S. Dist. LEXIS 14168 at *12 (N.D. Ill. Jan. 30, 2018).

their account of alleged excessive force incidents to the evidence discovered by investigators."[2] This effectively assures officers that they can use excessive force including against citizens like Nicholas and Tuttle, and avoid any repercussions. Judge Lake previously applied this exact theory in a case involving the same disciplinary process at HPD. Tellingly, Defendant's motion does not even cite this case. [3]

The investigative process at HPD gave Gallegos (and the other officers) 48-hour notice of every investigation.[4] The officers then were allowed to review all evidence – including BWC footage, audio, statements, and evidence – prior to crafting a statement with their lawyer.[5] HPD also prohibited IAD from reviewing an officer's prior disciplinary history[6] – notably here, from 2011 to 2019, Gallegos had been previously involved in six use of force charges, including three prior shootings and three use of force claims.[7]

Not coincidentally, prior to this investigation, the City of Houston for ten years had found every single police on-duty shooting – regardless of if the citizen was armed or not – as justified. The ultimate decisionmaker for this policy was the Chief of Police, who reviewed each officer involved shooting. Put differently, the City, through the Chief of Police, created a policy of allowing officers to change or alter their story to avoid any type of discipline. And it worked. The City always, without exception, found shootings of civilians by on duty officers justified.

The Harding Street investigation further flags the severe flaws with HPD's disciplinary process. As part of that, the City disregarded a slew of lies by Gallegos and others. For this motion,

---

[2] *Id.* at *12-13.
[3] *Estate of Baker v. Castro*, CIVIL ACTION NO. H-15-3495, 2018 U.S. Dist. LEXIS 170949 at *35-36 (S.D. Tex. Aug. 31, 2018).
[4] Pls.' Ex AD (Dep. of Nguyen) at 40:2-40:12.
[5] Pls.' Ex AD (Dep. of Nguyen) at 43:15-45:25.
[6] Pls. Ex. AD (Dep. of Nguyen) at pg. 35.
[7] Pls. Ex. 87; Pls. Ex. F (Dep. of Gallegos) at pg. 24-26.

Nicholas and Tuttle have flagged five key contradictions or changes in testimony by the officers wholly ignored by the City's "process":

- Sworn testimony change #1: In his sworn IAD interview, Gallegos testified that Ms. Nicholas did not "actually **lay her hands on the weapon**."[8] At his deposition: Gallegos now testified he saw Nicholas "pulling at" the shotgun and touching "the weapon itself."[9] No fingerprints were taken of the gun.[10]

- Sworn testimony change #2 – In his sworn statement to homicide, Lovings swore that "as soon as I entered the house, I saw a female to the left of us."[11] Yet, in his deposition, Lovings testified that he never saw Nicholas that day.[12]

- Sworn testimony change #3 – Pardo testified that when he approached the door to grab Lovings, he saw Tuttle sitting down, with a gun in his right hand.[13] At his deposition, he testified that the gun, he believed, was in his "left hand."[14]

- Sworn testimony change #4: Lovings testified that after he saw Nicholas in the house, "Officer Medina moved toward her." Yet, in his deposition, Lovings testified that he "never saw . . . Officer Medina."[15]

- Sworn testimony change #5 – In his second homicide statement, Officer Gallegos testified that after he shot Nicholas, he "observed the suspect **fall onto the couch** towards the west wall." Yet in his deposition, Gallegos backtracked and claimed he saw her "turn and fall **towards** the couch," but he "lost visual because [he] sunk back in behind the wall."[16]

The officers also could not get their stories straight with each other.[17] For example, Lovings

---

[8] Pls. Ex. 92 at Page 24.

[9] Pls. Ex. F (Dep. of Gallegos) at pg. 102:20-103:7.

[10] Pls. Ex. B-1 Declaration and Report of Scott at pg. 38.

[11] Pls. Ex. 165 Lovings Homicide Statement.

[12] Pls. Ex. AG (Dep. of Lovings Vol I. ) at 31:5-32:14.

[13] Pls. Ex. 158 at pg. 38 (Pardo SIU statement).

[14] Pls. Ex. AL (Dep. of Pardo) at 66:15-67:13.

[15] Pls .Ex. AG (Dep. Lovings Vol 1) at 33:24-24:2.

[16] Pls. Ex. F (Dep. of Gallegos) pg. 110.

[17] Plaintiffs have now learned of an additional contradiction. Officer Gallegos, Pls. Ex. F, testified at 153:17-20 "Q. Nobody within Squad 15 during this raid was wearing a body worn camera, true? A. No, sir. Narcotics didn't wear body worn cameras." Yet, during the underlying criminal trial, Steven Byrant testified that he was told by Gallegos, that Clemente Reyna had a BWC during the raid. See "LIVE BLOG: Gerald Goines' former HPD partner, Steven Bryant, drops bombshell during testimony Day 4 of ex-HPD officer Gerald Goines' murder trial." Available at https://www.click2houston.com/news/local/2024/09/12/live-blog-ex-

claimed Tuttle shot first; Medina and Salazar claimed Lovings shot first; yet Gallegos and Sepolio testified that they first heard a shotgun – meaning Medina took the first shot.[18] Most telling, the physical evidence also contradicted the officers' testimony. For example, according to Squad 15 officers, Tuttle shot at least 11-13 times during the raid.[19] The only problem? Based on the evaluation of his revolver and the scene, Tuttle shot either three times or four times at most.[20] Similarly, the forensic evidence contradicted the actual location of Nicholas and Tuttle when they were murdered.

But what does HPD do when the physical evidence contradicts the statements of the officers? They ignore this evidence, and instead baldy accept the officers' statements as true. Most damning, the IAD investigator, Commander Nguyen, could not identify any other evidence, besides the statement of officers, that he relied on for his conclusions that Gallegos's shooting was justified.

```
                        84
19   Uh, besides the testimonial statements or,
20   uh, statements of officers, what other evidence did you
21   rely on to support your recommendation regarding, uh,
22   Officer Gallegos' shooting, uhm, of Ms. Nicholas?
25            THE WITNESS:  The recommendation was based
                        85
 1   on the testimony of the officers.
```

---

hpd-narcotics-officers-phone-records-contradict-account-of-drug-purchase-before-deadly-harding-st-raid/
Because Bryan took the fifth in his deposition in this matter, Plaintiffs have been unable to question him about this.

[18] Pls. Ex. F (Dep. of Gallegos) at 93:15-17; Pls. Ex. AM (Dep. of Sepolio) at pg. 68.

[19] *See* Pls. Ex. H (Dep. of Salazar) at 50:11-50:24 (claiming Tuttle shot 3-4 times initially at Medina); Pls. Ex. AM (Dep. of Sepolio) at 83:7-16 (testifying he believed Tuttle shot multiple times as he grabbed Medina); Pls. Ex. AK. (one shot at Lovings); Pls. Ex. F (Dep. of Gallegos) at 111:17-18 (Gallegos sees two shots at Reyna and Goines); Pls. Ex. F (Dep. of Gallegos) at pg. 209 and 118:1-14 (Gallegos sees another shot); Pls.' Ex. 156; Pls. Ex. AL (Dep. of Pardo) at 59:18-60:2 (Pardo adds another shot).

[20] Pls. Ex. A-1, Declaration and Report of Maloney; Lt. Pls. Ex. AK at pg. 88 ("4 fired cartridge cases recovered from Tuttle's pistol").

. . .

86

4   But as you sit here today, are you able to
5  name a single piece of other evidence?
6    A.  I cannot name --
8       THE WITNESS:  -- other evidence.[21]

This is simply the purpose of the policy – tacitly encourage excessive force.

In addition to the above, the intended and usual investigation also missed key and vital details that would have helped confirm that this shooting was not justified. This included the following refusals to actually evaluate highly relevant evidence:

- HPD refused to take fingerprints on Medina's shotgun, where Gallegos claimed she grabbed it;[22]

- HPD refused to take fingerprints on Loving's rifle, where Lovings claimed Tuttle grabbed it;

- •   Without consequence or even attempting to determine who was responsible, HPD admitted someone(s) logged onto Goines's computer at HPD's own headquarters, while he was in the hospital, which points to invokes the likelihood of serious concerns about altering or deleting highly relevant evidence. HPD never even determined or attempted to determine who did that or recovery what might be altered or deleted;[23]

- HPD refused to chart the "magazine associated with Lovings rifle" – meaning there is an "unknown number of remaining cartridges in Lovings rifle," and an "unknown brand of cartridges being fired through the magazine."[24]

- There is no evidence that HPD measured and weighed the bullet that struck Lovings with the bullet that struck Goines – as recommended by Lt. Wolf to determine if the bullet that struck Goines was consistent with Tuttle's weapon;[25] and

- HPD Officers, in violation of HPD policy, failed to activate their BWC during the raid.[26] And Chief Art Acevedo ordered the perimeter officers to turn their body cameras off while still on the scene as he was questioning officers at the scene.[27]

- HPD refused to test DNA from Medina against blood stain on the Couch on the south

---

[21] Pls. Ex. AD (Dep. of Nguyen) at 84-86.
[22] Pls. Ex. B-1, Scott Declaration.
[23] Pls. Ex. 32  at pg. 44 of the report.
[24] Pls. Ex. AK at pg. 86 and 88.
[25] Pls. Ex. AF (Dep. of Wolf) at 259:10-260:3.
[26] Pls.' Ex. 29, at Bates No. COH00005476-COH00005477.
[27] Pls.' Ex. AR.

side of the building;[28]

- HPD refused to collect and test bloodstain with Nicholas on the couch near the location on the north side, where she was shot;[29]

- HPD refused to collect and test bloodstain on the front doorframe/wall and on the floor by the door, which could have established of Tuttle ever went beyond the front door or who was shot and where, in the vicinity of the door;[30]

- HPD refused to locate or review the bullet "recovered from the couch cushion" which was a .223 and contained both Rhogena Nicholas and Dennis Tuttles' DNA indicating the bullet struck both victims. According to Michael Maloney, this was the fatal bullet that struck Nicholas, recovered directly behind her body on the couch. [31]

- HPD failed to conduct a "shooting incident reconstruction"[32]

By this process, HPD accomplished its goal – it did not punish Gallegos. In light of this, police practices expert, Andy Scott, confirmed that "[b]ased on the lack of supervision and disciplinary action identified above, Gallegos and Squad 15 knew that their use of excessive deadly force would be met with tacit approval by supervisors, the Chief of Police."[33] In particular, "[t]his failure encouraged Gallegos and Squad 15 to continue their unlawful conduct, including the use of excessive deadly force."[34] Therefore, summary judgment should be denied.

Second, in addition to *Monell* liability, the City also argued that it did not violate the Constitutional rights of Nicholas and Tuttle. To support that, Ex-HPD officer Felipe Gallegos makes the same bogus justification he has asserted since January 28, 2019 – he intentionally shot and killed Nicholas because she was standing over HPD officer Frank Medina and reaching for his weapon. However, there are serious flaws with Gallegos's story – even with the shifting and changing versions by Gallegos. Officer Medina was already well outside the house before Gallegos

---

[28] Pls. Ex. 1-A, Declaration of Maloney (At his attached report at Pg. 5 of 52).
[29] *Id.*
[30] *Id.*
[31] Pls. Ex. 1-A, Declaration of Maloney (At his attached report at Pg. 6 of 52).
[32] Pls. Ex. 1-A, Declaration of Maloney (At his attached report at Pg. 7 of 52).
[33] Pls. Ex. B-1, Declaration of Scott.
[34] *Id.*

even fired his weapon. Worse yet? The bullet trajectory analyzed by forensic expert Michael Maloney makes it clear – Nicholas was on the distant side of the couch, not anywhere near where Medina was located. And Nicholas was shot in the right side, not the left side – meaning, that she could not have been standing over Medina when Gallegos intentionally shot her twice and killed her. Put simply, Felipe Gallegos shot Ms. Nicholas without any warning, while she posed no threat to him or his fellow officers. And the Fifth Circuit has long recognized that "[a] police officer may not seize an unarmed, non-dangerous suspect by shooting [her] dead."[35]

Similarly, the City also alleges that he shot Dennis Tuttle because he was a threat to officers. Yet when Gallegos fired the final two shots that struck Tuttle, he was already incapacitated after receiving seven bullet wounds. Specifically, at that point Tuttle (1) no longer could hold a weapon; (2) certainly did not raise a weapon; (3) was not facing Gallegos like he claimed; and (4) Gallegos shot him in the back of the head. The Fifth Circuit has previously made it clear – "an officer cannot continue using deadly force," once a suspect has been incapacitated.[36] But here, Gallegos executed Tuttle by shooting him in the back of the head. This is murder, not a justified shooting.

For all these reasons, the City's motion should be denied.

**II.**
**FACTUAL BACKGROUND**

**1.**  **The Houston Police Department establishes a system that encourages excessive force by**

HPD has a long history of encouraging excessive, deadly force against civilians who pose no threat to officers or others. This pattern is not an accident. Rather, HPD designed its policies, enforcement, and investigations of officer-involved shootings to create it. For example, in its investigation process regarding the shooting of a civilian by a police officer, HPD Internal Affairs

---

[35] *Releford v. Rosemon*, 678 F. App'x 267, 268 (5th Cir. 2017); *Brosseau v. Haugen*, 543 U.S. 194, (2004).
[36] *Roque v. Harvel*, 993 F.3d 325, 336 (5th Cir. 2021) (citing *Lytle v. Bexar Cnty.*, 560 F.3d 404, 413 (5th Cir. 2009)).

does not look at the police officer's complaint history[37] and gives the police chief the sole final disciplinary determination.[38] Additionally, an HPD police officer is not questioned until he has spoken with an attorney;[39] and given forty-eight hours to answer written questions with detailed instructions "how to write" the statement.[40] In that 48-hours, HPD gives officers access to body camera footage, HPD policies and SOPs, evidence, witness statements, or other statements, prior to an officer response.[41] Through this, with the instructions how to write their statements, officers are able to adapt and change their story to fit the evidence, while avoiding review of any potential excessive force.

As a result of this custom and practice, from 2009 to 2014, HPD had 194 intentional shootings of civilians, 81 of which were of unarmed civilians. IAD and the Chief of Police determined that every single one of those shootings was justified.[42] Between 2015 to 2016, on-duty HPD officers have killed 32 people, and IAD deemed every single one of those shootings justified.[43] In 2016, Art Acevedo took over as Chief, and this pattern continued. Chief Acevedo found every single shooting by an on-duty officer justified from 2016-2019.[44] Notably from 2017 through January 28, 2019, HPD – based on its own officer-involved shooting data – has reported 30 on duty officer involved shootings. Some of the weapons during this time period –unknown

---

[37] Pls.' Ex AD (Dep. of Nguyen) at 44:19-35:3.
[38] Pls.' Ex AD (Dep. of Nguyen) at 107:20-108:2.
[39] Pls.' Ex AD (Dep. of Nguyen) at 40:2-40:12.
[40] See e.g. Pls.' Ex. AT Officer notification.
[41] Pls.' Ex AD (Dep. of Nguyen) at 43:15-45:25.
[42] Pls.' Ex. B, Declaration of Andrew Scott.
[43] See generally, "HOMICIDE DIVISION 2015 HPD OFFICER INVOLVED SHOOTING INCIDENT" available at https://www.houstontx.gov/police/ois/2015.htm and "HOMICIDE DIVISION 2016 HPD OFFICER INVOLVED SHOOTING INCIDENTS," available at https://www.houstontx.gov/police/ois/2016.htm
[44] Pls.' Ex. S (Dep. of Acevedo) at pg. 15-18.

object,[45] a machete,[46] scissors and screwdriver,[47] no weapon,[48] "hands and/or feet,"[49] "other,"[50] and a vehicle leaving the scene.[51]

In light of this, HPD officers through January 28, 2019, knew that they could use deadly force without hesitation because they would not be disciplined, scrutinized, punished, or charged for shooting unarmed civilians.

## 2. **Background before HPD's armed home invasion**

Three weeks before the deadly attack, HPD first targeted 7815 Harding Street. On January 8th, Officers Morales and Blankenship-Reeves went to the house in response to an anonymous 911 call. The caller claimed that her 24-year-old daughter was inside the home doing heroin with a woman named "Reggie."[52] This call was objectively false, and the caller, Patricia Garcia, later pleaded guilty to federal crimes. That night, both officers made no contact with anyone in the house and did not notice any dogs or observe any activity in the residence at all.[53]

---

[45] "HOMICIDE DIVISION 2017 HPD OFFICER INVOLVED SHOOTING INCIDENTS" at March 10, 2017; See https://www.houstonx.gov/police/ois/2017.htm
[46] See "HOMICIDE DIVISION 2017 HPD OFFICER INVOLVED SHOOTING INCIDENTS" at April 27, 2017; available at https://www.houstonx.gov/police/ois/2017.htm
[47] See "HOMICIDE DIVISION 2017 HPD OFFICER INVOLVED SHOOTING INCIDENTS" at October 27, 2017 available at https://www.houstonx.gov/police/ois/2017.htm
[48] "HOMICIDE DIVISION 2018 HPD OFFICER INVOLVED SHOOTING INCIDENTS" at December 25, 2018, November 28, 2018; Sept. 4, 2017; April 27, 2017; April 24, 2017 available at
https://houstonx.gov/police/ois/inc_no/66457618.htm and
https://www.houstonx.gov/police/ois/2018.htm
[49]HOMICIDE DIVISION 2018 HPD OFFICER INVOLVED SHOOTING INCIDENTS" at November 14, 2018 available at https://www.houstonx.gov/police/ois/2018.htm
[50] "HOMICIDE DIVISION 2018 HPD OFFICER INVOLVED SHOOTING INCIDENTS" at September 8, 2018; July 23, 2018; and June 18, 2018 available at
https://www.houstonx.gov/police/ois/2018.htm
[51] "HOMICIDE DIVISION 2018 HPD OFFICER INVOLVED SHOOTING INCIDENTS" at May 26, 2018 available at https://houstonx.gov/police/ois/inc_no/66457618.htm
[52] *See* Pls.' Ex. J (Morales Ex. 15) at COH00005692 (Morales's 3/18/2019 IAD statement).
[53] *See* Pls.' Ex. J (Morales Dep.) at 10:16 – 11:7, 23:4-18; Pls.' Ex. I (Blankenship-Reeves Dep.) at 26:21 - 29:12.

Following that evening, Blankenship-Reeves passed on a note she prepared about the call to fellow Lieutenant Marsha Todd – Blankenship-Reeves's significant other.[54] Todd then passed this tip to Officer Gerald Goines – a member of HPD's Narcotics Squad 15. Specifically, she told him she "[n]eed[ed] a favor" for a "case worked on a house," and she knew he would "do it right."[55] She then wrote "Heroin."[56]

For Goines and Squad 15, the timing of this tip was a lucky break – it gave them an opportunity to have a "picture day" in full uniforms prior to the departure of Officer Gallegos, who planned transfer to SWAT the next week.[57] By January 28, Goines had lied to secure the no-knock warrant to raid the home of unsuspecting Nicholas and Tuttle later that evening.[58] As explained in greater detail in Response to the City's Motion for Summary Judgment regarding the warrant claims, Goines committed perjury by concocting a false story that a CI had gotten drugs from Tuttle. In other words, the warrant was based solely on lying under oath.

**3. The approach to the house for HPD's unlawful armed home invasion**

As 5:00 PM approached on January 28th, Squad 15 drove to 7815 Harding in their van. None of the members of Squad 15 had body worn cameras ("BWC"). And while the officers in the perimeter – Nicole Blankinship-Reeves, Richard Morales, Samuel Garza, Valeriano Rios, and Yvette Ortiz – all had BWCs, they failed to activate their BWC as they exited their vehicles, as

---

[54] *See* Pls.' Ex. I (Blankenship-Reeves Dep.) at 146:7 – 149:1.
[55] Exhibit 25, Text Message; see also *See* Ex. AE (Todd Dep.) at 55:7-23, 69:23 – 70:15 ("Q. Okay. And then on January the 11th you texted to Gerald Goines and you said: Need a favor. I need a case worked on a house, and I know you will do it right. Period. Heroin. Period. Were those your words? A. Yes.").
[56] *Id*.
[57] *See* Pls.' Ex. 171 (Reyna Ex. 171) at COH00038514 (Reyna 2/5/2019 SIU interview).
[58] *See* Pls.' Ex. 31 (French Ex. 31); Ex. G (French Dep.) at 14:12 – 15:12 (authenticating warrant).

required by HPD policy.[59] Instead, Morales activated his BWC as Squad 15 made entry into the house – this is the first audio of the approach.[60] Rios activated his BWC after he took cover behind a truck.[61] Blankinship, Garza, and Ortiz activated their BWCs after the shooting had ended.[62] Ultimately, HPD determined that these five officers violated HPD policy by failing to properly and timely activate their BWCs.[63]

While incomplete, the available footage paints a disgusting and tragic picture. As Squad 15 approaches 7815 Harding Street, they assemble a "stack" of Medina, Lovings, Bryant, Salazar, Pardo, Sepolio, Ashraf, Gallegos, Reyna, Goines, and Wood.[64] As Morales activates his BWC, a loud bang echoes – either the first gun shot or the breaching of the door.[65,66] Medina forces his way into the house first, followed by Lovings, Salazar, and Pardo – all four with guns out.

Within the next eight seconds, Medina fires his shotgun at the family dog.[67] Lovings also shoots at the dog at least twice.[68] Without hearing the sound of another gunshot,[69] Medina is then hit by a bullet or bullet fragment from Lovings.[70] As Rios runs to take cover behind a blue truck

---

[59] The BWC at HPD has a two-minute buffer of video only. Meaning, once Morales and Rios turned on their BWC, the video buffered the prior two minutes without sound.
[60] Pls.' Ex. AC, "Ranger Sync of BWC" at the 27 second mark of the video; *see also* Pls.' Ex. 29, at Bates No. COH00005476-COH00005477.
[61] *Id.* at the 43 second mark of the video; *see also* Pls.' Ex. 29, at Bates No. COH00005476-COH00005477
[62] Pls.' Ex. 29, at Bates No. COH00005476-COH00005477.
[63] *Id.*
[64] Pls. Ex. AK Ranger PowerPoint at pg. 24.
[65] Pls. Ex. AC, Ranger Sync of BWC at the 0:27 of the video. .
[66] Wolf has opined that this must be a gunshot. See Exhibit AK at pg. 43.
[67] Pls. Ex. N (Dep. of Medina) at 45:18-22; see also Ex. AC.
[68] Pls. Ex. 165, Lovings Homicide statement.
[69] Pls. Ex. N (Dep. of Medina) at 46:5-6.
[70] Pls. Ex. A-1 at pg. 33 of 52("Officer Medina was shot in back of his right shoulder that travelled transversely and impacted the paraspinal muscle. Multiple small metallic bullet fragments consistent with . . . a fragmenting .223. are noted in the wound track."). Only Lovings had shot a .223 at that point.

in front of the house, he turns his BWC toward the front of the house. This view shows Felipe Gallegos standing to the back left of the door – as shown circled in red.[71] The Texas Rangers' report also admits Gallegos's positioning.[72]



In the next 4-5 seconds, ten to twelve shots are fired – Salazar and Lovings fire most, if not all, of those shots.[73] Specifically, Salazar testified that he fired eight to ten shots before he fell outside of the house.[74] Lovings also fired at least nine times during the attack.[75]  And undisputedly, these shots occurred before Lovings fell from a gunshot to the neck.[76]

In the middle of that sequence – approximately six seconds after Rios begins to retreat to the truck – Sepolio pulls Medina outside of the house and reaches the street. [77] Based on their location, Sepolio grabbed and carried Medina from the house at or near the time of the series of

---

[71] Exhibit AC,  BWC at 0:30-0:35.
[72] Exhibit AC,  BWC at 0:30-0:35; *see also* Exhibit AK, PowerPoint provided by Ranger Wolf. Ranger Wolf specifically identified Gallegos at pg. 50.
[73] Pls.' Ex. AC – BWC Sync from 0:35- 0:39.
[74] Pls.' Ex. H (Dep. of Salazar) 70:22-71:10.
[75] Pls.' Ex AF (Dep. of Wolf) at 115:18-116:8.
[76] Pls.' Ex. AF (Dep. of  Wolf) at 116:9-23.
[77] Pls.' Ex. AC – BWC Sync from 0:40 (in the top right corner video); see also Exhibit AK, Ranger Wolf's findings confirming that this is Sepolio and Medina.

shots by Salazar and Lovings.[78] As Rios reaches the truck, he briefly lifts his BWC toward the

front of the house.[79] In this short snippet, Medina and Sepolio are behind the van, and a short

sleeved, tattooed Gallegos[80] stands to the far left and away from the house.



Gallegos

Unknown officer

Medina/Sepolio

---

[78] *Id.*; In addition, this is further corroborated by the statements of Sepolio, Lovings, and Medina. While Medina does not recall when exactly in the sequence Sepolio grabbed him, he does not report exiting past any fallen officers. Pls. Ex. 131 (Medina Ex. 131) (3/27/2019 Medina IA interview). To the contrary, he recalled walking past the stack on his way out. Id. Similarly, Sepolio has confirmed that he does not recall observing Lovings down until after returning from escorting Medina to safety, when he noted Lovings already pulled away from the house and in the yard. *See* Ex. AM (Sepolio Dep.) at 73:7 – 74:4; *see also* Ex. 105 (1/29/2019 Sepolio SIU Statement) (confirming that he noticed Goines and Lovings down in the yard for the first time upon returning to the house from escorting Medina). Lovings likewise does not recall seeing Medina make an exit while he was laying incapacitated in the doorway to the home. Pls.' Ex. AG (Lovings Dep. Vol 1) at 34:13 – 20.

[79] Pls.' Ex. AC – BWC Sync from 0:43.

[80] This particular individual is Gallegos based on (1) his short sleeves, which Lt. Wolf previously used to identify him (based on his rifle and short sleeve shirt) and is seen in the group photo that day, only Gallegos, Goines, and Bryan wore short sleeves Pls. Ex. 167; (2) his mask matches the mask that Gallegos was wearing that night; see Pls. Ex 99; (3) the photo appears to show tattoos consistent with Gallego and is consistent with his build and skin tone; and (4) it is logically consistent with his prior position to the left of the house.

During this time, the BWC captures four to five more shots.[81] Again, these shots are consistent with firing by Lovings and Salazar. At that same timestamp, Gallegos starts to move forward from his outside location towards the house, with Medina already outside the home.[82] In the following seconds, glass breaks and an someone – likely Lovings – screams in pain.[83]

4. **Gallegos murders Nicholas and lies to justify his homicide.**

For the remaining portion of the attack, the BWC does not capture a visual of the house, and instead merely provides audio of screams and gunshots. But the available evidence still reveals the sequence of events. After Gallegos hears the "gunfire exchange going on inside the residence,"[84] – the shots fired by Lovings and Salazar – Gallegos moves to the "right of the front porch."[85] He then sees "Officer Salazar and Officer Pardo fall backwards off the front porch."[86] Per Gallegos, Lovings then drops in the doorway.[87]

At that moment – after the series of shots by Salazar and Lovings, after Pardo and Salazar fell, and after Lovings was shot – Gallegos finally sees inside the house.[88] At that point, he spots Ms. Nicholas and shoots her without warning.[89] To justify this homicide, Gallegos swore he saw Nicholas "grabbing with both hands tugging at the shotgun" and "standing over Officer Medina tugging at his shotgun that is slung to his vest saying, Motherf****r, motherf****r."[90] According to him, Nicholas was not "exactly squared up with" him, but "at an angle."[91] He admits that he

---

[81] Pls.' Ex. AC – BWC Sync from 0:41-0:46.
[82] Pls.' Ex. AC – BWC Sync from 0:46.
[83] Pls.' Ex. AC – BWC Sync from 0:47-0:49.
[84] Pls. Ex. F (Dep. of Gallegos) at 99:10-16.
[85] Pls. Ex. F (Dep. of Gallegos) 96:20-97:3.
[86] Pls. Ex. F (Dep. of Gallegos) at 99:12-17.
[87] Pls. Ex. F (Dep. of Gallegos) at 100:23-101:1.
[88] Pls. Ex. F (Dep. of Gallegos) at 102:10-25.
[89] Pls. Ex. F (Dep. of Gallegos) at 108:3-11; 109:7-19,
[90] Pls. Ex. F (Dep. of Gallegos) at 102:10-25; 105:25-106:3.
[91] Pls. Ex. F (Dep. of Gallegos) at 107:24-108:2.

shot her in the "upper torso area"; but he "can't . . . pinpoint exactly where they hit, but [he] saw [his] rounds actively hit her."[92]  He further could not even identify whether the bullets struck her left side or right side.[93]  But this version from Gallegos flags two incredible inconsistencies – (1) where was Medina at the time that Gallegos shot Nicholas and (2) how did Nicholas sustain a fatal bullet wound to her right side of her body?

The answer to the first question is easy – Medina and Sepolio were already outside of the house on the street by the van. Officer Gallegos lied about Medina's location and Nicholas grabbing the gun to justify the murder.

Forensic evidence answers the second question. As confirmed by NCIS forensic investigator Maloney, Nicholas died on the north side of the couch, not in the area where Medina was located. [94] This is important because at the time of her death, Nicholas was found with her chest and head on the couch and her legs on the floor, and a pillow covering part of her right arm and face.[95] She sustained at least two gunshot wounds, including wounds to her right chest and right thigh.[96] The forensic pathologist for the Harris County Institute of Forensic Sciences who completed the autopsy of Ms. Nicholas confirmed the fatal shot was the one that entered through her right torso, which blew through all four chambers of her heart.[97]  This injury caused Ms. Nicholas's death mere seconds after she was hit.[98]  The entrance wound on the right side of her

_____

[92] Pls. Ex. F (Dep. of Gallegos) at 108:12-21.
[93] Pls. Ex. F (Dep. of Gallegos) 180:16-19.
[94] Pls.' Ex. A-1, Declaration and Report of Maloney at pg. 31 of 52 ("Rhogena Nicholas was not over the body of Officer Medina, as reported by several officers, where he had collapsed on the couch. She was physically removed by at least 8 feet from his location. Additionally were she over him attempting to gain control of his shotgun she could not have been shot on her right side as her left side would have been exposed to Gallegos shooting position.")
[95] *Id.*
[96] Pls. Ex.51 (autopsy report for Rhogena Nicholas).
[97] Pls.' Ex. AH (Benyon Dep.) at 74:14 – 78:4.
[98] Pls.' Ex. AH (Benyon Dep.) at 74:14 – 78:4.

body eliminates the possibility that Gallegos could have shot Nicholas while she was standing over Medina because the right side of her body would have been facing an opposite angle from Gallegos. Indeed, Maloney has testified "were she over [Medina] attempting to gain control of his shotgun she could not have been shot on her right side as her left side would have been exposed to Gallegos shooting position."[99] Furthermore, Maloney determined: (a) Nicholas was seated or getting up from the couch when she was shot; (b) she was on the far side from the door; (c) there was an obstruction (coffee table) for injured police officer to have walked around to be on the couch near her; (d) bloodstains on the couch by the door indicate the location of a second person, most likely the bleeding officer; and (e) Nicholas was not next to the policeman or reaching over his body for the shotgun when she was shot.[100] In other words, Gallegos shot and killed Nicholas, while she sat on the north end of the couch. And he did with Medina outside the home.

5. **Gallegos murders Tuttle by shooting him in the back of the head and lies about what happened to justify his homicide**

As Gallegos intentionally and knowingly shoots the unarmed Nicholas, the fatal bullet grazes Tuttle who had approached the front of the house.[101] Gallegos then shoots into the side of the house. He then circles to the tree in front of the door.[102] In the next flurry of shots from Gallegos, Reyna is hit with bullet fragments and Goines is hit in the face. Both of those shots came from a .223 – meaning, Gallegos, the only officer shooting at .223 during this period, shot Reyna and Goines.

---

[99] Pls.' Ex. A-1, Declaration and Report of Maloney at pg. 31 of 52.
[100] Id. at A-1, Declaration and Report of Maloney at pg. 30 of 52.
[101] A-1, Declaration and Report of Maloney at pg. 31 of 52 ("The fatal shot to her torso first grazed the arm of Dennis Tuttle").
[102] Pls. Ex. AK, Final Presentation by the Rangers at pg. 40 ("05:28:32 Gallegos is seen taking cover behind a tree in the front yard (CH2)(Officer is in black short sleeve shirt), and Sgt. Reyna or Sgt. Wood is heard yelling "I'm hit".).

During the attack, Tuttle sustained nine total bullet wounds. First, "[h]e received shots to both his shoulder and a grazing wound to his right forearm.."[103] Following that, Mr. Tuttle "began to turn away from the door," but "[a]s he turned he received shots to both arms and hands."[104] As confirmed by Maloney and Dr. Bux – a forensic pathologist – "[a]t this point he was incapable of holding a weapon."[105] Maloney and Dr. Bux's opinions are supported by photographs of Tuttle's wounds taken at the scene and at the morgue. While graphic, these photos further make it clear – Tuttle could not have held a gun.



106

In addition the five bullets that ripped through his body and his pre-existing right wrist injury (and wrist brace), the AR-15 shots caused catastrophic damage to his wrist.[107] The bullet ripped apart bones, tendons, ligaments, and muscle in his dominant, right wrist.[108] Combined with that, Tuttle's left arm and hand sustained gruesome, catastrophic injuries.[109] It is simply inconceivable that anyone with injuries like Tuttle's could grasp, hold, lift, raise, aim, and or fire a pistol at anyone. At a minimum, there is genuine factual evidence that Tuttle could not.

Disabled from his wounds, Tuttle then had "his back to the door[] and [is] . . . drop[ping]

---

[103] A-1, Declaration and Report of Maloney at pg. 32 of 52 .
[104] *Id.*
[105] *Id.*
[106] Pts. Ex. 54, 56, and 57.
[107] Pts. Ex. Ex. 57.
[108] *Id.*
[109] Pts. Ex. Ex. 54, Pts. Ex. 57; Pls. Ex. 56.

to the floor."[110] In the next 10-20 seconds, Lovings, who is still near the doorway, tells Gallegos he "need[s] to take a head shot."[111] And at the top of his lungs, Gallegos yells "shut the f**k up," and shoots  Tuttle in the buttocks/thigh.[112] "A single bullet passes between his legs as he approaches a parallel position to the floor, grazes his chest and enters his chin."[113] A full twenty seconds later, as the unarmed Tuttle puts his body weigh on "his upper body by his elbows,"[114] Gallegos fatally shoots Tuttle "in the back of his head/neck."[115] Gallegos screams "stop moving" after that shot.[116] Tuttle then "collapses to the floor partially on his right side and remains in that position."[117]



Tuttle's gun is later found under a heater.[119] Put simply, Gallegos murdered Tuttle when he was unarmed – at that point, he was incapable of holding a gun –  by shooting him in the back of the

---

[110] *Id.*

[111] Pls. Ex. AG, deposition of Lovings Vol. 1 at 72:23-73:7.

[112] Pls.' Ex. AC – BWC Sync from 1:20- -1:23; *See also* Pls. Ex. A-1, Declaration and Report of Maloney at pg. 32; Pls. Ex. F (Dep. of Gallegos) at 144:13-14 (confirming that Gallegos said "shut the f**k up").

[113] Pls. Ex. A-1, Declaration and Report of Maloney at pg. 32.

[114] Id.

[115] Pls.' Ex. AC – BWC Sync from 01:46- 01:48 (stop moving yelled); Pls. Ex. F (Dep. of Gallegos) at 144:16-17 (confirming that Gallegos said "stop moving")

[116] Pls. Ex. A-1, Declaration and Report of Maloney at pg. 32; Pls. Ex. F (Dep. of Gallegos) at pg. 139-140.

[117] *Id.*

[118] Pls. Ex. A-1, Declaration and Report of Maloney at pg. 21 of 52.

[119] Id. at pg. 24.

head.

## 6. Squad 15's evolving version of the armed home invasion and shooting at 7815 Harding Street

Following the unlawful home invasion, HPD's policy – indeed, the policy that encourages excessive force – entitled the Squad to special investigative treatment. Combined with this review of evidence, many of the officers then reported "tunnel vision" during the events.[120] Medina – a key potential witness to the shooting of Nicholas – even claimed he was knocked unconscious during the home invasion.[121] But strangely, even though they were each entitled to review prior statements and evidence, the officer's statements still included changes in their sworn testimony that contradict their prior sworn statements. For this motion, Plaintiff have flagged five important testimony changes.

- Sworn testimony change #1: In his sworn IAD interview, Gallegos testified that Ms. Nicholas did not "actually **lay her hands on the weapon**."[122] At his deposition: Gallegos now testified he saw Nicholas "pulling at" the shotgun and touching "the weapon itself."[123] No fingerprints were taken of the gun.[124]

- Sworn testimony change #2 – In his sworn statement to homicide, Lovings testified that "as soon as I entered the house, I saw a female to the left of us."[125] Yet, in his deposition, Lovings testified that he never saw Nicholas that day.[126]

- Sworn testimony change #3 – Pardo testified that when he approached the door to grab Lovings, he saw Tuttle sitting down, with a gun in his right hand.[127] At his deposition, he testified that the gun, he believed, was in his "left hand."[128]

- Sworn testimony change #4: Lovings testified that after he saw Nicholas in the house,

---

[120] Pls. Ex. H (Salazar Dep.) at 77:18-21; Pls. Ex. N (Medina Dep.) at 48:17-20; Pls. Ex. 125 at pg. 2 (Wood Walkthrough statement).
[121] Pls. Ex. N (Medina Dep.) at 74:7-13.
[122] Pls. Ex. 92 at Page 24.
[123] Pls. Ex. F (Dep. of Gallegos) at pg. 102:20-103:7.
[124] Pls. Ex. B-1 Declaration and Report of Scott at pg. 38.
[125] Pls. Ex. 165 Lovings Homicide Statement.
[126] Pls. Ex. AG (Dep. of Lovings Vol I. ) at 31:5-32:14.
[127] Pls. Ex. 158 at pg. 38 (Pardo SIU statement).
[128] Pls. Ex. AL (Dep. of Pardo) at 66:15-67:13.

"Officer Medina moved toward her." Yet, in his deposition, Lovings testified that he "never saw . . . Officer Medina."[129]

- Sworn testimony change #5 – In his second homicide statement, Officer Gallegos testified that after he shot Nicholas, he "observed the suspect **fall onto the couch** towards the west wall." Yet in his deposition, Gallegos backtracked and claimed he saw her "turn and fall **towards** the couch," but he "lost visual because [he] sunk back in behind the wall."[130]

In addition to shifting testimony, the officers also could not get their stories straight with each other – even when under oath. For example, Lovings – and only Lovings – testified that the first shot was by Dennis Tuttle. Yet, Medina testified that the first shot was to his right – logically, Lovings.[131] Salazar also confirmed that Lovings shot the dog first,[132] while Pardo testified generally that "police officers" fired first.[133] And Gallegos and Sepolio testified that they first heard a shotgun – meaning Medina took the first shot.[134]

Furthermore, the physical evidence also contradicts the officers' testimony. For example, according to Squad 15 officers, Tuttle shot at least 11-13 times during the raid. The only problem? Based on the evaluation of his revolver and the scene, Tuttle shot either three times or four times at most.[135] Expanding on that, at the outset of the shooting, Salazar testified that Tuttle shot at Medina 3-4 times.[136] Following those shots, Sepolio testified, as he was grabbing Medina, he "believe[d]" Tuttle shot "multiple times" at him – meaning, at least two additional shots.[137]

---

[129] Pls .Ex. AG (Dep. Lovings Vol 1) at 33:24-24:2.
[130] Pls. Ex. F (Dep. of Gallegos) pg. 110.
[131] Pls. Ex. N (Dep. of Medina) at pg. 45.
[132] Pls. Ex. 145, Salazar homicide statement.
[133] Pls. Ex. AL (Dep. of Pardo) at 39:7-11.
[134] Pls. Ex. F (Dep. of Gallegos) at 93:15-17; Pls. Ex.AM (Dep. of Sepolio) at pg. 68.
[135] Pls. Ex. A-1, Declaration and Report of Maloney; Lt. Pls. Ex. AK at pg. 88 ("4 fired cartridge cases recovered from Tuttle's pistol").
[136] Pls. Ex. H (Dep. of Salazar) at 50:11-50:24.
[137] Pls. Ex. AM (Dep. of Sepolio) at 83:7-16.

Lovings is then shot by Tuttle.[138] After Lovings hits the ground, Gallegos hears "more than one shot" from Tuttle inside the house – meaning at least two more shots.[139] Gallegos then sees Tuttle "shoot" Reyna and Goines from inside the house[140] –another two shots. And finally, according to Pardo, Tuttle actually fired multiple times at Reyna, not just one – meaning at least an additional shot.[141] This testimony is inconsistent, contradictory of the evidence, and not credible.

Finally, the physical evidence also contradicts the story spun by Gallegos regarding his fatal shots of Nicholas and Tuttle. First, while Gallegos claims that Nicholas was over Medina, (1) the bullet trajectory analysis by Maloney places her on the south couch;[142] (2) the BWC showing that Medina was not in the house;[143] and (3) Dr. Bux testimony that the wound would have completely incapacitated her in the spot she was found.[144] Similarly, while Gallegos claims that Tuttle raised a gun at him prior to the fatal shots of Tuttle, (1) the bullet trajectory shows Tuttle was struck in the back of the head – not facing Gallegos[145] – and (2) the testimony of Dr. Bux, that, "[a]t this point he was incapable of holding a weapon."[146]

**7.** **Consistent with its policy and custom of turning a blind eye, HPD's Internal Affairs ignores critical evidence and inaccurate statement and instead exonerate the officers**

Despite these incredible contradictions and holes in the evidence, HPD and Chief Art Acevedo cleared the officers of excessive force. Why? Because this is exactly the result that HPD

---

[138] Pls. Ex. AK.
[139] Pls. Ex. F (Dep. of Gallegos) at 111:17-18.
[140] Pls. Ex. F (Dep. of Gallegos) at pg. 209 and 118:1-14.
[141] Pls.' Ex. 156; Pls. Ex. AL (Dep. of Pardo) at 59:18-60:2 (Pardo testified Tuttle shot multiple times, but cannot recall if it was three times)
[142] Pls.' Ex. A-1, Declaration and Report of Maloney at pg. 31 of 52.
[143] Pls.' Ex. AC – BWC Sync from 0:40 (in the top right corner video); see also Exhibit AK, Ranger Wolf's findings confirming that this is Sepolio and Medina.
[144] Pls. Ex. C-1.
[145] Ex. A-1, Declaration and Report of Maloney at pg. 32 of 52 ("on the floor he raises his upper body by his elbows and is fatally shot in the back of his head/neck by Officer Gallegos.")
[146] Pls. Ex. C-1.

had designed its system to reach.

IAD provided 48-hour notice to the officers. As part of that, IAD provided review of important evidence and testimony prior to any statements.[147] Even with these advantages, HPD prohibited IAD from reviewing an officer's disciplinary history – notably here, from 2011 to 2019, Gallegos had been previously reviewed for six use of force charges, including three prior shootings and three use of force claims.[148] Undisputedly, this process dramatically differed from the investigation of citizens.[149]

Even knowing this background, IAD took virtually no steps to determine if the officers were fabricating their stories – a shocking investigative tactic in light of the serious contradictions with their own testimony and physical evidence.[150] Commander Nguyen, the investigative officer, could not even remember receiving any training to prevent "fabrication or distortion of testimony in an interrogation,"[151] much less ever making a finding in his time at IAD that an officer was untruthful.[152] Even more telling, he could also not even identify a single time from 2017 to 2019 where IAD sustained an officer-involved shooting allegation.[153]   In all, Nguyen could not even confirm that it would be dangerous for a police department to authorize a "culture of turning a blind eye to excessive force."

> 60
> 12   Uh, certainly, you agree it would be a
> 13   problem if a police department had a history of hiding or
> 14   avoiding finding a officer-involved shooting to be a
> 15   violation of policy?
> 17            THE WITNESS:  Well, it depends on what

---

[147] Pls. Ex. AD (Dep. of Nguyen) at pg. 44-46.
[148]  Pls. Ex. 87;  Pls. Ex. F (Dep. of Gallegos) at pg. 24-26.
[149] Pls. Ex. AD (Dep. of Nguyen) at 51:7-15.
[150] Pls. Ex. AD (Dep. of Nguyen) at 52 -56.
[151] Pls. Ex. AD (Dep. of Nguyen) 55:21-56:6.
[152] Pls. Ex. AD (Dep. of Nguyen) at 56-57.
[153] Pls. Ex. AD (Dep. of Nguyen) at 58:8-15.

18   department and where we're talking about and how many
19   officer-involved shootings they have been involved in.
. . .
                       62
4    Q.   (BY MR. AVERY) Do you agree that it would be
5    dangerous if there was a culture of turning a blind eye to
6    excessive force in a police department?
8          THE WITNESS:  That is a very reasonable
9    statement, but like I said, it depends on the situation
10   and what department you're talking about and what's going
11   on.[154]

Why could Commander Nguyen not answer such an easy question? Because HPD had created that

exact culture.

Ultimately, Nguyen found the shooting in this case justified, and Art Acevedo approved

this finding.  To reach this conclusion, Ngueyn exclusively relied on the officers' statements.[155]

And while Nguyen testified that "any contradictory statements should be addressed and looked . .

. into," the investigation never weighed or addressed any contradictory statements.[156]  Because of

this failure, Nguyen, as part of the investigation, never addressed the contradictions including, (1)

who shot first; (2) whether Medina was even in the house; (3) whether Nicholas was anywhere

near Gallegos claimed; or (4) whether Tuttle was capable of holding a gun.[157] Nguyen, instead,

ignored the contradictions, ignored the possibility of fabrication, and simply cleared the officers

because of their unsupported claims.

The allegations in this lawsuit about the disciplinary process at HPD were not a surprise

to HPD. Rather, in a different case, *Baker v. Castro*, the plaintiff also made this argument in 2018

– prior to the Harding Street shooting. The City and its policy makers knew that Baker had made

---

[154] Pls. Ex. AD (Dep. of Nguyen).
[155] Pls. Ex. AD (Dep. of Nguyen) at  85:13-18; 86:4-8.
[156] Pls. Ex. AD (Dep. of Nguyen) at  34:10-18.
[157] See generally Pls. Ex. 29.

these allegations. But as opposed to addressing this policy and ensuring that its supervisor did not

encourage excessive force, HPD did nothing. Commander Nguyen testified that he had never even

heard an allegation about this type of disciplinary process.[158] Likewise, Nguyen could not recall

any effort or training to address any potential custom of turning a blind eye of excessive force.[159]

This culture not only existed, but HPD leadership fostered it and refused to take any steps to

prevent it.

Squad 15 was aware of this faulty process and HPD's culture of encouraging excessive. By

example, when Gerald Goines was asked about this precise culture or encouragement, his answer?

"On the advice of counsel, I invoke my Fifth Amendment privilege against self-incrimination."

```
                    31
1   Q   (By Mr. Doyle)  And you knew you could get
2   away with it yet again, as a result of the years of
3   similar misconduct/cover-up of excessive use of force
4   approved and committed by the Houston Police
5   Department's pattern and practice?
7     A   On the advice of counsel, I invoke my Fifth
8   Amendment privilege against self-incrimination and
9   respectfully decline to answer.
. . .
                    32
19  Q   (By Mr. Doyle)  You were aware, from your
20  prior experience with the Houston Police Department,
21  that there would be no attempt to compare the physical
22  evidence at the scene with the statements of yourself
23  and other officers, enabling you to lie and cover up
24  excessive use of force against Dennis Tuttle and
25  Rhogena Nicholas?
                    33
2     A   On the advice of counsel, I invoke my Fifth
3   Amendment privilege against self-incrimination and
4   respectfully decline to answer.[160]
```

---

[158] Pls. Ex. AD (Dep. of Nguyen) at  pg. 61-63.
[159] *Id*.
[160] Pls. Ex. X (Dep. of Goines)

This is because officers knew that HPD would authorize this type of conduct.

Ultimately, police practices expert, Andy Scott, confirmed that "[b]ased on the lack of supervision and disciplinary action identified above, Gallegos and Squad 15 knew that their use of excessive deadly force would be met with tacit approval by supervisors, the Chief of Police."[161] In particular, "[t]his failure encouraged Gallegos and Squad 15 to continue their unlawful conduct, including the use of excessive deadly force."[162]

**8. The Ranger investigation utilizes the same flawed pattern of HPD and ignores Gallegos's testimony regarding the sequence of events entirely.**

Following IAD's investigation, the Texas Rangers also investigated the officer involved shooting at the request of the Harris County District Attorney. But just like Nguyen, Lt. Wolf, the assigned investigator, simply assumed that the officers' statements were accurate. Wolf testified that the there was "no evidence" that the officers "were lying."[163]

Ignoring the incredible inconsistencies identified above, Wolf then created an impossible and illogical sequence of events. But in making this sequence, Wolf – likely because he realized that Medina could not have been in the house when Gallegos claimed he was – completely re-ordered the timeline of events.[164] The problem? This directly contradicts Officer Gallegos's testimony, as well as the body camera footage. And if there is "no evidence" that the officers "were lying,"[165] how can Wolf determine that Gallegos shot Nicholas prior to Lovings' being shot and Salazar and Pardo's fall, when Gallegos – under oath three separate times – claimed he shot Nicholas after those events?

---

[161] Pls. Ex. B-1 Report and Declaration of Scott at pg. 45.
[162] Pls. Ex. B-1 Report and Declaration of Scott at pg. 45.
[163] Pls. Ex. AF (Dep. of Wolf) 81:24-82:6.
[164] Pls. Ex. AK, PowerPoint by Ranger Wolf at pg. 53-54.
[165] Pls. Ex. AF (Dep. of Wolf) 81:24-82:6.

To reach this conclusion, Wolf creates a story whole cloth. First, Salazar, Pardo, and Lovings all clear the door after Medina is hit – an alleged finding that is not supported or even claimed by any officer. It is also inconsistent with Sepolio's testimony that he had to "push" his way through "multiple people" and "squeezed into the crowd" to get to officer Medina on the couch.[166] Wolf continues by stating that Gallegos moves from the left side of the house to the right, sees Nicholas when the door clears and shoots her, while she is over Medina.[167] Sepolio, apparently immune to any bullets, then grabs Medina and makes it to the street in a few seconds.[168] Salazar, Pardo, and Lovings then return to their prior spots and continue shooting at Tuttle, and, in contradiction to Gallegos, then fall outside the door.[169]

This conclusion not only is physically illogical and contradicts every officer's statement, but it also contradicts the BWC and the physical evidence. Again, at the outset of the unlawful home invasion, after three shots, Gallegos stands to the left of the house. Seconds later, Medina is on the street.[170] Yet Gallegos has moved further to the left and back – not to the right side of the house where he shoots Nicholas.[171] Only after Medina is gone, Gallegos then moves to the right

---

[166] Ex. AM (Dep. of Sepolio) at 76:15-77:7
[167] Pls. Ex. AK, PowerPoint by Ranger Wolf at pg. 54.
[168] *Id.*
[169] *Id.*
[170] Exhibit AC, BWC at 0:30-0:35; *see also* Exhibit AK, PowerPoint provided by Ranger Wolf. Ranger Wolf specifically identified Gallegos at pg. 50.
[171] Pls.' Ex. AC – BWC Sync from 0:43. Again, this particular individual is Gallegos based on (1) his short sleeves, which Lt. Wolf previously used to identify him (based on his rifle and short sleeve shirt) and is seen in the group photo that day, only Gallegos, Goines, and Bryan wore short sleeves Pls. Ex. 167; (2) his mask matches the mask that Gallegos was wearing that night; see Pls. Ex 99; (3) the photo appears to show tattoos consistent with Gallego and is consistent with his build and skin tone; and (4) it is logically consistent with his prior position to the left of the house.

of the house.[172,173]This also explains how Tuttle's DNA is on the bullet that struck Nicholas.

Meaning, after Lovings, Pardo, Salazar, and Medina are out of the house, Tuttle was able to move

to the front door.  But under the Ranger's timeline? Four to six police officers stood at or near the

doorway who would have prevented Tuttle from reaching the door.

The decision to re-order the sequence suggests Lt. Wolf reached these conclusions because

he knew that Medina could not have been in the house when Gallegos claims he shot Nicholas.

And as a result, Gallegos murdered Nicholas without any warning, much less any justification.

## 9.  Key Disputed facts and missing evidence

Finally, because this case includes a large record and substantial evidence, there are many

disputed issues of fact that preclude summary judgment. But for ease of reference, Plaintiffs have

highlighted the following dispositive facts that are disputed:

- Tuttle shot Medina. This is disputed because Maloney has testified that Medina was shot with a .223 (meaning Lovings shot him);[174]

- Tuttle shot Goines. This is disputed because Maloney has testified that Goines was shot with a .223 (meaning Gallegos shot him)[175] and Lt. Wolf[176] confirmed that the bullet could not be matched based on its damage;

- Tuttle shot Reyna. This is disputed because Maloney has testified that Reyna was shot with a .223 (meaning Gallegos shot him), Lt. Wolf had no "scientific evidence" that

---

[172] *Id.*

[173] In addition, even if Officer Gallegos moved from the left side, as Lt. Wolf identified, to the right side from the 0:35 period on the video, the shooting already starts with Gallegos still at the left side of the house (at 0:35 seconds on the video) and not in a position to shoot. Within four seconds (at 0:39) Sepolio and Medina are already spotted out of the house past the tree and nearing the street.  There is simply was not sufficient time for the door to clear, Gallegos to move to the right side, Sepolio, Ashraf, Pardo, Lovings, Salazar to all magically clear the door, Gallegos to see Nichols over Medina, shoot her twice, and then Sepolio to "push" his way in and grab Medina and make it to out of the house nearing the street.  Likewise, Gallegos made it clear – he did not fire at this point, and only shot after Lovings, Salazar, and Pardo fell – which undisputedly had not yet occurred.

[174] Pls. Ex. A-1,  Declaration of Maloney at pg. 33.

[175] Pls. Ex. A-1, Declaration of Maloney at pg. 34.

[176] Pls. Ex. AF (Dep. of Wolf) at pg.259.

Tuttle shot Reyna;[177]

- Nicholas was reaching for Medina's gun and posed a threat to the safety of Medina. This is contradicted by the BWC footage as explained above, Gallegos's testimony about the timeline, and Maloney's testimony that Nicholas was on the other side of the couch and hit in the other side of her body;[178]

- Nicholas was shot on the couch near where Medina had been located. Again, Maloney disputes this location;[179]

- Tuttle held a gun during the final two shots by Gallegos and posed a threat of safety to Gallegos. This is disputed by Dr. Bux and Maloney.[180]

Similarly, HPD also lost or failed to collect key evidence – evidence that could have provided important context to this unlawful home invasion. This includes:

- HPD refused to take fingerprints on Medina's shotgun, where Gallegos claimed she grabbed it;[181]

- HPD refused to take fingerprints on Loving's rifle, where Lovings claimed Tuttle grabbed it;

- • Without consequence or even attempting to determine who was responsible, HPD admitted someone(s) logged onto Goines's computer at HPD's own headquarters, while he was in the hospital, which points to invokes the likelihood of serious concerns about altering or deleting highly relevant evidence. HPD never even determined or attempted to determine who did that or recovery what might be altered or deleted;[182]

- HPD refused to chart the "magazine associated with Lovings rifle" – meaning there is an "unknown number of remaining cartridges in Lovings rifle," and an "unknown brand of cartridges being fired through the magazine." ;[183]

- There is no evidence that HPD measured and weighed the bullet that struck Lovings with the bullet that struck Goines – as recommended by Lt. Wolf to determine if the bullet that struck Goines was consistent with Tuttle's weapon;[184] and

- HPD Officers, in violation of HPD policy, failed to activate their BWC during the raid.[185] And Chief Art Acevedo ordered the perimeter officers to turn their body

---

[177] Pls. Ex. AF (Dep. of Wolf) at 274:7-8.
[178] Pls. Ex. A-1, Declaration of Maloney at pg. 31.
[179] Id.
[180] Pls. Ex. A-1, Declaration of Maloney at pg. 32; Pls. Ex. C-1.
[181] Pls. Ex. B-1, Scott Declaration
[182] Pls. Ex. 32 at pg. 44 of the report.
[183] Pls. Ex. AK at pg. 86 and 88
[184] Pls. Ex. AF (Dep. of Wolf) at 259:10-260:3.
[185] Pls.' Ex. 29, at Bates No. COH00005476-COH00005477

cameras off while still on the scene as he was questioning officers at the scene.[186]

- HPD refused to test DNA from Medina against blood stain on the Couch on the south side of the building;[187]

- HPD refused to collect and test bloodstain with Nicholas on the couch near the location on the north side, where she was shot;[188]

- HPD refused to collect and test bloodstain on the front doorframe/wall and on the floor by the door, which could have established of Tuttle ever went beyond the front door or who was shot and where, in the vicinity of the door;[189]

- HPD refused to locate or review the bullet "recovered from the couch cushion" which was a .223 and contained both Rhogena Nicholas and Dennis Tuttles' DNA indicating the bullet struck both victims. According to Michael Maloney, this was the fatal bullet that struck Nicholas, recovered directly behind her body on the couch. [190]

- HPD failed to conduct a "shooting incident reconstruction"[191]

Stripped to its legal argument, Gallegos's summary judgment motion requires that the facts above must be undisputed. They are not. As a result, summary judgment must be denied.

**III.**
**Gallegos violated the rights of Tuttle and Nicholas because he engaged in excessive deadly force**

In its motion for summary judgment, the city makes the exact argument from Felipe Gallegos's motion for summary judgment. Plaintiffs incorporate both of their responses to that motion, as if stated herein. For the reasons identified in detail there, Gallegos engaged in excessive force when he shot and killed both of them.

**IV.**
**Municipal liability**

Next, the City has moved for summary judgment regarding municipal liability under *Monell*. "A city may be held liable under Section 1983 only for its own illegal acts, not pursuant

---

[186] Pls.' Ex. AR.
[187] Pls. Ex. 1-A, Declaration of Maloney (At his attached report at Pg. 5 of 52).
[188] *Id.*
[189] *Id.*
[190] Pls. Ex. 1-A, Declaration of Maloney (At his attached report at Pg. 6 of 52).
[191] Pls. Ex. 1-A, Declaration of Maloney (At his attached report at Pg. 7 of 52).

to a theory of vicarious liability.[192] To succeed on a claim under Section 1983, the plaintiff must demonstrate that the city "had some inadequate custom or policy that acted as the moving force behind a constitutional violation."[193] "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." The burden on the plaintiff is to "identify the policy, connect the policy to the [municipality] itself and show that the particular injury was incurred because of the execution of that policy."[194]

Various types of *Monell* claims have developed over the years."[195]  Broken down, generally this includes five different types of claims:

(1) Written policy statements, ordinances, or regulations that deprive citizen's their constitutional rights.[196]

(2) Widespread practice by nonpolicy making employees "that is so common and well settled as to constitute a custom that fairly represents municipal policy."[197] This is sometimes referred to as a "series of bad acts" theory of liability.[198]

(3) Official policy may also exist where a municipality fails to train its employees, demonstrating a "deliberate indifference" to the rights of its inhabitants.[199] This also requires showing a "series of bad acts."[200]

(4) Absent a pattern, a claim may be variable where the highly predictable consequence of a failure to train, supervise, or discipline would result in the specific injury suffered.[201]   This is sometimes referred to as a "highly

---

[192] *Connick v. Thompson*, 563 U.S. 51, 60, (2011).
[193] *Forgan v. Howard Cty., Tex.*, 494 F.3d 518, 522 (5th Cir. 2007) (citing *Monell v. Dep't of Soc. Servs. of N.Y.,* 436 U.S. 658, 690-91, (1978)).
[194] *Bennett v. City of Slidell*, 728 F.2d 762, 767 (5th Cir. 1984).
[195]  *Aviles v. Saldivar*, CIVIL ACTION NO 4:22-cv-03571, 2023 U.S. Dist. LEXIS 148899 at *10 (S.D. Tex. Aug. 23, 2024)
[196] *Webb v Town of Saint Joseph*, 925 F3d 209, 214-15 (5th Cir 2019).
[197] *Id.*
[198] *Arrington v. City of Chicago*, No. 17 C 5345, 2018 U.S. Dist. LEXIS 14168  at *7-8 (N.D. Ill. Jan. 30, 2018)
[199] *Aviles*, CIVIL ACTION NO 4:22-cv-03571, 2023 U.S. Dist. LEXIS 148899 at *10 (identifying that a Monell claim for "a failure to train, supervise, or discipline.")
[200] *Arrington*, No. 17 C 5345, 2018 U.S. Dist. LEXIS 14168  at *7-8.
[201] *Bd. of the Cty. Com'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997); *Arrington*, No. 17 C 5345, 2018 U.S. Dist. LEXIS 14168.

predictable consequence" theory.[202]

(5) And "the existence of a custom or policy may be shown through a 'single unconstitutional action' performed by a "final policymaker." This is sometimes referred to as a ratification theory of liability.[203]

Following this legal foundation, Plaintiffs have asserted three separate types of *Monell* claims. First, Defendant's policy of failing to discipline officer's and instead encouraging excessive force, led to the highly predictable consequence of excessive deadly force in this case. Second, the City, via Chief Acevedo, ratified the excessive force in this case by encouraging excessive force. And third, the City, failed to discipline its employees, demonstrating a "deliberate indifference" to Plaintiffs via a series of bad acts combined with other misconduct. Nicholas and Tuttle address each claim separately.

**A. The City of Houston had a policy of not disciplining officers who commit excessive force and instead encouraging excessive force, which led to the highly predictable consequence of excessive deadly force in this case.**

For a failure to discipline, train, or supervise claim, a plaintiff must show that (a) the municipality, through an official policymaker, failed to discipline its officer, (b) the failure amounted to deliberate indifference, and (c) the failure directly caused the constitutional violation in question.[204] Generally, this means that a plaintiff must show the city's disciplinary program is both inadequate and that this inadequacy resulted in the deprivation of constitutional rights.[205] Many times, a plaintiff will make this showing by providing "a pattern of abuses" by the undisciplined group. Such a finding will establish both the official policy and deliberate indifference – the necessary showing for a failure to discipline claim. Some Courts have referred

---

[202] *Arrington*, No. 17 C 5345, 2018 U.S. Dist. LEXIS 14168 at *7-8.
[203] *Roundtree*, No. SA-18-CV-01117-JKP-ESC, 2022 U.S. Dist. LEXIS 55027.
[204] *Hunter v City of Houston*, 564 F Supp 3d 517, 529 (S.D. Tex 2021) (citing *Deville v Marcantel*, 567 F3d 156, 171 (5th Cir 2009).
[205] *Roberts v City of Shreveport*, 397 F3d 287, 293 (5th Cir 2005); se*e also City of Canton v Harris*, 489 US 378, 390, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)

to this type of claim as a series of bad acts theory. This type of theory is discussed in detail in the third section (Section C).

In contrast, Courts have also recognized that failure to discipline does not need to be systemic. For example, in *Brown v Bryan County* the Fifth Circuit explained – "under limited circumstances, § 1983 liability can attach for a single decision not to train an individual officer even where there has been no pattern of previous constitutional violations."[206] While *Brown* involved a failure to train case, the logic of *Brown* equally applies to a failure to discipline claim. However, to prove causation, the plaintiff must "prove that the highly predictable consequence of a failure to train would result in the specific injury suffered."[207] "Claims of this variety most often proceed on argument that the municipality's disciplinary, training, or supervision program is inadequate in some way, and that this inadequacy resulted in the deprivation of constitutional rights."[208] "The failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury."[209]

Following this background, in *Arrington v. City of Chicago*, the Northern District of Illinois addressed this precise type of claim.[210] That case reviewed a claim at the 12(b)(6) standard regarding allegations of for excessive force and wrongful death. Specifically, Ronald Arrington was killed during a high-speed chase when police officers "caus[ed] [the vehicle] to roll over and crash."[211] As addressed below, the Plaintiff also pleaded a series of bad act claims theory. But in

---

[206] *Brown v Bryan County*, 219 F3d 450, 459 (5th Cir 2000).
[207] *Estate of Davis v. City of N. Richland Hills*, 406 F.3d. 375, 386 (5th Cir. 2005).
[208] *Aviles*, CIVIL ACTION NO 4:22-cv-03571, 2023 U.S. Dist. LEXIS 148899 at *10 (citing *Roberts v City of Shreveport*, 397 F3d 287, 293 (5th Cir 2005) and (*City of Canton v Harris*, 489 US 378, 390, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)).
[209] *Id.*
[210] No. 17 C 5345, 2018 U.S. Dist. LEXIS 14168.
[211] *Id.* at *3.

addition to that, the plaintiff pleaded a "custom or practice by the City of which excessive force is a highly predictable consequence."[212]

Specifically, the city "perpetuate[d] the custom of excessive force among its police officers by allowing internal investigatory procedures to provide accused officers an opportunity to conform their account of alleged excessive force incidents to the evidence discovered by investigators."[213] In other words, through this "opportunity for officers to get their stories straight," the custom plausibly assured the defendant officer "that he could use excessive force in his pursuit of [the plaintiff] and not worry about being meaningfully disciplined or punished."[214] As a result, the Court found that "by allowing investigatory procedures that permit an accused officer to cover up instances of excessive force, the City sends a message to officers that it condones overly aggressive and unconstitutional policing, thereby causing officers to use excessive force when they might not otherwise if they knew they would be held fully accountable for such actions."[215]

Emphasizing this point, in *Baker v. Castro*, Judge Lake recently addressed whether "inadequate policies and customs of investigating, punishing, and disciplining police officers who shoot civilians could be a moving force behind an unconstitutional use of excessive deadly force by a police officer."[216] And while the Court in *Baker* did not clarify if it reviewed the case under either the series of abuse theory or the highly predictable consequence theory, the Court relied solely on "uniform outcomes" of prior shooting investigations and at the same time, the Court (and the plaintiff) did not detail the facts and circumstances of those shootings. The Court further cited to *Grandstaff v City of Borger*, 767 F2d 161 (5th Cir 1985) – the seminal Fifth Circuit case

---

[212] *Id.* at *11.
[213] *Id.* at *12-13.
[214] *Id.* at *12.
[215] *Id.* at *13.
[216] *Id.* at *13.

involving a single incident Monell claim, as opposed to a series of bad acts. In other words, the *Baker* plaintiff was making a claim under the highly predictable consequence theory – not a series of related and systemic bad acts. The Court reviewed it as such.

With that foundation, Judge Lake reviewed *Grandstaff v. City of Borger, Tex.*,[217] and noted that "[w]here a reckless disregard for human life and safety is 'prevalent among the city's police officers [and] threatens the life and security of those whom they encounter, and if that recklessness is attributable to the instruction or example or acceptance of or by the city policymaker, the policy itself is a repudiation of constitutional rights."[218] And "[i]f a police officer is aware that his reckless use of deadly force will be met with the approval of city policymakers, the 'moving force' requirement is satisfied."[219]

At the summary judgment stage, Judge Lake then outlined the relevant customs and policies of HPD, as presented by the plaintiffs, including:

> [HPD Internal Affairs] (1) uses fewer classifications than for other types of use of force incidents; (2) does not look at the police officer's complaint history; and (3) gives the police chief the sole final disciplinary determination. Additionally, general HPD custom and policy following the shooting of a civilian provides that the shooting police officer is: (1) not questioned until he has spoken with an attorney; (2) allowed to do an unrecorded "walk-through" of the scene, while accompanied by an attorney; (3) never given a live interview; and (4) given forty-eight hours to answer written questions with an attorney's assistance. It is also noteworthy that it is standard procedure to conduct a live, recorded interview of any shooter in a non-police shooting.[220]

Not surprisingly, the results of that policy were damning – HPD had "deemed justified" 194 of 194 intentional shootings of civilians from 2009 to 2014. Notably, "Eighty-one of these shootings

---

[217] *Estate of Baker v. Castro*, CIVIL ACTION NO. H-15-3495, 2018 U.S. Dist. LEXIS 170949 at *35-36 (S.D. Tex. Aug. 31, 2018).
[218] *Estate of Baker*, 2018 U.S. Dist. LEXIS 170949 at *36
[219] *Id.*
[220] *Id.* at *36-37

were of unarmed civilians."[221] Based on that, the court found that the "[t]he uniform outcomes of the past police shooting investigations along with the less adversarial treatment of a police shooter raises a fact issue regarding Defendant City's policies and customs . . ."[222] And as a result "[a] jury could reasonably find that Defendant City had an unofficial policy and custom of turning a blind eye to its officers' excessive uses of force."[223]

Thus, based on *Baker*, *Arrington*, and *Grandstaff*, Plaintiffs will show below that (1) the City created a custom that assured Gallegos "that he could use excessive force in his pursuit of [Tuttle and Nicholas] and not worry about being meaningfully disciplined or punished," and (2) this was based on the deliberate indifference and moving force of HPD because this failure led to the highly predictable consequence of excessive deadly force in this case.

    i.    **The City of Houston City created a custom that assured Gallegos "that he could use excessive force in his pursuit of [Tuttle and Nicholas] and not worry about being meaningfully disciplined or punished," and this led to the highly predictable consequence of excessive deadly force in this case.**

Here, just like *Baker* and *Arrington*, the City also created a custom that assured Gallegos "that he could use excessive force in his pursuit of [Tuttle and Nicholas] and not worry about being meaningfully disciplined or punished."[224] Specifically, the investigative process at HPD gave Gallegos (and the other officers) 48-hours' notice of the investigation.[225] The officers then were allowed to review all evidence – including BWC footage, audio, statements, and evidence – prior to giving a statement with their lawyer.[226] And again, the process also prohibited IAD from

---

[221] *Id.* at *37.
[222] *Id.*
[223] *Id.*
[224] *Arrington*, No. 17 C 5345, 2018 U.S. Dist. LEXIS 14168 at *12.
[225] Pls. Ex. 92 (at COH00005999)(Gallegos confirms he received a 48-hour notice).
[226] Pls. Ex. 92 (at COH00006044-45)(detailing all the evidence Gallegos received prior).

reviewing an officer's disciplinary history[227] – notably here, from 2011 to 2019, Gallegos had been previously reviewed for six use of force charges, including three prior shootings and three use of force claims.[228]

The flaws in this process were directly known to the City. The plaintiffs in the *Baker* case made this precise argument. Despite that, Commander Nguyen testified that he had never even heard an allegation about flaws or problems with the disciplinary process. [229] Likewise, Nguyen could not recall any effort or training to address any potential custom of turning a blind eye of excessive force.[230] In other words, even after the allegations in the Baker case, HPD leadership fostered this culture and refused to take any steps to prevent it or address the allegations.

Worse yet, even knowing this background, IAD failed to even take basic steps to determine if the officers were fabricating their stories during the investigation.[231] Nguyen could not even remember receiving any training to prevent "fabrication or distortion of testimony in an interrogation,"[232] much less ever making a finding in his time at IAD that an officer was untruthful.[233] Instead, the process at IAD sent a clear message – IAD will simply take the officer at their word on their face.[234] Similarly, during the investigation, while officers "are advised not to speak to each other about the case," Nguyen could not identify any steps that IAD takes to ensure that this rule is being followed.[235] Even more telling, Nguyen could also not even identify

---

[227] Pls. Ex. AD (Dep. of Nguyen) at pg. 35.
[228] Pls. Ex. 87; Pls. Ex. F (Dep. of Gallegos) at pg. 24-26.
[229] Pls. Ex. AD (Dep. of Nguyen) at pg. 61-63.
[230] *Id.*
[231] Pls. Ex. AD (Dep. of Nguyen) at 52 -56.
[232] Pls. Ex. AD (Dep. of Nguyen) 55:21-56:6.
[233] Pls. Ex. AD (Dep. of Nguyen) at 56-57.
[234] Pls. Ex. AD (Dep. of Nguyen) at 16:23-17:4 (When asked if there was any practices or policies that HPD has mandated to prevent or avoid deception or fabrication of testimony, Nguyen answered he could not think of a policy, but "you are taught . . . you have to be truthful."
[235] Pls. Ex. AD (Dep. of Nguyen) at 547:13-48:14.

a single time from 2017 to 2019 where IAD sustained an officer-involved shooting allegation.[236] In all, Nguyen could not even confirm that it would be dangerous for a police department to authorize a "culture of turning a blind eye to excessive force." [237]

In light of this background, police practices expert, Andy Scott, testified that "there was a custom and practice by HPD to not thoroughly investigate officer-involved shootings (OIS), resulting in the vast majority of HPD OIS being ruled as justified."[238] Scott flagged that "every shooting that happened in the City of Houston between 2009 and 2014 was determined to be justifiable." And notably, "[t]hese shootings involved armed and unarmed civilians."[239] Combined with that, in 2015 to 2016, on-duty HPD officers have killed 32 people, and IAD deemed every single one of those shootings justified.[240] After Chief Art Acevedo took over in 2016 this pattern continued. For on-duty officer shootings, Chief Acevedo found every single shooting justified from 2016-2019.[241] This type of uniformity is directly consistent and shows the process and culture of turning a blind eye to excessive force.

Consistent with this culture, the investigation here was also severely lacking and included severe flaws and holes. As opposed to reviewing forensic evidence and physical evidence, the investigation largely relied only on testimonial statements by officers. In other words, this was an outcome-oriented investigation set up to take the officers at their word – after allowing them to review all available evidence – and never testing their statements for fabrication. For example,

---

[236] Pls. Ex. AD (Dep. of Nguyen) at 58:8-15.
[237] Pls. Ex. AD (Dep. of Nguyen) at 60:12-62:11.
[238] Pls. Ex. B (Declaration of Scott and Report) at B-1 pg. 43.
[239] *Id.*
[240] See generally, "HOMICIDE DIVISION 2015 HPD OFFICER INVOLVED SHOOTING INCIDENT" available at https://www.houstontx.gov/police/ois/2015.htm and "HOMICIDE DIVISION 2016 HPD OFFICER INVOLVED SHOOTING INCIDENTS," available at https://www.houstontx.gov/police/ois/2016.htm
[241] Pls.' Ex. S (Dep. of Acevedo) at pg. 15-18.

HPD failed to take the following steps, which would have been imperative in a legitimate investigation:

- HPD refused to take fingerprints on Medina's shotgun, where Gallegos claimed she grabbed it;[242]

- HPD refused to take fingerprints on Loving's rifle, where Lovings claimed Tuttle grabbed it;

- Without consequence or even attempting to determine who was responsible, HPD admitted someone(s) logged onto Goines's computer at HPD's own headquarters, while he was in the hospital, which points to invokes the likelihood of serious concerns about altering or deleting highly relevant evidence. HPD never even determined or attempted to determine who did that or recovery what might be altered or deleted;[243]

- HPD refused to chart the "magazine associated with Lovings rifle" – meaning there is an "unknown number of remaining cartridges in Lovings rifle," and an "unknown brand of cartridges being fired through the magazine." ;[244]

- There is no evidence that HPD measured and weighed the bullet that struck Lovings with the bullet that struck Goines – as recommended by Lt. Wolf to determine if the bullet that struck Goines was consistent with Tuttle's weapon;[245] and

- HPD Officers, in violation of HPD policy, failed to activate their BWC during the raid.[246] And Chief Art Acevedo ordered the perimeter officers to turn their body cameras off while still on the scene as he was questioning officers at the scene.[247]

- HPD refused to test DNA from Medina against blood stain on the Couch on the south side of the building;[248]

- HPD refused to collect and test bloodstain with Nicholas on the couch near the location on the north side, where she was shot;[249]

- HPD refused to collect and test bloodstain on the front doorframe/wall and on the floor by the door, which could have established of Tuttle ever went beyond the front door or who was shot and where, in the vicinity of the door;[250]

- HPD refused to locate or review the bullet "recovered from the couch cushion" which was a .223 and contained both Rhogena Nicholas and Dennis Tuttles' DNA indicating

---

[242] Pls. Ex. B-1, Scott Declaration
[243] Pls. Ex. 32 at pg. 44 of the report.
[244] Pls. Ex. AK at pg. 86 and 88
[245] Pls. Ex. AF (Dep. of Wolf) at 259:10-260:3.
[246] Pls.' Ex. 29, at Bates No. COH00005476-COH00005477
[247] Pls.' Ex. AR
[248] Pls. Ex. 1-A, Declaration of Maloney (At his attached report at Pg. 5 of 52).
[249] *Id.*
[250] *Id.*

the bullet struck both victims.  According to Michael Maloney, this was the fatal bullet that struck Nicholas, recovered directly behind her body on the couch. [251]

- HPD failed to conduct a "shooting incident reconstruction"[252]
- HPD failed to conduct a "shooting incident reconstruction"[253]

In all, Maloney concluded that: HPD's "[f]ailure to spend the time and resources necessary to fully document and collect evidence from the scene of an officer involved shooting, one where officers were injured severely hampered serious reconstruction efforts," and effectively allowed HPD to simply "approv[e] the officers['] version of events."[254]

Consistent with this tacit encouragement and policy, Nguyen found the shooting in this case justified, and Chief Art Acevedo approved this finding.  Yet to stretch to make this finding, Ngueyn only relied on the officers' statements.[255] And while Nguyen testified that "any contradictory statements should be addressed and looked . . . into," the investigation never weighed or addressed any contradictory statements.[256] Because of this failure, Nguyen, as part of the investigation, never addressed the contradictions including, (1) who shot first; (2) whether Medina was even in the house; (3) whether Nicholas was anywhere near Gallegos claimed; or (4) whether Tuttle was capable of holding a gun.[257] Nguyen, instead, ignored the contradictions, ignored the possibility of fabrication, and simply cleared the officers because of their unsupported claims.

HPD knew about this process and pattern. When asked at his deposition about it, Gallegos could not identify a single time that a complaint was sustained against an officer based on the discharge of a weapon.

29

---

[251] Pls. Ex. 1-A, Declaration of Maloney (At his attached report at Pg. 6 of 52).
[252] Pls. Ex. 1-A, Declaration of Maloney (At his attached report at Pg. 7 of 52).
[253] Pls. Ex. 1-A Declaration of Maloney (At his attached report at Pg. 7 of 52).
[254] *Id.*
[255] Pls. Ex. AD (Dep. of Nguyen at 85:13-18; 86:4-8.
[256] Pls. Ex. AD (Dep. of Nguyen) at  34:10-18.
[257] See generally, Pls. Ex. 29 (showing that Nguyen in his report did not flag this)

3    Q.  In all of your employment history with the
4    Houston Police Department are you aware of a single
5    incident were an officer has intentionally discharged his
6    weapon at an animal or a citizen and been found to have
7    been not justify in doing so?
10      A.  I don't recall, sir.[258]

Again, this is also important because it was not the first time that IAD found Gallegos justified in

a police shooting or use of force. Rather six separate times IAD made this finding.[259] And

importantly, only two years prior in 2017, IAD found Gallegos justified in a shooting of unarmed

women in a car in Bellaire, during a police chase.[260]

Based on this, police practices expert, Andy Scott, confirmed that "[b]ased on the lack of

supervision and disciplinary action identified above, Gallegos and Squad 15 knew that their use of

excessive deadly force would be met with tacit approval by supervisors, the Chief of Police."[261]

In particular, "[t]his failure encouraged Gallegos and Squad 15 to continue their unlawful conduct,

including the use of excessive deadly force."[262]

Following *Baker* and *Arrington*, Plaintiffs have provided sufficient evidence to defeat

summary judgment.

ii.    **Nicholas and Tuttle have established the elements of (1) deliberate indifference
       and (2) causation/moving force because officers knew that their use of
       excessive force would be met with the approval of city policymakers.**

Next, in this type of case, Nicholas and Tuttle must show deliberate indifference and

causation.  To do that, they must provide evidence that the serious flaws in the disciplinary policy

and the failure to discipline led to the highly predictable consequence of excessive deadly force.[263]

---

[258] Pls. Ex. F (Dep. of Gallegos) at 29.
[259] Pls. Ex. 87;  Pls. Ex. F (Dep. of Gallegos) at pg. 24-26
[260] Pls. Ex. F (Dep. of Gallegos) at pg. 27-28.
[261] Pls. Ex. B and B-1 ( Declaration and Report of Scott) at pg. 45.
[262] Pls. Ex. B and B-1 ( Declaration and Report of Scott) at pg. 45.
[263] *Arrington*, No. 17 C 5345, 2018 U.S. Dist. LEXIS 14168  at *7-8.

In other words, by setting up the policy to encourage excessive force, it is highly predictable that an officer will engage in excessive force. As explained by the Fifth Circuit, an injury is highly predictable only when the city "failed to train its employees concerning a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face." [264] But undoubtedly, the "duty not to use excessive force' has been recognized as a clear constitutional duty in this respect."[265] Moreover, particularly for narcotic squads who commonly engage in no-knock raids, excessive force is a situation these officers were certain to face. Thus, the result of this attack – the death of Tuttle and Nicholas – was a highly predictable consequence of this policy.

Generally, "when a police officer knows their use of excessive force 'will meet with the approval of city policymakers, the affirmative link/moving force requirement is satisfied.'"[266] This is even more true in a case based on the highly predictable consequence theory because the consequence is directly linked to an obvious violation of constitutional right. And here, Nicholas and Tuttle have presented evidence that "the City has a policy of turning a blind eye and knowingly refusing to thwart the unconstitutional conduct of its police officers in using excessive force."[267] A reasonably jury could also infer that Gallegos used force with knowledge that the City would exact no consequence for his actions. And as a result, this practice was the moving force -- behind the alleged constitutional violation.

Even more so here, this deliberate indifference was confirmed and approved by the Chief of Police because he was the final decisionmaker. This is particularly true here, because each OIS

---

[264] *Aviles*, CIVIL ACTION NO 4:22-cv-03571, 2023 U.S. Dist. LEXIS 148899 at *12 (citing *Littell v Houston Independent School District*, 894 F3d 616, 624-25 (5th Cir 2018))
[265] *Id.*
[266] *Lujan v. Beard*, No. EP-21- CV-302-FM, 2022 U.S. Dist. LEXIS 61023 at *13-14 (W.D. Tex. Mar. 31, 2022)
[267] *Santibanes v. City of Tomball,* 654 F. Supp. 2d 593, 614 (S.D. Tex. 2009

investigation required that the Chief of Police review the shooting to make a determination.[268] In other words, the policymaker was a key figure and had knowledge of this encouragement. Furthermore, as explained in Section (B), Chief Acevedo further affirmed and acknowledged this policy because he falsely claimed to the public six months after the raid that HPD had probable cause. This type of statement to the public, even in the face of the perjury by Goines, "would support a jury's conclusion that the City engaged in 'unworthy, if not despicable, means to avoid legal liability.'"[269]

For all these reasons, Defendant's motion should be denied.

**B. Chief Acevedo, via ratification and final policy maker action, encouraged and authorized excessive force.**

Next, Chief Acevedo, via ratification and final policy maker action, encouraged and authorized the precise type of excessive force that occurred in this case. "Under the ratification theory of municipal liability, the Fifth Circuit has held that, 'if the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.'"[270] However, "a policymaker who defends conduct that is later shown to be unlawful does not necessarily incur liability on behalf of the municipality."[271]

Many times, this type of liability is combined with or confused with the highly predictable consequence" theory. Judge Ellison artfully flagged and explained this:

However, Fifth Circuit case law is, at times, less than clear about whether

---

[268]  Pls. Ex. AD (Dep. of Nguyen) at 107:20-108:13.
[269] *Roundree*, No. SA-18-CV-01117-JKP-ESC, 2022 U.S. Dist. LEXIS 55027  at *29 (citing Grandstaff, 767 F.2d at 166).
[270] *Roundtree*, No. SA-18-CV-01117-JKP-ESC, 2022 U.S. Dist. LEXIS 55027 at *20 (citing *Vega v. Cameron Cty., Texas*, 856 F. App'x 532, 533 (5th Cir. 2021)).
[271] *Id*. (citing *St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988)).

ratification is a truly independent theory of municipal liability, as *Praprotnik* suggests, or whether ratification is simply indicative of a pre-existing policy or custom, as *Grandstaff* suggests. Some cases do appear to treat ratification as an independent theory of recovery. Other post-*Praprotnik* cases might be read to suggest that ratification is a viable theory of recovery only to the extent that it is indicative of municipal policy or custom. As explained above, this Court understands Praprotnik to have announced an independent theory of municipal liability premised on ratification. To the extent Fifth Circuit and district courts in this Circuit occasionally analyze ratification claims by asking whether a policymaker's approval of a subordinate's act is sufficient to establish a municipal policy, this Court understands those courts to be asking whether that act itself constitutes policy, as they must do under *Praprotnik*, not whether it is indicative of pre-existing policy. [272]

As a result, many cases contain similar or overly complicated analysis combining these types of liability. But, as explained by Judge Ellison, ratification is a unique and separate type of liability To be clear, under a ratification theory, as explained by the Supreme Court in *City of St. Louis v. Praprotnik*, occurs when: "the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."[273] This is distinct from showing that a failure to discipline was "the highly predictable consequence of not" disciplining its officers, which "would apply force in such a way that the Fourth Amendment rights of [citizens] were at risk." [274]

The Western District of Texas addressed a similar failure to discipline/ratification argument in *Roundtree v. City of San Antonio*.[275] In that case, three men were located in a house in San Antonio, when several police officers entered "without any verbal warning."[276] One of the officers shot and killed a plaintiff, hit another with a bullet, and narrowly missed the third. While the officer alleged he saw the plaintiff "reaching for a gun in his waistband at the time" of the shooting, the

---

[272] *Hobart v. City of Stafford*, 916 F. Supp. 2d 783, 794 (S.D. Tex. 2013)
[273] *Hobart v. City of Stafford*, 916 F. Supp. 2d 783, 792-93 (citing Praprotnik, 485 U.S. at 127).
[274] *Brown*, 219 F.3d 450, 461..
[275] No. SA-18-CV-01117-JKP-ESC, 2022 U.S. Dist. LEXIS 55027.
[276] *Id.* at *2.

plaintiff disputed that.[277] Worse yet, "despite not being in possession of any weapon," one of the plaintiffs "was arrested and charged with unlawful possession of a firearm."[278]

In that case, the plaintiff argued that the city ratified the officer's violations by after the fact by "fail[ing] to discipline or otherwise reprimand Casanova for his obvious violations and reckless behavior."[279] As explained by the Court, the "City approved and ratified [the officer's] conduct, let the entire [police] force know that it supported what he did, in spite of its own policies."[280] As a result, the officer "received no discipline, reprimand, or order for further training from McManus and/or the City, despite glaring violations of policy and conduct that his fellow officers described as 'reckless' . . . [the policymakers] have ratified and approved of Casanova's conduct, which itself establishes a custom and policy supporting the use of unjustified, and unconstitutional, deadly force."[281]

Importantly, "before any investigation could be conducted," the Chief "immediately adopted [the officer's] version of the events, which erroneously included [the plaintiff]. being in possession of a handgun, claiming that [the officer's] conduct was justified because one of the occupants had a gun."[282] Yet, "[i]t is undisputed that Roundtree did not possess a gun during the incident that formed the basis of this lawsuit."[283] Combined with that, the City charged the plaintiff "with felon in possession of a firearm and pursued the case against him as one element of its efforts to cast a negative light on the occupants of 217 Roberts in order to protect Casanova and justify

---

[277] *Id.* at *2.
[278] *Id.* at *3.
[279] *Id.* at *20.
[280] *Id.*
[281] *Id.* at *21.
[282] *Id.* at *22.
[283] *Id.* at *21.

his conduct."[284] Based on this, the Court determined that "the City's actions go beyond good faith statements, generally defending conduct that is later shown to be unlawful, or making an internal administrative decision that an officer's conduct does not warrant discipline."[285] And as a result, the Court further explained that "[s]hould the jury reach the conclusion that the City then took extreme measures to defend Casanova and to shield itself from liability, the jury would be entitled to infer that Casanova's conduct on October 17, 2018 demonstrated the policy of the San Antonio Police Department as approved by its policymaker."[286]

### i. Chief Acevedo ratified the conduct by making knowingly false statements to the public to attempt to shield and avoid the City from liability.

Mirroring Plaintiff's failure to discipline claims, the City ratified this misconduct by (1) the disciplinary process that encouraged excessive force (as mentioned in Section A); (2) the specific review of those disciplinary acts, which mandated that the Chief of Police review every officer involved shooting,[287] and (3) Chief Art Acevedo's statements to the public following Plaintiffs' death that confirmed it authorized this particular bad conduct.

In more detail, just like *Roundtree*, the City, through Art Acevedo, "go beyond good faith statements, generally defending conduct that is later shown to be unlawful, or making an internal administrative decision that an officer's conduct does not warrant discipline."[288] Instead, Acevedo continued to make false statements about Nicholas and Tuttle, even in the face that he knew Goines had committed perjury to get the warrant. In more detail, Acevedo first confirmed that he knew there was no probable cause for the warrant.

79

---

[284] *Id*. at *22.
[285] *Id*. at *30.
[286] *Id*. at *31.
[287] Pls. Ex. AD (Dep. of Nguyen) at 107:20-108:13.
[288] *Roundtree*, No. SA-18-CV-01117-JKP-ESC, 2022 U.S. Dist. LEXIS 55027 at *30.

```
19  Q.  Yeah.  But absolutely positively you can admit
20  now when you say, "We had probable cause," it didn't
21  happen in January 2019?
23     A.  Not based on his affidavit with false
24  information.
25     Q.  Well, everything that was used to do this warrant
               80
 1  execution there was no probable cause to go into that
 2  home?
 4     A.  I would agree, yes.[289]
```

Yet, just like Roundtree, Acevedo, however, was confronted at his position with statements he made to the public six months after the raid.  At that time,  Acevedo still falsely claimed that HPD "had a reason to be there," and "probable cause," which effectively accused Nicholas and Tuttle of being heroin dealers.  Acevedo acknowledged his statement, but – now years later – attempted to step-back from his comments, claiming that he simply meant they had a reason for an investigation, not that they had "probable cause" or a reason for the raid.

```
               82
10  Q.  So you have the investigation and then still six
11  months later having the investigation, having it confirmed
12  there was no probable cause, you still were happy to claim
13  there was probable cause --
15     Q.  -- in public?
17     A.  Well, I think when you look at that, I'm talking
18  about a reason, and there's a reason to target that house
19  in terms of investigate that house is what I was saying.
. . .
               84
 3     Q.  So our jurors who've had a chance to see it
 4  twice, you weren't claiming there was probable cause in
 5  November, that's what you're telling us today?
 7     A.  I think I was claiming -- I was saying there's a
 8  reason why we were investigating that house.[290]
```

The only problem? In his statement to the public in 2019, Acevedo directly claimed that there was

---

[289] Pls. Ex. S (Dep. of Acevedo).
[290] *Id.*

probable cause.[291] And when confronted with this, Acevedo ultimately conceded it:

> 84
> 16  Q.  You used the word probable cause, didn't you?
> 18      A.  I did use the word probable cause, but I was
> 19  talking about the reason for the investigation in terms of
> 20  why we started investigating that location in the first
> 21  place.  That's what I meant by that.[292]

This type of statement to the public, even in the face of the perjury by Goines,  "would support a jury's conclusion that the City engaged in 'unworthy, if not despicable, means to avoid legal liability.'"[293]

Furthermore, Acevedo's ratification combines with the analysis above in Section A regarding the highly predictable consequence theory.  Specifically, knowing that (1) HPD established a disciplinary process as its official policy that allows officers to change and adapt theory story to avoid excessive force;  (2) the Chief of Police, who reviews every excessive force shooting case,[294] uniformly finds these shootings justified;[295] (3) Gallegos, and other officers, did change and adapt theory story; (4) IAD simply took the word of the officers without conducting a legitimate review of the evidence; (5) IAD found the conduct of Gallegos justified; and (6) the Chief of Police publicly, six months after the murder, claimed a lie – that there was probable case to be at the house. This conduct shows that the Chief of Police ratified and authorized the excessive force by Gallegos. Following *Roundtree*, the Court should deny summary judgment.

### ii.        The Ratification was the Moving Force of Plaintiffs' Injuries

Next, this ratification was the moving force of Plaintiff's injury.  Judge Hoyt addressed this

---

[291] *Id.* at 83:9-14.
[292] *Id.*
[293] *Roundtree*, No. SA-18-CV-01117-JKP-ESC, 2022 U.S. Dist. LEXIS 55027  at *29 (citing Grandstaff, 767 F.2d at 166).
[294] Pls. Ex. AD (Dep. of Nguyen) at 107:20-108:13
[295] Pls. Ex. B, at pg. 45.

type of argument in *Santibanes v. City of Tomball*.[296] In that case, during a vehicle stop, an officer

shot a bullet that struck a plaintiff, as he commanded them to raise their hands. The officer claimed

the shot was accidental discharge, not an intentional shooting.[297]  The Chief of Pollice "reviewed

the incident report and personally interviewed [the officer] shortly after the incident."[298] He also

"had the benefit of the information provided by the Harris County Sheriff's Department and the

internal affairs office of the Tomball Police Department."[299] Based on his review, the Chief cleared

the officer of wrongdoing and concluded "no credible evidence suggested  that [he] fired his

weapon intentionally."[300] The Court explained that the Chief "elected not to view the dashboard

video, which places the plausibility of Sergeant Williams' version of the facts into  question."[301]

He also ignored violations of policy by the officer. And the Chief "was aware of the modification

to the trigger component of Sergeant Williams' weapon as well as the fact that  [the officer] did not

blame his weapon's discharge on a malfunction."[302]

In finding that this conduct was the moving force of the ratification by the Chief, the Court

explained that "it is reasonable to infer that [the officer] used deadly force with the knowledge that

the City would exact no consequence for his actions."[303] This is based on a "policy of turning a

blind eye and knowingly refusing to thwart the unconstitutional conduct of its police officers in

using excessive force."[304] Citing to *Grandstaff*, the Court explained "that if reckless disregard for

human life by police officers is 'attributable to the instruction or example or acceptance of or by

---

[296] 654 F. Supp. 2d 593.
[297] *Id.* at 600.
[298] *Id.* at 613.
[299] *Id.*
[300] *Id.* at 613-14.
[301] *Id.*
[302] *Id.* at 614
[303] *Id.*
[304] *Id.*

the city policymaker, the policy itself is a repudiation of constitutional rights,' and where police officers know that use of deadly force in conscious disregard to the rights and safety of others will meet with the approval of city policymakers, the moving force requirement is satisfied."[305]

Judge Ellison again carefully addressed the difficulty of causation standard for ratification. He explained:

> This Court believes that the best way to reconcile the ratification theory announced in *Praprotnik* with the causation requirement of § 1983 would be to cabin the theory to those cases where subsequent ratification can be said to have, in some sense, caused the deprivation. Praprotnik itself arose in the employment context.. It is easy to see how, in an employment context, where a subordinate's decision may be subjected to an internal review by a policymaker before becoming final, ratification can be understood to have caused the deprivation; by approving the subordinate's actions, the policymaker, in effect, continues the deprivation. In contrast, it is difficult to understand how the subsequent ratification of a subordinate's excessive use of force is a cause of that completed violation. Indeed, the Fifth Circuit, in an unpublished opinion, has recognized that ratification is "most readily conceptualized in contexts like employment.'[306]

But he further made it clear – "the Fifth Circuit has never actually limited the ratification theory to the employment context, or to any other context where liability premised on ratification can be reconciled conceptually with the causation requirement of § 1983."[307] Instead, "the Fifth Circuit and this district court have, on numerous occasions, considered whether a policymaker's subsequent approval of an allegedly excessive use of force could subject the municipality to liability based on ratification, thus suggesting that a ratification claim is at least theoretically possible in such a context." [308]

Judge Ellison, in analyzing the facts of that case, explained that "[a] factfinder may conclude that [the] Chief [] ratified the alleged unconstitutional basis for the actions if the record

---

[305] *Id.* (citing *Grandstaff*, 767 F.2d at 170).
[306] *Hobart*, 916 F. Supp. 2d at 795.
[307] *Id.*
[308] *Id.*

supports a conclusion that, even on [the officer's] version of the facts, his actions were 'manifestly indefensible.'"[309] And based on his review, Judge Ellison found that the ratification theory was viable in that particular case because the "physical evidence from the February 18, 2009 incident, evidence of Officer Estrada's state of mind, and indications in the record that Chief Krahn did not consider it his role to evaluate the reasonableness of Officer Estrada's assessment of the threat level." [310]

Following this background, Chief Acevedo made false public statements to limit the exposure of the city. At the same time, IAD and Acevedo found the shooting justified. Yet, this was part of an overarching policy to encourage excessive force based on a lack of discipline. As explained above, "when a police officer knows their use of excessive force 'will meet with the approval of city policymakers, the affirmative link/moving force requirement is satisfied.'"[311] And just like *Rountree* and *Santibanes*, here, Nicholas and Tuttle have presented evidence that "the City has a policy of turning a blind eye and knowingly refusing to thwart the unconstitutional conduct of its police officers in using excessive force."[312] As part of this ratification theory, this includes post-injury statements by the Chief to avoid liability – an act consistent with the policy of not taking disciplinary action against officers, which is something the HPD officer's knew at that time. A reasonably jury could infer that Gallegos used force with "knowledge that the City would exact no consequence for his actions."[313]And as a result, this practice "was the 'moving force' -- behind the alleged constitutional violation."

Therefore, summary judgment should be denied.

---

[309] *Id.* at 798.
[310] *Id.*
[311] *Lujan*, No. EP-21- CV-302-FM, 2022 U.S. Dist. LEXIS 61023 at *13-14.
[312] *Santibanes*, 654 F. Supp. 2d at 614.
[313] *Id.*

## C. Failure to Discipline based on its history of failing to take action against officers for shooting unarmed citizens.

As the third basis for Monell liability, Nicholas and Tuttle have also asserted that the failure to discipline, based on the city's pattern and history, amounts to a policy through a series of bad acts. To prove this type of claim, a plaintiff must show similar unconstitutional acts "have occurred for so long and with such frequency that the course of conduct demonstrates the governing body's knowledge and acceptance of the disputed conduct."[314] This pattern must be "sufficiently numerous prior incidents," but not "[i]solated instances."[315] Similarly, to prove a pattern also requires similarity and specificity; "[p]rior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question."[316]

The Western District of Texas addressed this theory in *Barnes v. City of El Paso*.[317] To prove this theory of liability, the plaintiff argued that "[f]rom 2012 to 2016, based on a limited data set that does not include all instances, EPPD officers utilized excessive deadly or intermediate force at least twenty-one times—fourteen of which resulted in deaths."[318] The plaintiffs then addressed 10 of these in detail. In addition to that, "She also contextualizes these events with statistics about the use of force by officers in El Paso."[319] This includes ""[a] limited review of citizen complaints between 2014 and 2016 show a high rate of excessive force complaints' by El Paso citizens."[320] Through this, the plaintiff presented evidence that El Paso's rate of excessive force complaints was "four-to-five times greater than the national average."[321]

---

[314] *Id.*
[315] *McConney v. City of Hous.*, 863 F.2d 1180, 1184 (5th Cir. 1989).
[316] *McCully v. City of N. Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005).
[317] 677 F.Supp. 3d 594 (W.D. Tex. 2023).
[318] *Id.* at 608.
[319] *Id.*
[320] *Id.*
[321] *Id.*

In response, the City claims that these incidents were neither similar nor numerous enough to show a pattern. In rejecting this, the Court noted that the pleading standard is lower for proving a pattern. But the Court also explained that the plaintiff had provided "detailed examples with statistics that place them in a larger context."[322] And "Courts have recognized that a plaintiff can plead sufficient facts to show a custom of constitutional violations by pleading 'a combination of statistics, past incidents, and statements by city officials.'"[323] Based on that, the Court explained that the statistics provide "a comparative dimension—showing that EPPD receives significantly more excessive force complaints per officer than police departments across the nation."[324] Thus, the Court denied the motion to dismiss.

Next, in *Arrington v. City of Chicago*, the Northern District of Illinois addressed a failure to discipline case based on a series of bad acts at the 12(b)(6) stage.[325] As explained, in that case, the plaintiff had died via alleged excessive force during a police chase. To prove a series of bad acts, the plaintiff cited "six examples of excessive force verdicts or settlements concerning actions of Chicago police officers in addition to Arrington's case."[326] Based on the size of the city of Chicago, the Court questioned that pattern alone. But citing to the DOJ's report on the Chicago Police Department, the Court found sufficient evidence combined with this pattern to justify a series of bad acts. It explained:

> Nevertheless, as is widely known in the Chicago legal community, the Department of Justice completed a report dated January 13, 2017 finding that the Chicago Police Department "engages in a pattern or practice of unconstitutional use of force." This finding was based on a review of Chicago Police Department and IPRA records concerning incidents between January 2011 and April 2016. Although the Justice Department's conclusion was not available to the City until January 2017, the

---

[322] *Id.* at 610.
[323] *Id.*
[324] *Id.*
[325] No. 17 C 5345, 2018 U.S. Dist. LEXIS 14168.
[326] Id. at *8.

evidence on which the report is based was readily available to City policymakers in the period of time preceding the incident causing Arrington's death. This evidence is more than sufficient to plausibly infer that the City has a custom or practice of tolerating or enabling the use of excessive force by its police officers, and that the City was on notice of this custom or practice during the relevant time period prior to Arrington's death.[327]

And based on this pattern combined with the DOJ report, the Court found a sufficient series of bad acts at the pleading stage.

### i. Pattern of abuses

Here, Plaintiff has presented evidence of a pattern of conduct and deliberate indifference of a failure to discipline officers who shoot and kill non-threatening citizens.

First, just like in *Baker*, Plaintiff has presented evidence of a policy of uniform action by the Chiefs of Police from 2009 through January 28, 2019. From 2009 to 2014, HPD had 194 intentional shootings of civilians, 81 of which were of unarmed civilians. IAD and the Chief of Police determined that every single one of those shootings was justified.[328] Between 2015 to 2016, on-duty HPD officers have killed 32 people, and IAD deemed every single one of those shootings justified.[329] In 2016, Art Acevedo took over as Chief, and this pattern continued. Chief Acevedo found every single shooting by an on-duty officer justified from 2016-2019.[330]

While this evidence is different from the DOJ report in *Arrington* or the statistical evidence in *Barnes*, the evidence of uniform decisions regarding excessive force also supplements and combines with the pattern below, to show a series of bad acts. Specifically, it provides direct and

---

[327] *Id*. at *9-10.
[328] Pls.' Ex. B, Declaration of Andrew Scott.
[329] See generally, "HOMICIDE DIVISION 2015 HPD OFFICER INVOLVED SHOOTING INCIDENT" available at https://www.houstontx.gov/police/ois/2015.htm and "HOMICIDE DIVISION 2016 HPD OFFICER INVOLVED SHOOTING INCIDENTS," available at https://www.houstontx.gov/police/ois/2016.htm
[330] Pls.' Ex. S (Dep. of Acevedo) at pg. 15-18.

important context to the custom of always and uniformly justifying excessive force, including for the shooting of citizens.

Second, Plaintiffs have presented evidence of additional examples of excessive force combined with the policy of allowing and encouraging excessive force.  This this includes:

- The shooting of Baker. *Baker v. Castro*, H-15-3495, in the Southern District of Texas. In that case, The Plaintiff was shot on January 13, 2015 by an HPD officer.[331]  Baker was unarmed. The plaintiffs identified the precise issues regarding excessive force and Defendants' inadequate policies and training.[332] The officer, consistent with the pattern above, was found justified. Ultimately, the City settled the *Baker* case for approximately $1.2 million.[333]

- The excessive force against Nicolas Watson. *Watson v. Gallegos*, 4:15-cv-01300 in the Southern District of Texas.[334]  In that case, the Plaintiff arrived at home from work when two Houston police officers, including Gallegos, jumped out of a car and told him to "freeze motherf****r."  Gallegos then punched him several times, threw him on the ground, and handcuffed him. The other officer pointed a gun at Watson.[335] As shown in his disciplinary record, his conduct was justified. The City paid $200,000 to settle this lawsuit.[336]

- The Shooting of George Benard.[337] Benard v. Goines and Byrant, Case No. 4:15-cv-00734, in the S.D. of Texas. On March 19, 2013, as part of a no-knock warrant obtained by Gerald Goines, Squad 15 raided 6725 Sherwood Street. Although the warrant targeted his brother, HPD shot and severely wounded George Bernard during the raid.[338]  As HPD forced entry, Mr. Bernard raised his hands and complied with HPD's demands, but HPD still shot him. During the subsequent search, HPD attempted to argue that the shooting was justified because a "pellet" gun was located in the cluttered room near the location where Mr. Bernard fell. The City and Chief of Police determined the shooting was justified. Mr. Bernard sued the officers for excessive force, and after the Court denied summary

---

[331] *Baker*, 2018 U.S. Dist. LEXIS 170949 at *2

[332] *Id.*

[333] Cameron Langford, *Houston to Pay $1.2M to Family of Black Man Killed by Cop*, COURTHOUSE NEWS SER., Jan. 8, 2010, https://www.courthousenews.com/houston-to-pay-1-2m-to-family-of-black-man-killed-by-cop/

[334] Pls. Ex. AA.

[335] *Id.*

[336] *See e.g.* "Houston to pay $200K to truck driver claiming excessive force by police," available at https://www.chron.com/politics/houston/article/Houston-to-pay-200k-to-truck-driver-who-was-13336120.php.

[337] Ex. AQ

[338] Id.

judgment, the City settled the claim.[339]

- The excessive force against Reuben Williams. *Williams v. City of Houston*, 4:16-cv-03342 in the Southern District of Texas. In that case, the plaintiff was handcuffed for a DUI, when an officer forcibly tied him to a chair and choked him. He was then slammed his head on the frame and shoved him into the wall.[340] The City settled this case for approximately $100,000.

- Excessive Force against Jose Gomez. *Gomez v. City of Houston*, 4:18-cv-01224, in the Southern District of Texas. A jury determined that Officers engaged in Excessive Force against Jose Gomez and awarded over $1 million in damages.[341] In this case, the officer "honked his horn at Gomez and Gomez turned into the far right-hand lane to let the police go by. But they pulled him over for making an illegal turn. The officers ordered Gomez, now 44, out of his vehicle after he said he did not have his driver's license. The arrest was recorded by their body cameras. As Simmerman handcuffed Gomez, Heaven grabbed his arm and said, "Don't tense up on me, motherfucker. Don't you tense up on me." Simmerman then wrestled Gomez face-first to the ground and he and Heaven forced Gomez's arms behind his back."[342]

- Excessive Force against Alan Pean. *Pean v. City of Houston*, 2016-43519B, pending in the 127th District Court of Harris County, Texas. Pean "had a history of bipolar disorder and, according to court documents, was seeking help for acute emotional distress—he'd hallucinated that men were trying to invade his apartment."[343] Yet, HPD shot Pean while he was naked and unarmed in a hospital in August 2015. Despite this, HPD found this shooting justified. [344] The City of Houston settled the case for $902,500.[345]

To be clear, Plaintiff is not arguing that there is a pattern of excessive force in warrant execution. That is Defendant's frame of the argument. Rather, Plaintiffs have argued that there is

---

[339]Andrew Kragie, *Houston set to pay man shot in 2013 police raid,* Hou. Chron., July 24, 2017 https://www.chron.com/news/houston-texas/article/Houston-set-to-pay-family-of-man-killed-in-police-11307987.php

[340] Massarah Mikati, City settles lawsuit alleging HPD used excessive force, July 28, 2019, https://www.chron.com/houston/article/Settlement-reached-with-HPD-for-assault-14191533.php

[341] Pls. Ex. AI.

[342] Cameron Langford, Houston Cops Ordered to Pay $1.1 Million for Traffic Stop Assault , July 14, 2021, at https://www.courthousenews.com/houston-cops-ordered-to-pay-1-1-million-for-traffic-stop-assault/

[343] Michele Pricher, Naked Man Shot In Hospital By Houston Cop Gets $900K Settlement., January 4, 2023, https://www.texasobserver.org/alan-pean-naked-houston-police-settlement/

[344] See August 28, 2015 at, "HOMICIDE DIVISION 2015 HPD OFFICER INVOLVED SHOOTING INCIDENT" available at https://www.houstontx.gov/police/ois/2015.htm

[345] Michele Pricher, Naked Man Shot In Hospital By Houston Cop Gets $900K Settlement., January 4, 2023, https://www.texasobserver.org/alan-pean-naked-houston-police-settlement/

a pattern of turning a blind eye toward excessive force and allowing misconduct to be met with approval. Plaintiffs recognize that the City of Houston's size also impacts the pattern. But again, Plaintiffs have presented evidence of this conduct combined with the pattern described in section A – namely that Defendant's encouraged misconduct as explained there. Specifically, the City designed and implemented a system that allowed an officer to adapt and change its testimony to conform with the evidence to justify their conduct 100% of the time.

Therefore, following *Barnes* and *Arrington*, Plaintiffs have met their burden to show a pattern combined with additional evidence of a policy.

**ii.**      **Deliberate indifference and causation**

Regarding deliberate indifference and causation, as explained above, "when a police officer knows their use of excessive force 'will meet with the approval of city policymakers, the affirmative link/moving force requirement is satisfied.'"[346] Because this same argument is already addressed in Section A(ii), Plaintiffs incorporate their response in Section A to this element here.

**V.**
**STATE LAW CLAIMS**

Defendant also challenges Plaintiff's state law claims – which are simply the derivative method for asserting wrongful death and survival under Section 1983. In other words, Plaintiffs have not asserted a TTCA claim against the City. Plaintiffs incorporate their response to the City's warrant motion for summary judgment as if stated herein.

**VII.**
**CONCLUSION**

For all the reasons identified in this response, Plaintiffs requests that the Court deny this Motion for Partial Summary Judgment.

---

[346] *Lujan*, No. EP-21- CV-302-FM, 2022 U.S. Dist. LEXIS 61023 at *13-14.

_/s/ Jeffrey I. Avery_

Michael Patrick Doyle
Patrick M. Dennis
Jeffrey I. Avery
Patrick Doyle
DOYLE DENNIS AVERY LLP
The Clocktower Building
3401 Allen Parkway, Suite 100
Houston, Texas 77019
Email: service@doylelawfirm.com

CHARLES C. BOURQUE, JR.
_Admitted Pro Hac Vice_
ST. MARTIN & BOURQUE, LLC
315 Barrow St.
Houma, LA 70360
985-876-3891 (phone)
985-851-2219 (fax)
cbourque@stmblaw.com

Attorneys for Plaintiffs
Patricia Nicholas, as temporary
administrator of the Estate of
Rhogena Nicholas and Jo Ann
Nicholas, individually and as an
heir of the Estate of Rhogena
Nicholas

_/s/ Boyd Smith_

Michael T. Gallagher
L. Boyd Smith, Jr.
Pamela R. McLemore
2905 Sackett Street
Houston, TX 77098
Telephone: (713) 238-7705
Facsimile: (713) 238-7852
mike@gld-law.com
bsmith@gld-law.com
pamm@gld-law.com

Attorneys for Plaintiffs
Clifford F. Tuttle, Jr. as
Representative of the Estate
of Dennis W. Tuttle,
Deceased, Robert Tuttle, and
Ryan Tuttle

## CERTIFICATE OF SERVICE

I, the undersigned attorney, do hereby certify that a true and correct copy of the foregoing document was forwarded to the following counsel of record on this the 13th day of September, 2024 via CM/ECF, hand delivery, electronic mail, overnight courier, U.S. Mail, certified mail, return receipt request, or facsimile, pursuant to the Federal Rules of Civil Procedure.

_/s/ Jeffrey I. Avery_
Jeffrey Avery