UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| CLIFFORD TUTTLE, et. al. | Case No. 4:21-cv-00270 |
| Consolidated with | |
| JOHN NICHOLAS, et.al. | |
| Plaintiffs, | |
| v. | |
| CITY OF HOUSTON; ART ACEVEDO, et. al. | |
| Defendants. | (JURY DEMANDED) |

**PLAINTIFFS' RESPONSE TO DEFENDANT CITY OF HOUSTON'S MOTION FOR
PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS'
CLAIMS BASED ON SERVICE OF THE WARRANT**

This response addresses Defendants City of Houston's ("the City") motion for summary

judgment on Plaintiffs' Section 1983 claims and wrongful death and survival claims related to the

Houston Police Department's ("HPD") service of the no-knock warrant on 7815 Harding Street.[1]

**I.**
**Introduction and Summary of Argument**

HPD cast Goines as a standalone bad actor, so that it can absolve itself of all responsibility.

To do this, the City consistently references former Chief Acevedo's testimony that "there's still no

evidence of systemic corruption before or after Harding Street other than Gerald Goines." But what

arose through Goines *is the evidence of systemic corruption* in HPD before Harding Street;[2] these

---

[1] ECF No. 305.

[2] Plaintiffs will set aside that the investigations undertaken by HPD were almost entirely limited to
Goines and did not actually look for evidence of systemic corruption or criminal conduct outside of

systemic issues within the Narcotics Division were always in plain sight. The City only needed to acknowledge them.

Yet, there is strong evidence that active supervision and enforced checks on Goines could have prevented the constitutional violations and the Tuttles' ensuing deaths – the post-incident investigation of the Squad. Specifically, HPD investigated Goines and his supervision after the Tuttles were dead. These investigations revealed that even with the obvious risks arising from allowing street-level narcotics officers like Goines to unilaterally obtain no-knock warrants, HPD had allowed these officers to flout standard operating procedures in place to safeguard against what occurred with no oversight, fear of discipline, or efforts to verify their underlying policework.

Still, HPD claims that regardless of these failings, Goines was determined to do evil. And despite Chief Acevedo's and others in his department's insistence that nothing could have caught and prevented Goines obtaining a false no-knock warrant against the Tuttles, the investigations themselves revealed that HPD was able to determine that Goines had a history of fabricating investigations and information to obtain false no-knock warrants. In other words, the City insinuates that ***the police were incapable of doing investigatory work*** beforehand. But the record shows that HPD was indeed capable of finding out that same information before the Tuttles were killed. The City just failed to do so. Because of this failure, HPD created an environment in which Goines felt comfortable obtaining the unconstitutional no-knock warrant for the Tuttles' home.

The Tuttles' families have now brought a *Monell* claim against the City addressing the unreasonable search and seizure in violation of the Fourth Amendment arising from Squad 15's service of the fraudulent no-knock warrant. HPD failed to appropriately supervise Gerald Goines and

---

Goines.

Squad 15, HPD knew or should have known that its existing policies and supervision gave rise to an obvious risk that Goines would violate citizens constitutional rights sooner or later, and there is a causal connection between the City's failure and policies and the Tuttles' constitutional rights being violated. In addition, there is also evidence that former Chief Acevedo has ratified the conduct of Squad 15's supervisors after the fact, demonstrating his approval for how they supervised Goines and his fellow Squad 15 members as consistent with the supervision policies within HPD. Taking the evidence presented and applying the appropriate inferences favorably to Plaintiffs, there are fact issues that preclude summary judgment on this claim.

Despite the City's claims, what happened was not an unavoidable tragedy. Goines, and HPD's policies and practices, directly caused these two murders. Instead of a calm Monday evening in their home with their dogs, the Tuttles faced a hail of gun fire – the expected result of years of lacking policy enforcement in the HPD's narcotics squads, wrongdoing by members of HPD's Narcotics Squad 15 in expected response to the policy framework within which they operated, and deliberate indifference to the obvious potential for constitutional violations by their superiors.

Finally, the City's reliance on Judge Hanks's decision in *Jeffrey v. City of Houston*, 2024 WL 1313897 (S.D. Tex. Mar. 27, 2024) is misplaced. *Jeffrey* was dismissed on the pleadings pursuant to Federal Rule of Civil Procedure 12(b)(6) after the plaintiff did not plead his *Monell* claim with sufficient particularity. Judge Hanks did not have this same record – particularly including the evidence attached to this motion, which creates a fact issue at a minimum on Plaintiffs' claims based on the theory that the City failed to supervise Goines and the Narcotics Division. Furthermore, in *Jeffrey*, the plaintiff pleaded only failure to train, not failure to supervise. This case includes the claim of failure to supervise against the City. *Jeffrey* has no application here.

**II.**

## Relevant Facts

### A. The Unconstitutional No-Knock Raid at 7815 Harding Street

Monday, January 28, 2019 was "picture day" for Goines and his fellow narcotics officers in HPD's Squad 15. As Sargeant Reyna, one of the immediate supervisors of Squad 15 recalled, he contacted the members of Squad 15 on the Friday before the raid to see if anyone in the group "ha[d] something going" so they could "take some pictures before we go and do a warrant so that we can get pictures for the guy that's leaving."[3] The "guy" Sargeant Reyna was referring to was Squad 15 member Officer Gallegos, who was being promoted to SWAT the following week.[4]

Goines reportedly responded to Reyna that day he "might have something."[5] By the afternoon of January 28, Goines had secured the no-knock warrant to raid the home of the unsuspecting Tuttles later that evening.[6] Despite the claim that Reyna knew about the investigation before the raid, Reyna disputed that. Specifically, he has testified that he did not learn about the warrant and specific target until after Goines had obtained the no-knock warrant, and only a few hours before the raid.[7]

After a short briefing that afternoon, Goines disclosed that there were several white armed male suspects and a pit bull in the house, and that the main suspect was known to carry a handgun in his waistband.[8] The team departed for 7815 Harding Street in southeast Houston to serve the no-knock warrant on the Tuttles' home.[9] After arriving and breaching the Tuttles' door, the Squad 15

---

[3] Pls.' Ex. 171 at COH00038514 (Reyna 2/5/2019 SIU interview).
[4] Pls.' Ex. F at 13:9 – 18 (Gallegos Dep.).
[5] Pls.' Ex. 171 at COH00038514 (Reyna 2/5/2019 SIU interview).
[6] *See* Pls.' Ex. 31 (7815 Harding St. warrant).
[7] Pls.' Ex. E at 27:16 – 28:9 (Reyna Dep.). Goines did not even obtain the warrant until approximately 1:30 pm on the day of the raid. *See* Pls.' Ex. 31 at COH00037439.
[8] *See* Pls.' Ex. 145 (Salazar's 1/29/2019 statement); Pls.' Ex. H at 30:2-8 (Salazar Dep.). If you ask Sargeant Reyna, however, he recalls a different warning from Goines that there was a white or Hispanic male who was known to carry a weapon with a dog in the house. *See* Pls.' Ex. 171 at COH00038520-21 (Reyna 2/5/2019 SIU interview).
[9] *Id.*

members claim that a gun battle between them and Dennis Tuttle ensued.[10] Following the raid, Plaintiffs Dennis Tuttle and Rhogena Nicholas were dead in their home.[11]

As would later emerge, the Tuttles were innocent victims. Goines obtained the no-knock warrant without probable cause and based on lies. Specifically, on January 8, 2019, Patricia Garcia – a neighbor of Tuttle and Nicholas – initiated false 911 calls regarding Tuttle and Nicholas, claiming that her daughter was at 7815 Harding, doing "heroin" with "Reggie."[12] In response, HPD dispatched Officers Morales and Blankenship-Reeves. Upon their evaluation of the Tuttles' residence, Morales and Blankenship-Reeves claim they identified no activity at all in the residence, much less criminal conduct.[13] Nevertheless, Blankenship-Reeves documented her notes regarding the 911 calls on a notepad and passed that information to her significant other, Narcotics Division Lieutenant, Marsha Todd.[14] Todd then passed this tip to Officer Gerald Goines – a member of HPD's Narcotics Squad 15. Specifically, she told him she "[n]eed[ed] a favor" for a "case worked on a house," and she knew he would "do it right."[15] She then wrote "Heroin."[16]

Goines then testified under oath that on January 27th (1) he personally saw the Confidential Informant ("CI") enter the Harding Street house, (2) he searched the CI prior to entering the house,

---

[10] *See* Sections II.3-9 of Pls.' Resp. to the COH MSJ on Excessive Force. Plaintiffs incorporate in full the facts as laid out in Factual Background Section of Pls.' Resp. to the COH MSJ on Excessive Force [ECF No. 330], which provides much more detail on how the raid occurred.

[11] Plaintiffs describe the raid itself in significantly more detail in their Response to the City's excessive for Motion for Summary Judgment. They incorporate that response here.

[12] *See* Pls.' Ex. I at 13:9 – 14:18 (Blankenship-Reeves Dep.).

[13] *See* Pls.' Ex. I at 26:21 - 29:12 (Blankenship-Reeves Dep.); Pls.' Ex. J at 10:16 – 11:7, 23:4-18 (Morales Dep.).

[14] *See* Pls.' Ex. I (Blankenship-Reeves Dep.) at 146:7 – 149:1.

[15] Exhibit 25, Text Message; see also *See* Ex. AE (Todd Dep.) at 55:7-23, 69:23 – 70:15 ("Q. Okay. And then on January the 11th you texted to Gerald Goines and you said: Need a favor. I need a case worked on a house, and I know you will do it right. Period. Heroin. Period. Were those your words? A. Yes.").

[16] *Id.*

(3) he saw the CI return from the house with the drugs and (4) the CI observed a handgun carried by a resident of the house.[17]  This was a lie.  The CI never visited 7815 Harding Street, much less bought heroin there.  Nor did Goines.  HPD's later investigations have confirmed that Goines fabricated information and misrepresented all of these "facts" in his search warrant affidavit to obtain the no-knock search warrant.[18]  Worse yet, Officer Bryant, had also violated multiple policies and committed criminal conduct for his role in attempting to help Goines fabricate his basis for the warrant.[19]

**B. HPD's Narcotics Division and Squad 15**

While the City attempts to fold Narcotics Squad 15 into the broader HPD framework to dilute HPD's failings, this case is about the policies and customs particular to HPD's Narcotics Division. Narcotics Squad 15, of which Goines was a member, was one of only four general enforcement squads in HPD's Narcotics Division.[20]  Within HPD, the entire Narcotics Division, including the four general enforcement squads and the special task forces, had fewer than 200 officers.[21]  While there were certain general orders and standard operating procedures ("SOPs") applicable to all of HPD, the Narcotics Division had its own written SOPs that dictated how things operated particularly within that division.[22]  In other words, HPD promulgated policies and procedures that applied only in the Narcotics Division.

Despite the potential for corruption and other misbehavior from extended time in a vice squad, many of Squad 15's members had been narcotics officers for five or more years at the time of the raid.[23] Of Squad 15's immediate supervisors, Sargeant Reyna had been a supervisor of HPD narcotics

---

[17] *See* Pls.' Ex. 31 (7815 Harding St. warrant).
[18] Defs.' Ex. 14 at COH00075957 (Goines Warrant Investigation Synopsis).
[19] Pls.' Ex. 32 at COH00037521.
[20] *See* Defs.' Ex. 3 to the COH MSJ on Warrant [ECF No. 305-1].
[21] Pls.' Ex. K at 172:6-16 (Follis Dep.).
[22] Defs.' Ex. 18 (Narcotics Division SOPs).
[23] Pls.' Ex. D (Goines's HPD Employment History) (joined narcotics in 1993); Pls.' Ex. L at 9:22

squads since 2014 and Sargeant Wood had been a supervisor of HPD narcotics squads since 2017.[24]

Likewise, Lieutenant Gonzales had been a supervisor of HPD narcotics squads since 2004.[25]

Narcotics Squad 15 had its own chain of command up to Chief Acevedo made up of two Sergeants (Reyna and Wood), Lieutenant Gonzales, Commander Follis, Assistant Chief Jones, and Executive Assistant Chief Slinkard.[26]

### C. The fallout from Harding Street highlights HPD's policy of letting narcotics officers run wild with minimal supervision.

After the raid made national news, HPD commissioned multiple internal audits and investigations to learn more about what went so wrong in the Narcotics Division. Unfortunately, these audits were still mostly only cursory looks focused primarily into Goines.

#### 1. The Post-Incident Audit of a Selection of Goines's Warrants

One of these audits included an internal investigation into Goines obtaining the Harding Street warrant. Following the investigation, HPD detectives determined Goines fabricated information and misrepresented facts before swearing to the contents of his search warrant affidavit to obtain the no-knock warrant.[27] The investigation further detailed that "while investigating the validity of the search warrant and affidavit at 7815 Harding Street, Special Investigations Unit, Squad #2 revealed *a pattern of criminal misconduct by former Officer Goines and former Officer Bryant*."[28] This pattern with respect to Goines included falsifying bases for warrants, falsifying offense reports, paying confidential informants for work not done, signing overtime forms for work not done, and having at

---

– 10:20 (Bryant Dep.) (eleven years in narcotics); Pls.' Ex. M at 9:16 – 10:21 (Ashraf Dep.) (at least nine years in narcotics at time of raid); Pls.' Ex. N at 8:9 – 14 (Medina Dep.) (four or five years as part of Squad 15); Pls.' Ex. O at 8:3 – 13 (Lovings Dep. Vol. II) (five years in narcotics).
[24] Pls.' Ex. E at 10:7 – 11:16 (Reyna Dep.); Pls.' Ex. Q at 6:10 – 20 (Wood Dep. Vol. II).
[25] Pls.' Ex. R at 9:3 – 12 (Gonzales Dep.).
[26] Pls.' Ex. S at 178:14 – 179:7 (Acevedo Dep.).
[27] Defs.' Ex. 14 at COH00074947 (Goines Warrant Investigation Synopsis).
[28] *Id.* at COH00074958 (emphasis added).

least 20 different undocumented drugs in various amounts and a stolen gun in his work vehicle, among various other procedural violations of HPD policies relating to case investigative and documentation work across multiple investigations preceding the Harding Street raid.[29] In all, the investigation resulted in HPD specifically identifying six additional no-knock warrants obtained by Goines using false information that were executed by the Narcotics Division in year prior to Harding Street.[30]

While the City touts the finding regarding only six fabricated warrants as a sign of isolated wrongdoing, this is simply misdirection. The corporate representative for HPD could not confirm if HPD actually investigated any warrants beyond those six that were identified as part of this audit. This is likely why the City did not contest as inaccurate the additional five incidents involving fraudulent investigations from narcotics officers alleged in the Amended Complaint.[31] This was consistent with testimony from Chief Acevedo, who decided that HPD would not perform an exhaustive audit to uncover all of Goines's wrongdoing.[32]

As a further significant finding, even though the report did not address whether any conduct for Goines's supervisors Lieutenant Gonzales or Sargeant Reyna was criminal, the report documented multiple instances in which other individuals in the Narcotics Division – specifically, Lieutenant Gonzales, Sargeant Reyna, and Officer Bryant – signed receipts for payments to confidential informants that simply never occurred.[33, 34] While the results of the report were turned over to the Harris County District Attorney's Office, the report concluded:

Per standard operating procedures and acknowledged by former and active Narcotics

---

[29] *See Id.* (general report in entirety).
[30] *Id.*
[31] Pls.' Ex. T at 68:5 – 18, 78:13 – 86:15, 93:14 – 97:4 (Duplechain Corp. Rep. Dep.).
[32] Pls.' Ex. S at 43:13 – 48:24 (Acevedo Dep.).
[33] The investigative report noted that Lieutenant Gonzales did not even provide a statement for the investigation. Defs.' Ex. 14 at COH00074959.
[34] *See* Defs.' Ex. 14 at COH00074959, COH00074961 – COH00074963, COH00074966.

Division officers, a witnessing officer was required to be present during confidential informant payments. As stated in the Narcotics Division Standard Operating Procedures, the confidential informant payment forms were required to be completed and signed at the time funds were dispersed to the confidential informant. The amount of the confidential informant payment dictated the rank of the witnessing officer required to be present during a confidential informant payment. The following witnessing officers signed in the witness section on the CI payment receipts of the above listed narcotics investigations: former Lieutenant Robert Gonzales, former Sergeant Clemente Reyna, and former Officer Steven Bryant. In addition, recovered confidential informant payment forms related to this investigation contained no witnessing officer's signature. After further review of confidential informant payment forms in this investigation, detectives discovered multiple inconstancies in payment procedures and inaccurate representation of confidential informant payments.[35]

### 2. The Post-Incident Audit of Squad 15's Supervision

Another post-incident audit included internal affairs investigations conducted by HPD's Lieutenant Jonathan French and Sargeant Jeffrey Rexroad into the supervision practices of only Squad 15. They then made their report to Chief Acevedo. But importantly, the findings regarding HPD's supervision of Squad 15 similarly condemn HPD's Narcotics Division for multiple failures of supervision and a horrendous culture.[36] The investigation concluded that Squad 15's immediate supervisors, Gonzales, Reyna and Wood, each individually failed to properly supervise their subordinate Squad 15 officers.[37] More specifically, it identified no instances in which any supervisor of Squad 15 would ever actually try to verify the investigation or the controlled buy.[38] To the contrary, the report highlighted how narcotics squads supervisors utilized a trust but never verify management policy – often in violation of HPD's Narcotics Division policy. This includes:

---

[35] *Id.* at COH00074968. Lieutenant Gonzales and Sergeant Reyna were later criminally indicted by the Harris County District Attorney for their respective conduct as supervisors within the Narcotics Division, along with Sargeant Wood. *See* Pls.' Ex. Y (Gonzales Charging Instrument); Pls.' Ex. Z (Reyna Charging Instruments); Pls. Ex. 127 and 128 (Wood Charging Instruments). The criminal case against Gonzales was dismissed without an adjudication of guilt or innocence. Wood and Reyna still have multiple criminal felony charges pending adjudication.

[36] Pls.' Ex. 32 (Lt. French Investigation Report).

[37] Pls.' Ex. G at 51:25 – 52:9 (French Dep.).

[38] *Id.* at 82:10 – 15 (French Dep.).

- Redacted
- Redacted

- Redacted
- Redacted

---

[39] Pls.' Ex. 32 at COH00037487 (Lt. French Investigation Report). Of note, the sergeants did accept a tactical plan for the warrant obtained by Goines, and a briefing was held to prepare for a raid of the location despite the noted deficiencies. *See id.* at COH00037495.
[40] *Id.* at COH00037488.
[41] *Id.*

Redacted

· Redacted

·

· Redacted

·

---

[42] *Id.* at COH00037489.
[43] *Id.* at COH00037490.
[44] *Id.* at COH00037488.

# Redacted

- "Sergeant Reyna was asked if he ever did anything to verify the information listed on the tactical plan and warrant. Sergeant Reyna explained that the tactical plans would show if there was a controlled buy, but the only way to verify the controlled buy would be to start questioning his case agents' honesty, which he realized was now an issue; however, at the time he had no reason to question his officers' honesty. Sergeant Reyna admitted that his agents did not give him their CI receipts for funds prior to running warrants, because it was not common practice. Reyna referred back to questioning the honesty of his case agents, 'if I ask those two officers, hey, give me the receipt, give me the - give me - show me the CI payment and it's already reached the point where he's standing in front of a judge and swearing to all this, what makes anybody think that that receipt form is gonna be honest as well, you know. They're – they're signing an affidavit or the one officer is signing an affidavit saying it's all right, he could just as well give me a receipt that is not right' Sergeant Rexroad reframed his question, stating this was not about questioning the honesty of officers, but in fact adding an additional layer of verification. Sergeant Reyna understood but affirmed this was not common practice in the Narcotics Division."[46]

- "When asked how the sergeants check the accuracy of the warrant, Sergeant Wood stated that they have an open atmosphere in the office so they are talking with the officers and getting updates all week. Sergeant Wood then added he did not know that Officer Goines had made a controlled buy prior to the day of the warrant. Sergeant Wood stated that Officer Goines should have completed a report the day he made the buy or had at least some sort of documentation regarding the buy. Sergeant Wood added that it is not routine for them to look at other stuff outside of the warrant, such as the CI receipts or offense reports to verify any information."[47]

- "Sergeant Wood was asked if he would expect an incident report or other documentation from Officer Goines [for Harding Street] since the supervisors had knowledge of it on Friday and they did not attempt to run the warrant until the next week. Sergeant Wood stated yes he would have expected an incident report or any other documentation from Officer Goines. He also added that if there was a system in place where they had the case tracking sheet and it was in the SOP, they would have reviewed that stuff before the warrant. He also stated they

---

[45] *Id.* at COH00037491 – 37492 (emphasis added).
[46] *Id.* at COH00037493 - 37494.
[47] *Id.* at COH00037500 - 37501.

are usually going by what the case agents tell them and the supervisors trust that the case agents are telling the truth and they are keeping the supervisors informed on a daily basis. Sergeant Wood reiterated that if there was a system in place such as guidelines or forms that the case agents filled out at the beginning of an active case that would keep the supervisors informed and let them know what was going on, it would help hold the case agents accountable for the information especially in the affidavits."[48]

- "Sergeant Wood was also presented with a report that SIU investigators completed in which they had found [in Goines's vehicle] cocaine, hydrocodone, prescription acetaminophen, other kinds of contraband and a stolen gun. Sergeant Wood stated that was unacceptable and there was no reason for Officer Goines to have any of that in his vehicle. Sergeant Wood was asked if Officer Goines had obtained these narcotics in controlled buys then every piece of contraband or narcotics should have a case tracking sheet and a CI receipt for funds attached to it. Sergeant Wood replied yes and if Officer Goines never completed a case tracking sheet then there was no way for anyone to find out what Officer Goines did or had. Sergeant Wood acknowledged that if a case tracking sheet was not completed, the supervisors would never know of the case agent's activities and that was an issue. Sergeant Wood added by saying that brings him back to the point of there being something on the front end of the investigation, a process in which to document, then the supervisors would know what the case agents were doing."[49]

- "It was pointed out to Sergeant Wood that if everything falls back on the case tracking sheets that the officers are creating, it leaves the officers to police themselves to notify everybody what they're doing and it leaves a lot of room with no oversight for the officers to not be doing what the're supposed to do and the supervisors have no way to find out. Sergeant Wood replied 'And like I said I've only been there for two years and this is the way that - the system told me. But I think they should add some other protocols to the system to, uh .. Well like, uh, maybe something that tells us that they're initiating a, uh, maybe a form or something that they fill out and maybe an activity sheet or something that tells us what they're doing and, um, and, uh, they're supposed to turn that in weekly or something like that. Uh, but you're right it - it probably the - the - if you have a dishonest person, uh, or two dishonest people that are working together it's very hard to catch a mis- uh, their, uh, mistakes.' "[50]

- "It was then pointed out to Sergeant Wood that the audit team had to create 14 case files just for the year 2018 from stuff that was all over Officer Goines' desk, filing cabinet, or car. Sergeant Wood stated that there was no reason why Goines never created a file for the 14 cases. When asked if Officer Goines had all the case tracking sheets and reports done but had not compiled it into a case file, wouldn't the supervisors expect to have seen the report, Sergeant Wood replied yes. He also added that if there is no information for the supervisors to see then they're not going to see it, that if it's not caught by the case tracking list then there is no way of knowing and it goes back to what he had said earlier about having another

---

[48] *Id.* at COH00037502.

[49] *Id.* at COH00037503.

[50] *Id.* at COH00037504 - 37505.

procedure in place. The weak link in the chain is whether or not the officers do their case tracking sheets for anybody else to have any idea what is going on."[51]

- "[Sargeant Wood] also stated this was way out of the ordinary and this did not represent what the Narcotics Division is about. Sergeant Wood stated if it was required to turn in a packet of some sort before every briefing to the sergeant for review it may slow things down, but it would probably be a better way to go. Sergeant Wood was asked if he thought that having a closer review of anything related to the Harding Street case would have changed or possibly affected the outcome of what had happened, Sergeant Wood replied 'yes' and 'no.' "[52]

- "This investigation was able to show that Sergeant Reyna took his officers at their word versus verifying and spot checking their activities. Sergeant Reyna was responsible [for] supervis[ing] the activities of his case agents including Officer Goines. Sergeant Reyna was presented with the findings of Officer Goines' vehicle inventory in which untagged narcotics and a stolen pistol was found. Sergeant Rexroad asked Sergeant Reyna how it was possible for Officer Goines to have those items in his vehicle . . . Sergeant Reyna affirmed that case tracking sheets and CI receipts for funds should have been connected to the narcotics found in Officer Goines' vehicle. Sergeant Reyna was shown instances in which Officer Goines documented weapons in his search warrants; however, they were not documented in the related incident reports. Sergeant Reyna agreed that the discrepancies should have been caught. Sergeant Reyna attested that by closely monitoring his case agents' investigations, it might seem that he was questioning their honesty. However, this should not have been a consideration in simply checking with his officers to ensure they were following policy."[53]

- "Sergeant Wood attested that unless there was a reason to check his officer's case, 'we shouldn't have to babysit.' Sergeant Wood admitted he did not see a problem before 'but this -when you have an officer like this, uh, **obviously there should be a better process in place**.' "[54]

As a result, IAD sustained multiple allegations against Lieutenant Gonzales and Sergeants Reyna and Wood for violating supervisory Narcotics Enforcement Division SOPs.[55]  Even with the purported thorough post-incident review of supervisory practices, however, HPD's investigation did not bother to look into any potential failings outside of Squad 15, nor did the investigation scrutinize supervisors higher than Lieutenant Gonzales (*i.e.*, it failed to address consider and address the

---

[51] *Id.* at COH00037505.
[52] *Id.* at COH00037507.
[53] *Id.* at COH00037533.
[54] *Id.* at COH00037536 (emphasis added).
[55] *Id.* at COH00037537 – 37538.

supervision of Chief Acevedo, Executive Assistant Chief Slinkard, Assistant Chief Jones, and Commander Follis).[56]

### 3. The Post-Incident Audit of Widespread SOP Violations in the Narcotics Enforcement Division

In another after-the-fact audit by Assistant Chief Lopez, HPD commissioned an administrative internal review of their existing Narcotics Division SOPs regarding warrant service and the handling of confidential information.[57] Again, rather than perform an exhaustive review to understand the full extent of the issues and expose any widespread issues, this audit included only a limited review of three years of Goines's and Bryant's case files and an approximately 10% sample from two-years' worth of case files preceding the raid for the Narcotics Enforcement Division's four general enforcement squads, squads nos. 9, 10, 14, and 15.[58]

Upon reviewing the case files, the audit team divided the errors into various categories, as discussed further in the audit report itself. While many HPD witnesses describe these errors as "administrative" when discussing this audit in depositions, that auditors also found "confidential informant errors," "evidence errors," "investigative errors," "offense report errors," and "operation errors."[59]

---

[56] Pls.' Ex. G at 52:10 – 54:15 (French Dep.).
[57] Defs.' Ex. 15 at COH0005359 (Narcotics Division Audit)
[58] *Id.* at COH0005364, COH0005378.
[59] *Id.* at COH0005374 – 5375.

| Administrative Errors | | |
|---|---|---|
| Code | Error | Definition |
| A1 | No Blue Back | The case file was not turned on or the file was recreated by the audit team |
| A2 | No Case Tracking Number | There was no Narcotics Division CT number created for this case |
| A3 | Case Tracking Error | There are errors on the case tracking sheet |
| A4 | Late Case Tracking Entry | Case Tracking Sheet was entered late |
| A5 | Missing Case Review Sheet | Case Review Sheet not attached to the case investigative file |
| A6 | No Supervisor Signature on Case Review Sheet | No Supervisor Signature on Case Review Sheet |
| Confidential Informant Errors | | |
| C1 | Expense Report Error | Errors on expense report relating to expenditures |
| C2 | Unauthorized Informant Payment | Informant was paid prior to supervisory approval |
| C3 | Expense Discrepancy | Discrepancies between expense report and offense report |
| C4 | Informant Documentation not Adequate | CI payment form does not offer adequate information to justify payment |
| C5 | No Expense Letter | Expense Letter missing |
| Evidence Errors | | |
| E1 | Late Evidence Submittal | Evidence was submitted days after recovery |
| E2 | Evidence Discrepancy | Discrepancy between submission slip and offense report relating to date, weight, or other inconsistencies |
| E3 | Evidence Submission Slips Missing | No evidence submission slips found in case file |
| Investigation Errors | | |
| I1 | Thoroughness of Investigation | Report was missing portions of the investigation which questioned procedural issues relating to the warrant or arrest |
| Offense Report Errors | | |
| O1 | Inadequate Offense Report | Case lacked sufficient details to explain PC or procedural errors discovered |
| O2 | Incomplete Offense Report | Report lacked supplements, narratives and errors |
| O3 | Late Report Entry | Report completed weeks or months post incident |
| Operations Errors | | |
| S1 | Supervisory Conduct | Supervisor not present when required |
| T1 | Tactical Plan | Tactical plan not signed or missing |
| W1 | Late Warrant Return | Warrant returned late to the courts |
| W2 | Warrant Discrepancy | Numerous errors on warrants |
| W3 | Warrant Procedural Errors | Search and arrest warrants based on controlled buys by informants with vague information. These should be just search warrants |
| W4 | No Search warrant in case file | No search warrant in case file |
| W5 | No Warrant Return | Search warrant not returned to court |
| Z1 | No errors found | No errors |

With respect to Goines and Bryant, the audit revealed 404 errors in their combined 231 investigations in those three years. Some had multiple errors on the same case.[60] These errors ranged from no blue backs, unauthorized informant payments, late evidence submittal, case files demonstrating a lack of thoroughness of investigation, and warrant discrepancies and procedural errors.[61] With respect to Goines, the audit revealed that 48% of the time in a selection of 84 of his cases, he failed to deposit recovered narcotics in a timely fashion.[62] For the broader general enforcement squads in the Narcotics Division, the audit sampling revealed that there were 306 errors

---

[60] *Id.* at COH0005373.
[61] *Id.* at COH0005375.
[62] *Id.* at COH0005376.

among 173 cases for Squads 14 and 15[63] and 409 errors among 252 cases for Squads 9 and 10.[64]





Figure 19 North General Enforcement Types of Case Errors 2017 to 2019

Altogether, there were consistently nearly twice as many SOP violations reflected in the case files as there were even cases reviewed. Significant among the concluding findings and recommendations, the audit observed:

> The audit revealed the necessity to place additional emphasis on supervisory oversight, confidential informant handling, and changes to the department's policies and procedures on cases involving search warrants
>
> . . . .
>
> The audit overwhelmingly supports the need to improve administrative procedures, specifically, supervisory review of case files and case tracking. In almost 25% of all cases turned in by Narcotics Case Agents, supervisors failed to sign the "Case File Review Sheet." This sheet is required to be signed by the squad sergeant. The review sheet is vital to maintain supervisory oversight of cases submitted by a Narcotics Case Agent. Over 11% of the cases submitted were turned in late to intake. Many of the cases were turned in over six months to a year later which is in violation of Narcotics SOP 100/2.03 "Case Tracking Sheet."[65]

---

[63] *Id.* at COH0005379.

[64] *Id.* at COH0005386.

[65] *Id.* at COH0005417 – 5419.

While the audit report claimed the auditors did not confirm any criminal activity occurring between a confidential informant and a narcotics case agent, the summary further noted that such a finding was not even possible to achieve due to the audit's focus and scope, which did not include interviews with informants and witnesses.[66]

### D. Goines's Practice of Consistently Obtaining No-Knock Warrants with No Weapons Collected

In addition to the various policies and customs to disregard rules and supervision reflected in the investigations, Goines's other misconduct surprisingly did not seem to raise any red flags for his supervisors. Specifically, between 2012-2019, Goines requested and filed sworn affidavits related to search warrants for approximately 109 drug cases.[67] In those warrants, Goines requested a no-knock warrant roughly 95% of the time by representing that the suspect possessed a firearm inside the target location.[68] Yet in all but one of those cases – 99.08% of his drug search warrants – Goines never recovered a firearm in the subsequent inventory list after the raid.[69] There is no evidence identified that anyone within HPD ever inquired about the discrepancy.

### E. The Pre-Raid Priorities for HPD's Narcotics Division Uncovered Through Discovery

As the City rightfully points out, on paper, HPD promulgated policies before the raid like General Order 200-08 through which it assumed the duty for its supervisory personnel from sergeants all the way up to Chief Acevedo to prevent violations of the law or the rules and regulations of HPD: "[s]upervisors shall actively enforce the law and the policies and procedures of the Houston Police Department. Supervisors shall not permit or otherwise fail to prevent violations of the law or the rules,

---

[66] *Id.* at COH0005419.
[67] Pls.' Ex. AB (Goines Warrants and Evidence Returns).
[68] *Id.*
[69] *Id.*

regulations, policies or procedures of the Houston Police Department by any employee."[70] Supervisors were further tasked with monitoring their teams "for patterns of inappropriate behavior or performance and initiat[ing] appropriate intervention in a timely manner."[71] These duties were understood as an obligation of what HPD supervisors were supposed to be doing all the way up to former Chief Acevedo, including by Acevedo himself.[72]

Yet the evidence int his case makes it clear – as a pattern and practice, HPD did not comply with SOPs, much less ensure honest police work in its Narcotics Division. Instead, just like the audits showed, the Division's practice authorized and allowed its officers to take any action – no questions asked.[73] And based on his interactions with his superiors in the highest levels of the force, a good job in narcotics meant making arrests and recovering contraband; there were otherwise not conversations had with his supervisor at HPD's highest levels concerning whether the Narcotics Division was complying with SOPs, performing documentation, and doing honest police work:

> 222
> 13    How did you know whether your
> 14    Division was doing good work or not?
> 15    A. Well, I had a conversation almost every day
> 16    with Chief Jones, the Assistant Chief, who I reported
> 17    to. We would go out at all hours of the day and night
> 18    and I would send him emails from the scenes about what
> 19    happened, what we recovered; and he was constantly
> 20    telling me we were doing a good job.
> 21    Q. And what was a good job?
> 22    A. Making arrests, recovering contraband.
> 23    Q. Did a good job include complying with the
> 24    standard operating procedures for documentation?

---

[70] Pls.' Ex. G at 66:5 – 67:22 (French Dep.).
[71] Defs.' Ex. 26 at COH0042261 (GO 300-24).
[72] Pls.' Ex. K at 45:19 – 46:3 (Follis Dep.); Pls.' Ex. S at 107:13 – 108:2 (Acevedo Dep.).
[73] Pls.' Ex. K at 41:6 – 13, 81:6 - 23 (Follis Dep.) ("Q. What did you do as his captain to make sure that Lieutenant Gonzales was supervising the daily operations of his squad and ensuring conformance with departmental policies and procedures? A. I took Lieutenant Gonzales at his word. Q. Anything else? A. No, sir.") (objection omitted).

1    A. My understanding, he was talking about a good
2    job of making the arrests. That's the information that
3    I gave him.
4    Q. (BY MR. DOYLE) What about ensuring that the
5    Division is documenting drugs, confidential informants,
6    cash properly, consistently?
7    [objection omitted]
8    A. We did not talk about that. I don't know what
9    he thought about that.[74]

This policy focus of focusing on field operations and results was similarly echoed by Chief

Acevedo in his deposition:

106
14    Q. Well, when you say "short time," by 2019 you'd
15    been there a little more than two years?
16    A. I got there -- basically my first workday was
17    December 1st of -- oh, shoot, I don't remember the year.
18    MS. MARTIN: '16.
19    A. '18?
20    MS. MARTIN: '16.
21    A. '16, yeah. Yeah, I mean, I spent a lot of time
22    down in narcotics, I'd go out on operations. I did a lot
23    of paying attention to what's going on.
24    Q. What you're talking about going out in the field
25    talking to the people in their office including the unit

107
1    stationed at Travis?
2    A. Yes, sir.
3    Q. But the hard work of actually going through the
4    documentation, see whether the policies, procedures are
5    being followed, whether case files were being reviewed,
6    there's proper supervisory oversight, had you ever
7    assigned anyone to do that?
8    [objection omitted]
9    A. Well, we -- I was -- not to do an additional one,
10   no, but we had -- we have an entire chain of command, we
11   -- that was involved in looking at and supervising the
12   operation.[75]

---

[74] Pls.' Ex. K at 222:13 – 223:9 (Follis Dep.).
[75] Pls.' Ex. S at 106:14 – 107:12 (Acevedo Dep.).

This focus on operational results and field exercises was also reflected in the productivity reports for the Narcotics Division, which the City references as one of the supposed checks that went to supervisors concerning the division's operations. These "productivity reports" focus on numbers of busts, charges, and amounts of drugs recovered by each squad, with no mention of compliance with SOPs or procedures.[76]

This additional evidence is consistent with HPD's approach towards the Narcotics Division of favoring results over safeguards. As Commander Follis explained in his deposition, neither he nor any of his predecessors would make any effort to look behind the investigation case files to verify information in them from narcotics officers unless there was an affirmative indicator or complaint of impropriety they were made aware of, otherwise "it just wasn't done."[77]

**F. HPD's pre-raid written policies reflect the autonomy granted to street-level narcotics officers to self-manage and obtain no-knock warrants with minimal checks.**

Further showing the real policies and practice in the Narcotics Division, HPD had no requirement that supervisors review any of the underlying investigative efforts by Narcotics officers before an officer obtained a no-knock search warrant. For example:

- SOP 200/1.02 on Activity Authorization speaks to a case agent notifying a supervisor prior to initiating an investigation, arrest, search warrant, buy/bust, or execution of consent to search, but it does not expressly include any requirement of inquiry into the underlying investigation.

- SOP 200/1.12 on Search Warrants/Buy Busts and Open-Air Investigations speaks to procedures for executing search warrants, but it does not expressly include any requirement of inquiry into the underlying investigation leading to the search warrant before the warrant is actually executed.[78]

---

[76] *See* Pls.' Ex. 188 (Productivity Reports); Ex. T at 28:1-25 (Duplechain Corp. Rep. Dep.).
[77] Pls.' Ex. K at 167:16 – 169:16 (Follis Dep.).
[78] Defs.' Ex. 18 at COH0010739, COH0010754 - 10758 (Narcotics Division SOPs).

Additionally, the SOPs expressly permitted for squad supervisors (*i.e.*, sergeants) or their designees (*i.e.*, officers) to prepare case tracking sheets.[79] This was significant, as Sergeant Wood would explain in HPD's post-incident investigations, because if there is no case tracking sheet, "then there was no way for anyone to find out what Officer Goines did or had."[80] Due to the structure of these policies, this resulted in a known practice within the Narcotics Division of street-level officers like Goines being permitted to prepare their case tracking sheets at their convenience, leaving their supervisors without one of the checks that should keep them apprised of ongoing investigations.[81]

Only after the raid, HPD changed is SOPs, including: (1) search and arrest warrant tactical plans will be reviewed by the case agent's chain of command up to the division commander; (2) additional detail required on documentation of contact(s) with CIs, including all conversations (electronic and in person); (3) a narcotics division lieutenant is required to conduct a face-to-face biannual review of randomly selected informants from each officer who has a registered firearm; (4) supervisors are now required to review investigative efforts which support the search warrant affidavit; (5) search warrant request require the signature of a District Court Judge; (6) quarterly training for narcotics officers to discuss policy updates, relevant laws, and legal ramifications with a specific focus on supervisory awareness concerning the use of no-knock warrants; (7) constraining the Narcotics Division to conduct only "Knock and Announce" warrants; and significantly, (8) Chief of Police approval for any no-knock warrants.[82] The fact these changes were made in combination with the demonstrated patterns inconsistent with these changes discussed in the post-incident audits

---

[79] *Id.* at COH0010713.
[80] Pls.' Ex. 32 at COH00037503 (Lt. French Investigation Report); *see also* Pls. Ex. K 118:3 - 21 (Follis Dep.).
[81] Pls.' Ex. 32 at COH00037532 (Lt. French Investigation Report).
[82] *Id.* at COH0005364 - 5367.

confirm these were not practices for the Narcotics Division before the raid and not consistent with the policies endorsed by HPD prior to the raid.

### G. Even after all that has transpired and the ensuing investigations, Chief Acevedo maintains that there is no evidence that there was any corruption in Squad 15 prior to the raid.

Former Chief Acevedo's deposition was taken in February 2024.[83] After having an opportunity to review the findings of the above-referenced narrowly targeted audits undertaken by HPD, and after multiple former members of HPD's Narcotics Division, including Lieutenant Gonzales, Sergeants Reyna and Wood, and Officers Armstrong, Ashraf, Gallegos, Lovings, Maxwell, Medina, Goines, Pardo, Reyna, and Bryant, were indicted or pled guilty to criminal charges arising from their work in HPD's Narcotics Division.[84] Former Chief Acevedo continues to insist that there was no evidence of corruption in Squad 15 prior to the raid:

> 20    Q. You mentioned earlier that still to this day
> 21     in 2024 from your perspective there's no evidence that there
> 22    was any corruption in Squad 15 prior to the raid. Is that
> 23     your position?
> 24    A. Yes.[85]

### IV.
### Argument and Authorities

If any person acting "under color of any statute, ordinance, regulation, custom, or usage, of any State" deprives a United States citizen of any constitutional right, he may be liable in a suit for money damages.[86] In *Monell v. Dep't of Soc. Servs.*, the Supreme Court held that municipalities like

---

[83] Pls.' Ex. S at 1 (Acevedo Dep.).
[84] *See* Pls.' Ex. 127 and 128 (Wood Criminal Charging Documents); Pls.' Ex. Z (Reyna Criminal Charing Document); Pls.' Ex. Y (Gonzales Criminal Charging Document); ECF No. 113, *United States of America v. Steven O. Bryant*, 4:19-cr-00832, United States District Court Southern District of Texas (Bryant Plea Agreement).
[85] Pls.' Ex. S at 215:20 – 24 (Acevedo Dep.).
[86] 42 U.S.C. § 1983.

the City may be liable for a plaintiff's constitutional harms pursuant to § 1983.[87]

**A. Taking Plaintiffs' supported facts as true, there is a factual dispute over *Monell* liability arising from HPD's failure to supervise Goines.**

As one avenue of imposing *Monell* liability on a municipality, a plaintiff may maintain a failure to supervise claim against a municipality by showing (1) the City failed to train or supervise the officer(s) involved; (2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and (3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights.[88] In this way, the Supreme Court has recognized that *Monell* liability can arise from gaps in supervision despite known or obvious risks of constitutional violations because a "city's 'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the City itself to violate the Constitution.' "[89]

**1. HPD failed to adequately supervise and/or discipline Goines.**

The record, including Goines "pattern of criminal activity," in this case makes it clear –HPD failed to adequately supervise Goines as one of its narcotics officers. Goines (and many of his other coworkers and supervisors) consistently flouted SOPs put in place to prevent incidents from Harding Street from happening.[90] The post-incident investigations detailed above, make this conclusion unavoidable. This includes the findings concerning: (1) Goines obtaining *at least* six confirmed

---

[87] *Monell*, 436 U.S. 658, 690 (1978).

[88] *Hutcheson v. Dall. Cty.*, 994 F.3d 477, 482 (5th Cir. 2021); *see also Covington v. City of Madisonville*, 812 F. App'x 219, 226-29 (5th Cir. 2020) (discussing concept of failure to supervise *Monell* claim).

[89] *Connick v. Thompson*, 563 U.S. 51, 61-62 (2011).

[90] *See* Pls.' Ex. K at 122:6-19 (Follis Dep.) (Q. "Do you wish the supervision had been a little better leading up to the Harding Street raid? [objection omitted] A. So all I can say about that, sir, is that, you know, we have many, many, many policies and procedures in place to avoid situations like this.").

fraudulent no-knock warrants in addition to Harding Street; (2) stashing a stolen gun and drugs in his vehicle and desk from unknown sources; (3) paying confidential informants for work not performed (4) consistently indicating weapons observed to obtain no-knock warrants with no weapons recovered with no questions asked; and (5) violating various other department SOPs concerning his case files and investigations.[91] HPD Narcotics Division did not look into the investigations of case officers like Goines to test the veracity of their work absent an affirmative indicator they received that something was wrong, which they claim they all somehow claim they did not have here.[92]

The City attempts to immunize itself by pointing out that Goines and the other Defendants were in regular contact with the supervisors who asked about their work. Those supervisors, Sergeants Reyna and Wood and Lieutenant Gonzales, pleaded their Fifth Amendment privilege well over 150 times combined when facing deposition questions concerning their supervision of HPD's narcotics squads and Goines.  This even includes responses to basic questions regarding whether they were i supervisors of Squad 15 and whether they were generally familiar with the cases agents were working and whether any checks were done into case agents' investigations.[93] They further invoked their Fifth Amendment privilege or generally refused to answer deposition questions asking them to acknowledge the well-known risks of improper influences and participation in unconstitutional practices that may arise from HPD's practice of not routinely rotating narcotics officers out of the division and not verifying case agent investigations, as well as questions about their knowledge of

---

[91] *See* Section III.C, *supra*.
[92] *See* Pls.' Ex. K at 167:16 – 169:16 (Follis Dep.); Pls.' Ex. 32 at COH00037488, COH00037493 – 37494, COH00037533 (Lt. French Investigative Report).
[93] *See, e.g.*, Pls.' Ex. R at 9:13 – 10:20, 13:20 – 15:1, 21:6 – 25:24 (Gonzales Dep.); Pls.' Ex. E at 16:6 – 19:2, 28:10 – 33:7, 67:9 – 73:22, 94:15 – 95:9 (Reyna Dep.); Pls.' Ex. Q at 7:7 - 9:14, 11:13 – 15:25, 19:2 – 20:16 (Wood Dep. Vol. II).

Squad 15 engaging in illegal conduct and submitting false affidavits.[94]  Goines himself invoked the Fifth Amendment privilege to every question during his deposition concerning his practices, not providing any information beyond an adverse inference about what his supervisors might have known.[95] In combination with the other evidence demonstrating a lack of supervision of Goines, a permissible adverse inference should be drawn about how much these supervisors actually communicated with Goines about his work and supervised him overall.[96]

The City also touts the audits and integrity checks that it claims it subjected its narcotics squads to before the raid to prevent officers like Goines from breaking the law as countervailing evidence of supervision. But these were financial and budgetary audits. HPD did not design this type of audit to uncover lies about investigations before obtaining warrants and/or that they were actually performed against members of Squad 15.[97] In contrast, the evidence suggests that approximately ten years before Harding Street, HPD stopped its process of internally auditing case files for errors like the audit that Assistant Chief Lopez undertook after Harding Street. And Acevedo did not commission

---

[94] *See* Pls.' Ex. R at 20:5 – 21:5, 87:1 – 12 (Gonzales Dep.); Pls.' Ex. P at 84:16 – 85:14 (Wood Dep. Vol. I).

[95] Pls.' Ex. X (Goines Dep.).

[96] *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them.").

[97] *See* Pls.' Ex. K at 126:11 – 127:9, 171:4 - 16 (Follis Dep.) (describing the audits of the narcotics division as "budgetary" and confirming that he was just looking to make sure that financial numbers lined up); Pls.' Ex. T at 187:24 – 190:23, 180:11 – 182:25 (Duplechain Corp. Rep. Dep.) (discussing no knowledge of audits in the preceding five years like the one HPD undertook after the Harding St. raid to determine if Officer Goines was lying on warrants); Ex. 33 to the COH's MSJ on Warrant [ECF No. 305-7] (DOJ Financial Audit). Of note, consistent with the point Plaintiffs make regarding HPD's practice of disregarding the written SOPs that are supposed to provide the checks and balances on officers, the DOJ audit determined that the HPD was not following its own procedures by "not maintaining a complete or accurate centralized inventory of all equitable sharing purchases. . . In our judgment, by not adhering to its own procedures, the HPD cannot ensure that its accountable property is used for its intended purpose." *Id.* at COH00083651.

any such audits before the raid.[98]

The City also attempts to undermine the red flag raised by Goines consistent practice of obtaining no-knock warrants in the seven years preceding Harding Street even though the evidence return did not reflect a weapon recovered 99% of the time.  Apart from the speculation, the City misses the point: Goines pursued this unconstitutional practice of consistently obtaining no-knock warrants for years with no guns returned without his supervisors inquiring into the discrepancy, demonstrating the environment within which Goines and his fellow narcotics officers operated.[99, 100]  One of HPD's own audits highlights this should have been a cause for concern before the raid: "Sergeant Reyna was shown instances in which Officer Goines documented weapons in his search warrants; however, they were not documented in the related incident reports. Sergeant Reyna agreed that the discrepancies should have been caught."[101]

Even for the City's example of Goines being "grounded" to his desk at some undocumented and indefinite time while he caught up paperwork, Goines's employment file shows he was never

---

[98] Pls.' Ex. S at 102:12 – 106:13 (Acevedo Dep.); Pls.' Ex. 119 ("The question of internal inspections and why the practice was stopped l0 years ago for the Narcotics Division was brought up. We asked if Assistant Chief Lopez knew that answer, Assistant Chief Lopez stated that he did not know why that happened.").

[99] *See* Pls.' Ex. R at 93:4 – 95:3 (Gonzales Dep.) (invoking Fifth Amendment privilege to avoid answering what checks were done regarding Goines's practice of obtaining no-knock warrants); *see also* Pls.' Ex. U at 93:15 – 94:15 (Dr. Scott Dep.) ("Q. It contains -- let me ask it to you this way; did you see anything when you were reading the affidavit that jumped out at you that wait a minute, this isn't right, this is a red flag, I need to go talk to somebody about this?  A. Absolutely. The red flag would be here I have another no-knock warrant by Officer Goines, and the issue of no-knock warrants should be -- based on my experience, knowledge, and training, are executed in lesser numbers than knock and announce. And so these chronic knock -- no-knock warrants would be a red flag.").

[100] *See Richards v. Wisconsin,* 117 S. Ct. 1416, 1418 (1997) ("The Fourth Amendment does not permit a blanket exception to the knock-and-announce requirement for felony drug investigations.") (internal citation omitted).

[101] Pls.' Ex. 32 at COH00037533.

actually ever disciplined.[102] Redacted

.[103] The audits also discuss the numerous flaws in the after-the-fact blue back review system HPD had in practice as its "official" policy to assure proper work was doing done, with many files having no indication they were reviewed and/or many files lost.[104] While The City may cast these SOP violations as merely widespread administrative errors, they are reflective of the practices in HPD's Narcotics Division of disregarding safeguards that the HPD supervisors understood or should have understood prevent individuals like Goines from violating Plaintiffs' and others constitutional rights.[105] Even then these post-warrant-service review processes, however (to the extent an officer bothered generating the paperwork), amount to nothing more than a policy of break down doors first, have the supervisor check later that the paperwork looks fine.

Altogether, the evidence demonstrates that the supervisors in the HPD Narcotics division failed to monitor Goines investigations, allowed him to violate numerous SOPs relating to tracking his investigations, did not verify any details he provided about his investigations before he obtained no-knock warrants, and the existing policies unilaterally allowed him near free reign to consistently pursue no-knock warrants with minimal checks.

2. **HPD's turning a blind eye to the activities of Goines, a longtime narcotics squad officer, demonstrated deliberate indifference to the obvious constitutional**

---

[102] Pls.' Ex. D at COH00035471 (Goines Employment File) (showing no record of discipline); Pls.' Ex. T at 104: 4 – 8 (Duplechain Corp. Rep. Dep.) (COH's corporate representative confirming that Goines never received any official disciplinary actions from 2014 – 2019).

[103] *See* Pls.' Ex. 32 at COH00037491 – 37492 (Lt. French Investigation Report).

[104] *Id.*; Defs.' Ex. 15 at COH0005418 – 5419 (discussing 25% of case review forms for files not even being signed by supervisors) (Narcotics Division Administrative and SOPs Audit).

[105] *See* Pls.' Ex. K at 122:6-24, 201:9 – 202:5 (Follis Dep.); Pls.' Ex. S at 96:6 – 98:14 (Acevedo Dep.).

**violations that were likely to occur.**

There are generally two ways to demonstrate the deliberate indifference element. Plaintiffs address each of these separately.

### a. A factfinder could determine that Chief Acevedo should have been aware of Goines' pattern of false investigations and obtaining fraudulent no-knock warrants.

First, a plaintiff can show deliberate indifference by providing evidence the officer(s) violated constitutional rights "so often" that the factfinder can infer from the pattern of violations that "the need for further training [or supervision] must have been plainly obvious to the . . . policymakers."[106] There is no "rigid rule regarding numerosity to prove a widespread pattern of unconstitutional acts."[107] Particularly when "the violations are flagrant or severe, the fact finder will likely require a shorter pattern of the conduct to be satisfied that diligent governing body members would necessarily have learned of the objectionable practice and acceded to its continuation."[108]

Applying this standard here, there were at least two pieces of pattern evidence of Goines's behavior that show a risk of constitutional violations. And importantly this pattern should have put HPD on notice that Goines required additional supervision. First, Goines had a demonstrated practice of almost exclusively obtaining no-knock warrants—approximately 100 no-knock warrants in that period—with no indication that a gun was recovered following the execution of 99% of those warrants.[109] Second, Goines had, at the minimum, six confirmed instances of obtaining fraudulent no-

---

[106] *Littell v. Hous. Indep. Sch. Dist.,* 894 F.3d 616, 624 (5th Cir. 2018); *Martin v. Snyder*, 2023 U.S. Dist. LEXIS 131178, at *18-19 (S.D. Fla. July 28, 2023) ("to the extent a single rogue employee engages in a widespread pattern of misconduct, such pattern should be considered for purposes of placing the municipal entity on actual or constructive notice of the need for further training and supervision of the rogue employee.").
[107] *Jackson v. Valdez*, 852 F. App'x 129, 135 (5th Cir. 2021).
[108] *Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984) (en banc).
[109] Pls.' Ex. AB (Goines Warrants and Evidence Returns).

knock warrants in the two years prior to the Harding Street warrant.[110]

While the City may contend that its policymaker had no actual knowledge of these patterns, "[c]onstructive knowledge may be inferred from the widespread extent of the practices, general knowledge of their existence, manifest opportunities and official duty of responsible policymakers to be informed, or combinations of these."[111] Here, HPD should have known about these patterns of unconstitutional behavior from Goines. To start, there can be no reasonable dispute that there is actual knowledge of the written SOPs concerning obligations to supervise subordinates, ensure that subordinates were complying with the law, and to be aware of any patterns reflecting improper activity.[112] Additionally, known policies in place allowed street-level narcotics officers like Goines to obtain no-knock warrants without supervisor review or investigation. Further, the City cannot claim ignorance of Goines's history of no-knock warrants and fraudulent warrants where it failed to follow documentation that would have flagged this activity. This is even worse because a HPD had an obligation to know of obvious widespread administrative errors within the Narcotics Division suggesting inadequate policework and supervision were the default practices.[113]

Similarly, the City cannot claim ignorance of any discrepancies with Goines's history of no-knock warrants where the City's failed to follow its own policies, which would have flagged Goines's

---

[110] *See* Defs.' Ex. 14 (Investigative Report on Goines Warrants).

[111] *Pineda v. City of Houston*, 291 F.3d 325, 330 n.15 (5th Cir. 2002).

[112] *See* Pls.' Ex. G at 66:5 – 67:22 (French Dep.); Defs.' Ex. 26 at COH0042261 (GO 300-24); Pls.' Ex. S at 107:13 – 108:2 (Acevedo Dep.).

[113] *See Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984) (en banc) ("[c]onstructive knowledge may be attributed to the governing body on the ground that it would have known of the violation if it had properly exercised its responsibilities."); *Page v. O'Leary*, 2022 U.S. Dist. LEXIS 200626, at *24 (S.D. Fla. Nov. 2, 2022) (denying MSJ on *Monell* claim due in part to fact dispute over constructive knowledge: "[t]he Court agrees Defendant cannot claim ignorance of the above evidence-related abnormalities due to a failure to follow its own written policies.").

activities.[114]  These considerations and obligations – along with Chief Acevedo's practice of talking and visiting with narcotics officers – strongly support that he should have been aware of Goines's patterns of unconstitutional activity.[115]

On top of this, even prior to Harding Street, multiple HPD narcotics officers (Goines included) were cited by judges and falsely accused citizens alike for fabricating investigations and details in warrants.  Because of this, Chief Acevedo reasonably should have been apprised of this issue within the HPD Narcotics Division.[116]  At the minimum, this evidence together raises a fact issue on whether the policymaker had constructive knowledge of Goines's patterns of unconstitutional activity to show deliberate indifference.

      **b.** **The evidence demonstrates that the failure to adequately supervise Goines and his fellow narcotics officers gave rise to the obvious risk that a narcotics officer may fabricate investigations to obtain an invalid no-knock warrant.**

In addition (and in combination to the above) method, Plaintiffs may also meet the deliberate indifference element by showing "that in light of the duties assigned to . . . employees the need for more or different training [or supervision] is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the municipality can reasonably be said to

---

[114] *See Page v. O'Leary*, 2022 U.S. Dist. LEXIS 200626, at *24 (S.D. Fla. Nov. 2, 2022) (denying MSJ on *Monell* claim due in part to fact dispute over constructive knowledge: "[t]he Court agrees Defendant cannot claim ignorance of the above evidence-related abnormalities due to a failure to follow its own written policies.").

[115] Pls.' Ex. S at 106:14 – 107:12 (Acevedo Dep.).

[116] *See In re Prophet*, 2024 Tex. Crim. App. Unpub. LEXIS 317, at *4 (Crim. App. Aug. 21, 2024) (overturning a 2011 conviction for an individual that was subject to a false warrant obtained by Goines and noting that in his original trial testimony "applicant specifically denied the remainder of Goines's assertions and testified that Goines was lying."); *Ex parte Mallet*, 602 S.W.3d 922, 928 (Tex. Crim. App. 2020) (overturning a 2011 conviction for an individual that "maintained his innocence from the time he was indicted and has consistently insisted that Goines lied."); *United States v. Mayes*, 2008 U.S. Dist. LEXIS 140941, at *7 (S.D. Tex. July 16, 2008) (J. Ellison citing an HPD narcotics officer's search warrant affidavit testimony as incredible due to indications information was directly copied from another, unrelated investigation).

have been deliberately indifferent to the need."[117] As the Second Circuit has explained the inquiry, "if a supervisor's steps are proven so meaningless or blatantly inadequate to the task that he may be said to be deliberately indifferent notwithstanding his nominal supervisory efforts, liability will lie."[118] Consistent with this second approach, continued adherence to an approach that the policymakers know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—*i.e.,* the "deliberate indifference" necessary to trigger municipal liability.[119] A "single incident of an alleged constitutional violation resulting from the policy may serve as a basis for liability so long as that violation was an obvious consequence of the policy."[120]

Here, this caselaw begs the question – when is it an obvious risk that a street-level narcotics officer like Goines will fabricate details on a search warrant affidavit to obtain a no-knock warrant? The answer is easy – there is an obvious risk of fabricated warrants when a department (1) evaluates narcotics officers on results, (2) allows officers to operate on the streets performing narcotics enforcement for multiple years without transfer to other divisions, (3) allows officers to maintain their own investigation case files with minimal details for supervisor review (permitted partially by express policies and partially by customs and practices uncovered in the audits); (4) allows officers to

---

[117] *City of Canton v. Harris*, 489 U.S. 378, 390 (1989); *see also Burge v. St. Tammany Par.*, 336 F.3d 363, 373 (5th Cir. 2003) ("[A] plaintiff, unable to show a pattern of constitutional violations, may establish deliberate indifference by showing a single incident with proof of the possibility of recurring situations that present an obvious potential for violation of constitutional rights, such that it should have been apparent to the policymaker that a constitutional violation was the highly predictable consequence of a particular policy or failure to train [or supervise].").

[118] *Reynolds v. Giuliani*, 506 F.3d 183, 196 (2d Cir. 2007).

[119] *Bd. of the Cty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997).

[120] *Brown v. Bryan County, OK.*, 219 F.3d 450, 460 (5th Cir. 2000), *citing City of Canton*, 489 U.S. at 396 ("Where a section 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of constitutional rights of their citizens, the dictates of *Monell* are satisfied.").

consistently violate rules and procedures in the Narcotics Division SOPs without disciplinary repercussion; (5) takes officers at their word and fails to check their investigations absent an affirmative complaint; and (6) gives the unilateral ability to officer to obtain no knock warrants with review from supervisors under the policy framework in place.[121] This is precisely what HPD did here.

The City's corporate representative confirmed – there are certain safety and evidence-recovery incentives that would drive a narcotics officer to seek a no-knock warrant. This is particularly true here because HPD conducted an inadequate investigation e to confirm details about who and what is awaiting on the other side of the target's door , (which the evidence demonstrates was likely the case in at least Harding Street and many other warrant services because Goines consistently did not perform investigations he claimed he did).[122] In policing terms, officers like Goines in HPD's narcotics division had the motive to seek unconstitutional no-knock warrants if investigations were not actually being conducted, and the opportunity to do so because of the minimal oversight in place and the policies allowing them to seek such warrants with little fear of repercussion.

This risk is not unpredictable. Popular culture and media portrayals – such as Training Day or the Wire – have shown the obvious and expected results of giving narcotics officers free reign to

---

[121] *See Metris-Shamoon v. City of Detroit*, 545 F. Supp. 3d 506, 525 (E.D. Mich. 2021) (denying MSJ for City on Plaintiffs' *Monell* failure-to-supervise claim upon Plaintiffs' showing of similar circumstances to what the evidence demonstrates in this case: "a reasonable jury considering Plaintiffs' evidence could find both that there was inadequate supervision in the Narcotics Unit, and that the absence of a warrant review process was closely related to the allegedly fraudulent affidavit in Plaintiffs' case"); *Torain v. City of Phila.*, 2023 U.S. Dist. LEXIS 5660, at *33 (E.D. Pa. Jan. 12, 2023) ("In addition, there is evidence that these failures amount to deliberate indifference. First, municipal policymakers knew that employees would confront situations where they would need to establish probable cause in order to secure a warrant or make an arrest; this is simply a part of the job. The City was also on notice that there had been a history of employees mishandling such situations in the past [. . .] [f]inally, the City knew that the misconduct by [Narcotics Field Units] officers—fabricating evidence or probable cause would frequently deprive individuals of constitutional rights, as this conduct is illegal and was the source of much litigation against them.").

[122] Pls.' Ex. V at 32:7 - 34:22 (Termeulen Corp. Rep. Dep.).

manage themselves and obtain search warrants without supervisor checks. Harding Street is not the first time that narcotics officers have fabricated investigations and abused their power. As a result, greater supervision of these officers in particular is more necessary than typical patrol officers. [123]  A

<hr />

[123] *See, e.g.*, *H.H. v. City of N.Y.*, 2017 U.S. Dist. LEXIS 124317, at *14 (E.D.N.Y. Aug. 4, 2017) ("The heightened potential for corruption among narcotics officers is well-documented and well-known to the NYPD and was detailed in the Mollen Commission Report and the GAO Report. . . The Mollen Commission found that, unlike other types of corrupt police officers, who may ignore or protect criminals, corrupt narcotics officers are more likely to actively commit crimes themselves . . . In fact, according to Mr. Pollini, the NYPD has a policy of not placing officers in the narcotics division for longer than five years precisely because narcotics officers are at such a heightened risk of corruption."); Detroit Police Department, *Investigation of the Major Violators Corruption Incident* ([FINAL_REPORT_OPERATION_CLEAN_SWEEP.pdf (detroitmi.gov))](#) (November 2021) at pp. 110 – 111 (investigative report from the City of Detroit, MI concerning its Narcotics division and widespread findings of false information in search warrants: "OCSTF investigators found that the MVU officers' search warrant affidavits were not reviewed by supervision or management prior to submission to the Wayne County Prosecutor's Office and courts, meaning there was a lack of supervisory oversight in this area. The officers were solely responsible for the legal content, circumstances, elements, grammar and the overall structure of their search warrant affidavits. Additionally, MVU officers were responsible for making the determination on the validity of their own probable cause. Due to the importance of the search warrant affidavit, this was a huge responsibility for a police officer."); *Torain v. City of Phila.*, 2023 U.S. Dist. LEXIS 5660, at *8 (E.D. Pa. Jan. 12, 2023) ("In the late 1980s and early 1990s, the NFU [Narcotics Field Unit] of the Philadelphia Police Department (PPD) systemically violated citizens' civil rights, stole money and drugs, planted evidence on suspects, fabricated the legal basis for search and seizure warrants, and committed perjury."); *Commonwealth v. Cunningham*, 2013 Pa. Super. Unpub. LEXIS 772, at *20-21 (Sep. 26, 2013) ("The articles, 3 published in December of 2012, detailed the corruption of Philadelphia narcotics officers including several involved in the instant case (Betts, Licciardello, and Spicer). The articles revealed that District Attorney Seth Williams of Philadelphia wrote a letter to Philadelphia's Police Commissioner indicating that these officers would no longer be called to testify in drug cases because they had lost all credibility. The articles noted that the officers' actions had given rise to numerous charges including the use of excessive force, false arrests, and the filing of fraudulent reports."); United States Attorney's Office, Southern District of Texas, *Pleas Entered in Panama Unit Case* (September 2013) (*[Southern District of Texas | Pleas Entered In Panama Unit Case | United States Department of Justice](#)*); *see also* Pls.' Ex. U at 161:1-7 (Dr. Scott Dep.) ("[F]irst and foremost when a new chief comes into place the chief should do two things; immediately order a full inventory of the property room and immediately do and conduct an audit of the narcotics unit. Those are the two areas that law enforcement officers usually finding themselves getting into trouble.").

Concerning the linked reports, Plaintiffs' request that the Court take judicial notice of these public-

failure to do so amounts to deliberate indifference to the obvious risk of corrupt officers fabricating bases for no-knock warrants.

The City knows that audits are important and that failure to conduct audits can have dangerous consequences. In fact, the City previously trained HPD personnel about the importance of audits. According to a course outline for an HPD training session for supervisors, "[a]udits are essential."[124] Other HPD training materials stress the need to look for "problems lying in wait—that people knew about or should know about" before a tragedy occurs.[125] The City's decision to stop its practice of internal inspections in the Narcotics Division ten years prior to Harding Street constitutes deliberate indifference to that known risk.

Yet, the City faults lawyers in the criminal justice system for not policing the police. Even then, the City seems to contend that the only way to prevent Goines a fear of getting caught lying under oath after the fact. Yet there were otherwise no demonstrated mechanisms in place that would have led to that occurring absent an incident like Harding Street.

This argument flips the type of supervision necessary to prevent deprivations like the death of the Tuttles. At that point, the obvious constitutional harm has already been realized. As demonstrated across various industries and segments of society (e.g., banking, publicly traded companies), audits and procedural safeguards discourage individuals in roles of public trust from acting dishonestly before violations occur. These controls and audits are unfortunately necessary and expected and – maybe more importantly – they are in addition to laws that punish the wrongdoers after the fact. In contrast, here, up and down the chain of command, however, HPD shirked responsibility and blamed

---

record governmental investigations and releases, which are excepted from hearsay limitations under Federal Rule of Evidence 803(8)(iii). *See* Fed. R. Evid. 201, 803(8)(iii).
[124] Pls.' Ex. 16 at COH0004785.
[125] Pls.' Ex. 19 at COH00047108.

the other supervisors for not doing their job of keeping on top of their subordinates—it cannot be that if they are all to blame, none of them are to blame.

### 3. There is a causal connection between the lack of supervision and the constitutional violation against the Tuttles.

When evaluating a *Monell* claim, "finding causation is not a mechanical exercise like working a math problem and getting an answer, but instead requires jurors to view evidence in its totality, draw on their life experiences and common sense, and then reach reasonable conclusions about the effects of particular action ***and*** inaction."[126] While the City does not contest in its motion this element of the failure to supervise theory, the evidence demonstrates that there is at the minimum a fact issue over whether the City policies and inaction were a cause of the violation of the Tuttles' constitutional rights.

In more detail, Plaintiffs' expert Dr. Andrew Scott, the former chief of the Boca Raton, FL Police Force and a chair/leader of multiple law enforcement accreditation groups, has expressed his opinion that the failings of supervision identified were the moving force or proximate cause of the underlying constitutional violations by Goines and the moving force or proximate cause of the death of Tuttle and Nicholas.[127] He has further explained the practices prevalent of minimal supervisory oversight made it possible for Goines to obtain a warrant using false information, and that it is more likely than not that HPD would have prevented Goines from putting false information in a warrant if HPD had sufficiently supervised him.[128] One of HPD's internal investigators, Lieutenant French, similarly agreed in his deposition that it was "certainly possible" that the risk of officer misconduct could increase if there is inadequate tracking of cash or confidential informants, such as what occurred

---

[126] *J.K.J. v. Polk Cty.*, 960 F.3d 367, 384-85 (7th Cir. 2020) (emphasis added).
[127] Pls.' Ex. B (Dr. Scott Report) at "Opinion 2" starting on 007936 NICHOLAS.
[128] *See* Pls.' Ex. U at 203:21 – 204:2, 108:8 – 110:25; 82:24 – 88:11 (Dr. Scott Dep.).

with Goines.[129]

Further, "the high degree of predictability" of constitutional violation that constitutes notice, the Supreme Court has emphasized, "may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable."[130] That is certainly the case here, as Plaintiffs have demonstrated that the constitutional violation should have been expected in these circumstances where a long-time narcotics officer is given free-reign to generate no-knock warrants and operate with minimal checks on his honesty.[131]

**B. HPD's customs and policies for narcotics officers permitted Goines to obtain no-knock warrants with minimal oversight and caused a violation of plaintiffs' constitutional rights.**

As another avenue of *Monell* liability, a plaintiff may identify "(1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy (or custom)."[132]

An "official policy" for *Monell* liability may be written or it may be shown through "a persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy."[133] Despite the City's touting of its written policies, "the

---

[129] Pls.' Ex. G at 159:12 – 160:5 (French Dep.).

[130] *Bryan County*, 520 U.S. at 409-10.

[131] *See Covington v. City of Madisonville*, 812 F. App'x 219, 228 (5th Cir. 2020) ("Thus, in that sense, the City caused the violation by not timely employing appropriate supervisory measures in order to prevent reasonably anticipated unlawful conduct by a city employee."); *cf. Cazares v. Frugoli*, 2017 U.S. Dist. LEXIS 49938, at *59-61 (N.D. Ill. Mar. 31, 2017) (Denying MSJ on similar theories: "[a]gain, when viewing the evidence in the light most favorable to Plaintiffs, there is sufficient evidence to support a reasonable jury's conclusion that [the officer's] decision to drink and drive on April 10, 2009, was caused by his belief that he was impervious to consequences due to the CPD's administrative lapses and attendant code of silence.").

[132] *Moore v. LaSalle Mgmt. Co.*, 41 F.4th 493, 509 (5th Cir. 2022).

[133] *Lawson v. Dallas Cnty.*, 286 F.3d 257, 263 (5th Cir. 2002) (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir.1984) (en banc)).

existence of written policies of a defendant are of no moment in the face of evidence that such policies are neither followed nor enforced."[134]

A cognizable policy for purposes of § 1983 liability may, therefore, be evidenced by custom "even though such a custom has not received formal approval through the body's official decision-making channels."[135] Further, while an unconstitutional official policy renders a municipality culpable under § 1983, even a facially innocuous policy will support liability if it was promulgated with deliberate indifference to the "known or obvious consequences" that constitutional violations would result.[136]

Here, the City had a custom of minimal supervision and oversight concerning narcotics officers, and its express policies allowed them to unilaterally obtain no-knock warrants without checks into their underlying investigations. The evidence of these policies is discussed at length above, and is reflected in the audits that found deficient supervision in Squad 15, consistent disregard for written SOPs across multiple Narcotics Divisions squads, testimony from Chief Acevedo and Commander Follis confirming that they trusted their subordinates were following SOPs with no required honesty checks, and the express policies that allowed Goines to obtain no-knock warrants with no questions asked.[137]

To save from needless repetitive argument for elements already discussed in another context, Plaintiffs refer the Court to the above discussions of the policymaker's knowledge of the practices

---

[134] *City of St. Louis v. Praprotnik*, 485 U.S. 112, 131 (1988); *see also Bennett v. Pippin*, 74 F.3d 578, 586 (5th Cir.), *cert. denied*, 519 U.S. 817 (1996) ("the existence of a well-established, officially-adopted policy will not insulate the municipality from liability.").

[135] *Milan v. City of San Antonio*, 113 F. App'x 622, 625 (5th Cir. 2004) (quoting *Monell*, 436 U.S. at 691).

[136] *Piotrowski v. City of Hous.*, 237 F.3d 567, 579 (5th Cir. 2001) (citing *Bd. of Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 407 (1997)).

[137] *See* Section III.C-D, *supra*.

and customs in the Narcotics Division, and deliberate indifference to the risks of constitutional violations emerging from: (1) the practices in the Narcotics Division of officers consistently disregarding their SOPs; (2) the practices in the Narcotics Division of supervisors not making efforts to check the veracity of their subordinates' work; (3) Goines's history of consistently obtaining no-knock warrants with documented return of weapons (i.e., unconstitutional no-knock warrants obtained on false premises); and/or (4) Goines's pattern of obtaining at least six no-knock warrants based on fraudulent investigations.

Further, a similar analysis applies as has already been discussed above concerning whether the policies and customs at issue played a role in causing the constitutional violations that occurred.

## C. The City ratified the practices that caused the violation of the Tuttles' constitutional rights after the fact.

Ratification theory provides another way of holding a city liable for a *Monell* violation under § 1983. Under that theory, a city can be held liable if the policymaker approves a subordinate's decision and the basis for it, as this "ratification" renders the subordinate's decision a final decision by the policymaker.[138]  In this way, a "[p]olicy or custom may be inferred if, after the [incident] ... officials took no steps to reprimand or discharge the [officers], or if they otherwise failed to admit the [officers'] conduct was in error."[139]  In other words, "a plaintiff may be able to support a *Monell* claim by showing that an official policymaker came to the defense of a subordinate's manifestly indefensible conduct."[140]

Here, there is evidence that the policymaker was aware of the ensuing investigations and their findings concerning the supervisory practices of Goines and the Narcotics Squad overall that caused

---

[138] *Grandstaff v. City of Borger, Texas*, 767 F.2d 161, 171 (5th Cir. 1985) ("Subsequent acceptance of dangerous recklessness by policymaker tends to prove his preexisting disposition and policy.").
[139] *McRorie v. Shimoda*, 795 F.2d 780, 784 (9th Cir. 1986).
[140]*Garcia v. Harris County*, 2022 U.S. Dist. LEXIS 109728, at *8 (S.D. Tex. June 2, 2022).

the violation of the Tuttles' constitutional rights. The evidence further shows that HPD was perfectly fine with the Narcotics Division's trust but not verify approach to supervision as consistent with HPD's policy for narcotics officers. For years, the longtime officers of the Narcotics Division, including Goines, Bryant, Ashraf, and Lovings, consistently received perfect evaluations, demonstrating that the supervisory measures of evaluations were meaningless.[141] Wood also received perfect scores on his performance evaluations since becoming a narcotics squad supervisor in 2017 and that continued after the raid, leading him to believe his supervision was acceptable and approved by HPD.[142] Even though his most recent evaluation report before the raid contained supervisor comments indicating the he need to more closely monitor his subordinate squads' activities, Lieutenant Gonzales likewise received perfect scores on his biannual reviews from 2011 through 2018, indicating to him that his supervisors thought he was doing good work.[143] Sergeants Reyna and Wood and Lieutenant Gonzales were permitted to retire facing no discipline for their supervision approach and with honorable discharge status and benefits following the Harding Street raid.[144] Chief Acevedo has further confirmed in his recent deposition that he was satisfied with Commander Follis's work as a supervisor in the Narcotics Division and that he was in no way demoted or disciplined for anything that occurred relating to Harding Street.[145]

HPD's decision to not perform a more expansive review of prior warrants from other officers

---

[141] *See* Pls.' Ex. D (Goines Employee File)(given perfect 5 – Outstanding on Evaluations from 2003 – 2019); Pls.' Ex. AN (Bryant Employee File) (given perfect score 2006 – 2019); Pls.' Ex. AO (Ashraf Employee File) (given perfect scores 2008 – 2019) Pls.' Ex. AP (Lovings Employee File) (given perfect scores 2014 - 2019).

[142] Pls.' Ex. Q at 10:12 – 11:12 (Wood Dep. Vol. II).

[143] Pls.' Ex. R at 28:4 – 19 (Gonzales Dep.) (discussing history of perfect reviews); Pls.' Ex. G at 54:18 – 56:15 (French Dep.).

[144] Pls.' Ex. E at 14:2 – 7 (Reyna Dep.); Pls.' Ex. P at 84:4 – 15 (Wood Dep. Vol I); Pls.' Ex. R at 12:5-15 (Gonzales Dep.); Pls.' Ex. K at 18:14 – 21, 107:12 - 17 (Follis Dep.).

[145] Pls.' Ex. S at 101:15 – 22 (Acevedo Dep.).

in the narcotics division for instances of fabrications demonstrates that it still prefers not to know certain things despite demonstrated red flags that suggest more investigation is necessary.[146] Instead, Chief Acevedo continued to make public media statements months after having received the investigative reports detailing the fraudulent warrant findings that his officers had "probable cause" to go into the Tuttles' home.[147]  The City's conduct in this case mirrors the City of Borger's conduct in *Grandstaff v. Borger*.  In that case, the Fifth Circuit affirmed a jury verdict based in part on ratification:

> Peace officers stand at the front of law and the ordering processes of society. They restrain the violator, protect the compliant, and represent constituted authority in the scenes of both peace and turbulence of community life. We depend heavily upon their skill and disposition. They deserve and require the understanding and support of judges as well as of all citizens. Where any officer fails -- whether for lack of courage, judgment, integrity, or humaneness -- all the community suffers. We suffer because vested authority has failed to prevent some harm or because authority has been sullied and abused. With any abuse of authority the entire ordering process is weakened. The public trusts the entire process less, and antagonism to all figures of authority rises. No one should be more alert to the cost of failure than responsible law enforcement officers and we who work in the courts. We must do what we can to avoid the failures, to prevent their reoccurrence, and -- at all times -- stay true to the requisites of honesty and accountability imposed upon all who are at once representative of the law and subject to it.

> The City and officers insist, to this day, that they are free of fault and deserve no blame. They display no sense of obligation other than to this joint disclaimer and defense. There is not a single word in this record about any effort at any time by the City of Borger to avoid police failure or abuse. The officers, called to the witness stand by the plaintiffs, were evasive and forgetful and self-contradictory.[148]

---

[146] *Hunter v. County of Sacramento*, 652 F.3d 1225, 1234 (9th Cir. 2011) ("[E]vidence of inaction—specifically, failure to investigate and discipline employees in the face of widespread constitutional violations—can support an inference that an unconstitutional custom or practice has been unofficially adopted by a municipality.").

[147] Pls.' Ex. S at 77:19 – 84:21 (Acevedo Dep.); *see also* Squad 15 supervisors pleading the Fifth Amendment in response to even basic and non-incriminating questions about their supervision of Squad 15. Pls.' Ex. R at 9:13 – 10:20, 13:20 – 15:1, 21:6 – 25:24 (Gonzales Dep.); Pls.' Ex. E at 16:6 – 19:2, 28:10 – 33:7, 67:9 – 73:22, 94:15 – 95:9 (Reyna Dep.); Pls.' Ex. Q at 7:7 - 9:14, 11:13 – 15:25, 19:2 – 20:16 (Wood Dep. Vol. II).

[148] *Grandstaff* , 767 F.2d 161, 166 (5th Cir. 1985).

### A. The City is not entitled to summary judgment on Plaintiffs' state law claims for wrongful death and survival.

The City seeks judgment on Plaintiffs' state law claims for wrongful death and survival action. To support a claim for wrongful death, Plaintiffs must show that: (1) the plaintiff is a statutory beneficiary of the decedent; (2) the defendant is a person or corporation; (3) the defendant's wrongful act caused the death of the decedent; (4) the decedent would have been entitled to bring an action for the injury if he or she had lived; and (5) the plaintiff suffered actual injury.[149] To support a survival action, a plaintiff must show that: (1) plaintiff is the legal representative of the decedent's estate; (2) the decedent had a cause of action for personal injury to his or her health, reputation, or person before he or she died; (3) the decedent would have been entitled to bring an action for the injury if he or she had lived; and (4) the defendant's wrongful act caused the decedent's injury.[150]

As the Fifth Circuit has confirmed, all Plaintiffs must show to meet the causation element is "that the defendant's wrongful actions more likely than not caused the decedent's death." Here, as demonstrated by the evidence discussed, there is a fact issue over whether the City's policies and supervision of Goines and Squad 15 were a proximate cause of Plaintiffs' deaths.[151] While the City tries to reframe the question by claiming that Goines committed an intentional tort by obtaining a fraudulent warrant, there is no such basis for that faulty analogy in the law.

### V.
### Conclusion

---

[149] TEX. CIV. PRAC. & REM. CODE §§ 71.001-71.004, 71.010.
[150] TEX. CIV. PRAC. &REM. CODE § 71.021.
[151] Proximate cause is normally a fact issue and may only be a question of law where the facts are conclusive. *Whitmire v. Terex Telelect, Inc.*, 390 F. Supp. 2d 540, 558 (E.D. Tex. 2005) (citing *Purina Mills, Inc. v. Odell*, 948 S.W.2d 927, 935 (Tex. App.—Texarkana 1997, pet. denied)).

For the reasons stated above, the Plaintiffs respectfully requests that the Court deny the City's Motion for Partial Summary Judgment on Plaintiffs' Section 1983 and state law claims based on service of the warrant, and grant Plaintiffs all other and further relief to which they are entitled, whether in law or equity.

Respectfully submitted,

/s/ Michael Doyle

Michael Patrick Doyle
Patrick M. Dennis
Jeffrey I. Avery
Patrick Doyle
DOYLE DENNIS AVERY LLP
The Clocktower Building
3401 Allen Parkway, Suite 100
Houston, Texas 77019
Email: service@doylelawfirm.com

CHARLES C. BOURQUE, JR.
*Admitted Pro Hac Vice*
ST. MARTIN & BOURQUE, LLC
315 Barrow St.
Houma, LA 70360
985-876-3891 (phone)
985-851-2219 (fax)
cbourque@stmblaw.com

**Attorneys for Plaintiffs**
**Patricia Nicholas, as temporary**
**administrator of the Estate of**
**Rhogena Nicholas and Jo Ann**
**Nicholas, individually and as an**
**heir of the Estate of Rhogena**
**Nicholas**

/s/ Boyd Smith

Michael T. Gallagher
L. Boyd Smith, Jr.
Pamela R. McLemore
2905 Sackett Street
Houston, TX 77098
Telephone: (713) 238-7705
Facsimile:  (713) 238-7852
mike@gld-law.com
bsmith@gld-law.com
pamm@gld-law.com

**Attorneys for Plaintiffs**
**Clifford F. Tuttle, Jr. as**
**Representative of the Estate**
**of Dennis W. Tuttle,**
**Deceased, Robert Tuttle,**
**and Ryan Tuttle**

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing brief was served on the attorney of record for each party in the above case in accordance with the Federal Rules of Civil Procedure on September 13, 2024.

/s/ Michael Patrick Doyle