UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| CLIFFORD TUTTLE, et. al. | Case No. 4:21-cv-00270 |
| Consolidated with | |
| JOHN NICHOLAS, et.al. | |
| Plaintiffs, | |
| v. | |
| CITY OF HOUSTON; ART ACEVEDO, et. al. | |
| Defendants. | (JURY DEMANDED) |

**PLAINTIFFS' RESPONSE TO DEFENDANT
ROBERT GONZALES'S MOTION FOR SUMMARY JUDGMENT**

This response addresses Defendant Robert Gonzales's Motion for Summary Judgment.[1]

**I.
Introduction and Summary of Argument[2]**

Lieutenant Gonzales was a longtime supervisor of HPD narcotics squads. He was fully familiar with Goines, a longtime street-level narcotics officer, and Goines's approach to policework, including fabricating investigations and consistently obtaining no-knock warrants with no recovered weapons. In some cases, Gonzales affirmatively helped Goines by violating HPD policies meant to protect against misconduct involving confidential informants and cash payments.

When given the chance to clear himself under oath from what Plaintiffs have alleged was his

---

[1] ECF No. 312.
[2] Defendant Gonzales has still, to date, not filed an answer. Plaintiffs filed a motion for summary judgment in light of that. Plaintiffs request that the Court grant that motion, and as a result, deny this motion.

wrongdoing as Goines's supervisor, Gonzales instead decided to block testimony by interposing his Fifth Amendment privilege. Aside from the resulting adverse inferences, other relevant evidence underscores his refusal to exercise supervisory oversight while fully embedded in his squad's practices.

Indeed, the evidence Plaintiffs present confirms that Gonzales was deliberately indifferent to the highly predictable risk of Goines obtaining a fraudulent no-knock warrant against the innocent Tuttles and Squad 15 officers engaging in excessive force during the ensuing violent raid. It also shows Gonzales's supervisory misconduct played a significant role in causing the violation of the Tuttles' constitutional rights to be free from unreasonable search and seizure and excessive force. Further, qualified immunity is not warranted for Gonzales because it has been clear in the Fifth Circuit for decades that a supervisor can be held liable without a qualified immunity defense when his or her subordinates violate a citizen's constitutional rights, and the supervisor was deliberately indifferent to that risk beforehand.

As the Fifth Circuit held in affirming this Court's decision not to dismiss the claims against Gonzales at the pleading stage, the theories of liability against Gonzales are legitimate. Those same theories are now supported by evidence that creates factual disputes precluding summary judgment:

> The threshold for pleading a failure-to-supervise claim is high, but we conclude that it is satisfied here. Plaintiffs allege multiple specific instances in which Goines fraudulently obtained a search warrant and in which violence occurred. They further allege that Gonzales—in his capacity as Goines's supervisor—knew about these infractions, but did nothing to correct them. As such, these allegations present the uncommon case where deliberate indifference may be attributed to an officer's supervisor. The facts alleged also support the inference that Gonzales failed to supervise Goines, and that a causal link exists between his failure to supervise and the actions that ultimately occurred. The district court did not err in allowing this claim to proceed.[3]

---

[3] *Tuttle v. Sepolio*, 68 F.4th 969, 975-76 (5th Cir. 2023).

## II.
## Summary Judgment Standard

For summary judgment, the initial burden falls on the movant to identify areas essential to the non-movant's claim in which there is an "absence of a genuine issue of material fact."[4] Summary judgment under Rule 56 is only appropriate when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.[5] "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party."[6] The burden is on the moving party to make such a showing.[7]

The Court must accept as true the nonmoving party's version of events in order assess whether, in the absence of factual disputes, judgment as a matter of law is appropriate.[8] Where disputes of material fact exist, they preclude the imposition of summary judgment.[9] Viewing the facts in the light most favorable to the nonmoving party applies equally to more abstract factual disputes.[10]

## III.
## Relevant Facts[11]

---

[4] *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005).
[5] *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).
[6] *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 417 (5th Cir. 2008).
[7] *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 161 (1970)
[8] *Scott v. Harris*, 550 U.S. 372, 380 (2007); *cf. Tarver v. City of Edna*, 410 F.3d 745, 753 (5th Cir. 2005) ("Any credibility determination made between the officers' and [plaintiff's] version of events is inappropriate for summary judgment.") *Carroll v. Ellington*, 800 F.3d 154, 168 (5th Cir. 2015) ("If a fact is not undisputed, we must 'accept the plaintiffs' version of the facts as true.' ").
[9] *Meadours v. Ermel*, 483 F.3d 417, 423 (5th Cir. 2007).
[10] *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (emphasizing the "importance of drawing inferences in favor of the nonmovant").
[11] Plaintiffs incorporate in full the facts as detailed more extensively in Plaintiffs' responses to the City of Houston's motions for summary judgment on Plaintiffs' excessive force claims and warrant claims [ECF Nos. 330, 331].

**A. The Lead Up to the Unconstitutional No-Knock Raid at 7815 Harding Street**

The Tuttles were innocent victims of an illegal no-knock warrant executed without probable cause, obtained by former HPD Narcotics Squad 15 member, Gerald Goines. Specifically, on January 8, 2019, a neighbor initiated false 911 calls about Tuttle and Nicholas, claiming that her daughter was at 7815 Harding doing "heroin."[12] In response, HPD dispatched that evening Officers Morales and Blankenship-Reeves, who approached the house and shined a light at the residence, but neither officer noticed any activity in the residence.[13]

Nevertheless, Blankenship-Reeves documented her notes regarding the 911 calls and passed that information to her significant other, Narcotics Division Lieutenant Marsha Todd.[14] Todd then relayed the information to narcotics officer Goines on January 11.[15] By January 28, Goines had secured the no-knock warrant to raid the home of the unsuspecting Tuttles later that evening.[16] As explained in greater detail in Plaintiffs' Response to the City's Motion for Summary Judgment regarding the Warrant Claims, Goines committed perjury to obtain the warrant by concocting a false story that a CI had gotten drugs from Tuttle on the 27th and that Tuttle was armed. Later investigations confirmed no such buy occurred and Goines fabricated the whole thing.

**B. The Unconstitutional No-Knock Raid**[17]

---

[12] *See* Pls.' Ex. I at 13:9 – 14:18 (Blankenship-Reeves Dep.).
[13] *See* Pls.' Ex. I at 26:21 - 29:12 (Blankenship-Reeves Dep.); Pls.' Ex. J at 10:16 – 11:7, 23:4-18 (Morales Dep.).
[14] *See* Ex. I at 146:7 – 149:1 (Blankenship-Reeves Dep.).
[15] Pls.' Ex. 32 at COH00037482 (Lt. French Investigative Report).
[16] *See* Pls. Ex. 31 (7815 Harding warrant).
[17] Plaintiffs' version of facts concerning the actual raid at 7815 Harding Street are detailed much more extensively in Plaintiffs' Response to the City's Motion for Summary Judgment on Excessive Force. *See* ECF No. 330 at Factual Background.

Squad 15's no-knock raid of the Tuttles' home happened around 5:00 pm on January 28, 2019. It started with the members of Squad 15 assembling a "stack" and breaching the door, at which point the officers forced their way into the home with guns drawn.[18] Within the next eight seconds, Officers Medina and Lovings shoot the Tuttles' dog, and Medina was hit by a bullet or bullet fragment from Lovings.[19] Soon after, Officer Sepolio pulls Medina outside of the house and reaches the street.[20] In the following seconds, glass breaks and an someone – likely Lovings – screams in pain.[21] At that moment – after the series of shots by Squad 15 members, after other members of Squad 15 fell out of the home, and after Lovings was shot – Officer Gallegos finally sees inside the house.[22]

At that point, Gallegos claims he spots Ms. Nicholas and shoots her without warning.[23] To justify this homicide, Gallegos swore he saw Nicholas "grabbing with both hands tugging at the shotgun" and "standing over Officer Medina tugging at his shotgun that is slung to his vest saying, Motherf****r, motherf****r."[24] According to him, Nicholas was not "exactly squared up with" him, but "at an angle."[25] He admits that he shot her in the "upper torso area"; but he "can't . . . pinpoint exactly where they hit, but [he] saw [his] rounds actively hit her."[26] But this story flags two incredible inconsistencies – (1) where was Medina at the time that Gallegos shot Nicholas and (2) how did

[18] Pls.' Ex. 29, at Bates No. COH00005476-COH00005477,

[19] Pls. Ex. N (Dep. of Medina) at 45:18-22; see also Pls.' Ex. AC; Pls.' Ex. A at pg. 33 of 52 ("Officer Medina was shot in back of his right shoulder that travelled transversely and impacted the paraspinal muscle. Multiple small metallic bullet fragments consistent with . . . a fragmenting .223. are noted in the wound track."). Only Lovings had shot a .223 at that point.

[20] Pls.' Ex. AC – BWC Sync from 0:40 (in the top right corner video); see also Pls.' Ex. AK, Ranger Wolf's findings confirming that this is Sepolio and Medina.

[21] Pls.' Ex. AC – BWC Sync from 0:47-0:49.

[22] Pls.' Ex. F (Dep. of Gallegos) at 102:10-25.

[23] Id. at 108:3-11; 109:7-19.

[24] Id. at 102:10-25; 105:25-106:3.

[25] Id. at 107:24-108:2.

[26] Pls.' Ex. F (Dep. of Gallegos) at 108:12-21.

Nicholas sustain a fatal bullet wound to the right side of her body, when her left side would have been facing Gallegos if she was standing over Medina?

The first question is easy – Medina and Sepolio were already outside of the house on the street, as detailed above. Gallegos lied about Medina's location to justify the murder. The answer to the second question is more complicated but answered by forensic analysis of the scene—Gallegos actually shot and killed Nicholas while she was sitting on her couch near where her body was found, far away from where Gallegos reported seeing her in his statements as standing over Medina.[27]

### C. Lieutenant Gonzales Failure to Supervise Squad 15.

While HPD's investigations were far, far, far away from comprehensive concerning all of Squad 15's members and the failings up the entire chain of command that led to the Tuttles' deaths, there were at least some investigations into Goines and his immediate supervisors, Lieutenant Gonzales and Sergeants Reyna and Wood. Gonzales became a supervisor of HPD narcotics squads in 2004, meaning he had been supervising HPD narcotics squads for about 15 years at the time of the raid.[28] At that time, he was responsible for Squad 14 and Squad 15.[29] The extent of Gonzales's wrongdoing as the purported supervisor is detailed much more in the referenced investigative reports and Plaintiffs' response to the City's Motion for Summary Judgment on the Warrant.[30] Among the highlights, however, the investigations noted:

- # Redacted

---

[27] Pls.' Ex. A-1, Declaration and Report of Maloney at pg. 30 of 52.
[28] Pls.' Ex. R at 9:3 – 12 (Gonzales Dep.).
[29] *See* Ex. 3 from City's MSJ on Warrant [ECF No. 305-1].
[30] *See* Pls.' Resp. to City's MSJ on Warrant at Section III.C. [ECF No. 331].

# Redacted

- 

- 

- 

---

[31] Pls.' Ex. 32 at COH00037531 – 37532 (Lt. French Investigative Report) (emphasis in original).
[32] *Id.* at COH00037491 – 37492 (emphasis added).
[33] *Id.* at COH00037480.

# Redacted

- 

- 

- 

---

[34] *Id.* at COH00037487. Of note, the sergeants did accept a tactical plan for the warrant obtained by Goines, and a briefing was held to prepare for a raid of the location. *See* COH00037495.

[35] *Id.* at COH00037488.

[36] *Id.* at COH00037488.

[37] *Id.* at COH00037486.

# Redacted

In addition to these investigations, a limited administrative audit of the case files from the two narcotics squads under Gonzales's supervision for the two years prior to the raid uncovered rampant deficiencies in the investigative work documented by his officer charges, and widespread issues with over a third of the sampled case files having no indication of supervisor review, which was one of Gonzales's primary responsibilities.[39] While Gonzales may cast these as primarily administrative paperwork issues, that greatly undersells the significance of these findings, as discussed in more detail in Plaintiffs' Response to the City's Motion for Summary Judgment on the Warrant.[40]



Finally, consistent with the internal investigation into Gonzales's supervision identifying CI payments inconsistent with HPD policies and other irregularities, Gonzales was ultimately criminally indicted for misappropriating funds due to approving payments by Goines and Gallegos to

---

[38] Defs.' Ex. 14 at COH00074968 (Investigation Report of Goines Six Warrants).

[39] Defs.' Ex. 15 at COH0005378 – 5383 (Administrative Audit of Narcotics Division SOPs and Files).

[40] *See* Pls.' Resp. City's MSJ on Warrant at Section III.C.3 [ECF No. 331].

Confidential Informants after the informants had already made narcotics purchases and without

laboratory testing of the drugs for admission into evidence in the case. While the criminal proceedings

were ultimately dismissed before trial for unknown reasons and without an adjudication of Gonzales's

guilt or innocence, the charging indictment affidavit sworn to by an HPD Lieutenant details

Gonzales's wrongdoing in this regard.[41]

**D. Gonzales asserts the Fifth Amendment privilege to nearly every question concerning Harding Street and his supervision of Goines and Squad 15 at his deposition.**

Plaintiffs had the opportunity to depose Gonzales on February 27, 2024.[42] Throughout his

deposition, Gonzales consistently asserted the Fifth Amendment privilege—over 100 times in total—

and refused to answer questions concerning his actual knowledge of and involvement in Goines's

investigation into 7815 Harding Street (or lack thereof) before obtaining the warrant, his supervision

of Squad 15, his knowledge of past issues with Goines concerning Goines's practice of obtaining

fraudulent warrants based on non-existent investigations and obtaining no-knock warrants without

weapons actually being recovered, the findings of HPD's audits concerning Gonzales's deficient

supervision of Squad 15, and other topics relevant to this case and the claims against Gonzales.[43, 44]

**IV.**
**Argument and Authorities**

For supervisory liability to apply to Gonzales, Plaintiffs must show that the conduct of

Gonzales denied Plaintiffs their constitutional rights.[45] When, as here, Plaintiffs' allege failure to

---

[41] Pls.' Ex. Y (Gonzales Charging Affidavit).
[42] Pls.' Ex. R at 1 (Gonzales Dep.).
[43] *See, e.g.*, *Id.* at 9:13 – 10:20, 16:19 – 38:7, 41:20 – 49:18, 56:13 – 67:16, 85:9 – 96:4 (Gonzales Dep.).
[44] For more discussion on Goines's years-long practice of obtaining no-knock warrants by claiming weapons were seen during CI buys, only for no guns to be recovered or noted in raids and the red flag that should have raised, see Plaintiffs' Resp. to City's MSJ on Warrant at Sections III.D and IV.A.1. [ECF No. 329].
[45] *Roberts v. City of Shreveport*, 397 F.3d 287, 292 (5th Cir. 2005).

supervise, "the plaintiff must show that: (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiffs rights; and (3) the failure to train or supervise amounts to deliberate indifference."[46]

**A. Summary Judgment is not warranted on Tuttle's and Nicholas's claims against Gonzales for supervisory liability arising from the warrant claim.[47]**

**1. Gonzales was deliberately indifferent to the risk of the constitutional violation.**

Plaintiffs can demonstrate that Gonzales was deliberately indifferent to the risk of Goines obtaining a fraudulent no-knock warrant against the Tuttles in two ways. First, Plaintiffs can show that Gonzales had actual or constructive knowledge that Goines violated constitutional rights "so often" such that the factfinder can infer from the pattern of violations that "the need for further training [or supervision] must have been plainly obvious . . . ."[48] Second, in *City of Canton v. Harris*, "the Supreme Court left open the possibility that a need to train [or supervise] could be 'so obvious,' resulting in [] liability without a pattern of prior constitutional violations."[49] This means Plaintiffs can show that Goines's single constitutional violation in the Harding Street case of obtaining a fraudulent no-knock warrant without probable cause was an obvious result of Gonzales's supervision, such that his deficient supervision was deliberately indifferent to the risk. "Constructive knowledge [of Goines's patterns and the risks] may be inferred from the widespread extent of the practices, general

---

[46] *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 452-53 (5th Cir. 1994).
[47] Gonzales does not contest the predicate constitutional violation for this claim.
[48] *Littell v. Hous. Indep. Sch. Dist.,* 894 F.3d 616, 624 (5th Cir. 2018); *Martin v. Snyder*, 2023 U.S. Dist. LEXIS 131178, at *18-19 (S.D. Fla. July 28, 2023) ("to the extent a single rogue employee engages in a widespread pattern of misconduct, such pattern should be considered for purposes of placing the municipal entity on actual or constructive notice of the need for further training and supervision of the rogue employee.").
[49] *See* City of Canton v. Harris, 109 S. Ct. 1197, 1200 (1989).

knowledge of their existence, manifest opportunities and official duty of responsible policymakers to be informed, or combinations of these."[50]

As explained in more detail in Plaintiffs' Response to the City's Motion for Summary Judgment on the Warrant, Gonzales displayed deliberate indifference to the risk of Goines obtaining a fraudulent no-knock warrant in at least four respects that would preclude summary judgment as factual disputes.[51] First, based on his obligations as Goines's supervisor and HPD's own policies requiring active supervisory oversight and Gonzales's review of Goines's investigatory work after the fact, he actually knew or should have known that: (1) Goines consistently failed to do investigations according to procedures for years (as flagged in the audits);[52] (2) Goines had a pattern of obtaining fraudulent warrants, at least six confirmed by HPD in the year prior to Harding Street, of which Gonzales should have been responsible for reviewing Goines's investigative work and noticing issues;[53] (3) Goines consistently obtained no-knock warrants with no guns returned, again, something that should have been obvious to Gonzales in his review of case files;[54] and (4) Gonzales's own participation in disregard for SOPs and policies would send a signal to Goines that his superior did not care what he did. These patterns should have triggered interventions by Gonzales, but he apparently chose not to do so.[55]

---

[50] *Pineda v. City of Houston*, 291 F.3d 325, 330 n.15 (5th Cir. 2002).
[51] *See* Plfs.' Resp. to City's MSJ on Warrant at Section IV [ECF No. 331].
[52] *See id.*; Defs.' Ex. 15 (Administrative Audit of Narcotics Division); Defs.' Ex. 14 (Report on Investigation in Goines Warrants); Pls.' Ex. 32 (Lt. French Investigative Report).
[53] *Id.*
[54] *See* Gonzales's MSJ at 17 [ECF. No. 312]. (noting that Gonzales's supervisory obligations included "lieutenant review of Blue Backs, semi-annual performance reviews, review of CI fund receipts, and compilation and circulation of productivity reports, which described the amounts of narcotics, weapons, and cash seized during enforcement activity.").
[55] *See* Order on Gonzales MTD at 10 [ECF No. 229]("Goines' history of illegal conduct was significant enough that Gonzales should have anticipated it would likely result in a future constitutional violation.").

Second, Gonzales knew or should have known that practicing "a trust but don't verify" management policy for his narcotics officers like Goines would lead to an obvious risk that an officer might fabricate the basis for a no-knock warrant. This is particularly important, as Gonzales was aware that his Squads were permitting case officers to track their own investigations (i.e., allowing officers to decide what to report and when with no documentation for supervisors to review), but he did not stop the practice.[56]

Third, Gonzales knew or should have known as one of Goines's direct supervisors that Goines did not actually spend two weeks investigating Harding Street and the Tuttles, as Goines portrayed in the search warrant affidavit. Gonzales received the details of the planned raid and investigation prior to the raid and claimed he reviewed them, but as with his practice, apparently did not bother to ask about Goines's investigation despite Gonzales claiming himself that it would be uncommon for him not to know about such an investigation going on.[57]

Highly significant on each of these points, Gonzales did not deny that he was unaware of any of these issues and patterns with Goines during his sworn deposition testimony. Instead, Gonzales's persistent assertion of Fifth Amendment privilege in response to questions about what he knew about Goines's investigations and practices concerning obtaining warrants and his prior supervisory history of Goines gives rise to a permissible adverse inference against him on these issues.[58] This adverse

---

[56] Pls.' Ex. 32 at COH00037531 – 37532 (emphasis in original) (Lt. French Investigative Report)
[57] *See id.* at COH00037485("Lieutenant Gonzales became aware of the investigation a few hours before the briefing. Lieutenant Gonzales explained that he received a copy of the tactical plan and search warrant and reviewed both."); *id.* at COH00037486(Gonzales detailing that he would have been expected to be apprised of the Harding Street investigation if it was going on two weeks).
[58] *See, e.g.*, Pls.' Ex. R at 10:4 – 12, 41:20 – 49:18, 85:9 - 96:4 (Gonzales Dep.); *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them.").

inference in combination with the extensive evidence demonstrating Gonzales's demonstrated history

of failing to supervise the narcotics officers in his squads as uncovered by the investigations and audits

discussed above gives rise to a factual dispute that precludes summary judgment on this element.

   2. **There is a causal link between Gonzales's supervision and the constitutional violation of unreasonable search and seizure.**

"The high degree of predictability" of constitutional violation that constitutes notice, the

Supreme Court has emphasized, "may also support an inference of causation—that the [supervisor's]

indifference led directly to the very consequence that was so predictable."[59] That is certainly the case

here, as Plaintiffs have demonstrated the multiple ways in which Gonzales's supervision of Goines

and the narcotics squads under him created an environment in which Goines felt comfortable

fabricating a no-knock warrant with no concern that his supervisors would ever take steps to check in

to his work or reprimand him for violations of HPD policies.[60] As explained in more detail in

Plaintiffs' Response to the City's Motion for Summary Judgment on the Warrant, the causal link

between Gonzales's supervision and the constitutional violation of Gonzales's subordinate obtaining

a fraudulent warrant emerges from multiple failings on Gonzales's part.

For Gonzales in particular, his personal involvement in helping Goines flout checks and

balances like signing for CI payments in violation of HPD's policy and his failure to address the red

flags addressed by Goines' consistent practice of obtaining no-knock warrants with no weapons

returned only contributed further to the constitutional violations that were ultimately committed.[61] In

other words, a jury could infer that if the rules and laws did not matter to Gonzales, Goines, a narcotics

---

[59] *Bryan County*, 520 U.S. at 409-10.
[60] *See* Plaintiffs' Resp. to City's MSJ on Warrant Sections III-IV [ECF No. 331].
[61] *Id.*

street-level officer to feel the same way based on his supervisor's disinterest and dishonesty, and this

played a role in causing the fraudulent no-knock warrant being obtained.

**B. Summary Judgment is not warranted on Nicholas's claim against Gonzales for supervisory liability arising from the excessive force.**

**1. Taking Plaintiffs' facts (supported by the evidence) as true, there is a predicate constitutional violation of Nicholas's right to be free from excessive force.**

There is a basic, but fundamental flaw in Gonzales's argument of there not being a predicate

violation of Nicholas's constitutional right to be free from Gallegos's excessive force: Gonzales

presents his version of the facts concerning what occurred during the raid as absolutely true, but

Plaintiffs have presented their own facts concerning what actually happened during the raid, as

supported by the evidence.[62] Plaintiffs' facts confirm that Gallegos violated Nicholas's constitutional

right by executing her when she was posing no threat and was unarmed. Because the Court must take

Plaintiffs' facts as true and they demonstrate a predicate constitutional violation, summary judgment

is not warranted on this ground.

**2. Gonzales was deliberately indifferent to the risk of the constitutional violation.**

Gonzales focuses his argument here on pointing out that Gallegos did not have a demonstrated

pattern of prior uses of excessive force. Do not take the bait. Gonzales knew or should have known

as a supervisor of a squad that consistently served no-knock warrants that HPD had a demonstrated

history of failing to hold officers responsible for incidents of shooting civilians.[63] Further, Gonzales

knew or should have known the common-sense implications of a no-knock raid and the risk for

violence and excessive force that could occur if his officers engaged in gunfire. Finally, as discussed,

Gonzales was familiar with the culture he fostered within the HPD narcotics squads he supervised

---

[62] *See* Plaintiffs' Resp. to Gallegos's MSJ on Excessive Force at Factual Background [ECF No. 330].

[63] *See id.*

that the rule of law and checks and balances were not the priority. There is also a factual dispute over whether Gonzales knew or should have known that if he was permitting his officers to violate the constitution by pursuing no-knock warrants without adequate probable cause, other constitutional violations may follow based on an understanding of tolerance for disregard for constitutional protections.

> **3. There is a causal link between Gonzales's supervision and the constitutional violation.**

Again, despite Gonzales's framing otherwise, this claim is about how his policies and management of Goines, Gallegos, and Squad 15 overall caused one of his Squad 15 officers to engage in excessive force because the officer believed he could do so based on the policy frameworks in place within the broader HPD for investigating and justifying officer shootings, and the officers' understanding that Gonzales himself would believe and back up whatever his squad members reported. The combination of these factors create a factual issue for jury determination if the excessive force was caused by these factors.

> **C. There is clearly established law defeating Gonzales's argument for qualified immunity against both supervisory liability theories.**

As this Court has already recognized in dispatching Gonzales's motion to dismiss on this same argument regarding qualified immunity against Plaintiffs' claims, it has been clearly established in the Fifth Circuit for decades that supervisors of police officers can be liable for the unconstitutional actions of their officers, even if they did not participate in those actions, if the supervisor "knew or should have known that the allegedly unconstitutional acts were occurring and [the supervisor] acquiesced in them."[64] This ruling was further upheld by the Fifth Circuit in this lawsuit.[65]

---

[64] *Wanger v. Bonner*, 621 F.2d 675, 680 (5th Cir. 1980).
[65] *See Tuttle v. Sepolio*, 68 F.4th 969, 975-76 (5th Cir. 2023).

Indeed, the Fifth Circuit's opinion in *Crittindon v. LeBlanc* undermines Gonzales's contention that the qualified immunity analysis should require a showing beyond notice to a supervisor that they can be held liable for deliberate indifference to their subordinate's unconstitutional acts.[66] In that decision, the Fifth Circuit evaluated whether there was clearly established law for the alleged underlying constitutional violation.[67] Having determined there was such law, the Court determined that the supervisors had "fair warning" that their failure to address such violations would result in ensuing constitutional violations.[68]

Here, the law on lying to obtain a warrant and executing a no-knock warrant where there is no reasonable suspicion that announcing would be futile or dangerous had been established for decades.[69] Likewise, when Squad 15 shot and killed Nicholas while she was unarmed and not engaging in any force against the officers, such conduct was clearly established as illegal.[70]

**D. Regardless of the Court's decision on the other claims, Gonzales should not be granted an order dismissing all of Plaintiffs' claims because he did not move for summary judgment on Plaintiffs' conspiracy claim against him.**

While Gonzales states in his motion that the only claims remaining against him are Nicholas's supervisory liability theory stemming from the excessive force claim and both Nicholas's and Tuttle's supervisory liability claims stemming from the warrant, he does not address each Plaintiff's conspiracy claim against him in his motion for summary judgment. Specifically, the Nicholas Plaintiffs pled the following:

---

[66] 37 F.4th 177, 188 (5th Cir. 2022).
[67] *Id.* at 188.
[68] *Id.*
[69] *See Hart v. O'Brien*, 127 F.3d 424, 442 (5th Cir. 1997) (lying for a warrant was established as a constitutional violation in 1978)
[70] *Releford v. Rosemon*, 678 Fed. Appx. 267, 268 (5th Cir. 2017) (the Supreme Court established in 1985 that a police officer may not seize an unarmed, nondangerous suspect by shooting him).

In addition, Defendants had a long-standing agreement and plan to obtain illegal search warrants, via perjury and through misuse of confidential informants. Specifically, as part of this agreement, Squad 15, Lt. Todd, and Lt. Gonzales, agreed and knew that member[s] of Squad 15, including Goines, would obtain illegal search warrants in violation of the Fourth and Fourteenth Amendments. Each member[s] of the conspiracy agreed to the plan and intended to further its purpose. In addition, Squad 15 also financially profited from the illegal raids because each member billed thousands of dollars each year in overtime in executing the illegal raids. As a result of this scheme, Defendants violated Nicholas's constitutional rights.[71]

Likewise, the Tuttle Plaintiffs pled:

On January 28, 2019, while acting under color of Texas law, all individually named Defendants deprived and conspired to deprive Dennis of his rights under the Fourth Amendment as incorporated and applied to the states through the Fourteenth Amendment by using excessive and deadly force during the execution of the no-knock search warrant at 7815 Harding Street.

. . . .

On January 28, 2019, while acting under color of Texas law, all individually named Defendants deprived and conspired to deprive Dennis of his rights under the Fourth Amendment as incorporated and applied to the states through the Fourteenth Amendment by using excessive and deadly force during the execution of the no-knock search warrant at 7815 Harding Street.[72]

Because Gonzales has failed to move for summary judgment on Plaintiffs' conspiracy claims against him, an order granting Gonzales dismissal of all of Plaintiffs' claims should not be granted. Instead, those claims remain alleged against him, along with any other claims against Gonzales for which the Court determines that summary judgment is not merited.

## V.
## Conclusion

For the reasons stated above, the Plaintiffs respectfully requests that the Court deny Gonzales's motion for summary judgment, and deny Gonzales's request for total relief from all claims against Gonzales, as Plaintiffs still have conspiracy claims that were not addressed in Gonzales's motion for summary judgment.

---

[71] ECF No. 49 ¶ 160.
[72] ECF No. 48 ¶¶ 97, 112.

Respectfully submitted,

<u>/s/ Michael Doyle</u>                                    <u>/s/ Boyd Smith</u>

Michael Patrick Doyle                              Michael T. Gallagher
Patrick M. Dennis                                  L. Boyd Smith, Jr.
Jeffrey I. Avery                                   Pamela R. McLemore
Patrick Doyle                                      2905 Sackett Street
DOYLE DENNIS AVERY LLP                             Houston, TX 77098
The Clocktower Building                            Telephone: (713) 238-7705
3401 Allen Parkway, Suite 100                      Facsimile:  (713) 238-7852
Houston, Texas 77019                               mike@gld-law.com
Email: service@doylelawfirm.com                    bsmith@gld-law.com
                                                   pamm@gld-law.com
CHARLES C. BOURQUE, JR.
*Admitted Pro Hac Vice*                            ***Attorneys for Plaintiffs***
ST. MARTIN & BOURQUE, LLC                          ***Clifford F. Tuttle, Jr. as***
315 Barrow St.                                     ***Representative of the Estate***
Houma, LA 70360                                    ***of Dennis W. Tuttle,***
985-876-3891 (phone)                               ***Deceased, Robert Tuttle,***
985-851-2219 (fax)                                 ***and Ryan Tuttle***
cbourque@stmblaw.com

***Attorneys for Plaintiffs***
***Patricia Nicholas, as temporary***
***administrator of the Estate of***
***Rhogena Nicholas and Jo Ann***
***Nicholas, individually and as an***
***heir of the Estate of Rhogena***
***Nicholas***

**Attorneys for Plaintiffs**

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned certifies that a copy of the foregoing brief was served on the attorney of record for each party in the above case in accordance with the Federal Rules of Civil Procedure on September 13, 2024.

<u>/s/ Michael Patrick Doyle</u>