UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| CLIFFORD TUTTLE, et. al. | Case No. 4:21-cv-00270 |
| Consolidated with | |
| JOHN NICHOLAS, et.al. | |
| Plaintiffs, | |
| v. | |
| CITY OF HOUSTON; ART ACEVEDO, et. al. | |
| Defendants. | (JURY DEMANDED) |

**PLAINTIFFS' RESPONSE TO DEFENDANT STEVEN BRYANT'S MOTIONS FOR SUMMARY JUDGMENT (NICHOLAS PLAINTIFFS) AND (TUTTLE PLAINTIFFS)**

This response addresses Defendant Steven Bryant's nearly identical Motions for Summary Judgment concerning the Nicholas Plaintiffs' claims and Tuttle Plaintiffs' claims. [1,2]

**I.
Introduction and Summary of Argument**

Despite being one of Goines's longtime primary collaborators in obtaining fraudulent warrants against innocent Houstonians, and someone who has already pled guilty for jumping into action immediately following the illegal raid on 7815 Harding Street to fabricate evidence of drugs seized at the home to cover-up Goines and his own misconduct, former HPD narcotics officer Steven Bryant seeks summary judgment absolving him from any and all liability in this civil lawsuit brought by the families of the innocent victims of the raid on 7815 Harding Street, Dennis Tuttle and Rhogena

---
[1] ECF No. 313.
[2] ECF No. 314.

Nicholas ("the Families"). Despite this, there is substantial evidence confirming that he violated the Tuttles' constitutional right to be free from unreasonable search and seizure by helping Goines obtain the illegal warrant or failing to stop the raid when he knew that no probable cause for the raid existed, thereby playing a role as a contributing cause of the unsuspecting Tuttles' untimely deaths in a hail of gunfire while they were settling in for a quiet evening at their home in January 2019.

## II.
## Summary Judgment Standard

For summary judgment, the initial burden falls on the movant to identify areas essential to the non-movant's claim in which there is an "absence of a genuine issue of material fact."[3] Summary judgment under Rule 56 is only appropriate when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.[4] "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party."[5] The burden is on the moving party to make such a showing.[6]

The Court must accept as true the nonmoving party's version of events in order assess whether, in the absence of factual disputes, judgment as a matter of law is appropriate.[7] Where

---

[3] *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005).
[4] *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).
[5] *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 417 (5th Cir. 2008).
[6] *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 161 (1970)
[7] *Scott v. Harris*, 550 U.S. 372, 380 (2007); *cf. Tarver v. City of Edna*, 410 F.3d 745, 753 (5th Cir. 2005) ("Any credibility determination made between the officers' and [plaintiff's] version of events is inappropriate for summary judgment.").

disputes of material fact exist, they preclude the imposition of summary judgment.[8] Viewing the facts in the light most favorable to the nonmoving party applies equally to more abstract factual disputes.[9]

### III.
### Relevant Facts[10]

**A. The Unconstitutional No-Knock Raid at 7815 Harding Street**

Monday, January 28, 2019 was "picture day" for Gerald Goines, Steven Bryant, and their fellow narcotics officers in HPD's Squad 15. As Sergeant Reyna, one of the immediate supervisors of Squad 15 recalled, he contacted his squad members on the Friday before the raid to see if anyone in the group "ha[d] something going" so they could "take some pictures before we go and do a warrant so that we can get pictures for the guy that's leaving."[11] Goines reportedly responded to Reyna that day he "might have something."[12] By the afternoon of Monday, January 28, Goines had secured the no-knock warrant to raid the home of the unsuspecting Tuttles later that evening.[13]

As would later emerge, the Tuttles were innocent victims of an illegal no-knock warrant executed without probable cause, obtained by Goines only two weeks after he was directed towards them by someone not in his chain of command and under clearly dubious grounds. On January 8, 2019, Patricia Garcia – a neighbor of Tuttle and Nicholas – initiated false 911 calls about Tuttle and

---

[8] *Meadours v. Ermel*, 483 F.3d 417, 423 (5th Cir. 2007).
[9] *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (emphasizing the "importance of drawing inferences in favor of the nonmovant").
[10] Plaintiffs incorporate in full the facts as laid out in Plaintiffs' Responses to the COH's MSJs on Excessive Force and the Warrant [ECF Nos. 328, 329].
[11] Pls.' Ex. 171 at COH00038514 (Reyna 2/5/2019 SIU interview); *see Esquivel v. Kendrick*, 2023 U.S. App. LEXIS 22839, at *10 (5th Cir. Aug. 29, 2023) ("[I]n civil actions, federal courts may admit police reports pursuant to the public records exception to the hearsay rule. . . . In civil cases, police reports may also be admitted under the business records exception to the hearsay rule.").
[12] *Id.*
[13] *See* Pls.' Ex. 31 (7815 Harding warrant).

Nicholas, claiming that her daughter was at 7815 Harding, doing "heroin" with "Reggie."[14] In response, HPD dispatched Officers Morales and Blankenship-Reeves to the Tuttles' home. Upon their evaluation of the Tuttles' residence, Morales and Blankenship-Reeves claim they identified no activity at all in the residence.[15] Nevertheless, Blankenship-Reeves documented her notes regarding the 911 calls on a notepad and passed that information to her significant other, Narcotics Division Lieutenant, Marsha Todd.[16] Todd then relayed the information to Goines, who was in a different narcotics squad from the one supervised by Todd, on January 11, 2019.[17] Goines then testified under oath to obtain a no-knock warrant that on January 27th (1) he personally saw the CI enter the Harding Street house, (2) he searched the CI prior to entering the house, (3) he saw the CI return from the house with the drugs and (4) the CI observed a handgun carried by a resident of the house.[18]

In reality, the CI never visited 7815 Harding Street, much less bought heroin from Tuttle or any person at 7815 Harding Street. Nor did Goines. HPD's later investigations have confirmed that Goines fabricated information and misrepresented all of these "facts" in his search warrant affidavit to obtain the no-knock search warrant against the Tuttles at their 7815 Harding Street home.[19]

**B. Officer Bryant's Important Role in Causing the violations of the Tuttles' constitutional rights and their deaths.**

While Goines was unquestionably one bad actor in what HPD's Narcotics Squad 15 did to the Tuttles on January 28, 2019, evidence would soon come to light suggesting he was not alone in

---

[14] *See* Pls.' Ex. I at 13:9 – 14:18 (Blankenship-Reeves Dep.).
[15] *See* Pls.' Ex. I at 26:21 - 29:12 (Blankenship-Reeves Dep.); Pls.' Ex. J at 10:16 – 11:7, 23:4-18 (Morales Dep.).
[16] *See* Pls.' Ex. I at 146:7 – 149:1 (Blankenship-Reeves Dep.).
[17] Pls.' Ex. 32 at COH00037482 (Lt. French Investigation Report).
[18] *See* Pls.' Ex. 31 (7815 Harding warrant).
[19] Defs.' Ex. 14 at COH00075957 (Investigative Report on Goines Warrants).

his wrongdoing. The Harding Street search warrant indicated that Bryant was listed as accompanying Goines on the 27th to witness the CI buy at the house.[20]

As detailed in one of the investigative reports following the raid, Bryant's supervisors quickly became suspicious of his involvement after he tagged the narcotics on the 30th supposedly obtained from the fabricated Harding Street buy—*i.e.*, three days after Goines said the buy occurred and two days after the raid, in violation of HPD Narcotics Division policy requiring purchased narcotics to be tagged the same day:

> Lieutenant Gonzales informed Commander Follis that Officer Bryant had just tagged the narcotics earlier that day, from the controlled buy which supposedly occurred three days earlier, on January 27, 2019. "*I [Commander Follis] became very concerned about this and voiced my concerns to Lieutenant Gonzales, who had no reasonable explanation for the delay.*" In addition, Lieutenant Gonzales told Commander Follis that Officer Bryant was trying to locate the CI Commander Follis called Officer Bryant directly. Commander Follis described Officer Bryant as sounding nervous and hesitant as he questioned him about the CI Officer Bryant told Commander Follis he was unable to locate the CI "*I asked him what part of town he and Officer Goines picked her up on Sunday, to make the controlled buy. He got extremely quiet for several seconds and then told me he had not been with Officer Goines when he picked her up and that he was not with Officer Goines during the controlled buy.*" Commander Follis asked Officer Bryant why he had not been with Officer Goines during the controlled buy and Officer Bryant told him he had been in the area in case Officer Goines needed him. When asked how he knew which CI to look for, Officer Bryant told Commander Follis that Officer Goines had provided him with the CI's name and CI number earlier that day.
>
> . . . .
>
> Commander Follis then ordered Officer Bryant to come to his office because the Homicide Division's Special Investigations Unit (SIU) needed to speak with him. Commander Follis advised that while Officer Bryant waited to speak with SIU, he told Commander Follis that he never saw the CI on the date of the controlled buy. Commander Follis asked Officer Bryant how he knew about the narcotics found in Officer Goines' center console and Officer Bryant told him he found the narcotics while looking through Officer Goines' vehicle and assumed he needed to tag it. Commander Follis asked Officer Bryant how he knew the narcotics found in Officer Goines' center console was from the Harding Street controlled buy. Officer Bryant told Commander Follis that he met with Officer Goines later the night of the controlled

---

[20] Pls.' Ex. 31 at COH00037441.

> buy and Officer Goines showed him the drugs. Commander Follis admitted he did not ask Officer Bryant why he went inside Officer Goines' vehicle and he was unaware of anyone asking Officer Bryant to go into the vehicle. Commander Follis recalled that at that point he realized there was something very wrong with the Harding Street investigation, and at a minimum, there were serious policy violations.[21]

As the investigation continued, Bryant's stories regarding what he did, what he knew, and when continued to change:

> On February 7, 2019, Officer Bryant indicated he became aware of the Harding Street investigation on January 27, 2019, when Officer Goines called him and told him he was going to do a buy. Officer Goines told Officer Bryant he did not need him to accompany him to the buy. Officer Bryant indicated he was not involved in the Harding Street investigation until receiving the phone call from Officer Goines. He also indicated he was unaware he had been listed in the search warrant by Officer Goines.
>
> Officer Bryant became aware of Officer Goines' CI used to make the buy when he was told by Officer Goines at the hospital. Officer Bryant stated he never had contact with this CI and he stated he did not witness any buys from 7815 Harding Street. Officer Bryant stated he did not conduct any surveillance of 7815 Harding Street, but did a drive by of the residence the morning of the warrant, January 28, 2019. Officer Bryant recovered two baggies of heroin from Officer Goines' city vehicle after he was told over the phone by Officer John-Louis that the narcotics purchased from a controlled buy at 7815 Harding Street were in Officer Goines' center console. Officer Bryant admitted he had not seen the narcotics prior to recovering them from Officer Goines' vehicle.[22]

As evident comparing them side by side, in this later retelling of events, Bryant's second retelling portrayed that he did not actually ever meet Goines the night of January 27 to view the drugs and he actually learned the drugs were in Goines car through an intermediary, not Goines, despite what he originally told Commander Follis on those points. The fraudulent markers raised with Bryant's conduct were summarized in a conclusion note in one of the post-incident investigatory reports:

> Officer Bryant was found to have demonstrated poor judgment during this investigation, Officer Bryant had no involvement in the Harding Street investigation. He was found to have not been present during the alleged controlled buy of narcotics

---

[21] Pls.' Ex. 32 at COH00037478 - 37479 (Lt. French Investigative Report).
[22] *Id.* at COH00037509.

from 7815 Harding Street, which was proven to not have occurred. Officer Bryant was initially questioned by Commander Follis, who wrote in his administrative statement, *"While Officer Bryant was waiting in my office, I asked him something else about the CI, I don't remember exactly what it was, but he told me he had never even seen the CI on the date of the alleged control buy. I asked him how he came to tag the narcotics earlier on this date, and he told me he was looking through G's car for something else, saw the dope, and figured it needed to be tagged. I asked him how he knew it was from the Harding Street investigation and he told me he had hooked up with G later during the night of the controlled buy, and G showed it to him."* Officer Bryant later told Sergeant Bass and Detective Rodriguez that he supplemented Officer Goines' case stating he had identified the substance purchased from 7815 Harding Street because he received information from Officer John-Louis, describing what the narcotics looked like. Officer Bryant told Sergeant Bass and Officer Rodriguez, *"I made a mistake."* Officer Bryant retired before Sergeant Rexroad could serve him for an administrative interview, thus Officer Bryant never answered questions as to

why he wrote his supplement and why he initially told Commander Follis that he met with Officer Goines on the night of January 27, 2019, to identify the narcotics, but later told Detective Rodriguez and Sergeant Bass that he did not see the narcotics until he recovered them from Officer Goines' city vehicle.[23]

While the investigations into Harding Street were still ongoing, Officer Bryant retired from HPD on March 8, 2019, without ever providing HPD's internal affairs division a statement regarding the Harding Street investigation.[24] Those investigations would later determine that Bryant had violated multiple HPD policies and committed criminal conduct for at least his role in attempting to help Goines cover up the fabricated basis for the warrant.[25] Bryant has since pled guilty to "Destruction, Alteration, or Falsification of Records in Federal Investigations and Bankruptcy, in violation of Title 18, United States Code, Section 1519" in relation to his efforts to falsely attribute the heroin from Goines's car to the Tuttles following the raid.[26] Relevant here, among the listed factual bases for the plea agreement, is the following:

---

[23] *Id.* at COH00037529.
[24] *Id.* at COH00037509 (French 32)
[25] *Id.* at COH00037521 (French 32).
[26] *See* ECF No. 113, *United States of America v. Steven O. Bryant*, 4:19-cr-00832, United States District Court Southern District of Texas (Bryant Plea Agreement).

    f. Defendant Bryant first learned about the possible execution of a search warrant at the residence located at 7815 Harding Street from co-defendant Gerald M. Goines on the night of Sunday, January 27, 2019. Goines called the defendant and explained that he was going to do a buy, without mentioning the location of the "buy." Defendant offered to meet Goines at the "buy'" location, but Goines declined. In the past, Goines and the defendant had falsely listed each other as the second officer present when each had used confidential informants ("CI") to make drug buys when, in truth and in fact, the other officer was not present. This was in violation of HPD policies. The defendant has never done a CI buy with Goines.

    g. On January 27, 2019, when Goines called the defendant to let him know he was going to do a "buy," the defendant understood at that time that Goines was probably going to falsely identify the defendant as the second officer who witnessed an actual CI buy; this false report about the second officer was consistent with their practice.

. . . .

    i. At approximately noon on January 28, 2019, Goines gave Defendant Bryant the address for the search warrant he wanted to execute, 7815 Harding Street. That was the first time the Defendant learned of the address where the search warrant was to be executed. At that time, the defendant drove by 7815 Harding Street for the first time to surveille the location.[27]

### C. Bryant is implicated directly in other instances of working to Goines to falsify investigations in support of warrants.

In addition to the investigation of Harding Street, HPD also commissioned an investigation into a selection of six additional warrants that Goines had obtained in the year preceding the Harding Street raid.[28] That investigation uncovered that Bryant and Goines had a history of working together to fabricate details about investigations, leading to a practice of routinely obtaining illegal warrants.

While the underlying investigative report provides more detail on this practice in each of the six investigated instances, excerpts from one example from in this report as illustrative of what Bryant and Goines were found to have routinely participated in together as accomplices:

### 6807 Goforth Street Narcotics Investigation

    According to former Officer Goines, he conducted the 6807 Goforth Street narcotics investigation with former Officer Bryant. Former Officer Goines authored offense

---

[27] *Id* at 9.
[28] Defs.' Ex. 14 (Investigative Report on Goines's Warrants). HPD chose not to investigate any other of Goines's likely fraudulent warrant activity.

report 514914-18, in which he documented a controlled buy carried out with the assistance of a confidential informant. In his offense report, former Officer Goines wrote that on April 23, 2018, at approximately 21:00 hours, the confidential informant bought crack cocaine at the above listed residence from an unknown black male. Records showed that former Officer Goines generated the controlled buy offense report two days after the buy on April 25, 2018, at 13:21 hours, and tagged the purchased narcotics shortly after at 13:24 hours. Documentation associated to the controlled buy revealed that former Officer Goines and former Officer Bryant submitted signed overtime forms requesting paid overtime for this operation.

. . . .

Confidential informant payment receipts identified CI #1 as the confidential informant paid for the investigative work pertaining to the 6807 Goforth Street narcotics investigation. Two CI payment receipts dated on April 23, 2018, had former Officer Bryant as the witness to the payment. A third receipt dated on April 25, 2018, documented former Sergeant Reyna's signature as witness to the payment for the results of the warrant service.

. . . .

From statements made by CI #1 during multiple interviews, CI #1 insisted she had no knowledge of the location and did not recognize Mr. Allen. CI #1 claimed she neither provided any information nor participated in a controlled buy related to this investigation. CI #1 admitted she received payment for the investigation, despite doing no work, and confirmed her signature on the confidential informant payment forms. CI #1 explained she received all of the payments on April 25, 2018 at 8300 Mykawa Road and another officer was present during the payment.

According to phone records obtained through search warrants, on the day of the controlled buy, data analysis showed no communication between CI #1, former Officer Goines and former Officer Bryant. However, their devices location showed them to be in an area near 6807 Goforth Street around the time of the controlled buy. Concerning the days in which CI #1 allegedly received her confidential informant payment, available phone records did not show activity consistent with their cell phones being located at or near 8300 Mykawa Road.[29]

The conclusion of the investigative report had the following to say about Bryant and his consistent behavior of working with Goines as a willing accomplice, pursuing warrants based on events that Bryant claims he was a part of, but never happened:

In conclusion, by combining and analyzing the various sources of information, detectives

---

[29] *Id.* at COH00074690 - 74691.

were able to determine former Officer Goines knowingly portrayed false or misleading information in order to obtain no knock search warrants in his investigations. Former Officer Bryant was often listed as a party to former Officer Goines' investigations as documented in offense reports and search warrant affidavits. Supporting documentation in the form of CI payment receipts (for controlled buys) and an overtime form showed former Officer Bryant was complicit in former Officer Goines' criminal misconduct.[30]

**D. Bryant asserts the Fifth Amendment privilege to nearly every question concerning the Harding Street case at his deposition in this lawsuit.**

The Families had the opportunity to depose Bryant on February 13, 2024.[31] Throughout his deposition, Bryant consistently asserted his Fifth Amendment privilege and refused to answer questions concerning the Harding Street case.[32] This included questions about his knowledge of and involvement in Goines's investigation into 7815 Harding Street (or really lack thereof) before obtaining the warrant and before the raid.[33] Bryant also asserted his privilege and refused to answer questions about other Goines investigations in which Bryant was listed as a witness to controlled buys and whether Bryant was actually present, repeatedly facilitating Goines' unconstitutional actions.[34]

## IV.
## Argument and Authorities

**A. Plaintiffs do not oppose dismissal of the claim for excessive deadly force against Bryant.**

Based on information developed through the course of discovery in this lawsuit, Plaintiffs do not oppose the Court granting Bryant's request for summary judgment on the excessive deadly force claim against him.

**B. The evidence of Bryant's history with Goines, inconsistent stories concerning what he knew about the Harding Street investigation and when, along with the permissible negative inferences that should be drawn against him raise fact issues precluding summary judgment on Plaintiffs' unreasonable search and seizure claim.**

---

[30] *Id.* at COH00074967 – 74968.
[31] Pls.' Ex. L at 1 (Bryant Dep.)
[32] *See id.* at 22:17 – 40:23, 48:1 – 52:2 (Bryant Dep.).
[33] *See id.* at 22:17 - 29:9 (Bryant Dep.).
[34] *See id.* at 25:13 – 26:2 (Bryant Dep.).

10

To support a § 1983 claim based on unreasonable search and seizure, a plaintiff is required to allege facts demonstrating that: (1) the defendant violated the Constitution or federal law; and (2) the defendant was acting under the color of state law while doing so.[35] The Fourth Amendment guarantees "the right of the people to be secure in their persons ... against unreasonable searches. and seizures ... and [that] no warrants shall issue, but upon probable cause."[36] "The Supreme Court has defined probable cause as the 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.' "[37] Further, "[a]n officer is liable for failure to intervene when that officer: (1) knew a fellow officer was violating an individual's constitutional rights, (2) was present at the scene of the constitutional violation, (3) had a reasonable opportunity to prevent the harm but nevertheless, (4) chose not to act." *Whitley v. Hanna,* 726 F.3d 631, 646 (5th Cir. 2013).

Plaintiffs have pleaded two theories of liability against Bryant arising from his involvement with Goines in obtaining the no-knock warrant for 7815 Harding Street. First, Plaintiffs allege that Bryant is directly liable for his active role in helping Goines obtain the warrant. Second, Plaintiffs have pleaded that Bryant is liable for failing to intervene when he knew that the warrant lacked

---

[35] *Gomez v. Toledo,* 446 U.S. 635, 640 (1980).
[36] U.S. CONST. amend. IV.
[37] *Piazza v. Mayne,* 217 F.3d 239, 245-46 (5th Cir. 2000) (quoting *Michigan v. DeFillippo,* 443 U.S. 31, 37 (1979)). Under Fifth Circuit law, if facts supporting an arrest are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation for false arrest, potentially insulating the arresting officer from liability. *Arizmendi v. Gabbert,* 919 F.3d 891, 897 (5th Cir. 2019). "Despite review by an independent intermediary, the initiating party may [still] be liable for false arrest if the plaintiff shows that 'the deliberations of that intermediary were in some way tainted by the actions of the defendant.' " *Deville v. Marcantel,* 567 F.3d 156, 170 (5th Cir. 2009) (quoting *Hand v. Gary,* 838 F.2d 1420, 1428 (5th Cir. 1988)).

probable cause.

Bryant attacks these theories in two ways. First, he tries to cast Plaintiffs' expert Dr. Scott as supportive of the position that Bryant had nothing to do with the fraudulently obtained warrant in advance of the warrant being issued. Unfortunately, this argument is not the trump card for a simple reason—its akin to pointing out that Plaintiffs' forensic expert or the medical examiner could not speak to any and all issues in the lawsuit either.

In other words, Dr. Scott's testimony is perfectly consistent with what he was reviewing in this case to form the opinions on the issues he was asked to evaluate. In particular, he has opinions addressing: (1) whether Goines had probable cause for obtaining the no-knock warrant; (2) the failings of HPD to supervise Goines and their impact; (3) whether the force used against the Tuttles' was excessive; (4) HPD's customs and practices related to excessive force.[38] Whether Bryant was complicit with Goines beforehand in obtaining the fraudulent warrant was not something that Dr. Scott has evaluated as an expert. Dr. Scott's deposition testimony was ultimately nothing more than he had not reviewed record materials that had provided him with sufficient information to form expert opinions about Bryant's role. That makes sense, because as with most experts, Dr. Scott was provided with materials that allowed him to form the opinions that he is offering in this case, but he did not have the entire evidentiary record. For example, Dr. Scott did not review and consider the HPD investigative report discussed above concerning Bryant's past practice of working with Goines to obtain false warrants and he did not have Bryant's deposition testimony concerning what he knew and when because those materials were not necessary for the opinions he was offering.[39]

---

[38] Pls.' Ex. B (Dr. Scott Report).
[39] *Id.*

Related to that point, as his second attack, Bryant attempts to neutralize the adverse inference that should be used against him in response to his refusal to answer deposition questions about his involvement with Goines prior to the raid by arguing that inference alone is insufficient to defeat summary judgment.[40] Plaintiffs, however, do not need to rely entirely on Bryant's assertion of Fifth Amendment privilege in response to questions concerning what he knew about the Harding Street investigation and when to demonstrate that there is a fact issue on this claim.

Altogether, Plaintiffs can present evidence for the factfinder that shows: (1) Bryant and Goines had a history of working together on investigations in which the warrants were based on fabricated information and events that did not occur; (2) in the Harding Street case, Bryant was apprised of the investigation in advance of obtaining the warrant and likely knew that Goines would be including false information in the no-knock warrant based on their prior history as accomplices to the exact same misconduct; (3) Bryant initially told his supervisors that he met with Goines the night before the warrant was obtained and identified the drugs purportedly bought from Harding Street, he later changed his story, but it is up to the factfinder to sus out the truth; (4) after the raid debacle, Bryant leapt into action to fabricate evidence in support of the warrant, evidencing his knowledge that the details within the warrant were untrue and his prior illegal conduct; (5) Bryant consistently changed his stories about his involvement with Goines in the investigation prior to and after the raid; and (6) negative inferences that should be drawn against Bryant due to his decision to assert the Fifth

---

[40] *See Newby v. Enron Corp. (In re Enron Corp. Sec., Derivative & ERISA Litig.)*, 762 F. Supp. 2d 942, 960 (S.D. Tex. 2010) ("While a jury in a criminal case is not permitted to draw adverse inferences when a defendant invokes his Fifth Amendment right and refuses to testify, it is well established that 'the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them.'") (quoting *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)).

13

Amendment Privilege in response to questions on these issues evidence the pattern of his misconduct.[41]

This evidence together is certainly enough to raise a fact issue for jury consideration on whether Bryant directly played a role in the violation of the Tuttles' constitutional right to be free from unreasonable search and seizure, or at the minimum, that Bryant was aware that Goines lacked probable cause behind the warrant and failed to intervene to stop its service.

### C. Summary Judgment is not warranted on Plaintiffs' state law claims for wrongful death and survival action as Bryant played a role in causing the Tuttles' deaths.

Bryant further seeks summary judgment on Plaintiffs' state law claims for wrongful death and survival action. To support a claim for wrongful death, a plaintiff must show that: (1) the plaintiff is a statutory beneficiary of the decedent; (2) the defendant is a person or corporation; (3) the defendant's wrongful act caused the death of the decedent; (4) the decedent would have been entitled to bring an action for the injury if he or she had lived; and (5) the plaintiff suffered actual injury.[42] To support a survival action, a plaintiff must show that: (1) plaintiff is the legal representative of the decedent's estate; (2) the decedent had a cause of action for personal injury to his or her health, reputation, or person before he or she died; (3) the decedent would have been entitled to bring an action for the injury if he or she had lived; and (4) the defendant's wrongful act caused the decedent's injury.[43]

Bryant contests these actions by arguing that Plaintiffs' lack evidence that Bryant played a role in causing Plaintiffs deaths.[44] As the Fifth Circuit confirmed, all Plaintiffs must show to meet the

---

[41] *See* Section III, *supra.*
[42] TEX. CIV. PRAC. & REM. CODE §§ 71.001-71.004, 71.010.
[43] TEX. CIV. PRAC. &REM. CODE § 71.021.
[44] *See Slade v. City of Marshall*, 814 F.3d 263, 264 (5th Cir. 2016) ("a plaintiff seeking to recover on a wrongful death claim under § 1983 must prove both the alleged constitutional deprivation required by § 1983 and the causal link between the defendant's unconstitutional acts or omissions and the death of the victim, as required by the state's wrongful death statute.").

causation element is "that the defendant's wrongful actions more likely than not caused the decedent's death."[45] Further, Bryant's role in the constitutional violation does not need to be the sole cause of the Tuttles' deaths.[46] Unlike the situation in *Slade v. City of Marshall, Tex.*, this is not a case in which the Tuttles were already heading towards death through their own acts and Bryant's failure to intercede lessened their chance of survival when they were already more likely than not to die.[47] Here, as demonstrated by the evidence discussed, there is a fact issue over whether by helping Goines obtain the fraudulent no-knock warrant and/or failing to intervene when he knew that there was not probable cause for the warrant, Bryant was a proximate cause of Plaintiffs' deaths.[48]

### D. Regardless of the Court's decision on the other claims, Bryant should not be granted an order dismissing all of Plaintiffs' claims because he did not move for summary judgment on Plaintiffs' conspiracy claim against him.

While Bryant states in his motions for summary judgment that Plaintiffs only bring two causes of action under 42 U.S.C. §1983, respectively for excessive deadly force and unreasonable search and seizure, and two Texas state law claims, respectively a survival action and wrongful death claim, he does not address each Plaintiff's conspiracy claim against him in his motions. Specifically, the Nicholas Plaintiffs plead the following:

> In addition, Defendants had a long-standing agreement and plan to obtain illegal search warrants, via perjury and through misuse of confidential informants. Specifically, as part of this agreement, Squad 15, Lt. Todd, and Lt. Gonzales, agreed and knew that member[s] of Squad 15, including Goines, would obtain illegal search warrants in violation of the Fourth and Fourteenth Amendments. Each member[s] of the conspiracy agreed to the plan and intended to further its purpose. In addition,

---

[45] *Id.* at 265.
[46] *Id.* at 267 (holding Texas state law causation standards apply for these claims).
[47] *Id.*
[48] Proximate cause is normally a fact issue and may only be a question of law where the facts are conclusive. *Whitmire v. Terex Telelect, Inc.*, 390 F. Supp. 2d 540, 558 (E.D. Tex. 2005) (citing *Purina Mills, Inc. v. Odell*, 948 S.W.2d 927, 935 (Tex. App.—Texarkana 1997, pet. denied)); *Meaux Surface Prot., Inc. v. Fogleman*, 607 F.3d 161, 169 (5th Cir. 2010) ("A jury may infer proximate cause from circumstantial evidence.").

15

> Squad 15 also financially profited from the illegal raids because each member billed thousands of dollars each year in overtime in executing the illegal raids. As a result of this scheme, Defendants violated Nicholas's constitutional rights.[49]

Likewise, the Tuttle Plaintiffs plead:

> On January 28, 2019, while acting under color of Texas law, all individually named Defendants deprived and conspired to deprive Dennis of his rights under the Fourth Amendment as incorporated and applied to the states through the Fourteenth Amendment by using excessive and deadly force during the execution of the no-knock search warrant at 7815 Harding Street.
>
> . . . .
>
> On January 28, 2019, while acting under color of Texas law, all individually named Defendants deprived and conspired to deprive Dennis of his rights under the Fourth Amendment as incorporated and applied to the states through the Fourteenth Amendment by using excessive and deadly force during the execution of the no-knock search warrant at 7815 Harding Street.[50]

Despite this, Bryant requests an order dismissing all of Plaintiffs' claims against him in his motions for summary judgment. Because Bryant has failed to move for summary judgment on Plaintiffs' conspiracy claims against him, an order granting Bryant dismissal of all of Plaintiffs' claims should not be granted. Instead, those claims remain alleged against him, along with any other claims against Bryant for which the Court determines that summary judgment is not merited.

## V.
## Conclusion

For the reasons stated above, the Plaintiffs respectfully requests that the Court deny Bryant's motions for summary judgment with respect to Plaintiffs' claims under 42 U.S.C. §1983 for unreasonable search and seizure and for the Texas state-law survival and wrongful death claims, and deny Bryant's request for total relief from all claims against Bryant, as Plaintiffs still have conspiracy claims that were not addressed in Bryant's motions for summary judgment.

---

[49] ECF No. 49 ¶ 160.
[50] ECF No. 48 ¶¶ 97, 112.

Respectfully submitted,

| | |
|---|---|
| */s/ Michael Doyle* | */s/ Boyd Smith* |

| | |
|---|---|
| Michael Patrick Doyle | Michael T. Gallagher |
| Patrick M. Dennis | L. Boyd Smith, Jr. |
| Jeffrey I. Avery | Pamela R. McLemore |
| Patrick Doyle | 2905 Sackett Street |
| DOYLE DENNIS AVERY LLP | Houston, TX 77098 |
| The Clocktower Building | Telephone: (713) 238-7705 |
| 3401 Allen Parkway, Suite 100 | Facsimile:  (713) 238-7852 |
| Houston, Texas 77019 | mike@gld-law.com |
| Email: service@doylelawfirm.com | bsmith@gld-law.com |
| | pamm@gld-law.com |

CHARLES C. BOURQUE, JR.
*Admitted Pro Hac Vice*
ST. MARTIN & BOURQUE, LLC
315 Barrow St.
Houma, LA 70360
985-876-3891 (phone)
985-851-2219 (fax)
cbourque@stmblaw.com

*Attorneys for Plaintiffs Clifford F. Tuttle, Jr. as Representative of the Estate of Dennis W. Tuttle, Deceased, Robert Tuttle, and Ryan Tuttle*

*Attorneys for Plaintiffs Patricia Nicholas, as temporary administrator of the Estate of Rhogena Nicholas and Jo Ann Nicholas, individually and as an heir of the Estate of Rhogena Nicholas*

# CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing brief was served on the attorney of record for each party in the above case in accordance with the Federal Rules of Civil Procedure on September 13, 2024.

/s/ Michael Patrick Doyle