UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| CLIFFORD TUTTLE, et. al. | |
| Consolidated with | |
| JOHN NICHOLAS, et.al. | |
| Plaintiffs,<br>v. | Case No. 4:21-cv-00270 |
| | (JURY DEMANDED) |
| CITY OF HOUSTON; ART ACEVEDO, et. al.<br>Defendants. | |

**THE TUTTLE AND NICHOLAS PLAINTIFFS' RESPONSE TO DEFENDANT FELIPE GALLEGOS'S MOTION FOR SUMMARY JUDGMENT**

**I.**
**Introduction**

In seeking summary judgment on the excessive force claims by Rhogena Nicholas, Ex-HPD officer Felipe Gallegos makes the same attempted justification he has asserted since January 28, 2019 – he intentionally shot and killed Nicholas because she was standing over HPD officer Frank Medina and reaching for his weapon. But there are serious problems with Gallegos's story. Officer Medina was already well outside the house before Gallegos even fired his weapon.[1][2] Worse yet? The bullet trajectory analyzed by forensic expert, Michael Maloney, makes it clear – Nicholas

---

[1] Pls.' Ex. AC, Synced BWC Video (showing Gallegos to the far left of the house and not in his shooting position at the time that Medina has already left the house); Pls.' Ex. AK the PowerPoint Presentation by Wolf (showing that Medina was already out of the house before Lovings was shot); and Pls.' Ex. F (Dep. of Gallegos) confirming that Gallegos did not start shooting until after Lovings was hit and Pardo and Salazar fell, even though Medina was already out of the house at that time per Lt. Wolf and per the basic sequence of the shooting.

[2] In citing to exhibits, Plaintiffs utilize the same exhibits filed for all of their response to summary judgment at [ECF No. 334.]

was on the other side of the couch, not in the vicinity where Medina was located.[3]  And Nicholas was shot in the right side, not the left side, which definitely establishes that she could not have been standing over Medina when Gallegos intentionally shot her twice and killed her.[4]  Put simply, Felipe Gallegos shot Ms. Nicholas without any warning, while she posed no threat to him or his fellow officers.  And the Fifth Circuit has long recognized that  "[a] police officer may not seize an unarmed, non-dangerous suspect by shooting [her] dead." [5]

Similarly, Gallegos also alleges that he shot Dennis Tuttle because he was a threat to officers. Yet when Gallegos fired the final two shots that struck Tuttle, he was already incapacitated after receiving seven bullet wounds. Specifically, at that point Tuttle (1) had been shot seven times;[6] (2) no longer could hold a weapon;[7] (3) certainly did not raise a weapon;[8] (4) was not facing Gallegos like he claimed;[9] and (5) Gallegos shot him in the back of the head.[10]  The Fifth Circuit has previously made it clear – "an officer cannot continue using deadly force," once a suspect has been incapacitated.[11] But here, Gallegos executed Tuttle by shooting him in the back of the head. This is murder, not a justified shooting.

---

[3] Pls.'  Ex. A-1, Declaration and Report of Maloney at pg. 31 of 52.
[4] *Id.*
[5] *Releford v. Rosemon*, 678 F. App'x 267, 268 (5th Cir. 2017).
[6] Pls.'  Ex. A-1, Declaration and Report of Maloney at pg. 32 of 52.
[7] Pls.'  Ex. A-1, Declaration and Report of Maloney at pg. 31 of 52 ("Both Tuttles left and right hands/arms sustained significant damage from gunshots, he would not have been able to continue to hold a weapon in either hand"); Exhibit C and C-1, Declaration of Dr. Bux.
[8] *Id.*
[9] Pls.' Ex. A-1, Declaration and Report of Maloney at pg. 32 of 52 ("With his back to the door, and beginning to drop to the floor, he was shot in the buttocks/thigh. A single bullet passes between his legs as he approaches a parallel position to the floor, grazes his chest and enters his chin. Once on the floor he raises his upper body by his elbows and is fatally shot in the back of his head/neck by Officer Gallegos.")
[10] *Id.*
[11] *Roque v. Harvel*, 993 F.3d 325, 336 (5th Cir. 2021) (citing *Lytle v. Bexar Cnty.*, 560 F.3d 404, 413 (5th Cir. 2009)).

For these reasons, as explained in further detail below, summary judgment must be denied.

## II.

## FACTUAL BACKGROUND

**1. The Houston Police Department establishes a system that encourages excessive force by**

HPD has a long history of encouraging excessive, deadly force against civilians who pose no threat to officers or others. This pattern is not an accident. Rather, HPD designed its policies, enforcement, and investigations of officer-involved shootings to create it. For example, in its investigation process regarding the shooting of a civilian by a police officer, HPD Internal Affairs does not look at the police officer's complaint history[12] and gives the police chief the sole final disciplinary determination.[13] Additionally, an HPD police officer is not questioned until he has spoken with an attorney;[14] and given forty-eight hours to answer written questions with detailed instructions "how to write" the statement.[15] In that 48-hours, HPD gives officers access to any body camera footage, HPD policies and SOPs, evidence, witness statements, or other statements, prior to an officer response.[16] Through this, with the instructions how to write their statements, officers are able to adapt and change their story to fit the evidence, while avoiding review of any potential excessive force.

As a result of this custom and practice, from 2009 to 2014, HPD had 194 intentional shootings of civilians, 81 of which were of unarmed civilians. IAD and the Chief of Police determined that every single one of those shootings was justified.[17] Between 2015 to 2016, on-duty HPD officers have killed 32 people, and IAD deemed every single one of those shootings

---

[12] Pls.' Ex AD (Dep. of Nguyen) at 44:19-35:3.
[13] Pls.' Ex AD (Dep. of Nguyen) at 107:20-108:2.
[14] Pls.' Ex AD (Dep. of Nguyen) at 40:2-40:12.
[15] Pls.' Ex. AT Officer notification.
[16] Pls.' Ex AD (Dep. of Nguyen) at 43:15-45:25.
[17] Pls.' Ex. B, Declaration of Andrew Scott.

justified.[18]  In 2016, Art Acevedo took over as Chief, and this pattern continued. Chief Acevedo found every single shooting by an on-duty officer justified from 2016-2019.[19]  Notably from 2017 through January 28, 2019, HPD – based on its own officer-involved shooting data – has reported 30 on duty officer involved shootings. Some of the weapons during this time period include, unknown object,[20] a machete,[21] scissors and screwdriver,[22] no weapon,[23] "hands and/or feet,"[24] "other,"[25] and a vehicle leaving the scene.[26]

Considering this, HPD officers through January 28, 2019, knew that they could use deadly force without hesitation because they would not be disciplined, scrutinized, punished, or charged for shooting unarmed civilians.

## 2. Background before HPD's armed home invasion

Three weeks before the deadly attack, HPD first targeted 7815 Harding Street. On January

---

[18] "HOMICIDE DIVISION 2015 HPD OFFICER INVOLVED SHOOTING INCIDENT" available at  https://www.houstontx.gov/police/ois/2015.htm and "HOMICIDE DIVISION 2016 HPD OFFICER INVOLVED SHOOTING INCIDENTS," available at https://www.houstontx.gov/police/ois/2016.htm

[19] Pls.' Ex. S (Dep. of Acevedo) at pg. 15-18.

[20]  "HOMICIDE DIVISION 2017 HPD OFFICER INVOLVED SHOOTING INCIDENTS" at March 10, 2017; See https://www.houstontx.gov/police/ois/2017.htm

[21] See  "HOMICIDE DIVISION 2017 HPD OFFICER INVOLVED SHOOTING INCIDENTS" at April 27, 2017; available at  https://www.houstontx.gov/police/ois/2017.htm

[22] See  "HOMICIDE DIVISION 2017 HPD OFFICER INVOLVED SHOOTING INCIDENTS" at October 27, 2017 available at https://www.houstontx.gov/police/ois/2017.htm

[23] "HOMICIDE DIVISION 2018 HPD OFFICER INVOLVED SHOOTING INCIDENTS" at December 25, 2018, November 28, 2018; Sept. 4, 2017; April 27, 2017; April 24, 2017 available at https://houstontx.gov/police/ois/inc_no/66457618.htm and https://www.houstontx.gov/police/ois/2018.htm

[24]HOMICIDE DIVISION 2018 HPD OFFICER INVOLVED SHOOTING INCIDENTS" at November 14, 2018 available at  https://www.houstontx.gov/police/ois/2018.htm

[25] "HOMICIDE DIVISION 2018 HPD OFFICER INVOLVED SHOOTING INCIDENTS"  at September 8, 2018; July 23, 2018; and June 18, 2018 available at https://www.houstontx.gov/police/ois/2018.htm

[26] "HOMICIDE DIVISION 2018 HPD OFFICER INVOLVED SHOOTING INCIDENTS" at May 26, 2018 available at https://houstontx.gov/police/ois/inc_no/66457618.htm

8th, Officers Morales and Blankenship-Reeves went to the house in response to an anonymous 911 call. The caller claimed that her 24-year-old daughter was inside the home doing heroin with a woman named "Reggie."[27] This call was objectively false, and the caller, Patricia Garcia, later pleaded guilty to federal crimes. That night, both officers made no contact with anyone in the house and did not notice any dogs or observe any activity in the residence at all.[28]

Following that evening, Blankenship-Reeves passed on a note she prepared about the call to fellow Lieutenant Marsha Todd – Blankenship-Reeves's significant other.[29] Todd then passed this tip to Officer Gerald Goines – a member of HPD's Narcotics Squad 15. Specifically, she told him she "[n]eed[ed] a favor" for a "case worked on a house," and she knew he would "do it right."[30] She then wrote "Heroin."[31]

For Goines and Squad 15, the timing of this tip was a lucky break – it gave them an opportunity to have a "picture day" in full uniforms prior to the departure of Officer Gallegos, who planned transfer to SWAT the next week.[32] By January 28, Goines had lied to secure the no-knock warrant to raid the home of unsuspecting Nicholas and Tuttle later that evening.[33] As explained in greater detail in Response to the City's Motion for Summary Judgment regarding the warrant claims, Goines committed perjury by concocting a false story that a CI had gotten drugs from

---

[27] See Pls.' Ex. J (Morales Ex. 15) at COH00005692 (Morales's 3/18/2019 IAD statement).
[28] See Pls.' Ex. J (Morales Dep.) at 10:16 – 11:7, 23:4-18; Pls.' Ex. I (Blankenship-Reeves Dep.) at 26:21 - 29:12
[29] See Pls.' Ex. I (Blankenship-Reeves Dep.) at 146:7 – 149:1.
[30] Pls.' Ex. 25, Text Message; Ex. AE (Todd Dep.) at 55:7-23, 69:23 – 70:15 ("Q. Okay. And then on January the 11th you texted to Gerald Goines and you said: Need a favor. I need a case worked on a house, and I know you will do it right. Period. Heroin. Period. Were those your words? A. Yes.").
[31] Id.
[32] See Pls.' Ex. 171 (Reyna Ex. 171) at COH00038514 (Reyna 2/5/2019 SIU interview).
[33] See Pls.' Ex. 31 (French Ex. 31); Ex. G (French Dep.) at 14:12 – 15:12 (authenticating warrant).

Tuttle. In other words, the warrant was based solely on lying under oath.

**3.  The approach to the house for HPD's unlawful armed home invasion**

As 5:00 PM approached on January 28th, Squad 15 drove to 7815 Harding in their van. None of the members of Squad 15 had body worn cameras ("BWC"). And while the officers in the perimeter – Nicole Blankinship-Reeves, Richard Morales, Samuel Garza, Valeriano Rios, and Yvette Ortiz – all had BWCs, they failed to activate their BWC as they exited their vehicles, as required by HPD policy.[34] Instead, Morales activated his BWC as Squad 15 made entry into the house – this is the first audio of the approach.[35] Rios activated his BWC after he took cover behind a truck.[36] Blankinship, Garza, and Ortiz activated their BWCs after the shooting had ended.[37] Ultimately, HPD determined that these five officers violated HPD policy by failing to properly and timely activate their BWCs.[38]

While incomplete, the available footage paints a disgusting and tragic picture. As Squad 15 approaches 7815 Harding Street, they assemble a "stack" of Medina, Lovings, Bryant, Salazar, Pardo, Sepolio, Ashraf, Gallegos, Reyna, Goines, and Wood.[39] As Morales activates his BWC, a loud bang echoes – either the first gun shot or the breaching of the door.[40,41] Medina forces his way into the house first, followed by Lovings, Salazar, and Pardo – all four with guns out.

Within the next eight seconds, Medina fires his shotgun at the family dog.[42] Lovings also

---

[34] The BWC at HPD has a two-minute buffer of video only. Meaning, once Morales and Rios turned on their BWC, the video buffered the prior two minutes without sound.

[35] Pls.' Ex. AC, "Ranger Sync of BWC" at the 27 second mark of the video; *see also* Pls.' Ex. 29, at Bates No. COH00005476-COH00005477

[36] *Id.* at the 43 second mark of the video; *see also* Pls.' Ex. 29, at Bates No. COH00005476-COH00005477

[37] Pls.' Ex. 29, at Bates No. COH00005476-COH00005477

[38] *Id.*

[39] Pls. Ex. AK Ranger PowerPoint at pg. 24.

[40] Pls. Ex. AC, Ranger Sync of BWC at the 0:27 of the video. .

[41] Wolf has opined that this must be a gunshot. Exhibit AK at pg. 43.

[42] Pls. Ex. N (Dep. of Medina) at 45:18-22; see also Ex. AC.

shoots at the dog at least twice.[43] Without hearing the sound of another gunshot,[44] Medina is then

hit by a bullet or bullet fragment from Lovings.[45] As Rios runs to take cover behind a blue truck

in front of the house, he turns his BWC toward the front of the house. This view shows Felipe

Gallegos standing to the back left of the door – as shown circled in red.[46] The Texas Rangers'

report also admits Gallegos's positioning.[47]



In the next 4-5 seconds, ten to twelve shots are fired – Salazar and Lovings fire most, if not all, of

those shots.[48] Specifically, Salazar testified that he fired eight to ten shots before he fell outside of

the house.[49] Lovings also fired at least nine times during the attack.[50]  And undisputedly, these

---

[43] Pls. Ex. 165, Lovings Homicide statement

[44] Pls. Ex. N (Dep. of Medina) at 46:5-6

[45] Pls. Ex. A-1 at pg. 33 of 52("Officer Medina was shot in back of his right shoulder that travelled transversely and impacted the paraspinal muscle. Multiple small metallic bullet fragments consistent with . . . a fragmenting .223. are noted in the wound track.").  Only Lovings had shot a .223 at that point.

[46] Exhibit AC,  BWC at 0:30-0:35.

[47] Exhibit AC,  BWC at 0:30-0:35; *see also* Exhibit AK, PowerPoint provided by Ranger Wolf. Ranger Wolf specifically identified Gallegos at pg. 50.

[48] Pls.' Ex. AC – BWC Sync from 0:35- 0:39.

[49] Pls.' Ex. H (Dep. of Salazar) 70:22-71:10.

[50] Pls.' Ex AF (Dep. of Wolf) at 115:18-116:8.

shots occurred before Lovings fell from a gunshot to the neck.[51]

In the middle of that sequence – approximately six seconds after Rios begins to retreat to the truck – Sepolio pulls Medina outside of the house and reaches the street. [52]



Based on their location, Sepolio grabbed and carried Medina from the house at or near the time of the series of shots by Salazar and Lovings.[53] As Rios reaches the truck, he briefly lifts his BWC toward the front of the house.[54] In this short snippet, Medina and Sepolio are behind the van, and a short sleeved, tattooed Gallegos[55] stands to the far left and away from the house.

---

[51] Pls.' Ex. AF (Dep. of Wolf) at 116:9-23.
[52] Pls.' Ex. AC – BWC Sync from 0:40 (in the top right corner video); see also Exhibit AK, Ranger Wolf's findings confirming that this is Sepolio and Medina.
[53] *Id*.; In addition, this is further corroborated by the statements of Sepolio, Lovings, and Medina. While Medina does not recall when exactly in the sequence Sepolio grabbed him, he does not report exiting past any fallen officers. Pls. Ex. 131 (Medina Ex. 131) (3/27/2019 Medina IA interview). To the contrary, he recalled walking past the stack on his way out. Id. Similarly, Sepolio has confirmed that he does not recall observing Lovings down until after returning from escorting Medina to safety, when he noted Lovings already pulled away from the house and in the yard. *see also* Ex. 105 (1/29/2019 Sepolio SIU Statement) (confirming that he noticed Goines and Lovings down in the yard for the first time upon returning to the house from escorting Medina). Lovings likewise does not recall seeing Medina make an exit while he was laying incapacitated in the doorway to the home. Pls.' Ex. AG (Lovings Dep. Vol 1) at 34:13 – 20.
[54] Pls.' Ex. AC – BWC Sync from 0:43.
[55] This particular individual is Gallegos based on (1) his short sleeves, which Lt. Wolf previously used to identify him (based on his rifle and short sleeve shirt) and is seen in the group photo that day, only Gallegos, Goines, and Bryan wore short sleeves Pls. Ex. 167; (2) his mask matches the mask that Gallegos was wearing that night; see Pls. Ex 99; (3) the photo appears to



During this time, the BWC captures four to five more shots.[56] Again, these shots are consistent with firing by Lovings and Salazar. At that same timestamp, Gallegos starts to move forward from his outside location towards the house, with Medina already outside the home.[57]  In the following seconds, glass breaks and an someone – likely Lovings – screams in pain.[58]

**4.  <u>Gallegos murders Nicholas and lies to justify his homicide.</u>**

For the remaining portion of the attack, the BWC does not capture a visual of the house, and instead merely provides audio of screams and gunshots. But the available evidence still reveals the sequence of events. After Gallegos hears the "gunfire exchange going on inside the residence,"[59] – the shots fired by Lovings and Salazar – Gallegos moves to the "right of the front porch."[60] He then sees "Officer Salazar and Officer Pardo fall backwards off the front porch."[61]

---

show tattoos consistent with Gallego and is consistent with his build and skin tone; and (4) it is logically consistent with his prior position to the left of the house.
[56] Pls.' Ex. AC – BWC Sync from 0:41-0:46.
[57] Pls.' Ex. AC – BWC Sync from 0:46.
[58] Pls.' Ex. AC – BWC Sync from 0:47-0:49.
[59] Pls. Ex. F (Dep. of Gallegos) at 99:10-16.
[60] Pls. Ex. F (Dep. of Gallegos) 96:20-97:3.
[61] Pls. Ex. F (Dep. of Gallegos) at 99:12-17.

Per Gallegos, Lovings then drops in the doorway.[62]

At that moment – after the series of shots by Salazar and Lovings, after Pardo and Salazar fell, and after Lovings was shot – Gallegos finally sees inside the house.[63]  At that point, he spots Ms. Nicholas and shoots her without warning.[64]   To justify this homicide, Gallegos swore he saw Nicholas "grabbing with both hands tugging at the shotgun" and "standing over Officer Medina tugging at his shotgun that is slung to his vest saying, Motherf****r, motherf****r."[65]  According to him, Nicholas was not "exactly squared up with" him, but "at an angle."[66]  He admits that he shot her in the "upper torso area"; but he "can't . . . pinpoint exactly where they hit, but [he] saw [his] rounds actively hit her."[67]  He further could not even identify whether the bullets struck her left side or right side.[68]  But this version from Gallegos flags two incredible inconsistencies – (1) where was Medina at the time that Gallegos shot Nicholas and (2) how did Nicholas sustain a fatal bullet wound to her right side of her body?

The answer to the first question is easy – Medina and Sepolio were already outside of the house on the street by the van. Officer Gallegos lied about Medina's location and Nicholas grabbing the gun to justify the murder.

Forensic evidence answers the second question. As confirmed by NCIS forensic investigator Maloney, Nicholas died on the north side of the couch, not in the area where Medina was located. [69] This is important because at the time of her death, Nicholas was found with her

---

[62] Pls. Ex. F (Dep. of Gallegos) at 100:23-101:1.
[63] Pls. Ex. F (Dep. of Gallegos) at 102:10-25.
[64] Pls. Ex. F (Dep. of Gallegos) at 108:3-11; 109:7-19,
[65] Pls. Ex. F (Dep. of Gallegos) at 102:10-25; 105:25-106:3.
[66] Pls. Ex. F (Dep. of Gallegos) at 107:24-108:2.
[67] Pls. Ex. F (Dep. of Gallegos) at 108:12-21.
[68] Pls. Ex. F (Dep. of Gallegos) 180:16-19.
[69] Pls.' Ex. A-1, Declaration and Report of Maloney at pg. 31 of 52 ("Rhogena Nicholas was not over the body of Officer Medina, as reported by several officers, where he had collapsed on the

chest and head on the couch and her legs on the floor, and a pillow covering part of her right arm and face.[70] She sustained at least two gunshot wounds, including wounds to her right chest and right thigh.[71] The forensic pathologist for the Harris County Institute of Forensic Sciences who completed the autopsy of Ms. Nicholas confirmed the fatal shot was the one that entered through her right torso, which blew through all four chambers of her heart.[72]  This injury caused Ms. Nicholas's death mere seconds after she was hit.[73]  The entrance wound on the right side of her body eliminates the possibility that Gallegos could have shot Nicholas while she was standing over Medina because the right side of her body would have been facing an opposite angle from Gallegos.  Indeed, Maloney has testified "were she over [Medina] attempting to gain control of his shotgun she could not have been shot on her right side as her left side would have been exposed to Gallegos shooting position."[74] Furthermore, Maloney determined: (a) Nicholas was seated or getting up from the couch when she was shot; (b) she was on the far side from the door; (c) there was an obstruction (coffee table) for injured police officer to have walked around to be on the couch near her; (d) bloodstains on the couch by the door indicate the location of a second person, most likely the bleeding officer; and (e) Nicholas was not next to the policeman or reaching over his body for the shotgun when she was shot.[75] In other words, Gallegos shot and killed Nicholas, while she sat on the north end of the couch. And he did with Medina outside the home.

5.  **Gallegos murders Tuttle by shooting him in the back of the head and lies about what happened to justify his homicide**

---

couch. She was physically removed by at least 8 feet from his location. Additionally were she over him attempting to gain control of his shotgun she could not have been shot on her right side as her left side would have been exposed to Gallegos shooting position.")

[70] *Id.*

[71] Pls. Ex.51 (autopsy report for Rhogena Nicholas).

[72] Pls.' Ex. AH (Benyon Dep.) at 74:14 – 78:4.

[73] Pls.' Ex. AH (Benyon Dep.) at 74:14 – 78:4.

[74] Pls.'  Ex. A-1, Declaration and Report of Maloney at pg. 31 of 52

[75] Id. at A-1, Declaration and Report of Maloney at pg. 30 of 52

As Gallegos intentionally and knowingly shoots the unarmed Nicholas, the fatal bullet grazes Tuttle who had approached the front of the house.[76] Gallegos then shoots into the side of the house. He then circles to the tree in front of the door.[77] In the next flurry of shots from Gallegos, Reyna is hit with bullet fragments and Goines is hit in the face. Both of those shots came from a .223 – meaning, Gallegos, the only officer shooting at .223 during this period, shot Reyna and Goines.

During the attack, Tuttle sustained nine total bullet wounds. First, "[h]e received shots to both his shoulder and a grazing wound to his right forearm.."[78] Following that, Mr. Tuttle "began to turn away from the door," but "[a]s he turned he received shots to both arms and hands."[79] As confirmed by Maloney and Dr. Bux – a forensic pathologist – "[a]t this point he was incapable of holding a weapon."[80] Maloney and Dr. Bux's opinions are supported by photographs of Tuttle's wounds taken at the scene and at the morgue.  While graphic, these photos further make it clear – Tuttle could not have held a gun.



[81]

---

[76] A-1, Declaration and Report of Maloney at pg. 31 of 52 ("The fatal shot to her torso first grazed the arm of Dennis Tuttle")

[77] Pls. Ex. AK, Final Presentation by the Rangers at pg. 40 ("05:28:32 Gallegos is seen taking cover behind a tree in the front yard (CH2)(Officer is in black short sleeve shirt), and Sgt. Reyna or Sgt. Wood is heard yelling "I'm hit".)

[78] A-1, Declaration and Report of Maloney at pg. 32 of 52

[79] *Id.*

[80] *Id.*

[81] Pts. Ex. 54, 56, and 57

In addition the five bullets that ripped through his body and his pre-existing right wrist injury (and wrist brace), the AR-15 shots caused catastrophic damage to his wrist.[82] The bullet ripped apart bones, tendons, ligaments, and muscle in his dominant, right wrist.[83] Combined with that, Tuttle's left arm and hand sustained gruesome, catastrophic injuries.[84] It is simply inconceivable that anyone with injuries like Tuttle's could grasp, hold, lift, raise, aim, and or fire a pistol at anyone. At a minimum, there is genuine factual evidence that Tuttle could not.

Disabled from his wounds, Tuttle then had "his back to the door[] and [is] . . . drop[ping] to the floor."[85] In the next 10-20 seconds, Lovings, who is still near the doorway, tells Gallegos he "need[s] to take a head shot."[86] And at the top of his lungs, Gallegos yells "shut the f**k up," and shoots  Tuttle in the buttocks/thigh.[87] "A single bullet passes between his legs as he approaches a parallel position to the floor, grazes his chest and enters his chin."[88] A full twenty seconds later, as the unarmed Tuttle puts his body weigh on "his upper body by his elbows,"[89] Gallegos fatally shoots Tuttle "in the back of his head/neck."[90] Gallegos screams "stop moving" after that shot.[91] Tuttle then "collapses to the floor partially on his right side and remains in that position."[92]

---

[82] Pts. Ex. Ex. 57

[83] *Id.*

[84] Pts. Ex. Ex. 54, Pts. Ex. 57; Pls. Ex. 56

[85] *Id.*

[86] Pls. Ex. AG, deposition of Lovings Vol. 1 at 72:23-73:7

[87] Pls.' Ex. AC – BWC Sync from 1:20- -1:23; *See also* Pls. Ex. A-1, Declaration and Report of Maloney at pg. 32; Pls. Ex. F (Dep. of Gallegos) at 144:13-14 (confirming that Gallegos said "shut the f**k up")

[88] Pls. Ex. A-1, Declaration and Report of Maloney at pg. 32

[89] Id.

[90] Pls.' Ex. AC – BWC Sync from 01:46- 01:48 (stop moving yelled); Pls. Ex. F (Dep. of Gallegos) at 144:16-17 (confirming that Gallegos said "stop moving")

[91] Pls. Ex. A-1, Declaration and Report of Maloney at pg. 32; Pls. Ex. F (Dep. of Gallegos) at pg. 139-140.

[92] *Id.*



Tuttle's gun is later found under a heater.[94] Put simply, Gallegos murdered Tuttle when he was unarmed – at that point, he was incapable of holding a gun – by shooting him in the back of the head.

6. **Squad 15's evolving version of the armed home invasion and shooting at 7815 Harding Street**

Following the unlawful home invasion, HPD's policy – indeed, the policy that encourages excessive force – entitled the Squad to special investigative treatment. Combined with this review of evidence, many of the officers then reported "tunnel vision" during the events.[95] Medina – a key potential witness to the shooting of Nicholas – even claimed he was knocked unconscious during the home invasion.[96] But strangely, even though they were each entitled to review prior statements and evidence, the officer's statements still included changes in their sworn testimony that contradict their prior sworn statements. For this motion, Plaintiff have flagged five important testimony changes.

- Sworn testimony change #1: In his sworn IAD interview, Gallegos testified that Ms. Nicholas did not "actually **lay her hands on the weapon**."[97] At his deposition: Gallegos now testified he saw Nicholas "pulling at" the shotgun and touching "the

---

[93] Pls. Ex. A-1, Declaration and Report of Maloney at pg. 21 of 52.
[94] Id. at pg. 24.
[95] Pls. Ex. H (Salazar Dep.) at 77:18-21; Pls. Ex. N (Medina Dep.) at 48:17-20; Pls. Ex. 125 at pg. 2 (Wood Walkthrough statement).
[96] Pls. Ex. N (Medina Dep.) at 74:7-13.
[97] Pls. Ex. 92 at Page 24.

weapon itself."[98] No fingerprints were taken of the gun.[99]

- Sworn testimony change #2 – In his sworn statement to homicide, Lovings testified that "as soon as I entered the house, I saw a female to the left of us."[100] Yet, in his deposition, Lovings testified that he never saw Nicholas that day.[101]

- Sworn testimony change #3 – Pardo testified that when he approached the door to grab Lovings, he saw Tuttle sitting down, with a gun in his right hand.[102] At his deposition, he testified that the gun, he believed, was in his "left hand."[103]

- Sworn testimony change #4: Lovings testified that after he saw Nicholas in the house, "Officer Medina moved toward her." Yet, in his deposition, Lovings testified that he "never saw . . . Officer Medina."[104]

- Sworn testimony change #5 – In his second homicide statement, Officer Gallegos testified that after he shot Nicholas, he "observed the suspect **fall onto the couch** towards the west wall." Yet in his deposition, Gallegos backtracked and claimed he saw her "turn and fall **towards** the couch," but he "lost visual because [he] sunk back in behind the wall."[105]

In addition to shifting testimony, the officers also could not get their stories straight with each other – even when under oath. For example, Lovings – and only Lovings – testified that the first shot was by Dennis Tuttle. Yet, Medina testified that the first shot was to his right – logically, Lovings.[106] Salazar also confirmed that Lovings shot the dog first,[107] while Pardo testified generally that "police officers" fired first.[108] And Gallegos and Sepolio testified that they first heard a shotgun – meaning Medina took the first shot.[109]

---

[98] Pls. Ex. F (Dep. of Gallegos) at pg. 102:20-103:7.
[99] Pls. Ex. B-1 Declaration and Report of Scott at pg. 38.
[100] Pls. Ex. 165 Lovings Homicide Statement.
[101] Pls. Ex. AG (Dep. of Lovings Vol I. ) at 31:5-32:14.
[102] Pls. Ex. 158 at pg. 38 (Pardo SIU statement)
[103] Pls. Ex. AL  (Dep. of Pardo) at 66:15-67:13.
[104] Pls .Ex. AG (Dep. Lovings Vol 1) at 33:24-24:2.
[105] Pls. Ex. F (Dep. of Gallegos) pg. 110.
[106] Pls. Ex. N (Dep.  of Medina) at pg. 45.
[107] Pls. Ex. 145, Salazar homicide statement.
[108] Pls. Ex. AL (Dep.  of Pardo) at 39:7-11.
[109] Pls. Ex. F (Dep. of Gallegos) at 93:15-17; Pls. Ex.AM (Dep. of  Sepolio) at pg. 68.

Furthermore, the physical evidence also contradicts the officers' testimony. For example, according to Squad 15 officers, Tuttle shot at least 11-13 times during the raid. The only problem? Based on the evaluation of his revolver and the scene, Tuttle shot either three times or four times at most.[110] Expanding on that, at the outset of the shooting, Salazar testified that Tuttle shot at Medina 3-4 times.[111] Following those shots, Sepolio testified, as he was grabbing Medina, he "believe[d]" Tuttle shot "multiple times" at him – meaning, at least two additional shots.[112] Lovings is then shot by Tuttle.[113] After Lovings hits the ground, Gallegos hears "more than one shot" from Tuttle inside the house – meaning at least two more shots.[114] Gallegos then sees Tuttle "shoot" Reyna and Goines from inside the house[115] –another two shots. And finally, according to Pardo, Tuttle actually fired multiple times at Reyna, not just one – meaning at least an additional shot.[116] This testimony is inconsistent, contradictory of the evidence, and not credible.

Finally, the physical evidence also contradicts the story spun by Gallegos regarding his fatal shots of Nicholas and Tuttle. First, while Gallegos claims that Nicholas was over Medina, (1) the bullet trajectory analysis by Maloney places her on the south couch;[117] (2) the BWC showing that Medina was not in the house;[118] and (3) Dr. Bux testimony that the wound would have completely incapacitated her in the spot she was found.[119] Similarly, while Gallegos claims that

---

[110] Pls. Ex. A-1, Declaration and Report of Maloney; Lt. Pls. Ex. AK at pg. 88 ("4 fired cartridge cases recovered from Tuttle's pistol")
[111] Pls. Ex. H (Dep. of Salazar) at 50:11-50:24.
[112] Pls. Ex. AM (Dep. of Sepolio) at 83:7-16.
[113] Pls. Ex. AK.
[114] Pls. Ex. F (Dep. of Gallegos) at 111:17-18.
[115] Pls. Ex. F (Dep. of Gallegos) at pg. 209 and 118:1-14.
[116] Pls.' Ex. 156;  Pls. Ex. AL (Dep. of Pardo) at 59:18-60:2 (Pardo testified Tuttle shot multiple times, but cannot recall if it was three times)
[117] Pls.' Ex. A-1, Declaration and Report of Maloney at pg. 31 of 52.
[118] Pls.' Ex. AC – BWC Sync from 0:40 (in the top right corner video); see also Exhibit AK, Ranger Wolf's findings confirming that this is Sepolio and Medina.
[119] Pls. Ex. C-1.

Tuttle raised a gun at him prior to the fatal shots of Tuttle, (1) the bullet trajectory shows Tuttle was struck in the back of the head – not facing Gallegos[120] – and (2) the testimony of Dr. Bux, that, "[a]t this point he was incapable of holding a weapon."[121]

### 7.  Consistent with its policy and custom of turning a blind eye, HPD's Internal Affairs ignores critical evidence and inaccurate statement and instead exonerate the officers

Despite these incredible contradictions and holes in the evidence, HPD and Chief Art Acevedo cleared the officers of excessive force. Why? Because this is exactly the result that HPD had designed its system to reach.

IAD provided 48-hour notice to the officers. As part of that, IAD provided review of important evidence and testimony prior to any statements.[122] Even with these advantages, HPD prohibited IAD from reviewing an officer's disciplinary history – notably here, from 2011 to 2019, Gallegos had been previously reviewed for six use of force charges, including three prior shootings and three use of force claims.[123] Undisputedly, this process dramatically differed from the investigation of citizens.[124]

Even knowing this background, IAD took virtually no steps to determine if the officers were fabricating their stories – a shocking investigative tactic in light of the serious contradictions with their own testimony and physical evidence.[125] Commander Nguyen, the investigative officer, could not even remember receiving any training to prevent "fabrication or distortion of testimony in an interrogation,"[126] much less ever making a finding in his time at IAD that an officer was

---

[120] Ex. A-1, Declaration and Report of Maloney at pg. 32 of 52 ("on the floor he raises his upper body by his elbows and is fatally shot in the back of his head/neck by Officer Gallegos.")
[121] Pls. Ex. C-1.
[122] Pls. Ex. AD (Dep. of Nguyen) at pg. 44-46.
[123] Pls. Ex. 87; Pls. Ex. F (Dep. of Gallegos) at pg. 24-26.
[124] Pls. Ex. AD (Dep. of Nguyen) at 51:7-15.
[125] Pls. Ex. AD (Dep. of Nguyen) at 52 -56.
[126] Pls. Ex. AD (Dep. of Nguyen) 55:21-56:6.

untruthful.[127] Even more telling, he could also not even identify a single time from 2017 to 2019 where IAD sustained an officer-involved shooting allegation.[128]  In all, Nguyen could not even confirm that it would be dangerous for a police department to authorize a "culture of turning a blind eye to excessive force."

> 60
> 12   Uh, certainly, you agree it would be a
> 13   problem if a police department had a history of hiding or
> 14   avoiding finding a officer-involved shooting to be a
> 15   violation of policy?
> 17       THE WITNESS:  Well, it depends on what
> 18   department and where we're talking about and how many
> 19   officer-involved shootings they have been involved in.
> . . .
> 62
> 4   Q.   (BY MR. AVERY) Do you agree that it would be
> 5   dangerous if there was a culture of turning a blind eye to
> 6   excessive force in a police department?
> 8       THE WITNESS:  That is a very reasonable
> 9   statement, but like I said, it depends on the situation
> 10   and what department you're talking about and what's going
> 11   on.[129]

Why could Commander Nguyen not answer such an easy question? Because HPD had created that exact culture.

Ultimately, Nguyen found the shooting in this case justified, and Art Acevedo approved this finding.  To reach this conclusion, Ngueyn exclusively relied on the officers' statements.[130] And while Nguyen testified that "any contradictory statements should be addressed and looked . . . into," the investigation never weighed or addressed any contradictory statements.[131]  Because of this failure, Nguyen, as part of the investigation, never addressed the contradictions including, (1)

---

[127] Pls. Ex. AD (Dep. of Nguyen) at 56-57.
[128] Pls. Ex. AD (Dep. of Nguyen) at 58:8-15.
[129] Pls. Ex. AD (Dep. of Nguyen).
[130] Pls. Ex. AD (Dep. of Nguyen) at  85:13-18; 86:4-8.
[131] Pls. Ex. AD (Dep. of Nguyen) at  34:10-18.

who shot first; (2) whether Medina was even in the house; (3) whether Nicholas was anywhere near Gallegos claimed; or (4) whether Tuttle was capable of holding a gun.[132] Nguyen, instead, ignored the contradictions, ignored the possibility of fabrication, and simply cleared the officers because of their unsupported claims.

The allegations in this lawsuit about the disciplinary process at HPD were not a surprise to HPD. Rather, in a different case, *Baker v. Castro*, the plaintiff also made this argument in 2018 – prior to the Harding Street shooting. The City and its policy makers knew that Baker had made these allegations. But as opposed to addressing this policy and ensuring that its supervisor did not encourage excessive force, HPD did nothing. Commander Nguyen testified that he had never even heard an allegation about this type of disciplinary process.[133] Likewise, Nguyen could not recall any effort or training to address any potential custom of turning a blind eye of excessive force.[134] This culture not only existed, but HPD leadership fostered it and refused to take any steps to prevent it.

Squad 15 was aware of this faulty process and HPD's culture of encouraging excessive. By example, when Gerald Goines was asked about this precise culture or encouragement, his answer? "On the advice of counsel, I invoke my Fifth Amendment privilege against self-incrimination."

```
                    31
1   Q   (By Mr. Doyle)  And you knew you could get
2   away with it yet again, as a result of the years of
3   similar misconduct/cover-up of excessive use of force
4   approved and committed by the Houston Police
5   Department's pattern and practice?
7       A   On the advice of counsel, I invoke my Fifth
8   Amendment privilege against self-incrimination and
9   respectfully decline to answer.
. . .
```

---

[132] See generally Pls. Ex. 29.
[133] Pls. Ex. AD (Dep. of Nguyen) at  pg. 61-63.
[134] *Id.*

                                    32
19    Q    (By Mr. Doyle)  You were aware, from your
20    prior experience with the Houston Police Department,
21    that there would be no attempt to compare the physical
22    evidence at the scene with the statements of yourself
23    and other officers, enabling you to lie and cover up
24    excessive use of force against Dennis Tuttle and
25    Rhogena Nicholas?
                                    33
2     A    On the advice of counsel, I invoke my Fifth
3     Amendment privilege against self-incrimination and
4     respectfully decline to answer.[135]

This is because officers knew that HPD would authorize this type of conduct.

Ultimately, police practices expert, Andy Scott, confirmed that "[b]ased on the lack of supervision and disciplinary action identified above, Gallegos and Squad 15 knew that their use of excessive deadly force would be met with tacit approval by supervisors, the Chief of Police."[136] In particular, "[t]his failure encouraged Gallegos and Squad 15 to continue their unlawful conduct, including the use of excessive deadly force."[137]

## 8.  The Ranger investigation utilizes the same flawed pattern of HPD and ignores Gallegos's testimony regarding the sequence of events entirely.

Following IAD's investigation, the Texas Rangers also investigated the officer involved shooting at the request of the Harris County District Attorney. But just like Nguyen, Lt. Wolf, the assigned investigator, simply assumed that the officers' statements were accurate. Wolf testified that the there was "no evidence" that the officers "were lying."[138]

Ignoring the incredible inconsistencies identified above, Wolf then created an impossible and illogical sequence of events. But in making this sequence, Wolf – likely because he realized

---

[135] Pls. Ex. X (Dep. of Goines)
[136] Pls. Ex. B-1 Report and Declaration of Scott at pg. 45.
[137] Pls. Ex. B-1 Report and Declaration of Scott at pg. 45.
[138] Pls. Ex. AF (Dep. of Wolf) 81:24-82:6.

that Medina could not have been in the house when Gallegos claimed he was – completely re-ordered the timeline of events.[139] The problem? This directly contradicts Officer Gallegos's testimony, as well as the body camera footage. And if there is "no evidence" that the officers "were lying,"[140] how can Wolf determine that Gallegos shot Nicholas prior to Lovings' being shot and Salazar and Pardo's fall, when Gallegos – under oath three separate times – claimed he shot Nicholas after those events?

To reach this conclusion, Wolf creates  a story whole cloth. First, Salazar, Pardo, and Lovings all clear the door after Medina is hit – an alleged finding that is not supported or even claimed by any officer. It is also inconsistent with Sepolio's testimony that he had to "push" his way through "multiple people" and "squeezed into the crowd" to get to officer Medina on the couch.[141] Wolf continues by stating that Gallegos moves from the left side of the house to the right, sees Nicholas when the door clears and shoots her, while she is over Medina.[142] Sepolio, apparently immune to any bullets, then grabs Medina and makes it to the street in a few seconds.[143] Salazar, Pardo, and Lovings then return to their prior spots and continue shooting at Tuttle, and, in contradiction to Gallegos, then fall outside the door.[144]

This conclusion not only is physically illogical and contradicts every officer's statement, but it also contradicts the BWC and the physical evidence. Again, at the outset of the unlawful home invasion, after three shots, Gallegos stands to the left of the house. Seconds later, Medina is

---

[139] Pls. Ex. AK, PowerPoint by Ranger Wolf at pg. 53-54.
[140] Pls. Ex. AF (Dep. of Wolf) 81:24-82:6.
[141] Ex. AM (Dep. of Sepolio) at 76:15-77:7
[142] Pls. Ex. AK, PowerPoint by Ranger Wolf at pg. 54.
[143] *Id.*
[144] *Id.*

on the street.[145]  Yet Gallegos has moved further to the left and back – not to the right side of the house where he shoots Nicholas.[146]  Only after Medina is gone, Gallegos then moves to the right of the house.[147,148]This also explains how Tuttle's DNA is on the bullet that struck Nicholas. Meaning, after Lovings, Pardo, Salazar, and Medina are out of the house, Tuttle was able to move to the front door.  But under the Ranger's timeline? Four to six police officers stood at or near the doorway who would have prevented Tuttle from reaching the door.

The decision to re-order the sequence suggests Lt. Wolf reached these conclusions because he knew that Medina could not have been in the house when Gallegos claims he shot Nicholas. And as a result, Gallegos murdered Nicholas without any warning, much less any justification.

## 9. Key Disputed facts and missing evidence

Finally, because this case includes a large record and substantial evidence, there are many disputed issues of fact that preclude summary judgment. But for ease of reference, Plaintiffs have

---

[145] Exhibit AC,  BWC at 0:30-0:35; *see also* Exhibit AK, PowerPoint provided by Ranger Wolf. Ranger Wolf specifically identified Gallegos at pg. 50.

[146] Pls.' Ex. AC – BWC Sync from 0:43. Again, this particular individual is Gallegos based on (1) his short sleeves, which Lt. Wolf  previously used to identify him (based on his rifle and short sleeve shirt) and is seen in the group photo that day, only Gallegos, Goines, and Bryan wore short sleeves Pls. Ex. 167; (2) his mask matches the mask that Gallegos was wearing that night; see Pls. Ex 99; (3) the photo appears to show tattoos consistent with Gallego and is consistent with his build and skin tone; and (4) it is logically consistent with his prior position to the left of the house.

[147] *Id.*

[148] In addition, even if Officer Gallegos moved from the left side, as Lt. Wolf identified, to the right side from the 0:35 period on the video, the shooting already starts with Gallegos still at the left side of the house (at 0:35 seconds on the video) and not in a position to shoot. Within four seconds (at 0:39) Sepolio and Medina are already spotted out of the house past the tree and nearing the street.  There is simply was not sufficient time for the door to clear, Gallegos to move to the right side, Sepolio, Ashraf, Pardo, Lovings, Salazar to all magically clear the door, Gallegos to see Nichols over Medina, shoot her twice, and then Sepolio to "push" his way in and grab Medina and make it to out of the house nearing the street.  Likewise, Gallegos made it clear – he did not fire at this point, and only shot after Lovings, Salazar, and Pardo fell – which undisputedly had not yet occurred.

highlighted the following dispositive facts that are disputed:

- Tuttle shot Medina. This is disputed because Maloney has testified that Medina was shot with a .223 (meaning Lovings shot him);[149]

- Tuttle shot Goines. This is disputed because Maloney has testified that Goines was shot with a .223 (meaning Gallegos shot him)[150] and Lt. Wolf[151] confirmed that the bullet could not be matched based on its damage;

- Tuttle shot Reyna. This is disputed because Maloney has testified that Reyna was shot with a .223 (meaning Gallegos shot him), Lt. Wolf had no "scientific evidence" that Tuttle shot Reyna;[152]

- Nicholas was reaching for Medina's gun and posed a threat to the safety of Medina. This is contradicted by the BWC footage as explained above, Gallegos's testimony about the timeline, and Maloney's testimony that Nicholas was on the other side of the couch and hit in the other side of her body;[153]

- Nicholas was shot on the couch near where Medina had been located. Again, Maloney disputes this location;[154]

- Tuttle held a gun during the final two shots by Gallegos and posed a threat of safety to Gallegos. This is disputed by Dr. Bux and Maloney.[155]

Similarly, HPD also lost or failed to collect key evidence – evidence that could have

provided important context to this unlawful home invasion.  This includes:

- HPD refused to take fingerprints on Medina's shotgun, where Gallegos claimed she grabbed it;[156]

- HPD refused to take fingerprints on Loving's rifle, where Lovings claimed Tuttle grabbed it;

- Without consequence or even attempting to determine who was responsible, HPD admitted someone(s) logged onto Goines's computer at HPD's own headquarters, while he was in the hospital, which points to invokes the likelihood of serious concerns about altering or deleting highly relevant evidence. HPD never even determined or attempted to determine who did that or recovery what might be altered or deleted;[157]

---

[149] Pls. Ex. A-1,  Declaration of Maloney at pg. 33.
[150] Pls. Ex. A-1, Declaration of Maloney at pg. 34.
[151] Pls. Ex. AF (Dep. of Wolf) at pg.259.
[152] Pls. Ex. AF (Dep. of Wolf)  at 274:7-8;
[153] Pls. Ex. A-1, Declaration of Maloney at pg. 31.
[154] Id.
[155] Pls. Ex. A-1, Declaration of Maloney at pg. 32; Pls. Ex. C-1.
[156] Pls. Ex. B-1, Scott Declaration
[157] Pls. Ex. 32  at pg. 44 of the report.

- HPD refused to chart the "magazine associated with Lovings rifle" – meaning there is an "unknown number of remaining cartridges in Lovings rifle," and an "unknown brand of cartridges being fired through the magazine."[158]

- There is no evidence that HPD measured and weighed the bullet that struck Lovings with the bullet that struck Goines – as recommended by Lt. Wolf to determine if the bullet that struck Goines was consistent with Tuttle's weapon;[159] and

- HPD Officers, in violation of HPD policy, failed to activate their BWC during the raid.[160] And Chief Art Acevedo ordered the perimeter officers to turn their body cameras off while still on the scene as he was questioning officers at the scene.[161]

- HPD refused to test DNA from Medina against blood stain on the Couch on the south side of the building;[162]

- HPD refused to collect and test bloodstain with Nicholas on the couch near the location on the north side, where she was shot;[163]

- HPD refused to collect and test bloodstain on the front doorframe/wall and on the floor by the door, which could have established of Tuttle ever went beyond the front door or who was shot and where, in the vicinity of the door;[164]

- HPD refused to locate or review the bullet "recovered from the couch cushion" which was a .223 and contained both Rhogena Nicholas and Dennis Tuttles' DNA indicating the bullet struck both victims.  According to Michael Maloney, this was the fatal bullet that struck Nicholas, recovered directly behind her body on the couch.[165]

- HPD failed to conduct a "shooting incident reconstruction"[166]

Stripped to its legal argument, Gallegos's summary judgment motion requires that the facts above must be undisputed. They are not. As a result, summary judgment must be denied.

### III.
### Gallegos violated the rights of Tuttle and Nicholas because he engaged in excessive deadly force

Under the Fourth Amendment, Nicholas and Tuttle had a constitutionally protected right

---

[158] Pls. Ex. AK at pg. 86 and 88
[159] Pls. Ex. AF (Dep. of Wolf) at 259:10-260:3.
[160] Pls.' Ex. 29, at Bates No. COH00005476-COH00005477
[161] Pls.' Ex. AR
[162] Pls. Ex. 1-A, Declaration of Maloney (At his attached report at Pg. 5 of 52).
[163] Id.
[164] Id.
[165] Pls. Ex. 1-A, Declaration of Maloney (At his attached report at Pg. 6 of 52).
[166] Pls. Ex. 1-A, Declaration of Maloney (At his attached report at Pg. 7 of 52).

to be free from unreasonable seizures, including excessive, deadly force.[167] To prove a deprivation

of that right, Nicholas and Tuttle "must show (1) an injury, (2) which resulted directly and only

from the use of force that was clearly excessive, and (3) the excessiveness of which was clearly

unreasonable."[168] Notably, excessive-force claims are "necessarily fact-intensive," so the Court

must "examine the totality of the circumstances to determine whether an officer's actions were

objectively unreasonable."[169]

The "reasonableness inquiry is an objective one."[170] And a Court must "look at the case

from the perspective of a reasonable officer on the scene, paying 'careful attention to the facts and

circumstances of each particular case.''[171] As part of this evaluation, the Fifth Circuit has held that

the excessive force inquiry includes whether the officer "was in danger at the moment of the threat

that resulted in the [officer's] shooting [of the victim]."[172] "So, the focus of the inquiry should be

on 'the act that led [the officer] to discharge his weapon[.]'"[173] For example, in denying summary

judgment regarding qualified immunity in a similar death case, Judge Lake recently explained as

follows:

> The particular circumstances factor into whether the officer acted reasonably in
> terms of the amount of force deployed. 'The objective reasonableness of the force
> . . . depends on the facts and circumstances of the particular case, such that the need
> for force determines how much force is constitutionally permissible." An officer
> may use deadly force if he "has probable cause to believe that the suspect poses a
> threat of serious physical harm, either to the officer or to others.'
>
> Reasonableness considerations regarding the need for and the amount of force
> necessary include: 1) whether the suspect was armed; 2) whether the suspect posed

---

[167] *Garza v. Briones*, 943 F.3d 740, 744-45 (5th Cir. 2019).
[168] *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009) (quoting *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir.2009)).
[169] *Rockwell v. Brown*, 664 F.3d 985, 991-992 (5th Cir. 2011).
[170] *Winzer v. Kaufman Cnty.*, 916 F.3d 464, 474 (5th Cir. 2019)
[171] *Escobar v. Montee*, 895 F.3d 387, 394 (5th Cir. 2018)
[172] *Id*. at 993.
[173] *Amador v. Vasquez*, 961 F.3d 721, 728 (5th Cir. 2020) (*quoting Manis*, 585 F.3d at 845).

an immediate threat to the safety of the officers or the public; 3) whether the suspect resisted arrest; 4) whether a warrant was employed and the severity of the crime for which the suspect was to be arrested; 5) whether more than one suspect or police officer was involved; and 6) whether other dangerous or exigent circumstances existed at the time of arrest. Reasonableness is judged from the perspective of a reasonable officer on the scene, not in hindsight. In judging an officer's actions, the court must recognize the difficulty of making split-second judgment calls under high pressure conditions and accord the officer appropriate latitude.[174]

The Fifth Circuit recently addressed an excessive force of a deadly shooting in *Crane v. City of Arlington*.[175] In that case, the plaintiff was driving his vehicle with two passengers and a child.[176] "While Crane was stopped at a traffic light at approximately 11:38 p.m., Officer Elsie Bowden pulled up behind him."[177] As the light turned green, Bowden allegedly "saw an object being tossed from the passenger's side."[178] Claiming that it may be "a crack pipe and called for backup; Roper responded."[179] Bowden pulled over Crane, but realized that the object that was thrown out of the car was simply a candy cane.[180] Rather than simply let Crane leave, she "ran a warrant check, which found that Crane had warrants for several misdemeanors and a possible felony probation violation."[181] After an argument about the warrants, "Roper put his arm around Crane's neck."[182] "The passengers contend that when Crane, with Roper's gun pointed at him, moved his hand to turn off the car in compliance with Roper's order, Roper shot him, his head fell backwards, the engine revved and the car lurched backward, striking Bowden—by now behind the

---

[174] *Estate of Baker v. Castro*, No. H-15-3495, 2018 U.S. Dist. LEXIS 170949 *20-21 (S.D. Tex. Aug. 31, 2018).
[175] *Crane v. City of Arlington*, 50 F.4th 453 (5th Cir. 2022).
[176] *Id.* at 459.
[177] *Id.*
[178] *Id.*
[179] *Id.*
[180] *Id.*
[181] *Id.*
[182] *Id.* at 160.

car—before moving forward and running over Bowden again and speeding off."[183] Ultimately, Roper had shot Crane four times, and he died.[184]

The family of Crane filed a 1983 lawsuit for excessive force. Roper moved for summary judgment based on qualified immunity. While the "district court acknowledged that [the passengers] presented different accounts of when the first shot occurred," it still "found that 'a reasonable jury could not believe [the passengers'] account of the shooting.'"[185] The Court dismissed the case based on qualified immunity. The family appealed.

On review, the Court reversed the District Court.  The Court first reviewed the use of force factors the Supreme Court established in *Graham v. Connor*.[186] These factors are: "the severity of the crime at issue, whether the suspect poses a threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest." And while "While all factors are relevant, the "threat-of-harm factor typically predominates the analysis when deadly force has been deployed.'"[187] Regarding this factor, the Court found it particularly persuasive that the plaintiff "was shot while unarmed with Roper's arm around his neck."[188] Combined with a that, "from his position, Roper could see if Crane was reaching for a gun, as could the other officers outside the vehicle, yet none of them—including Roper—reported a suspicion of a weapon."[189] Roper also asserted that the threat came from the car, but the Court found that this was a "question

---

[183] *Id.*
[184] *Id.*
[185] *Id.* at 461.
[186] *Id.* at 463 (citing *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)).
[187] *Id.* (citing *White v. Pauly*, 580 U.S. 73, 137 S. Ct. 548, 196 L. Ed. 2d 463 (2017) (per curiam)).
[188] *Id.*
[189] *Id.* at 464.

for the jury."[190] In reviewing this factor, the Court also weighed that the other officers had "deliberately, and rapidly, eschew lesser responses when such means are plainly available and obviously recommended by the situation."[191]

In reviewing the remaining to factors, the Court noted that they "do not weigh as heavily upon our analysis, they yet demand attention."[192] The Court explained that deadly force is not appropriate for an "unconfirmed felony probation violation warrant and multiple confirmed misdemeanor warrants."[193] And third, the Court found that "it was not reasonable for Roper to believe that Crane was attempting to flee or that any such attempt to do so posed a threat to life."[194] As a result, the Court reversed the trial court and remanded the case.

The Northern District of Mississippi in *Geiger v. Monroe County* addressed a similar issue no-knock warrant leading to excessive force.[195] In that case, officers killed the plaintiff during the service of a search warrant on his home in the early morning hours of October 28, 2015.[196] The plaintiff's family argued that the no-knock entry was a violation of the Fourth Amendment and that the officers engaged in excessive force In rejecting this at summary judgment, the Court explained "at least two specific genuine issues of material fact preclude summary judgment."[197] First, there was competing evidence as to whether Defendant ever "never announced who they were."[198] And "according to [the plaintiff's girlfriend], all of the shooting occurred after the door

---

[190] *Id.*
[191] *Id.*
[192] *Id.* at 465 (citing *Aguirre v. City of San Antonio*, 995 F.3d 395, 408 (5th Cir. 2021)).
[193] *Id.*
[194] *Id.*
[195] *Geiger v. Monroe County*, No. 1:16-CV-95-SA-DAS, 2018 U.S. Dist. LEXIS 101198 (N.D. Miss. June 18, 2018).
[196] *Id.* at *1.
[197] *Id.* at *18.
[198] *Id.*

was already closed."[199] Second, and maybe even more importantly, the Court flagged "different accounts that [the police officer] himself has given."  Specifically, the Court noted:

> In his statement of facts, Sloan reported that he saw Keeton with a gun in his hand firing in Deputy Mitchell's direction. In his deposition testimony, Sloan states that Keeton would have had to come out onto the porch in order for Sloan to see him. In addition to these factual disputes, there are differences between the other Deputies' accounts of the incident, and expert evidence and testimony regarding whether Keeton was shot directly or through the door. The fact finders' credibility assessment of these witnesses is crucial to the determination of whether a reasonable officer in Sloan's position could have reasonably believed that [*19] Keeton posed a threat of serious harm.[200]

The Fifth Circuit later affirmed this ruling.[201]

### A. Gallegos engaged in excessive force against Nicholas when he murdered the unarmed and non-dangerous Nicholas.

Following *Baker* and *Crane*, Gallegos's use of force was excessive against Nicholas under the *Graham* factors. First, regarding "the most important . . . factor in determining the objective reasonableness of an officer's use of force" – whether she posed "an immediate threat to the safety of the officers or others," at the time Gallegos shot her,[202] Gallegos can only point to a lie to justify his shooting: his claim that she posed a threat to Medina.  This factor "typically predominates the analysis when deadly force has been deployed."[203]

Importantly, by the time that Gallegos saw Nicholas, Medina was not in the house, and Nicholas sat on the far south end of the couch. The only threat that Gallegos has alleged?  The made-up story that Nicholas reached for Medina's gun. Specifically, Gallegos claimed his "only reason" for shooting Nicholas was "that if she could get ahold of his shotgun and shoot or finish

---

[199] *Id.*
[200] *Id.* at *18-*19.
[201] *Geiger v. Sloan*, 780 Fed. Appx. 150 (5th Cir. Aug. 8, 2019).
[202] *Graham*, 490 U.S. at 396;
[203] *Harmon v. City of Arlington*, 16 F.4th 1159, 1163 (5th Cir. 2021).

or kill Officer Medina, I had to stop that before it happened."[204] Yet besides this fabrication, Gallegos has not identified any legitimate sign of threat that Nicholas could have shown. In contrast, Nicholas was on the back of the couch and unarmed.[205] This is not a threat that can justify deadly force. Combined with that, just like *Crane*, here, "officers deliberately, and rapidly, eschew lesser responses when such means are plainly available and obviously recommended by the situation."[206] Specifically, Medina, the officer who confronted Nicholas, confirmed – he "didn't see the need for deadly force" based on the actions he saw.[207] Put simply, Gallegos's use of force was excessive.

Similarly, there is no evidence that Nicholas "was actively resisting or trying to evade arrest by flight."[208] Indeed, at best, Nicholas was in "shock" or "surprised."[209] As Officer Ashraf explained – "[t]hat's the typical reaction when we conduct a search warrant, shock."[210] At the initial interaction, Officer Medina made it clear – he "didn't see the need for deadly force."

> 104
> 19    Q. And let me ask it a little clearer. Based on
> 20    your evaluation how you responded, you did not see any
> 21    justification for using deadly force against Ms. Nicholas
> 22    while you saw her first until you lost consciousness?
> 23        A. I can attest that I didn't see the need for
> 24    deadly force from what I perceived of her behavior and
> 25    that's why I did not use deadly force.[211]

Furthermore, at the time Gallegos shot her – the pertinent time for this evaluation – there is absolutely no evidence that Nicholas was resisting or evading. As explained by the Fifth Circuit,

---

[204] Ex. F (Dep. of Gallegos) at 180:8-10.
[205] Pls. Ex. A-1 at pg. 31; Pls. Ex. AC – BWC.
[206] *Crane*, 50 F.4th at 464.
[207] Pls. Ex. (Dep. of Medina) at 104:19-25.
[208] *Id.*
[209] Pls. Ex. (Dep. of Ashraf) at 44:15-16.
[210] Pls. Ex. (Dep. of Ashraf) at a44:15-16.
[211] *Id.*

"officers must assess not only the need for force, but also 'the relationship between the need and the amount of force used."[212]  While, here, Nicholas was certainly screaming, that does not justify the use of deadly force. After all, she was the victim of an unlawful home invasion in which officers wrongfully broke down the door of her home and began shooting.

Third the "severity of the crime" factor also does not justify shooting Nicholas. The warrant was admittedly fraudulent.  Nicholas had not committed any crime. This factor strongly favors Nicholas. But regardless, even if the warrant was legitimate, drug related crimes do not justify shooting Nicholas. Instead, at the time that Gallegos shot her, (1) Gallegos gave her no warning,[213] (2) she was unarmed, (3) she was not threatening Medina,[214] and (4) she was shot through all four chambers of her heart.  As a result, "[a] jury could reasonably find that the degree of force the officers used was not justifiable under the circumstances."[215]  This favors Nicholas's claim.

In addition to the *Graham* factors, just like *Geiger*, serious credibility issues regarding the testimony of Gallegos and other officers "is crucial to the determination of whether a reasonable officer in [Gallegos's] position could have reasonably believed that [Nicholas] posed a threat of serious harm." [216] This includes:

- Gallegos's change in sworn testimony that Nicholas did not touch Medina's weapon to his new claim Nicholas grabbed the gun;[217]
- The inconsistency between Gallegos's testimony that he shot and killed Nicholas after Lovings, Pardo, and Salazar fell, in contrast to the Ranger's conclusions that it occurred prior to that; [218]

---

[212] Pls. Ex.  (Dep. of Medina)
[213] Pls. Ex. F (Dep. of Gallegos) at 108:3-11; 109:7-19,
[214] Ex. A-1. Moreover, Plaintiff has previously detailed that Medina was not in the house.
[215] *Crane*, 50 F.4th at 465.
[216] *Geiger,* No. 1:16-CV-95-SA-DAS, 2018 U.S. Dist. LEXIS 101198 at *18-*19.
[217] *Compare* Pls. Ex. 92 at Page 24 (Gallegos initial statement) *with* Pls. Ex. F (Dep. of Gallegos) at pg. 102:20-103:7.
[218] *Compare* Pls. Ex. AK, PowerPoint by Ranger Wolf at pg. 53-54 (stating Gallegos shot Nichols prior to Lovings, Salazar, and Pardo's fall) *with* Pls. Ex. F (Dep. of Gallegos) at 102:10-

- The video evidence showing Gallegos away from the door to the left of the house and not in his shooting position prior to Medina reaching the street;[219,220]

- Gallegos's inability to identify where the bullets struck Rhogena Nciholas and the inconsistency between his story and trajectory of the fatal bullet;[221] and

- The forensic evidence that Nicholas was struck and killed, while on the north side of the couch, not near Medina's prior location.[222]

Put simply, there are substantial factual contradictions that show Nicholas was unarmed and not threatening. Yet Gallegos shot and killed her.

Gallegos, in attempt to side-step this mountain of evidence, argues that based on Plaintiff's theory of the case, this shooting was not intentional. This misconstrues that testimony. Like all experts, Maloney has not and will not opine on the intent or state of mind of Gallegos. But Maloney did testify about the line of vision of Gallegos – specifically that he did not have a "good view" or "thorough view" of her at the time he pulled the trigger.[223]  This does not mean that Gallegos did not see Nicholas either as he shot her or prior to shooting her. Rather, Gallegos has repeatedly admitted that he intentionally shot Nicholas.[224] As a result, whether he had a "good view" or

---

25; (As soon as Lovings falls in the doorway I can actually finally see and gain access -- view into the residence from where I'm standing.  The very first thing I see is Officer Medina laying on the couch -- or not laying but sitting back on the couch, and I see Ms. Rhogena  Nicholas standing over Officer Medina tugging at his shotgun that is slung to his vest saying, Motherfucker, motherfucker.") and at 108:3-11; 109:7-19 (Gallegos shot Nicholas)

[219] Pls.' Ex. AC – BWC Sync from 0:43.

[220] The Fifth Circuit has placed particular emphasis on video evidence.  It explained: "although courts view evidence in the light most favorable to the nonmoving party, they give greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene." *Griggs v. Brewer*, 841 F.3d 308, 312 (5th Cir. 2016) (citing *Carnaby v. City of Hous.*, 636 F.3d 183, 187 (5th Cir. 2011).

[221] *Compare* Pls. Ex. A-1, Declaration of Maloney explaining "were she over him attempting to gain control of his shotgun she could not have been shot on her right side as her left side would have been exposed to Gallegos shooting position" *with* Pls. Ex. F (Dep. of Gallegos) at pg. 107 (Gallegos claims Nichola was "squared up" with him and pulling at the shotgun, yet she is struck in the right side through her left side.

[222] Pls. Ex. A-1 at pg. 31.

[223] Pls. Ex. W (Dep. of Maloney Vol. I) at 135:3-21.

[224] Pls. Ex.  F (Dep. of Gallegos) at 180:11-15.

"thorough view" of her at the time he pulled the trigger, there is no dispute that Gallegos acted intentionally.

Therefore, summary judgment regarding excessive force must be denied.

**B. Gallegos engaged in excessive force against Tuttle when he murdered him.**

Next, the Fifth Circuit has explained that when there are distinct moments of alleged excessive force, it is proper to analyze each separately.[225] Here, the key excessive threat against Tuttle requires looking at the final two shots. The first, to his buttocks through his chest to his chin.[226] The second is directly to the back of his head.[227]

As a threshold matter, simply because Tuttle had a gun does not justify excessive force – particularly because (1) Police officers fired their guns first at dogs (and struck another police officer),[228] and (2) at the time that Gallegos shot him in the back of the head, Tuttle did not have a weapon.[229] Federal Court precedent makes it clear – "a police officer may not use deadly force against a non-threatening individual, even if the individual is armed, and even if the situation is volatile."[230] Indeed, police officers "may not kill suspects who do not pose an immediate threat to their safety or the safety of others simply because they are armed, including in some circumstances

---

[225] *Tucker v. City of Shreveport*, 998 F.3d 165, 171 (5th Cir. 2021) (concluding that officers tackling a suspect and then punching and kicking him while on the ground "are 'two distinct moments of force' that must be separately analyzed").

[226] Pls. Ex. A-1, Declaration of Maloney at pg. 32.

[227] Pls. Ex. A-1, Declaration of Maloney at pg. 31.

[228] Every witness but Lovings, claims that the Police shot first. In addition, the first human struck was Medina. And Maloney determined that Medina was hit by an officer. Pls. Ex. A-1, Declaration of Maloney at pg. 33.

[229] Pls. Ex. A-1, Declaration of Maloney at pg. 32.

[230] *Est. of Aguirre v. Cnty. of Riverside*, 29 F.4th 624, 629 (9th Cir. 2022) (noting that "a police officer may not use deadly force against a non-threatening individual, even if the individual is armed, and even if the situation is volatile"); *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) (holding that deadly force was unreasonable where the suspect possessed a rifle but was not pointing it at the officers and was not facing the officers when they shot

in which the suspect has 'committed a violent crime in the immediate past."[231]

A closer look at the *Graham* factors shows that summary judgment is not appropriate. First, there is a mountain of evidence that Tuttle did not pose a threat to Gallegos when he executed him. Tuttle sustained seven bullet wounds prior to the final two shots.[232]  He received shots to both shoulder and a grazing wound to his right forearm.[233] Following that, Mr. Tuttle "received shots to both arms and hands."[234] As confirmed by Maloney and Dr. Bux – a forensic pathologist – "[a]t this point he was incapable of holding a weapon." [235] Tuttle then had "his back to the door[] and [is] beginning to drop to the floor." As Gallegos yells "shut the f**k up," he shoots  Tuttle in the buttocks/thigh" and the "bullet passes between his legs as he approaches a parallel position to the floor, grazes his chest and enters his chin."[236] Twenty seconds later, Gallegos then yells "stop moving" and in that same moment he fatally shoots Tuttle "in the back of his head/neck."[237] Based on these facts, Tuttle (1) no longer had a weapon;[238] (2) certainly did not raise a weapon like Gallegos claimed;[239] (3) was not facing Gallegos like he claimed;[240] and (4) Gallegos shot him in the back of the head.[241] Tuttle did not pose an immediate threat to Gallegos or anyone.

Again, the "severity of the crime" factor also does not justify shooting Tuttle.  The warrant was admittedly fraudulent.  Combined with that, the first bullets – namely, the shooting of his dog

---

[231] *Harris v. Roderick*, 126 F.3d 1189, 1203-04 (9th Cir. 1997)
[232] Pls. Ex. A-1, Declaration of Maloney at pg. 32.
[233] *Id.*
[234] *Id.*
[235] *Id.* and Pls. Ex. C-1.
[236] Pls. Ex. A-1, Declaration of Maloney at pg. 32; Pls.' Ex. AC – BWC Sync from 1:20- -1:23; *See also* Pls. Ex. A-1, Declaration and Report of Maloney at pg. 32; Pls. Ex. F (Dep. of Gallegos) at 144:13-14 (confirming that Gallegos said "shut the f**k up")
[237] Pls. Ex. A-1, Declaration of Maloney at pg. 32
[238] *Id.*
[239] *Id.*
[240] *Id.*
[241] *Id.*

and the shooting of Medina – were fired by HPD officers Medina and Lovings. And under Texas

Penal Code 9.31(c), Tuttle was entitled to defend himself and his wife from the illegal entry and

excessive force by HPD. This section states:

> The use of force to resist an arrest or search is justified: (1) if, before the actor offers
> any resistance, the peace officer (or person acting at his direction) uses or attempts
> to use greater force than necessary to make the arrest or search; and (2) when and
> to the degree the actor reasonably believes the force is immediately necessary to
> protect himself against the peace officer's (or other person's) use or attempted use
> of greater force than necessary.[242]

In other words, even when Tuttle shot Lovings – whether it was the 20th bullet fired or the 4th bullet

fired – Tuttle did not commit a crime. Rather, Tuttle instead was defending his family from

unlawful search and excessive deadly force.  Therefore, even viewing the totality of the unlawful

home invasion, the severity of the crime factor supports in favor of Tuttle.  But certainly, when

limited to the final two shots, Tuttle – who had not committed any unlawful act – could not have

posed any lethal threat because he could not have held a weapon.

Furthermore, the City assumes – despite no evidence – that Tuttle and Nicholas knew that

the group storming their house were police officers. The record contradicts this. First, it was dark

in the house.[243] Pardo described it as: "black" inside, the "residence was just dark," and it wasn't

lit up, it was dark in there."[244] Sepolio also recalls that "it was real dark."[245] The officers wore dark

military style uniforms with dark lettering.[246] As stated under oath by Lieutenant Billy Milan:

"entry into the home would be made without any…announcements to the occupants (and) it is

reasonably foreseeable that the homeowners would be surprised (and) could be concerned that a

---

[242] Texas Penal Code Section 9.31(c)
[243] Pls. Ex. 7 (Blankinship-Reeves IAD statement) at  (describing the house as "very dark inside.".
[244] Pls. Ex. 158 (IAD statement by Pardo) at COH00006171 and COH00006173
[245] Pls. Ex. 107 (Sepolio IAD Statement) at COH00005940).
[246] Pls. Ex. 99

burglary was taking place…"[247] Furthermore, the BWC footage does not capture any officer announcing themselves.[248]

As a result, this evidence contradicts that the officers ever announced themselves, much less that Tuttle or Nicholas heard or appreciated it under the terrifying circumstances. Ranger Wolf describes the concept of "auditory exclusion" which occurs in critical incidents.[249] In critical incidents an officer is not going to hear things like commands because "the auditory side of their brain shuts down."[250] Particularly at the summary judgment stage, a juror could certainly conclude that Tuttle and Nicholas would suffer the same auditory deficit. In short, there is ample evidence that Tuttle thought he and his wife were being attacked by criminals and he fired justifiably in self-defense.

Third, at the time that Gallegos shot Tuttle in the back of the head and thigh/buttocks, he was not "actively resisting or trying to evade arrest by flight."[251] Again, Tuttle was on the ground, he could not have held a gun, and facing the floor.[252] Gallegos gave him no warnings or commands besides yelling "shut the f**k up."[253] With this record, in that moment, Tuttle could not have resisted or evaded arrest.

To avoid this evidence, Gallegos asserts three arguments. Each fail to show that deadly force was justified. First, Gallegos claims that Tuttle had shot officers, waived his gun, and threatened to shoot officers. This, however, ignores the testimony of Maloney and Bux that makes it clear – Tuttle could not have held a gun, much less threaten an officer with a gun prior to the

---

[247] Pls. Ex. 42.
[248] See Pls. Ex. AC.
[249] Pls. Ex. AF (Dep. of Wolf) at115:23 -116:3
[250] *Id.*
[251] *Crane*, 50 F4th. At 463.
[252] Pls. Ex. A-1, Declaration of Maloney at pg. 32
[253] Pls. Ex. F, (Dep. of Gallegos) at 144:4-14.

final two shots.[254]  And the relevant review is based on the time period that Gallegos shot him –

not alleged conduct prior to the shoot.  Gallegos was not entitled to execute Tuttle when he was

incapacitated.

Second, Gallegos argues that Maloney's testimony is merely "hindsight and speculation"

and Gallegos lacked knowledge of this at the time of his shots.  Gallegos, in his motion, emphasizes

his own testimony about the events, which he claims are not contradicted.  But this argument only

flags that his testimony is filled with contradictions and lies. Indeed, this is the exact type of

evidence that the Court in *Geiger* found "crucial to the determination of whether a reasonable

officer in [his] position could have reasonably believed that [the plaintiff] posed a threat of serious

harm."[255] Particularly, in this case, where Gallegos lied about Nicholas grabbing the gun, Medina

being in the house, Nicholas's position, and Tuttle pointing a gun at him, once Dr. Bux confirmed

Tuttle could not have held a weapon.

Third, Gallegos argues that Tuttle – at that point, unable to hold a gun, laying on the ground

with severe wounds and not facing Gallegos – was still a threat to Gallegos and Lovings. This

claim simply ignores that Tuttle had been incapacitated by the shots. And the Fifth Circuit has

made it clear – "a passing risk to a police officer is not an ongoing license to kill an otherwise

unthreatening suspect."[256]

This case is particularly similar to the Fifth Circuit's decision in *Mason v. Lafayette City-

Parish Consolidated Government.*[257] In that case, officers responded to an armed robbery at an

---

[254] Pls. Ex. A-1, Declaration of Maloney at pg. 32.
[255] *Geiger*, No. 1:16-CV-95-SA-DAS, 2018 U.S. Dist. LEXIS 101198 at *18-*19.
[256] *Lytle v. Bexar Cnty.*, 560 F.3d 404, 413 (5th Cir. 2009); see also *Plumhoff v. Rickard*, 572 U.S. 765, 777, 134 S. Ct. 2012, 188 L. Ed. 2d 1056 (2014) ("This would be a different case if petitioners had initiated a second round of shots after an initial round had clearly incapacitated Rickard and had ended any threat of continued flight.")
[257] 806 F.3d 268 (5th Cir. 2015).

apartment.[258] During a standoff, an officer unleashed a dog on the suspect, after he saw a gun. The officer then alleged that the suspect reached for a gun when the dog attacked him.[259] The officers shot him five times.[260] After those shots, the suspect lay incapacitated on the ground. After claiming he saw additional movement reaching for the gun, an officer shot him two more times.[261] The suspect's girlfriend disputed this: testifying that  he only lifted his head and put it back down.[262] Similarly, the plaintiff's expert testified that it would have been painful and ineffective for the suspect to move his arm.[263] Based on this, the Fifth Circuit denied the officer's claimed qualified immunity based on those factual disputes.

Just like *Mason*, Tuttle – a disabled United States Navy veteran – was incapacitated after the first 7 shots.[264] He had a prior injury and already had a bandaged hand before he was shot repeatedly.[265] Gallegos's testimony is contradicted by the ballistic evidence showing that Tuttle was shot in the back of the head and not facing him. Exactly like *Mason*, factual issues preclude summary judgment on this excessive force claim.

## IV.
### Qualified Immunity does not Apply because "it is unreasonable for an officer to 'seize an unarmed, non-dangerous suspect by shooting him dead.'"

Next, under the second prong of the qualified immunity test, the Court must determine whether the constitutional right was clearly established within the specific context of the case.[266]

---

[258] *Id.* at 271.
[259] *Id.* at 274.
[260] *Id.*
[261] *Id.*
[262] *Id.*
[263] *Id.* at 277.
[264] Pls. Ex. A-1, Declaration of Maloney at pg. 32
[265] Pls. Ex. F (Dep. of Gallegos) at 135:23-126:2 (confirming his hand was previously bandaged before the shooting)
[266] *Saucier*, 533 U.S. at 201.

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right."[267] This does not mean that the very conduct in question has been previously held unconstitutional.[268] There need not be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."[269]

First, regarding Nicholas, when addressing the shooting of unarmed, non-dangerous people, there is no doubt – "[a] police officer may not seize an unarmed, non-dangerous suspect by shooting [her] dead." [270] Fourth Amendment cases "clearly establish—and did so by January 2019—that an officer may not shoot unarmed individuals who pose no threat of danger.[271] Indeed, the Fifth Circuit has already denied qualified immunity related to the same facts as pleaded in her complaint, that Nicholas now has proven at summary judgment.

Second, as explained in more detail above regarding the excessive force deprivations, Tuttle had a clearly established right not to be executed after he was incapacitated. As the Fifth Circuit explained "after incapacitating a suspect who posed a threat, an officer cannot continue using deadly force."[272] Therefore, Gallegos is not entitled to qualified immunity.

## VI.
## STATE LAW CLAIMS

Defendant also challenges Plaintiff's state law claims – which are simply the derivative method for asserting wrongful death and survival under Section 1983. In other words, Plaintiffs

---

[267] *Reichle v. Howards*, 566 U.S. 658, 664 (2012).
[268] *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 377 (2009).
[269] *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011).
[270] *Releford v. Rosemon*, 678 F. App'x 267, 268 (5th Cir. 2017).
[271] *Estate of Baker*, 2018 U.S. Dist. LEXIS 170949 at *21.
[272] *Roque v. Harvel*, 993 F.3d 325, 336 (5th Cir. 2021) (citing *Lytle v. Bexar Cnty.*, 560 F.3d 404, 413 (5th Cir. 2009)).

have not asserted a TTCA claim against the City. Plaintiffs incorporate their response to the  City's

Warrant MSJ here, as if stated herein.

**VII.**
**CONCLUSION**

For all the reasons identified in this Response, Plaintiffs requests that the Court deny this

Motion for Summary Judgment on Plaintiffs' claims against Gallegos.

*/s/ Jeffrey I. Avery*                                     */s/ Boyd Smith*

Michael Patrick Doyle                           Michael T. Gallagher
Patrick M. Dennis                                   L. Boyd Smith, Jr.
Jeffrey I. Avery                                       Pamela R. McLemore
Patrick Doyle                                          2905 Sackett Street
DOYLE DENNIS AVERY LLP                 Houston, TX 77098
The Clocktower Building                        Telephone: (713) 238-7705
3401 Allen Parkway, Suite 100             Facsimile:  (713) 238-7852
Houston, Texas 77019                           mike@gld-law.com
Email: service@doylelawfirm.com         bsmith@gld-law.com
                                                              pamm@gld-law.com
CHARLES C. BOURQUE, JR.
*Admitted Pro Hac Vice*                           Attorneys for the Tuttle
ST. MARTIN & BOURQUE, LLC             family
315 Barrow St.
Houma, LA 70360
985-876-3891 (phone)
985-851-2219 (fax)
cbourque@stmblaw.com
Attorneys for the Nicholas family

**CERTIFICATE OF SERVICE**

I, the undersigned attorney, do hereby certify that a true and correct copy of the foregoing
document was forwarded to the following counsel of record on this the 13th day of September,
2024 via CM/ECF, hand delivery, electronic mail, overnight courier, U.S. Mail, certified mail,
return receipt request, or facsimile, pursuant to the Federal Rules of Civil Procedure.

*/s/ Jeffrey I. Avery*
Jeffrey Avery