UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| CLIFFORD TUTTLE, et. al.<br><br>Consolidated with<br><br>JOHN NICHOLAS, et.al.<br><br>Plaintiffs,<br>v.<br><br>CITY OF HOUSTON; ART ACEVEDO, et. al.<br><br>Defendants. | Case No. 4:21-cv-00270<br><br><br><br><br><br>(JURY DEMANDED) |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTIONS TO EXCLUDE THE TESTIMONY OF MICHAEL MALONEY AND ANDREW SCOTT

Regarding the first expert challenge, Police practices experts, like Andrew Scott, routinely testify about established police practices in civil rights cases like this one. It is well established that "in constitutional tort cases, expert testimony regarding sound professional standards governing a defendant's actions can be relevant and helpful."[1] Such experts typically use their education, training, and experience to identify generally accepted national police standards and offer opinions about whether the officer or department deviated from (or complied with) those standards. This is precisely the type of testimony that Andrew Scott has proffered in this case.

Combined with that, Scott has testified that HPD created a uniform policy – combined with other favorable disciplinary measures – that created and enabled excessive force. In other words, the City actively "enables the use of excessive force by maintaining loopholes in its investigatory procedures that permit officers to conform their stories to the facts, and provides specific examples of

---

[1] *Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013).

1

what those loopholes are."[2] Scott provided important context about the uniform decision of IAD that further established and shows this practice. Furthermore, this District has previously denied a similar objection by the City to Andrew Scott's testimony. For the same reasons, the Court should deny the motion.

Similarly, Defendants also have moved to exclude the testimony of forensic investigator, Michael Maloney. In this case, Maloney did the following:

- "Conduct[ed] a crime scene investigation for the recovery and documentation of evidence remaining at 7815 Harding Street. Specifically collect and document remaining ballistic evidence, blood stain pattern/DNA evidence, and trajectories."

- "Conduct[ed] a review of both the Houston Forensic Science Center and Texas Ranger's processing, documentation and analysis of the scene."

- "Conduct[ed] a crime scene analysis/reconstruction to determine the location and position of civilian and law enforcement personnel associated with the shootings and their dynamic interaction at the times the shots were fired. This will include an evaluation of wound dynamics and lines of sight between the shooter and those shot at the time the weapons were discharged. "

- "Conduct[ed] statement audits to determine the veracity of witnesses statements for forensic viability."[3]

Despite spending days reviewing and documenting evidence on the scene, Defendants criticize Maloney for not reviewing the officers' "deposition transcripts – which it claims Plaintiffs "shielded" him from – even though he read and analyzed the officers' IAD and homicide statements, which were taken near the time of the incident. Moreover, Maloney has confirmed that his opinions are based on forensic science, not simply based on what officers said in deposition. Further emphasizing this point, Plaintiffs direct the Court to their summary judgment briefing which confirms that various portions of officers' testimony is false, inconsistent, or unreliable. Put bluntly, Defendant is free to cross-

---

[2] *Arrington v. City of Chicago*, No. 17 C 5345, 2018 U.S. Dist. LEXIS 14168 at *18 (N.D. Ill. Jan. 30, 2018).
[3] Pls. Ex. A, Declaration and Report of Maloney. In citing to Exhibits, Plaintiffs utilize the same exhibits filed for summary judgment [ECF No. 334.]

examine Maloney on the documents he received and the weight of his testimony as a result.[4] But Defendant has failed to point to a legitimate basis to exclude his testimony based on the documents that they will attempt to use to place their spin on the evidence.[5]

Second, Defendant also claims Maloney's opinions regarding the location of Nicholas should be excluded. To reach that conclusion, the City argues that that Maloney's opinions "related to the shooting of Nicholas are unreliable because he did not exclude other possible alternatives or consider deposition testimony" – namely how Tuttle and Nicholas's DNA got on the bullet.[6] First, this misses the clear testimony of Maloney – his opinions regarding the location of Nicholas are supported by other evidence, regardless of the DNA on the bullet.[7] Thus, excluding his testimony is simply not supported.

But in addition, expert evidence "is not inadmissible merely because it is unable to exclude all possible causal factors other than the one of interest."[8] This is not a differential diagnosis for a medical causation opinion. Rather, Maloney – combined with other forensic evidence – opined that this bullet passed through both Tuttle and then fatally struck Nicholas. And here, where Maloney has "a reasonable factual basis," via the DNA report to opine that the bullet struck them both, "a court should not exclude it. Rather, it is for opposing counsel to inquire into the expert's factual basis."[9]

Therefore, Defendant's motion should be denied.

## Standard Of Review

---

[4] *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998).
[5] *Moss v. Ole South Real Estate, LLC*, 933 F.2d 1300, 1307 (5th Cir. 1991).
[6] Defendant's motion at pg. 13.
[7] Pls. Ex. A, Deposition of Maloney at pg. 41-43.
[8] *Southwire Co. v. J.P. Morgan Chase & Co.*, 528 F. Supp. 2d 908, 930 (W.D. Wis. 2007).
[9] *United States v. 0.161 Acres of Land*, 837 F.2d 1036, 1040 (11th Cir. 1988) (emphasis added); *see also Amrosini v. Labarraque*, 101 F.3d 129, 140 (D.C.Cir.1996)(the fact that an expert has not eliminated all possible hypothesis or "causes" *"only goes to the accuracy of the conclusion, not the soundness of the methodology."); Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 156 (3d Cir.1999)(holding that "an expert's causation conclusion should not be excluded because he or she has failed to rule out every possible alternative cause.").

"The Federal Rules of Evidence and interpreting case law require that an expert be qualified and that the expert's testimony be relevant and reliable."[10] "To be relevant, the testimony must also assist the trier of fact to understand the evidence or to determine a fact in issue."[11] Notably, "the trial judge has broad discretion in deciding whether the evidence is relevant and sufficiently reliable to be admissible."[12] Under Rule 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data;(c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

Although these factors apply to scientific, technical and other specialized knowledge, the United States Supreme Court has recognized that the *Daubert factors* "do not constitute a definitive checklist or test."[13] The factors do not necessarily apply in all scenarios, so a trial court must be flexible in its application of the *Daubert* factors and other factors consistent with *Daubert*.[14] For that reason, a trial court may consider one or more of the *Daubert* factors, but has broad discretion in gauging the reliability of expert testimony.[15] In exercising this discretion, the *Daubert* court cautioned that a motion to strike an expert under *Daubert* is not meant to act as a replacement for "vigorous cross-examination" of an expert.[16] That is, an expert should not be struck based upon cross-examination material.

---

[10] *In re Horizon Vessels, Inc.*, Civil No, H-03-3280 2007 WL 655927 (S.D. Tex. Feb. 18, 2007) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).
[11] *Id.* (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)).
[12] *Id.* (citing *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir.2004)).
[13] *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999).
[14] *Id*. at 150-51
[15] *Id*. at 141-42.
[16] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993).

Similarly, the trial court's role is not to determine the truth or falsity of the expert's opinion.[17] Rather, the trial court's role is to make the initial determination whether the expert's opinion is relevant and whether the methods and research upon which it is based are reliable.[18] And the test for reliability "is not the correctness of the expert's conclusions but the soundness of his methodology."[19] Alternative or opposing opinions or tests do not "preclude the admission of the expert's testimony-they go to the weight, not the admissibility."[20] Furthermore, "[d]isputes as to the strength of [an expert's] credentials, faults in his use of [a particular] methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony."[21]

## ARGUMENT

As part of their motion, Defendants have challenged two opinions by expert Andrew Scott and two opinions by Michael Maloney. Plaintiffs address each of these four arguments separately.

**1. Scott's opinion regarding the warrant process provides important context for the jury**

For its first argument, the City attacks "Scott's first opinion that Goines obtained the warrant based on fabricated evidence is uncontested, needlessly cumulative, and unlikely to aid the jury." While the City claims this is "uncontested," Goines has pleaded the fifth amendment in response to this claim. Likewise, expert testimony is important to provide context to Plaintiff's *Monell* claims – claims that are certainly disputed. And it has long been recognized that expert witnesses may "describe professional standards and identify departures from them."[22] Such testimony is relevant because it "can give a jury a baseline to help evaluate whether a defendant's deviations from those

---

[17] *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 749 (3d Cir. 1994), cert. denied sub nom. *General Elec. Co. v. Ingram*, 131 L. Ed. 2d 134 (1995).
[18] *Id.*
[19] *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995)).
[20] *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998).
[21] *Id.* (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995)).
[22] *West v. Waymire*, 114 F.3d 646, 653 (7th Cir. 1997).

standards were merely negligent or were so severe or persistent as to support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights." Federal Courts of Appeals around the country have reached similar conclusions.[23]

Therefore, the court should deny the motion regarding the first opinion of Scott.

## 2. Scott's opinion regarding the disciplinary process is reliable and supported by the factual evidence in this case.

Next, regarding the fourth opinion, the City argues that Scott's testimony should be excluded "because it is irrelevant to the claims brought against the City" and unreliable. The City largely criticizes Scott based on its claim that he relied on data regarding use of force investigations without independently analyzing each incident. Similarly, the City also cites a summary judgment decision that reviewed Scott's testimony. In that case, the Court granted summary judgment and noted that Scott's testimony – namely that "48 justified uses of deadly force was 'highly improbable,' without identifying a single incident where he believed that the use of deadly force was unreasonable – was not sufficient to establish to create an issue of facts regarding notice. [24] That is not the evidence in this case.

Taken together, both of these arguments, however, miss the point of Scott's testimony and Plaintiffs' case. Nicholas and Tuttle have provided evidence from Scott showing that the decision-making process at HPD is uniform. In other words, it is another example – combined with evidentiary issues and investigative failures – that shows HPD's practice of encouraging excessive

---

[23] *See e.g. El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 460 (8th Cir. 2011) (agreeing with conclusions of police practices expert in finding that jury should have been allowed to hear the case); *see also Restivo v. Hessemann*, 846 F.3d 547, 579-80 (2d Cir. 2017) (citing Jimenez and affirming admissibility of police practices expert to identify professional practices and departures); *MirandaRivera v. Toledo-Davila*, 813 F.3d 64, 71 (1st Cir. 2016) (expert allowed to opine that actions were "contrary to generally accepted police practices"); *Young v. County of Los Angeles*, 655 F.3d 1156, 1162 (9th Cir. 2011) (discussing evidence of a police practices experts who stated basic standards); *Estate of Smith v. Marasco*, 318 F.3d 497, 509 (3d Cir. 2003) (police practices expert who opined that officers conduct "fell significantly below accepted professional standards").
[24] *Btesh v. City of Maitland*, No. 10-CV-71-19, 2011 U.S. Dist. LEXIS 83464 at *98 (M.D. Fla. July 29, 2011)

force. Nicholas and Tuttle are not attempting to create a pattern via those decision that puts HPD on notice of a custom.[25] To be clear, "Plaintiff's 'highly predictable consequence' theory alleges that the City actively enables the use of excessive force by maintaining loopholes in its investigatory procedures that permit officers to conform their stories to the facts, and provides specific examples of what those loopholes are."[26] This is not the "type of Monell claim that requires allegation of multiple examples."[27] Scott's opinion supports this theory because it shows that the outcomes are uniform.

Finally, in *Baker*, the Court addressed and rejected a similar argument from the City about Scott. Specifically, Defendant argues that the "the foundation for Scott's opinion is newspaper articles, which, per his retelling, reported that all officer involved shootings from 2009 to 2014 were deemed justified." The Court rejected a similar argument in Baker as follows:

> Defendants also take issue with Scott's basing his fifth opinion on newspaper articles and articles that have not been peer reviewed. Defendants argue that any testimony based on those articles should be excluded because the articles have not been peer reviewed and are "classic, inadmissible hearsay." Defendants have offered no legal authority stating that an expert must also vouch for the methodology of the articles he references. Rule 702 requires only that Scott's testimony is "the product of reliable principles and methods." Additionally, whether the articles are inadmissible hearsay is irrelevant unless Plaintiff tries to admit the articles into evidence.[28]

Furthermore, while Art Acevedo became chief in 2016 – both the same disciplinary process and the same uniform result continued. Between 2015 to 2016, on-duty HPD officers have killed 32 people, and IAD deemed every single one of those shootings justified.[29] In 2016, Art Acevedo took over as Chief, and this pattern continued. Indeed, for on-duty officer shootings, Chief Acevedo found

---

[25] In response to summary judgment, Plaintiffs have explained that this process and uniform outcome combined with specific events creates knowledge. However, that is a distinct argument.
[26] *Arrington*, No. 17 C 5345, 2018 U.S. Dist. LEXIS 14168 at *18
[27] *Id.*
[28] *Estate of Baker v. Castro*, CIVIL ACTION NO. H-15-3495, 2018 U.S. Dist. LEXIS 244560 (S.D. Tex. Mar. 13, 2017)
[29] *See generally*, "HOMICIDE DIVISION 2015 HPD OFFICER INVOLVED SHOOTING INCIDENT" available at https://www.houstontx.gov/police/ois/2015.htm and "HOMICIDE DIVISION 2016 HPD OFFICER INVOLVED SHOOTING INCIDENTS," available at  https://www.houstontx.gov/police/ois/2016.htm

every single shooting as justified from 2016-2019.[30] Notably from 2017 through January 28, 2019, HPD – based on its own officer-involved shooting data – has reported 30 on duty officer involved shootings. Some of the weapons during this time period –unknown object,[31] a machete,[32] scissors and screwdriver,[33] no weapon,[34] "hands and/or feet,"[35] "other,"[36] and a vehicle leaving the scene.[37]

As a result, Scott's opinions are relevant and reliable, and Defendant's motion should be denied.

### 3. Maloney's opinions are based on sufficient evidence and supported by the record

Next, Defendant objects to the totality of Maloney's opinion because it argues that Maloney – a forensic investigator – only reviewed one deposition and amended part of his opinions when presented with evidence during the deposition. To be clear, this case involves substantial document production. Expecting an expert to review every single document is not reasonable. Despite this, the City has only identified deposition transcripts as the key "missing" information that Maloney did not rely on in his report or opinions. This, however, ignores two key components to his review – (1) Maloney reviewed the IAD statements and sworn testimony of the officers provided near the time of the shooting and (2) Maloney's scientific review and opinions are derived "from the spent bullet cases, from the trajectories, from the bloodstain patterns, from the interaction of the above," to

---

[30] Pls.' Ex. S. deposition of Acevedo at pg. 15-18.
[31] "HOMICIDE DIVISION 2017 HPD OFFICER INVOLVED SHOOTING INCIDENTS" at March 10, 2017; See https://www.houstontx.gov/police/ois/2017.htm
[32] See "HOMICIDE DIVISION 2017 HPD OFFICER INVOLVED SHOOTING INCIDENTS" at April 27, 2017; available at https://www.houstontx.gov/police/ois/2017.htm
[33] See "HOMICIDE DIVISION 2017 HPD OFFICER INVOLVED SHOOTING INCIDENTS" at October 27, 2017 available at https://www.houstontx.gov/police/ois/2017.htm
[34] "HOMICIDE DIVISION 2018 HPD OFFICER INVOLVED SHOOTING INCIDENTS" at December 25, 2018, November 28, 2018; Sept. 4, 2017; April 27, 2017; April 24, 2017 available at https://houstontx.gov/police/ois/inc_no/66457618.htm and https://www.houstontx.gov/police/ois/2018.htm
[35] HOMICIDE DIVISION 2018 HPD OFFICER INVOLVED SHOOTING INCIDENTS" at November 14, 2018 available at https://www.houstontx.gov/police/ois/2018.htm
[36] "HOMICIDE DIVISION 2018 HPD OFFICER INVOLVED SHOOTING INCIDENTS" at September 8, 2018; July 23, 2018; and June 18, 2018 available at https://www.houstontx.gov/police/ois/2018.htm
[37] "HOMICIDE DIVISION 2018 HPD OFFICER INVOLVED SHOOTING INCIDENTS" at May 26, 2018 available at https://houstontx.gov/police/ois/inc_no/66457618.htm

determine "who was where, firing what, and when."[38] As he made clear – "statements aren't reconstruction."[39]

Furthermore, it is not particularly shocking that Maloney, a forensic investigator who conducted a reconstruction, has not reviewed every deposition or every document. This is even less surprising when the officers gave sworn statements and provided IAD interrogations about the incident, much closer in time to the shooting. Combined with that, Maloney conducted an inspection and reconstruction at 7815 Harding Street from May 10, 2019, to May 13, 2019.

And as Maloney explains, the key for a scientific review of is not statements – it is to determine where the bullets came from, not who shot them. He further explained this at his deposition:

> The reconstruction should be done with the premise -- well, the scientific me -- excuse me. The scientific method is problem, hypothesis, data, experimentation, and then we get to conclusion. But what happens is the last thing we look at is statements. We determine scientifically what happened there. That's why, when you ask me some questions, such as who is the shooter there, I don't know. I just know that bullets struck there, so there was a shooter there. So this is not an illustration of what the officers said happened. And unfortunately, with the ranger's version of events, he is basically reconstructing based upon their statement of events instead of looking at the physical evidence first, and then seeing if their statements are supported by the physical evidence. That's why, earlier, when you were asking me where Medina was in the room and what he was doing, all I can tell you is physically, this is where he most likely is. Whether he says he looked left, whether he says he looked right, we have no way of knowing that. That's just based on his statement and statements aren't reconstruction. Reconstruction is from the spent bullet cases, from the trajectories, from the bloodstain patterns, from the interaction of the above can we determine who was where, firing what, and when.
>
> So that's my critique of the ranger, is that he started with the story already laid out by accepting the premise that the officers were telling the truth, which he actually states in his report. He says, it's considered that all officers are telling the truth unless there's contrary evidence to that, but then he ignores the contrary evidence because it doesn't come from a source that he recognizes, such as our DNA and the bullet that we recovered. So, yeah. The ranger didn't do a reconstruction. The ranger bulleted out and did diagrams that basically showed the officers' versions of

---

[38] Pls.' Ex. A, Declaration of Maloney.
[39] Pls.' Ex. W, (Dep. of Maloney Vol I) at 81:22-83:12.

events correlated into one action that moved forward.[40]

With this foundation, unless wholly unreliable, the data on which the expert relies goes to the weight and not the admissibility of the expert opinion."[41] Accordingly, expert opinions which overlook certain data are not typically excluded on that basis. [42] "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[43] Emphasizing this point, the Tenth Circuit has found that even where an expert's factual knowledge was incomplete, the testimony was still "sufficiently detailed . . . to permit his expression of an opinion as to the cause of the damages allegedly incurred."[44] This type of argument goes "to [the] weight of [the] expert's testimony, not its admissibility."[45] Indeed, "the full burden of exploration of the facts and assumptions underlying the testimony of an expert witness [is] squarely on the shoulders of opposing counsel's cross-examination."[46]

To the extent that Defendants seek to challenge Maloney's opinions based on his review of certain documents, they are free to cross-examine him. This is particularly true when he has reviewed sworn statements of officers, yet Defendant is now claiming he should have reviewed depositions as well. In contrast, Maloney, a forensic investigator, conducted a reconstruction based on the accepted scientific methodology. His opinions are vital and important to this case.

Therefore, the Defendant's motion should be denied.

### 4. Maloney's opinions regarding Nicholas are reliable and relevant

---

[40] Pls.' Ex. W, (Dep. of Maloney Vol I) at 81:22-83:12.
[41] *Rosiere v. Wood Towing*, LLC, No. 07-1265, 2009 U.S. Dist. LEXIS 36010, 2009 WL 982659, at *1 (E.D. La. Apr. 8, 2009).
[42] *Moss v. Ole South Real Estate, LLC*, 933 F.2d 1300, 1307 (5th Cir. 1991).
[43] *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)).
[44] *Quinton v. Farmland Indus., Inc.*,928 F.2d 335, 337-38 (10th Cir. 1991).
[45] *Id*. citing (*Ramsey v. Culpepper*, 738 F.2d 1092, 1101 (10th Cir. 1984)).
[46] *Smith v. Ford Motor Co.,* 626 F.2d 784, 793 (10th Cir. 1980).

Next, Defendant – via creation of a false premise – argues that Maloney's testimony placing Nicholas on the North side of the couch should be excluded. Specifically, the City argues that that Maloney's opinions "related to the shooting of Nicholas are unreliable because he did not exclude other possible alternatives or consider deposition testimony."[47] This is argument fails for two reasons – (1) Maloney's opinions regarding the location of Nicholas are not predicated only on the DNA on the bullet; and (2) any evidence of alternative cause – particularly, one that Maloney does not believe – simply goes to the weight of the opinion, not *Daubert*. In other words, Maloney has opined more likely than not, the bullet went through Tuttle and Nicolas. That is the standard in this case. This is not a differential diagnosis in a medical causation case.

First, rejecting the entirety of Defendant's argument, in his deposition Maloney explained that even absent the DNA, he still scientifically places Nicholas on the north couch.

```
                          41
16   Q.  Mr. Maloney, correct me if I'm wrong, but
17   your opinion about Rhogena's location when she was
18   shot is based, in part, on her DNA being on the bullet
19   that came out of the couch; right?
20       A.  That's a part of it, yes.
21       Q.  And your opinion about her position coming
22   to standing is based on a combination of the DNA being
23   on the bullet that came out of the couch and the
24   position of the bullet in the couch; right?
25       A.  Yes.  The established trajectory, yes.
 . . .

                          42
 9   Q.  So if the DNA came from the couch itself,
10   we can't peg where she was standing when she was shot;
11   right?
12       A.  Yes.  We still can.  It was only partially
13   used for.
14       Q.  Okay.
15       A.  So the DNA on the bullet wasn't the
16   exclusive indicator.
17       Q.  What were the other indicators?
```

---

[47] Defendant's motion at pg. 13.

```
18        A.  The blood flows on her body and her
19   position and where she dropped, the medical examiner's
20   statements as to how much movement she could have done
21   after she received the shot.  So there were a variety
22   of other factors.  The trajectories that were
23   established for those bullets that went through the
24   corner of the door frame, which was part of the
25   cluster that's very close to the one that went
                      43
 1   through -- or the -- I've established, because the DNA
 2   that I believe went through her.  So as I said, there
 3   were a variety of factors that placed her on the couch
 4   in that position when she was shot, or that location,
 5   other than just the DNA bullet one.[48]
```

As a result, Defendant's attempt to limit Maloney's testimony regarding Nicholas's shooting far exceeds even its own argument. Put simply, the DNA evidence is not necessary for Maloney's opinions regarding Nicholas's location. It is only necessary to establish that the bullet went through Tuttle before striking her.

Second, expert evidence "is not inadmissible merely because it is unable to exclude all possible causal factors other than the one of interest."[49] Moreover, "opinions based on information from others are admissible. Such opinions may be vulnerable to attack as based on self-serving or erroneous assumptions, but those attacks go to the weight, not the admissibility, of the opinions." [50] "[W]here the expert's testimony has a reasonable factual basis, a court should not exclude it. Rather, it is for opposing counsel to inquire into the expert's factual basis."[51]

---

[48] Pls.' Ex. AU, (Dep. of Maloney Vol II).
[49] *Southwire Co. v. J.P. Morgan Chase & Co.*, 528 F. Supp. 2d 908, 930 (W.D. Wis. 2007).
[50] *In re Asbestos Products Liab. Litig. (No. VI)*, 714 F. Supp. 2d 535, 546 (E.D. Pa. 2010) objections overruled, 2010 WL 4676563 (E.D. Pa. Nov. 15, 2010) ("To the extent that the Defendants argue that the testimony of Plaintiffs' experts is not sufficient to prove causation, this is a separate question from the threshold question of admissibility of expert evidence.").
[51] *United States v. 0.161 Acres of Land*, 837 F.2d 1036, 1040 (11th Cir. 1988) (emphasis added); *see also Amrosini v. Labarraque*, 101 F.3d 129, 140 (D.C.Cir.1996)(the fact that an expert has not eliminated all possible hypothesis or "causes" "only goes to the accuracy of the conclusion, not the soundness of the methodology.*"); Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 156 (3d Cir.1999)(holding that "an expert's causation conclusion should not be excluded because he or she has failed to rule out every possible alternative cause.").

This is particularly true here, where there is no dispute – a bullet struck and killed Ms. Nicholas. The City only disputes whether the bullet contained the DNA of Tuttle and then fatally struck her. As a result, Defendant's case standard for a different type of proposition – that "medical causation experts must have considered and excluded other possible causes of injury." This is generally the case for specific causation opinions – like differential diagnosis – for medical conditions. That is not the issue here. Regardless, even in the medical context the exclusion of alternatives is sometimes unnecessary in identifying the cause of a medical condition when adequate direct support exists for the expert's own causal hypothesis.[52] This is particularly true here, when other evidence establishes that the bullet struck Nicholas, including the trajectory, blood stain analysis, and medical examiner's statements.[53]

Furthermore, Maloney explained that he did not "believe" that the DNA could have derived from the couch, but the DNA analyst would be a better source to answer that question.

```
                        156
 8  Q.  Could Dennis Tuttle's DNA, from having sat
 9  on the couch, have transferred to the bullet fragment
10  that you retrieved from the couch?
11      A.  Is that a possibility?
12      Q.  Yes.
13      A.  I think going to an actual DNA analyst that
14  has the sensitivity of the tests that were used, et
15  cetera, would be a better source to ask that question
16  to.  I'm not comfortable answering it.
17      Q.  The answer is you don't know?
18      A.  The answer is I don't believe so but
19  there's a better source.
20      Q.  The DNA that was recovered from the bullet
21  fragment from the couch was not blood DNA; correct?
22      A.  Was the -- I have to ask the question
23  because DNA is DNA.  Are you asking was the blood
24  source on the bullet DNA?
25      Q.  Correct.
                        157
```

---

[52] *Cf., e.g., Tardif v. City of New York*, 344 F. Supp. 3d 579, 601-02 (S.D.N.Y. 2018)
[53] Pls.' Ex. AU, (Dep. of Maloney Vol II) at pg. 41-43

```
1    A.  I don't know.
2    Q.  Okay.
3    A.  It was done by a swab.  I don't know if
4  there was a reddish-brown tint or anything else, at
5  the point that they swabbed that.  Again, that would
6  go back to the DNA analyst.[54]
```

Therefore, Defendant's motion should be denied.

## CONCLUSION

Therefore, the Tuttle and Nicholas Plaintiffs request that the Court deny Defendant's motion to exclude the testimony of Andrew Scott and Michael Maloney.

| /s/ Jeffrey I. Avery | /s/ Boyd Smith |
|---|---|
| Michael Patrick Doyle<br>Patrick M. Dennis<br>Jeffrey I. Avery<br>Patrick Doyle<br>DOYLE DENNIS AVERY LLP<br>The Clocktower Building<br>3401 Allen Parkway, Suite 100<br>Houston, Texas 77019<br>Email: service@doylelawfirm.com<br><br>CHARLES C. BOURQUE, JR.<br>*Admitted Pro Hac Vice*<br>ST. MARTIN & BOURQUE, LLC<br>315 Barrow St.<br>Houma, LA 70360<br>985-876-3891 (phone)<br>985-851-2219 (fax)<br>cbourque@stmblaw.com<br><br>Attorneys for Plaintiffs<br>Patricia Nicholas, as temporary administrator of the Estate of Rhogena Nicholas and Jo Ann Nicholas, individually and as an heir of the Estate of Rhogena Nicholas | Michael T. Gallagher<br>L. Boyd Smith, Jr.<br>Pamela R. McLemore<br>2905 Sackett Street<br>Houston, TX 77098<br>Telephone: (713) 238-7705<br>Facsimile:  (713) 238-7852<br>mike@gld-law.com<br>bsmith@gld-law.com<br>pamm@gld-law.com<br><br>Attorneys for Plaintiffs Clifford F. Tuttle, Jr. as Representative of the Estate of Dennis W. Tuttle, Deceased, Robert Tuttle, and Ryan Tuttle |

---

[54] Pls.' Ex. W, (Dep. of Maloney Vol I).

**CERTIFICATE OF SERVICE**

 I, the undersigned attorney, do hereby certify that a true and correct copy of the foregoing document was forwarded to the following counsel of record on this the 13th day of September, 2024 via CM/ECF, hand delivery, electronic mail, overnight courier, U.S. Mail, certified mail, return receipt request, or facsimile, pursuant to the Federal Rules of Civil Procedure.
*/s/ Jeffrey I. Avery*
Jeffrey Avery