IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CLIFFORD F. TUTTLE, JR., REPRESENTATIVE OF THE ESTATE OF DENNIS W. TUTTLE, DECEASED, ROBERT TUTTLE, AND RYAN TUTTLE, | § § § § § | |
| Plaintiffs | § § | |
| v. | § § | Civil Action No. 4:21-cv-00270 |
| CITY OF HOUSTON, *et al.*, | § § § | |
| Defendants. | § | |

**AND**

| | | |
|---|---|---|
| JOHN NICHOLAS, as temporary administrator of the Estate of Rhogena Nicholas and JO ANN NICHOLAS, individually and as an heir of the Estate of Rhogena Nicholas, | § § § § § | |
| Plaintiffs | § § | |
| v. | § § | Civil Action No. 4:21-cv-00272 |
| CITY OF HOUSTON, *et al.*, | § § § | |
| Defendants. | § | |

**CITY OF HOUSTON'S REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS BASED ON ALLEGED <u>EXCESSIVE FORCE</u>**

Recognizing the fatal flaws in their case, plaintiffs have abandoned the majority of their municipal liability theories:[1] (1) "official policy" based on a formally announced policy;[2] (2) "official policy" based on a custom;[3] (3) failure-to-train;[4] (4) failure-to-supervise;[5] (5) failure to promulgate adequate policies;[6] and (6) all theories related to use of force against Tuttle's dog.[7]  At an absolute minimum, all of these claims should be dismissed.[8]

Plaintiffs concede that only three theories remain on which they attempt to pin the City's liability: (1) failure to discipline, as "demonstrat[ed] [by] a deliberate indifference to Plaintiffs via a series of bad acts," (2) failure to discipline, which "led to the highly predictable consequence of excessive deadly force," and (3) Chief Acevedo's alleged "ratifi[cation]" of Gallegos' excessive use of force.[9]  Plaintiffs' arguments in support of these theories are quagmires of misapprehended and misapplied principles of municipal liability.  Nevertheless, what *is* clear is that Plaintiffs have not raised a genuine issue of material fact sufficient to overcome summary judgment on any of their remaining liability theories or the reasonableness of Gallegos' use of force against Tuttle and Nicholas.  Rather, Plaintiffs rely on spurious arguments unsupported by summary judgment-level evidence or even their own experts.  Consequently, the City's Motion for Partial Summary Judgment on Plaintiffs' claims based on alleged excessive force ("Motion") should be granted.

---

[1] *See* Dkt. 330 at 31.
[2] Dkt. 308 at 3 & n.4, and Argument Sections I.B, C.
[3] *Id*.
[4] *Id*. at 3 & n.5, and Argument Sections I.B, D.
[5] *Id*.
[6] *Id*. at 3 & n.6, and Argument Sections I.B, E.
[7] *Id*. at Argument Section II.
[8] *Sweetin v. City of Tex. City*, 568 F. Supp. 3d 789, 798 (S.D. Tex. 2021) (granting summary judgment on claims that plaintiffs had "abandoned" by "fail[ing] to address the defendant's [summary judgment] arguments on these claims"), *rev'd in part on other grounds*, 48 F.4th 387 (5th Cir. 2022).
[9] Dkt. 330 at 31.

I.     **Plaintiffs Have Not Raised an Issue of Material Fact as to their Remaining Theories.**

   A.   The City is entitled to summary judgment on Plaintiffs' failure-to-discipline theory based on their "series of bad acts" concept.

Plaintiffs assert a failure-to-discipline theory based on the concept that the City engaged in a "series of bad acts."[10]  For Plaintiffs to prevail on a failure-to-discipline theory, they must prove that (1) prior to the Harding Street incident, HPD's use-of-force disciplinary policy was inadequate, (2) Chief Acevedo was deliberately indifferent to the known or obvious consequences that constitutional violations would result from that inadequate policy, and (3) HPD's inadequate disciplinary policy directly caused Tuttle and Nicholas' injuries. *Edwards v. City of Balch Springs*, 70 F.4th 302, 313 (5th Cir. 2023);  *Barnes v. City of El Paso*, 677 F. Supp. 3d 594, 612 (W.D. Tex. 2023).  Plaintiffs have failed to carry their burden for each of these elements.

   1)   *Plaintiffs' admission that they have not established a prior pattern of officers using excessive force during service of search warrants is fatal to their claim.*

Because municipal disciplinary policies can be "inadequate" in ways that do not violate citizens' constitutional rights, "[i]t is nearly impossible to impute lax disciplinary policy to the City without showing a pattern" of "unremedied abuses of citizens' rights."[11]  *Piotrowski v. City of Houston*, 237 F.3d 567, 582 (5th Cir. 2001); *see Barnes*, 677 F. Supp. 3d at 612 ("[A] lenient disciplinary policy does not itself run afoul of any right enumerated in the Constitution.").  Thus, to prove that the City's use-of-force disciplinary policy was constitutionally inadequate, Plaintiffs must show both that HPD had an inadequate disciplinary policy and that the policy resulted in a pattern of pre-Harding Street constitutional violations similar to the ones at issue in this case.

---

[10] *Id*. at 31, 51-56.

[11] With respect to quoted material, unless otherwise indicated, all brackets, ellipses, footnote call numbers, internal quotations, and citations have been omitted for readability. All emphasis is original unless otherwise indicated.

*Peterson v. City of Fort Worth*, 588 F.3d 838, 851 (5th Cir. 2009); *see also Aviles v. Saldivar*, No. 4:22-CV-03571, 2023 WL 5487668, at *4 (S.D. Tex. Aug. 23, 2023) ("demonstration of a pattern" matters for establishing both an inadequate disciplinary policy and deliberate indifference).

A pattern "cannot simply be for any and all bad or unwise acts" by officers. *Peterson*, 588 F.3d at 851. "Case law is clear that Plaintiff[s] [are] required to show a pattern of ***similar constitutional violations*** resulting in injuries." *Bailey v. Dallas Cnty.*, No. 3:09-CV-0865-K, 2012 WL 1033502, at *21 (N.D. Tex. Mar. 28, 2012) (emph. added), *aff'd sub nom. Bailey v. Quiroga*, 517 F. App'x. 268 (5th Cir. 2013). As Plaintiffs acknowledge, this pattern "must point to *the specific violation in question*."[12] *Peterson*, 588 F.3d at 851 (emph. added). In other words, Plaintiffs must present a sufficient number of "other incidents that are *fairly similar to what transpired in the present dispute*," otherwise their Section 1983 claim based on HPD's allegedly inadequate disciplinary policy fails. *Lewis v. City of Houston*, No. 4:22-CV-00844, 2023 WL 2249991, at *7 (S.D. Tex. Feb. 27, 2023) (emph. added) (dismissing claims because plaintiff failed to show how prior incidents that occurred in jail setting and/or involved hands-on force "has anything to do with" officer's alleged use of excessive force during service of warrant); *Woods v. Harris Cnty.*, No. 4:18-CV-1152, 2022 WL 18396216, at *10 (S.D. Tex. May 26, 2022) (granting summary judgment for county because plaintiff alleged that officer used excessive force against pedestrian after witnessing him commit a misdemeanor, but the prior incidents concerned traffic stops, incidents in county jail, or use of force in response to active, potentially lethal aggression), *report and rec. adopted sub nom as to municipal liability, Thomas v. Harris Cnty.*, No. CV H-18-1152, 2022 WL 22596773 (S.D. Tex. Aug. 22, 2022), *aff'd sub nom. Woods v. Harris Cnty.*, No.

---

[12] *Id*. at 51 (acknowledging that Plaintiffs must show a "pattern" of "similar unconstitutional acts," and that proving a pattern "requires similarity and specificity").

4

22-20482, 2024 WL 1174185 (5th Cir. Mar. 19, 2024); *Flores v. Harris*, No. CV H-17-3817, 2019 WL 1426313, at \*27 (S.D. Tex. Mar. 29, 2019) (granting summary judgment for the City because none of the prior incidents involved conduct sufficiently similar to the underlying incident).

Here, Plaintiffs allege that the constitutional violations at issue are Gallegos' alleged uses of excessive deadly force against Nicholas and Tuttle during service of the search warrant.[13] Accordingly, to survive summary judgment Plaintiffs must establish a pattern of (1) HPD officers using excessive force, (2) during service of search warrants, (3) prior to the Harding Street incident. *See e.g.*, *Lewis*, 2023 WL 2249991, at \*7 (S.D. Tex. Feb. 27, 2023).  ***Plaintiffs concede that they have not even tried to establish such a pattern***: "Plaintiff is [sic] not arguing that there is a pattern of excessive force in warrant execution."[14]  Under the law in this circuit, ***on that basis alone***, the City is entitled to summary judgment on Plaintiffs' failure-to-discipline Section 1983 claim.

### a) Plaintiffs' "series of bad acts" concept does not defeat summary judgment.

Plaintiffs try to avoid the obvious consequence of their failure to establish a pattern by instead submitting (1) the number of justified HPD officer-involved shootings that occurred between 2009 and 2014, (2) the alleged number of justified on-duty officer-involved shootings that occurred between 2015 and 2016[15], and (3) an unspecified number of on-duty officer-involved shootings that were justified during Chief Acevedo's tenure before the Harding Street incident.[16]

---

[13] Dkt. 48 ¶ 112; Dkt. 49 ¶¶ 5-6.

[14] Dkt. 330 at 55.

[15] There is no evidence in the record that all of these shootings were considered justified.  The online summaries to which Plaintiffs cite do not indicate whether shootings were justified (*see* Dkt. 330 at 8 n.43), and Plaintiffs have not provided the Court with the IAD investigations of these shootings, which would include the determinations of whether the shootings were justified.

[16] *Id*. at 53.  Plaintiffs' representation that "Chief Acevedo found every single shooting by an on-duty officer justified from 2016-2019" is a misleading representation of Chief Acevedo's deposition testimony.  In response to the question, "[W]as there a single time that you as the final decision maker found an officer-involved shooting unjustified?" Chief Acevedo testified that he

According to Plaintiffs, these statistics alone demonstrate a "pattern" of "bad acts," which Plaintiffs (erroneously) believe is enough to survive summary judgment despite the lack of a pattern showing that other citizens' suffered ***constitutional*** violations similar to those that Tuttle and Nicholas are alleged to have suffered.[17]

Notably, the vast majority of incidents that Plaintiffs cite occurred not only prior to Chief Acevedo's tenure but also five to ten years before the Harding Street incident. Plaintiffs also disregard the fact that between January 1, 2016, and the Harding Street incident—a period in which HPD narcotics officers served over 913 search warrants—***zero*** citizens were shot by HPD officers during the service of search warrants.[18] Further, Plaintiffs give no context to their numbers, despite the Fifth Circuit's directive to do so.[19] *Peterson*, 588 F.3d at 851 & n.4; *Lewis*, 2023 WL 2249991, at *7 (noting that a "pattern" must include "a significant number of previous incidents placed in the context of the size of the police department, the number of criminal incidents investigated, and [such] specificity that the other incidents are fairly similar to what transpired in the present dispute"). Therefore, Plaintiffs' statistics do not satisfy their burden of proof in this case.

Furthermore, Plaintiffs provide no evidence that any of the incidents they cite involved unjustified uses of force. Mere speculation that discipline was warranted does not give rise to municipal liability without proof of a resulting pattern of ***constitutional*** violations similar to the

---

recalled making such a finding at least three different times during his tenure as Chief of HPD. Dkt. 336-52, Acevedo Depo. at 14:17-19:3. Notably, Chief Acevedo was never specifically asked about "on-duty officer" shootings as opposed to officer-involved shootings generally. *See generally* Dkt. 336-52, Acevedo Depo.

[17] Dkt. 330 at 53, 56.

[18] Dkt. 308 at 31 & n.208.

[19] Plaintiffs do not dispute that they have failed to carry their burden of "provid[ing] context that would show a pattern." *Peterson v. City of Fort Worth*, 588 F.3d 838, 851 (5th Cir. 2009); *see* Dkt. 308 at 46; Dkt. 330 at 56 (recognizing in passing "that the City of Houston's size also impacts the pattern").

one at hand. *See Peterson*, 588 F.3d at 851. To hold otherwise would effectively hold the City liable for its employee's tortious conduct, which is expressly prohibited by *Monell*. *See Pinder v. Skero*, 375 F. Supp. 3d 725, 746-47 (S.D. Tex. 2019) (granting summary judgment for county where prior incidents "d[id] not refer to similar types of force or incidents," because holding the county liable without that additional information "would be effectively to hold the County liable for [its employee] on the theory of respondeat superior").

Plaintiffs rely on *Barnes v. City of El Paso* and *Arrington v. City of Chicago*, No. 17 C 5345, 2018 WL 620036 (N.D. Ill. Jan. 30, 2018), for the novel argument that a "series of bad acts" alone, without proof of similar constitutional violations, is sufficient to establish a pattern.[20] But both of those cases addressed the sufficiency of allegations for purposes of surviving Rule 12(b)(6) motions to dismiss, not motions for summary judgment. As noted in *Sinegal v. City of El Paso* (upon which *Barnes* relied for its Rule 12(b)(6) ruling), "the specificity that is required at the Rule 12(b)(6) stage" for establishing a pattern is less than that which is required in this circuit at the summary judgment stage. *Sinegal v. City of El Paso*, No. EP-19-CV-107-KC, 2020 WL 13442013, at *15-16 (W.D. Tex. July 6, 2020) (recognizing that decisions by the Fifth Circuit on motions for summary judgment "demand[] much greater specificity, distinguishing the nature and circumstances of the excessive force used in the prior incidents from the force used in the case at bar'). Thus, in *Oporto v. City of El Paso*, despite having previously held that the plaintiffs' allegations of a pattern were sufficient to survive a Rule 12(b)(6) motion to dismiss, the court granted summary judgment for the city because the plaintiffs had not satisfied the Fifth Circuit's requirement of establishing prior constitutional violations similar to the incident at issue. *Oporto v. City of El Paso*, No. EP-10-CV-110-KC, 2012 WL 2191697, at *5 (W.D. Tex. June 14, 2012)

---

[20] Dkt. 330 at 51-53.

(noting that the standards for establishing a pattern "are different on summary judgment" than on a motion to dismiss).  Neither *Barnes* nor *Arrington* relieve the plaintiffs of their burden to provide the Court with a pattern of prior constitutional violations, which plaintiffs have not done here.

Plaintiffs also rely on *Baker v. Castro*, an unreported 2018 case in which Magistrate Judge Nancy Johnson found  that "uniform outcomes" of past police shooting investigations and "less adversarial treatment of a police shooter" raised a fact issue as to whether the City had inadequate use-of-force disciplinary policies.  *Baker v. Castro*, No. CV H-15-3495, 2018 WL 4762984, at *16-17 (S.D. Tex. Aug. 31, 2018), *report and rec. adopted*, No. CV H-15-3495, 2018 WL 4762958 (S.D. Tex. Oct. 2, 2018).  Unlike the incident at issue here, *Baker* concerned an off-duty officer chasing down and shooting an unarmed suspect.  Notably, the *Baker* case did not address the well-established Fifth Circuit requirement—reiterated by the Fifth Circuit merely one year before the *Baker* opinion—that a plaintiff demonstrate a pattern of similar ***constitutional*** violations.  *Quinn v. Guerrero*, 863 F.3d 353, 365 (5th Cir. 2017) (the city's alleged "code of silence, under which officers [were] tacitly encouraged to use excessive force by the department's failure to discipline," "d[id] not establish an unconstitutional policy or custom" because the Plaintiffs "failed to allege a pattern of complaints by other citizens" claiming that their rights had been violated).  *Baker* has never been cited with approval by any other court, including the Fifth Circuit.

Additionally, *Baker* is distinguishable from this case based on the facts and evidence before this Court.  Magistrate Judge Johnson  relied on the evidence presented to her and the record before her, which consisted of officer-involved shootings that took place five to ten years prior to the Harding Street incident, and years before Chief Acevedo became chief of HPD.  Unlike the record before the *Baker* court, the City has presented post-*Baker* evidence that:

- Between January 1, 2016, and January 28, 2019, ten HPD officers were found to have engaged in unjustified uses of force, and in each instance the officer was disciplined or resigned in lieu of undergoing the disciplinary process.[21]

- During Chief Acevedo's tenure, two additional officer-involved shootings were found to be unjustified.[22]

- Chief Acevedo transferred investigations of officer-involved shootings and other possible police misconduct from Homicide to SIU so that investigating officers were specifically trained to investigate officer-involved shootings and detect potential officer misconduct.[23]

Moreover, Magistrate Judge Johnson based her ruling on eight different HPD-related "customs and policies," only one of which is similar to the alleged disciplinary inadequacies at issue here. *Compare Baker* 2018 WL 4762984, at 16 (HPD gave an officer forty-eight hours to answer written questions) *with* Dkt. 330 at 2 ("HPD gave Gallegos . . . 48-hour notice of every investigation"). Strikingly, Plaintiffs fail to mention that HPD was ***required by law*** to give Gallegos written notice of the administrative investigation at least "48 hours" before questioning him.[24]   Tex. Loc. Gov't Code §§ 143.312(b)(2), (g) (requiring 48-hour notice for administrative investigations of alleged police officer misconduct "that could result in punitive action against that person").   Thus, the sole "custom and policy" at issue in both *Baker* and this case does not support Plaintiffs' claim that HPD had an inadequate disciplinary policy.

Plaintiffs' "series of bad acts" concept fails to overcome summary judgment.

---

[21] Dkt. 308 at 30 & nn.202, 203.

[22] *Id*. at 29-30 & n.201.

[23] *Id*. at 27 & nn.188, 189.

[24] The 48-hour notice requirement does not apply to non-administrative criminal or homicide investigations, and as such, none of the Individual Officers were given 48-hour notice before being questioned in relation to SIU's homicide investigation.   *See e.g.*, Ex. 53, Gallegos witness statement (taken approximately seven hours after the Harding Street incident); Ex. 54, Bryant witness statement (same); Ex. 55, Pardo witness statement (same).

### b) Plaintiffs' six "examples of excessive force" do not defeat summary judgment.

Plaintiffs also try to overcome their failure to demonstrate a pattern of similar constitutional violations by citing six incidents of alleged excessive force[25]—five of which occurred prior to Chief Acevedo's tenure[26]—where officer "misconduct" was purportedly "met with approval."[27] But generalized police "misconduct" does not give rise to municipal liability without proof of a resulting pattern of constitutional violations similar to the one at issue. *See Peterson*, 588 F.3d at 851. Moreover, none of the incidents that Plaintiffs cite are sufficiently similar to the Harding Street incident to establish a pattern.

Three of the cited incidents resulted in alleged injuries that do not "point to the specific violation in question." *Id.* Specifically, (1) *Watson* involved a burglary suspect allegedly being "punched," "thr[own] . . . on the ground," and "handcuffed"[28] while being apprehended;[29] (2)

---

[25] This is the first time that Plaintiffs have cited five of the six incidents. The *Bernard* incident, which occurred at 6725 Sherwood, was alleged in Plaintiffs' complaints and already addressed in the City's Motion. *See* Dkt. 308 at 45-46; Dkt. 308-15, 6725 Sherwood Incident Report at pg. 10.

[26] *See infra* nn.28-34.

[27] Dkt. 330 at 54-56. Pursuant to Federal Rule of Evidence 408, the City objects to Plaintiffs' evidence of the City's settlements in *Baker*, *Watson*, *Benard*, *Williams*, and *Pean*. *See id.* at 54-55. Such evidence is inadmissible to prove the existence of an inadequate HPD disciplinary policy or the City's knowledge of, or deliberate indifference to, the same. Fed. R. Evid. 408(a). *See e.g.*, *Naes v. City of St. Louis*, No. 4:19-CV-02132-SEP, 2021 WL 6049815, at *6 (E.D. Mo. Dec. 21, 2021) (holding that reliance on settlement agreements to substantiate a putative *Monell* custom was impermissible under Rule 408); *W.E. Green v. Baca*, 226 F.R.D. 624, 640-41 (C.D. Cal. 2005) (holding that evidence of settlements from other actions, the amount of those settlements, and the manner in which they were negotiated was inadmissible under Rule 408 "to prove defendant's *Monell* policy" or "defendant's deliberate indifference"); *see also Kinan v. City of Brockton*, 876 F.2d 1029, 1034 (1st Cir. 1989) ("[C]onsiderations leading to a settlement are many and varied . . . . [Such] cases, therefore, cannot be used to prove custom or practice."); *Rhinehart v. Scutt*, No. 2:11-CV-11254-DT, 2014 WL 5361936, at *19 (E.D. Mich. June 20, 2014), *report and recommendation adopted in part*, No. 11-CV-11254, 2014 WL 5361939 (E.D. Mich. Oct. 21, 2014) (holding that "existence of cases which ended in settlements" did nothing "to establish the existence of a . . . policy or custom of ignoring or acquiescing in constitutional violations").

[28] Dkt. 330 at 54.

[29] Ex. 49, 5622 Belarbor Investigation Summary at pg. 1.

*Williams* involved a person allegedly being "handcuffed," "tied . . . to a chair," "choked," and "shoved"[30] after being arrested for suspicion of driving while intoxicated;[31] and (3) *Gomez*—the only incident that occurred during Chief Acevedo's tenure—involved a person being "wrestled . . . to the ground" and having his arms "forced . . . behind his back" while being arrested after a traffic stop.[32]  None of these incidents occurred during service of a search warrant, concerned an officer-involved shooting, or resulted in the death of a citizen.

A fourth incident, the *Bernard* incident, which the City addressed in its Motion, involved a person being wounded—not killed—by an officer's use of force in response to Bernard's threatening conduct.[33]  Where, as in *Bernard*, an officer "likely had probable cause to [seize]" a person, such an incident does not support a pattern of constitutional violations.  *Davidson v. City of Stafford*, 848 F.3d 384, 396 (5th Cir. 2017).  Even if the Court assumes that the remaining two incidents cited by Plaintiffs, which occurred in 2014 and 2015,[34] "point to the specific violation in question" (*Peterson*, 588 F.3d at 851), two purported incidents of excessive use of force occurring during the five-year time span preceding the Harding Street incident do not demonstrate a pattern.  *Davidson*, 848 F.3d at 396–97 (no pattern: two prior incidents over three-and-a-half years); *Carnaby v. City of Houston*, 636 F.3d 183, 190 (5th Cir. 2011) (no pattern: two prior incidents of "excessive" use of force in Houston over four years).

---

[30] Dkt. 330 at 55
[31] Ex. 50, 51 Riesner Investigation Summary at 1-2.
[32] Dkt. 330 at 55.
[33] Dkt. 308 at 45-46 & n.246 (addressing the incident at 6725 Sherwood).
[34] *Baker*, a 2014 incident, involved an off-duty officer shooting a suspect after a police chase.  Ex. 51, *Baker* Fourth Am. Compl. at ¶¶ 17, 28, 49, 52.  *Pean*, a 2015 incident, involved a mental health patient being wounded, not killed, by an officer's use of force after responding to a call for security by hospital staff.  Ex. 52, *Pean* First Am. Pet. at 2.

Plaintiffs' six examples of dissimilar uses of force do not obviate Plaintiffs' fatal failure to demonstrate a pattern of prior similar constitutional violations.

### 2)   *Plaintiffs have not raised an issue of fact regarding deliberate indifference.*

In addition to proving a pattern of similar constitutional violations, Plaintiffs are obligated to show deliberate indifference on the part of Chief Acevedo. *Edwards*, 70 F.4th at 313. Plaintiffs are noticeably silent on their "burden to establish a pattern of similar constitutional violations to show deliberate indifference."[35] *Id*. No doubt this is because, as discussed, Plaintiffs essentially concede that they have not demonstrated such a pattern.[36]

Instead, Plaintiffs rely on principles from the "single incident exception,"[37] through which deliberate indifference can be established if the "highly predictable consequence" of a policymaker's "*single decision*" to not act "would result in the specific injury suffered." *Aviles*, 2023 WL 5487668, at *5-6; *see also Bailey*, 2012 WL 1033502, at *20 (noting that proving deliberate indifference via the single incident exception, "though not impossible," is "[v]ery difficult"). As noted in the City's Motion, Plaintiffs never asserted in their complaints that the single incident exception applied in this case.[38] It is only now, in response to the City's Motion, that Plaintiffs' raise this theory for the first time. As such, this is improperly before the Court. *Jackson v. Gautreaux*, 3 F.4th 182, 188 (5th Cir. 2021).

Further, Plaintiffs' claim does not fit within the very narrow scope of the single incident exception. The facts of this case are wholly distinguishable from the seminal "single incident exception" case in this circuit, *Brown v. Bryan County*, 219 F.3d 450 (5th Cir. 2000). In *Brown*,

---

[35] *See generally* Dkt. 330 at 40-42, 56.
[36] *Id*. at 55.
[37] *See id*. at 41 (relying on excerpts from the "single incident exception" discussion in *Aviles v. Saldivar*, No. 4:22-CV-03571, 2023 WL 5487668, at *5-6 (S.D. Tex. Aug. 23, 2023)), 56.
[38] Dkt. 308 at 52 n.263.

the plaintiff was injured during a traffic stop when a deputy threw her to the ground. *Brown*, 219 F.3d at 454. In support of the plaintiff's failure-to-train theory (a theory that Plaintiffs have abandoned in this case), the record showed that the twenty-one year old deputy had received no formal law enforcement training and had a known history of disciplinary problems; the situation was admittedly known by the policymaker sheriff; and the sheriff nonetheless allowed the deputy to assist in patrols. *Id*. at 454-56. The Fifth Circuit concluded that deliberate indifference could be inferred against the county based on the sheriff's single decision to hire a deputy with known disciplinary problems, coupled with the county's failure to provide him with any training whatsoever. *Id*. at 462, 465.

Since *Brown*, the Fifth Circuit has expressed its "reluctan[ce] to expand" the narrow exception articulated in that case. *Burge v. St. Tammany Par.*, 336 F.3d 363, 373 (5th Cir. 2003); *see also Gabriel v. City of Plano,* 202 F.3d 741, 745 (5th Cir. 2000) ("We have consistently rejected application of the single incident exception and have noted that proof of a single violent incident ordinarily is insufficient to hold a municipality liable for inadequate training."). Consistent with that reluctance, the Fifth Circuit does not appear to have ever expanded the single incident exception to a failure-to-discipline claim, and the City is unaware of any failure-to-discipline case within this circuit in which a plaintiff prevailed on the single incident exception. Indeed, *Brown* appears to be the only "single incident" case published in the Fifth Circuit in which a plaintiff prevailed. *Littell v. Houston ISD*, 894 F.3d 616, 625 n.5 (5th Cir. 2018).

Furthermore, even if the single incident exception could successfully be applied to a failure-to-discipline case, the Fifth Circuit has "reserved the single-incident method of proving deliberate indifference for cases in which the policymaker provides ***no training whatsoever*** with respect to the relevant constitutional duty." *Littell*, 894 F.3d at 625 n.5 (emph. added); *see also*

*Speck v. Wiginton*, 606 F. App'x. 733, 736–37 (5th Cir. 2015) (noting that the Supreme Court's example of a hypothetical case fitting the single incident exception is a municipality "arm[ing] its police force with firearms and deploy[ing] the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force" (quoting *Connick v. Thompson*, 563 U.S. 51, 63 (2011)).  In contrast to that type of failure-to-train case, the City has demonstrated that during the relevant timeframe HPD provided extensive and comprehensive training to its officers, including the Individual Officers involved in this suit, on the appropriate use of force and how to conduct search warrants.[39]  Indeed, Plaintiffs' policy expert does not criticize HPD's training,[40] and Plaintiffs have since abandoned any claim based on the failure to train.[41]  Further, in this case, the City *did* discipline officers for unjustified uses of force.[42]

Therefore, because this case does not meet the extremely narrow single incident exception, and Plaintiffs have not otherwise established a pattern demonstrating deliberate indifference, summary judgment should be granted for the City.

### 3) *Plaintiffs have not raised an issue of fact regarding moving force.*

Finally, Plaintiffs have not raised a fact issue as to whether the City's allegedly inadequate disciplinary policy directly caused Tuttle and Nicholas' injuries.  *Barnes*, 677 F. Supp. 3d at 612.  Plaintiffs rely on a quote from *Lujan v. Beard*, No. EP-21-CV-00302-FM, 2022 WL 986442, at *5 (W.D. Tex. Mar. 31, 2022), that "when a police officer knows their use of excessive force will meet with the approval of city policymakers, the affirmative link/moving force requirement is satisfied."[43]  But the *Lujan* court made that statement in the face of very different facts—namely,

---

[39] Dkt. 305 at Factual Background Section II; Dkt. 308 at Factual Background Section II.B.
[40] Dkt. 309-12, Scott Depo. at 18:8-12.
[41] *See supra* at 1-2 & n.8.
[42] Dkt. 308 at 29-30 & nn.201-203.
[43] Dkt. 330 at 41, 56.

that the officer alleged to have assaulted the plaintiff "was the subject of numerous internal complaints and lawsuits alleging excessive force, but faced no consequences—and sometimes not even an investigation—for his behavior."  *Lujan*, 2022 WL 986442, at *5.  Unlike the officer in *Lujan*, Plaintiffs have presented no evidence that Officer Gallegos, or any other HPD officer for that matter, "was the subject of numerous internal complaints and lawsuits alleging excessive force but faced no consequences . . . [or] investigation." *Id*.  Indeed, the summary judgment evidence in this case shows that all officer-involved shootings were investigated by the Internal Affairs Division[44] and that during Chief Acevedo's tenure, prior to the Harding Street incident, ten officers were found to have engaged in unjustified uses of force, and in each instance the officer was disciplined or resigned in lieu of undergoing HPD's disciplinary process.[45]  In addition, every officer-involved shooting was separately investigated by the Special Investigations Unit, which presented its findings and evidence to the Harris County District Attorney's Office to determine whether criminal charges should be pursued against any of the officers involved.[46]  *Lujan* has no application to this case.

Plaintiffs make a last-ditch effort to survive summary judgment by suggesting that "[a] reasonabl[e] jury could also infer that Gallegos used force with knowledge that the City would exact no consequences for his actions."[47]  But  Plaintiffs have offered only rank speculation that (1) Gallegos believed that the City allowed use of deadly force "with impunity and approval,"[48] or (2) "that this knowledge was the affirmative cause for . . . use [of] deadly excessive force." *James v. Harris Cnty.*, 508 F. Supp. 2d 535, 549 (S.D. Tex. 2007), *aff'd*, 577 F.3d 612 (5th Cir. 2009).

---

[44] Dkt. 308 at Factual Background Section II.D.
[45] *Id*. at 30 & nn.202, 203.
[46] *Id*. at Factual Background Section II.D.
[47] Dkt. 330 at 41, 56.
[48] Dkt. 48 ¶ 131; *see also* Dkt. 49 ¶ 166.

Plaintiffs have presented no evidence in support of this. Their expert's opinion that "[b]ased on the lack of supervision and disciplinary action . . . Gallegos and Squad 15 knew that their use of excessive deadly force would be met with tacit approval by supervisors"[49] is both conclusory and unsubstantiated. Moreover, Plaintiffs' expert bases his opinion on use-of-force incidents that occurred five to ten years prior to the Harding Street incident, and years before Chief Acevedo became chief of HPD.[50] Further, his opinion is contrary to the evidence in this case that the City's multi-faceted supervision of officers' uses of force was rigorous and effective and that the City appropriately disciplined officers when use of force was not justified.[51] To Plaintiffs' chagrin, the evidence demonstrates that it was Tuttle and Nicholas' own threatening conduct that caused their injuries, and no additional or different use-of-force disciplinary policies would have changed that.[52]

Because Plaintiffs have not raised a genuine issue of material fact for any of the elements of their failure-to-discipline theory based on the "series of bad acts" concept, the City should be granted summary judgment.

B. The City is entitled to summary judgment on Plaintiffs' failure-to-discipline theory based on their "highly predictable consequence" concept.

Plaintiffs assert a second failure-to-discipline theory based on a "highly predictable consequence" concept.[53] Plaintiffs acknowledge (as they must) that in order to prevail on their theory, they are required to demonstrate (1) an inadequate disciplinary policy, (2) deliberate indifference and (3) moving force—that is, direct causation of the alleged violations of Tuttle and

---

[49] Dkt. 330 at 40.
[50] Dkt. 336-35, Scott report at 007959 NICHOLAS (relying on incidents "that happened in the City of Houston between 2009 and 2014").
[51] Dkt. 308 at Factual Background Sections II.C & II.E.
[52] *See id*. at Factual Background Section I & Argument Section I.A; *see also infra* Sections II, III.
[53] Dkt. 330 at 31-42.

Nicholas' constitutional rights.[54]  *See Barnes*, 677 F. Supp. 3d at 612.  Plaintiffs' deliberate

indifference and moving force arguments are identical to those made in support of Plaintiffs'

"series of bad acts" theory.[55]  Accordingly, for the reasons already discussed, Plaintiffs have failed

to raise an issue of material fact regarding deliberate indifference or causation,[56] and summary

judgment on Plaintiffs' "highly predictable consequence" failure-to-discipline theory is warranted.

Moreover, Plaintiffs have not raised a genuine fact issue as to whether the City had an

inadequate use-of-force discipline policy.  As discussed, they have not demonstrated the requisite

"pattern of ***similar constitutional violations***" arising from such an alleged policy.  *Bailey*, 2012

WL 1033502, at *21 (emph. added).

Plaintiffs try to work around the absence of a pattern by relying on *Arrington*,[57] an

unreported case from the Northern District of Illinois, and its holding that a plaintiff can survive a

Rule 12(b)(6) motion to dismiss even in the absence of a pattern "if it can be shown that the [the

plaintiff's] injury is a highly predictable consequence of a municipal custom and practice."

*Arrington*, 2018 WL 620036 at *3.  Not only is *Arrington* non-precedential authority whose Rule

12(b)(6) analysis has no application here, the "highly predictable consequence" theory articulated

---

[54] *Id*. at 35.

[55] *Id*. at 40-42, 56.

[56] Plaintiffs seem to suggest that to prove causation they may "'prove that the highly predictable consequence of a failure to train would result in the specific injury suffered.'"  *Id*. at 32 (quoting *Estate of Davis v. City of N. Richland Hills*, 406 F.3d 375, 386 (5th Cir. 2005).  But *Davis*' reference to "the highly predictable consequence of a failure to train" was not for purposes of satisfying the causation element of a failure-to-act claim.  Rather, it was for purposes of satisfying the deliberate indifference element via the single incident exception: "[T]here is a so-called single incident exception . . . .  To rely on this exception, a plaintiff must *prove that the highly predictable consequence of a failure to train would result in the specific injury suffered*."  *Davis*, 406 F.3d at 385-86.  The Court then clarified that a plaintiff must still separately prove "that the failure to train represented the 'moving force' behind the constitutional violation"—that is, direct causation— which is the causation element of a failure-to-act claim.  *Id*. at 386.

[57] Dkt. 330 at 32-33.

in *Arrington* is merely a version of the previously discussed "single incident exception," which does not apply in this case.

In support of its "highly predictable consequence" holding, *Arrington* relied on *dicta* from *Board of County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 409 (1997) that "a plaintiff might succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations" in the "narrow range of circumstances" where the "violation of federal rights [is] . . . a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations."  *See Arrington*, 2018 WL 620036 at *3 (quoting *Bryan County*, 520 U.S. at 409).  The Fifth Circuit has interpreted *Bryan County* as permitting a single decision by a policymaker to "constitute a policy for which [a municipality] may be liable," "even where there has been no pattern of previous constitutional violations," but only in a very narrow range of circumstances.  *Brown*, 219 F.3d at 459, 462 (applying *Bryan County*'s "single incident exception" to a failure-to-train theory).  As discussed, *Brown* is the only known "published 'single incident' failure to train case in our circuit in which the plaintiff prevailed" (*Littell*, 894 F.3d at 625 n.5), and it does not appear that the single incident exception has ever been successfully applied to a failure-to-discipline case such as this.  Moreover, the circumstances in *Brown* differed substantially from the facts in that case.  Specifically, the policymaker in *Brown*—the county sheriff—admitted that the county provided no training whatsoever to its officers, thereby effectively conceding the inadequacy of the county's officer training program.  *Brown*, 219 F.3d at 456.  In contrast, HPD officers were provided extensive training on appropriate use of force and how to properly serve search warrants.[58]  In addition, Plaintiffs have not identified

---

[58] Dkt. 305 at Factual Background Section II; Dkt. 308 at Factual Background Section II.B.

a single prior incident where an HPD officer's use of force was either deemed or in fact unjustified and the offending officer was not appropriately disciplined.

Plaintiffs also argue that *Baker* absolves them of the need to demonstrate a pattern of similar prior constitutional violations. But as discussed above, *Baker* runs afoul of well-established Fifth Circuit precedent regarding the need for a pattern and is distinguishable from this case based on the facts and evidence.[59]

Plaintiffs' reliance on *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985) is also misplaced.[60] *Grandstaff* upheld a jury finding that the City of Borger was liable under a failure-to-train theory despite there being no evidence of prior similar incidents where six police officers mistook an innocent bystander who was driving a slow-moving truck for someone suspected of a minor traffic violation, "poured their gunfire at the truck" "without awaiting any hostile act or sound," and ultimately killed the bystander. *Grandstaff*, 767 F.2d at 165, 168. The Fifth Circuit upheld the jury's finding because the conduct of both the officers during the incident and the city policymakers in the wake of the incident were sufficient to infer ratification by city policymakers of the officers' reckless disregard for human life and a *de facto* policy of such. *Id*. at 171-72.

This case is clearly distinguishable from the extreme factual situation in *Grandstaff*. *See Barkley v. Dillard Dep't Stores, Inc.*, 277 F. App'x. 406, 413 (5th Cir. 2008) ("*Grandstaff* . . . has not enjoyed wide application in our circuit."). Far from the "incompetent and catastrophic performance" and "gross . . . abuse of the use of deadly weapons" at issue in *Grandstaff* (*Grandstaff*, 767 F.2d at 171), Gallegos' uses of force against Nicholas and Tuttle were neither unreasonable nor excessive in light of the undisputed evidence that Tuttle fired his revolver at the

---

[59] *See supra* Section I.A(1)(a).
[60] Dkt. 330 at 33, 35.

officers 3-4 times; four officers were shot during the incident, including Lovings, whom Tuttle shot in the neck; Medina was shot prior to any officer shooting Nicholas or Tuttle; and immediately prior to killing Nicholas and Tuttle, Gallegos perceived both of them as immediate threats to himself and/or other officers.[61]   Moreover, as will further be discussed, Chief Acevedo did not ratify any alleged use of excessive force by Gallegos.[62]   Accordingly, *Arrington*, *Baker*, and *Grandstaff* do not relieve Plaintiffs of their burden to demonstrate a pattern of prior constitutional violations similar to the ones at issue.  As addressed, Plaintiffs have failed to do so.

For these reasons, the City is entitled to summary judgment on Plaintiffs' "highly predictable consequence" failure-to-discipline theory.

C.   The City is entitled to summary judgment on Plaintiffs' ratification theory.[63]

Plaintiffs' final theory of liability is that Chief Acevedo ratified Gallegos' alleged uses of excessive force.[64]   If a policymaker approves a subordinate's decision *and* the basis for it, the policymaker's ratification may be chargeable to the municipality "because their decision is final." *Peterson*, 588 F.3d at 848.  However, while ratification theory "is still good law, . . . the Fifth Circuit has repeatedly said that it is applicable only in the most extreme factual situations." *Studzinski v. City of Austin*, No. A-19-CV-709-ML, 2020 WL 8674122, at *11 (W.D. Tex. Dec. 28, 2020).  It is not intended to turn just "any use of force incident where the officer was not

---

[61] Dkt. 308 at Factual Background Section I; *see also infra* Sections II & III

[62] *See infra* Section I.C.

[63] Plaintiffs incorrectly equate ratification with the theory that "a single unconstitutional action [was] performed by a final policymaker." Dkt. 330 at 31.  The latter theory, which is a means of proving a municipality's "custom," refers to a situation (not at issue in this case) where a policymaker "personally commit[s]" "a single constitutional violation sufficient to confer liability on the City."   *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 170 (5th Cir. 2010) (distinguishing the "single constitutional violation" theory from ratification); *see* Dkt. 308 at 49 n.254 (noting that Plaintiffs have never alleged that a single decision by a City policymaker established a "custom" in this case).

[64] Dkt. 330 at 31, 42-50.

reprimanded into grounds for municipal liability." *Id*.

Plaintiffs contend that conduct taken both before and after the Harding Street incident by (1) HPD generally, (2) Gallegos and other officers, (3) the Internal Affairs Division, and (4) the chief of police demonstrates ratification of Gallegos' alleged uses of excessive force.[65]   But because only post-incident actions by a municipal policymaker are relevant to a ratification theory[66] (*Peterson*, 588 F.3d at 848), and "a department's investigation, report, and conclusions regarding an incident do not amount to ratification" (*Madden v. Gribbon*, No. 3:21-CV-1168-S, 2022 WL 4360558, at *9 (N.D. Tex. Sept. 20, 2022)), only Plaintiffs' evidence of "Chief Art Acevedo's statements to the public following Plaintiffs' death[s]" is relevant to Plaintiffs' theory.[67]

The sole statement of "ratification" on which Plaintiffs rely was made by Chief Acevedo in November 2019 after the IAD issued its investigative report on Goines' use of fictitious information to obtain the search warrant.[68]   Plaintiffs maintain that Chief Acevedo "falsely claimed that HPD 'had a reason to be there [at the Harding Street house],' and [had] 'probable cause'" for the search warrant.[69]   However, as acknowledged by Plaintiffs,[70] Chief Acevedo subsequently testified that although he "use[d] the word probable cause," what "[he] was talking about [was] the reason for the investigation in terms of why we started investigating that location in the first place"[71] because HPD had received a 911 call for 7815 Harding Street, and a female on that street had identified the house as a "dope house."[72]

---

[65] *Id*. at 45, 47.
[66] Plaintiffs do not dispute that Chief Acevedo is the only City policymaker relevant to this case.
[67] *Id*. at 45.
[68] *Id*. at 46.
[69] *Id*.
[70] *Id*. at 46-47.
[71] Dkt. 336-52, Acevedo Depo. at 84:16-85:23.
[72] Ex. 56, Excerpt of Jan. 31, 2019, press conference.

Nevertheless, even if Chief Acevedo's statement regarding the search warrant amounted to a representation that there was probable cause to search the Harding Street house (which it does not), the statement still would not constitute ratification of Gallegos' alleged uses of excessive force.  Chief Acevedo's statement only concerns probable cause for the _search warrant_ and does not even address (let alone approve) (1) Gallegos' alleged _seizures_ of Tuttle or Nicholas (i.e., use of force), or (2) the bases thereunder.  *Davidson*, 848 F.3d at 395 ("ratification" must approve both a subordinate's decision and the basis for it).

Further, Plaintiffs cite no authority in support of their position that despite a policymaker's alleged statement of "ratification" having nothing to do with a subordinate's decision or the basis for it, the statement can still serve as the "moving force" for the plaintiff's injury.  *See Hobart v. City of Stafford*, 916 F. Supp. 2d 783, 795 (S.D. Tex. 2013) (noting that although "this Circuit apparently tolerates" use-of-force claims based on theories of ratification, "it is difficult to understand how the subsequent ratification of a subordinate's excessive use of force is a *cause* of that completed violation").  As discussed, it was the threatening conduct of Nicholas and Tuttle that directly caused their injuries, not Chief Acevedo's post-incident statement.

Because Plaintiffs have not raised an issue of fact in support of their ratification theory,[73] Summary judgment should be granted for the City on this theory.

---

[73] Plaintiffs rely on *Roundtree v. City of San Antonio*, No. SA-18-CV-01117-JKP-ESC, 2022 WL 903260 (W.D. Tex. Mar. 28, 2022), in support of their ratification theory.  But Plaintiffs misrepresent that the *Roundtree* court made factual findings and legal holdings that the court never made.  Dkt. 330 at 43-44.  Plaintiffs misconstrue the court's summarization of *the plaintiffs' summary judgment response* in that case as judicial holdings.  *Compare id. with Roundtree*, 2022 WL 903260 at *8; *see also* Dkt. 330 at 45 (misrepresenting the *Roundtree* court's *dicta* as a holding).  Although *Roundtree* ultimately denied summary judgment on the plaintiffs' municipal liability claims that were brought under a ratification theory, the court did so because there was an issue of fact as to whether "the City ratified [the officer's] conduct by engaging in a campaign to tarnish the reputations of the people inside [the house at issue] as a means to avoid legal liability," which is not at issue in this case.  *Roundtree*, 2022 WL 903260 at *11.

## II.    Plaintiffs Have Not Raised an Issue of Material Fact as to Whether Gallegos' Use of Force Against Nicholas was Reasonable.

In response to the City's Motion, Plaintiffs have abandoned their expert's theory that Gallegos accidentally shot Nicholas.  They now adopt Gallegos' account that he intended to shoot her.[74]  Consequently, Plaintiffs have also dismantled their expert's theory that Nicholas was on the far side of the room at the north end of the couch when she was shot.  Plaintiffs' expert concluded that if Nicholas had been at the north end of the couch (as the expert believes she was), it would have been impossible for Gallegos to see her (hence, the "accidental shooting" theory).[75]  But in light of Plaintiffs' concession that Gallegos did, in fact, see Nicholas at the time he shot her, their expert's theory that Nicholas was at the north end of the couch when she was shot is now defunct.  Consequently, Plaintiffs have not raised a material issue of genuine fact regarding Nicholas' position of standing over Medina when Gallegos shot her.

Further, Plaintiffs do not dispute that Nicholas' hands tested positive for gunshot residue[76] or that it would have been reasonable for Gallegos to believe that Nicholas posed an imminent threat of serious harm to Medina if she was reaching for his gun while he lay injured on the couch.[77]

---

[74] Dkt. 330 at 14 ("[Gallegos] spots Ms. Nicholas and shoots her[.]"), 16 ("Gallegos intentionally and knowingly sho[t] . . . Nicholas.").

[75] Dkt. 336-34, Maloney report at  22, 26, & 35 of 71 ("[Nicholas] was on the far side of the poorly illuminated room and . . . was not visible from [Gallegos'] firing position/location.").

[76] Dkt. 308 at 14 & n.81

[77] *See generally* Dkt. 330.  Plaintiffs' reliance on *Brousseau v. Haugen*, 543 U.S. 194 (2004), and *Releford v. Rosemon*, 678 F. App'x 267, 268 (5th Cir. 2017) (Dkt. 330 at 7 n.35) does not discredit the undisputed contention here that it would have been reasonable for Gallegos to believe that Nicholas posed an imminent threat of serious harm if she was reaching for Medina's gun.  To the contrary, as the Supreme Court stated in *Tennessee v. Garner*, 471 U.S. 1, 11 (1985), upon which *Brousseau* and *Releford* rely, deadly force is only unreasonable "[w]here the suspect poses no immediate threat to the officer and no threat to others . . . . A police officer may not seize an unarmed, nondangerous suspect by shooting him dead. . . . Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to . . . us[e] deadly force."  *See Brousseau*, 543 U.S. at 203 (quoting *Garner*); *Releford*, 678 F. App'x at 268 (same).

Instead, Plaintiffs try to avoid the conclusion that Gallegos' use of force was reasonable by conjuring an alternative and entirely new version of events. Plaintiffs allege that Gallegos' shooting of Nicholas came *after* the injured Medina was removed from the Harding Street house. This is the first time the Plaintiffs have made this assertion. Indeed, it is not alleged anywhere in their complaints,[78] nor is it found in the report of their shooting reconstruction expert, Michael Maloney. It was not until after the City pointed out that Plaintiffs could not assert a Section 1983 claim based on the "accidental shooting" theory espoused by Maloney that Plaintiffs concocted this new theory. Because this alternative version is nothing more than unsubstantiated assertions and speculation, it is insufficient to show the existence of a genuine issue for trial, and summary judgment should be granted for the City. *Clark v. City of Alexandria*, -- F. 4th --, 2024 WL 4224357, at *4 (5th Cir. Sept. 18, 2024) ("[C]onclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden in a motion for summary judgment.").

Plaintiffs attempt to rearrange the events of the Harding Street incident by relying on a single screenshot from Rios' body worn camera footage taken outside of the Harding Street house as Medina was being removed to the street.[79] Plaintiffs theorize that Gallegos shot Nicholas *after* Medina was removed from the house and not while he was laying injured on the couch. But there are two glaring problems with Plaintiffs' theory that prevent them from relying on this evidence to defeat summary judgment.

First, Plaintiffs admittedly do not know who the person in the screenshot is, and the City understands that Gallegos will be submitting a declaration in conjunction with his reply

---

[78] *See generally* Dkts. 48 & 49.
[79] Dkt. 330 at 13.

establishing the person in the screenshot is *not* Gallegos.[80]  Plaintiffs' unsubstantiated speculation[81] cannot create a genuine issue of fact as to whether he reasonably perceived Nicholas as posing an imminent threat of serious harm to Medina or other officers when Gallegos shot her.  *Id*.

Further, Plaintiffs provide no support—other than their *ipse dixit*—for the assertion that the moment captured on their screenshot occurred *before* Gallegos' shooting of Nicholas rather than afterward.  In direct conflict with (1) multiple Individual Officers' testimony,[82] (2) the Texas Ranger's investigative report,[83] and (3) even the report of Plaintiffs' shooting reconstructionist expert,[84] Plaintiffs rearrange the sequence of events to fit their new theory that Medina was not in the house when Nicholas was shot.[85]  But not even Plaintiffs' own expert has ever advanced that

---

[80] The City incorporates Gallegos' declaration by reference.

[81] During the depositions taken in this case, Plaintiffs did not present this screenshot to any of the officers who were present at the Harding Street incident, including Gallegos, or ask any of them whether the person in the photo appeared to be Gallegos. As is evident from the screenshot itself, neither tattoos nor the person's "build" or "skin tone" are readily visible (*id*. at 13 n.80), let alone the person's face. Although a potential head covering can be seen, Gallegos' unrefuted testimony is that he did not wear a facemask during service of the warrant. Dkt. 309-5, Gallegos Depo. at 201:13-16.  In fact, Plaintiffs do not even argue that Gallegos wore a face mask during the Harding Street incident.  Rather, they rely on photos that HPD took of Gallegos *after* the incident (*see* Dkt. 330 at 13 n.80 (citing Plfs. Ex. 99)), for which Gallegos "was actually asked to put my mask on for the picture." Dkt. 309-5, Gallegos Depo. at 200:17-201:1.  Moreover, in addition to admitting that there were at least two other officers who wore short sleeve shirts for the Squad 15 photo that was taken earlier that day (Dkt. 330 at 13 n.80), Plaintiffs present no evidence of how many officers wore short sleeve shirts during the Harding Street incident.

[82] *See e.g.*, Dkt. 309-5, Gallegos Depo. at 102:10–19 (Gallegos testifying that he saw Nicholas standing over Medina); Dkt. 309-18, Pardo Depo. at 45:3-6 (Pardo testifying that he saw Nicholas standing over Medina), 46:6-11 (same).

[83] Dkt. 309-4, Wolf Depo. at 108:7-15.

[84] Dkt. 336-34, Maloney report at 25 of 71 (depicting Medina on the couch inside the house at the time Gallegos shot Nicholas).

[85] Even the camera footage on which Plaintiffs rely discounts their theory.  As Gallegos testified, shortly after shooting Nicholas he broke an exterior window to gain further visibility into the house.  Dkt. 308 at 14 & n.88.  The camera footage confirms Gallegos' account because the timestamp for Plaintiffs' screenshot (Dkt. 330 at 13 n.79 (noting that the screenshot was taken at BWC Sync from 0:43)), is a mere four seconds before the sound of breaking glass is heard (Dkt. 336-62, body worn camera footage at 0:47), which is consistent with Nicholas having already been shot by the time the events captured in Plaintiffs' screenshot occurred.

theory.[86]    Plaintiffs cannot meet their burden for overcoming summary judgment with an unsubstantiated assertion such as this.  *Id.*

Plaintiffs also challenge Gallegos' account of the shooting based on Nicholas sustaining a fatal bullet wound to the front, right side of her chest.  Plaintiffs rely on their expert's conclusion that Gallegos could not have shot the front, right side of Nicholas chest while she was tugging at the shotgun slung on the vest of Medina (who lay slumped on the couch) because "were she over him attempting to gain control of his shotgun . . . her left side would have been exposed to Gallegos['] shooting position."[87]    But neither Plaintiffs nor their expert have ever provided any evidence, explanation, or analysis supporting their unsubstantiated conclusion that in "attempting to gain control of [Medina's] shotgun" Nicholas necessarily would have "exposed" only her left side to Gallegos.[88]    Mere speculation such as this does not defeat summary judgment.  *Bailey v. Ramos*, 657 F. Supp. 3d 927, 940 (W.D. Tex. 2023) (noting that summary judgment should be granted where "critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant").

The Texas Rangers' investigation conclusively established that Nicholas' position was consistent with Gallegos' statements based on their trajectory analysis and the medical examiner's report,[89] as well as the timing and sequence of events.[90]

---

[86] *See supra* n. 84.

[87] Dkt. 308 at 16; Dkt. 336-34, Maloney report at 35-36 of 72.

[88] Dkt. 336-34, Maloney report at 35-36 of 72; *see* Dkt. 309-5, Gallegos Depo. at 107:19-108:2 (Gallegos explaining that when Nicholas was over Medina, her body was "not exactly squared up with me but at an angle to where I can see the entire front side of her body").

[89] Ex. 57 at 146:9-147:13 ("Because of the flight path of the bullet.  It's slightly downward coming across her body – excuse me -- with Gallegos having been down at the exterior of the house shooting at her in a slightly lower position.  If she leans or is stepping forward or moving forward and just orients her body slightly downward, you will create that flight path coming through her body and it will have a slightly upward flight path with her leaning forward in that position.").

[90] *Id.* at 108:7-15 (establishing that within 8 seconds the dog, Medina, and Nicholas had been shot).

Plaintiffs have failed to raise a genuine issue as to any fact that is material to the issue of whether Gallegos reasonably believed that Nicholas posed an imminent risk of serious harm to Medina or the other officers.[91] Summary judgment should be granted for the City.

## III. Plaintiffs Have Not Raised an Issue of Material Fact as to Whether Gallegos' Use of Force Against Tuttle was Reasonable.

Plaintiffs do not dispute that Tuttle "was a threat when he was shooting at the officers," as admitted by Plaintiffs' expert.[92]  In light of the threat Tuttle posed, Plaintiffs also do not dispute that the Individual Officers' first seven shots of Tuttle were reasonable.  Plaintiffs' only complaint is that Gallegos' last two shots of Tuttle were excessive because at some point prior to those final two shots Tuttle purportedly become incapacitated.[93]  However, not even Plaintiffs' policy expert agrees with Plaintiffs' theory, for he believes only the last and final shot of Tuttle was excessive.[94]

Plaintiffs' argument is undercut by the fact that they have never maintained that Tuttle "clearly [gave] himself up" to the Individual Officers. *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014) (holding that officers' use of deadly force did not violate the Fourth Amendment where

---

[91] Neither *Crane v. City of Arlington*, 50 F.4th 453 (5th Cir. 2022) nor *Geiger v. Monroe Cnty.*, No. 1:16-CV-95-SA-DAS, 2018 WL 3025951 (N.D. Miss. June 18, 2018) support Plaintiffs' case. *See* Dkt. 330 at 29 (incorporating by reference Plaintiffs' response to Gallegos' motion); Dkt. 334 at 26-29. Unlike here, both *Crane* and *Geiger* involved eyewitness testimony that directly contradicted officers' statements regarding the threats of harm that suspects posed. *See Crane*, 50 F.4th at 463 (accepting as true the facts alleged by vehicle passengers who were eyewitnesses to the shooting); *Geiger v. Sloan*, 780 F. App'x 150, 154 (5th Cir. 2019) (affirming district court's finding that there was a dispute of material fact in the *Geiger* case because the account from the suspect's girlfriend, who was an eyewitness to the shooting, "completely diverge[d]" from the officer's).  Further, in *Geiger* the officer himself later admitted that contrary to his previous statement, he did not see the suspect shooting at officers at all.  *Geiger*, 780 F. App'x at 154.  Such facts distinguish *Crane* and *Geiger* from this case.  Gallegos has never changed his account that Nicholas and Tuttle both posed imminent threats of serious harm to the Individual Officers, and none of the other Individual Officers, who were the only eyewitnesses to the incident, have ever "diverge[d]" from Gallegos' account regarding Nicholas and Tuttle's threatening conduct.

[92] Dkt. 309-12, Scott Depo. at 157:4-5 ("clearly Mr. Tuttle was a threat when he was shooting.").

[93] Dkt. 330 at 17-18.

[94] Dkt. 309-12, Scott Depo. at 23:3-9, 23:25-24:4.

suspect posed a "severe threat to public safety," and he never "clearly [gave] himself up"). Nor is there evidence that prior to the final shot (or final two shots) of Tuttle "it was clear to [Gallegos] that [Tuttle] was no longer a threat." *Cantu v. Austin Police Dep't*, No. 1:21-CV-00084-DAE-SH, 2023 WL 8634821, at *8 (W.D. Tex. Dec. 12, 2023), *report & rec. adopted*, No. 1:21-CV-84-DAE, 2024 WL 492395 (W.D. Tex. Feb. 8, 2024). Not even Plaintiffs' expert opines that Gallegos knew Tuttle was purportedly incapacitated.[95]

Corroborated officer testimony shows that even in his final moments Tuttle continued to threaten the Individual Officers with his gun.[96]  Even considering **only Plaintiffs' version of events**, at the time of the final shot (1) Tuttle faced Lovings, who lay injured and in a vulnerable position in the entryway of the house just a few feet away from Tuttle, (2) Tuttle raised his upper body and propped himself up by his elbows, (3) Tuttle's weapon lay in close proximity to him, and (4) none of the Individual Officers knew that Tuttle was supposedly unable to hold a weapon.[97] Furthermore, Plaintiffs do not dispute that prior to the last two shots of Tuttle, four officers had already been shot and wounded, and Tuttle had neither voluntarily relinquished his weapon nor communicated any intent to surrender. Thus, even under Plaintiffs' version of events, there is no genuine issue of fact challenging the reasonableness of Gallegos' final two shots of Tuttle.  *Harris*, 745 F.3d at 772 ("[U]se of deadly force is not unreasonable when an officer would have reason to believe that the suspect poses a threat of serious harm to the officer or others."); *see also Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014) ("[I]f police officers are justified in firing at a suspect . . ., the officers need not stop shooting until the threat has ended.")

---

[95] Dkt. 309-3, Maloney Depo. I at 190:22-191:4.
[96] Dkt. 308 at Factual Background Section I.
[97] Dkt. 309-3, Maloney Depo. I at 179:16–191:5.

**IV.     Plaintiffs are Entitled to Summary Judgment on Plaintiffs' State Law Claims.**

Plaintiffs fail to grasp that governmental immunity, unless waived, immunizes the City from both suit and liability.  *Smit v. SXSW Holdings, Inc.*, 903 F.3d 522, 530 (5th Cir. 2018). Having failed to demonstrate a valid waiver, Plaintiffs' wrongful death and survival claims must be dismissed. *See e.g.*, *Aguirre v. City of San Antonio*, 995 F.3d 395, 422 (5th Cir. 2021) (explaining that the TTCA does not waive governmental immunity arising out of intentional tort).

## CONCLUSION

For the reasons stated above, the City respectfully requests that the Court grant the City's Motion for Partial Summary Judgment on Plaintiffs' claims based on use of force, and grant the City all other and further relief to which it is entitled, whether in law or equity.

Dated: September 27, 2024                    Respectfully submitted:

BECK REDDEN LLP                              THE ODOM LAW FIRM

/s/ Alistair B. Dawson                       /s/ Al Odom
Alistair B. Dawson                           Al Odom
State Bar No. 05596100                       State Bar No. 15201100
Federal Bar I.D. 12864                       Federal Bar I.D. 12913
adawson@beckredden.com                       601 Sawyer Street, Suite 225
Garrett S. Brawley                           Houston, Texas 77007
State Bar No. 24095812                        Telephone: (713) 357-5153
Federal Bar I.D. 3311277                      E-mail: aodom@aodomlawfirm.com
Lena E. Silva
State Bar No. 24104993
Federal Bar I.D. 3608019
1221 McKinney St., Suite 4500
Houston, Texas 77010-2010
Telephone: (713) 951-3700

ATTORNEYS FOR DEFENDANT CITY OF HOUSTON

29

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was sent to all counsel of record on this the 27th day of September 2024, pursuant to the Federal Rules of Civil Procedure.

<u>*/s/ Alistair B. Dawson*</u>
Alistair B. Dawson