UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| CLIFFORD TUTTLE, et. al. <br><br> Consolidated with <br><br> JOHN NICHOLAS, et.al. <br><br> Plaintiffs, <br> v. <br><br> CITY OF HOUSTON; ART ACEVEDO, et. al. <br> Defendants. | Case No. 4:21-cv-00270 <br><br> (JURY DEMANDED) |

### THE TUTTLE AND NICHOLAS PLAINTIFFS' OBJECTION AND RESPONSE TO DEFENDANT FELIPE GALLEGOS'S DECLARATION

Defendant, Felipe Gallegos, has filed new evidence as part of his reply brief – specifically, a new sworn declaration with additional testimony. The City of Houston has also noted and cited to this affidavit in its reply brief. Plaintiffs file this objection, and in the alternative, additional response, to address the new evidence in the declaration.

Generally, "[t]he purpose for having a motion, response, and reply is to give the movant the final opportunity to be heard, and 'to rebut the nonmovants' response, thereby persuading the court that the movant is entitled to the relief requested by the motion.'"[1] Thus, the non-movant may respond only "when the movant . . . attempts to present new evidence at the reply stage."[2] By authorizing this additional briefing, the Court allows the non-movant "the opportunity to respond to [a] new argument raised in the defendant's reply brief."[3] Based on that, Plaintiffs object to the new affidavit, and, alternatively, respond to this new evidence.

---

[1] *Murray v. TXU Corp.*, No. 3:03-CV-0888-P, 2005 U.S. Dist. LEXIS 10298, 2005 WL 1313412, at * 4 (N.D. Tex. May 27, 2005) (Solis, J.)
[2] *Murray*, 2005 U.S. Dist. LEXIS 10298, 2005 WL 1313412, at * 4.
[3] *See Pennsylvania Gen. Ins. Co. v. Story,* No. 3:13-CV-0330-G, 2003 U.S. Dist. LEXIS 9923, 2003 WL 21435511, at *1 (N.D. Tex. June 10, 2003).

1

First, Gallegos claims that (1) "the picture does not depict [his] body or reflect [his] body type," and (2) "appears to depict a person wearing a long-sleeved Houston Narcotics t-shirt." The still shots from Exhibit "AC" reject both claims. Specifically, the picture makes it undeniable – the officer has a short-sleeved shirt, and Ranger Wolf previously identified Gallegos based on his short-sleeved shirt.[4]






[5]

Second, Gallegos testified that he was "never on the side of the house where the figure labelled as "Gallegos" in this image is depicted." Yet, Ranger Wolf previously placed Gallegos to

---

[4] Pls.' Ex. AK at pg. 25 (identifying Gallegos by his "short sleeve shirt").
[5] Pls.' Ex. "AC," Synced BWC Video and Pls.' Ex. 99.

the left of the house upon entry.[6] Thus, at the very least, Gallegos started on the left side of the door/porch.

In addition, in light of the contradictions and changes in testimony by Gallegos, his credibility is an issue for the jury to determine. This is particularly true because he has already changed his sworn testimony, including that (1) Nicholas was grabbing as opposed to reaching for the gun[7] and (2) that he broke a window after shooting Nicholas when he previously claimed this happened before shooting Nicholas.[8]

Finally, Gallegos and the City appear to argue that Plaintiffs have predicated their timeline of events – particularly, that Gallegos shot Nicholas after Medina had left the house – only on this picture of Gallegos. This is inaccurate. Regardless of the picture of the short-sleeved officer, the evidence shows that Gallegos killed Nicholas after Medina was out of the house. This includes the following:

- Gallegos has testified under oath - multiple times - he did not shoot Nicholas until (1) Lovings is shot and (2) Pardo/Salazar fall out of the house.[9] Yet based on the testimony of Wolf and Pardo, Lovings and Pardo shot a combined 17-19 times prior to them falling out of the house, and prior to Gallegos ever firing a shot.[10] Likewise, Medina fired one shot prior to this occurring.[11] Yet by the time Medina and Sepolio have left the building, at most 12-15[12] shots have been fired. In other words, Gallegos did not fire his gun until after Medina left the house.

---

[6] Pls.' Ex. AK at pg. 51.
[7] *Compare* Pls. Ex. 92 at Page 24 (Gallegos testified that Ms. Nicholas did not "actually **lay her hands on the weapon**.") *with* Pls. Ex. F (Dep. of Gallegos) at pg. 102:20-103:7 (Gallegos now testified he saw Nicholas "pulling at" the shotgun and touching "the weapon itself.").
[8] See footnote 18.
[9] Pls. Ex. F (Dep. of Gallegos) at 100:23-101:1 (his deposition); Pls's Ex. 92 at COH00006001 (his IAD statement);
[10] Pls.' Ex. H (Dep. of Salazar) 70:22-71:10 (Salazar shot 8-10 times prior to falling); Pls.' Ex AF (Dep. of Wolf) at 115:18-116:8 (Lovings shot at least nine times prior to being shot and falling).
[11] Pls. Ex. 131 (IAD statement of medina) at COH000005905
[12] Pls.' Ex. "AC," Synced BWC Video through 0:38.3 seconds.

- The video shows Gallegos to the left of the door after the first 2-3 shots in the house.[13] Ranger Wolf places Gallegos in this position. The audio captures the sound of guns firing between the 35.8 to 0.35.9 mark of the video until approximately 38.2 to 38.3 seconds. During this period, approximately 10-12 shots are fired. By the 40.5 second mark, the BWC captures Sepolio and Medina already nearing the street.[14] Yet in the middle of that firing sequence – specifically, at the 36.65 mark of the video – the BWC captures the officer that Wolf identified as Gallegos to the left of the door. This is confirmed by Wolf's placement of Gallegos at the front of the house.[15] It would be impossible for Gallegos to have moved to the right of the house and shot Nicholas in the 1.5 seconds between that time period and the last shot fired in this series. Most importantly, by the time the BWC captures the next shot being fired after this sequence, Medina and Sepolio are outside of the house.

- As confirmed by Mike Maloney, the bullet that struck Nicholas contained the DNA of Dennis Tuttle.[16] Meaning, the bullet struck Tuttle, while he was at the doorway, and then fatally struck Nicholas.[17] It would be impossible – and inconsistent with the testimony of every officer – for Tuttle to have been in the doorway prior to Lovings, Salazar, and Pardo falling out of the house. This is because Lovings, Salazar, Pardo, Sepolio, and even Ashraf would all have been inches from Tuttle. Instead, this must have occurred after Lovings, Salazar, Pardo, Sepolio, and Medina left the house. As a result, Gallegos could not have shot Nicholas when Medina was in the house.[18]

---

[13] Pls.' Ex. "AC," Synced BWC Video a 0:34 to 0:36 seconds; *see also* Pls.' Ex. AK at pg. 51 (placing Gallegos to the left).
[14] Pls.' Ex. "AC," Synced BWC Video a 0:40
[15] Pls.' Ex. AK at pg. 51 (placing Gallegos to the left).
[16] Pls. Ex. 1-A, Declaration of Maloney (At his attached report at Pg. 6 of 52).
[17] *Id.*
[18] The City argues in its reply brief, that the "camera footage on which Plaintiffs rely discounts their theory" because "[a]s Gallegos testified, shortly after shooting Nicholas he broke an exterior window." The City argues that the picture is taken approximately "four seconds before the sounds of breaking glass is heard." But this only flags another change of sworn testimony by Gallegos. In his IAD statement, Gallegos testified that he broke the window **before** shooting Nicholas. Pls's Ex. 92 at COH00006001 to 6002 ("I moved from behind the tree and moved up towards what was a window that was to the right of the front door and I began to break the window with my rifle, trying to gain vision . . . I kinda backed out and as soon as I backed out, um, I saw two officers, um, fall off the porch - fall back off the porch. And immediately, uh, Officer Lovlngs, um, dropped in the doorway. . . When he dropped, I gained vision in the door and since I was to the right of the door, I could only see in and to the left, where I saw Officer Frank Medina on the couch and then a female standing over him yelling, "Motherfucker motherfucker. . . When saw that, uh, I immediately, um discharged at the female.") In other words, the City's argument is directly consistent with the location and timeline of the shooting. It is also consistent that Gallegos ran toward the house, broke the window, and then shot Nicholas in the four seconds after the picture above.

4

- Medina does not recall when exactly in the sequence Sepolio grabbed him, he does not report exiting past any fallen officers. [19] To the contrary, he recalled walking past the stack on his way out.[20]

## CONCLUSION

For all the reasons identified in this objection, Plaintiffs requests that grant Plaintiff's objection and deny Defendants' Motions for Summary Judgment.

| | |
|---|---|
| */s/ Michael P. Doyle* | */s/ Boyd Smith* |
| | |
| Michael Patrick Doyle | Michael T. Gallagher |
| Patrick M. Dennis | L. Boyd Smith, Jr. |
| Jeffrey I. Avery | Pamela R. McLemore |
| Patrick Doyle | 2905 Sackett Street |
| DOYLE DENNIS AVERY LLP | Houston, TX 77098 |
| The Clocktower Building | Telephone: (713) 238-7705 |
| 3401 Allen Parkway, Suite 100 | Facsimile: (713) 238-7852 |
| Houston, Texas 77019 | mike@gld-law.com |
| Email: service@doylelawfirm.com | bsmith@gld-law.com |
| | pamm@gld-law.com |
| CHARLES C. BOURQUE, JR. | |
| *Admitted Pro Hac Vice* | Attorneys for the Tuttle |
| ST. MARTIN & BOURQUE, LLC | family |
| 315 Barrow St. | |
| Houma, LA 70360 | |
| 985-876-3891 (phone) | |
| 985-851-2219 (fax) | |
| cbourque@stmblaw.com | |
| Attorneys for the Nicholas family | |

## CERTIFICATE OF SERVICE

I, the undersigned attorney, do hereby certify that a true and correct copy of the foregoing document was forwarded to the following counsel of record on this the 13th day of September, 2024 via CM/ECF, hand delivery, electronic mail, overnight courier, U.S. Mail, certified mail, return receipt request, or facsimile, pursuant to the Federal Rules of Civil Procedure.

*/s/ Jeffrey I. Avery*
Jeffrey Avery

---

[19] Pls. Ex. 131 (Medina Ex. 131) (3/27/2019 Medina IA interview).
[20] *Id.*