# PLAINTIFFS' EXHIBIT 32

# OFFICE OF LEGAL SERVICES

# INTERNAL AFFAIRS DIVISION



# CONFIDENTIAL FILE

# ISSUE RECORD #  54155-2019



Confidential - Subject to Protective Order

COH00037473

# INVESTIGATIVE FILE INDEX

## Complaint of the Chief of Police

## Issue Record #54155-2019

I.   **SYNOPSIS**
- Synopsis – J. L. French, Lieutenant

II.  **RECORD of COMPLAINT**
- Issue Record Form

III. **INVESTIGATION**
- Investigative Report – J. P., Sergeant

IV.  **STATEMENTS**
- J. A. John-Louis, Police Officer – Administrative Statement
- N. L. Blankinship-Reeves, Police Officer – Administrative Statement
- M. H. Todd, Lieutenant – Administrative Interview
- P. Q. Follis, Commander – Administrative Statement
- R. Gonzales, Lieutenant – Administrative Interview
- C. R. Reyna, Sergeant – Administrative Interview
- T. A. Wood, Sergeant – Administrative Interview

V.   **OFFENSE REPORT**
- Houston Police Incident Report # 120867-19 with Supplements
- Houston Police Incident Report # 133932-19 with Supplements
- Houston Police Incident Report # 254979-19 with Supplements
- Houston Police Incident Report # 250210-19 with Supplements
- Harris County Precinct 4 Constable's Office Incident Report #1700-03415

VI.  **MISCELLANEOUS**
- Search Warrant for 7815 Harding Street
- Search Warrant for 2721 Napoleon Street
- Tactical Plans
- Blue Note from Lieutenant M. Chavez
- Officer G. Goines Narcotics Division Expense Account for January 2019
- Narcotics Division Arrest Cases by Employee Search
- Emails between Sergeant C. Reyna and Lieutenant R. Gonzales
- Screenshot of Group Text for Narcotics Squad #15
- Photographs of Notes from Officer Blankinship-Reeves to Lieutenant Todd
- Text Messages from Lieutenant Todd to Officer Goines
- NCIC/TCIC Offline Search
- SIU Interview with Officer Goines
- Notes Passed between Officer Goines and Lieutenant M. Todd
- Search of Officer Goines' Desk at the Southeast Narcotics Office
- SIU Searches of Officer Goines' City Vehicle
- Photographs of Officer Goines' City Vehicle and Recovered Contraband
- Surveillance Video from 7819 Harding Street

- Surveillance Video from CI #6730's Residence
- Photograph of Evidence Submission Envelope for Officer S. Bryant
- Cellbrite Data
- Criminal Intelligence Division Compilation of Cell Phone Records
- Officer Goines' iCloud Data
- Hard Drive Downloads from City Desktop Computers
- User Logon Activity for Officer Goines
- Overtime Request Forms
- Case Activity Sheets
- Photo Spread
- 1200 Travis Evidence Room and Gun Room Keys Sign-Out and Sign-In Log
- Narcotics Operational Control Center (NOCC) Number Application
- SIU Interviews with Narcotics Division Personnel Regarding 7815 Harding Street
- SIU Interviews with Narcotics Division Personnel Regarding 2721 Napoleon Street
- Phone Records Provided by Officer J. A. John-Louis
- SIU Interviews with Confidential Informants
- Body Worn Camera (BWC)
- Event History
- Unit History
- Dispatch Recording
- Retirement Notification
- Narcotics Division Standard Operating Procedures
- Audit of Narcotics Cases Related to Officer G. Goines
- Letters of Notification to Officers
- Police Personnel System (PPS)

Confidential - Subject to Protective Order

# CHAPTER 143 REQUIREMENTS
## ISSUE RECORD #54155-2019

## I. COMPLAINT INFORMATION

DATE OF INCIDENT:    1/28/19          DATE OF DISCOVERY:    1/28/19

HOW DISCOVERY DATE WAS DETERMINED:    Call Out

DATE COMPLAINT WAS NOTARIZED:    N/A

## II. NOTIFICATION(S)

### FORMAL IAD NOTIFICATION OF RECEIPT OF COMPLAINT

| | OFFICER (S) NAME | DATE RECEIVED | BY WHOM | HOW NOTIFIED |
|---|---|---|---|---|
| 1. | J. A. John-Louis | 3/7/19 | Sgt J. Rexroad | Letter |
| 2. | N. L. Blankinship-Reeves | 3/13/19 | Sgt J. Rexroad | CDW |
| 3. | M. H. Todd | 2/22/19 | Sgt J. Rexroad | Letter |
| 4. | P. Q. Follis | 2/26/19 | Sgt J. Rexroad | Letter |
| 5. | R. Gonzales | 2/22/19 | Sgt J. Rexroad | Letter |
| 6. | C. R. Reyna | 2/22/19 | Sgt J. Rexroad | Letter |
| 7. | T. A. Wood | 4/1/19 | Sgt J. Rexroad | CDW |

### 48-HOUR NOTICE(S)

| | OFFICER (S) NAME | DATE RECEIVED | BY WHOM | DATE OFFICER'S LETTER RECEIVED |
|---|---|---|---|---|
| 1. | J. A. John-Louis | 3/11/19 | Sgt J. Rexroad | 3/14/19 |
| 2. | N. L. BLankinship-Reeves | 3/13/19 | Sgt. J. Rexroad | 3/18/19 |
| 3. | M. H. Todd | 3/18/19 | Sgt J. Rexroad | 3/20/19 |
| 4. | P. Q. Follis | 3/19/19 | Sgt J. Rexroad | 3/22/19 |
| 5. | R. Gonzales | 3/18/19 | Sgt J. Rexroad | 3/21/19 |
| 6. | C. R. Reyna | 3/28/19 | Sgt J. Rexroad | 4/1/19 |
| 7. | T. A. Wood | 4/1/19 | Sgt J. Rexroad | 4/3/19 |

### NATURE OF COMPLAINT

| | COMPLAINANT(S) NAME | DATE RECEIVED | BY WHOM | TYPE OF DOCUMENT |
|---|---|---|---|---|
| 1. | Chief of Police | 1/28/19 | Sgt S. Schwartz | Issue Record Form |

COH00037476

# CITY OF HOUSTON
INTER OFFICE CORRESPONDENCE

TO: Art Acevedo
Chief of Police

VIA: H. R. Morris, Commander
Internal Affairs Division

A. Spiegel, Deputy Director
Office of Legal Services

FROM: J. L. French, Lieutenant
Internal Affairs Division

DATE: May 6, 2019

SUBJECT: **Complaint of Chief of Police
Issue Record #54155-2019**

## INVESTIGATION SUMMARY

The attached Internal Affairs Division (IAD) investigative report was compiled by Sergeant Jeffrey P. Rexroad, employee #Redacted, and responded to the complaint of the Chief of Police against **Officers Gerald M. Goines, employee #**Redacted **and Steven O. Bryant, employee** #Redacted, both of the Special Investigations Command, Narcotics Division, for **"Criminal Activity."** Specifically it was alleged that Officers Goines and Bryant used fictitious information in a search warrant affidavit used to obtain a "No Knock" warrant of a residence located at 7815 Harding Street. The warrant was executed on January 28, 2019, at approximately 1337 hours and resulted in an officer involved shooting. The officer involved shooting resulted in the deaths of Mr. Dennis Tuttle and Ms. Rhogena Nicholas; and the injuries of five Houston police officers. The officer involved shooting was investigated under Issue Record #54047-2019. This investigation also looked into the facts and circumstances revolving around a search warrant affidavit for Redacted Napoleon Street and its connection to the Harding Street investigation.

During the course of this investigation, additional allegations of **"Supervisory Conduct"** were investigated against **Sergeant Clemente R. Reyna, employee #**Redacted**; Sergeant Thomas A. Wood, employee #**Redacted**; and Lieutenant Robert Gonzales, employee #**Redacted, all three assigned to the Narcotics Division, specifically in regard to their oversight over the squad responsible for executing the "No Knock" warrant on Harding Street and their responsibilities as required by the Narcotics Division's Special Operating Procedures (SOPs).

**Commander Paul Q. Follis, employee #**Redacted, is the head of the Narcotics Division. Commander Follis was the first supervisor to discover potential problems with the Harding Street investigation. Commander Follis recalled that the evening of January 28, 2019, he received a phone call from Lieutenant Marsha Todd, notifying him of an officer involved shooting on the South Central radio channel. Commander Follis tuned in to the radio channel and realized that the shooting involved Narcotics Division officers. Commander Follis recalled hearing Sergeant Clemente Reyna requesting help over the air.

COH00037477

Commander Follis drove to Memorial Herman Hospital in the Texas Medical Center to check on the condition of his officers. When he arrived, Commander Follis spoke directly with three of the injured: Sergeant Reyna, Sergeant Wood, and Officer Frank Medina. Commander Follis was able to get an idea of what happened during the search warrant, but did not question the injured about the investigation. *"At this point, I knew that the shooting teams were already at the scene and would be handling the investigation, so I decided to stay at the hospital with my wounded officers and their families."* Commander Follis explained that prior to being advised of this incident by Lieutenant Todd, he had no knowledge of the Harding Street investigation.

On January 30, 2019, Commander Follis met with Chief Acevedo and members of the Executive Staff. Chief Acevedo requested that the Narcotics Division locate the confidential informant (CI) used in the Harding Street investigation. Commander Follis next met with Lieutenant Gonzales and he requested a copy of the Evidence Submission Form for the seized narcotics purchased by the CI, during a controlled buy from January 27, 2019. Commander Follis familiarized himself with the Harding Street search warrant and affidavit before speaking with Lieutenant Gonzales. When he spoke with Lieutenant Gonzales, he requested the lieutenant have Officer Bryant locate the CI. *"I chose Officer Bryant for this task because he was listed in the search warrant affidavit as having witnessed the narcotics that were purchased by the CI. I assumed he had been with Officer Goines the entire time Goines claimed to be with the CI, since it is Department policy to have at least 2 officers present when dealing with a CI."*

Lieutenant Gonzales informed Commander Follis that Officer Bryant had just tagged the narcotics earlier that day, from the controlled buy which supposedly occurred three days earlier, on January 27, 2019. *"I became very concerned about this and voiced my concerns to Lieutenant Gonzales, who had no reasonable explanation for the delay."* In addition, Lieutenant Gonzales told Commander Follis that Officer Bryant was trying to locate the CI. Commander Follis called Officer Bryant directly. Commander Follis described Officer Bryant as sounding nervous and hesitant as he questioned him about the CI. Officer Bryant told Commander Follis he was unable to locate the CI. *"I asked him what part of town he and Officer Goines picked her up on Sunday, to make the controlled buy. He got extremely quiet for several seconds and then told me he had not been with Officer Goines when he picked her up and that he was not with Officer Goines during the controlled buy."* Commander Follis asked Officer Bryant why he had not been with Officer Goines during the controlled buy and Officer Bryant told him he had been in the area in case Officer Goines needed him. When asked how he knew which CI to look for, Officer Bryant told Commander Follis that Officer Goines had provided him with the CI's name and CI number earlier that day.

Commander Follis briefed Assistant Chief J. G. Jones and then asked Officer Morton and Officer Kowal to locate the CI. Commander Follis wrote that Officer Morton and Officer Kowal quickly located the CI and she willingly came with them to 1200 Travis Street. Commander Follis then ordered Officer Bryant to come to his office because the Homicide Division's Special Investigations Unit (SIU) needed to speak with him. Commander Follis advised that while Officer Bryant waited to speak with SIU, he told Commander Follis that he never saw the CI on the date of the controlled buy. Commander Follis asked Officer Bryant how he knew about the narcotics found in Officer Goines' center console and Officer Bryant told him he found the narcotics while looking through Officer Goines' vehicle and assumed he needed to tag it.

Commander Follis asked Officer Bryant how he knew the narcotics found in Officer Goines' center console was from the Harding Street controlled buy. Officer Bryant told Commander Follis that he met with Officer Goines later the night of the controlled buy and Officer Goines showed him the drugs. Commander Follis admitted he did not ask Officer Bryant why he went inside Officer Goines' vehicle and he was unaware of anyone asking Officer Bryant to go into the vehicle. Commander Follis recalled that at that point he realized there was something very wrong with the Harding Street investigation, and at a minimum, there were serious policy violations. Commander Follis never saw anything in the form of documentation to indicate that Officer Bryant had been present at the controlled buy. *"The only thing I saw linking him to the buy was Officer Goines' warrant affidavit which indicated Officer Bryant had seen the narcotics and recognized it as heroin. I also saw the submission form Officer Bryant filled out to tag the dope 3 days later, but it does not indicate he was present for the buy."*

Commander Follis was advised by the SIU that they did not believe the CI was involved in the controlled buy, so they would wait to interview Officer Bryant at a later date. Commander Follis released Officer Bryant and spoke with Lieutenant Gonzales, instructing him to check Officer Goines' work area and vehicle at the Southeast Division for any documentation regarding the investigation that could identify another CI. According to Commander Follis, Lieutenant Gonzales was just supposed to look inside Officer Goines' vehicle, but opted to drive the vehicle to 1200 Travis Street. There, Commander Follis followed Lieutenant Gonzales to the parking garage and Lieutenant Gonzales opened Officer Goines' vehicle. Commander Follis described a mess inside of the vehicle and he also described finding paperwork that did not pertain to the Harding Street investigation. Commander Follis explained that he and Lieutenant Gonzales did not conduct a thorough search of Officer Goines' vehicle as the two were looking for specific information. When the two were unable to find anything, Lieutenant Gonzales drove the vehicle back to the Southeast Division and secured it.

Commander Follis contacted Officer Bryant again on February 1, 2019. Commander Follis ordered Officer Bryant to come to 1200 Travis Street for an interview with the SIU. Once he arrived, Officer Bryant declined to give the SIU a statement on the advice of his attorney. Per Assistant Chief J. G. Jones, Commander Follis escorted Officer Bryant to the Internal Affairs Division, where he was relieved of duty. Commander Follis indicated he contacted Officer Bryant a couple of weeks after he was relieved of duty after hearing that Officer Bryant was having a difficult time. *"Nothing about the Harding Street incident was discussed. I have not spoken to him since."*

Commander Follis stated he had contacted Officer Goines on a few occasions since January 28, 2019. The first instance was the morning after the shooting on January 29, 2019. Officer Goines was unable to speak but wrote on a piece of paper that he did not want to let Commander Follis down. Commander Follis admitted he did not think much of it at the time, believing that Officer Goines was on strong medication and also figuring that Officer Goines was talking about the results of the warrant service. Over the next two to three weeks, Commander Follis saw Officer Goines during brief hospital visits. Commander Follis recalled the morning of February 16, 2019, as he visited with Officer Goines at the hospital, after the media began to report about the problems with the search warrant affidavit. Commander Follis stated he saw Officer Goines again on February 21, 2019, as Officer Goines was being released from the hospital.

Confidential - Subject to Protective Order                                                    COH00037479

Commander Follis explained he had gone to the hospital to meet with an SIU investigator who had a warrant for Officer Goines' personal cell phone. *"Since he was about to leave the hospital, and the investigator was not there yet, I explained about the warrant and asked him for his phone. He said he did not have his phone and did not know where it was."* Afterwards, Commander Follis spoke with Sergeant Bass of the SIU, and it was determined he would not further pursue Officer Goines' personal cell phone.

Commander Follis spoke with Officer Goines one last time when Goines called him to ask if he could arrange for an extension with IAD because he could not find his hat shield to turn into them since he was relieved of duty. Commander Follis reached out to IAD and an extension was granted. Commander Follis wrote this was his last contact with Officer Goines. Throughout their conversations, the Harding Street investigation was not discussed.

Commander Follis related in his statement that he had no prior knowledge of the Harding Street investigation before the warrant was served. *"It is not uncommon for me, as the division commander, to not be informed of every investigation because we have hundreds of investigations, to varying degrees, a year. I had no knowledge of a warrant being obtained as a result of this investigation, and certainly no knowledge that a warrant was scheduled to be served on this date. This is not common, because as the division commander, S.O.P.200/1.12, pg. 2, section 3 states, "The captain shall receive a copy prior to the raid," referring to a copy of the Tactical Plan."*

Commander Follis could not recall how often he had visited the Southeast Division, where the South General Enforcement squads are located. He explained that the Narcotics Division was housed at 13 different locations throughout the city; when he visited the various locations, his investigators were often out on the streets. Commander Follis stated he did regularly communicate with his officers at 1200 Travis Street and out on scenes. Commander Follis did not feel that there was a problem at the Southeast Division that would have been found by walking through the work station. *"If there are personnel or administrative issues anywhere within the division, I would believe and expect that they would be brought to my attention by the officers, supervisors or lieutenants that work at these locations. Issues are regularly brought to my attention this way."* Commander Follis cited his reputation for dealing with personnel issues quickly and stated he did not believe the problems with the Harding Street investigation were any indication of a systemic problem within the Narcotics Division.

Commander Follis discussed Lieutenant Gonzales' performance ratings, citing that his last rating for the period ending February 28, 2019, indicated that Lieutenant Gonzales needed to closely monitor his squad's paperwork, reports, and daily documentation. The report also indicated Lieutenant Gonzales needed to be more aware of his squad's activities. The previous performance rating for the period that ended August 31, 2018, indicated that Lieutenant Gonzales needed to follow-up on assignments more.

Commander Follis had not reviewed any of the performance ratings for Officer Goines or Officer Bryant. Commander Follis indicated it was impractical to review every performance rating as the Narcotics Division was staffed with 188 employees; however, he would review any ratings if

COH00037480

officers were consistently low performers or if they had a significant ratings drop from one rating period to the next.

Regarding Lieutenant Gonzales and the Harding Street investigation, Commander Follis stated he was never made aware of the investigation prior the execution of the search warrant on January 28, 2019. *"Lieutenant Gonzales would regularly advise me of the warrants his squads were running, by sending me a Tactical Plan of the warrant operation. In fact, on January 28, 2019, I received a Tactical Plan from one of the South sergeants, at the request of Lieutenant Gonzales, regarding a warrant on Tierwester, they were planning on serving during the day of January 29th. Because of the Harding Street incident, this warrant was not served. I don't recall the exact date and time I last spoke to Lieutenant Gonzales about an investigation, but I never spoke to him about the Harding Street investigation, because as previously stated, I knew nothing about it until after the incident."*

**Note:** The Harding Street investigation began with a "Code 2 In-Progress Narcotics Activity" call for service to 7815 Harding Street on January 8, 2019, under incident #034246-19. **Officer Nicole Blankinship-Reeves, employee** #Redacted, and **Officer Richard Morales, employee** Redacted, both of the Eastside Division, were assigned to the call.

**Officer Blankinship-Reeves** submitted an administrative statement to Sergeant Rexroad. She indicated in her statement that she and Officer Morales responded to the call for service at 7815 Harding Street on January 8, 2019. While on scene, she ran the license plate of a vehicle parked in the driveway of 7815 Harding Street and found that the vehicle returned to an address off of TC Jester, not Harding Street. Officer Blankinship-Reeves stated she did no further investigation on scene beyond running the license plate. Officer Blankinship-Reeves also wrote that she had no indication of anyone carrying weapons inside the residence. *"I did not discover any information regarding the occupants of 7815 Harding Street indicating they are known to carry weapons on their person. In the call slip the caller advised there were weapons in the residence. I did not observe any weapons inside the residence or on anybody as I never saw a person from 7815 Harding Street that night on January 8, 2019."*

Officer Blankinship-Reeves passed the information from 7815 Harding Street to Lieutenant Marsha Todd of the Narcotics Division. Officer Blankinship-Reeves acknowledged that she provided Lieutenant Todd with a yellow piece of notebook paper with information she had gathered from 7815 Harding Street. Officer Blankinship-Reeves researched various websites, including HCAD, to gather the information she provided to Lieutenant Todd. Prior to running the call for service on Harding Street, Officer Blankinship-Reeves had never responded to the location and had no knowledge of any activities at the residence. Regarding seeing a man with a large dog in the yard of the residence, she indicated she saw this man after January 8, 2019.

Officer Blankinship-Reeves explained that 7815 Harding Street was in her patrol beat, so she drove through the area often, but could not recall how many times between the initial call for service and January 28, 2019, the day the warrant was served. Officer Blankinship-Reeves attended the warrant briefing on January 28, 2019, which was led by Officer Goines. During the briefing, Officer Goines indicated a white male lived at the residence and this male was known

to carry a pistol in his waistband. According to Officer Goines, heroin had been purchased from the residence.

Officer Blankinship-Reeves was assigned to the perimeter team. During the briefing, Officer Blankinship-Reeves advised that she had seen a while male with a large dog in the front yard of the residence. During the briefing, the possible suspects were not identified. Officer Blankinship-Reeves explained that she did not speak up about possible suspect identifications because she did not have the yellow sheet of paper she had turned over to Lieutenant Todd. Further, Officer Blankinship-Reeves wrote, *"I do not run narcotics investigations nor am I in the narcotics division and I do not know every protocol in narcotics investigations. I did not notify any supervisor that I had gathered information on the possible identities of the possible occupants on 7815 Harding, other than initially giving the yellow paper to Lt. Todd. Again, I do not run narcotics investigations I was there for support on running a warrant and a uniformed presence."* Officer Blankinship-Reeves wrote that at the time of the briefing, the information provided did not appear to contradict the information she had previously gathered.

**Lieutenant Marsha H. Todd, employee #**Redacted, is assigned to the Narcotics Division. Lieutenant Todd received information from Officer Blankinship-Reeves regarding the call for service to 7815 Harding Street. In turn, Lieutenant Todd turned over information for 7815 Harding Street to Officer Goines, to initiate the investigation into possible narcotics activities at the residence.

Lieutenant Todd recalled that the night of January 8, 2019, the same date that Officer Blankinship-Reeves ran the call for service to 7815 Harding Street, she received a phone call from Officer Blankinship-Reeves and Officer Morales, inquiring how to spell heroin, because the two were going to add information to their call slip. Both officers discussed the call for service. After January 8, 2019, Lieutenant Todd received Officer Blankinship-Reeves' notes on yellow paper. The notes contained information gathered by Officer Blankinship-Reeves regarding the call for service, as well as research conducted by Officer Blankinship-Reeves detailing the potential owner of the residence, drivers' licenses and names. Lieutenant Todd recalled that on January 11, 2019, she texted Officer Goines and sent him a photograph of Officer Blankinship-Reeves' notes.

Officer Goines was not assigned to Lieutenant Todd, but the two were friends, had known one another for a long time, and Lieutenant Todd thought it would be an easy case for Officer Goines. *"I thought Officer Goines would move forward and work it."* Lieutenant Todd stated that she often handed out cases but spread them out amongst investigators. She could not recall the last case she gave to Officer Goines prior to passing along the Harding Street information. After giving Officer Goines the Harding Street information, Lieutenant Todd did not notify Officer Goines' supervisors. Lieutenant Todd was asked if she ever directly gave the notes to Officer Goines. Lieutenant Todd recalled texting Officer Goines that the notes would be in her office and to contact Officer Blankinship-Reeves if he had any questions. One day when the notes were gone, Lieutenant Todd assumed that Officer Goines had taken them.

Lieutenant Todd was asked how information such as leads, clues and cases was disseminated to investigators. Lieutenant Todd indicated sometimes information was given directly to

supervisors and sometimes given directly to investigators/officers. Information may be given to a certain squad, for example a heroin or pill squad. Regarding passing information along to supervisors, Lieutenant Todd stated that there was no formal process.

Lieutenant Todd stated she did not recall speaking to Officer Goines about the Harding Street investigation between the time she provided him with the information and the time of the search warrant. Lieutenant Todd stated she would not normally follow-up with the investigator, *"I kinda went here you go, go work it."* Lieutenant Todd recalled speaking with Officer Goines the morning of the search warrant, but the two did not discuss Harding Street.

Lieutenant Todd became aware of the warrant and officer involved shooting while working an extra job and listening to her radio, which was tuned in to the North Division radio channel. Sergeant Reyna had gotten onto the radio channel and called out for help. Lieutenant Todd called Commander Follis to notify him of the shooting. She then drove to the hospital and assisted the nurses with identifying the wounded officers. Lieutenant Todd then assisted with notifications, and delegated notifying family members. Lieutenant Todd spoke with Sergeant Reyna as he was awake and talking, but the conversation was brief and did not go into specific details of what occurred during the warrant service.

In the days following the shooting, Lieutenant Todd became aware that the CI name provided by Officer Goines was not the correct CI. Lieutenant Todd spoke to Commander Follis and the following morning she spoke with Officer Goines, at which time he provided her with the name "Reese." Afterwards, Lieutenant Todd sent out teams of investigators to locate all of the confidential informants registered to Officer Goines. The confidential informants were brought back to 1200 Travis Street to be interviewed.

Lieutenant Todd discussed the written notes between her and Officer Goines during her hospital visit. Lieutenant Todd recalled that when she arrived, Officer Goines motioned for his wife to leave the hospital room. Officer Goines had a clipboard and paper. He wrote to Lieutenant Todd, *"They said it was a problem with the warrant."* Lieutenant Todd told Officer Goines she only wanted the CI's name and he wrote the name *"Reese,"* and then wrote *"But she's going to be scared."* Officer Goines also wrote that "*Bird*" was in trouble and the captain was mad. Lieutenant Todd explained that "*Bird*" was Officer Bryant's nickname, and Officer Goines was just writing stuff down, not necessarily responding to any questions from her. Lieutenant Todd assured Officer Goines at that time that Officer Bryant was not in any trouble and Commander Follis was not mad at him. Lieutenant Todd recalled that after writing the note, Officer Goines tried to rip up the note into pieces, but did not have the strength to do it. Lieutenant Todd stated, *"And he didn't have a lot of strength and so right in front of it I took it and tore it up, you know, completely and I'm like no, no, no I got it. And then I put it in my pocket in my BDUs."* Lieutenant Todd returned to her office, taped the note back together, and then turned over the note to the SIU.

Lieutenant Todd was asked about the other notes written by Officer Goines. In one instance, Officer Goines wrote, *"It's all legit"*, which to Lieutenant Todd meant that the warrant was legitimate. Officer Goines also wrote that he wanted everything to go smoothly.

     COH00037483

Page 8, Investigation Summary, Issue Record #54155-2019

Lieutenant Todd explained that she crumpled up and kept this additional note, which was also turned over to the SIU. Lieutenant Todd called Commander Follis after her conversation with Officer Goines. The two discussed that Officer Goines had a CI named Patrice but Officer Goines had written "Reece"; and Commander Follis directed a team to go out to locate the CI. Lieutenant Todd clarified that she later sent out teams to locate the other informants registered with Officer Goines. Lieutenant Todd also recalled an additional note that Officer Goines had written to her earlier in the week, after the shooting, that she did not hold onto. In that note, Officer Goines mentioned underestimating the suspect and something to the affect that he should have had more officers with him. At that point and time, Lieutenant Todd did not know of any problems with the Harding Street search warrant.

Lieutenant Todd was asked if she had spoken with Officer Bryant since January 28, 2019. Lieutenant Todd stated she had not spoken to Officer Bryant about the Harding Street investigation, but saw him at a fire station benefit.

Lieutenant Todd was asked again if it was common to assign cases to officers in other squads and to not notify their supervisor. Lieutenant Todd stated she had done it before, it was not uncommon to do, and there was no written policy to provide the officer's supervisor with notice. Lieutenant Todd explained that if an officer had a specialty, she may ask them to look into something. Lieutenant Todd explained how her squad handled investigations. *"There are people that would give officers in my squad a clue, um, and they're gonna go out and begin working it. At some point when they develop something then they'll go tell the sergeant, or if she feels a need she'll tell me. But I don't necessarily in my squad need a phone call the minute someone calls and says I've got a clue."* Lieutenant Todd described the number of clues received by the Narcotics Division as *"enormous"* and based upon the number of clues she believed there was a point a supervisor should know about an investigation, but not as soon the first clue was received.

Lieutenant Todd was asked why she decided to keep the note from Officer Goines instead of throwing it away. Lieutenant Todd explained that she had a feeling she needed to keep the paper. She had not kept the note from Officer Goines earlier that week, but once now that she was trying to locate a CI, she had a feeling she needed to hang on to the note.

Lieutenant Todd explained that her squad did not conduct "No Knock" warrants, but did develop probable cause and everything else needed for an investigation. It was not uncommon to obtain a search warrant and execute said warrant within a short time frame, or three days later; it was dependent on the factors surrounding the warrant.

# Redacted

Page 9, Investigation Summary, Issue Record #54155-2019

# Redacted

Confidential - Subject to Protective Order

Page 10, Investigation Summary, Issue Record #54155-2019

# Redacted

Confidential - Subject to Protective Order

Page 11, Investigation Summary, Issue Record #54155-2019

# Redacted

Confidential - Subject to Protective Order

Page 12, Investigation Summary, Issue Record #54155-2019

# Redacted

Confidential - Subject to Protective Order

Page 13, Investigation Summary, Issue Record #54155-2019

# Redacted

Confidential - Subject to Protective Order

Page 14, Investigation Summary, Issue Record #54155-2019

Redacted

Confidential - Subject to Protective Order

Page 15, Investigation Summary, Issue Record #54155-2019

# Redacted

Confidential - Subject to Protective Order

Page 16, Investigation Summary, Issue Record #54155-2019

# Redacted

**Sergeant Clemente R. Reyna** was Officer Goines' and Officer Bryant's direct supervisor, along with Sergeant Wood. Sergeant Reyna ran the Harding Street warrant with Officer Goines and was injured by gunfire during the incident. He was interviewed by Sergeant Rexroad and Sergeant Powell on April 1, 2019, regarding this investigation. Sergeant Reyna explained that his squad was responsible for investigating citizen complaints, conducting street investigations, search warrants, and he described his squad as *"the jack of all trades."* Sergeant Reyna stated that he and Sergeant Wood were equally responsible for the supervisory duties of their squad.

Sergeant Reyna advised he had some knowledge of the Harding Street investigation prior to the day the warrant was served on January 28, 2019. Officer Goines told him he was trying to develop a search warrant for a residence on the east side of Houston; however, Sergeant Reyna was unaware of the address until the day of the warrant. Sergeant Reyna explained that this was not unusual or against the norm to not know the address because often one location checked during a narcotics investigation could lead to an additional location, or additional information could come from a CI, so it was very common to move on to another address. Sergeant Reyna expected to hear about such locations once his officers were ready to take actionable steps such as obtaining a warrant, stopping traffic from the location, setting up surveillance of the location, or doing a knock and talk. Sergeant Reyna was asked if it was unusual to not have knowledge of a controlled buy. Sergeant Reyna explained that it was not uncommon, because the case agents had *"a lot of leeway because they may be working on one location, have one location in mind, it just don't work out for a lot of various reasons."*

Sergeant Reyna recalled that after speaking with Officer Goines about working something on the eastside, he received a *"GroupMe"* text message from Sergeant Wood on Sunday stating that the squad was not taking photographs. He later received a *"GroupMe"* text from Officer Goines asking if everyone was good to run a warrant on Monday, which told Sergeant Reyna that Officer Goines had already developed the case he told him about a few days prior. That Monday, Sergeant Reyna and Officer Goines spoke and Sergeant Reyna confirmed that they were still going to run the warrant. Officer Goines told Sergeant Reyna that he would get the paperwork to him. Sergeant Reyna did not ask Officer Goines for specifics at that time.

Sergeant Reyna explained that he did not review any paperwork regarding Harding Street until he received the tactical plan and warrant. He further explained that it was within his discretion to call off the warrant if saw any discrepancies; however, *"this tac plan was a clear cut that it was a controlled buy for heroin and everything seemed according to SOP and – and proper procedure."* Sergeant Reyna explained that in order to have verified that something was wrong or out of sorts, *"you've have to be there with that case agent, riding in that car with him and making sure that everything is perfect. And if you were to reach that point with any case agent, they shouldn't be doing cases anymore because now that trust is gone. They don't have – you're – you're suspecting them and not having the – knowledge, training, experience or not following policy to do things correctly."* According to Sergeant Reyna, one would have to suspect that their officer was lying to reach that point.

Sergeant Reyna continued that he never had any red flags or suspicions of Officer Goines. Officer Goines had been in the Narcotics Division for 25 years. Sergeant Reyna explained that with street level warrants, even though a CI may describe one type of narcotic as being inside the location, it was not uncommon to recover other types of drugs or something different than what was described. Sergeant Reyna stated, *"they're the small homes that we receive citizens' complaints on. So those, those, uh, dealers that are there in and out, different people, different drugs, you know, so it's common. It's common, yeah, to – to have those tac plans say one thing or the controlled buy was for one drug and it's a different drug that's recovered from inside."*

Sergeant Reyna attended the briefing for Harding Street. He recalled that Officer Goines gave basic information that a white male had been seen with a weapon inside, heroin had been purchased from the residence, the occupants had a dog, which was verified by patrol at the briefing, and they were suspected of having heroin inside the residence. Sergeant Rexroad pointed out that the tactical plan had not been signed. Sergeant Reyna explained that the tactical plans per the SOP did not require a signature, just review and approval and a copy forwarded to the lieutenant. Sergeant Reyna further explained that he would send his lieutenant the tactical plan via email which had his digital signature, which meant he had reviewed the plan and given his ok. Sergeant Reyna further pointed out that the bottom of the tactical plan had check boxes for notifications made via in-person, phone, or email. Sergeant Reyna stated he never signed tactical plans and never had a plan returned to him for signature.

Sergeant Reyna explained that he reviewed the tactical plan/warrants, by reading the narrative and making sure that everything fell within the threat matrix; otherwise SWAT would take over running the warrant. The Harding Street warrant was standard and did not fall outside of the threat matrix. Sergeant Reyna stated that the lieutenant was also emailed a copy of the warrant, and would send a reply that he had looked over the tactical plan; and in rare occasions, Sergeant Reyna would even call his lieutenant for approval.

Sergeant Reyna was asked if he ever did anything to verify the information listed on the tactical plan and warrant. Sergeant Reyna explained that the tactical plans would show if there was a controlled buy, but the only way to verify the controlled buy would be to start questioning his case agents' honesty, which he realized was now an issue; however, at the time he had no reason to question his officers' honesty. Sergeant Reyna admitted that his agents did not give him their CI receipts for funds prior to running warrants, because it was not common practice. Sergeant

Page 18, Investigation Summary, Issue Record #54155-2019

Reyna referred back to questioning the honesty of his case agents, *"if I ask those two officers, hey, give me the receipt, give me the – give me – show me the CI payment and it's already reached the point where he's standing in front of a judge and swearing to all this, what makes anybody think that that receipt form is gonna be honest as well, you know. They're – they're signing an affidavit or the one officer is signing an affidavit saying it's all right, he could just as well give me a receipt that is not right."* Sergeant Rexroad reframed his question, stating this was not about questioning the honesty of officers, but in fact adding an additional layer of verification. Sergeant Reyna understood but affirmed this was not common practice in the Narcotics Division.

Sergeant Rexroad referenced Sergeant Reyna's SIU interview in which he admitted he was unaware of any surveillance or controlled buys from 7815 Harding Street prior to executing the warrant. Sergeant Reyna attested that the supporting documentation was that of the signed search warrant, which was taken before a judge and sworn to. Sergeant Rexroad then asked what Sergeant Reyna did on a regular basis to ensure his officers were following policy. Sergeant Reyna explained that he did regularly meet with his officers, updated them on tips and clues; and in turn expected updates from them. Sergeant Reyna also explained that his case agents were expected to develop their own cases. He further stated officers are brought into the division because they have demonstrated they can be proactive and are the best investigators.

Sergeant Reyna advised that the Narcotics Division had a tracking database, which documented what cases the agents had, narcotics and money recovered, and other statistics. Sergeant Reyna would then review reports and cases once the blue back files were turned in. Initially, officers would complete the first part of the report and complete the rest of the body of the report the next day. Sergeant Rexroad referenced Officer Goines' original report for Harding Street in which Officer Goines documented tagging heroin. Sergeant Reyna stated if Officer Goines listed heroin as tagged, he would have expected that Officer Goines tagged the narcotics that same day and there was no reason that Officer Goines should have left any narcotics in his city vehicle.

Sergeant Reyna was asked to explain what a risk analysis threat assessment was. Sergeant Reyna explained that he looked for fully automatic weapons, assault rifles, fortifications to the objective, a history of violence, especially against officers. If three or more threats were found, or there were fully automatic weapons, it was referred over to SWAT. Sergeant Reyna advised this was done for Harding Street, by way of using Google Street View and by Sergeant Wood conducting surveillance on the target location. Prior to the warrant, Officer Arechiga went to the location and verified that there was a vehicle in front of the residence on Harding Street.

Sergeant Reyna was asked if he would have expected Officer Goines to provide the name and photographs of the potential residents of Harding Street. Sergeant Reyna admitted that the notes provided to Officer Goines did match the suspect description from the briefing; however, he advised that this would have been a good investigative step for Officer Goines to take, and unless a CI could say for certain that this was the guy they bought from, than it would not be out of the ordinary to refrain from naming a suspect. Sergeant Reyna stated that Officer Goines never showed him the notes he had been given on a yellow sheet from Lieutenant Todd

Confidential - Subject to Protective Order

Sergeant Reyna was asked if he expected for his officers to list weapons in the report if they listed them in a warrant affidavit. Sergeant Reyna agreed that the weapons should have been listed in the incident report, *"especially if they're using it as a basis for a warrant."* Sergeant Reyna was asked if he could have caught such a discrepancy by reviewing the report and warrant. Sergeant Reyna said if he would have caught a mistake such as that during a meeting, he would have questioned his case agent how the gun information had been obtained. Sergeant Reyna indicated, *"and if they had told me my CI told me that he's known to carry a weapon, um, you know, it still would've been good enough to proceed with that. Especially if they – again, if they had stood in front of the judge and said this is what they told me, this is the information I have."*

Sergeant Reyna was asked if it was normal for an officer to execute every single warrant as a "No Knock" warrant. He responded, *"No, it's - I really don't think it's anything abnormal about it. I mean, like I said, we - we work in southeast Houston for the most parts and - you know, and Third Ward area as far as, uh, Goines. I know (unintelligible) a lot of those either northeast, south- or - or - or Third Ward or southeast, so, I mean, there's, oh, just a lot of crooks out there and they all have guns."*

Sergeant Reyna was asked about deploying flash bangs because on the Harding Street tactical plan it was stated that officers would attempt to deploy flash bangs; however, this was not done. Sergeant Reyna explained that the small size of the residence was the main factor in the decision to not deploy flash bangs. Sergeant Reyna explained that in small quarters, the smoke would not dissipate in time, and he and his officers would have been blinded, as well as the being backlit while running through the door. Sergeant Reyna said the dog was also a factor, but in his mind, it was mainly the size of the house. Initially, Officer Goines had wanted to use the flash bang, but during the briefing, he told the group that they would not use a flashbang.

Sergeant Reyna was questioned about the 2721 Napoleon Street tactical plan. Sergeant Reyna advised that this was the location that possibly had a live grenade, and he learned about it a week before the warrant service. Sergeant Reyna recalled he told Officer Goines that they would not run the warrant, to refer it to SWAT, and SWAT may not even want to run the warrant, instead they may opt to hand it over to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). SWAT ultimately stated that they could run the warrant; but the warrant was cancelled because SWAT received a call out. The next night, a briefing was held; however, Officer Goines notified Sergeant Reyna that there was no activity and the warrant was cancelled. Sergeant Reyna notified Commander Follis that the warrant was dead and they would have to rebuild the case if the investigation continued.

Sergeant Rexroad pointed out that the investigation began on a Friday and it was not until Tuesday that Sergeant Reyna's group planned to execute the warrant. Sergeant Reyna affirmed that there was no controlled buy report. Sergeant Reyna agreed that if it was required to have CI receipts and a controlled buy report prior to running the warrant, he would have caught the discrepancy; however, Sergeant Reyna also pointed out that the Harding Street warrant took place a week later, and that was also a reason he had not seen any supporting documentation for Napoleon Street. Sergeant Reyna stated he did basic research of Napoleon Street, but was not supposed to be the supervisor, Sergeant Wood was.

Sergeant Reyna stated he never had any red flags with Officer Goines regarding him failing to tag narcotics. Sergeant Rexroad listed some of the found narcotics from Officer Goines' vehicle, which was found by SIU, as well as a stolen gun found in his vehicle. Sergeant Reyna stated this should not have happened. Sergeant Reyna attested that Officer Goines knew that all of the narcotics and any evidence had to be tagged and should have generated a case tracking sheet and or CI receipt for funds.

Sergeant Reyna stated that since he returned to the Narcotics Division approximately five years ago, the case agents had been the ones generating the case tracking sheets, which was *"common practice."* Sergeant Reyna was asked who was responsible for generating the case tracking (CT) sheets according to the Narcotics Division SOP. He responded, *"And the SOP says the supervisor or the designee."* Sergeant Reyna admitted the case tracking database would be better if it was limited to supervisors only, but it was a wide open database that anyone could access. Sergeant Reyna also agreed that if Officer Goines had generated case tracking sheets for the evidence found in his vehicle, a supervisor would have been able to track whether the narcotics had been tagged or listed in a report. Sergeant Reyna thought it was unbelievable that Officer Goines had a stolen gun in his city vehicle. Sergeant Reyna attested that he had no idea Officer Goines had contraband in his desk as well a firearm. Sergeant Reyna advised that the Southeast Division's Narcotics Division office had a safe available for storage of a personal firearm if needed by the officers.

Sergeant Reyna was asked if he had any issues with Officer Goines turning in reports. He responded, *"he's, you know, been habitually late doing reports. He's a senior officer. Probably give him too much leeway as far as his timeframes doing reports and all that. But, um, you know, like I say, he's been - he's always been well respected and highly regarded in the division and - and, um, you know, he's constantly assisting with training and, um, numerous other things and he's gone to survival schools and helping out there. So - but is he late on reports, yes, he's been late on reports."* Sergeant Reyna stated he spoke with Officer Goines numerous times about late reports, but stated it was difficult since Officer Goines took time off because he had so much leave built up. Sergeant Reyna stated that besides the late reports, he'd never had an issue with Officer Goines' tactical side and he was a highly respected training officer in tactical schools. Sergeant Reyna explained that even though Officer Goines was sometimes late with his reports, other officers were speedy, turned in their work, only to find that those cases still showed up as outstanding because the lady in charge of tracking cases did not update the completed cases.

Regarding the case tracking sheets, Sergeant Reyna explained that the sheets were formulated to keep track of statistics throughout the Narcotics Division and had to be generated once an enforcement action was taken via a controlled buy, traffic stop, or surveillance. Sergeant Reyna reaffirmed that a supervisor or designee could generate a case tracking sheet and thought that the SOP said to have a sheet within five days. Sergeant Rexroad advised that the SOP stated once the case tracking sheet was generated, the investigator had ten days to complete the investigation and a supervisor had five days to review the finished investigation.

Sergeant Reyna stated he never saw a case tracking sheet for Harding Street. Sergeant Reyna stated that his lieutenant would send out a list of outstanding case tracking sheets for the

sergeants to follow up with. Often, the cases had been paused because of an arrest or change in status of the investigation, so the supervisors would get updates from their case agents as to the status of the case. Sergeant Reyna stated that within the first day of a controlled buy, a case tracking sheet should be created.

Sergeant Rexroad again referred to the audit of cases conducted by Chief Lopez's office. He pointed out instances in which case tracking sheets were generated weeks after the initial buy. Sergeant Reyna stated that they were way too late. Regarding tracking the late case tracking sheets, Sergeant Reyna referred back to the outstanding list sent out by his lieutenant and affirmed this was the only way to know that a case tracking sheet was late. When asked if he could track because he would know when the buys took place, Sergeant Reyna stated they were then waiting for blue back reports. Sergeant Reyna stated he would know about his officers making a buy on the same day, but admitted he would sometimes lose track of his officers completing a case tracking sheet, *"they're all putting together cases at different times and they may have had every intention of doing the CT and get everything done but they've been helping everybody else on other cases and it – it... ...sometimes it's slow, sometimes it gets overwhelming."* Sergeant Reyna admitted that if his officers did not have the case file turned in within the ten days, it would be something he needed to track and address, but stated he had nine case agents and was trying to keep track of them all doing different things. Sergeant Reyna stated there could be a better system in place to track the cases; and possibly something in which a case tracking number was not generated until a supervisor was notified first because the current system did not notify a supervisor if their officer created a case tracking sheet. Sergeant Reyna admitted it was very common for a blue back file to go beyond the ten day limit for completion. Sergeant Reyna stated that he received a list of late cases and would have his investigators focus on only their late cases in order to catch up. He added, *"And all of 'em except for Goines are very good on doing that."*

Sergeant Rexroad pointed out 14 cases found in the audit in which case files were created for Officer Goines' cases. Sergeant Reyna explained that unless the case agent entered a case tracking sheet, there was no way to track a case. He added, *"No, absolutely not. And like - and like you mentioned earlier, unless they actually enter them as a case file and get things done, we don't know what's outstanding out there. As supervisors we don't know what's been put in that system unless they actually put it in."* Sergeant Rexroad asked Sergeant Reyna how some of Officer Goines' cases went a year or more without being turned in. Sergeant Reyna blamed Quality Control section stating that cases were turned in, but were not always removed from the system. Sergeant Reyna advised that there were stacks of cases, no filing system, and no communication from Quality Control section to notify that a case had been cleared. Sergeant Reyna admitted that Officer Goines had case files that he did not finish and turn in, but still blamed the verification system as *"not good enough."*

Sergeant Reyna was asked if he notified his lieutenant of his investigators' cases that went beyond 60 days. Sergeant Reyna stated that he did receive a list from his lieutenant of the outstanding cases and would approach his officers to request updates. Sergeant Reyna stated that most of his investigators had finished their cases, except for Officer Goines. He went on to state, *"we'd go – I talked to Goines. We sat him down said, you know, "You need to get these cases*

*and get it done." Um, but again we were constantly running into issues where he would just take off and take off and take off 'cause he's just got so much time..."*

Sergeant Rexroad pointed out three cases worked by Officer Goines, found during the audit, in which the original warrants were still attached to the case file. Sergeant Reyna found no reason for Officer Goines to have the original warrants in his case files. Sergeant Reyna stated he would do his best to catch such things, but attested that anything could affect the outcome of a case, and having the original warrants left with the case file was more of a *"procedural and administrative problem afterwards,"* but admitted it could also create a problem for the district attorney's office.

Sergeant Reyna discussed the rules of conducting a controlled buy. He stated that he never had any red flags or issues with Officer Goines conducting controlled buys or dealing with CI. Sergeant Reyna stated it was against policy to socialize, take money, buy gifts, or conduct anything beyond business with a CI. Sergeant Reyna stated Officer Goines was never given permission to conduct a controlled buy without a second officer and never given permission to conduct undercover work alone. Sergeant Reyna explained the rules for paying a CI. He explained that any payment had to be witnessed and a CI receipt was to be completed before the CI was released. Sergeant Reyna explained the payment limits and was asked about a double payment found during the audit. Sergeant Reyna stated that it could be done either way and the payment was within his threshold. Sergeant Reyna also explained that he would sign as a witness on the CI receipt for funds form, but the reviewed by date would be later, which was not a problem because he had witnessed the transaction.

Sergeant Reyna was asked if he ever audited his officers' expense affidavits, which included a monthly compilation of money drawn, spent, expenditures, narcotics recovered, and money returned. Sergeant Reyna explained he did review his officers' expense affidavits and there was a sergeant who also spent two weeks a month verifying the expense reports. Sergeant Reyna was asked if he ever saw any expense paperwork for 2721 Napoleon Street or 7815 Harding Street. Sergeant Reyna never saw any supporting documentation but stated he knew that Officer Goines had expenses listed on his expense letter.

Sergeant Rexroad asked Sergeant Reyna if he tracked his officers' expenses throughout the month, prior to the officer completing an expense affidavit. Sergeant Reyna referred back to whether or not his officers had entered a case tracking sheet. He explained, *"...then they can't enter a database entry without the CT. So they don't get a chance to put the CT in until ten days later it's gonna not match up with maybe the date of the expense, you know. So - so, yeah, so really my - my best option is to wait until everything complies at the end of the month but, you know do my best to verify it all through there and make sure all the numbers match, uh, what's documented in the reports, this and that so, like I said I try my best to make sure everything matches up."*

Sergeant Reyna was asked about Officer Goines' performance. Sergeant Reyna explained that he had been Officer Goines' supervisor on and off for the past four years. Sergeant Reyna acknowledged Officer Goines had been a problem with administrative paperwork but he was a good teammate and leader. Sergeant Reyna also discussed the review process and thought an

email sent to supervisors when a case agent generates a case tracking form would help prevent future problems.

Sergeant Reyna was asked if having additional information about the occupants of 7815 Harding Street would have made a difference in his decisions. *"Um, I really don't think so, I mean, because you're talking, you know, whether somebody has a criminal history, doesn't have a criminal history...um, doesn't really determine the actions you're gonna take when - when their warrant is run, you know. Um, it's definitely if the information that I - that I did have and was given to me was that this person was known to carry a gun and it wouldn't have changed. I don't think it would've changed anything on that. Um, yeah, 'cause, I mean, like I said, whether they have a criminal history or not doesn't't mean they're not willing to, you know, come out shooting."* Sergeant Reyna concluded the interview by recognizing there were administrative mistakes, but stated prior to running the warrant at 7815 Harding Street, he had *"zero knowledge"* of any activities that could have led to the tragedy.

**Sergeant Thomas A. Wood** was a direct supervisor of Officer Goines and Officer Bryant and shared this responsibility with Sergeant Reyna. Sergeant Wood sustained a serious knee injury during the Harding Street warrant execution. He was interviewed on April 3, 2019, at 0914 hours. The interview started out with Sergeant Wood explaining he had been with the General Enforcement South Squad for approximately two years. He stated that the unit handles many different things such as street pops, lower case narcotics activity, running search warrants, buy busts, and dealing with confidential informants. Sergeant Wood stated there are nine officers, one K9 officer, and two sergeants assigned to the squad. He stated he and another sergeant basically split up the supervisory responsibilities amongst the two of them and that no one officer is assigned to a particular sergeant.

Sergeant Wood stated that he had prior knowledge about Officer Goines working an investigation on the Sunday prior to the incident. Sergeant Wood sent out a group text to the squad telling them that they were going to get together to take pictures but then he canceled the group pictures for a later time when somebody had a warrant. Sergeant Wood then stated that Officer Goines replied that he might have something on Monday. Sergeant Wood stated that he didn't know the address, but what Officer Goines was referring to was Harding Street.

Sergeant Wood stated that it was not uncommon for the sergeants not to know that the case agents were working on something, especially if the officer was conducting surveillance on a location and nothing happened. If that was the case, then the officers usually didn't tell them about it so the supervisors would never know. On the other hand, if the officer found that some action needed to be taken then the officers would usually let the supervisors know or at least tell one of them they had an on-going investigation. Sergeant Wood added that the majority of the cases came from CIs, other officers such as divisional tactical officers, Chief of Police complaints, the No-Dope line, and/or self-initiated cases. Usually the sergeants assigned the lead officers on the case when they had cases handed down to them.

When asked about knowing the actual address for Harding Street, Sergeant Wood stated that he was sitting at his desk next to Sergeant Reyna's desk when he advised Sergeant Reyna that he had not received anything on the warrant that Officer Goines had put together. Sergeant Reyna

Page 24, Investigation Summary, Issue Record #54155-2019

then saw that Sergeant Wood's email address was not correct on the emailed warrant and tactical plan so he forwarded it to Sergeant Wood and that was when Sergeant Wood saw the actual location for the warrant on Harding Street. Sergeant Wood stated that he reviewed the warrant and the tactical plan, made copies like he always does, and placed them in their tactical box that they carry with them to all investigation locations.

Sergeant Wood stated that he drove by the target location on the way to the briefing to check the location to make sure what was in the tactical plan. Once he was at the briefing, Officer Goines gave a description of the house, which matched what Sergeant Wood saw as he drove by. According to Sergeant Wood, Officer Goines stated it was occupied by an older white man and female and that the suspect was known to carry a gun. Sergeant Wood also stated Officer Goines told them that his CI bought heroin from the house and at first they were going to use a flash bang but then decided during the briefing that they would not use one because of the size of the house and the presence of a dog. Sergeant Wood stated later in the interview that since a dog was mentioned and the house was so small; throwing a flash bang in the small room would cause problems because the smoke affects everyone's vision, plus the dog is holding up the officers. He added the officers become a sitting target, so he believed that they made the right call for not using the flash bang. He also stated that after the fact, they found a lot of paper and stuff on the floor which likely would have created a fire hazard. Sergeant Wood stated that both supervisors and the case agent can have a say in when to use the flash bangs but the supervisors have the final decision.

Sergeant Wood stated that he has never signed a tactical plan, because they require the case agents to email them the signed warrant and tactical plan after they are completed for the sergeant's review to make sure everything is good. Once approved by the sergeant, they will email it to the lieutenant. If something is wrong with anything, the sergeants send it back to the case agent for corrections. All of this is completed by email and that was their way of verifying that the lieutenant has the corrected tactical plan. If the lieutenant has questions, he usually calls by phone. Sergeant Wood stated that both he and Sergeant Reyna look at the tactical plan and the warrant unless one of them is not there that day but if they both are at work then both review the documents. Sergeant Wood stated that both he and Sergeant Reyna approved the tactical plan for Harding Street and then Sergeant Reyna emailed it to Lieutenant Gonzales.

During his review, Sergeant Wood stated he makes sure all the people are listed right and also reviews the threat assessment form. If it doesn't pass the threat assessment questions, then they'll pass it over to SWAT. As far as the threat assessment form, Sergeant Wood looks to see if there are fully automatic weapons, previous violent history, assault rifles, heavily fortified, or any elaborate system that they can't handle. Sergeant Wood stated that the threat assessment form has to be done before any warrant is executed and stated both he and Sergeant Reyna reviewed and approved the threat assessment form for Harding Street. Sergeant Wood also makes sure that the warrant is signed and makes sure there are no mistakes on the description of the house and how the case agents got there to that point.

When asked how the sergeants check the accuracy of the warrant, Sergeant Wood stated that they have an open atmosphere in the office so they are talking with the officers and getting

COH00037500

updates all week. Sergeant Wood then added he did not know that Officer Goines had made a controlled buy prior to the day of the warrant.

Sergeant Wood stated that Officer Goines should have completed a report the day he made the buy or had at least some sort of documentation regarding the buy. Sergeant Wood added that it is not routine for them to look at other stuff outside of the warrant, such as the CI receipts or offense reports to verify any information.

When asked how the sergeants of a squad make sure the officers are doing what they are supposed to be doing according to policies, Sergeant Wood stated that they have a narcotics database that keeps up with the stats and they also have the blue backs that they review after a case is closed. He added that it is also verbal communications and the officers tell them where they're going with their case and if they need help but added that it would not be possible to know everything that all nine officers were doing all of the time. Sergeant Wood stated that they talk to the officers throughout the week and sometimes daily, depending on how the officers' investigations are working out because some cases may be put on hold while one officer is helping another officer on his case. At other times, some cases may not work out and the officers are all over the place but the sergeants try to keep up with everyone weekly.

Sergeant Wood stated there is no form to fill out to keep track of the officers' productivity except for the database in which the officers fill out their case tracking sheets and expense reports, and the completed blue backs that they review. During his review of the completed blue backs, Sergeant Wood stated that he reviews the reports and tries to make sure that they are accurate and contain all the right information.

Sergeant Wood was then asked about two incident reports that made no mention of any weapons being at the locations but in the warrants, Officer Goines stated that weapons were seen. It was asked of Sergeant Wood if he would have seen the discrepancy if he would have read the report and the warrant prior to serving the warrant and he replied that he probably would have caught that and he would have addressed it with the case agent because that is important information to have. Sergeant Wood stated that he would have the case agent fix the report but that if the case agent stated that there was a gun in the affidavit and told him directly that there was a gun; they would still run the warrant in addition to amending the report. Sergeant Wood stated that he wouldn't know about the report if he only read the warrant and the tactical plan but if the case agent completes the UC buy report or incident report, and he mentions a weapon, either verbally or in the warrant affidavit, then the case agent should document it on the first line of his report.

Sergeant Wood also stated it would be better if they had a system in place where the case agents could send them the case tracking sheets to provide them more information up front, but if it was to the point where the case agent was in front of a judge and getting the warrant signed, based on the experience and level the case agents are on, there should not be any mistakes like that. He added some other system besides what they have now would be helpful.

Sergeant Wood was then asked about the hand written notes that Lieutenant Todd gave Officer Goines that included the names, addresses, birthdays of the people related to Harding Street. Sergeant Wood was asked if Officer Goines had this information would he have expected any of

Page 26, Investigation Summary, Issue Record #54155-2019

the information to be included in the briefing. Sergeant Wood stated that yes, he would expect it to be included in the briefing if Officer Goines could have verified and positively identified those people in the house. Sergeant Wood stated that he expected the officers to try and verify the identity of the person who sold the dope by running the criminal history of the person and gathering a picture of that person and even taking that picture to the CI, asking the CI if that was the same person they had bought the dope from. Sergeant Wood added if the CI verified that was the person, then he would have shown the pictures at the briefing. Sergeant Wood stated that would have been the proper steps to take but he had never seen that done before.

Sergeant Wood stated since this situation included a male with a gun, the only difference it would have made in the way they ran the warrant, is if they had known the male had a violent criminal history, but in this case Sergeant Wood thought they would have done everything the same. Sergeant Wood stated that it was not abnormal for Officer Goines to have only "No Knock" warrants due to the geographical area in which they work and it is nothing that would have raised Sergeant Wood's attention to.

Sergeant Wood was asked if there was any surveillance being conducted on Harding Street prior to the execution of the warrant and he replied yes; an officer that was doing a rotation with them was on location giving updates on the radio about what he saw and any activity around the house. Sergeant Wood stated they require an hour's worth of surveillance done on a target prior to them running the warrant. Sergeant Wood stated that as he was going to the briefing he drove by the location and he believed that the officer was already out there doing the surveillance.

Sergeant Wood was asked about the warrant at <sup>Redacted</sup> Napoleon Street in which Officer Goines had mentioned that his CI had possibly seen grenades at the location. Sergeant Wood stated that this was a warrant that they handed off to SWAT because of the grenades and they tried to run it on two separate nights, but one night SWAT got called off due to another issue. The next night, Officer Goines called it off because there was no activity at the house. Sergeant Wood stated that when the second attempt was called off, Sergeant Reyna advised that they were going to call it off completely and if Officer Goines wanted to pursue it anymore, he was going to have to start over again. Sergeant Wood stated that he received all of the information regarding Napoleon Street from Sergeant Reyna the Friday before they tried running the warrants. Sergeant Wood was asked if he would expect and incident report or other documentation from Officer Goines since the supervisors had knowledge of it on Friday and they did not attempt to run the warrant until the next week. Sergeant Wood stated yes he would have expected an incident report or any other documentation from Officer Goines. He also added that if there was a system in place where they had the case tracking sheet and it was in the SOP, they would have reviewed that stuff before the warrant. He also stated they are usually going by what the case agents tell them and the supervisors trust that the case agents are telling the truth and they are keeping the supervisors informed on a daily basis.

Sergeant Wood reiterated that if there was a system in place such as guidelines or forms that the case agents filled out at the beginning of an active case that would keep the supervisors informed and let them know what was going on, it would help hold the case agents accountable for the information especially in the affidavits.

Confidential - Subject to Protective Order

Sergeant Wood then began to talk about when case agents were expected to tag narcotics and stated that all narcotics should be tagged immediately or pretty close to the end of a transaction or at least the same day. Sergeant Wood was presented with the offense report Officer Goines completed in which it stated that Officer Goines tagged 0.4 grams of heroin. Sergeant Wood stated when he read the report, he assumed the narcotics was tagged as stated and there was no reason for Officer Goines having narcotics inside his vehicle that he had claimed to have tagged. Sergeant Wood was also presented with a report that SIU investigators completed in which they had found cocaine, hydrocodone, prescription acetaminophen, other kinds of contraband and a stolen gun. Sergeant Wood stated that was unacceptable and there was no reason for Officer Goines to have any of that in his vehicle. Sergeant Wood was asked if Officer Goines had obtained these narcotics in controlled buys then every piece of contraband or narcotics should have a case tracking sheet and a CI receipt for funds attached to it. Sergeant Wood replied yes and if Officer Goines never completed a case tracking sheet then there was no way for anyone to find out what Officer Goines did or had.

Sergeant Wood acknowledged that if a case tracking sheet was not completed, the supervisors would never know of the case agent's activities and that was an issue. Sergeant Wood added by saying that brings him back to the point of there being something on the front end of the investigation, a process in which to document, then the supervisors would know what the case agents were doing. Sergeant Wood then stated but the officer that is honest will do his job and if he has something active going, the officer is going to do his case tracking sheet and go from there.

Sergeant Wood added that the case agents put together the blue backs and that is when the supervisors review it, but usually the officers keep them updated as they go, and the officers are supposed to be honest and not sidestep stuff. Sergeant Wood stated the supervisors have trust in the officers and they cannot be with nine officers the whole time.

Sergeant Wood stated if the officers were going out to make a controlled buy or any other type of activity and it's not within their normal duty hours, they put in for overtime. The investigator then asked if the officers notify the supervisors before the officers go out to make the deals that required working overtime and Sergeant Wood responded that the officers usually tell the supervisors because the officers are required to have other officers with them to work the deals. Usually if Sergeant Wood received an overtime slip, he would ask the officer what was going on to get an update. Sergeant Wood stated he did not receive any overtime slips for Officer Goines but he would expect to see them if Officer Goines was doing work on the weekends but he also added that Officer Goines was a little late getting his overtime slips in because he would burn time because of his seniority or would be asked to train elsewhere and he would not be in the office to complete the overtime forms in a timely manner.

Sergeant Wood stated that Officer Goines had problems getting his cases done which had been a problem with him before Sergeant Wood arrived in the Narcotics Division. Sergeant Wood stated he was on Officer Goines about it. Sergeant Wood described how they would get the case tracking report and blue back reports showing what cases were late or not closed. He would make copies of the list and present to each officer on the list and ask them about the case to see why it was not closed. Sergeant Wood also admitted there was an issue with the system because

a lot of the times, the officers would tell him they had already closed the case and had their stuff turned in on time. Sergeant Wood added that the officers were saying the system was broken and whoever was entering the information was not doing their job. Sergeant Wood stated that every time a list came out, he had to approach Officer Goines about problems on his follow-ups to get him caught up and he was really behind. Sergeant Wood added that Officer Goines was gone all the time because of training and he wasn't in the office like the other officers.

The interview then began to talk about the case tracking sheets and when they were expected to be produced and what information was on the sheet. Sergeant Wood stated that the case agents were responsible for producing the case tracking sheet and the information. He added if the officers were given a lead and they were checking a location and they did not see activity and nothing was going on, then a case tracking sheet would not be created; but if the officers saw activity, then the officers would send their CI to do a buy and they would expect to see the case tracking sheet within 24 hours of that buy. Sergeant Wood stated that both he and Sergeant Reyna have the case agents generate the case tracking sheets since the job is proactive, self-initiated and the officers have firsthand knowledge.

Sergeant Wood was shown case tracking sheets from the audit on Officer Goines' case files and was made aware that several of the case tracking sheets were created several days later after the controlled buy. Sergeant Wood stated this was unacceptable but stated he would not know what the officers were doing if the case tracking sheet was not created by the officer. Sergeant Wood added the officers should still generate the case tracking sheet but an automatic email should be forwarded to the supervisor so they are aware of the activity the officers were doing and the supervisors could catch any problems and ask the officers about it. Sergeant Wood added they are not notified of a case tracking sheet until the officer turned in their final blue back unless the supervisor has a reason to go behind them and check but at this level the supervisors should not have to babysit.

Sergeant Wood stated he did not see a problem before because everything seemed to work, but if there is an officer like this, obviously there should be a better process in place. Sergeant Wood stated he should catch any issues with the case tracking sheets being generated weeks later while he would review them and if he did see something wrong, he would talk to that officer and find out what was going on and make sure the officer was aware and read the SOP in regards to the timeline of the case tracking sheet.

It was then pointed out to Sergeant Wood that the case tracking sheets created by Officer Goines were all from 2018. Sergeant Wood was assigned to the squad during that time and he stated, *"Yeah, I probably should've been there yeah."* It was pointed out to Sergeant Wood that if everything falls back on the case tracking sheets that the officers are creating, it leaves the officers to police themselves to notify everybody what they're doing and it leaves a lot of room with no oversight for the officers to not be doing what they're supposed to do and the supervisors have no way to find out. Sergeant Wood replied *"And like I said I've only been there for two years and this is the way that – the system told me. But I think they should add some other protocols to the system to, uh..Well like, uh, maybe something that tells us that they're initiating a, uh, maybe a form or something that they fill out and maybe an activity sheet or something that tells us what they're doing and, um, and, uh, they're supposed to turn that in weekly or*

*something like that. Uh, but you're right it - it probably the - the - if you have a dishonest person, uh, or two dishonest people that are working together it's very hard to catch a mis- uh, their, uh, mistakes."*

When asked what is contained in the case file (blue backs), Sergeant Wood stated they contain the material that is produced on the case as far as evidence and it should cover everything including CI receipts, reports, documenting everything the investigator has done. Sergeant Wood stated that the case files should be completed and turned in timely. He also stated sometimes the officers get sidetracked helping others in their squads or even other squads but as soon as the case is completed it should be turned in. It was then pointed out to Sergeant Wood that the audit team had to create 14 case files just for the year 2018 from stuff that was all over Officer Goines' desk, filing cabinet, or car. Sergeant Wood stated that there was no reason why Goines never created a file for the 14 cases.

When asked if Officer Goines had all the case tracking sheets and reports done but had not compiled it into a case file, wouldn't the supervisors expect to have seen the report, Sergeant Wood replied yes. He also added that if there is no information for the supervisors to see then they're not going to see it, that if it's not caught by the case tracking list then there is no way of knowing and it goes back to what he had said earlier about having another procedure in place. The weak link in the chain is whether or not the officers do their case tracking sheets for anybody else to have any idea what is going on.

Sergeant Wood was then asked if the lieutenant ever sees the case file before it goes to quality control and Sergeant Wood stated that the lieutenant actually gets all the case files, reviews them and takes them himself to quality control. When asked if Sergeant Wood was aware of any cases related to Officer Goines or other officers for 2018 over 60 days late and if he was supposed to notify anyone, Sergeant Wood replied that he believed the lieutenant was the one that was notified of the list and would then give the list to Sergeant Wood. Sergeant Wood said he would make a copy and ask the officers what was going on with the case, had it been cleared out, or was it ongoing. The officers then would fill in the blanks for him and give him an explanation and then Sergeant Wood would usually turn it back in to the lieutenant.

The Narcotics Division SOP state if a case is over 60 days old, then the supervisor was supposed to create a case tracking sheet documenting why the case is late. Sergeant Wood stated he believed that is what he was printing out and giving the officers asking them to give an explanation of why it's late, if it's completed, or if it's a mistake but he doesn't remember creating a case tracking sheet himself. Sergeant Wood stated *"I don't remember doing that. I don't remember seeing that. I don't think I've been – I can't say it didn't happen, but I – I haven't done it recently."*

Sergeant Wood then explained that the officers had five days to return a warrant after they get the warrant signed and stated that it was unacceptable for an original warrant to be placed in the case file long after the fact. In addition, he acknowledged there should be case tracking sheets and actual case files assigned to warrants if they have been served or attempted. Sergeant Wood was then asked if he was doing his review of the case file, should he have caught that there was an original warrant that had not been returned or the original warrant was in the case file and

Sergeant Wood stated, *"If it was turned in like that yes.   I should – I – probably should have caught that."*

Sergeant Wood explained what the rules were for controlled buys using a CI.  Sergeant Wood stated there has to be two officers, they pat the CI down prior to taking them to the house, give them the money and they have to maintain a visual on the CI the entire time.  The CI comes back to the car, the officers recover the narcotics, get the information from them, such as what was said, pay the CI, and then be on their way.  There has to be at least one officer keeping visual on the CI the entire time, from the time the CI leaves the car, to the house, and back to the car.  Sergeant Wood stated that they have to be searched both before and after the buy.

Sergeant Wood stated that he had never seen any red flags with Officer Goines regarding his handling of CI.  When asked if Sergeant Wood had any past issues with Officer Goines socializing with CI, he stated no and it was very unacceptable.

Sergeant Wood stated he had no issues with Officer Goines or anyone else doing controlled buys on their own.  Sergeant Wood stated he had never given anyone permission to do a controlled buy and he has never given permission for any officers to do an undercover (UC) buy on their own either.

Sergeant Wood explained that an UC buy was a totally different game, stating there has to be a supervisor and a lot more officers on the scene because you have to have a surveillance team and a rescue team.  He added it is definitely not something that anyone can do by themselves.  He stated he has never heard of anyone doing that before.  He also added that the supervisor has to be notified beforehand since the supervisor has to be on scene also.

Sergeant Wood explained the money threshold of when a supervisor has to be present for the payment of a CI for the purchase of narcotics.  He stated that a payment for services $50.00 and under, the officer can do it themselves and have the CI sign a receipt, above $50.00 a supervisor has to be present.  For the CI to make the purchase the threshold is $125.00 and under; if it is over $125.00, a supervisor has to approve and anything over $250.00 has to have a lieutenant's approval.  Sergeant Wood stated that all transactions have to have a witness to the transaction.  Sergeant Wood stated the CI receipt documents the payment which is put into the expense database.  He added the supervisors would not know what payments were done unless they looked at the expense database which had everything documented on there, but the officers get a certain amount of money as a monthly draw.  Sergeant Wood stated that the supervisors would not know that the officers made a $50.00 payment to a CI until the officers entered it into the system which should be done in a short time frame of the actual payment.  The supervisors check the database at the end of the month when they review the numbers of the draws and returns.

Sergeant Wood stated that he does have the ability to check the database as the month goes on to see what the officers are spending but unless he thought somebody was being dishonest, it doesn't happen.  He stated that when they get the end of month expense letter, the supervisors check with what the officers received as a draw and what they returned to make sure it all matches up.  If it does not then the supervisor gets with the officer and they go over the receipts.  Sergeant Wood also stated that when he has to be present with the officer to pay a CI, he always

Confidential - Subject to Protective Order

asked what it is for so it balanced against the expense letter. He added the monthly draw of what the officer received depends on if they had a good month or slow month; the good month earns a higher draw amount and the slow month does not get as much money.

Sergeant Wood explained that when the officers complete their end of month expenses, the supervisors check for coordinating documentation such as CI receipts and all their expenditures for the month to make sure it adds up. He also stated that Sergeant Reyna usually did this and he had not done one in about four months but he stated he does check everything when he does it. Sergeant Wood stated it can be called an audit and they have a sergeant at 1200 Travis Street that is assigned to just look at the audits. That sergeant goes through all of them to catch all clerical errors or if the numbers do not match up. Sergeant Wood stated that he cannot remember being called about Officer Goines' expenses having any discrepancies or errors.

When asked about Officer Goines' performance during Sergeant Wood's two years that he has been there, Sergeant Wood stated that Officer Goines was a good tactical officer but his follow up was not as good as far as paperwork. He stated no red flags ever popped up and Sergeant Wood never thought that Officer Goines was not trustworthy or had lied about stuff and it was all a surprise. Sergeant Wood added that he wanted to say that 99% of the officers do not cause any problems; and when officers are on the late list, he stated that the officers were justifiable. He also stated this was way out of the ordinary and this did not represent what the Narcotics Division is about.

Sergeant Wood stated if it was required to turn in a packet of some sort before every briefing to the sergeant for review it may slow things down, but it would probably be a better way to go. Sergeant Wood was asked if he thought that having a closer review of anything related to the Harding Street case would have changed or possibly affected the outcome of what had happened, Sergeant Wood replied *"yes"* and *"no."* He added that if Officer Goines lied through the whole thing and there are one or two officers working together; and they both lied, doing it on forms and willing to lie on an affidavit, he wouldn't know how to stop that. Sergeant Wood added he did not know if that was the answer but as far as the tactical part of the warrant, that was done perfectly. In addition, Sergeant Wood stated, but if there is an officer that was lying and he was willing to go that far to lie on an affidavit to a judge, to lie on the forms, everyone can still be misled.

Sergeant Wood was asked if Officer Goines worked with a regular partner and Sergeant Wood replied that Officer Goines only worked with a few people; and he was not like the rest of the officers who mixed it up and worked together. He stated Officer Goines usually worked with Officer Bryant. Mainly, it had to do with Officer Goines taking a lot of time off for either training or personal days off; so he was more by himself than he was with the other officers.

Sergeant Wood was asked if when he reviewed the blue backs, would that be the first time that he read the offense report and the associated documents and he replied, *"A majority of the time, yes."* He then added that unless the officer came to him with a problem that would be when he looked at the report.

Confidential - Subject to Protective Order

Sergeant Wood was asked about the group text that went out the Sunday prior to the warrant execution and was asked if that was a normal way for the squad to communicate which he stated it was and Sergeant Wood told the investigators that he still had a copy of the texts.

Sergeant Wood stated that when he drove by the Harding Street location on his way to the briefing, he believed that the officer that was conducting surveillance on the location was already gone when Sergeant Wood drove by and he was not sure what kind of vehicle the officer was driving.

Sergeant Wood added that he wanted to bring up one thing that he thought would help with the process. He stated he felt that if the supervisors could get an automatic notification when the officers pulled a NOCC number then the supervisors would know what the officers were doing. Sergeant Wood also stated he does not know why they have not done that before and does not know why they have not done the case tracking system that way but he has only been there for two years and stated *"Who am I?"*

**Officer Jerrod A. John-Louis, employee #**Redacted, is assigned to the Narcotics Division, TNET Squad 20. Officer John-Louis provided Sergeant Rexroad with an administrative statement on March 14, 2019. Officer John-Louis was on duty the day the warrant was executed by members of the Narcotics Division's Squad 15, at 7815 Harding Street. Officer John-Louis received a call from Sergeant Brandon, notifying him that officers had been shot. Officer John-Louis learned that one of the officers was Gerald M. Goines. Officer John-Louis recalled that he spoke with Officer Goines earlier the same day regarding Officer Goines running a search warrant; however, Officer John-Louis did not know the details of the "paper" that Officer Goines was going to run, stating that it was not uncommon for Narcotics Division officers to run multiple warrants in a given day. Officer John-Louis stated that he had no prior knowledge of the Harding Street investigation, and had no involvement with the investigation or execution of the search warrant.

Officer John-Louis recalled phone calls between him and Officer Bryant and during one of the phone calls; Officer Bryant asked him if Officer Goines had tagged the dope that had been purchased at 7815 Harding Street. Officer John-Louis believed that the phone calls between he and Officer Bryant occurred on January 29, 2019; either at 0345 hours or 2154 hours. As well, Officer John-Louis spoke with Officer Bryant and numerous other officers at the hospital after the shooting at 7815 Harding Street.

Officer John-Louis believed that Officer Bryant called him because he knew he was at the hospital with access to Officer Goines. Once Officer Bryant asked Officer John-Louis if Officer Goines had tagged the narcotics, Officer Bryant went into Officer Goines' hospital room to ask him. Officer Goines was unable to communicate by voice, so he wrote on a piece of paper that he had not tagged the narcotics evidence and it was located in the center console of his vehicle. Officer Goines wrote that the narcotics were heroin wrapped in napkins. Officer John-Louis communicated this to Officer Bryant.

Officer John-Louis stated that he had been partners with Officer Goines in the past; however, it had been over nine years, so he could not describe Officer Goines' pattern for tagging narcotics. Officer John-Louis recalled that Officer Goines would typically tag his own narcotics evidence.

Officer John-Louis responded to questions regarding Officer Goines' personal and city issued cellular phones. Officer John-Louis wrote that he never handled Officer Goines' personal phone, and he could not specifically recall if he handled Officer Goines' city issued phone, but recalled that he and Officer Bryant and Officer Mayo discussed how the phone would be turned over to Lieutenant Marsha Todd. In the end, Officer Mayo delivered Officer Goines' city issued phone to Lieutenant Todd at 1200 Travis Street.

**Officer John-Louis' Phone Records** were provided, by him, to Sergeant Rexroad. The records indicated that Officer John-Louis called Officer Bryant on January 29, 2019, at 0344 hours and at 0943 hours. Five additional outgoing calls were made to Officer Bryant on January 30, 2019, at 0944 hours, 0953 hours, 1103 hours, 1124 hours, and 1137 hours.

**Officer Steven O. Bryant** is a target of this investigation. Officer Bryant submitted a letter of retirement from the Department on March 7, 2019, and officially retired from the Department on March 8, 2019. Officer Bryant never provided the Internal Affairs Division with a statement regarding the Harding Street investigation; however, he initially declined to interview with the SIU on February 2, 2019, through his attorney, but later agreed to an interview with SIU investigators Detective Emma Rodriguez and Sergeant Rick Bass. During his interview on February 7, 2019, Officer Bryant indicated he became aware of the Harding Street investigation on January 27, 2019, when Officer Goines called him and told him he was going to do a buy. Officer Goines told Officer Bryant he did not need him to accompany him to the buy. Officer Bryant indicated he was not involved in the Harding Street investigation until receiving the phone call from Officer Goines. He also indicated he was unaware he had been listed in the search warrant by Officer Goines.

Officer Bryant became aware of Officer Goines' CI used to make the buy when he was told by Officer Goines at the hospital. Officer Bryant stated he never had contact with this CI and he stated he did not witness any buys from 7815 Harding Street. Officer Bryant stated he did not conduct any surveillance of 7815 Harding Street, but did a drive by of the residence the morning of the warrant, January 28, 2019.

Officer Bryant recovered two baggies of heroin from Officer Goines' city vehicle after he was told over the phone by Officer John-Louis that the narcotics purchased from a controlled buy at 7815 Harding Street were in Officer Goines' center console. Officer Bryant admitted he had not seen the narcotics prior to recovering them from Officer Goines' vehicle. Regarding Officer Goines' city and personal cell phones, Officer Bryant stated that they were originally found in the Narcotics Division raid van; however, they had been placed inside Officer Goines' city vehicle. Officer Bryant recovered both phones from Officer Goines' vehicle, took both home, and later gave the personal phone to Officer Goines' wife and the city phone to Lieutenant Todd.

Officer Bryant was asked about the supplement he completed in which he identified the narcotics he took possession of and tagged from Officer Goines' vehicle as the narcotics purchased from 7815 Harding Street. Officer Bryant stated he had received the information about the narcotics from Officer John-Louis, who had provided him with a description of the narcotics. He admitted

Confidential - Subject to Protective Order

Page 34, Investigation Summary, Issue Record #54155-2019

he *"made a mistake"* by describing the narcotics as if he was familiar with them from Harding Street.

Officer Bryant indicated he received the initial phone call from Officer Goines on Sunday, then spoke with him again Monday morning, at which time Officer Goines gave him the address for the search warrant. Officer Bryant stated he drove by the location on Harding Street and then ate lunch with Officer Goines. Officer Bryant attended the warrant briefing, but did not recall the names of any residents being mentioned, just potential targets, and a large dog.

**Officer Gerald M. Goines** is a target of this investigation. Officer Goines did not provide an interview to the Internal Affairs Division. On March 22, 2019, Officer Goines retired from the Houston Police Department. On February 13, 2019, Officer Goines was interviewed at Memorial Hermann – Texas Medical Center by Sergeant Rick Bass of the SIU. Officer Goines could not communicate through speech during the interview, instead opting to write notes in response to questions posed to him by Sergeant Bass. During the interview, Sergeant Bass asked Officer Goines the name of the CI used for the buy from 7815 Harding Street. Officer Goines wrote *"There was no confidential informant."*

Officer Goines wrote that he made the buy on January 27, 2019, during the evening, and purchased two bags of heroin, which he believed he tagged into evidence. Officer Goines recalled that the heroin was packed into two small baggies, in powder form. When asked where his case file was for 7815 Harding Street, Officer Goines wrote that all of his notes were on the HPD computer system.

Sergeant Bass showed Officer Goines a photograph of the narcotics evidence tagged by Officer Bryant, which had been recovered from Officer Goines' city vehicle. Officer Goines was asked if this was the same narcotics he had purchased from 7815 Harding Street. Officer Goines asked via note if he had not tagged the narcotics, and then wrote that yes, it would have been what he bought from 7815 Harding Street.

When asked if he wanted to add anything additional, Officer Goines wrote the following:

○ *"I screwed up because I made a buy without the correct manpower out there. I knew when I bought from him he would be still in possession."*
○ *"I made the purchase by my self"*
○ *"I was looking to buy from a female"*
○ *"I bought from the male"*
○ *"I had info regarding people at the residence"*
○ *"I'm not sure if the guy I bought from was male listed in info"*

Officer Goines also admitted that Officer Bryant never laid eyes on the narcotics he purchased from 7815 Harding Street, and he was the one that listed Officer Bryant in the affidavit.

**The Confidential Informants (CI)** registered with Officer Goines, including Ms. [Redacted] subcontracted by CI #[Redacted] to purchase heroin from [Redacted] Napoleon Street, were interviewed by the SIU.

CI #6730 aka CI#2, was interviewed three times by the SIU; her last interview was conducted on February 22, 2019. During her interviews, CI #6730 admitted to having a sexual relationship with Officer Goines. She also admitted that Officer Goines' made a one hour visit to her residence on Friday, January 25, 2019, that was a sexual encounter in which he performed oral sex on her. CI #6730 admitted that Officer Goines had photographs of her on his cell phone. Regarding Redacted Napoleon Street, CI #6730 learned about drugs being sold at the residence from her friend, Ms. Redacted who also told CI #6730 that she saw a grenade inside the house. She also learned about storage rooms off of Griggs Road, Mykawa Road, and Broad Street from Ms. Redacted CI #6730 told investigators that Ms. Redacted took her to the locations to confirm that the same guy sold out of the storage units. CI #6730 stated that Officer Goines knew she had used Ms. Redacted to conduct the purchase from 2721 Napoleon Street, which occurred on January 21, 2019. CI #6730 explained that Ms. Redacted made the purchase because the people at 2721 Napoleon Street thought that CI #6730 worked for the police. Officer Goines did not retrieve the narcotics purchased by Ms. Redacted from CI #6730 until January 23, 2019. The narcotics was described as two baggies of heroin, also referred to as boy and brown, and purchased for $20.00 given to her by Officer Goines. CI #6730 stated she also told Officer Goines about Ms. Redacted seeing a grenade inside the residence.

CI #6730 stated she had only purchased narcotics from black people, never from whites or Hispanics. CI #6730 was shown a photo array containing a driver's license photograph of Mr. Tuttle, and she did not recognize anyone from the array. CI #6730 stated she had no knowledge of 7815 Harding Street and also did not think that Ms. Redacted had any knowledge of Harding Street. CI #6730 admitted that she worked alone with Officer Goines and for no other HPD officers. She stated that she would meet with Officer Goines alone and whenever she was paid by him, a sergeant or lieutenant was present to sign paperwork at the Southeast Division. CI #6730 stated she was only paid by Officer Goines for work she actually did and when she turned over narcotics to Officer Goines, she assumed he tagged it into evidence and completed a report.

When asked if she sold narcotics, CI #6730 admitted that she did so to "*blend in.*" She was also asked if Officer Goines ever tipped her off about warrants or busts, but CI #6730 said Officer Goines never did. CI #6730 was also asked and stated that Officer Goines did not "*cut her in*" on narcotics and if he did, she would admit it.

CI #5696 aka CI #1, was interviewed by the SIU on January 30, 2019. CI #5696 stated she had known Officer Goines for approximately 15 years and met him while her husband was using drugs. CI #5696 had made around 35 purchases for Officer Goines and stated she trusted him as a man of his word. She added that she never purchased narcotics from anyone besides black people, and she was unfamiliar with 7815 Harding Street. She saw the news reports and stated she had never seen the couple before. CI #5696 admitted to purchasing drank, weed, pills, and heroin for Officer Goines. She explained that she would purchase heroin and tell the dealers she was buying it for someone else, unless it was a new seller, who did not know her, in which case she would claim the heroin was for her. CI #5696 stated whenever she was paid, which was sometimes a week later, there was always another officer with Officer Goines; however, whenever she received money to make the buys, it was only Officer Goines present.

Page 36, Investigation Summary, Issue Record #54155-2019

CI #5696 stated she had not performed a buy for Officer Goines in approximately two months. Regarding 7815 Harding Street, she claimed no knowledge of the location, and did not realize that Officer Goines was involved in the case from the news until officers from Narcotics Division called her to speak about Officer Goines. CI #5696 did not recognize 7815 Harding Street from news footage and stated again that she only purchased from black people. When shown photos of Mr. Tuttle and Ms. Nicholas, she advised she had never seen them before. CI #5696 was asked if Officer Goines lied about her going to the location on Harding Street. CI #5696 stated that yes, Officer Goines would have lied had he said she went there, but maybe he was trying to help her out to get credit for the controlled buy.

CI #5696 admitted she had received money from Officer Goines in the past, even though she had not made a buy. She stated that happened once or twice.

CI #5696 was interviewed a second time by SIU investigators on March 5, 2019. During this interview, CI #5696 stated she had been introduced to Officer Goines and had worked on and off with him for approximately 20 years, opposed to 15 years. CI #5696 told investigators she had last been paid approximately one week before the Harding Street raid for $300, but could not recall any details of the investigation. CI #5696 also admitted that the last time she had been paid for work she actually completed was one or two years ago. Sergeant Bass presented CI #5696 a list of payments made to her by Officer Goines by address. CI #5696 was shown <sup>Redacted</sup> Jutland Street, which was the last documented payment from Officer Goines. CI #5696 stated she did not recognize the address, did not take participate in the investigation, and was unfamiliar with the contents of the affidavit. CI #5696 was presented with 3600 and <sup>Redacted</sup> Tuam Street, both of which she recognized the locations but stated she had not made any purchases as a CI. CI #5696 was presented with <sup>Redacted</sup> Goforth Street and <sup>Redacted</sup> Nagle Street. CI #5696 was not familiar with Goforth Street and stated she had been inside Nagle Street, but never made a buy from the location. In two instances, <sup>Redacted</sup> McIlhenny Street and <sup>Redacted</sup> Napoleon Street, CI #5696 verified that she did in fact perform controlled buys from the locations.

**Ms.** Redacted (subcontracted out to purchase narcotics from <sup>Redacted</sup> Napoleon Street by CI #6730) was interviewed by the SIU on February 21, 2019. Ms. Redacted told investigators she knew that CI #6730 and Officer Goines had a sexual relationship because CI #6730 told her so. According to Ms. Redacted Officer Goines would come over to the house and CI #6730 would tell Ms. Redacted to take her grandchild and go into another room; however, Ms. Redacted also stated she had never seen Officer Goines and could not identify him if she saw him. She knew of Officer Goines to go by the nickname "Big Teddy Bear" because that was how CI #6730 referred to him.

Approximately three to four days before Harding Street raid, Officer Goines came over and Ms. Redacted overheard CI #6730 telling him that there was a lot of stuff in that house. Ms. Redacted explained that CI #6730 was talking about the house at Napoleon Street and Drew Street, where a man named Zoe (described as a tall, light skinned black male with a beard...in his early 50's) lived and sold drugs such as pills, crack cocaine, heroin, and syrup. Ms. Redacted explained that she lived with the CI during the week, but had stayed over at Zoe's house to work for him on the weekends. **Zoe had a storage unit where he kept his drug stash, and Ms.** Redacted **took CI**

Page 37, Investigation Summary, Issue Record #54155-2019

#6730 over to the storage unit, but stated they did not go inside the storage unit. Ms. [Redacted] later overheard CI #6730 telling Officer Goines about the storage unit.

Ms. [Redacted] said that CI #6730 sold drugs out of a home in the Third Ward and Officer Goines "*worked both sides*" by taking drugs from suspects and giving it to CI #6730. CI #6730 even told Ms. Chartain that Officer Goines had given her a heads up when the "*jumpers*" were coming to raid her home.

Ms. [Redacted] described the narcotics she obtained after she was asked to make the "*buy*" by CI #6730. Ms. [Redacted] explained that she purchased two $10.00 bags of heroin which came packaged in two green bags. She was given a $20.00 bill to make the purchase. After CI #6730 dropped her off, she walked to the house and then walked back to "*Michael* [Redacted]" house where she met back up with CI #6730.

**Incident Report #120867-19** was generated by Officer Goines to document the heroin purchase. Officer Goines wrote that a narcotics purchase of brown powder substance was purchased from 7815 Harding Street by a confidential informant. Officer Goines listed the evidence as two plastic baggies containing 0.4 grams of heroin, as well as $20.00 (listed as a lost item).

**Officer Bryant** completed the first supplement to this incident on January 30, 2019. In his supplement, Officer Bryant wrote that he was conducting a follow up to the incident and was "involved" in the incident at 7815 Harding Street on January 28, 2019. Officer Bryant wrote that he previously assisted Officer Goines with the incident on January 27, 2019. Officer Bryant documented that the morning of January 30, 2019; he went into Officer Goines' vehicle to retrieve information regarding the investigation. While inside Officer Goines' vehicle, Officer Bryant observed a plastic bag containing a white napkin and two small packets of brown, powdery substance, which Officer Bryant identified as heroin based upon his training and experience. Officer Bryant wrote that he identified the powdery substance as the heroin purchased from 7815 Harding Street on January 27, 2019.

**Incident Report #133932-19** was generated by SIU Detective J. R. Snook to document the investigation into the Harding Street raid. The first supplement documented that Officer Robertson of the Narcotics Division produced a six person photographic array containing a driver's license photo of Mr. Tuttle. The photo array was turned over to Commander Follis. This photographic array was later shown to CI #6730 by Sergeant Pool. CI #6730 did not recognize anyone from the photo array. This report also documented a search conducted of Officer Goines' city vehicle and work area, as well as Officer Bryant's work area at the Southeast Division. During the search of Officer Goines' vehicle, $1,307.00 was discovered that showed no connection to any cases worked by Officer Goines.

The narcotics, two baggies of heroin, recovered by Officer Bryant from Officer Goines' city vehicle were photographed by a crime scene unit and returned to evidence. Home surveillance was collected from CI #6730's residence, which would later show a timeline of Officer Goines arriving and leaving from her home. Additionally, surveillance was recovered from the Taste of Texas restaurant that showed Officer Goines eating in the restaurant with his family on January 27, 2019. There were additional supplements entered to document the tagging of weapons

Confidential - Subject to Protective Order

Page 38, Investigation Summary, Issue Record #54155-2019

recovered from Officer Goines' vehicle as well as equipment from Officer Bryant, recovered after his retirement.

**Incident #250210-19** was also generated by Detective Snook to document the discovery of narcotics found inside Officer Goines' city vehicle by Narcotics Division Sergeant Howard. Officer Goines and Officer Bryant's city vehicle were eventually towed to the Dart Street Lot. There, Officer Goines' vehicle was found to have loose narcotics, some inside submission envelopes, as well as a .380 caliber pistol. It was later found that the .380 pistol was reported stolen out of Harris County Precinct #4 Constables Office under their incident number HC170003415.

Sergeant Rexroad detailed the found narcotics from Officer Goines' city vehicle during two different searches conducted by the SIU:

- 26.11 grams of unknown white powdery substance
- .33 grams of Heroin/Asian Powder
- .01 grams of unknown white powder inside empty pill bottle
- .44 grams of Amlodipine Besylate (used for people with coronary artery disease)
- 12.40 grams of Hydrochlorothiazide (diuretic)
- .11 grams of Alprazolam (anxiety medication, generic form of Xanax)
- .92 grams Carisoprodol / Soma (muscle relaxer)
- 3.30 grams of Hydrocodone / Vicodin / Loreset (opioid pain medication)
- .34 grams of Crack Cocaine
- .45 grams of other unknown brown substance
- 1.20 grams of Hydrocodone / Vicodin / Loreset (opioid pain medication)
- 12.40 grams of Benazepril Hydrochloride (blood pressure medication)
- 3.14 grams of unknown pink tablets
- 3.30 grams of Amoxicillin Trihydrate (antibiotic)
- 35.12 grams of Ibuprofen (anti-inflammatory medication)
- .18 grams of unknown white pill
- .50 grams of unknown clear pills
- .08 grams of unknown brown substance
- 3.40 grams of Watson 853 (Hydrocodone and Acetominophen based pain medicine)
- 9.80 grams of Marijuana
- 35 grams of Ibuprofen (anti-inflammatory medication)

Additionally, Detective Snook and Detective E. Rodriguez documented recovering a bottle of Testosterone, a syringe, and finding a baggy of brown/white powder and a glass pipe from Officer Goines' work area. Also during a search of Officer Goines' work area, three identification cards were found including, a social security card and two driver's licenses belonging to three females. This was discovered by Sergeant R. M. Cruz during a review of documents recovered from Officer Goines' work area.

Confidential - Subject to Protective Order

**Harris County Precinct 4 Constable's Office Incident Report #1700-03415** was obtained and reviewed by Sergeant Rexroad. This report documented the stolen .380 caliber pistol found in Officer Goines' city vehicle. The weapon was reported stolen from a vehicle on January 7, 2017,     **Redacted**     in Cypress. The complainant reported that her husband's truck was burglarized after he possibly left his truck unlocked. The husband's .380 caliber Walther PK380 was missing from the center console. There were no suspects listed in the report.

**The Search Warrant/Affidavit for 7815 Harding Street** was obtained and reviewed by Sergeant Rexroad. The warrant was signed off by Harris County Magistrate Gordon G. Marcum II on January 28, 2019. Officer Goines documented in section 2 of the affidavit that the residence was controlled by a *"white male, whose name is unknown. He is approximately 55 (55) years of age, five feet eleven inches (5'11) in height and one hundred and eighty (180) pounds in weight."*

- o In section 5 of the affidavit, Officer Goines wrote, *""probable cause for said belief by reason of the following facts and circumstances: On January 27, 2019, a narcotic investigation was being conducted at the above residence, located at 7815 Harding street, Houston, Harris County, Texas. Your affiant had previously received information that the above male, whose name is unknown, was selling narcotics. This investigation had been going on for approximately two (2) weeks by the Houston Police Narcotics Division.*

- o *"On 01/27/2019, your Affiant contacted the below confidential informant regarding the above location mentioned above. Your Affiant met with the confidential informant to further this narcotic investigation."*

- o *"The Affiant searched the confidential informant and found the confidential informant to be clear of any narcotics / and or paraphernalia."*

- o *"The confidential informant was provided U.S. currency by the Affiant for the purpose of buying narcotics from any individuals located at the above location in question."*

- o *"The Affiant observed the confidential informant go directly to the above location in question, where the confidential informant was met by a male from inside the above residence in question. After several minutes, the Affiant observed the confidential informant leave the residence in question and return directly to the Affiant. The confidential informant surrendered a quantity of brown powder substance to the Affiant."*

- o *"The term "boy" is a street slang for heroin. The confidential informant advised that the substance was purchased from the male described above and whose name is unknown."*

- o *"The confidential informant advised that additional quantity of brown powder substance was observed in the unknown male's hand which went back into the residence above of "7815 Harding street." The confidential informant also advised that*

COH00037515

> *the additional substance was in the care / custody and control of the male described above and whose name is unknown."*

○ *"The confidential informant was searched again after the completion of this investigation and found clear of any amount of narcotics"*

○ *"Surveillance was placed on the above location in question by the narcotic officers."*

○ *"The confidential informant stated that a weapon was observed at the residence above in question during the narcotic transaction." "The weapon appeared to be a semi-auto hand gun of a 9mm caliber."*

○ *"The quantity of brown powder substance purchased at the above residence located at "7815 Harding street" on 01/27/2019 was recognized by sight and texture as "heroin" by your Affiant and narcotic officer S. Bryant.*

The affidavit contradicted the statement Officer Goines made to the SIU in which he admitted to making the buy himself. This was also contradictory to the interviews conducted by SIU of the confidential informants in which each of them denied any knowledge of 7815 Harding Street, which also meant they would have no knowledge of weapons inside the residence and they each claimed to only have made narcotics purchases from black people.

**The Search Warrant/Affidavit for** [Redacted] **Napoleon Street** was also obtained and reviewed by Sergeant Rexroad. The affidavit indicated that a black male suspect named "Doe" was in possession of crack cocaine on January 22, 2019, and an investigation was ongoing for two weeks. The affidavit further indicated that a confidential informant was met, searched for contraband, and sent to conduct a controlled buy, in which the CI returned with crack cocaine. It was also documented that the CI observed a .40 caliber pistol inside the residence.

This contradicted CI #6730 and Ms. [Redacted] claims that Ms. [Redacted] was subcontracted to conduct the buy, by herself, with Officer Goines not present. It also contradicted that Ms. [Redacted] and CI #6730 claimed Ms. [Redacted] purchased two baggies of heroin, not crack cocaine, and that Officer Goines met CI #6730 two days later to retrieve the heroin from her.

An additional search warrant was obtained by Sergeant Rexroad from SIU for [Redacted] **South Wayside Drive.** This affidavit/search warrant was directly related to [Redacted] Napoleon Street as the location in which "Doe" stored narcotics. Officer Goines produced this affidavit to Harris County Judge Callan on January 23, 2019. The affidavit stated that Doe possessed crack cocaine, and had been under investigation for approximately two weeks. The affidavit stated that a confidential informant had been at the location within the last 24 hours and observed "circles", which amounted to an ounce of cocaine cooked into crack cocaine. The confidential informant also advised that a safe was seen in the location (storage room #112) and the safe contained marijuana and crack cocaine. The affidavit also stated that the confidential informant observed an unknown caliber semi-automatic pistol.

                                                    COH00037516

**The Tactical Plans** for **7815 Harding Street** as well as <sup>Redacted</sup> **Napoleon Street** were obtained and reviewed by Sergeant Rexroad. The tactical plan for Harding Street was created on January 28, 2019, at 1438 hours, under NOCC #00856. Officer Goines was listed as the case agent with Sergeant Reyna listed as the supervisor. The plan narrative stated that a controlled buy was made by a CI, in which a quantity of heroin was purchased. The plan indicated that the case agent maintained constant visual surveillance of the CI to and from the target location. The plan also indicated that officers would attempt to deploy a flash bang (NFDD) device due to weapons being observed on the suspect during the controlled buy.

The tactical plan for <sup>Redacted</sup> Napoleon was created on January 23, 2019, at 1114 hours, under NOCC #00645. Again, Officer Goines was listed as the case agent while Sergeant Wood was listed as the supervisor. Like 7815 Harding Street's tactical plan, this plan indicated that a case agent maintained constant visual surveillance of the CI to and from the target location, which contradicted Officer Goines' statement to SIU that he purchased heroin himself, and both CI #6730's statement to SIU that Ms. |Redacted| was subcontracted to purchase two bags of heroin from 2721 Napoleon.

There were no documented payments found for CI for 7815 Harding Street or 2721 Napoleon Street. Additionally, no case tracking sheet was created for Harding Street. The Narcotics Division had no case files for Harding Street or Napoleon Street. Emails between Lieutenant Gonzales and Sergeant Reyna affirmed that tactical plans were sent via email and acknowledged by Lieutenant Gonzales.

**A NCIC/TCIC Offline Search Inquiry** was conducted to find if anyone had searched for Mr. Tuttle or Ms. Nicholas' criminal histories between June 1, 2018, and February 2, 2019. Several hundred pages were found, but in brief, Officer Blankinship-Reeves was the first to run both names on January 8, 2019, and Officer Dylan Nabors of the Homicide Division was the next to run the names on January 28, 2019, the day of the Harding Street warrant and officer-involved shooting. Between the time of the initial call for service on January 8, 2019, and the day of the warrant service on January 28, 2019, no one ran Mr. Tuttle or Ms. Nicholas.

**Surveillance Footage from 7819 Harding Street** was obtained and reviewed by Sergeant Rexroad. This footage was captured from homeowner's personal surveillance equipment for January 27, 2019, and January 28, 2019. None of the vehicles used by Officer Goines were seen on camera driving past 7819 Harding Street on January 27, 2019, which would have been the date Officer Goines made the buy from 7815 Harding Street. 7819 Harding Street is next door to 7815 Harding Street.

**Surveillance Footage from CI #6730's residence** was obtained and reviewed. There were four videos that showed Officer Goines at CI #6730's residence, of note were video #107 and #207, from January 25, 2019, which showed Officer Goines arrive at the residence. CI #6730 answered her door in what appeared to be only underwear and Officer Goines entered the residence. Officer Goines remained in the residence for a little over one hour before leaving the home. CI #6730 admitted in her interview to the SIU that on this date Officer Goines performed oral sex on her.

Confidential - Subject to Protective Order

Page 42, Investigation Summary, Issue Record #54155-2019

**Cell Phone Records (Cellbrite Data)** was obtained and reviewed for Officer Goines' city phone, Officer Bryant's city and personal phones, and CI #6730's cell phone. Officer Goines' city cell phone showed communications between him and CI #6730 regarding Napoleon Street. Officer Goines also communicated with a SWAT officer about the contents of 2721 Napoleon Street, whether the Bomb Squad would respond, and ultimately, on January 24, 2019, Officer Goines communicated *"I'm gonna kill it"*, to end surveillance. Additional messages were found between Officer Goines and CI #6730 on January 26, 2019, in which CI #6730 was asked if she could trail the suspect from his house to a storage facility.

Of note, there were several phone calls found between Officer Goines and CI #6730; however, there were no calls between the two on January 27, 2019, which is when Officer Goines claimed that CI #6730 made the purchase from 7815 Harding Street. Two images were found of CI #6730 clad in her underclothes, one of which showed her posing in front of a mirror with a blurred male in the background, which is possibly Officer Goines.

Also of note, there were no messages found in Officer Goines' phone regarding 7815 Harding Street.

CI #6730's cell phone was searched with her consent. There were no messages found between her and Officer Goines. During her SIU interview, CI #6730 advised she erased messages between her and Officer Goines.

Officer Bryant's city and personal cell phones were searched and downloaded via Cellbrite. There were no recent messages found between Officer Bryant and Officer Goines. **NOTE:** Officer Bryant claimed that he received a phone call or text from Officer Goines on January 27, 2019, after 1700 hours. There were no phone calls or text messages found on either of Officer Bryant's phones from Officer Goines.

**Historical Phone Data** from Officer Goines, Officer Bryant, CI #6730, and Ms. Redacted was compiled by Sergeant T. Bickford of the Criminal Intelligence Division (CID), and the results were provided to Sergeant Rexroad. Records were reviewed for January 20, 2019, in regards to the 2721 Napoleon Street investigation, to determine if Officer Goines and CI #6730 met at the South Central Division and drove past [Redacted] Napoleon Street. Records indicated phone activity from both Officer Goines and CI #6730 near the South Central Division and later near the vicinity of [Redacted] Napoleon Street. Additional data showed that both phones also traveled near the vicinity of South Wayside Drive and the Gulf Freeway, which is near the storage facility documented in the affidavit for [Redacted] Napoleon Street, and later documented in the affidavit for [Redacted] South Wayside Drive.

Records were reviewed for January 21, 2019, the date in which Officer Goines and CI #6730 allegedly conducted a buy from 2721 Napoleon Street. Records indicated that CI #6730 and Ms. Redacted phones were in the vicinity of [Redacted] Napoleon Street, consistent with their stories that Ms. Redacted made the heroin buy as CI #6730 waited nearby; however, Officer Goines' phone records indicated that he was not in the same location as CI #6730 and Ms. [Redacted] From 1121 to 1158 hours, Officer Goines' phone showed him in the vicinity of downtown Houston. From 1158 to 1254 hours, Officer Goines' phone was unaccounted for. At 1210 hours, both Ms.

COH00037518

Page 43, Investigation Summary, Issue Record #54155-2019

Redacted and CI #6730's phones showed them near the South Central Division. At 1224 hours, Ms. Redacted and CI #6730's phones showed them near the area of Redacted Napoleon Street. There was no data showing Officer Goines near South Central Division of near 2721 Napoleon Street for January 21, 2019.

On January 23, 2019, phone records for both Officer Goines and CI #6730, indicate that both were in the vicinity of CI #6730's residence at Redacted at 0045 hours, which was consistent with CI #6730's home surveillance that showed Officer Goines at her residence at approximately 0047 hours.

Records from January 26, 2019, the date in which CI #6730 stated Officer Goines performed oral sex on her at her residence, showed that both Officer Goines and CI #6730's phones were in the vicinity of her residence at 0012 hours. This was consistent with CI #6730's surveillance footage that showed Officer Goines come over at 0012 hours and leave at 0120 hours.

Records from January 27, 2019, indicated the following: Officer Goines was in the area of River Oaks after midnight until 0112 hours as he headed towards his residence. From 0200 to 1143 hours, Officer Goines phone remained in a location consistent with his residence. At 1700 hours, Officer Goines' phone showed near North Fry Road and West Road until 1855 hours. At 1859 hours, Officer Goines' phone showed near Beltway 8 and IH-10, close to Memorial City Mall, which was consistent with the found receipt and surveillance footage that showed Officer Goines and his family at the Taste of Texas restaurant. At 2112 hours, the phone showed near IH-10 and Barker Cypress Road. At 2147 hours, the phone showed near Officer Goines' residence until 2221 hours. From 2221 hours until the morning, Officer Goines' phone showed no communication; however, at 0628 hours on January 28, 2019, the phone showed at Officer Goines' residence.

It was also found on January 27, 2019, that Officer Goines made a phone call to Officer Bryant at 1719 hours. This was consistent with Officer Bryant's statement that Officer Goines called him after 1700 hours to tell him he was "going to do a buy." This seemed to indicate that Officer Goines did not make a buy before 1700 hours on January 27, 2019; however, after 1700 hours, Officer Goines' phone records indicated he was in the northwest area of Houston, with no phone activity for January 27, 2019, to show him near South Central of 7815 Harding Street.

January 28, 2019, the day of the Harding Street raid, Officer Goines' phone showed him in downtown Houston for a majority of the day until 1317 hours, when his phone showed him near the Southeast Division. At 1616 hours, Officer Goines' phone showed in the area of 75th Street and Garland Drive, shortly before the Harding Street raid.

**Officer Goines' iCloud account** was searched and found to contain pictures of nude females, but nothing that pertained to the Harding Street investigation with the exception of a picture of the notes sent to Officer Goines from Lieutenant Todd.

**The computer hard drives** of Officer Goines and Officer Bryant were downloaded. Over 136 gigabytes of information was downloaded in an effort to find any evidence from 7815 Harding Street or Redacted Napoleon Street. Officer Goines' desktop computer had no evidence from 7815

Page 44, Investigation Summary, Issue Record #54155-2019

Harding Street and one file found for <sup>Redacted</sup> Napoleon Street, which appeared to be a draft of the search warrant. Officer Goines told Sergeant Bass during his interview that files for 7815 Harding Street were located on his computer hard drive; however, none were found.

Officer Bryant's hard drive was searched and it was found that Officer Bryant twice accessed a PDF file related to 7815 Harding Street. His first access was just prior to tagging the 0.4 grams of heroin and his second access was the following day, January 31, 2019. The file was not saved to the hard drive, indicating it may have been accessed from a removable drive (thumb drive). A search for <sup>Redacted</sup> Napoleon Street found no files but showed Google Maps was accessed to search the address on January 24, 2019.

**Officer Goines' computer** showed logged in under his name on January 30, 2019, at 2259 hours, while Officer Goines was still recovering in the hospital.

**The Narcotics Division's Officer Workroom Desktop Computer HPD349226** was searched for any files related to 7815 harding Street. Over 1 million files were searched with five files found related to Harding Street. Three documents were the same document discovered by Sergeant Rexroad and found to be the beginnings of the Harding Street search warrant. The files appeared to be a write-over of an old warrant from <sup>Redacted</sup> Tuam Street. The other two files found by Sergeant Rexroad were emails from Chief Acevedo, to the Department regarding 7815 Harding Street.

**Case Tracking Sheets from the audit** of Officer Goines' cases were reviewed by Sergeant Rexroad for 2018. At least eight case tracking sheets were created anywhere from nine days to 23 days after the initial transaction that necessitated the creation of a case tracking sheet.

**The 1200 Travis Evidence Sign-In/Sign-Out Log** was checked to verify Officer Goines' claim that he tagged the 0.4 grams of heroin into evidence on January 27, 2019, which he documented in incident #120867-19. There were no records found of Officer Goines signing out the key to the room.

**Body Worn Camera (BWC)** was reviewed from Officer Blankinship-Reeves and Officer Morales' cameras. These two responded on January 8, 2019, to 7815 Harding Street, during a call for service regarding the caller's daughter using drugs inside the residence. Footage captured a woman telling Officer Morales that she did not call the police; however, she was also on the phone and was heard saying that the cops were looking at the drug dealer's house. The footage showed the preliminary investigation in which the officers never entered the residence, but gathered the license plate from the driveway, even determining that the plate came back to an address off of TC Jester Boulevard, and not 7815 Harding Street.

**The Event History** for the call for service to 7815 Harding Street was obtained and reviewed and showed that the caller/reportee alleged there were guns inside of the residence and that her daughter was inside the home using drugs with "Reggie." The reportee also called back stating there were **multiple weapons and heroin** inside the residence. The reportee eventually refused to answer questions to dispatch, and the call was cleared as an information call with no arrests and no entry into the residence.

COH00037520

Page 45, Investigation Summary, Issue Record #54155-2019

**The 9-1-1 Call/Dispatch Tape** from the reportee was reviewed. The reportee stated that "Reggie" was a heroin addict. She also stated that "Reggie" lived in the home with her husband and there were machine guns inside the home. She also indicated that the homeowners ran drugs back and forth to Dallas. The reportee initially stated her daughter was 18 years-old and then changed and stated her daughter was 24 years-old, and her name was Melissa. The reportee indicated that she saw the officers on scene; however, she wished to remain anonymous and never spoke with them.

**CONCLUSION**

This investigation was conducted to look into the events surrounding the execution of a narcotics search warrant on January 28, 2019, at 7815 Harding Street, which led to a deadly officer involved shooting in which the residents, Mr. Dennis Tuttle and Ms. Rhogena Nicholas, were shot and killed and five Houston police officers suffered severe injuries. This investigation also looked into allegations of supervisory conduct against the group of supervisors that oversaw the operations of Narcotics Division Squad 15 and directly supervised Officer Goines and Officer Bryant. Both Officer Goines and Officer Bryant retired from the Houston Police Department in the midst of this investigation; therefore, neither provided a statement for this IAD investigation. Both Officers Goines and Officer Bryant provided interviews to the SIU, and an initial inquiry was conducted by Commander Follis to ascertain from Officer Bryant that there were serious issues with the search warrant for 7815 Harding Street. This investigation was able to prove that Officer Goines and Officer Bryant violated multiple policies and committed criminal conduct.

Officer Goines was provided with notes prepared by Officer Blankinship-Reeves, from Lieutenant Todd to investigate possible heroin dealing from the house at 7815 Harding Street. This was in response to an initial call for service on January 8, 2019, in which Officer Blankinship-Reeves and Officer Morales responded to a narcotics call. Officer Blankinship-Reeves' notes contained the identifying information of Mr. Tuttle and Ms. Nicholas, two vehicles which showed Mr. Tuttle as a driver and registered owner; and details of the call for service, in which an anonymous reportee alleged her daughter was inside the residence using heroin with *"Reggie"* and the residents had *"a lot of weapons."* The reportee wished to remain anonymous and called back multiple times. The reportee advised the residents had guns and heroin inside. The reportee also advised that the residents would not open the door if the police knocked. Officer Morales was able to make contact with the reportee, who demanded that the officers barge into the residence to arrest her daughter. The reportee was advised that the officers could not just barge in; she stated she wished to remain anonymous and provided no additional information.

This investigation showed that besides Officer Blankinship-Reeves and members of the Homicide Division researching Mr. Tuttle and Ms. Nicholas after the shooting occurred, no one else researched the couple prior to serving the warrant.

This investigation was able to show that Officer Goines fabricated the affidavit and search warrant for 7815 Harding Street and lied to Sergeant Bass during his hospital interview. **General Order 200-08 - Conduct and Authority, Section 2 – Truthfulness**, states in part:

*Employees shall not make false, untrue, or misleading statements (verbal or written, made directly by or authorized by the employee). Any statement or omission of pertinent information that intentionally, knowingly, or recklessly misrepresents facts or misleads others shall be considered a false statement. A violation of this policy may result in discipline up to and including indefinite suspension.*

While in the hospital, Officer Goines told Sergeant Bass via written notes that he made the purchase of two baggies of heroin from 7815 Harding Street on his own even though his affidavit/search warrant stated that a controlled buy was conducted by a CI. Officer Goines wrote, *"I made the purchase by my self."* Officer Goines was shown a photograph of the heroin and he identified it as the heroin he purchased from Harding Street, which he claimed to have purchased on January 27, 2019. Officer Goines claimed that he tagged the narcotics; however, two baggies of heroin were recovered from his city vehicle and tagged by Officer Bryant. Officer Goines admitted that Officer Bryant never observed the heroin, as he wrote in the affidavit for 7815 Harding Street. Additionally, a records check of the evidence room showed that Officer Goines never checked into the room as he claimed in incident report #120867-19, which was further proven when Officer Bryant found the heroin in Officer Goines' city vehicle.

CI #6730 and Ms. [Redacted] both admitted that Ms. [Redacted] urchased two baggies of heroin from 2721 Napoleon Street. Both described the heroin as a brown substance inside two green baggies. CI #6730 confirmed the narcotics after she was shown a photograph of the green baggies of heroin taken from Officer Goines city vehicle by Officer Bryant. Both women denied any knowledge of 7815 Harding Street, and both stated that they only made purchases from black people; Mr. Tuttle and Ms. Nicholas were caucasian. Phone records indicated that both women were in the vicinity of [Redacted] Napoleon Street on January 21, 2019, which is when the purchase of heroin from 2721 Napoleon Street by Ms. [Redacted] occurred. Phone records did not show Officer Goines' phone in the vicinity of Napoleon Street.

Officer Goines based his affidavit and search warrant on a heroin purchase, made by a confidential informant, from a white male armed with a possible 9mm handgun, at 7815 Harding Street on January 27, 2019. Officer Goines wrote that he physically observed the CI walk to and from the location and surrender the heroin to him.

CI #6730 and Ms. [Redacted] explained that the heroin was purchased from "Zoe," a light skinned black male that sold from [Redacted] Napoleon Street. Prior to the Harding Street investigation, Officer Goines formulated an affidavit and search warrant for [Redacted] Napoleon Street which was also based upon lies. Officer Goines wrote that "Doe" possessed crack cocaine, not heroin. Again, Officer Goines swore to physically observing the CI prior to and after the purchase. He wrote that the CI returned with a quantity of crack cocaine. Goines also wrote that the male was observed to have a .40 caliber pistol on him during the transaction with the CI. CI #6730 mentioned in her interviews with SIU that Ms. [Redacted] had possibly observed a grenade inside

the residence. Lieutenant Gonzales and Sergeant Reyna affirmed that a grenade was brought to their attention by Officer Goines, yet his affidavit made no mention of the grenade.

Officer Goines also wrote in both affidavits that the investigations had been ongoing for approximately two weeks before the affidavits. In a third interview with the SIU, CI #6730 was able to help investigators determine that the purchase from <sup>Redacted</sup> Napoleon Street occurred on January 21, 2019, and Officer Goines retrieved the narcotics from CI #6730 on January 23, 2019. Officer Goines listed the date of purchase in his affidavit as January 22, 2019, and described the purchase as crack cocaine. CI #6730 attested multiple times that the purchase made by Ms. Redacted was for heroin/brown/boy. Ms. Redacted affirmed this information as well.

Additionally, Sergeant Bass and members of SIU's Squad 2 found that Officer Goines generated an additional affidavit/search warrant for <sup>Redacted</sup> South Wayside Drive, an address related to the <sup>Redacted</sup> Napoleon Street investigation. In that affidavit, Officer Goines attested that "Zoe" was observed by a CI as having a semi-automatic weapon inside of a storage facility, as well as "circles" which was slang for an ounce of powder cocaine that had been cooked into crack cocaine. CI #6730 denied ever entering the storage facility, and Ms. Redacted stated she took CI #6730 to the storage facility but the two never went inside.

It was clear that Officer Goines fabricated many aspects of the 7815 Harding Street search warrant/affidavit. He contradicted himself during his interview with Sergeant Bass by claiming that he made the controlled buy by his self, CI #6730 and Ms. Redacted claimed to have purchased the heroin from <sup>Redacted</sup> Napoleon Street, which was consistent with phone records, records of which did not show Officer Goines in the vicinity during the day of the purchase, and finally, Officer Bryant's discovery of the heroin inside Officer Goines' vehicle further confirmed Goines' lies, as he documented tagging the narcotics, but was found to have never checked into the Narcotics evidence room. This investigation found sufficient evidence to sustain the allegation of Truthfulness against Officer Goines; however, as a result of his retirement from the Houston Police Department during the course of this investigation, the allegation of **Truthfulness** against **Officer Goines** shall be classified as **INFORMATION**.

The search warrant and affidavit for 7815 Harding Street was proven a complete fabrication. **Texas Penal Code Statute 37.10 – Tampering with Governmental Record**, states in part:

> *(a) A person commits an offense if he:*
>
> *(1) knowingly makes a false entry in, or false alteration of, a governmental record;*
> *(2) makes, presents, or uses any record, document, or thing with knowledge of its falsity and with intent that it be taken as a genuine governmental record;*
> *(5) makes, presents, or uses a governmental record with knowledge of its falsity;*
>
> *(2) An offense under this section is a felony of the third degree if it is shown on the trial of the offense that the governmental record was:*

Confidential - Subject to Protective Order

Page 48, Investigation Summary, Issue Record #54155-2019

> (D) a search warrant issued by a magistrate.

Officer Goines knowingly presented a magistrate with a false and fictitious affidavit for a search warrant to 7815 Harding Street. As such, his actions constituted a third degree felony. This investigation found sufficient evidence to sustain a cite of Criminal Activity – Tampering with Governmental Records against Officer Goines; however, as a result of his retirement during the course of this investigation, the allegation of **Criminal Activity – Tampering with Governmental Record** against **Officer Goines** shall be classified as **INFORMATION**.

Officer Goines violated multiple tenets of the Department's policy regarding confidential informants. **General Order 600-16 – Confidential Informants and Other Sources of Information, Section 4 - Code of Conduct for Officers**, states in part:

> *Officers shall not engage in any activity or behavior with a CI that could challenge the integrity of or bring embarrassment to the officer of the department.*
>
> *The following regulations are intended to govern the relationship between an officer and a confidential informant.*
>
> *a. Criminal activity by CIs shall not be encouraged or condoned.*
> *c. All meetings between a CI and an officer shall be attended by two officers (e.g., officer and partner or officer and supervisor). Prior to meeting a CI, officers must advise their supervisor.*
> *d. All significant meetings with a CI shall be documented by the investigator in an incident report or applicable activity report.*
> *e. Officers shall not socialize with CIs or their families.*

Sergeant Bass and Detective Emma Rodriguez conducted multiple interviews with CIs #6730, #5696, and Ms. Redacted, a friend of CI #6730, who admitted to purchasing the two baggies of heroin from Redacted Napoleon Street. In her interviews with Sergeant Bass and Detective Rodriguez, CI #6730 admitted that she met with Officer Goines alone and also was with Officer Goines alone during the purchases she made for him. CI #6730 also admitted that Officer Goines was aware that she used Ms. Redacted to make the buy from Napoleon Street because *"the guy said I'm the police."* CI #6730 also stated that Officer Goines was not present during the buy from Napoleon Street.

Officer Goines did not document any meetings with the confidential informants regarding 7815 Harding Street, Redacted Napoleon Street or Redacted South Wayside Drive. If controlled buys were performed as he attested to in each of the above mentioned affidavits for search warrant, those would have been significant meetings between Officer Goines and the CIs that should have been documented per subsection c of the above mentioned policy.

CI #6730 admitted that she was in photographs found on Officer Goines phone, but stated the photo in which he was standing naked behind her was taken a year or so ago. CI #6730 admitted to a sexual relationship with Officer Goines in one instance, Officer Goines was seen on CI

Confidential - Subject to Protective Order

#6730's surveillance camera going inside of her residence for approximately one hour. CI #6730 explained that in that instance, Officer Goines had performed oral sex on her inside of her home. She also stated that Officer Goines had taken her out to eat and paid for her food.

Finally, CI #6730 admitted to dealing drugs in order to blend in with the others. She admitted to selling marijuana and Xanax; however, this investigation was unable to prove whether or not Officer Goines had knowledge of CI #6730's criminal activity; this did not preclude the above listed violations. This investigation found sufficient evidence to sustain a cite of Improper Police Procedure – Dealing with Confidential Informants against Officer Goines; however, due to his retirement during the course of this investigation, the allegation against **Officer Goines** for **Improper Police Procedure – Dealing with Confidential Informants** shall be classified as **INFORMATION.**

A search of Officer Goines' work area at the Southeast Division Narcotics office as well as two searches of the interior of his city vehicle uncovered narcotics that could not be traced back to any ongoing investigations. Sergeant Rexroad, along with SIU Detectives Rodriguez and Snook discovered .15 grams of heroin in a plastic baggie, a bottle labeled Testosterone, a syringe with .01 grams of unknown substance and a glass pipe with .01 grams of unknown substance, from Officer Goines' work area. As well, Sergeant Rexroad recovered and tagged a .22 revolver from underneath Officer Goines' desk.

Searches of Officer Goines' city vehicle found powder and crack cocaine, various prescription pills, unknown brown substance, as well as a stolen Walther PK380, .380 caliber semi-automatic pistol reported stolen out of the Harris County Constable's Office Precinct #4 on January 7, 2017, under incident #1700-03415. Over $1,000.00 in cash was found inside Officer Goines' vehicle, which showed no connection to any investigation.

**Narcotics SOP 200/1.15 – Handling of Contraband and Evidence, Responsibility**, states in part:

*Recover and dispose of contraband and evidence in a manner, which protects officer integrity and case prosecution.*

## TASK

*1. Any officer recovering narcotics during an investigation will maintain complete control of same until final disposition unless they turn the narcotics over to another officer for tagging.*

*2. An offense report will be completed after any recovery of controlled substances and will detail the recovery location, the investigator recovering the evidence, chain of custody and final disposition.*

*3. All substances will be transported to the Central Evidence Receiving Unit (CER), CER Narcotics Drop box at 1200 Travis, or NOCC for proper*

Page 50, Investigation Summary, Issue Record #54155-2019

> disposition upon completion of the narcotics operation and will not be left in
> division offices or vehicles.
>
> 4. Case Agents will maintain the integrity of each narcotics investigation by
> insuring that the narcotics that are recovered are kept separated by each
> individual offense.
>
> 9. Any recovered stolen property will be tagged into the Property Room and
> listed in the offense report.

**Circular 07-0919-257,** dated September 19, 2007, states in part:

> Effective October 15, 2007, all firearms and firearms evidence (i. e. bullets,
> cartridge cases, shotshells, cartridges) will be submitted to the Property Room.

**General Order 100-01 – Internal Directives, Policy,** states in part:

> Employees shall abide by all internal directives of the Houston Police
> Department.    Internal directives are written policies and procedures
> established by the Chief of Police and published in the form of General
> Orders, Special Orders, Circulars, and Roll Call Training Bulletins. Violation
> of internal directives may be cause for disciplinary action.

Lieutenant Gonzales, Sergeant Reyna, and Sergeant Wood were all questioned regarding the amount of narcotics found in Officer Goines' vehicle, including the 0.4 grams of heroin used as the basis for the search warrant of 7815 Harding Street. All three agreed that narcotics should have been tagged the same day it was recovered. As such, there were no incident reports found to connect to any of the recovered narcotics and no chain of custody documentation.

Officer Goines should have tagged the .380 pistol which was discovered in his city vehicle. It is unknown how Officer Goines took custody of the weapon, but the weapon was reported stolen out of Harris County Constable's Office Precinct #4 on January 7, 2017, thus it should have been tagged into evidence. This investigation found sufficient evidence that Officer Goines violated Internal Directives; however, as a result of his retirement during the course of this investigation, the allegation of **Internal Directives** against **Officer Goines** shall be classified as **INFORMATION.**

Officer Goines showed a complete disregard for the integrity and well-being of his co-workers and the Department. **General Order 200-08 – Conduct and Authority, Sound Judgment,** states in part:

> Employees are expected to exercise sound judgment at all times. Employees'
> behavior shall be limited to conduct that is reasonable and prudent.  No
> employee shall commit any act on duty or off duty in an official or private
> capacity that may bring reproach, discredit, or embarrassment to the
> department.

Confidential - Subject to Protective Order

The actions of Officer Goines have caused embarrassment to the Houston Police Department. Officer Goines had a responsibility to conduct his investigations with integrity and respect. Officer Goines was able to retire during this investigation and left without answering questions as to why he chose to fabricate the Harding Street investigation and this investigation found sufficient evidence that Officer Goines exhibited a lack of Sound Judgment; however, Officer Goines retired during the course of this investigation, thus the conduct not alleged against **Officer Goines** for **Sound Judgment** shall be classified as **INFORMATION.**

Officer Bryant was untruthful regarding his involvement in the Harding Street investigation. Officer Bryant completed a supplement to Officer Goines' narcotics investigation under incident #120867-19. In supplement #002, Officer Bryant wrote that he identified the substance as the narcotics purchased from 7815 Harding Street. He later admitted that he was told by Officer John-Louis that the narcotics he found in Officer Goines' city vehicle was from the Harding Street purchase and he made a mistake by writing that he identified the narcotics from 7815 Harding Street. Officer Bryant was not with Officer Goines during the alleged purchase of narcotics. Officer Bryant admitted this to Commander Follis as well as the SIU. Officer Bryant admitted to Commander Follis he was *"in the area"* when Officer Goines met with the CI to conduct the controlled buy and he also told Commander Follis that he met up with Goines later and was shown the heroin. This investigation proved that Officer Goines and the CI never met to conduct a purchase from 7815 Harding Street; therefore, Officer Bryant's story to Commander Follis was fabricated. This investigation found sufficient evidence to sustain the allegation of Truthfulness against Officer Bryant; however, as a result of Officer Bryant's retirement during the course of this investigation, the allegation of **Truthfulness** against **Officer Bryant** shall be classified as **INFORMATION**.

Officer Bryant completed a supplement to Officer Goines' incident report on January 30, 2019, in which he claimed to have identified the narcotics as purchased from 7815 Harding Street; a purchase which never occurred, which was a fabrication on the part of Officer Goines. Officer Bryant wrote in his supplement, *""Officer Bryant had previously assisted Officer Goines in the investigation on 1/27/19." "Officer Bryant had identified the substance as heroin based on training and experience. Officer Bryant identified the substance as the narcotics purchased from 7815 Harding on 1/27/19."* Officer Bryant told SIU Detective Emma Rodriguez and Sergeant Bass during his February 7, 2019, interview that he did not know the identity of the CI used to make the purchase, he was unaware that Officer Goines had used untruthful information concerning him recognizing *"by sight and texture"* the heroin until after the search warrant was executed. Officer Bryant admitted that the first time he saw the heroin was after Officer John-Louis told him the heroin was in Officer Goines' vehicle, and he recovered the heroin from Officer Goines' vehicle. When asked why he did not simply document his recovery of the narcotics from Officer Goines' vehicle as it occurred, Officer Bryant stated that he *"made a mistake."* This investigation found sufficient evidence to sustain a cite of Criminal Activity – Tampering with Governmental Record against Officer Bryant; however, due to his retirement during the course of this investigation, the allegation of **Criminal Activity – Tampering with Governmental Record** against **Officer Bryant** shall be classified as **INFORMATION.**

Officer Bryant was found to have demonstrated poor judgment during this investigation. Officer Bryant had no involvement in the Harding Street investigation. He was found to have not been present during the alleged controlled buy of narcotics from 7815 Harding Street, which was proven to not have occurred. Officer Bryant was initially questioned by Commander Follis, who wrote in his administrative statement, *"While Officer Bryant was waiting in my office, I asked him something else about the CI, I don't remember exactly what it was, but he told me he had never even seen the CI on the date of the alleged control buy. I asked him how he came to tag the narcotics earlier on this date, and he told me he was looking through G's car for something else, saw the dope, and figured it needed to be tagged. I asked him how he knew it was from the Harding Street investigation and he told me he had hooked up with G later during the night of the controlled buy, and G showed it to him."* Officer Bryant later told Sergeant Bass and Detective Rodriguez that he supplemented Officer Goines' case stating he had identified the substance purchased from 7815 Harding Street because he received information from Officer John-Louis, describing what the narcotics looked like. Officer Bryant told Sergeant Bass and Officer Rodriguez, *"I made a mistake."* Officer Bryant retired before Sergeant Rexroad could serve him for an administrative interview, thus Officer Bryant never answered questions as to why he wrote his supplement and why he initially told Commander Follis that he met with Officer Goines on the night of January 27, 2019, to identify the narcotics, but later told Detective Rodriguez and Sergeant Bass that he did not see the narcotics until he recovered them from Officer Goines' city vehicle. This investigation found sufficient evidence to support a cite of Sound Judgment against Officer Bryant; however, as a result of his retirement during the course of this investigation, the conduct not alleged against **Officer Bryant** for **Sound Judgment** shall be classified as **INFORMATION.**

**Lieutenant Gonzales** was the head of Narcotics Division Squad 15. Lieutenant Gonzales was unaware of the Harding Street investigation until January 28, 2019, when Sergeant Reyna advised him the morning of the search warrant. Lieutenant Gonzales explained that it was not out of the ordinary for him to not be apprised of a pending investigation unless approached by a supervisor or case agent regarding an issue with the investigation. He reviewed the Harding Street tactical plan, via email, but recalled he did not provide the tactical plan to Commander Follis. *"usually the – the sergeant or the case agent or someone designate – designated will do that."*

Lieutenant Gonzales was responsible as the head of Squad 15 to ensure Commander Follis received a copy of the tactical plan for 7815 Harding Street. Lieutenant Gonzales was the last supervisor to approve the tactical plan after it was sent via email to him by Sergeant Reyna. **Narcotics Division SOP 200/1.12 – Search Warrants, Buy/Busts, and Street Pops, Search Warrants, Section 3**, states in part:

> *Supervisors and officers will signify that a threat assessment of the enforcement action has been completed by noting it on the TACTICAL RAID PLAN in the THREAT ASSESSMENT SECTION. The THREAT ASSESSMENT SECTION will be completed by the CASE AGENT and REVIEWED and*

> *APPROVED BY A NARCOTICS SERGEANT & LIEUTENANT. THE*
> *CAPTAIN SHALL RECEIVE A COPY PRIOR TO THE RAID.*

Lieutenant Gonzales did not ensure that Commander Follis received a copy of the tactical plan. When asked by Sergeant Rexroad if he had someone to provide Commander Follis with a copy of the tactical plan, Lieutenant Gonzales stated, *"It doesn't – we don't have a designated person that sometimes, uh, or in our SOP to do it. We just – it – usually someone takes the initiative to – to forward it, um, and so it's – in this case I guess it didn't get forwarded."* Lieutenant Gonzales stated that going forward it should be specified who is responsible to forward a copy to the commander.

Commander Follis indicated it was uncommon to not receive a tactical plan and to not have notice of a pending warrant, but Lieutenant Gonzales did not provide the tactical plan for 7815 Harding Street to Commander Follis. *"I had no knowledge of a warrant being obtained as a result of this investigation, and certainly no knowledge that a warrant was scheduled to be served on this date. This is not common, because as the division commander, S.O.P.200/1.12, pg. 2, section 3 states, "The captain shall receive a copy prior to the raid," referring to a copy of the Tactical Plan."*

As a result of Lieutenant Gonzales' failure to ensure Commander Follis received a copy of the tactical plan for 7815 Harding Street, the allegation of **Internal Directives** against **Lieutenant Gonzales** is **SUSTAINED**.

Lieutenant Gonzales admitted during his interview that if the Harding Street investigation had been ongoing for two weeks, he was unaware but should have known about the investigation, and Sergeants Reyna and Wood should have known as well. *"Well, apparently, yes. Uh, we would have but apparently the supervisor was just - I don't know if he was aware of it, uh, at the investigation but, um, a lot of times the investigators don't go to their supervisors and - and - and inform them of every investigation they're - they're doing at the time. They're, um, they should. Uh, sometimes - but it just depends on the investigation. They may just barely be gathering surveillance, getting some - they'll - they'll - they'll reach a point where there's enough information that they'll pass it onto the supervisor. So he - he may have started it but I don't know if he's had anything really concrete to - to - to actually approach the supervisor with as far as what kind of activity they had at that location."*

Lieutenant Gonzales stated that he expected his sergeants to verify information provided to them by their officers/case agents. *"My expectations are they need to follow up on - on every investigation that is - is ongoing and show some sort of, uh, update as far as what - what - where they're at in each of the process. Are they, you know, close to, um - um, where the source came from, what kind of information that source provided and what, uh, and - and verify that, uh, there is activity and make sure that, um, there's - there's - there's more than just one or two incidents where they - they observed that. Um, we want to be thorough as far as making sure that there is, uh, activity at those locations."*

Lieutenant Gonzales also stated that he expected his supervisors to ensure reports were entered related to investigations. *"I would definitely – would expect them to follow up and make sure*

that, uh, reports have been entered regarding the investigation." Lieutenant Gonzales also expected his supervisors to "scrutinize" issues regarding discrepancies in reports and affidavits, such as a weapon being listed in an affidavit, but not in the report.

Lieutenant Gonzales admitted he was unaware whether or not surveillance had been conducted prior to running the warrant on Harding Street, but when asked whether he expected surveillance to have been conducted, Lieutenant Gonzales said, "Oh, yes." Lieutenant Gonzales admitted that he would not have known of a delayed case tracking sheet until he saw the final blue back for an investigation. "I - if I notice it which is, uh, on occasion I'll - I'll advise the supervisor this - these CTs are coming in too late along with the reports and everything that's - that they're just being too delayed and I find out why, is there a valid reason for those delays. And many times it's just that the officer just - just didn't get it in in time. And I said, well, that's something we need to - they need to address."

Lieutenant Gonzales stated he did not agree with sergeants delegating the responsibility of generating case tracking sheets upon their case agents. "I don't agree with it and I - and I've said this is something they need to make sure that they do. So they've done it in the past. They've always done it in the past, the supervisors. But sometimes the supervisors, I don't know why but they take it upon to allow them to do that."

Lieutenant Gonzales also admitted that there was no way for a supervisor to verify information given by a case agent/officer. When asked if he knew if his supervisors ever did spot checks to check up on their officers or personally verified information, Lieutenant Gonzales stated, "No, I don't - I don't - unless they're out there at the scene with them through - through that processes, um, that's something that the - we - we just, uh, take the officer at his word, uh, as far as, uh, his completing that - that delivery with the - with a CI. Um, they're supposed to contact the, um, the supervisor, um, during that process and - and - and just make sure that they're aware that they're gonna meet a CI, they're going to, um, they're going to, um, uh, make that buy and when it's over. But, um, actually the officer - the supervisors, uh, are not required to be there, uh, during the process."

Lieutenant Gonzales stated that he was aware of past issues with Officer Goines' untimely reports. "we've spoken to him, uh - uh - uh, on occasion to make sure his reports were always turned in, uh - uh, promptly. And, uh, and - and as far as I know the supervisors have - have addressed that issue at - in the past. But, um, there were - there were definitely, um, uh, keeping on top of his - his, um, his, um, his report status as far as those he hadn't turned in as far as blue backs, um..." Sergeant Rexroad pointed out to Lieutenant Gonzales that there was no documentation found for <sup>Redacted</sup> Napoleon Street. Lieutenant Gonzales admitted that he relied on his supervisors to keep him abreast of investigations. "The only time I look at the case tracking sheet is, uh, when I get to the blue – blue back itself which is sometime down...at the end of the process. So those I depend on the supervisors to keep abreast of the officers', uh, entries, you know, on these – on the – on this documentation."

Lieutenant Gonzales stated that in the past, Officer Goines was kept from new cases until he caught up with paperwork. "Well, we - we basically he was not allowed to make any cases, uh, and basically just have to, um, do nothing but his - his - his, uh, his reporting until... And he was

     COH00037530

*not able to - not - not allowed to - to have any additional cases until he was able to get caught up with all his work. And that's what he was doing with probably a lot of this, he was - he was compiling a lot of this... ...to - to turn in."*

Regarding blue back case files, Lieutenant Gonzales was not sure of when a case was actually closed out. *"Well, the blue backs are just a documentation that - that, uh, that I review but it's - the case is completed. Now it's in the system. Uh - uh, I'm not - I'm not 100%, you have to check with the supervisors but I think they're already concluded, um, as far as, uh, before they - before they even start the process of, uh, some of these. As far as the investigation's already sort of concluded. I'm not - I'm pretty sure that they check to see if it is concluded in the system."*

Lieutenant Gonzales admitted that sometimes he and his sergeants did not catch the date on late warrant returns. This was in response to an example in which Sergeant Rexroad pointed out a warrant return turned in four months after the warrant. *"a lot of times the timestamp's on the back so we may, uh, on the back of the return so we may or not even - may not catch the date, uh, of - of what they, you know, we did the return. Um, I guess I just - we may be just checking to see if the return is done but we didn't check the date on when it was done."*

Lieutenant Gonzales was documented by Commander Follis in his February 2019 job performance review as needing to more closely monitor his squad's activities. This was completed after the January 28, 2019, Harding Street raid. Sergeant Rexroad cited examples from the Narcotics Division audit in which case tracking sheets were generated days and even weeks after the initial transaction. Lieutenant Gonzales stated that his supervisors should have been aware and ensured the case agents had entered the case tracking sheets. Lieutenant Gonzales placed the onus upon his supervisors during the majority of his answers regarding adherence to Narcotics Division SOPs. **General Order 200-08 – Conduct and Authority, Section 8 – Supervisory Conduct,** states in part,

> *Supervisors shall actively enforce the law and the policies and procedures of the Houston Police Department. Supervisors shall not permit or otherwise fail to prevent violations of the law or the rules, regulations, polices, or procedures of the Houston Police Department by any employee.*

Lieutenant Gonzales admitted that his sergeants should have asked more questions of Officer Goines. Lieutenant Gonzales, had the ultimate responsibility to ensure his sergeants conducted proper follow-up with the case agents, but as evidenced in this investigation, that failed to happen in the instance of 7815 Harding Street, with Officer Goines. Lieutenant Gonzales should have taken a more active role in the supervision of Squad 15. He was often unaware of investigations, stating he would not know of some until he received the blue back file. Lieutenant Gonzales' lack of involvement led to a system in which he relied almost solely upon his sergeants and case agents to handle investigations, thus leaving him uninformed and unable to question the status of ongoing investigations. Lieutenant Gonzales was capable and within his authority as the lieutenant of Squad 15 to make necessary changes to more closely monitor the activities of his investigators, but did not do so. Lieutenant Gonzales agreed during his interview that better review by his supervisors could have prevented some of Officer Goines' issues, but Lieutenant Gonzales did not ensure that his sergeants conducted adequate reviews. Lieutenant

Gonzales pointed out that he did not agree with his sergeants delegating case tracking sheets to their investigators, yet he did nothing to stop this practice. Further, Lieutenant Gonzales admitted that he relied upon his sergeants to keep him abreast of investigations; however, as the lieutenant, he had the authority and responsibility to know the activities of his investigators well before the conclusion of an investigation and turn-in of the blue back file. As a result, the allegation of **Supervisory Conduct** against **Lieutenant Gonzales** is SUSTAINED.

**Sergeant Reyna** was one of Officer Goines' sergeants. Sergeant Reyna was asked if he had any prior knowledge of the Harding Street investigation before January 28, 2019. Sergeant Reyna stated, *"Um, I had knowledge that he was doing an investigation, uh, a – we're trying to develop a search warrant on east – in east Houston, on the east side."* Sergeant Reyna admitted he did not know the address until the day of the warrant, stating, *"it's pretty normal. Um, 'cause - because they can tell me that I'm working on a search warrant location in eastside and they go to one location and it just doesn't work out for whatever reason but the CI or they may have other locations that as long as they're not being investigated by somebody else or if they already have a knock on the secondary location, they may go try that. So, uh, it's very common throughout Narcotics where you may be planning on trying one location, doesn't work out for whatever reason, move on to another location."*

Sergeant Reyna recalled discussing either the Thursday or Friday before the warrant with Officer Goines that he was working on a case in the east end of Houston and he asked Sergeant Reyna if he would be available to run the warrant, which Sergeant Reyna affirmed. When Sergeant Rexroad asked Sergeant Reyna if he asked Officer Goines any specifics about the warrant, Sergeant Reyna stated, *"Well, I mean, like I said, he's, uh, you know, obviously a very experienced Narcotics case agent. He's somebody that they've put forth as a trainer and put forth in videos about how to do things and so, you know, questioning him about was it a controlled buy, was it this other kind of buy, I know - it was 99% in my mind that it was gonna be a controlled buy. And then when I received the - the paperwork afterwards it just verifies everything. Or not afterwards but before the warrant, you know, that it - that it verifies everything, so..."*

Sergeant Reyna stated to question his case agents over details would amount to accusing the case agent of lying. *"You know, um, so, yeah, I mean, it - you basically have to suspect them of being - of lying to even reach that point."* Sergeant Reyna stated he never had any red flags with Officer Goines. Sergeant Reyna admitted that Officer Goines had past issues with his performance, administratively. *"You know, prior to this incident, um, as far as, you know, administratively, paperwork wise, yes, he was always - always the problem. Probably always has been for the 25 years he's been in, who knows."*

Sergeant Reyna was questioned over his responsibilities and expectations from his case agents and if he verified CI payments and receipts for funds prior to reviewing the tactical plan and running the warrant. Sergeant Reyna stated, *"it's borderline questioning their honesty. I mean, I under- I understand what you're saying about verification, I re- I do understand that about verification 'cause I'm - considering that's all I've been thinking about but, at the same time these - this particular case if - if - if I ask those two officers, hey, give me the receipt, give me the - give me - show me the CI payment and it's already reached the point where he's standing in*

*front of a judge and swearing to all this, what makes anybody think that that receipt form is
gonna be honest as well, you know. They're - they're signing an affidavit or the one officer is
signing an affidavit saying it's all right, he could just as well give me a receipt that is not right."*

This investigation was able to show that Sergeant Reyna took his officers at their word versus
verifying and spot checking their activities. Sergeant Reyna was responsible to supervise the
activities of his case agents including Officer Goines. Sergeant Reyna was presented with the
findings of Officer Goines' vehicle inventory in which untagged narcotics and a stolen pistol was
found. Sergeant Rexroad asked Sergeant Reyna how it was possible for Officer Goines to have
those items in his vehicle. *"there is no good answer for that. I mean, they're not - they're
absolutely not supposed to have that on them. They know that every piece of narcotics
contraband they come across has to be tagged, has to be listed under some case number. Should
have something to it for them to be - have anything outside of - of, you know, documented
contraband that they buy or come across, recover from a warrant, whatever, anything outside of
that, should not be there. Just flat out should not be there."* Sergeant Reyna affirmed that case
tracking sheets and CI receipts for funds should have been connected to the narcotics found in
Officer Goines' vehicle. Sergeant Reyna was shown instances in which Officer Goines
documented weapons in his search warrants; however, they were not documented in the related
incident reports. Sergeant Reyna agreed that the discrepancies should have been caught.
Sergeant Reyna attested that by closely monitoring his case agents' investigations, it might seem
that he was questioning their honesty. However this should not have been a consideration in
simply checking with his officers to ensure they were following policy. Further, Sergeant Reyna
explained that he confronted Officer Goines about the timeliness of his cases but cited that he
was often in training or taking time off because of his buildup of time to burn. *"I've talked to
him numerous times, told him we need to get this - you know, get this done, tried to help him get
the good thing on. Um, yeah, it's - it's difficult. You've got a - a senior officer, he gets so much
time off with all the time he has, too, I mean... that, training, it's just - it was difficult. It was
difficult. It was a constant issue that - that we were dealing with, you know."* Sergeant Reyna
was capable of denying Officer Goines time off to ensure his cases were kept up to date.
Sergeant Reyna reviewed Officer Goines' cases, thus he saw that Officer Goines turned in late
case tracking sheets, further, he knew that Officer Goines had problems with timeliness with his
paperwork, even though he stated he never had any red flags with Officer Goines. As Officer
Goines' supervisor, Sergeant Reyna should have kept better track of Officer Goines'
investigations, specifically his documentation, as Officer Goines was known to be habitually late
with his reports. Sergeant Reyna was made aware of late warrant returns and late case tracking
sheets generated by Officer Goines, which he should have been aware of knowing of Officer
Goines' administrative habits. As a result of these findings, the allegation of **Supervisory
Conduct** against **Sergeant Reyna** is SUSTAINED.

**Narcotics Division SOP 100/2.03 – Case Tracking Sheet, Section 3 of Operation**, states in
part:

> *The Narcotics Squad Supervisor, or designee, will access and complete a CT
> Sheet any and every time an arrest or seizure is made; however, Squad
> Supervisors will only obtain a CT# from this procedure once per investigation.*

Additionally, **General Order 200-08 – Conduct and Authority, Section 9 – Delegation of Responsibility,** states in part:

> *Supervisors who delegate tasks to subordinate employees are ultimately accountable for ensuring the tasks are completed.*

Sergeant Reyna stated that since he had returned to the Narcotics Division (approximately five years ago) *"every case agent has generated their own CT numbers. That's common practice there at the division."* Sergeant Reyna affirmed that he relied on his case agents to generate case tracking sheets. Sergeant Reyna was ultimately responsible for ensuring his officers/case agents generated the case tracking sheets. Sergeant Reyna admitted that he would rely on an outstanding list of case tracking sheets from his lieutenant. *"Um, well, like I said, because we don't generate the CTs, we normally have to wait until some kind of list will come out saying these CTs are outstanding."* According to Sergeant Reyna there was no notification sent to him when his case agent generated a case tracking sheet. Sergeant Reyna was presented with findings from the audit of Officer Goines in which case tracking sheets were produced days and even weeks after the initial transactions/buys. Sergeant Reyna stated that the outstanding report was the only way he could ascertain that a case tracking sheet was late. Ultimately, Sergeant Reyna was responsible for ensuring that the case tracking sheets were entered in a timely manner by his officers/case agents. Therefore, the allegations of **Internal Directives** and **Delegation of Responsibility** against **Sergeant Reyna** are SUSTAINED.

**Sergeant Wood** also shared supervisory responsibility for Squad 15 and Officer Goines. Sergeant Wood told Sergeant Rexroad and Sergeant Carroll that he found out about the Harding Street investigation on January 27, 2019, when Officer Goines responded to a group text message initiated by Sergeant Wood. *"I think Gerald responded, "I might have something for Monday and, uh, so let's, uh, work on doing something on Monday." And I didn't know the address but that - wh- what he was referring to ended up being Harding Street."*

Sergeant Wood recalled driving by 7815 Harding Street on the way to the warrant briefing to verify the address. When asked what he did to verify the information presented prior to running the warrant, Sergeant Wood stated, *"Uh, well obviously the main thing is that the, uh, search warrant has been signed. And so we review the search warrant and make sure there's no mistakes on the description of the house and how they got there and all that so if it's signed by the judge then that's what we go on."* Sergeant Wood did not know about a controlled buy for 7815 Harding Street until the day of the warrant. Regarding Officer Goines' documentation for Harding Street prior to running the warrant, Sergeant Wood stated, *"Well he should've done a, uh, like a - a CT then he should've done a prob- uh, write - the day - they're expected to do a report the day of the - the, uh - uh, of making a buy. So he should've made some kind of documentation within at least 24 hours of when he, uh, did the - you know, controlled buy and went out there and came back and everything. So there should have been some kind of documentation."*

Like Sergeant Reyna, Sergeant Wood advised that it was not common to check for CI receipt for fund forms or incident reports prior to running the warrant to verify information. *"No it's not routine."* When asked how often he had conversations with his officers for follow up, Sergeant

Wood replied, *"Well they'll let us know, um, like through, you know, weekly or throughout the day. It depends on, you know, how - how their investigation works out. Some - they'll be working on some and something might pu- get pull- on hold for w while that didn't work out. So they'll get - they'll g- they're kinda jumping back to cases, helping other people so they're kinda all over the place so but as far as - I - I'd say weekly that we keep up with everybody."* Sergeant Wood also stated that his officers *"were required to do their CTs and, uh, fill out their expense reports and all that."*

Sergeant Wood was shown affidavits from South Glen and 3206 Napoleon Street in which weapons were mentioned but not mentioned by Officer Goines in the incident reports. Sergeant Wood stated that he reviewed both and was at the 3206 Napoleon Street warrant execution. Sergeant Wood agreed it would have been an important discrepancy to point out and when asked how he would have addressed it, Sergeant Wood stated, *"Well I would've, uh, actually, uh, asked the, uh, case agent, uh, it wasn't mentioned in the report but you've mentioned - like let's say somebody had a gun, um, and if - if he forgot to mention it in the report then I'd say go back and add it, uh, that's important 'cause it should be mentioned if, uh, let's say he did a controlled buy there or whatever and then, uh, he said the CI saw a gun, it should be mentioned within the first of the report. So let's say that he says, "Yeah I did, uh, I did see a gun - the CI saw a gun at the location." And we're - let's say we're gonna run the warrant tomorrow or whatever, uh, I would say I'd go ahead and run it because I'm going by what he put in the affidavit which he said he saw a gun and he's telling me verbally that he saw a gun at the location. So just because he didn't mention it in the report, I would tell him to add it to the report but he's verifying with me through an affidavit and also he's verbally telling me that, uh, that he saw a pistol. So I think that would be fine."*

Sergeant Wood attested that if the case agent did not complete a CT sheet, *"then there's no way for anybody to find out what he has so – if it's not documented there's no way to – and if he's known liar now...or if everything's true then there's just no way to prove it."* Sergeant Wood advised that prior to Harding Street there had been no red flags concerning Officer Goines. "I think his follow up is a lot different than his tactical skills. His follow up, uh, I heard was a problem, uh, before I got there and I – I was on him about that, about getting his cases done." Sergeant Wood was again asked what he did to stay on top of Officer Goines' for his late documentation. *"Well I would stay - I'd stay on him on the list and, uh, he would turn stuff in and, um, and I mean some of the stuff was duplicates of stuff he's al- already turned in but he had a lot of cases out, um, and I've not- I notified the lieutenant and, uh, he, uh - uh, I - I'm not sure if he talked to the lieutenant or the lieutenant talked to him but, uh, that - you'd have to ask, uh...(Gonzalez) about that."*

Sergeant Rexroad presented examples from the Goines audit in which case tracking sheets were produced weeks after the investigation began. Sergeant Wood stated that was not acceptable but he would not know about the late cases without the officer generating a case tracking sheet. *"I think that the, uh, officer should still do the CT sheets but I think that a better system would be if when the CT is generated, uh, we get an automatic e-mail telling us when it - when it opened and all that so that way the dates are on there and everything and we can tell...when it was generated so if we have a problem we can ask them. But as far as right now there's nothing that tells us when or when they don't open a CT."*

COH00037535

Sergeant Wood attested that unless there was a reason to check his officer's case, *"we shouldn't have to babysit."* Sergeant Wood admitted he did not see a problem before *"but this – when you have an officer like this, uh, obviously there should be a better process in place."* Sergeant Wood admitted he should catch dates and late case tracking sheets and he would definitely talk to his guys. When asked about findings from the audit in which case files had to be created for 14 cases, Sergeant Wood stated, *"Well if there's no information, uh, if there's no information for us to see, we're not gonna see it. Um, if, uh, if it's not caught by the CT list, um, if it's not on the CT list there's no way of knowing."*

Sergeant Wood was asked if closer review could have prevented what happened at 7815 Harding Street. Sergeant Wood stated, *"Uh, yes and no. Um, that was only one circumstance of what happened. Do I think, uh, um, 'cause it - obviously not being able - well I can't say obviously 'cause the investigations not over but if they're saying what's true about Gerald he lies - he lied through the whole thing. So if - if you have an officer, or two officers that are working together and they're lying, uh, doing forms and all this - if they're willing to lie on an affidavit - to lie on a basic form of some sort is gonna be - I don't know how you would stop that."*

Sergeant Wood stated throughout his interview that his officers/case agents were proactive, did not need babysitting, and were relied upon to create case tracking sheets and update their supervisors with their activities, which sometimes they would never hear about unless a lead panned out. Sergeant Wood was responsible to keep a closer watch over his officers, which was his duty as a Narcotics Division supervisor; however, Sergeant Wood failed to adequately supervise. As a supervisor, Sergeant Wood could have required his officers to notify him of any investigations, whether or not a case tracking sheet was required, but he did not do so. As a result, the allegation of **Supervisory Conduct** against **Sergeant Wood** is **SUSTAINED**.

Sergeant Wood attested that case agents were responsible for completing the case tracking sheets and would only produce one if they had activity from a lead.

Sergeant Wood stated that he and Sergeant Reyna had their officers/case agents produce case tracking sheets because their job was proactive and the officers/case agents had firsthand knowledge of the cases. Ultimately, Sergeant Wood was responsible to ensure that the case tracking sheets were generated, either by him, Sergeant Reyna, or by their case agents. As a supervisor, Sergeant Wood was responsible to ensure his case agents completed a case tracking sheet if he delegated them to do so, which he indicated during his interview. As a result, the allegation of **Delegation of Responsibility** against **Sergeant Wood** is **SUSTAINED**.

Confidential - Subject to Protective Order

Page 61, Investigation Summary, Issue Record #54155-2019

## RECOMMENDATIONS

Based on the findings of the investigation, I recommend the following:

| | | |
|---|---|---|
| Officer: | **Gerald M. Goines, employee #**<sup>Redacted</sup><br>Phase Down C/Deferred | |
| Allegations: | **Truthfulness**<br>General Order 200-08 | **INFORMATION** |
| | **Criminal Activity**<br>Tampering with Governmental Record<br>Texas Penal Code 37.10 | **INFORMATION** |
| | **Improper Police Procedure**<br>General Order 600-16 | **INFORMATION** |
| | **Internal Directives**<br>General Order 100-01<br>Narcotics SOP 100/2.05<br>Circular 07-0919-257 | **INFORMATION** |
| | **Sound Judgment**<br>General Order 200-08 | **INFORMATION** |
| Officer: | **Steven O. Bryant, employee** <sup>Redacted</sup><br>Phase Down C/Deferred | |
| Allegations: | **Truthfulness**<br>General Order 200-08 | **INFORMATION** |
| | **Criminal Activity**<br>Texas Penal Code 37.10 | **INFORMATION** |
| | **Sound Judgment**<br>General Order 200-08 | **INFORMATION** |

Confidential - Subject to Protective Order

Page 62, Investigation Summ....y, Issue Record #54155-2019

| | | |
|---|---|---|
| Lieutenant: | **Robert Gonzales, employee** Redacted<br>Narcotics Division | |
| Allegations: | **Internal Directives**<br>General Order 100-01<br>Narcotics SOP 100/1.03 | **SUSTAINED** |
| | **Supervisory Conduct**<br>General Order 200-08 | **SUSTAINED** |
| Sergeant: | **Clemente R. Reyna, employee** Redacted<br>Narcotics Division | |
| Allegation: | **Supervisory Conduct**<br>General Order 200-08 | **SUSTAINED** |
| | **Delegation of Responsibility**<br>General Order 200-08 | **SUSTAINED** |
| Sergeant: | **Thomas A. Wood, employee** Redacted<br>Narcotics Division | |
| Allegation: | **Supervisory Conduct**<br>General Order 200-08 | **SUSTAINED** |
| | **Delegation of Responsibility**<br>General Order 200-08 | **SUSTAINED** |

J. L. French, Lieutenant
Internal Affairs Division

H. R. Morris, Commander
Internal Affairs Division

jlf:jlf

Confidential - Subject to Protective Order

## HOUSTON POLICE DEPARTMENT
### ISSUE RECORD FORM

Classification: CLASS I                        Issue No: 54155-2019

**INTAKE INFORMATION**

Information Received From: Police Officer        Preliminary Classification:   Interim
Complaint Method:          In Person
Report Date:               02/20/2019            Report Time:                  15:13

**INCIDENT INFORMATION**

Location:    7813 Harding ST Houston, Texas 77012
Date of Incident:    01/28/2019    Time: 13:27
Date of Discovery:   01/28/2019

**ISSUE DESCRIPTION:**

Call Out - Untruthful information is alleged to have been used to obtain a no-knock search warrant. Related case is 54047-2019.

**COMPLAINANT INFORMATION**                                                      1 of 1

Chief Of Police

**EMPLOYEES / ALLEGATIONS**

| Rank | Employee(s) | Emp# | Allegations |
|------|-------------|------|-------------|
| Senior Police Officer | Goines, Gerald M. | Redacted | Criminal Activity |
| Senior Police Officer | Bryant, Steven O. | Redacted | Criminal Activity |

**INTAKE SUPERVISOR:**

POLICE SERGEANT Schwartz, Shelly, Redacted, Internal Affairs Division

Revised 02/21/2019

Confidential - Subject to Protective Order                              COH00037539